**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 95-758 T**
**(Judge Nancy B. Firestone)**

**NATIONAL WESTMINSTER BANK PLC,**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

**DEFENDANT'S MOTION FOR RECONSIDERATION OF COURT'S JULY 16, 2004, ORDER, LIMITING SCOPE OF CAPITAL ISSUE**

Pursuant to RCFC 7(b) and 59(a), defendant respectfully moves the Court to reconsider the portion of its July 16, 2004, Scheduling Order that limited the scope of the "capital issue." As explained below, (1) a senior official during the years at issue at the U.K.'s bank regulatory authority (the Bank of England) reports that a U.K. bank was required to have capital to support the size and risk of its U.S. operations (generally, around 8% of a U.S. branch's risk-adjusted assets), but there was no accounting requirement specifying where, within the banking organization, such capital should be recorded (*i.e.*, the branch's books versus the books of the organization as a whole) and (2) a Dutch appellate court recently held that capital attributable to a branch under a separate and independent enterprise treaty

provision similar to Article 7(2) of the U.S.-U.K. Treaty may be computed in a manner comparable to the Bank of England's regulatory approach.

This Court, likewise, should determine the U.S. branches' capital by considering the amount of capital actually held within plaintiff's banking enterprise on account of the U.S. branches' operations, independent of plaintiff's accounting decisions regarding the location where such capital was booked. Failing to inquire about capital recorded elsewhere within the banking organization that reflects the branches' operations, and giving conclusive effect to plaintiff's exercise of discretion regarding where capital is recorded, would elevate accounting form over capital substance. As the Court has stated, "if, in fact, capital allotted to the branch was not properly noted on its books as 'capital'", additional capital may be allotted. *National Westminster Bank PLC v. United States*, 58 Fed. Cl. 491, 492 (2003); *accord id.* at 498 (adjustments to books are necessary to reflect the "real facts".) In further support of this Motion to Reconsider the Court's July 16, 2004, Order, defendant submits the following:

1. Richard Henry Farrant was educated at Oxford and has spent most of his professional life in the field of banking regulation. He was a member of the Basle Committee of Group of Ten countries' bank supervisors. The Basle Committee, as the Court is aware, was responsible for developing worldwide standards in 1988 for adequate bank capital. Mr. Farrant served with the Bank of England from 1967 to 1994, and during most of the years at issue, he was directly responsible for the Bank of England's regulatory policy, including capital adequacy. Mr. Farrant has prepared a report (attached as Exhibit 1 to this motion), which reaches the following conclusions:

- A U.K. banking organization such as plaintiff was required to hold capital to reflect its worldwide risk adjusted assets, including the risk adjusted assets of its U.S. branches,
- Generally, the required capital ratio for large banks such as plaintiff was in the vicinity of 8% of risk adjusted assets, and
- The Bank of England did not specify where within the banking organization's books the capital that reflects a U.S. branch's risk adjusted assets must be recorded.

2. Thus, during the years at issue, there was actual capital, computed by reference to the assets of plaintiff's U.S. branches, that supported the branches' activities. There was no requirement that such capital be recorded on the branches' books, and such capital evidently was recorded on plaintiff's consolidated books. The specific amount of actual capital held with respect to plaintiff's U.S. branches cannot be determined without further inquiry.

3. Attached as Exhibit 2 to this motion is a recent Dutch appellate decision, addressing the allocation of capital to a Dutch branch of a Belgium bank under Article 7(2) of the Belgium-Netherlands Treaty. Article 7(2) of that treaty, like Article 7(2) of the U.S.-U.K. Treaty, provides a separate enterprise principle and is based on the O.E.C.D. Model Treaty provision. The decision was reported in the International Tax Law Reports (7 ITLR 1) as Re X Bank (Europe) SA (Judgment date 25 February 2004), together with an unofficial English translation.

4. The Belgian Bank filed its Dutch corporate income tax return, claiming interest expense and a resulting net loss in reliance on the books prepared for the branch. (Ex. B at 20-22.) As in this

case, the branch's balance sheet showed assets equal to liabilities and no capital. (*Id*. at 21.) The booked net loss resulted in negative branch capital, but the Bank had substantial capital. (*Id*. at 22, 26.)

5. The Dutch court attributed capital to the branch and limited deductible interest expense. The court concluded it was clear that the branch made use of some of the Bank's substantial capital. (Ex. B at 22.)[1] In the court's view, it was "not plausible" that the capital prescribed by Belgian authorities served only as surety for the conduct of business in Belgium and not at all the Dutch branch. (*Id*. at 30.) Analyzing the independence principle in the treaty, the court concluded that the Dutch branch therefore had "own" capital that was recorded elsewhere on the Bank's books and that must be allocated to it. (*Id*.at 26-32.)

6. The court determined the amount of the branch's "own" capital. It was satisfied that the Dutch Revenue Department had "established a link" between the Bank's recorded capital and that of its Dutch branch.[2] (Ex. B at 30) Likewise, it noted that it was up to the Bank to explain why the branch did not have any recorded own capital and the bank's recorded capital should not serve the branch at all. (*Ibid*.) The bank failed to produce such evidence (other than to say, as plaintiff offers here, that interest is a normal business cost to banks). The court as a result concluded it was reasonable to calculate the branch's own capital by multiplying its risk adjusted assets by the Bank's

---

[1] Similarly, this Court ruled that "a branch of a foreign bank relies on the worldwide capital of the enterprise of which it is a part." *National Westminster Bank PLC v. United States*, 58 Fed. Cl. 491, 494 (2003).

[2] Mr. Farrant's report (Ex. A) establishes such a link here between plaintiff's and its U.S. branches' capital.

ratio of capital to risk adjusted assets (*i.e.*, its BIS ratio). (*Id.* at 30-31; *see also id.* at 22-23.) The Bank's calculated BIS-ratio was 10.2%. (*Id.* at 24, 26.)

7. The Dutch court accordingly sustained the Revenue Department's disallowance of interest expense, calculated by multiplying the Amsterdam Inter-Bank interest rate by the branch's own capital, determined in the manner described above. (Ex. B at 23-25, 30-31.)

Respectfully submitted,

s/Steven I. Frahm
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6504

EILEEN J. O'CONNOR
Acting Assistant Attorney General
MILDRED L. SEIDMAN
Chief, Court of Federal Claims Section

November 24, 2004

EXHIBIT 1

**Case No. 95-758T**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(Judge Nancy B. Firestone)**

**NATIONAL WESTMINSTER BANK PLC,**

**Plaintiff**

**v.**

**THE UNITED STATES**

**Defendant**

---

# U.K. REGULATORY CAPITAL REQUIREMENTS APPLICABLE TO THE OPERATIONS OF U.S. BRANCHES BY U.K. BANKS

---

**Report for the United States Department of Justice**
**Tax Division**
**Washington, DC**
**U.S.A.**

**by**
**Richard Henry Farrant**
**Berkshire, England**

**November 19, 2004**

EXHIBIT 1

## I. INTRODUCTION

I am asked by the U.S. Department of Justice, based on my experience and in relation to the period from 1981 to 1987 [referred to below as "the relevant period"], to:

- identify the regulatory authority(ies) responsible for the regulation of banks in the U.K. and describe the U.K. regulatory process applied to the capital adequacy of U.K. banks operating in the U.S.A. through branch establishments;

- discuss the relevant rules, guidelines, expectations, both formal and practical, regarding the level of capital to be held by U.K. banks with U.S. branches, and the determination of incremental capital attributable to a U.S. or other foreign branch of a U.K. bank, both when a branch begins operations, and thereafter;

- describe the consequences of failure by a U.K. bank to adhere to regulatory requirements or expectations.

## II. MY BANKING SUPERVISORY EXPERIENCE

As discussed in detail below, banking regulation in the United Kingdom during the relevant period was conducted primarily by the Bank of England. I was employed by the Bank of England from 1967 until 1994, and involved in its banking supervision activities from 1976 until 1994, although this included two periods in 1983 and 1984 to 1986 when I was lent to the Isle of Man and Hong Kong respectively to help their governments deal with banking crises. From 1978 until 1983, and from 1986 to 1994 I was directly responsible for the Bank of England's regulatory policy (including in relation to capital adequacy), initially as manager, and subsequently as an Assistant and then Deputy Head of Banking Supervision. I was a member of the Basle Committee of bank supervisors from Group of Ten countries.

In 1994, I became chief executive of the Securities and Futures Authority, the then regulator of U.K. securities business, and in 1997 became managing director of the Financial Services Authority, established to unify U.K. financial regulation, including banking regulation. I resigned from that position in 1999, and from 1999-2000, on behalf of the Hong Kong Government, I led an investigation to identify the causes of the failure of Hong Kong's largest investment bank. At the present time, I am Chairman of the Banking Code Standards Board, an organization composed of more than 150 subscribing banks and building societies, whose purpose is to ensure standards of good practice and to discipline subscribers that breach those standards. I was educated at Oxford University. I have attached my complete Curriculum Vitae as Exhibit A to this Report.

EXHIBIT 1

## III. EXECUTIVE SUMMARY

1. The Bank of England was the bank regulatory authority responsible for supervising the activities of U.K. banks such as National Westminster Bank PLC during the years at issue, including the adequacy of their capital.

2. The Bank of England used a Risk Assets ratio to determine whether clearing banks, such as National Westminster Bank PLC, had adequate capital. The Risk Assets Ratio compared a bank's capital to its risk adjusted worldwide assets. A bank's worldwide assets for purposes of the ratio included the assets of its branches in the United States.

3. The Bank of England determined the Risk Assets Ratio required of each bank based on its individual circumstances. Generally, the necessary Risk Assets ratio imposed ranged between 8% and 15%, with large, risk diversified clearing banks like National Westminster Bank PLC being at or near the 8% level.

4. The Bank of England's determination of adequate capital included capital computed by reference to the risk adjusted assets of a bank's U.S. branches.

5. The Bank of England's capital determination for a specific bank would normally be met by capital held at its U.K. headquarters and recorded on the books of the banking enterprise as a whole. However, it would not object to capital required against a bank's U.S. branch assets being held and recorded on the books of the U.S. branches.

6. Thus, based on Bank of England standards and practice at the time, it is clear that National Westminster Bank PLC held additional capital to support its branch operations in the United States. By "additional capital" I mean an amount of capital over and above the capital it would have had absent its six U.S. branches. In particular, I expect National Westminster Bank PLC had additional capital in the vicinity of 8% of the risk adjusted assets of the six U.S. branches.

7. I cannot be more precise about the capital actually maintained during the years at issue to support the U.S. branches, because the Court's ruling on July 16, 2004 precludes inquiry into this issue.

8. The Bank of England mainly relied on informal pressure to ensure large banks maintained their capital requirements, although it had reserve legal powers, which were strengthened in 1986.

EXHIBIT 1

## IV. ANALYSIS

### A. The regulatory process in 1981-1987

Following a crisis of confidence in small U.K. banks in the mid 1970's, requiring emergency liquidity support arranged by the Bank of England (referred to as "the Bank"), the Bank started formal supervision of all U.K. banks, initially without statutory backing. This was replaced by a statute based structure in 1979, when the Banking Act 1979 was implemented. This introduced a 2 tier regulatory structure, administered by the Bank of England. All businesses of taking deposits from the public must be licensed by the Bank as deposit-taking businesses, unless it "recognised" them as banks. National Westminster Bank became a recognised bank. The Bank had formal powers to require information and to direct licensed deposit takers, but no formal powers over recognised banks other than to withdraw recognition and thereby force them to seek licensed deposit taking status, or to apply to the courts to wind up an insolvent recognised bank. The theory underlying this was that the Bank did not wish to disturb its good informal relationship with recognised banks by acquiring formal powers over them, and could rely on its informal persuasive powers to ensure compliance with its wishes. However, the failure of a recognised bank in 1984 (Johnson Matthey) discredited this arrangement, and a new Banking Act was passed in 1986, which in broad terms abolished the category of recognised bank and extended the Bank's statutory powers to cover all deposit taking businesses. National Westminster Bank sought and was granted licensed bank status under the new Act. In reality, the process of supervision in relation to the capital adequacy of the major banks, including National Westminster Bank, remained largely unchanged.

In 1986, the London Stock Exchange agreed with the U.K. competition authorities to open up its membership to banks and banking groups, and this set in train a progressive loosening of previous barriers to entry in different specialised financial activities. The Financial Services Act, passed in 1986 and implemented over the next 2 years, required financial institutions, including banks, to seek separate authorisation for most forms of securities trading, investment management and investment advice from a number of self-regulatory bodies or the Securities and Investments Board (which supervised these self-regulatory bodies). From the end of 1987 these bodies began to impose their own capital requirements on banks' relevant activities within the U.K., which were "carved out" of the Bank of England's requirements, but this would not have had a material effect until 1988 at the earliest. They are in any case not relevant to U.S. branches of U.K. banks in the 1980's, since they did not apply to activities outside the U.K., and such activities were not then permitted in the U.S.A. by U.S. regulation. I conclude that the only relevant regulatory process during the relevant period was that administered by the Bank of England.

### B. Relevant rules, regulations and policies

The Banking Act 1979 and its 1986 successor required licensed deposit taking institutions and recognised banks to be fit and proper. One of the criteria for fit and properness was to have adequate capital for the range and scale of its business activities, including activities conducted outside the U.K., with the Bank empowered to decide how this should be measured and assessed. Following consultations with the banking industry, the Bank issued a series of policy statements describing how it would do this. The policy statements are attached to this Report as Exhibit B and consist of the following:

EXHIBIT 1

- The Measurement of Capital, September 1980 (the general framework)
- BSD/1983/1 (relevant section is treatment of large risk concentrations)
- BSD/1985/2 (treatment of revolving underwriting facilities and note issuance facilities)
- BSD/1986/1 (treatment of very large risk concentrations)
- BSD/1986/2 (further definition of subordinated debt eligible for capital base)
- BSD/1986/3 (general framework for consolidated supervision)
- BSD/1986/4 (eligibility of redeemable preference shares for capital base, and detailed adjustments to some risk asset categories)
- BSD/1987/1 (new general framework for large risk concentrations)

The key document is the Measurement of Capital, September 1980, which sets the basic blueprint that applied throughout the relevant period. (Bracketed references below refer to paragraphs of this document.) The important considerations for the purposes of U.K. capital requirements in relation to the operation of U.S. branches by large U.K. banks are the following:

- In assessing the capital adequacy and risk exposure of banking groups, it is necessary to take account of the business of all the branches at home and abroad (as well as the majority owned subsidiaries engaged in the banking business). (see paragraph 5).

- Two standard capital adequacy measurement techniques were utilized: The Risk Asset Ratio and the Gearing Ratio. Regulatory priority was applied to the Risk Asset Ratio. (see paragraph 8).

- The Risk Asset Ratio compared the quantity of capital and certain other liabilities which are capable of being set against losses without detriment to the interest of depositors in the bank (described as "the capital base"), with the total of the bank's assets after pro forma adjustment for their relative riskiness. Assets which were considered on average riskier than a typical loan to a business or individual customer were adjusted to a higher value than their balance sheet value, while assets considered to be less risky were adjusted to a fraction of their balance sheet value. The total of these assets so adjusted was described as the bank's "risk assets". The theory was that there should be a minimum safety margin of funds which could absorb losses against the risk of possible losses inherent in the bank's business measured by its risk assets.

- The Gearing Ratio compared the capital base with the current liabilities of the bank. The theory was that there should be a minimum safety margin of capital which could absorb losses against the total of liabilities which would have to be repaid even if losses were incurred.

- The Bank's approach to the assessment of capital adequacy was intended to be flexible, taking into account the individual circumstances of each bank, and not to

EXHIBIT 1

prescribe a precise numerical guideline for the capital needs of all institutions or groups of institutions. (see paragraphs 3, 4, 10, and 32).

- Capital adequacy of each bank was left to private determination by the Bank of England, after confidential discussions with the bank, according to each bank's circumstances. While the Bank vigorously opposed a bank's disclosure of the capital requirements the Bank determined, I recall that it was generally thought that the range of minimum risk asset ratios applied across the banking system was broadly from 8% for the largest and most risk diversified clearing banks, to 15% or more for small or new banks without a diversified business;

- The Bank placed high priority on tightly defining capital (described as the capital base in the document) in these ratios, since any change of capital has a hugely magnified effect on the ratio compared with a change of similar arithmetic size in risk assets or non-capital liabilities. Although the Risk Asset Ratio featured 8 different categories of risk assets, these were broad brush categories (see Appendix A of the document);

- Capital could include subordinated loans with an initial and remaining term of at least 5 years (and meeting certain other conditions), on which interest would be payable, However, subordinated loans could not provide more than one third of the total capital base (after adjusting for goodwill and other intangible assets). A reducing proportion of such capital would be included as its remaining term fell below 5 years;

- Assets were measured net of any provisions held specifically against their known diminution in value (see paragraph 20 of the document). But reserves and "provisions" which were freely available to absorb future losses not presently identified could be included in the capital base (see paragraph 21). Provisions against known or anticipated tax liabilities were excluded from the capital base (see paragraphs 22 and 23).

- As stated above, the intention was to apply the capital adequacy measures to worldwide assets of U.K. banks, and also on a consolidated basis to the subsidiaries of U.K. banks on a worldwide basis. Since, at that time the routine statistical returns only covered U.K. business, discussions would be held with banks to agree on an appropriate statistical framework for the classification of assets held abroad. (see paragraph 34).

The other documents listed above, and attached to this report, are included for completeness. They introduced more detail to the policy set out in the Measurement of Capital paper of September 1980, but this detail is unlikely to have impacted significantly on the application of capital adequacy to business conducted by the U.S. branches of National Westminster Bank in the relevant period.

EXHIBIT 1

### C. Capital adequacy policy applicable to clearing banks such as National Westminster Bank

The Bank of England's regulation of clearing banks in the relevant period, including National Westminster Bank, reflected their special position in the U.K. banking system. The four English clearing banks dominated U.K. retail banking, and were the key U.K. incorporated banks with large banking operations abroad, including in the U.S.A. Within the Banking Supervision Department in the Bank of England, one division of 6 to 8 people covered them and the four much smaller Scottish and Northern Irish retail banks, supported by a manager and a Deputy Head of Banking Supervision. These banks accounted for almost 10% of the total Banking Supervision staff, although there were then 600 banks recognised or licensed by the Bank at the time. These very large banks were supervised on an annual cycle, based on information specially commissioned from each bank. Once per year, the Bank, following discussions with each bank, would decide a programme of supervisory review tailored for it. This would then be pursued throughout that year. The review might include particular business streams, of which operations in the U.S.A. might be one, or particular aspects of the whole business, such as capital adequacy, or group management structure. The Bank would identify the specific information it needed for these reviews. This was in contrast to the supervision of all other banks, which broadly followed a quarterly (i.e. three monthly) cycle, reflecting their simpler business model and much smaller scale, and was usually based on the routine statistical returns made by that bank.

One reason why the very large banks, such as National Westminster Bank, were supervised on an annual cycle based on specially commissioned information was that until 1986 the Bank's routine statistical returns covered U.K. resident business only. This reflected their original purpose for monetary and economic policy observation. A new set of half-yearly returns on a worldwide single entity and consolidated basis was introduced in 1986, but it would not have been until after the end of the relevant period that reliance would have been placed on it for supervising the largest banks.

The Bank was keenly interested in promoting international cooperation and coordination of the supervision of internationally active banks: it played a key part in the development of international agreements at Basle in this area; and sought to foster close working relations with supervisors of banks in U.K. headquartered or owned elsewhere, and with foreign supervisors of the activities of U.K. banks abroad. The Bank had very close working relationships with the U.S. Federal Reserve System and the Comptroller of the Currency, and good relationships with the FDIC and New York State banking regulator. The Bank encouraged inspections of foreign banks in U.K. by their parental supervisors, although during the period under review the Bank did not employ on site inspection abroad of U.K. banks. However, it did routinely discuss the outcomes of inspections by U.S. regulators of U.S. branches of U.K. banks (although I believe it did not have direct access to the inspection reports themselves).

The Bank did not apply capital adequacy requirements to branches of foreign banks in the U.K., although where it was clearly dissatisfied with the headquarter supervision of a foreign bank, it would insist on the foreign bank's operations in the U.K. being conducted in a U.K. incorporated subsidiary, subject to full U.K. capital adequacy requirements. It is my understanding that U.S. bank regulators also did not apply capital adequacy requirements to U.S. branches of U.K. banks, and relied instead on the U.K.'s capital adequacy determinations.

Although there was no specific written policy, the Bank made clear that banks should discuss with it major new business initiatives, notably the commencement of foreign operations by U.K. banks. In some cases, these developments would not be permitted at all, where the Bank considered the risks could not be contained sufficiently. In other cases, they might be permitted within defined parameters, or on the basis that a higher Risk Asset Ratio or additional liquidity safeguards would be imposed. These would later be reviewed after the new business had bedded down, usually after a year or two. Other than the routine coverage of U.S. branch assets by the Risk Assets Ratio, I would judge that it is unlikely that National Westminster Bank would have had any additional capital requirements imposed on it arising from its U.S. branch operations in the 1980's. But I would judge that it is likely that the general business model and management of its U.S. branch business would have been included within the yearly review cycle during the relevant period.

**D. Adherence to capital adequacy policy requirements**

As already described, the Bank set Risk Asset Ratio requirements for each U.K. bank, according to its perception of its circumstances. The process involved discussion, and for recognised banks (such as National Westminster Bank) could be described as a one-sided negotiation, since the Bank had no formal powers to impose its will, other than to withdraw the bank's status as a recognised bank. A similar approach applied to dealing with failures to maintain the agreed requirement. At the start of the relevant period, in 1981, the Bank was still new to statutory supervision, and its approach was softer and more open to persuasion than it was at the end of the period, in 1987. By then, it had more experience and had become less tolerant. The status of recognised bank had been discredited by the failure of one of them, and had been abolished in the 1986 Banking Act. The Bank then acquired comprehensive legal powers over all banks, and was much more disposed to use them rather than rely on persuasion. These powers included all the usual powers to require information, directly inspect and give supervisory directions to any licensed institution, including imposition of new management, temporary cessation and/or termination of parts of the business, and application to the courts for court supervised administration and winding up.

As the Bank's attitude hardened towards the end of the relevant period, capital adequacy requirements increasingly took two forms: (1) a "trigger" ratio, triggering supervisory concern and an agreement on remedial action within a specified time, with subsequent tracking of remedial performance; and (2) a hard limit, where there was clear expectation of formal supervisorily imposed remedial action. (However, these only became an explicit part of policy when the 1988 Basle Accord on the capital adequacy of internationally active banks was implemented, after the end of the relevant period.) The U.K. clearing banks were thought to have trigger ratios of ½ to ¾% above the hard limit applied to them, although I am not confident as to when or how clearly this would have been articulated during the relevant period. It is very unlikely that National Westminster Bank was subject to use of formal powers during the relevant period. Assuming the National Westminster Bank had a hard limit of not less than 8% in the relevant period, it is reasonable to assume that it would have been reluctant to allow its actual Risk Asset Ratio fall below 8 1/2%, using the formulation of the ratio described in the Measurement of Capital policy document of September 1980.

EXHIBIT 1

To the best of my knowledge and belief, I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing statements are true and correct.

Executed in Berkshire, England on this 19th day of November, 2004.

Richard Farrant

Richard Henry Farrant

EXHIBIT 1

**EXHIBIT A**

**CURRICULUM VITAE**

**OF**

**RICHARD HENRY FARRANT**

EXHIBIT 1

# RICHARD HENRY FARRANT

Lane Farm,
Cherry Garden Lane,
Maidenhead,
Berkshire, SL6 3 QG,
England

**Phone / fax** +44 (0) 1628 822729
**Email** Richard.Farrant@btconnect.com

Date of birth: 20 May 1945

Married with two sons

Education: 11 'O' Levels: 3 'A' Levels; 1 'S' Level; Honours BA in Politics, Philosophy and Economics (Oxford University)

## CURRENT ACTIVITIES

1. **Banking Code Standards Board. Chairman.** The BCSB is a company, established by the banking and building societies industry to promote good standards and practice in banks' services for personal and small business customers, as a better alternative to statutory regulation by the Financial Services Authority. Its remit is to police two Banking Codes, to ensure they set minimum standards of good practice, and discipline subscribers who breach it. There are now over 150 subscribing banks and building societies.

2. **United Financial Japan International plc. Vice-Chairman and Chairman of the Audit and Compliance Committee**. A UK investment bank (£450 mns issued capital and reserves ) with two businesses: proprietary trading in a number of different security markets; and acting as an international securities brokerage and advisory house for Japan related customers. As the Chairman is resident in Japan, I act as de facto day to day Chairman.

3. **Institute of Chartered Accountants of England and Wales Investigation Committee. Chairman.** This Committee supervises investigations into malpractice by chartered accountants and acts as a disciplinary tribunal for all offences not involving expulsion from membership. I am a lay (ie. non-accountant) member.

4. **Sustrans**. **Chairman and senior trustee.** Sustrans is a company and charity which initiated and co-ordinates development of the 10,000 mile National Cycle Network and the national Safe Routes to Schools programme in UK, as part of its role to promote sustainable transport. It has 40,000 financial supporters, and spends approximately £12 mns per year.

5. Occasional **consultancy and lecturing assignments.** The consultancies have been in the financial business area, covering a range of financial regulatory, banking and governance issues, in Hong Kong, New Zealand, Russia, South Africa and Argentina. The lecturing has been mainly associated with the Toronto International Leadership Centre for Financial Sector Supervision.

EXHIBIT 1

**PAST POSITIONS AND CAREER**

**2000 – 2003. Gas and Electricity Markets Authority. Non-executive director and member of the Audit Committee.** GEMA was established on 1st December 2000 to unify and administer the regulation of the gas and electricity industry. I retired following completion of two terms of office.

**1997 - 2002. City Financial Law Panel. Panel member.** The FLP's purpose was to find practical solutions for problems which affect the wholesale financial markets resulting from legal uncertainty. The Panel acted as a test bed for professional analyses of suggested solutions. The panel was composed of a Law Lord, a senior judge, senior practicing lawyers, senior public officials, and industry practitioners. It was absorbed into the Bank of England's Financial Stability Division in 2002.

**1999 – 2000. Hong Kong Government. Companies Ordinance Inspector into the affairs of Peregrine Investments.** Peregrine Investments was Hong Kong's biggest investment bank until its collapse in 1998. The terms of reference called for me to identify the causes of its failure, judge the culpability of directors and senior managers, and identify lessons and possible public policy reforms. This required establishing a team of five persons and an office in Hong Kong. Large quantities of data had to be researched, analysed, and judged. My Report was published, and disqualification proceedings against the directors I criticised are in train.

**1997 – 1999. Financial Services Authority. Chief Operating Officer and Managing Director.** I was responsible to the Executive Chairman and Board for managing the merger of 10 existing financial regulators into the FSA, while not permitting day to day regulatory standards to slip. This included responsibility for finance, accommodation, human resources, information technology, overall day to day executive management, and relations (including service level standards) with the Boards and Commissions of the existing regulators.

I resigned following the successful completion of the merger on time and under budget, in order to broaden my interests.

**1993 – 1997. Securities and Futures Authority. Chief Executive and Director,** responsible for the regulation under the Financial Services Act of 1,360 firms involved in the securities, commodities and derivative markets.

I resigned following appointment to the Financial Services Authority, which took over the functions of the Securities and Futures Authority.

**1967 – 1993. Bank of England.** I followed a varied career path, including periods of overseas secondment to Washington DC, the Isle of Man and Hong Kong. My last role in the Bank of England was Deputy Head of Banking Supervision.

I resigned from the Bank of England following appointment to the SFA.

EXHIBIT 1

**EXHIBIT B**

**BANK OF ENGLAND**

**POLICY STATEMENTS**

# The measurement of capital

## A Introduction and general considerations

1 In 1975 the Bank of England published the conclusions of a Joint Working Party which had been formed by the Bank and the London and Scottish clearing banks to examine the nature of capital and of liquidity and to develop principles for assessing their adequacy.(1) Two methods of assessing the adequacy of capital were outlined: a 'free resources' ratio and a 'risk asset' ratio. The first broadly relates current liabilities to capital resources, excluding that part of capital which is devoted to financing infrastructure and other non-banking assets. The second broadly relates the risk of losses which are inherent in the assets of the business to the capital which is available to finance such losses. The 1975 paper argued that the risk measure was the more useful, and in recent years the Bank has come to place increasing emphasis on it.

2 Since 1975 the Bank has been able to test the conclusions of the Working Party in the course of supervisory discussions with a wide range of individual banks; and in the summer of 1979 a consultative paper was circulated developing further the principles put forward in 1975. This paper was the subject of further thorough discussion with the banking community. The present paper incorporates the results of this consultation and establishes, for the purpose of the Bank's continuing supervision under the Banking Act, a basis for assessing the adequacy of capital of all deposit-taking institutions as protection against the risk of loss.

3 In general, the Bank's approach to the assessment of capital adequacy rests on the following considerations. It must be flexible, taking account of the particular character of each institution, and should have regard not only to the interests of depositors with individual institutions but also to the maintenance of confidence in the system as a whole. It is concerned essentially with the capital needs of a continuing business. It must also take account of the acknowledged division of responsibilities among supervisory authorities internationally.

4 Thus the Bank considers that to prescribe a precise numerical guideline for the capital needs of all institutions or for groups of institutions would be inappropriately inflexible. Such an approach would endorse overtrading by some companies and be harmfully restrictive to others. Furthermore, it is recognised that a sufficient flow of earnings is essential as a first defence against losses and as a source of fresh capital to allow a business to grow or even to maintain the scope of its operations during a period of inflation. Profitability and other prudential considerations have their place within the assessment of capital adequacy so that, within a common framework for the measurement of capital applying to all institutions, the Bank's final assessment of the capital adequacy of a particular institution will involve qualitative judgments depending on the nature of its business. Within the field of supervised institutions there will therefore be a range of capital ratios regarded as adequate.

5 A broad international consensus has grown up in recent years that the primary responsibility for supervision of a banking institution rests with the authority of the country in which the head office of that institution is based. At the same time, it is also generally agreed that in assessing the capital adequacy and risk exposure of banking groups it is necessary to take account of the business of all the branches at home and abroad and all the wholly-owned and majority-owned subsidiaries engaging in financial business. In the case of UK-incorporated deposit-taking businesses, it is thus the Bank's approach in assessing capital adequacy to take account of their world-wide operations on a consolidated basis. The Bank also considers that deposit-taking subsidiary companies in the United Kingdom should be adequately capitalised in their own right. In addition to a consolidated measure the Bank will thus also have regard for the capital adequacy of individual deposit-taking companies within a group.

### The objectives

6 The following have been identified as the two most important objectives of capital ratios:

(i) to ensure that the capital position of an institution is regarded as acceptable by its depositors and other creditors; and

(ii) to test the adequacy of capital in relation to the risk of losses which may be sustained.

7 The first objective makes it desirable that one of the measures of capital to be employed by the Bank should be constructed of elements as far as possible available to the public. Depositors and other creditors have to form judgments about the capital adequacy of an institution using published information, and their reaction to these judgments will have an important bearing on the stability of each institution. The second objective requires information, an important part of which is likely to be available only to the supervisory authority and the institution itself. And the more sophisticated the testing mechanism, the less likely it is that the information will be available to the public in the necessary detail.

(1) The paper was reproduced in the Bank of England *Quarterly Bulletin*, September 1975, page 240.

8 In the light of the discussions and consultation mentioned earlier, the Bank has reviewed the ratios currently employed and their components to determine to what extent these objectives are met. It has concluded that the first objective is broadly met by relating current liabilities to capital resources (the 'free resources' ratio, which will hereafter be called the 'gearing ratio'); and that for the purpose of supervision the second objective is the more important so that the risk measure of capital adequacy should take precedence. But the gearing measurement will have a place in ensuring that an institution is not running ahead of its probable capacity to sustain its business in normal circumstances.

9 On the construction of the ratios, the Bank has concluded that some modification of its traditional method of calculating the gearing ratio is necessary; and that some amplification of the simple outline of the risk asset ratio presented in the 1975 paper is required in order more adequately to reflect the degree of risk attaching to different classes of asset.

10 The remainder of this paper is concerned with the construction of these ratios: basic definition of capital, definition of capital and liabilities for the gearing ratio, and definition of capital and risk assets for the risk asset ratio. For neither ratio is any specific numerical guideline established. The Bank takes the view that to publish such numbers would allow insufficient flexibility to take account of the different circumstances of particular institutions. Publication could also impair the ability of an institution to raise fresh capital when most in need. The Bank's views on capital adequacy have been discussed with individual banks in confidence for some time past. This will continue. The guidelines that are evolving are not intended to be inflexible. However, the Bank is firmly of the view that over the longer term certain standards must obtain. It will therefore wish to be assured that in planning for expansion all deposit-taking institutions give due weight to maintaining an acceptable margin of capital.

## B The capital base

11 The capital base will comprise the following:

(i) *Share capital*

The amount paid up (whether in full or in part) on the issued ordinary and non-redeemable preference shares. Share premium.

N.B. Authorised but unissued shares or the amount not paid up on any issued shares are *not* included. Redeemable preference shares are treated as subordinated loan capital (see below).

(ii) *Loan capital*

Loan capital which is fully subordinated to other creditors (including depositors), which has a minimum initial term of five years to maturity and incorporates no restrictive covenants: subject to a maximum of one third of the total capital base net of outstanding goodwill and to straight line 'amortisation' in the last five years of life (paragraphs 14–19).

(iii) *Minority interests*

When included in accounts as a result of the consolidation of subsidiary companies not wholly owned (paragraph 24).

(iv) *Reserves*

Balance on profit and loss account. General reserves, however described, including 'inner' reserves (paragraph 12).

(v) *Provisions*

General bad debt provisions, less any associated deferred tax asset (paragraphs 12 and 21).

N.B. Provisions against specific bad debts and for interest suspended, and provisions for deferred and current taxation, are *not* included (paragraphs 20, 22 and 23).

12 This definition of capital does not wholly accord with the objective of enabling depositors and creditors to see fully the position of an individual institution because inner reserves will not, and general bad debt provisions may not, be apparent to the public although their existence may be known. However, in the Bank's view, it would be unreasonable to disregard these important elements of capital in arriving at the gearing ratio; and for the risk asset ratio, it is accepted that the necessary information will not be fully available to the public.

13 This proposed definition of capital differs in its treatment of loan stocks and of provisions from that contained in the 1975 paper. The considerations that have led to these modifications are described below, together with a note on minority interests.

**Loan stocks**

14 The 1975 paper considered that the function of loan stocks is not to provide a reserve against losses but to finance part of the infrastructure of the business; and that such loan stocks should be subordinated and medium or long-term. This conclusion rested on the view that loan stocks are an inadequate substitute for shareholders' funds because of their impermanence and inability to absorb losses without precipitating a liquidation. The Bank has reviewed this approach to loan stocks in the context of a fresh look at the purposes for which capital is required and has concluded that the approach in the 1975 paper is too limited.

15 The following have been identified as the important purposes for which capital is required:

(i) to provide a cushion to absorb losses;

(ii) to demonstrate to potential depositors the willingness of the shareholders to put their own funds at risk on a permanent basis;

(iii) to provide resources free of fixed financing costs;

(iv) to be a suitable form of finance for the general infrastructure of the business.

16 Shareholders' funds are suitable for all these purposes. They carry no obligation for repayment and are available to absorb losses; they provide evidence of the commitment of

the shareholders to the company; there is normally no contractual obligation to pay dividends—and this characteristic, together with the stability of shareholders' funds, means that they are suited to financing infrastructure.

17 Loan stocks are less suitable for these purposes. They do not provide a reserve against losses for a business which continues to trade. They do not demonstrate to depositors a willingness of the shareholders to put capital at risk on a permanent basis; nor do they provide the same flexibility as that provided by shareholders' funds to pay or not to pay servicing costs. In times of low profitability loan stocks can impose a burden because of their fixed servicing costs. On the other hand, loan stocks, providing they are fully subordinated, do protect depositors against loss in a liquidation. There is, in a going concern, some reassurance to be gained from the presence of loan stocks, provided that they are medium or long-term, during periods of temporary loss: although they cannot be written down to absorb losses, their presence could enable the losses to be absorbed by ordinary capital and reserves with less threat to creditors' confidence in the institution. An incidental advantage of loan stocks is that where they are long-term and denominated in foreign currencies, they may improve the maturity and currency match between a bank's banking assets and liabilities. Thus it is clear that while the characteristics of subordinated loan stocks do not make them a full substitute for share capital, their presence can enhance the level of protection available to depositors.

18 The Bank has concluded that, subject to a limit referred to in the next paragraph, fully-subordinated loan stocks should be included within the capital base provided that they have a minimum initial term of five years and are subject to an 'amortisation' factor applied to loan stocks with less than five years remaining to maturity. This factor would discourage unduly short initial terms, soften the impact on capital ratios when loan stocks mature and are not replaced, and reflect the diminishing comfort afforded. In addition, the Bank will wish to ensure that loan stocks used as capital do not have performance or other unduly restrictive conditions attached to them which might trigger their immediate payment, probably when it could least be tolerated from a prudential standpoint.

19 The extent to which the capital base can prudently be enlarged by loan stock subject to the above conditions defies precise measurement. Clearly an institution with a given gearing and a given continuing rate of loss will survive for less time with positive net worth if its capital base contains a high proportion of loan stocks. How high a proportion is prudent must to a large extent be a matter of judgment. The Bank considers that the probability of losses of a size and a duration to cause real difficulty would not be perceptibly increased if subordinated loans were to form an amount not exceeding one third of the capital base net of outstanding goodwill. Institutions are, of course, not precluded from issuing loan stocks in excess of this figure, but the Bank would not include such excess in the capital base when assessing the adequacy of capital.

Provisions

20 The 1975 paper included specific provisions against advances and provisions for suspended interest within its definition of capital. The Bank has reconsidered this and concluded that amounts set aside to cover possible or probable losses that have already been identified provide no protection against future unidentified losses and they should therefore be excluded from the capital base. By the exclusion of specific provisions the Bank does not wish to penalise the prudent institution. Indeed the Bank attaches great importance to the early identification of bad debts and the creation of adequate provisions against them. Supervision will seek to ensure that all companies employ prudent policies in this regard and apply them consistently.

21 The Bank is aware that opinions differ about the nature of the general provision. Some argue that it is designed to cover latent but as yet unidentified bad debts already in the balance sheet, while others claim that in practice it is an unencumbered resource akin to reserves. The Bank has concluded that, where it is satisfied that a general provision is freely available to absorb future losses, it is appropriate to include it within the Bank's definition of the capital base. This is in line with the 1975 paper.

22 The treatment of deferred tax provisions has recently been clarified by the accounting standard SSAP 15[1] which states that, in future, provision should not be made for potential tax liabilities on which there is judged to be no claim in reasonable prospect. In principle the Bank accepts that such additional sums as now accrue to reserves (instead of to deferred tax account) under the standard should form part of the capital base. It follows that where continuing provision is made for this purpose, the Bank would not include this provision in its calculation of capital.

23 However, the Bank has noted that for many institutions a substantial proportion of capital resources is subject to a potential tax liability. It is also apparent that, in their interpretation of the accounting standard, companies and their auditors have adopted widely differing views on the probability of the tax becoming payable. This disparity of treatment appears to arise both from the inherent uncertainty of the judgment directors are required to make as well as from differences in the underlying nature of the business conducted by particular institutions. This means that, for the purpose of assessing capital adequacy, unquestioning acceptance of each institution's practice could penalise those who choose to adopt a more cautious policy. In time and with greater experience, the Bank would hope that a more consistent treatment of deferred tax will develop. Until then the Bank will monitor closely the policies adopted, particularly in those cases where potential tax liabilities are large in relation to other capital and where

(1) 'Accounting for deferred taxation', *Statement of standard accounting practice No. 15*, The Institute of Chartered Accountants in England and Wales, October 1978.

the absence of provision is justified on the assumption that existing timing differences will be replaced by new timing differences in future years. If for any institution the profile of maturing deferred tax suggests that the potential crystallisation of a tax payment in any future year could only be met by a material reduction in reserves rather than from an existing provision, the Bank may wish to deduct a proportion of the unprovided potential tax liability in calculating the appropriate capital base.

**Minority interests**

24 Minority interests are included in the capital base for the assessment of group capital adequacy on the grounds that minority capital in a subsidiary is available to support the proportional part of the liabilities of the subsidiary which is included in the group consolidation. However, the Bank considers that minority interests do not provide support to the group in equal measure to that provided by the parent's own share capital since, unlike that share capital, the minority capital is not available to support losses elsewhere in the group. Accordingly, the Bank would propose to examine carefully all those cases in which minority interests contribute significantly to the consolidated capital base, and to consider whether some part of them should properly be excluded from the base.

## C The gearing measurement

25 There are several possible gearing measurements, of which the simplest would be the ratio of the capital base to total liabilities (other than capital liabilities). The free resources ratio, however, incorporated some adjustments to the capital base. The Bank has reviewed these for the purpose of calculating the gearing ratio and has concluded that some of them tended to confuse elements of gearing, risk and liquidity in one calculation.

26 The Bank considers that the following deductions, which were referred to in the 1975 paper, should continue to be made:

(i) *Investments in subsidiaries and associated companies and trade investments*
Such investments are likely to be used as a basis for gearing by the affiliate, and unless some adjustment is made the capital in the parent will therefore be geared on twice. The preferred treatment in this case is to consolidate the business of the subsidiary and the parent, but when this is not done a deduction from the parent's capital is essential. Although not mentioned in the 1975 paper, lending to such companies which has the character of capital should also be deducted in full.

(ii) *Goodwill*
This is justified on the grounds of the uncertainty of the value of that part of the cost of acquiring an asset which exceeds its net asset value.

(iii) *Premises*

(iv) *Equipment and other fixed assets*
The argument for continuing to make a deduction of items (iii) and (iv) is that it is imprudent to employ depositors' funds to finance the offices from which banks operate and the equipment used in the business. The Bank has therefore concluded that a full deduction should continue to be made for the gearing ratio.

27 On the other hand, the following, which were commonly deducted in the free resources calculation (although not mentioned in the 1975 paper), are not considered appropriate deductions:

(i) *Unquoted investments*
This is one of the elements in which risk and liquidity are confused with gearing potential. These elements should be handled in the risk and/or liquidity measurement. For gearing purposes a total deduction is too harsh, particularly as some unquoted investments may be terminable fixed interest and in credit terms relatively risk-free.

(ii) *Connected lending (other than capital-type lending to subsidiaries)*
In practice it is recognised that connected lending is not homogeneous. The dangers are risk-related rather than gearing-related and are more appropriately observed in that context.

28 It remains to determine the non-capital liabilities ('public liabilities' in terms of the 1975 paper) to which the capital base, as adjusted, should be related in arriving at the gearing ratio. Past practice has been to take account only of deposit liabilities, although to this the Bank has traditionally added liabilities on acceptances. However, these definitions fail to take account of claims by other creditors. Furthermore acceptances, like other contingent liabilities, are more appropriately considered within the risk measure of capital adequacy; and the inclusion of acceptances (which are not always separately identified in published balance sheets) is inconsistent with the objective that the gearing ratio should, so far as possible, be capable of being calculated from published accounts. Thus for the purpose of the gearing ratio the Bank will measure the adjusted capital base against all other non-capital liabilities apart from contingent liabilities which are incorporated within the balance sheet.(1) This will effectively aggregate the claims of depositors and other creditors.

## D The risk measure

29 Some of the deductions from the capital base made in the gearing ratio are equally appropriate for the risk asset ratio. Investments in subsidiary and associated companies, trade investments, goodwill, and investment in plant and equipment will be deducted as described in paragraph 26 (i), (ii) and (iv). The 1975 paper suggested, in addition, a full deduction for premises but argued that the ready saleability of the branches of clearing banks justified a lower

(1) The liability of the Scottish and Northern Irish banks for their own note issue will not be included to the extent that it is covered by Bank of England notes and by coin. Subordinated loan stocks, disallowed by the qualifying criteria for the capital base, will also be excluded.

proportion of capital cover in their case. The Bank now considers that if the risk asset ratio is to fulfil its role as a test of the adequacy of capital in relation to the risk of loss, considerations of liquidity (of which the saleability of premises is an example) should be dealt with in a different context. Judged simply in terms of capital risk, bank premises are no more vulnerable to loss than other property assets. For the risk asset calculation, premises will therefore not be deducted but will be treated like other balance sheet assets. In calculating the capital base for the purpose of the risk measure, the Bank will have regard to any genuine hidden values in the balance sheet and to any over-statement of assets in relation to their market value.

30 In outlining the risk assets approach to the assessment of capital adequacy, the 1975 paper did not attempt to grade the risks incurred by banks and only identified three broad classes of risk assets: those with credit risk, those with forced sale risk, or those with a combination of both. The increased emphasis the Bank proposes to devote to this measure requires a more detailed differentiation between the degrees of risk attaching to various categories of asset. Consideration has also been given to whether there would be advantage in going further and attempting to incorporate additional risks such as fraud and other operational risks or concentrations of exposures on special sectoral and geographic risks. The Bank has concluded that to encompass all these elements within a single calculation would involve the construction of an excessively elaborate model whose appearance of accuracy could be dangerously misleading.

31 It is now intended that the standard risk asset calculation will take into account three types of risk inherent in the assets themselves but that weightings should be applied to different assets reflecting the extent to which they are susceptible to these risks. The three types of risk are:

(i) *credit risk*—the risk that claims on others may not be redeemable at the due date at their full book value;

(ii) *investment risk*—the risk that marketable claims on others, or directly held assets, may depreciate below their book value;

(iii) and as a further element within investment risk *forced sale risk*—the risk that actual and additional losses may be sustained because of the need to make untimely sales of assets which, depending on the narrowness of the market, may yield less than their quoted value.

32 This does not mean that the Bank will ignore the other risks already mentioned. In looking at the capital position of a particular institution the Bank will assess the risk asset ratio in the light of the perceived exposure to these other risks. This will involve a series of qualitative judgments and as a result there will be a range of ratios regarded as adequate according to the character of each institution's business. The assessment will also have regard for any marked divergence from the ratios which may obtain among similar institutions, and for changes over time in the ratios of particular institutions.

33 Each category of asset currently identifiable from statistical returns has been reviewed and a factor representing a risk weight has been ascribed to it. These weights attempt to reflect the relative risk of loss arising from credit or investment and forced sale risks inherent in a particular class of asset. For this purpose commercial advances are taken as a benchmark to which a weight of unity is therefore ascribed. The risks attaching to other assets may be less or more than those attaching to commercial advances. Thus, for example, the weight ascribed to market loans to listed banks is 0.2 and the weight attached to property is 2.0. A full classification of assets together with the risk factors attaching to them are contained in Appendix A to this paper. The risk asset ratio is calculated by multiplying each balance sheet asset by its weight to produce an adjusted total of risk assets and then establishing the proportion of this total represented by the capital base as modified by the items requiring a deduction. (A summary of the method of calculation is contained in Appendix B). This calculation represents only the first step in the assessment of capital adequacy by this method. Final assessment will take into account the particular circumstances of each institution. For example, the large institution with a well diversified spread of high quality lending will inherently be less exposed to risk, and therefore requires relatively less capital cover against its assets, than the small specialist institution with a narrower customer base.

34 Present statistical returns cover only assets held by the UK offices of reporting companies. They thus, for example, exclude assets held by overseas branches and subsidiaries of British banks. The Bank attaches importance to assessing the adequacy of capital against the consolidated total of risk assets. Discussions will therefore be held with those affected in order to agree an appropriate statistical framework for the classification of assets held abroad.

Bank of England
*September 1980*

EXHIBIT 1

# Appendix A
# Classification of assets and risk weights held by UK offices of reporting banks

| | |
|---|---|
| *(i) Nil weight* | Bank of England notes and UK coin<br>Other sterling notes<br>Balances with Bank of England<br>Special deposits with Bank of England<br>Debits in course of collection on banks in the United Kingdom<br>Balances with overseas offices of the reporting bank<br>Lending under special schemes for exports and shipbuilding<br>Certificates of tax deposit<br>Items in suspense<br>Refinanced lending at fixed rates<br>Gold physically held in own vaults<br>Gold held elsewhere on an allocated basis |
| *(ii) 0.1 weight* | Foreign currency notes and coin<br>UK and Northern Ireland Treasury bills |
| *(iii) 0.2 weight* | Debit items in course of collection on overseas banks<br>Market loans with listed banks, discount market, etc.<br>Market loans to UK local authorities and public corporations<br>Balances with banks overseas with a maximum term of up to one year (including claims in gold)<br>Bills other than UK and Northern Ireland Treasury bills<br>Other loans and advances to Northern Ireland Government, UK local authorities, public corporations and other public sector<br>British government stocks with up to eighteen months to final maturity<br>Acceptances drawn by UK and overseas banks and UK public sector<br>Claims in gold on UK banks and members of the London Gold Market |
| *(iv) 0.5 weight* | British government stocks with over eighteen months to final maturity<br>Northern Ireland government stocks<br>UK local authority and other public sector stocks and bonds<br>Acceptances drawn by other UK and overseas residents<br>Guarantees and other contingent liabilities |
| *(v) 1.0 weight* | Market loans placed with other UK residents<br>Other loans and advances, net of specific provisions for bad debts, but excluding connected lending<br>Assets leased to customers<br>Working capital provided for overseas offices of the reporting bank, both in the form of deposits and in other forms<br>Balances with banks overseas with a term of one year or over (including claims in gold)<br>Claims in gold on non-banks<br>Aggregate foreign currency position ( to be defined in the Bank's paper on 'Foreign Currency Exposure')<br>Other assets 'other', e.g. silver, commodities and other goods beneficially owned by the reporting bank<br>Other quoted investments, not connected |
| *(vi) 1.5 weight* | Connected lending (to be looked at case by case and to exclude market-type lending where this can be separately identified)<br>Unquoted investments (subject to case-by-case treatment) |
| *(vii) 2.0 weight* | Property (includes all land and premises beneficially owned by the reporting bank) |
| *Items to be deducted from capital* | Plant and equipment<br>Intangible assets<br>Investments in subsidiary and associated companies and trade investments |

# Appendix B
## Composition of gearing and risk asset ratios

| | Gearing ratio | | Risk asset ratio | Notes and definitions in text |
|---|---|---|---|---|
| 1 **Capital base** | | Share capital<br>Loan capital<br>Minority interests<br>Reserves<br>General provisions | | Paragraph 11 |
| 2 **Adjustments to capital base**<br>*Deduct* | Investments in subsidiaries and associates<br>Goodwill<br>Equipment<br>Premises<br>Other fixed assets | | Investments in subsidiaries and associates<br>Goodwill<br>Equipment<br><br>Other fixed assets | Paragraphs 26 and 29 |
| 3 **Adjusted capital base (1 - 2)** | | | | |
| 4 | **Deposits and other non-capital liabilities** | | | Paragraph 28 |
| 5 | Gearing ratio (3 : 4) | | | |
| 6 | | | Adjusted total of risk assets | Derived from the application of the risk weights in Appendix A |
| 7 | | | Risk asset ratio (3 as percentage of 6) | |

EXHIBIT 1

- # BSD Notices
  - ## BSD/1983/1 Notice to recognises banks and licenced deposit-takers (April 1983)

(April 1983)

The implementation of the Banking Act 1979 resulted in the recognition of about 300 banks and the licensing of another 300 deposit-taking institutions; many of the latter were new deposit-takers and others that had not previously been subject to the voluntary arrangements for supervision introduced by the Bank in 1975. In the course of its supervision the Bank has identified a number of matters which it feels should be drawn to the attention of authorised institutions generally. Though most of the points set out in this notice will concern only a minority of institutions, it is being addressed for information to all institutions authorised under the Banking Act. The Bank is ready to discuss with individual institutions the application of these points of guidance.

### 1 Connected lending

Assessment of the risks attaching to loans to companies or persons connected with the lending institution, its managers, directors or controllers, may be obscured by subjective considerations. In the Bank's view such lending can be justified only when undertaken for, the clear commercial advantage of the lending institution and should be negotiated and agreed on an arm's length basis.

The Bank does not normally expect connected business to form a significant proportion of assets. However it does not think it appropriate to set a single threshold figure, applicable in all circumstances, to the total amount of this type of lending since lending can be "connected" in many different ways. In the course of its supervision the Bank has therefore to make a judgement about the degree of connection to be attributed to an institution's loans and its acceptability. In order to do so, it requires full information on all matters relevant to each loan which may be of this kind. When connected lending on any scale exists or is contemplated, institutions should discuss and agree with the Bank the extent of such lending appropriate to their particular circumstances.

As stated in the Measurement of Capital paper, paragraph 26(i), lending to subsidiaries and associated companies which has the character of capital is normally deducted from the capital base of the lending institution. Furthermore, there may be occasions when either under the terms of the lending agreement or by virtue of the financial circumstances of the borrower, connected lending is closer to an injection of risk capital than the provision of a loan of certain value. In such cases the Bank may require the amount of this lending to be deducted from the capital base for prudential calculations.

### 2 Annual accounts and returns to the Bank of England

The Bank expects to receive copies of the annual report and audited accounts of each supervised institution not later than 6 months after the end of the institution's financial year and preferably within 3 months. The Bank also expects to receive regular returns within the time specified for each return, since the Bank's system of supervision depends in large measure on the information shown in these returns. Failure to submit returns on time, or to file accounts within 6 months of its year-end, may lead the Bank to review whether the institution concerned continues to meet the criteria in Schedule 02 to the Act.

EXHIBIT 1

## 3 Large loans to individual customers

If has become clear that some institutions are not sufficiently aware of the need to keep the size of individual exposures within prudent limits.

An important measure of capital adequacy used by the Bank is the Risk Asset Ratio* which calculates the adequacy of capital in relation to the risk of losses which may be incurred. That calculation takes no account of concentration of risk and the Bank in judging the level of the risk asset ratio appropriate for an institution assumes a good spread of assets. However, where it identifies undue concentration of risk, it will expect a higher ratio to be maintained. It follows that an increase in concentration will normally lead to a review of a previously indicated risk asset ratio, with a presumption that a higher ratio will be needed.

* See paragraphs 29, 34 of the Bank's paper. The Measurement of Capital (September 1980)

Experience suggests that exposures (loans, acceptances, guarantees, etc) to one customer or group of customers should not normally exceed around 10% of an institution's capital base.[2] Lending on such a scale should in any case be made only after the most careful credit assessment, against good and sufficient security and if the directors of the lending institution are confident that such exposure can be justified to the Bank. The more an individual exposure exceeds 10% of the capital base, the more rigorous the Bank will be in requiring justification. If loans in excess of 10% of the capital base have been or are to be made, the institution will normally be requested to maintain a level of capital resources significantly higher than that which would otherwise be required.

[2] Adjusted as set out under the heading "Risks Asset Ratio" in Appendix B of The Measurement of Capital paper

## 4 Risk of fraudulent invitations to lend/borrow/intermediate

Institutions appearing on the lists of authorised institutions published by the Bank - particularly smaller institutions in the licensed deposit-taker sector - may find that they are approached by persons unknown to them suggesting participation in very substantial business out of all proportion to their normal scale of activities. These approaches often concern international activities (involving foreign currencies or gold) and are said to be of a confidential nature. Often these approaches are made with the object of committing a fraud. While tactics may vary, the object of the fraud is usually to induce the institution approached either to make payments itself (eg in the form of advance commission or expenses) or to take some action which may lend plausibility to a story to be told to another institution. For this latter purpose any letter using an institution's printed stationery, even a simple letter declining the offer of funds, may be turned to advantage by those perpetrating the fraud.

If business of any substance is offered to an institution without a proper introduction from a trusted customer or financial associate, extreme care should be exercised in authenticating the nature and origins of the transaction and the bona fides of the agent introducing the business. The Bank asks to be informed of all offers which are considered dubious so that appropriate warnings may be given to other institutions. In doing so, the Bank will exercise the greatest care to respect any necessary confidences.

EXHIBIT 1

## ▪ 5 Floating charges

Deposit-taking institutions are reminded that they should not give floating charges over their assets as security for their own borrowing from banks or other sources. Where a lender seeks security in the form of a charge over assets, that charge must either be applied to specific assets or limited to a certain proportion of specified assets, such as hire purchase agreements, in order to ensure that there would always be sufficient unencumbered assets to meet the claims of depositors in a liquidation of the company.

The Bank expects to be informed in advanced of any agreement which would create a charge on an authorised institution's assets.

EXHIBIT 1

# BSD/1985/2 Off-Balance Sheet Risks: Note Issuance Facilities/Revolving Underwriting Facilities (April 1985)

Off-Balance Sheet Risks: Note Issuance Facilities/Revolving Underwriting Facilities

(April 1985)

1. Pressures on banks' capital adequacy ratios in recent years have contributed to a significant growth in off-balance sheet instruments not all of which are currently captured in the prudential measurement of capital and liquidity. This has lead not only to a growth in such new instruments but also to banks taking on such obligations on terms which, in the Bank's view, do not properly reflect the risks involved. The Bank, therefore, wishes to set in train a review, in consultation with banks and other institutions of the range of off-balance sheet risks to which they may be exposed in order to assess those risks more accurately. This review will include the treatment of more traditional and well-established contingent liabilities as well as instruments which have been developed more recently.

2. An area of particular concern arises from the obligations assumed by institutions which act as underwriters of note issuance facilities* or revolving underwriting facilities. The Bank considers that these obligations represent a long-term credit risk for an underwriting bank**, as the bank can be called upon to honour its undertaking to lend at any time during the life of the facility, including circumstances in which the financial position of the borrower has deteriorated and when it might otherwise prefer not to lend. This obligation is different from normal underwriting engagements where, unless the issue has been wrongly priced and is left with the bank, a bank's obligation to the borrower terminates when the issue has been completed.

   * For the purpose of this notice, these facilities are defined as arrangements which enable a borrower to raise funds through the issue of short-term paper, where the availability of funds is in effect guaranteed by a bank or a group of banks underwriting the issue of paper by the borrower. These include facilities arranged for both bank and non-bank borrowers, where the paper is issued in the form of certificates of deposit or promissory notes. They may also include multi-component facilities under which the underwriting institutions may make available alternative funds if the borrower chooses not to make an issue of the notes.

   ** For the purpose of this notice, the term "bank" includes recognised banks and licensed deposit-taking institutions.

3. Although many facilities now include a condition involving any material adverse change in the financial position of the borrower, the Bank considers that an underwriting bank could find itself under strong pressure to provide funds, particularly where there is a long-term relationship between the borrower and the bank.

4. The Bank therefore considers that a bank's underwriting obligations under a note issuance facility should be included in the measurement and assessment of this capital adequacy. The Bank will henceforth, as a provisional measure, treat all such obligations as contingent liabilities for capital adequacy purposes and will include them at a weight of 0.5 in the calculation of the risk asset ratio, whether or not the facility has been drawn down by the borrower. Where an institution holds paper issued under a note issuance facility of which it is an underwriter, its holding of the paper will be weighted as a balance sheet item, and the amount of its underwriting obligations reduced accordingly.

EXHIBIT 1

5. From discussions which the Bank has had with individual institutions, it is clear that many institutions already include underwriting obligations under note issuance facilities within their existing credit limits for individual borrowers. The Bank believes that this is a prudent practice and that it should be adopted by all banks underwriting these facilities. It is important that an underwriting institution makes a full credit assessment of a borrower under a note issuance facility in the same way as it would if it were making an advance, and that it keeps its exposure under continuous review during the life of the facility.

6. An underwriting institution should also ensure that in managing its liquidity it takes account of the possibility that it may be requested to take up at short notice any unsold notes issued by the borrower.

7. Although the Bank does not apply capital adequacy requirements to UK branches of overseas banks, the Bank nevertheless wishes to monitor branches' activities as underwriters of note issuance facilities and to include these obligations in measuring an institution's large exposures to individual customers. Branches of overseas banks should therefore report their underwriting obligations under these facilities to the Bank. Treatment of these obligations of overseas branches for capital adequacy purposes is of course a matter for the authorities in the home countries of these banks. The issues raised in this note have been discussed by the Bank with the authorities in the major industrialised countries who are also considering their own arrangements in respect of this business.

8. A statistical notice to all reporting institutions is being issued at the same time as this notice. In future an institution's underwriting obligations under a note issuance facility should be reported separately, as a contingent liability, under item 13.7 on the form Q7 or under item 7.6 on the form B7, as appropriate. These obligations should also be included where appropriate, under item 20 on the form Q7, or under items 11 and 12 on the form B7.

9. The increasing scale of many banks' obligations under note issuance facilities has prompted the Bank to bring them within the measurement of the risk asset ratio at an early stage. The Bank recognises that some of these facilities may be arranged for a bank borrower. In such cases there will initially be an inconsistency between the weight (0.5) given to all obligations under these facilities and the weight given to market lending to monetary sector institutions (0.2). This matter will, inter alia, be taken up in the broader review of off-balance sheet exposure referred to in paragraph 1.

10. Meanwhile the Bank is willing to discuss the impact of the introduction of this policy with any institution the calculation of whose capital adequacy will be materially affected.

EXHIBIT 1

- # BSD/1986/1 Large Exposures in Relation to Mergers and Acquisitions (February 1986)

Large Exposures in Relation to Mergers and Acquisitions

(February 1986)

0. A number of proposals for large mergers or acquisitions have recently been launched. It appears to the Bank that there has been a significant change in the scale and nature of banks'* traditional involvement in facilitating these transactions. In particular the Bank has noted arrangements or proposals for banks or banking groups:

   * For the purpose of this Notice, references to banks should be taken to include recognised banks and licensed deposit-takers.

   i. to acquire significant strategic shareholdings in companies involved;

   ii. to buy individual subsidiaries from a group involved.

   The Bank wishes to make clear its attitude to these arrangements in the light of its responsibilities under the Banking Act 1979.

1. Until further notice the Bank expects banks and banking groups to give it prior notification of their intention to enter into these types of transactions or any similar transactions.

2. The Bank will not normally regard as prudent such acquisitions of shares in a company which, taken together with existing exposures to that company or group, exceed 25% of the bank's or banking group's capital base.

3. Moreover, the bank will in certain circumstances treat acquisitions of such shares as though they were investments in subsidiaries and will deduct the value of the investment from the capital base.

4. The Bank will not give special treatment to vehicle companies which do not have the effect of transferring the risk of the exposure from the bank or banking group.

5. Where a bank or banking group is already committed, the Bank will discuss with these banks arrangements to bring their position into line with the Bank's requirements as soon as possible.

EXHIBIT 1

- # BSD/1986/2 Subordinated loan capital issued by recognised banks and licensed deposit-takers (March 1986)

Subordinated loan capital issued by recognised banks and licensed deposit-takers

(March 1986)

0. On 28 November 1984, the Bank issued a consultative note entitled "Subordinated Loan Capital issued by Recognised Banks and Licensed Deposit-takers". (For the purpose of this Notice, references to banks should be taken to include recognised banks and licensed deposit-takers.) The note addressed various matters relating to issues of loan capital by banks, and formed the basis for detailed discussions with the banking community about the arrangements applying to bank holdings of debt issued by banks for capital adequacy measurement purposes, the inclusion or perpetual subordinated debt in a bank's capital base and the supervisory treatment of all forms of subordinated debt issued by banks.

1. The Bank has since published the text of two letters* addressed to the British Bankers' Association reporting progress on these matters as discussions with the banks have proceeded. This Notice sets out the Bank's policy on these matters and as such is to be regarded as an addendum to the Bank's paper "The Measurement of Capital" (September 1980). References in this Notice to "The Measurement of Capital" are to this paper.

   * 16 May and 8 October 1985

## 2. Bank holdings of subordinated loan capital issued by other banks

3. The Bank is strongly committed to the principle that, in assessing capital adequacy any investment made in the capital of another bank, whether in the UK or overseas. should be deducted from the holder's capital base, to ensure that the same capital is not used by more than one institution to support its operations. Deduction applies to any subordinated loan capital issued by a UK bank authorised under the Banking Act 1979, or by a bank overseas. It also embraces holdings of subordinated and unsubordinated loan capital issued by holding companies of such institutions or financing vehicles within banking groups**.

   ** The principle of deduction applies to equity as well as loan capital but the concessions explained in this Notice apply only to loan capital if necessary - and presently banks holdings of equity are not great - further consideration may need to be given to the treatment of holdings of equity.

4. In recognition of the important role played by a number of banks in making a market for bank capital issues, however, the Bank is prepared to consider applications from primary and or secondary market-makers for concessions from the principle of deduction.

EXHIBIT 1

# 0. Primary market-makers

5. Those banks which can satisfy the Bank that they act as managers or underwriters for new issues of bank capital may qualify to be regarded as primary market-makers.

   The concession will allow such banks to hold such issues for up to 90 days from the date of issue***, after which a full deduction from the capital base will be made (unless the holding is accommodated within a bank's concession as a secondary market-maker). A bank to which a primary market-maker's concession applies will therefore be allowed to trade in issues which it has managed or under written during this 90 day period.

   *** The date of issue is to be taken as the day on which payment is made by the noteholders (and the first such date in the case of a partly paid issue).

# 0. Secondary market-makers

6. Secondary market-makers are those banks which can demonstrate to the bank that they undertake a committed and regular function as market-makers in banks' capital issues. Banks will be required to identify the particular issues for which they act as secondary market-makers.

7. The amount of the concession will be calculated individually for each market-maker and will normally be set within a range up to a maximum of 20% of the bank's adjusted capital base (as explained in the Measurement of Capital paper). In setting the concession for a subsidiary of a bank, which subsidiary is authorised under the Banking Act, some account may be taken of group capital. In the case of subsidiaries of overseas banks the amount agreed will, inter alia, be subject to the agreement of the supervisor of the parent bank.

8. The concession will be set as an absolute figure and notified in writing to the bank concerned. It will apply to a bank's net long position in bank debt held at the end of each working day, including any debt sold under repurchase agreements. Further details of the scope of the concession are given in the notes for completion of a new statistical return (see paragraph 11 below).

# 0. Primary and secondary market-makers

9. Any bank debt held under a primary or a secondary market-maker's concession will be weighted in the usual way at 1.0 in the calculation of the risk asset ratio. Other holdings of banks' capital will de deducted from the holder's capital base.

10. A holding of group paper by any entity within the bank group concerned should be maintained only on a restricted basis, which will be agreed with individual banks, and will be subject to full deduction from the capital base when calculating the capital ratios of the group on a consolidated basis.

11. Special reporting arrangements will apply in order that the Bank can monitor positions in banks' capital issues. A new quarterly Form MM is

EXHIBIT 1

being introduced for this purpose. The Bank also reserves the right to call from time to time for greater detail of the primary or secondary market portfolios held within either concession.

12. The size of holdings of individual issues held within either a primary or secondary market-maker's concession will be subject to the policy being established on the treatment of large exposures. (A separate consultative document "Large exposures undertaken by institutions authorised under the Banking Act 1979" was issued in July 1985, and a further paper will be issued in due course.)

# 0. Primary perpetual subordinated debt

13. Subordinated debt can be structured so as to bring it close to equity in terms of the protection which it offers to depositors. The principal features which give it this quality of "primary" capital are that it can absorb losses whilst leaving a bank able to continue to trade, that it has no fixed servicing costs (ie that there are circumstances in which the borrower can defer a payment of interest without bringing itself into default) and that the proceeds of the debt issue are made permanently available to the borrower.

14. The following are the conditions which must be satisfied for an issue of perpetual debt by a UK bank to be treated by the Bank as primary capital:

    a. The claims of the lender on the borrowing bank must be fully subordinated to those of all unsubordinated creditors.

    b. The debt agreement must not include any clauses which might trigger repayment of the debt. This will not, however, prejudice any right to petition for the winding-up of the borrower, for example, in the event of non-payment of interest on the debt (other than that which is deferred in accordance with paragraph (d) below).

    c. No repayment of the debt may be made without the prior consent of the Bank (see also paragraph 24 below).

    d. The debt agreement must provide for the bank to have the option to defer an interest payment on the debt (eg if the bank has not paid or declared a dividend payment in a preceding period).

    e. The documents governing the issue of the debt (hereafter referred to as the debt agreement) must provide for the debt and unpaid interest to be able to absorb losses, whilst leaving a bank able to continue trading. This can be achieved by providing for automatic conversion of the perpetual debt, and unpaid interest, into share capital should reserves become negative and where a capital reconstruction has not been undertaken. In such a case the bank will be required to maintain a sufficient margin of authorised but unissued share capital in order to allow a conversion of the debt into equity to be made at any time. Alternatively, instead of providing for automatic conversion, the debt agreement can expressly provide for the principal and interest on the debt to absorb losses, where the bank would not otherwise be solvent, and for the noteholders to be treated as if they were holders of a specified class of share capital in any liquidation of the bank. In this case the debt agreement will provide for the debt to be treated as if it had been converted into share capital either on

EXHIBIT 1

the day immediately preceding the presentation of a petition for the commencement of a winding-up of the borrowing institution or on the date of the creditors' or shareholders' meeting at which the relevant resolution for a winding-up was passed. The debt agreement must contain an explicit warning to noteholders that the debt can be treated in this way.

# 0. Inclusion of primary perpetual subordinated debt in the capital base

15. The amount of perpetual subordinated debt treated as primary capital will be limited to one half of a bank's capital base as defined in the measurement of Capital paper, excluding all loan capital* and after deducting goodwill and other intangible assets. (For example, where the capital base excluding all loan capital and intangible assets is 100, the maximum amount of perpetual subordinated debt which could be treated as primary capital is 50.)

16. The amount of all subordinated debt* which can be included in a bank's total capital base will be subject to an upper limit equal to the capital base excluding all loan capital* and after deducting goodwill and other intangible assets. (Continuing the example given in paragraph 15 above, the maximum amount of all subordinated debt* which could be included in bank's capital base is 100 - for example, 50 of primary perpetual subordinated debt and 50 of term subordinated debt.)

    * Primary perpetual and all other subordinated debt.

17. Term subordinated debt, and perpetual subordinated debt exceeding that allowed as primary capital under paragraph 15 above, will remain restricted to a maximum of one third of the total capital base after deducting goodwill and other intangible assets. (Taking the figure of 100 mentioned in paragraph 15 above and assuming an issue of primary perpetual subordinated debt of 20, term subordinated debt of up to 60 could be included in the capital base - on the basis that the term debt of 60 does not exceed one third of the total capital base of 180.)

18. Any subordinated debt which does not qualify to be included in a bank's capital base, within the limits described in paragraphs 15-17 above, will be treated in the normal way as part of a bank's long term funding.

19. The Bank expects shortly to issue a further Notice to all institutions authorised under the Banking Act, clarifying its treatment of a number of items in the calculation of banks' capital ratios. The Notice will, inter alia, cover the treatment of redeemable shares in a bank's capital base, and this in turn will affect the amount of perpetual subordinated debt which can count as primary capital for banks which have such shares in issue.

# 0. Supervisory treatment of all subordinated debt

20. The Measurement of Capital paper states that subordinated loan capital which is to be included in a bank's capital base (as defined in paragraph 11 of that paper) must, inter alia, have a minimum initial term to maturity of five years, However, the Deposit Protection Scheme offers protection to deposits which have an original term to maturity of not more than five years, so giving rise to the possibility of a loan stock with a term to maturity of exactly five years qualifying both as part of the capital base and for protection under the Deposit Protection Scheme. In order to

EXHIBIT 1

remove this inconsistency, the Bank has for some time required subordinated debt which is to form part of a bank's capital base to have, inter alia, a minimum initial term to maturity of five years and one day. This requirement does not affect loan capital already in issue.

21. The Measurement of Capital paper also states that in order to qualify for inclusion in a bank's capital base, the terms of a loan stock must not contain any restrictive covenants which might trigger immediate repayment.

22. The bank reaffirms that there should be no clauses in the loan agreement which can trigger early repayment of the debt. This includes cross-default clauses and negative pledges. Issues made before 28 November 1984* which contain such clauses will, however, continue to be included in banks' capital bases (although such clauses will not be allowed in respect of any extension of the redemption date or increase in the amount issued).

* This is the date of the Bank's consultative note referred to in paragraph 1 of this Notice when the Bank formally clarified its policy towards clauses which can trigger early repayment of debt.

23. As a further condition, the debt agreement must normally be subject to English law. Where an overseas operating subsidiary is issuing capital in its local market, the Bank will accept foreign law, although the subordination clause contained in the debt agreement or supporting guarantee must still generally be subject to English law. In certain circumstances, however, the Bank will accept foreign law throughout if this is necessary for the success of the issue in the local market. In all cases, however, the Bank must give its prior consent where foreign law is to apply.

24. The Bank requires that no early repayment of any subordinated loan capital may be made without its prior consent: such repayment will be permitted only where the Bank is satisfied that the bank's capital is adequate after repayment. A letter to the Bank, giving effect to this condition and undertaking to seek the Bank's prior consent to any material variation in the terms and conditions of an issue, will be required from the bank concerned. The Bank considers it essential that noteholders should be made aware of the restriction on early repayment, either via the loan agreement or in the offer documents or through other information sources commonly used in the markets.

25. Where it is proposed to make an issue of loan capital which is designed to be included in a bank's capital base, the Bank requires that it should be given prior notice of the issue and sufficient opportunity to consider and agree the loan documentation in advance. However, in order to facilitate the timing of issues, the Bank will accept "shelf documentation" so that only changes from this documentation need be discussed with the Bank before an issue.

EXHIBIT 1

- # BSD/1986/3 Consolidated Supervision of Institutions Authorised under the Banking Act 1979 (March 1986)

Consolidated Supervision of Institutions Authorised under the Banking Act 1979

(March 1986)

0. In a discussion paper published in May 1985, the Bank of England ("the Bank") described its proposed approach to the consolidated supervision of institutions authorised under the Banking Act 1979 (banks and licensed deposit-takers, which are hereafter referred to as "banks"). Following consultations with the banking community and other interested parties, the Bank is now issuing this statement of its policy. The policy has been agreed with H.M. Treasury and its implementation will fulfil, inter alia, the United Kingdom's obligation to comply with the European Communities' Consolidated Supervision Directive (1). (The supervision of financial conglomerates raises broader issues which are not addressed in this paper; the principles to be followed were set out in the answer to a Parliamentary Question on 21 January.)

   (1) Council Directive of 13 June 1983 on the supervision of credit institutions on a consolidated basis (83 350 EEC).

## Introduction

2. The Bank is committed to the principle that the supervision of institutions authorised under the Banking Act 1979 should be conducted on a consolidated basis and indeed the Bank has been carrying this out wherever banks are members of a wider group, although the particular approach adopted has inevitably depended on the nature of each group. The Bank has reviewed the way in which it conducts consolidated supervision of banks in the light of the European Communities' Consolidated Supervision Directive, the revised Basle Concordat (2), and developments in the financial system.

   (2) Committee on Banking Regulations and Supervisory Practices "Principles for the supervision of banks' foreign establishments" (Basle May 1983).

3. The terms "consolidated supervision" and "supervision on a consolidated basis" must be distinguished from the term "consolidation". "Consolidated supervision" essentially involves an assessment of the overall strength of a banking group together with an assessment of the impact on a bank of the operations of other parts of the group to which it belongs. "Consolidation" is used in this paper to mean the preparation of consolidated statistical returns covering a group, or part of a group. Consolidated supervision will often, but not always, require consolidated financial statements to be provided to the Bank.

4. The European Communities' Consolidated Supervision Directive was adopted in 1983 following consultations with the banking community. Although the Bank's previous, practice was already in line with the requirements of the Directive, there were areas where the Bank considered its procedures still needed to be developed further. The Directive itself is generally worded and only relates to subsidiaries of credit institutions which are themselves credit or financial institutions. However, the Bank believes that consolidated supervision, to be effective, needs to go some what further than the requirements of the Directive to include not only companies within a group which have

EXHIBIT 1

assets carrying a banking type risk but also, in particular cases, other companies.

5. In order to minimise duplication an possibly conflicting supervisory requirements the banking supervisors will have regard to the supervision carried out by other UK supervisory authorities. These include the Department of Trade and Industry, and a Designated Agency or a Self-Regulating Organisation under the proposals contained in the Financial Services Bill. The presumption must be that the supervisor of, for example, a securities company is the best judge of the adequacy of its capital. The Bank will to generally expect to have to make an independent quantitative assessment of the capital adequacy of group companies which are subject to detailed supervision by other UK supervisory authorities. The Bank's approach will, however, depend on the overall nature of the business of a company which is authorised to do investment or insurance business and the systems of supervision adopted by other UK supervisory authorities.

6. The Bank will not, therefore, normally require group companies undertaking an investment or insurance business and supervised by another UK supervisory body to be included within banks' consolidated statistical returns (except in relation to the country exposure return Form C1, and large exposures). Nevertheless all such companies will be included within the Bank's consolidated supervision of banking groups. To this end the Bank will wish to discuss with group management, inter alia, the organisational structure of the group as a whole and its plans for individual group companies, especially those which might have a significant impact on the financial position of the bank in the group. In addition, the Bank will maintain close relations with the supervisory bodies concerned so as to ensure that both they and the Bank are aware of significant developments in the group which may affect the companies for which they have responsibility.

7. Consolidated supervision of banks does not replace supervision on an unconsolidated basis, but is complementary to it. In some cases steps may have been taken to isolate the bank from the remainder of the group so that developments elsewhere in the group will have little, if any, effect upon it. In such a situation consolidated supervision may not serve any useful purpose.

## ▪ Objective

8. The bank will seek to examine the capital adequacy and risk concentration of banks on a consolidated basis where this is appropriate. This will include large exposures to individual borrowers, countries and other sectoral risks. At this stage the measurement of liquidity and foreign exchange exposure on a consolidated basis for all banks is not contemplated. The assessment of interest rate risk on a consolidated basis is not covered in this paper: the general subject of interest rate risk raises some complex questions which are under study. This paper sets out principles of general applicability which will govern the extent and manner in which consolidated supervision will be applied.

## ▪ Scope of consolidation

9. There are two main considerations in deciding which parts of a group should be included in consolidated statistical returns:

   i. the nature of the activities being undertaken; and

ii. the position of each company within the overall structure of the group.

In respect of those group companies which are not included in consolidated returns, the Bank will wish to obtain information separately about such individual companies which could have a significant impact on the health of the bank or banks within the group.

## ▪ Activities

10. In principle, for the purposes of supervision, figures for all companies which undertake financial business within a group or sub-group headed by a bank should be included in consolidated returns. Financial companies are easier to recognise then to capture within a straightforward definition. The European Communities' Consolidated Supervision Directive defines a financial institution as "an undertaking, not being a credit institution, whose principal activity is to grant credit facilities (including guarantees), to acquire participations or to make investments" (1). However, some other businesses not covered by this definition are financial in nature and these, and possibly others, should be included within the scope of a bank's consolidated returns. The annex to this paper lists the principal activities currently undertaken within banking groups. These may be divided into two groups:

(1) A credit institution is defined as "an undertaking whose business is to receive deposits or other repayable funds from the public and to grant credits for its own account"

a. those which should generally be included in consolidated returns unless there are special circumstances where it can be demonstrated that to do so would be undesirable or misleading; or

b. where inclusion in the consolidated returns will depend on the particular circumstances of the institution concerned.

Activities not included in the annex will need to be considered case by case.

## ▪ Group structures

11. The most important factors to consider before deciding whether inclusion of a particular company in consolidated returns is appropriate are:

i. the management structure;

ii. the size of the company in relation to the bank;

iii. the extent of any funding provided by the bank;

iv. potential calls on, or other adverse consequences for, the bank which may arise from the activities of the company.

Any one of these factors may be sufficient on its own to justify consolidation.

12. A key factor in any approach to consolidated supervision is the nature of the management control of the various companies in a group.

EXHIBIT 1

Accordingly, the Bank will normally accept for the purposes of consolidated statistical returns, and of consolidated supervision more generally, the coverage of banks' existing management and/or financial accounts, unless it has strong grounds for doing otherwise. The additional burden of consolidated supervision in terms of additional coverage and collection of statistics will therefore generally be rather limited.

13. If the companies whose activities the Bank wishes to capture in consolidated returns are all effectively managed from a particular company within a group, its approach will go with the grain of the group's own management control. Thus, if the Bank seeks consolidated statistics on this basis, the group's own management will probably also already require similar information.

14. If the Bank's approach to consolidated returns does not match the group's own management structure, the Bank will wish to discuss with the relevant group management whether the existing group control arrangements represent an acceptable basis on which to build the Bank's consolidated supervision or what mutually acceptable modifications can be devised.

15. As a general rule, all credit and financial companies owned by a bank, either directly or through intermediate holding companies, will be included in the consolidation. Sister companies owned by an ultimate non-bank parent and the ultimate parent itself will only be captured in the consolidation if there are particular reasons for doing so. The appropriate treatment in particular cases will be discussed with the management of the individual group.

16. The Bank accepts that practical considerations should determine the inclusion or exclusion of subsidiaries which do not have a significant effect on the overall picture. In some cases, banks will undoubtedly find it easier to consolidate all the companies in a group or sub-group. It is recognised that some of the companies to be consolidated will add little to the size of the balance sheet, but could have a significant impact on the profit and loss account and the reserves.

17. In some instances consolidation of a subsidiary's assets with those of its parent may not be meaningful because of significant differences in the nature of the assets and/or activities of the two institutions. In this case the companies will need to be considered separately. Although it is normally neither desirable nor appropriate to consolidate non-financial companies, the potential impact of such companies on the viability of a bank within the same group needs to be considered. The bank will not seek to extend its supervision to such companies, but it must be recognised that a major difficulty elsewhere in a widely diversified group may have some impact on the fortunes of a bank and the Bank must take account of this.

18. In conducting supervision on a consolidated basis, the Bank expects to have regular discussions with those members of the group's management who are familiar with, and have responsibility for, the overall group position. these discussions will be complementary to those held with the management of individual banks. The bank will also need to have discussions with the supervisors of companies within the group which are subject to separate supervision (for example, in respect of investment and insurance businesses).

19. Where the ultimate parent in a group is itself a bank, it is reasonable to assume that the management control starts with that company and can encompass all the subsidiaries which the Bank will wish to include within its consolidated supervision. The only issue to be considered in these circumstances is whether there are any sub-groups, incorporating

a separately authorised institution, which might be looked at separately as well as being incorporated in the overall consolidated supervision.

20. Where the ultimate parent is an overseas bank, the normal approach will be to include in the consolidated supervision only subsidiaries of the United Kingdom bank. There may, however, be circumstances where supervision on such a basis is of little real value and, subject to the terms of the European Communities' Consolidated Supervision Directive (1), need not be undertaken because of the nature of the supervision of the parent. On the other hand, there may be circumstances in which the Bank might wish to consider wider consolidation.

(1) The European Communities Directive allows supervisory authorities to forego supervision on a consolidated basis where the parent is subject to supervision on a consolidated basis by the supervisory authority of a Member State. It also provides for bilateral agreements to be reached with the authorities in non-member countries.

## Type of consolidation

21. The Bank's basic approach is to require full consolidation for all majority shareholdings in credit or financial institutions. Full consolidation of minority holdings may also be carried out where any one of the following applies:

a. the management is provided by the bank concerned;

b. the name of the bank is used and/or the bank is strongly identified with the institution;

c. there are no other substantial shareholders;

d. the associate is substantially funded by the bank.

Consolidation of a minority holding will not normally be required unless the holding is a material one in a company of significance. This will be determined on a case-by-case basis.

22. Even in cases where (a) to (d) above do not apply, the full consolidation of minority holdings in banks may still need to be considered. This is because even a relatively small shareholding in another bank may be seen to carry responsibilities which go beyond the capital invested. It is, therefore, necessary to capture this additional risk in assessing the position of a banking group. In other cases, namely where there is a good reason for the responsibilities, and therefore risks, to be limited to the shareholding, pro rata consolidation may be justified.

## Distribution of capital resources within a group

23. In determining the level of the risk assets ratios for each bank and each banking group, the Bank takes into account a range of factors which cannot be incorporated within the simple structure of risk weightings applied to assets in the calculation of risk asset ratios. these factors include, for example, the general nature of the business of a bank or banking group including the degree of diversification and the experience of management. An additional factor is the amount of capital held elsewhere in the group to which a bank belongs. The Bank also has

regard to the implications of particular group structures for banks' consolidated capital ratios.

24. In determining the balance between ratios calculated on a consolidated and unconsolidated basis for a group including a bank or banks, the following broad principles will govern the Bank's approach:

   a. Consolidated risk assets and gearing ratios will be calculated to assess the capital adequacy of the group as a whole.

   b. In assessing the adequacy, or otherwise, of consolidated capital ratios it will be necessary to examine the location of capital within the group to ensure that reliance is not being placed on surplus capital which is locked into particular countries, or indeed companies, and therefore which is not available to support the group more widely. Tax considerations are relevant, and the Bank may wish to make a notional deduction for the tax which might be payable if funds were to be transferred to another company within the group.

   c. Adequate capital ratios are required in each bank but, to avoid double counting, loans to group companies which are incorporated in the United Kingdom, and are separately authorised under the Banking Act, will be ignored. These funds will only be weighted in the company which lends them to a borrower which is not another UK incorporated group bank. (Similarly, intra-group contingent liabilities will also be excluded from the ratio calculations.)

   d. The Bank expects bank members of a group to maintain capital ratios in line with those expected of entirely independent banks undertaking the same range and scale of business. However, certain amendments to the calculation of the ratios, described in paragraphs 24(c) and 26 will be made: namely removing the double counting of certain intra-group lending and allowing non-bank subsidiaries which are effectively divisions of the parent to be included when calculating "solo" (ie unconsolidated) ratios.

25. As a matter of principle, the Bank will therefore assess and ensure capital adequacy both on a consolidated and unconsolidated basis. The Banking Act requires banks to maintain net assets which, together with other available financial resources, are considered appropriate by the Bank. However, this does not rule out the possibility that a bank may hold some of its own capital other than on its own balance sheet, particularly downstream where it is under the bank's control.

26. The Bank is prepared to consolidate certain subsidiaries in computing the "solo" ratios, specifically where all of the following apply:

   i. the subsidiary is at least 75% owned - to ensure complete control (and tax grouping) in most circumstances;

   ii. the management is undertaken by the parent company's own staff;

   iii. it is clear that there are no potential obstacles to the payment of surplus capital up to the bank, in particular taking account of overseas exchange controls, potential legal problems and taxation;

   iv. there is sufficient capital in the bank to fund the fixed assets in its own balance sheet and its investment in its own subsidiaries (this is to ensure that such assets are not funded by deposits);

v. the subsidiary is wholly funded by the bank itself.

## ▪ Large exposures

27. The bank believes that individual exposure should be monitored and controlled both at the group and the individual bank level. In a consultative paper (1) setting out proposals for its policy towards large exposures undertaken by banks, the Bank proposed a limit of 25% of capital base (2). This limit would apply, except in the most exceptional circumstances, for exposures to individual borrowers and groups of closely related borrowers which are undertaken either by a bank or a bank group. The paper also proposed that banks which are subsidiaries of other banks may be allowed to undertake exposures of up to 50% of capital base provided that, for groups headed by a UK incorporated bank, the exposure to the borrower remains overall within the 25% of capital base limits for the group and the parent bank.

(1) "Large exposures undertaken by institutions authorised under the Banking Act 1979" (July 1985)

(2) Adjusted capital base as defined in "The Measurement of Capital" 1980.

28. Following consultations with the banking industry and other interested parties, the Bank will issue a paper setting out its detailed policies (including the definition of an exposure) for the monitoring and control of large exposures. These will be applied both to the solo and consolidated positions of a bank.

## ▪ Foreign exchange exposure

29. In principle it is necessary to supervise the foreign exchange exposure of a group on a consolidated basis in addition to the exposure of an individual bank. The Bank's principal objective initially is to take account of the consolidated foreign exchange exposure in computing consolidated capital ratios rather than to monitor on a day to day basis the consolidated dealing position of a group. The Bank recognises, however, that it is often difficult to obtain all the necessary statistics to carry out a full consolidation. For the present therefore, it will concentrate on identifying all foreign exchange exposures - trading and structural - throughout a group, but will not require these to be regularly reported in the form of consolidated returns.

## ▪ Liquidity

30. The Bank recognises that group operations may be carried out in a number of markets which can differ in their legal, regulatory and institutional characteristics, in the stability of deposits and in the range of marketable instruments available to form a stock of liquid assets. A number of these markets may overlap to varying degrees, but the distinctive characteristics of each market mean that they cannot simply be aggregated. Neither a fully centralised nor a fully decentralised approach to the monitoring of liquidity is adequate for all purposes.

31. The Bank believes that the supervision of group liquidity should start from an assessment of the adequacy of liquidity by reference to each market in which a group operates, and with particular regard to the way in which management operates. Once an assessment of each market has been made, an overview can be taken on the extent to which

surplus liquidity in some markets can cover possible problems in others, and on the capacity of the central reserve (if any) to provide a breathing space in a crisis. The Bank will wish to discuss with each bank during the course of prudential interviews its liquidity position and policies on a consolidated basis. It is not intended at present to collect consolidated statistical returns for liquidity.

## Statistical issues

### Risk asset weightings

32. The weightings applied by the Bank to a bank's assets for the purpose of the risk assets ratio are set out in the Bank's paper "The Measurement of Capital". These weightings make little distinction between overseas assets of different kinds, for example, claims on governments or the private sector. Such an approach is less justifiable when considering the consolidated position of a group, a substantial part of whose capital and assets is held abroad.

33. In assessing the adequacy of capital on such a basis, therefore, differences in the risk associated with the assets held locally by each subsidiary need to be considered from the point of view of that institution rather than that of the parent company. A distinction between local and non-local assets needs to be applied to the existing weightings on calculating the risk assets of overseas subsidiaries. Accordingly, claims for example on the government of a country held by a subsidiary which is located in that country will be weighted in the same way as are claims on the United Kingdom government by a United Kingdom bank.

### Reporting requirements

34. Institutions will be required to provide consolidated data half-yearly. the consolidated returns will be additional to the unconsolidated returns already collected from banks on a monthly and quarterly basis.

35. Initially, the reporting arrangements for most institutions will require the completion of two forms - a new consolidated balance sheet (form CBS), and the existing Q7 form, which was designed for completion on either a consolidated or unconsolidated basis. At this stage the provision of data regarding foreign exchange exposure or the maturity structure of assets and liabilities will not be required on a consolidated basis.

36. The preparation of consolidated returns raises numerous technical problems of an accounting nature as the choice between alternative accounting practices, such as the valuation rules for assets and liabilities denominated in foreign currencies, can have a significant effect on the assessment of group capital. The accounting problems associated with the consolidation of overseas subsidiaries and associates may be especially acute. The bank will, therefore, with to discuss with a bank the accounting policies adopted where these could substantially effect its consolidated returns

EXHIBIT 1

## ▪ Annex Activities within Banking Groups

A Activities which will normally be included in consolidated returns:

bullion trading

business expansion funds management (1)

cheque and voucher trading

commodity broking and trading (2)

provision of executor/trustee services (1)

factoring & invoice discounting

financial/investment advice (1) (2)

hire purchase lending

house mortgage lending

insurance broking (1) (2)

investment/fund management (1) (2)

lease management (1)

leasing

money broking (1)

provision of pension services (1) (2)

securities trading (2)

securities underwriting (2)

trade finance

unit trust management (1) (2)

provision of venture/development capital

(1) It will only be appropriate to consolidate the balance sheet and profit and loss account of the management company, not the activities or funds managed.

(Premises beneficially owned and occupied by a bank but held in a subsidiary company should also be brought within the consolidation, as should subsidiaries whose only activity is to hold accrued profits, usually off-shore.)

B Activities where inclusion in the consolidated returns will depend on the circumstances of the institution concerned (3):

EXHIBIT 1

(3) These and other non-financial activities will generally only be included in consolidated returns if they are very small in relation to the balance sheet and business of the parent bank and it would be inconvenient to exclude them.

provision of computer services

diamond dealing/broking

estate agency

general insurance (2)

life assurance (2)

management services

plant hire services

property development/management

shipping agency services

travel agency services

(2) Banks' investment and insurance activities which are carried on through non-bank UK supervised subsidiaries will not normally be included in consolidated returns but will be taken into account, qualitatively, during the course of consolidated supervision.

EXHIBIT 1

BSD/1986/4
*(June 1986)*

*Notice to recognised banks and licensed deposit-takers*

# BANK OF ENGLAND

## BANKING SUPERVISION DIVISION

### The measurement of capital

1 The Bank's paper ''The Measurement of Capital'' (September 1980) describes the basis on which it assesses the capital adequacy of all UK incorporated institutions authorised under the Banking Act 1979.* One amendment has been made to this paper in that acceptances of bills drawn by non-banks, both in the UK and overseas, are weighted at 1.0 in the risk asset ratio. It was also announced in April 1985** that, as a provisional measure, underwriting obligations under note issuance facilities would henceforth be treated as a contingent liability and weighted at 0.5 in the risk asset ratio.

2 There are also a number of ways in which the system of measuring capital adequacy has been modified in practice since the broad framework of measurement was established in September 1980. One aspect was covered recently in a Notice to all authorised institutions of March 1986 (BSD/1986/2), which addressed various matters concerning subordinated debt. Certain of the other modifications are already in effect and, in most cases, they have been explained individually to the banks which are affected, in the course of the regular supervisory discussions. However, the Bank considers that it would now be helpful in the interests of consistency to explain the modifications more formally in this Notice to all authorised institutions.

### Plant and equipment financed by hire purchase and leasing

3 The Bank believes that it is necessary to clarify the treatment for capital adequacy purposes of plant and equipment financed by hire purchase and leasing where a bank is acting either as lessee or as lessor. The Bank has considered the implications of the provisions of Accounting Standard SSAP 21, which has established principles of accounting practice to be applied in the financial statements of lessors and lessees. These provisions affect banks and their subsidiaries and associates engaged in leasing business and particularly so banks which finance their infrastructure by means of finance leases.

4 In the calculation of a bank's capital ratios, plant, equipment and other fixed assets (apart from premises) are deducted in full from a bank's capital base. The Measurement of Capital paper explains that this deduction is made on the grounds that it is imprudent to deploy the depositors' funds to finance equipment needed to run the business. The Bank considers that this principle should apply wherever a bank has full enjoyment of such assets, regardless of the method used to finance them. Thus, the aquisition of all fixed assets (other than premises) under a hire-purchase contract, or the right to use an asset under a finance lease, will result in a deduction of the amount recorded as an asset on the balance sheet from a bank's capital base, because in both cases a bank can expect to employ the asset throughout its useful life in the same way as a fixed asset which it has purchased outright. An exception to this treatment is where a bank leases a fixed asset inwards and sub-leases it out, and is acting only as an intermediary between the original lessor and ultimate lessee. In this circumstance the asset may be treated as a leasing engagement for the intermediate bank as lessor, and weighted as appropriate in the calculation of its risk asset ratio.

5 The position is different where a bank lessee acquires the use of an asset under an operating lease (where the agreement is usually of a shorter period than under a finance lease). In this case the same asset is more likely to be leased to more than one lessee during

* For the purpose of this Notice, references to banks should be taken to include recognised banks and licensed deposit-taking institutions.

** The announcement was made in a Notice to authorised institutions (BSD/1985/2).

its useful life, and the lessee does not hold the asset in the same way as under a finance lease. From the viewpoint of the lessee the Bank considers that the nature of payments made under an operating lease is more akin to the payment of rent or other expenses. The Bank will therefore not make a deduction from the capital base of a bank lessee of an asset leased under an operating lease, nor will the asset be weighted in the lessee's risk asset ratio.

**6** Under current practice, assets leased out under a finance lease are given a 1.0 weight in the risk asset ratio of the bank as lessor. The Bank considers that the risks can be greater for a lessor under an operating lease. In addition to making its normal credit assessment of the lessee, the lessor will need to have knowledge of the likely residual value of the asset at the end of the first lease period and, if it is to be re-leased, the terms which might be obtained. However, operating leases where granted are akin to a bank's normal lending, and the Bank therefore believes that it would not be justifiable to treat assets leased out by banks under such leases in the same way as plant and equipment which form part of the infrastructure of the bank itself. Despite the distinction which can be drawn, the Bank will, in the interests of maintaining the simplicity of the risk asset ratio, give the same weight to assets leased out under both finance and operating leases in the calculation of the ratio.

**7** At present, all assets leased out under finance leases are weighted at 1.0 in the risk asset ratio, regardless of the status of the lessee. However, this is not consistent with the treatment of direct lending where, for example, lending to the UK monetary sector and local authorities is weighted at 0.2 and advances to the non-bank private sector are weighted at 1.0. The Bank is now bringing the treatment of leasing for bank lessors into line with that applied to lending. In future, and following the treatment outlined in paragraph 6 above, the Bank will weight assets leased out under finance and operating leases to members of the UK monetary sector, local authorities and public corporations at 0.2 in the calculation of the risk asset ratio. Since direct lending to building societies will in future also be weighted at 0.2 (see paragraph 15 below), assets leased out to such institutions will be similarly weighted at 0.2. Assets leased out under finance and operating leases to all other lessees will continue to be weighted at 1.0.

**8** The following is a summary of the treatment described in paragraphs 4-7 above.

(a) For a lessee bank under a finance lease, or a hirer under a hire purchase contract, a full deduction of the asset from its capital base (except where a bank leases a fixed asset inwards and sub-leases it out under finance lease terms, in which case the asset may be weighted in its risk asset ratio as for a bank lessor - see paragraph (c) below).

(b) For a lessee bank under an operating lease, no deduction of the asset from the capital base and no weight for the asset in calculating the risk asset ratio.

(c) For a lessor bank under a finance lease or an operating lease, a weight for the asset of 0.2 or 1.0 will be applied, according to the status of the lessee (see paragraph 7 above).

The Bank will keep under review its supervisory treatment of finance and operating leases, in the light of future developments in the leasing market.

**Redeemable shares in the capital base**

**9** The Bank's paper "The Measurement of Capital" (paragraph 11(i)) states that redeemable preference shares are treated in the same way as subordinated loan capital. This means that for capital ratio purposes such shares must have a minimum initial term to redemption of over five years (and be subject to straight line amortisation over the last five years of their life), and can only be included within a limit of one third of a bank's total capital base net of goodwill and other intangible assets.

**10** In the light of proposals put forward by banks for possible issues of redeemable preference shares, the Bank recognises that its current policy can make insufficient distinction between the different terms on which preference shares are issued or the circumstances in which such shares may be redeemed. In particular, shares may be redeemable at a fixed date in the future, or at the option of the issuer or the subscriber. In addition, the Companies Act 1985 provides that redeemable shares may only be redeemed out of distributable profits (or out of the proceeds of a fresh issue of shares made for the purposes of the redemption)*, and there may therefore be circumstances when

* However, under the Companies Act 1985 a private company may also redeem or purchase its own shares out of capital reserves in defined circumstances.

redemption cannot be made because distributable reserves are inadequate for this purpose. The Bank considers that its supervisory treatment of redeemable shares should make some allowance for these different factors.

**11** Like ordinary share capital, preference shares have two of the essential characteristics of primary capital. Firstly, they can absorb losses leaving the bank able to continue to trade. Secondly, the dividends paid on the shares can be reduced or passed so that such shares need not impose a fixed servicing cost on the issuing bank. Non-redeemable preference shares are also permanently available as capital for the issuer. Preference or other shares which provide for redemption at some future date of course cannot be regarded as permanent capital. This must be borne in mind in determining the quality of such shares as capital.

**12** Preference and other shares will be included in a bank's total capital base as follows.

(i) Non-redeemable preference shares, on the same basis as ordinary share capital.

(ii) Preference and other shares which are redeemable **only** at the option of the issuer, on the same basis as ordinary share capital **provided that** the bank undertakes to the Bank in writing that no redemption will be made without the prior consent of the Bank. (Preference and other shares redeemable at the option of the subscriber will **not** be included in a bank's capital base.)

(iii) Preference and other shares with a fixed redemption date can count as primary capital, and can be included as part of a bank's primary capital base, subject to the following conditions —

(a) the shares have a minimum initial term to maturity of over 25 years;

(b) the shares are amortised, for capital ratio purposes, on a straight line basis over the last five years of their life. Where, at the beginning of the five year period, distributable reserves are insufficient for the shares to be redeemed at the redemption date, the Bank will wish to discuss with the issuer the scale of amortisation to be applied.

(c) the amount of the shares which can be counted as part of the capital base will be included within the same limits as those applying to perpetual subordinated debt (paragraphs 15-17 of the Bank's Notice BSD/1986/2 of March 1986). Where such shares are included in a bank's capital base, they will therefore alter the amount of perpetual and/or term subordinated debt which can also be counted as part of the total capital base.

Where preference and other shares with a fixed redemption date do not meet the conditions mentioned above, they are included in a bank's total capital base on the same basis as ordinary subordinated loan capital.

**Buying-in of (or reduction in) own share capital**

**13** Under the Companies Act 1985 a company limited by shares or limited by guarantee and having a share capital may make a purchase of its own shares where, inter alia, it has been granted the necessary authority to do so by its shareholders. However, in all cases where a bank is granted such an authority, or in other cases where such an authority is not required under the Companies Act 1985, the prior consent of the Bank should be obtained before a purchase of, or reduction in, own shares takes place. Before giving its consent the Bank will wish to ensure that a bank's capital adequacy will be maintained after the purchase or reduction is made, since the effect will be to reduce the amount of share capital (and therefore, possibly, loan capital) which can be included in its total capital base.

**Bills**

**14** The Measurement of Capital paper (Appendix A, item (iii)) states that all bills other than UK and Northern Ireland Treasury Bills are weighted at 0.2 in the calculation of the risk asset ratio. Bills issued by local authorities and public corporations, and bills irrespective of the issuer where they have been accepted by any UK monetay sector institution, will continue to receive a weight of 0.2. However, other bills - which for the purpose of the risk asset ratio includes trade bills, promissory notes, other UK paper (including sterling commercial paper) and overseas bills - are now weighted at 1.0, to correspond with the weight given to direct lending to issuers of such paper.

**Lending to building societies**

**15** At present, lending to building societies falls within "Other loans and advances" for the purpose of calculating the risk asset ratio and is ascribed a weight of 1.0 (the Measurement of Capital paper, Appendix A, item (v)). However, the Bank considers that it would be more appropriate to accord a lower weight to lending to building societies, in line with that given to loans to the UK monetary sector. The Bank will therefore in future weight all claims on building societies at 0.2 in the risk asset ratio, except for holdings of floating rate notes or other paper issued by building societies with an original maturity of one year or more. Such holdings will be treated in the usual way as investments and weighted at 1.0 or 1.5, according to whether or not they are freely marketable.

**Statistical reporting**

**16** A statistical notice to all reporting institutions which is being issued today explains the consequences of these changes.

EXHIBIT 1

- # BSD/1987/1 Large Exposures Undertaken By Institutions Authorised Under the Banking Act 1987 (September 1987)

Large Exposures Undertaken By Institutions Authorised Under the Banking Act 1987

(September 1987)

## I INTRODUCTION

0. This notice sets out the policy of the Bank of England ("the Bank") towards large exposures entered into by institutions ("banks") authorised under the Banking Act 1987 (the "Banking Act") (1). As required by section 38 of the Banking Act this Notice (2) also sets out the principles by which the Bank will determine whether and the extent to which, a UK incorporated bank has an exposure which must be notified to the bank within the terms of that section. Section 38(1) of the Banking Act (3) requires UK-incorporated banks to make a report to the Bank if:-

hh. it has entered into a transaction or transactions relating to any one person as a result of which it is exposed to the risk of incurring losses in excess of 10% of its available capital resources; or

ii. it proposes to enter into a transaction or transactions relating to any one person which, either alone or together with a previous transaction or previous transactions entered into by it in relation to that person, would result in its being exposed to the risk of incurring losses in excess of 25% of those resources.

(1) Other than:-

(i) discount houses the policy for which is set out in a paper which is being circulated to the institutions concerned

(ii) banks whose sole function is to operate a money fund or similar facility. The exposures of such banks are considered separately outside the terms of the policy set out in this notice.

(2) Together with the detailed reporting instructions for the completion of the large exposures reporting forms.

(3) See Appendix I it should be noted that S 38(9) of the Banking Act states that an institution which fails to make a report as required by that section shall be guilty of an offence, and (S 38(10)) liable on summary conviction to a fine.

This requirement also applies where:-

the transaction or transactions relate to different persons if they are connected in such a way that the financial soundness of any of them may affect the financial soundness of the other or others or the same factors may affect the financial soundness of both or all of them [section 38(2) of the Banking Act].

1. The Banking Act's notification requirements relate only to a UK incorporated bank's large exposures which are either undertaken by the bank itself or, at the discretion of the Bank, the bank together with its

EXHIBIT 1

subsidiary or subsidiaries (4). The Bank is however also concerned in the course of its on-going supervision of banks with large exposures in a banking group defined more widely than allowed for by the Act, and exposures entered into by UK branches of overseas banks. The principles set out below (including the definition of an exposure) will therefore also be applied to banking groups, and UK branches of overseas banks (5).

(4) Paragraph 7(ii) of this notice sets out the circumstances in which subsidiaries of a bank may be consolidated for this purpose.

(5) In the case of the latter however, the bank measures exposures in relation to the balance sheet of the branch rather than the capital of the bank as a whole.

2. The large exposures policy is concerned with the size relative to a bank's capital of a bank's individual exposures to credit risk - the risk that claims on others may not be redeemed at the due date because of the inability of the counterparty to meet his obligations. The policy takes into account the form of the exposure (so as to reflect, for example, the actual amount at risk rather than the nominal amount in the case of certain interest rate and foreign exchange rate instruments) and the nature of the counterparty (thus exposures to banks are treated differently from those to non-banks).

3. The Bank's approach to large exposures takes into account the particular characteristics of individual banks, including the nature of their business and the experience of their management. A level of exposure in relation to capital which might be considered prudent for one bank may not be so for another. In particular, although 10% of capital base (6) has been chosen generally as the cut-off level for reporting, purposes, for some banks the Bank will determine it prudent to set a lower percentage. (7)

(6) The Banking Act (section 38) refers to 'available capital resources'. The Bank has determined that available capital resources should be represented by a banks capital base.

(7) In determining the acceptability of a large exposure the Bank will also take into account the number of a bank's large exposures.

4. The remainder of this notice is ordered as follows:-

| | |
|---|---|
| II | Coverage |
| III | Definitions<br><br>hh. An exposure<br><br>ii. Capital base<br><br>jj. Individual (and groupings of closely related) non-bank counterparties |
| IV | Banks' policy statements |
| V | Underwriting exposures |
| VI | Exposures to individual non-bank counterparties |
| VII | Exposures to counterparties connected to the reporting bank |
| VIII | Exposures to banks |
| IX | Exposures to countries |

EXHIBIT 1

| | |
|---|---|
| X | Exposures to economic sectors |
| XI | Exposures undertaken by banks which are subsidiaries of other banks |
| XII | Exposures undertakend by UK branches of overseas banks |
| XIII | Additional capital requirements covering a banks's large exposures |
| IV | Pre-notification reporting requirements in the case of exposures exceeding 25% of capital base |
| XV | Transitional arrangements |
| APPENDIX 1 | Section 38 of the Banking Act |
| APPENDIX 2 | Definition of capital base. |

## II COVERAGE

6. Exposures of UK incorporated banks will be considered, and will require to be reported on both an unconsolidated (solo) and consolidated basis. Exposures calculated on an unconsolidated basis are required to be reported quarterly and those calculated on a consolidated basis six monthly. Exposures will be considered in relation to the capital base (1) of the reporting bank and where appropriate, its capital base calculated on a consolidated basis.

   (1) See paragraphs 19 and 20 below.

7. Included within the coverage of a bank's unconsolidated returns are:-

   . all of its branches (including overseas branches); and

   i. any subsidiaries the Bank has agreed in writing may be consolidated for the purpose of the reporting bank's solo (ie unconsolidated) capital ratio in accordance with the principles set out in the Bank's notice on consolidated supervision (2). The reporting bank's exposures to such subsidiaries will not be separately assessed nor require to be reported.

   (2) "Consolidated supervision of institutions authorised under the Banking Act 1979" BSD/1986/3 (paragraph 26).

8. In assessing a bank's exposures on a consolidated basis the companies to be consolidated with the bank (which may include sister companies, and holding companies as well as subsidiaries) will be agreed by the Bank in accordance with the principles set out in the Bank's notice on consolidated supervision (3). Where these principals determining that a sub-group of a banking group should be separately assessed (including a requirement for separate consolidated returns to be provided) a bank's large exposures will also be assessed on that basis.

   (3) ibid (paragraphs 9-20). It should be noted (paragraph 6 ibid) that the coverage of a bank's consolidated large exposures returns includes group companies supervised by another UK supervisory body.

9. A bank which is a branch of an overseas bank is also required to report its large exposures. The Bank's policy (set out in paragraph 60 below) towards large exposures in branches of overseas banks takes into account the need for such exposures to be assessed in relation to the capital and exposures of the bank as a whole as well as to the balance sheet of the branch.

EXHIBIT 1

10. The Bank recognises that it may be difficult to obtain information on large exposures from some overseas branches or overseas companies within a group and that in certain cases there may be legal obstacles to branches and companies providing the information. The Bank will wish to discuss such difficulties with individual banking groups.

## III DEFINITIONS

(a) An exposure (1)

(1) Exposures entered into by banks as trustees are not covered by S38 of the Banking Act nor by the policy described in this notice.

11. A large exposures policy is concerned with concentrations of risk. It is therefore appropriate that the measure of exposure should reflect the maximum loss should a counterparty (2) fail. Consistent with this principle an exposure for the purpose of the large exposures policy encompasses the amount at risk arising from the reporting bank's:-

(2) See paragraphs 21 to 28 below.

. claims on a counterparty including actual claims, and potential claims which would arise from the drawing down in full of undrawn advised facilities (whether revocable or irrevocable, conditional or unconditional) which the bank has committed itself to provide, and claims which the bank has committed itself to purchase or underwrite; and

i. contingent liabilities arising in the normal course of business, and those contingent liabilities which would arise from the drawing down in full of undrawn advised facilities (whether revocable or irrevocable, conditional or unconditional) which the bank has committed itself to provide; and

ii. assets, and assets which the bank has committed itself to purchase or underwrite, whose value depends wholly or mainly on a counterparty performing his obligations, or whose value otherwise depends on that counterparty's financial soundness but which do not represent a claim on the counterparty. (3)

(3) This category includes, principally equities and equity warrants which do not represent a claim on the issuer but whose value depends, inter alia on the issuer's financial soundness.

12. The amount of risk under paragraph 11(i), (ii) and (iii) above will be taken as the full amount (book value) of the reporting bank's claims and contingent liabilities to potential claims and liabilities in the case of undrawn facilities (4) unless stated otherwise in the detailed reporting instructions issued by the Bank for the completion of the large exposures returns.

(4) It may be the practice for a bank or banking group to have sub-limits within an overall facility limit for the different types of business or to be advised by different branches or subsidiaries of the bank. These sub-limits may total more than the overall facility limit in such cases the exposure is taken as the overall facility limit rather than the aggregate of the sub-limits provided that the bank or banking group concerned has satisfied the Bank that its systems are adequate to ensure that its actual exposure is at all times contained within the overall limit.

For:-

EXHIBIT 1

. underwriting commitments

the amount at risk, in the case where a bank has underwritten an issue of securities (equities or bonds), should be measured as its credit equivalent amount (5). For:-

i. interest rate contracts (including interest rate swaps, forward rate agreements and interest rate options purchased); and

ii. foreign exchange rate contracts (including cross currency swaps, forward foreign exchange contracts and foreign exchange options purchased)

the basis of measurement is yet to be determined.

(5) The method of calculation is set out in section V.

13. In the case where an asset is being traded, claims on the counterparty to the transaction which occur whilst the transaction is in the course of settlement do not constitute an exposure falling within the large exposures policy. Such claims arise either after payment has been made but before an asset is delivered, or before payment has been received but after an asset has been delivered. However, claims on a counterparty which arise from the failure of the counterparty to settle within 7 days after the due date are deemed to constitute an exposure and are therefore required to be reported.

14. A counterparty's failure to settle may also involve a bank in loss even where the bank itself may not have settled. This potential loss, which represents the net cost of replacing the counterparty in a proposed transaction, is also deemed not to be an exposure falling within the scope of the large exposures policy (1).

(1) Except in the case of interest rate and foreign exchange rate agreements (see paragraph 12 above).

15. Although exposures arising from settlement risk are not presently included within the scope of the large exposures policy the control of such exposures needs to be carefully considered by banks. Inadequate controls could be a cause of substantial loss for a bank. The Bank will therefore pay particular attention during the course of its supervision to how individual banks control such risks.

16. In calculating a bank's exposure from its securities trading operations a bank's exposure is calculated as its net long position in a particular security (a short position in one security issue does not qualify to be offset against a long position in another issue made by the same issuer). The exposure is reportable as an exposure to the issuer.

17. It may be impractical for some banks to introduce systems which would enable them to calculate their exposure (in accordance with the definition of an exposure set out in this section) to individual counterparties at all times. Such banks, which will usually have an extensive branch network or group structure, will typically have adopted a system of limits which are allocated to individual branches or group companies but which ensure that the overall exposure to a counterparty is controlled. For such banks the Bank may agree that, for the purpose of post notification, the maximum exposure to a counterparty occurring during a reporting period is not required to be reported; but they will be required to report their actual exposure at the reporting date and the control limit for that counterparty if either exceeds 10% of their capital base. The bank must have satisfied the Bank that it can control the size of its exposures through the adoption and allocation of counterparty

EXHIBIT 1

limits. The Bank will need to be satisfied that the bank's control systems are such that its exposure to a counterparty may reliably be taken as being no higher than its adopted limit for that counterparty.

18. The reporting instructions, which include the detailed definition of an exposure, may be amended from time to time in order, inter alia, to take into account new forms of risk-taking activities undertaken by banks and changes in market practice.

(b) Capital Base

19. The definition of the capital base is that used for calculating a bank's risk asset ratio with the exception that a bank's holding of another bank's capital is not deducted. The components of the capital base are set out in Appendix II (2).

(2) A full description of the components of the capital base os set out in the Bank's paper. The Measurement of Capital (September 1980) as amended in respect of perpetual debt by the Bank's notice of March 1986 (BSD/1986/2) and in respect of preference shares by the Bank's notice of June 1986 (BSD/1986/4).

20. Banks require a firm figure for their capital base against which they can operate, and the Bank can monitor, their large exposures policies. Therefore the figure for the capital base to be used for this purpose will be agreed by the Bank with the reporting bank on the basis of the bank's audited balance sheet for the latest financial year. The Bank will, however, adjust this figure for new issues of capital during the course of the year and take account of other major changes to the capital base, either upwards or downwards. In either circumstance the amended figure will be agreed with the bank and advised to it in writing.

(c) An individual non bank counterparty and a group of closely related non bank counterparties (3)

(3) The term ‘individual non-bank counterparty’ is subsequently used in this notice to include ‘groups of closely related non bank counterparties’.

21. Exposures are required to be reported and controlled according to the nature of the counterparty (4). For this purpose an individual non-bank counterparty comprises natural and legal persons and includes individual trusts, corporations, unincorporated For further information about the European Regulatory Library, contact Technical Indexes on businesses (whether as sole traders or partnerships) and non-profit making bodies.

(4) The counterparty to an exposure will as a rule be the borrower (customer), the person guaranteed or the issuer of a security in certain cases where the bank has based a credit decision solely (or very largely) on the strength of a guarantee from a third party the exposure may qualify to be reported as an exposure to the guarantor.

22. Exposures to local governments, public corporations and other public sector entities will be generally included within the large exposures policy as exposures to individual non-bank counterparties. An exposure to such a body, whether resident in the United Kingdom or overseas, will however be considered as an exposure to a central government where either -

. the central government has guaranteed all that body's liabilities; or

EXHIBIT 1

i. the central government has guaranteed the exposure and the guarantee is in an acceptable form.

23. In the case of a guarantee under paragraph 22(ii) above the guarantee should be explicit and unconditional, and, in particular should not depend upon the bank meeting or continuing to fulfil its contractual obligations to the counterparty in respect of the exposure, or performance conditions laid down by the guarantor being met either by the bank or the public sector body. Exposures covered by this provision will usually be in the form of market issues made by public sector bodies such as major public utilities which are in effect raising finance on behalf of a government.

24. Whether public sector exposures meet the criteria set out in paragraphs 22 and 23 above will be determined on a case by case basis. (1)

(1) For exposures covered by ECGD bank guarantees see paragraph 38 below.

25. Individual non-bank counterparties exclude overseas central governments. Exposures to overseas central governments will be considered in the context of exposures to countries [see paragraph 53 below (2)].

(2) The Bank will however require such exposures to be reported to it.

26. A group of closely related non-bank counterparties exists where individual non-banks "are connected in such away that the financial soundness of any of them may affect the financial soundness of the other or others or the same factors may affect the financial soundness of both or all of them" (3). In such cases the exposure to these individual non-banks should be aggregated and considered as a single exposure to ‘a group of closely related non-banks’.

(3) S38(2) of the Banking Act.

27. It is not possible to give a comprehensive list of the different types of relationship between individual counterparties which it is reasonable to consider as giving rise to a common risk and therefore which constitutes a group of closely related non-banks. However the detailed reporting instructions identify some illustrative relationships which, prima facie, qualify to be considered in this way.

28. Where there is doubt in a particular case whether a number of individual counterparties constitute a group closely related non-banks or where, notwithstanding that the relationship between a number of counterparties identified in the reporting instructions exist, the counterparties do not share a common risk the circumstances should be discussed with the Banking Supervision Division to determine how the exposure(s) should be reported.

## IV BANKS' POLICY STATEMENTS

29. The Bank requires each bank to set out its policy on large exposures, including exposures to individual customers, banks, countries and economic sectors, in a policy statement. In the case of UK incorporated banks, this policy should be formally adopted by the bank's board of directors. Moreover, the Bank expects banks not to implement significant changes in their policies without prior notification to, and discussion with, the Bank. Significant departures from a bank's stated policy, in particular those involving breaches of the agreed levels, will lead the Bank to consider whether the bank continues to meet the statutory minimum criteria for authorisation.

EXHIBIT 1

30. The necessary control systems to give effect to a bank's policy on large exposures must be clearly specified and monitored by its board. The Bank will discuss the effectiveness of the control systems in operation during the course of its on-going supervision of banks. The maintenance of adequate accounting and other records and internal control systems throughout a bank's business is an explicit requirement for authorisation under the Banking Act. The Bank will require banks to obtain reports from reporting accountants (normally their auditors) on whether the records and systems meet the Bank's requirements (1). The Bank will, as part of a rolling programme of examinations, require reporting accountants to pay particular attention to the systems for the control and reporting of large exposures.

(1) The Bank' s requirements are set out in a notice "Guidance note on accounting and other records and internal control systems and reporting accountants' reports thereon" (BSD/1987/2)

September 1987.

## V UNDERWRITING EXPOSURES (2)

(2) This section deals only with the underwriting (both lead underwriting and sub-underwriting) of discrete issues of securities. The special treatment for underwriting set out in this section does not extend to any commitments of a continuing or revolving nature.

31. The risks involved in underwriting differs substantially from those involved in ending activities typically undertaken by banks. The likelihood of a bank experiencing a loss from an underwriting commitment is related to the risk of actually having to take up the securities, possibly leading to a subsequent forced sale. Although there is an element of credit risk this is generally low. The former risk is affected by the type of underwriting commitment, and forced sale risk by the nature of the security underwritten. For these reasons the amount at risk on an issue is more reasonably measured in the context of a large exposures policy by some proportion of the amount underwritten rather than by the full amount of the issue. In addition, the Bank recognises that more flexibility is warranted in assessing underwriting proposals which must be notified to it before being entered into.

32. The Securities and Investments Board (‘SIB’) and The Securities Association (‘TSA’) have proposed (3) capital requirements for underwriting positions which reflect an assessment of the relative risks in different types of underwriting deals and different types of securities. These capital requirements (or as subsequently amended) provide a basis for determining the proportions of the amount underwritten to be considered at risk (the 'credit equivalent' amount) for the purpose of this policy. Where a bank has taken a position by underwriting a securities issue, the credit equivalent amount (which should be calculated intra-day including the first day of issue) will be the SIB/TSA's capital requirement (4) for that position multiplied by ten (5). It should be noted that the SIB/TSA's capital requirements can vary during the course of an underwriting and the credit equivalent amount may consequently also vary. A more detailed note setting out the basis of this system of measurement will be available to banks which undertake underwriting transactions.

(3) ‘Proposals for position risk capital requirements’ (Part 4) July 1987.

(4) More formally the IPRR (Investment Position Risk Requirement).

(5) However (i) where these capital requirements do not reflect a

EXHIBIT 1

reduction from the SIB/TSA's normal PRFs (Position Risk Factoral or a reduced requirement for the initial period of an underwriting or for an initial period after entering into an underwriting commitment, the initial PRF should be assumed to have been applied for that period (iii) where securities are taken up be a bank under an underwriting commitment the exposure should be taken as their book value.

33. The SIB/TSA's proposals permit the netting of amounts sub-underwritten from the underwriting commitment. This may be done in calculating the credit equivalent amount for the large exposures policy.

34. Where the credit equivalent amount of an underwriting (6) exceeds 10% of the reporting bank's capital base the bank is required to report it as an exposure in the same way as for other forms of exposure. Where the credit equivalent amount of a proposed underwriting (6) exceeds 25% of capital base the exposure is also required to be notified to the Bank before the commitment is entered into. The Bank will seek to minimise the time it takes to assess whether an underwriting exposure which, as measured, exceeds 25% of capital base, is prudent, by agreeing general guidelines with each bank which undertakes this business. Where such a guideline has not been agreed, the minimum prior notification period will be as set out in Section XIV below.

(6) Together with other exposures the bank may have to the same counterparty.

- # VI EXPOSURES TO INDIVIDUAL NON-BANK COUNTERPARTIES

35. Each bank will be expected to justify to the Bank its policy on exposures to individual counterparties, including the maximum size of an exposure contemplated, and to satisfy the Bank that excessive risks are not being undertaken. Relevant factors which the Bank will expect a bank to have taken into account when setting its policy and considering the acceptability of particular exposures include, for example, the standing of the counterparty, the nature of the bank's relationship with the counterparty, the nature and extent of security taken against the exposure, the maturity of the exposure, and the bank's expertise in the particular type of transaction. Exposures to counterparties connected with the bank - for example, subsidiaries or sister companies or companies with common directors - will continue to be particularly closely examined. (Exposures to counterparties connected to the reporting bank are considered in section VII)

36. Exposures which exceed 10% of a bank's capital base are required to be reported (1). The more an individual exposure exceeds 10% the more rigorous the Bank will be in requiring a banks management to justify that exposure. Most banks are not expected, however, to adopt policies which lead to 10% being exceeded as a matter of course.

(1) As explained in section 1 above this figure may be set at a lower level for individual banks.

37. The Bank does not expect exposures to an individual counterparty to exceed 25% of a bank's capital base other than in the most exceptional circumstances.

38. While the Bank will take security into account when considering the acceptability of a bank's exposures up to 25% of its capital base, the presence of security taken on its own will generally not be considered by the Bank as an acceptable reason for an exposure to exceed 25%.

EXHIBIT 1

However, where the security fully covers the exposure and is in the form of British Government Stock ('BGS'), cash deposits held with the lender or an ECGD bank guarantee the existence of that security will be considered as sufficient justification for an exposure to exceed 25% of the bank's capital base (see also paragraph 63 below). In the case of:-

. an exposure secured by BGS the lender's legal title to the security should be fully protected and the BGS should be located in the same legal jurisdiction as the exposure. An appropriate margin over the amount of the exposure should be maintained to cover fluctuations in the market value of the securities. The margin should inter alia reflect the maturity of the exposure, and the arrangements for marking to market the security and for ensuring that any result deficiency in the margin is made up;

i. an exposure secured by a cash deposit, the lender's legal title to the deposit should be fully protected and the deposit should be located in the same legal jurisdiction, and have identical or longer maturity than the exposure. Where the cash deposit is in a different currency from the exposure an appropriate margin over the amount of the exposure should be maintained to cover fluctuations in the relevant exchange rates. The margin should, reflect the arrangements for ensuring that any resultant deficiency in the margin following an exchange rate change is made up;

ii. an exposure secured by an ECGD bank guarantee, the Bank will require to be fully satisfied that the reporting bank has sufficient expertise and systems in place to ensure that its obligations under the guarantee are met fully (2).

(2) Unless the Bank has notified the reporting bank that it is fully satisfied in this respect such exposures are not expected to exceed 25%.

## ▪ VII EXPOSURES TO COUNTERPARTIES CONNECTED TO THE REPORTING BANK

39. Exposures to companies or persons connected with the lending bank, its managers, directors or controllers require to be given particular consideration since the decision to undertake such exposures may be influenced by subjective considerations which prevent a proper credit assessment of the bank's counterparty from being carried out. Such exposures can be justified only when undertaken for the clear commercial advantage of the lending bank, and when it is negotiated and agreed on an arm's length basis.

40. It is recognised that lending can be "connected" in many different ways, and that each such exposure, therefore, requires to be considered individually.

41. Exposures to subsidiaries which are regarded, within the Bank's policy on consolidated supervision, as, in effect, divisions of the parent bank (1), and are consolidated with the parent bank in the calculation of the bank's capital ratio on a solo basis, are excluded from the scope of the large exposures policy.

(1) The consolidated supervision paper (paragraph 26) sets out the

EXHIBIT 1

criteria for determining which subsidiaries may be treated as divisions of the parent bank viz(i) the subsidiary should be at least 75% owned (ii) the management should be provided by the parent bank, (iii) there should be no obstacles to the payment of surplus capital up to the parent, (iv) there should be sufficient capital in the bank to fund the fixed assets in its own balance sheet and its investment in the subsidiary, and (v) the subsidiary should be wholly funded by the bank.

42. Exposures to group companies which are themselves authorised under the Banking Act other than one which controls, directly or indirectly, the lending bank, will be generally considered on a case by case basis.

43. In respect of exposures to other group companies the Bank's policy allows a bank to take on a treasury role on behalf of the group as a whole. Although by borrowing in order to on lend to group companies a bank will increase its exposure to those companies, a centralised treasury operation which is properly conducted may reduce the overall risks for the bank and bank group as a whole. Thus the central treasury function of a bank in a group strengthens the bank's control over the operations (including risk taking) of the other group companies and facilitates the efficient management of group finance so as to reduce financing costs.

44. Thus where it is considered by the Bank appropriate for a bank to undertake a group treasury role, exposures of a maturity of up to one year to:-

. group non-bank financial (2) companies (3) included in the bank's (or its UK parent bank's) consolidated supervisory returns;

(2) The definition of 'financial' is set out in paragraph 10 of the Bank's notice BSD/1986/3 and the annex to that notice (The definition embraces activities listed in A of the annex but other activities may be considered as qualifying if appropriate).

(3) Which may include sister companies as well as subsidiaries.

i. group companies supervised by another UK financial supervisor;

ii. a group company authorised under the Banking Act which controls directly or indirectly the lending bank; and

iii. connected overseas banks

will be reviewed with the bank's management. Appropriate levels for such exposures will be agreed on a case by case basis (see also paragraph 62 below). It will be for the bank to satisfy the Bank that it should fulfil such a role and has appropriate management and other group control systems in place to ensure that risk-taking in those group companies is properly monitored and controlled.

45. Exposures to group banks, financial and non-financial companies, not covered by paragraphs 41 to 44 above will be aggregated and considered as an exposure to an individual non-bank counterparty.

46. Exposures to connected gilt-edged market makers and Stock Exchange money brokers will be treated in the same way as exposures to banks for the reasons set out in paragraph 52 below.

EXHIBIT 1

47. Other forms of connected exposure, in particular, to companies with which directors are associated, will be considered on a case by case basis. Where the link with the connected company is fairly remote, for example, where a non-executive director of a large bank is a director of the borrowing company, the exposure may be considered as acceptable up to the normal level for that bank. If, however, there is a particularly close connection, the exposure will be aggregated within the 25% level for connected lending set out in the preceding paragraph.

48. The Bank will continue to examine particularly closely all exposures to companies or persons connected to a lending bank and will continue to deduct them from the bank's capital base if they are of the nature of a capital investment or are made on particularly concessionary terms.

## ▪ VIII EXPOSURES TO BANKS

49. The Bank will review with each bank at least once a year its policy on, and limits for, lending to other banks, including banks overseas. In addition, a bank's large exposures to other banks will require to be reported quarterly to the Bank. Although the Bank will not apply common maximum percentages to interbank exposures with a maturity of 1 year and under, all such exposures of more than 10% of capital base will be monitored. Exposures of over 1 year maturity to banks will be considered in the same way as exposures to individual non bank counterparties. In considering the acceptability of an exposure to a bank, account will be taken of exposures to counterparties connected to that bank.

50. The difference in treatment between short-term inter-bank exposures and non-bank exposures is justified because short-term lending to banks is normally liquid and loans of this kind are generally likely to involve a lower degree of risk than lending to other borrowers. For smaller banks, depositing large amounts with major banks will often be an entirely prudent way of employing depositors' funds. Lending short-term to banks, however, involves some risk. The bank will therefore, expect banks to adopt appropriate policies covering all their exposures to banks.

51. The risks arising from some forms of exposure which may be nominally short-term may, however, be significantly different in degree from the risks involved in traditional short-term interbank lending. The Bank will expect banks to take account of different types of exposure when considering their limits for other banks and, if necessary, to set separate sub-limits.

52. For the purpose of its policy on large exposures, the Bank will treat exposures to gilt-edged market-makers and Stock Exchange money brokers in the same way as interbank exposures (1). Such treatment is justified because of the nature of the markets in which the forms operate and their role in these markets.

(1) Overseas central banks other central monetary institutions, and state owned banks, are also considered as banks except that exposures to such counterparties will be considered as exposures to central governments where guarantee arrangements are in place which meet the same qualifying criteria as apply for public sector bodies (see paragraphs 22 and 23 above).

EXHIBIT 1

## ▪ IX EXPOSURES TO COUNTRIES

53. The Bank does not believe that a common guideline exposure limit should be applied to banks' exposures to countries; nor does it consider it appropriate to publish guideline percentages for the acceptable level of exposure to particular countries. Banks will, however, be expected to set limits for country exposures on the basis of their own risk assessments. The nature of the exposure (for example, whether it is trade finance or longer term balance of payments finance) will be relevant in considering an acceptable level of exposure. The Bank will continue to monitor closely banks' country risk exposures, and discuss them with banks' managements. Banks and banking groups will continue to be required to report their country exposures on the S1 (claims), S2 (claims) and C1 forms. Branches of overseas banks will continue to be required to report their country exposures in the B1 form. Banks will also be required to report separately any exposures to central governments other than HMG (2) which exceed 10% of their capital base.

(2) For a UK bank or UK banking group, exposures to HMG are not considered to carry risks which fall within the scope of the large exposures policy.

## ▪ X EXPOSURES TO ECONOMIC SECTORS

54. The extent to which a bank may be prudently exposed to a particular industrial sector or geographical region will vary considerably depending upon the characteristics of the bank and the sector or region concerned. Sectors and regions are difficult to define and the definitions for one bank may not be appropriate for another. The Bank will not therefore apply common maximum percentages to banks' sectoral exposures. At present, banks which report monthly provide an analysis of their lending and acceptances to UK residents based upon the Standard Industrial Classification (Form Q3). These analyses, which do not cover all exposures, arecarried out for general statistical purposes and continue to be required (together with Form Q1 which provides information on the basis of the sectors used for National Accounts purposes). In addition some banks report for supervisory purposes largely on the basis of the sectoral classification used for their own management reports.

55. The Bank will continue to monitor banks' exposures to sectors and regions and will wish to discuss with all banks their internal monitoring systems and the appropriateness of the sectors identified in their internal management reports. The Bank will wish to ensure that banks have prudent lending policies which take into account the dangers from over-exposure to particular economic sectors both within the United Kingdom and worldwide. the same applies to regional concentrations. Such policies will need to be adjusted from time to time in order to take account of changing market conditions and economic trends, the Bank will wish to obtain information on sectoral and regional exposures from banks' internal monitoring systems but the Bank does not intend to introduce a new standardised reporting system for all banks.

EXHIBIT 1

# ▪ XI EXPOSURES UNDERTAKEN BY BANKS WHICH ARE SUBSIDIARIES OF OTHER BANKS

56. When a bank is a subsidiary of another bank (1), the bank may be prepared to accept a policy on large exposures to individual borrowers unconnected with the bank which allows exposures which exceed 25% of the subsidiary bank's capital base. However, the Bank considers that such subsidiaries should take on exposures exceeding 25% of their own capital base only if they are entered into within the terms of a policy agreed by the parent bank and provided that there are entered into within the terms of a policy agreed by the parent bank and provided that there are arrangements (2) in place acceptable to the Bank for the parent bank to protect the subsidiary should the exposure become non performing or require to be written off. The Bank will require written confirmation from the parent bank that the exposure is retained in the subsidiary's balance sheet at the parent banks request in order to meet group objectives and will need to be satisfied as to the nature of the exposure concerned. These requirements recognise that it may be the policy in some bank groups to concentrate particular types of lending or other facilities in one subsidiary.

    (1) The definition of 'subsidiary' will normally be that used in the Companies Act 1985 (section 736) but the Bank may be prepared to extend the definition to banks which are otherwise effectively controlled by another bank and where the latter has undertaken to stand fully behind the related bank. The Bank does not intend that the concession should apply to consortium banks unless there is one major shareholding bank which can be said effectively to control the consortium bank and which is prepared to stand fully behind it as if it was its own subsidiary.

    (2) An acceptable arrangement should prevent a bank's capital from becoming deficient as a result of experiencing a loss on such an exposure. It may take a number of forms and may where appropriate include for example a formal guarantee or refinancing agreement to cover the whole of the exposure or an undertaking to make up any resultant deficiency in the subsidiary's capital. The arrangement should be legally enforceable by the subsidiary.

57. In the case of authorised bank subsidiaries of UK banks, in order for an exposure exceeding 25% of capital base to be acceptable in the subsidiary bank, the parent bank must at all times have room to take over the exposure without itself exceeding the 25% of capital base level. Also the total exposure of the bank group to the customer must be within 25% of the group's capital base. The Bank will need to be satisfied that adequate control systems are in place to ensure that counterparty risk taken in the group as a whole is properly monitored and controlled.

58. In the case of authorised banks which are subsidiaries of overseas banks the Bank will wish to agree with the supervisory authority of the parent bank the size of exposures which can be undertaken by the subsidiary within the terms of this policy. It will also require written assurance from the overseas supervisor that he is content for the subsidiary to undertake the level of exposure in question. In agreeing, the level for the subsidiary the Bank will take into account the degree and extent of the consolidated supervision of the banking group exercised by the parent supervisory authority.

EXHIBIT 1

59. Overseas bank subsidiaries of UK banks will be expected to conform to the regulatory requirements of the country in which they are located. The Bank's policy on large exposures applies directly only to banks authorised under the Banking Act and to UK banking groups taken as a whole, including their overseas subsidiaries and associated companies. But as a part of its consolidated supervision of banking groups, the Bank will continue to identify subsidiaries other than UK banks within the group which undertake significant exposures in order to monitor large exposures within the group overall.

## ▪ XII EXPOSURES UNDERTAKEN BY UK BRANCHES OF OVERSEAS BANKS

60. Large exposures can only properly be assessed by the supervisor in relation to the capital and the exposures of the bank as a whole. It is accepted that it is the home supervisor's responsibility to carry out such an assessment. Knowledge of large exposures in a branch is, however, important for a host supervisor, particularly, but not solely, in order to carry out a full assessment of the branch's liquidity. The Bank therefore wishes to continue to examine and discuss with the management of each branch its largest exposures measured in relation to the balance sheet of the branch and reserves the right to discuss with the home supervisory authority the size of exposures undertaken by the UK branch. The Bank will also give particular consideration to the exposure of branches of overseas banks to the country of incorporation of the bank.

## ▪ XIII ADDITIONAL CAPITAL REQUIREMENTS COVERING A BANK'S LARGE EXPOSURES

61. Where a UK incorporated bank has a number of exposures to a non bank counterparty of more than 10% of capital base the Bank will generally require higher capital ratios to be maintained than would otherwise be the case. The amount of additional capital will depend, inter alia, upon the acceptability of the exposures when considered against the bank's policy agreed with the Bank; the criteria set out in paragraph 4 above; and the number of such exposures, their individual size and nature. These requirements will also be applied in the case of exposures to banks with a maturity of over one year.

62. Additional capital will not normally be required to cover exposures exceeding 10% to group financial companies which arise as a result of the reporting bank fulfilling a group treasury role within the terms of paragraphs 43 and 44 above.

63. In those cases where an exposure exceeds 25% the Bank will require additional capital cover which will be significantly higher than would be required for an exposure of less than 25%. Additional capital will not be required to cover exposures secured by cash, BGS or an ECGD bank guarantee which meet the criteria set out in paragraph 38 above. An additional requirement for capital will otherwise generally apply whether or not the Bank agrees that the exposure has been incurred in the most exceptional circumstances. The undertaking of an exposure in excess of 25% by a bank in other than the most exceptional circumstances will also call into question whether the bank fulfils the criteria set out in the

EXHIBIT 1

Banking Act. In all such cases the Bank would consider whether the bank's authorisation should be revoked.

64. Additional capital will also generally be required where a bank subsidiary of a bank has a number of exposures to non-bank counterparties of more than 10% of capital base. However, where an exposure exceeds 25% of the subsidiary's capital base and the parent bank has made arrangements (within the terms of the policy set out in paragraph 56) to protect the subsidiary if problems occur, the additional capital cover, if any, may be held in the parent bank rather than the subsidiary. The additional capital cover will be determined by the size of the exposure (together with other exposures to the same counterparty entered into by the parent bank) in relation to the parent bank's capital base.

65. In the case of exposures to banks of 1 year and under, and country and sectoral exposures the Bank may require banks to maintain higher capital ratios in cases where there are particular concentrations of risk.

## ▪ XIV PRE-NOTIFICATION REPORTING REQUIREMENTS IN THE CASE OF EXPOSURES EXCEEDING 25% OF CAPITAL BASE

66. Exposures not covered by the circumstances set out in paragraph 67 below to individual non-bank counterparties, banks, and central governments which a UK incorporated bank proposes to enter into, and which either alone or together with other exposures to that counterparty would exceed 25% of the bank's capital base, are required to be notified to the Bank before the bank becomes committed to the counterparty (1). If the Bank is to come to a considered view about whether it would be prudent for the bank to undertake such a commitment, adequate notice is necessary. The period of notice will depend principally upon the complexity of the proposed transaction but should normally be at least two clear business days before the commitment is to be finalised. The formal notice should be given in writing, although the Bank will expect oral notice of the proposed transaction to take place at the earliest practical date. Written notice of the proposed transaction should include the size of the exposure, the purpose of the exposure, its maturity, the name and nature of the counterparty, and details of security. Where appropriate, statements from the bank's professional advisers evidencing the nature and risks of the transaction, and other supporting material may also be required.

(1) In the case of an exposure denominated in foreign currency or in the form of a marketable security the size of the exposure may be less than 25% of the bank's capital base when entered into, but may exceed 25% solely as a result of a subsequent exchange rate change or a change in this market price. Such exposures should be notified at the quarterly reporting date and not at the time the exposure first exceeds 25%.

67. Where a bank has previously notified to, and agreed with, the Bank its limits for lending of a maturity of up to one year to banks, and for exposures to overseas central governments, exposures of over 25% to individual counterparties covered by the limits are not required to be pre-notified to the Bank providing they do not exceed those limits.

68. Exposures to overseas countries, and economic sectors, which exceed 25% of the bank's capital are also not covered by the pre-notification

EXHIBIT 1

requirements. However, where a proposed transaction will result in an exposure which represents a significant departure from the bank's statement of policy on its large exposures agreed with the Bank (see Section IV above), the Bank will expect the proposed transaction to be notified to and discussed with it.

## ▪ XV TRANSITIONAL ARRANGEMENTS

69. Most banks already have an asset structure which is consistent with the policy outlined in this paper and have adopted and applied lending policies which require little or no alteration. However, some banks have, for example, exposures exceeding the 25% level which are not justified on exceptional circumstances grounds set out in paragraph 38 above, and the eventual inclusion (paragraph 12 above) of certain off-balance sheet risks not previously included in the definition of exposure will initially increase that number. Commercial realities may mean that such exposures For further information about the European Regulatory Library, contact Technical Indexes on cannot be reduced quickly, though some may be capable of being reduced through a negotiated agreement between the bank and the borrower. Where necessary, and taking into account banks' legal commitments, the Bank will agree a transitional period with individual banks during which they will be expected to reduce any large exposures which currently exceed the levels agreed with the Bank. During that period, however, the Bank will continue to take into account such large exposures in assessing the adequacy of the bank's capital (see section XIII above).

## ▪ APPENDIX I BANKING ACT 1987 S38. REPORTS OF LARGE EXPOSURES

S38

69. An authorised institution, other than one whose principal place of business of outside the United Kingdom, shall make a report to the Bank if:-

. it has entered into a transaction or transactions relating to any one person as a result of which it is exposed to the risk of incurring losses in excess of 10 per cent, of its available capital resources; or

a. it proposes to enter into a transaction or transactions relating to any one person which, either alone or together with a previous transaction or previous transactions entered into by it in relation to that person, would result in its being exposed to the risk of incurring losses in excess of 25 per cent, of those resources.

70. Subsection (1) above applies also where the transaction or transactions relate to different persons if they are connected in such a way that the financial soundness of any of them may affect the financial soundness of the other or others or the same factors may affect the financial soundness of both or all of them.

71. If an authorised institution to which subsection (1) above applies has one or more subsidiaries which are not authorised institutions the Bank may by notice in writing to that institution direct that that subsection shall apply to it as if the transactions and available capital resources of the subsidiary or subsidiaries, or such of them as are specified in the notice, were included in those of the institution.

EXHIBIT 1

72. The reports required to be made by an institution under subsection (1) above shall be made, in a case within paragraph (a) of that subsection, in respect of such period or periods and, in a case within paragraph (b) of that subsection, at such time before the transaction or transactions are entered into, as may be specified by notice in writing given to the institution by the Bank; and those reports shall be in such form and contain such particulars as the Bank may reasonably require.

73. For the purposes of this section a transaction entered into by an institution relates to a person if it is:-

   . a transaction under which that person incurs an obligation to the institution or as a result of which he may incur such an obligation;

   a. a transaction under which the institution will incur, or as a result of which it may incur, an obligation in the event of that person defaulting on an obligation to a third party; or

   b. a transaction under which the institution acquires or incurs an obligation to acquire, or as a result of which it may incur an obligation to acquire, an asset the value of which depends wholly or mainly on that person performing his obligations or otherwise on his financial soundness;

   and the risk of loss attributable to a transaction is, in a case within paragraph (a) or (b) above, the risk of the person concerned defaulting on the obligation there mentioned and, in a case within paragraph (c) above, the risk of the person concerned defaulting on the obligations there mentioned or of a deterioration in his financial soundness.

74. Any question whether an institution is or would be exposed to risk as mentioned in subsection (1) above (or in that subsection as extended by subsection (2)) shall be determined in accordance with principles published by the Bank or notified by it to the institution concerned; and those principles may in particular make provision for determining the amount at risk in particular circumstances or the extent to which any such amount is to be taken into account for the purpose of this section.

75. For the purpose of his section the available capital resources of an institution (or, in a case within subsection (3) above, or an institution and its relevant subsidiary or subsidiaries) and the value of those resources at any time shall be determined by the Bank and notified by it to the institution by notice in writing; and any such determination, which may be varied from time to time, shall be made by the Bank after consultation with the institution concerned and in accordance with principles published by the Bank.

76. The principles referred to in subsections (6) and (7) above may make different provisions for different cases and those referred to in subsection (6) may, in particular, exclude from consideration, either wholly or in part, risks resulting from transactions of a particular description or entered in to in particular circumstances or with persons of particular descriptions.

77. An institution which fails to make a report as required by this section shall be guilty of an offence; but where an institution shows that at the time the report was required to be made it did not know that the facts were such as to require the making of the report it shall not be guilty of an offence by reason of this failure to make a report at that time but shall be guilty of an offence unless it makes the report within seven days of becoming aware of those facts.

EXHIBIT 1

78. An institution guilty of an offence under this section shall be liable on summary conviction to a fine not exceeding the fifth level on the standard scale.

79. The Treasury may after consultation with the Bank by order:-

. amend subsection (1) above so as to substitute for either of the percentages for the time being specified in that subsection such other percentage as may be specified in the order;

a. make provision, whether by amending subsection (5) above or otherwise, with respect to the transactions and risks to be taken into account for the purposes of this section,

but any such order shall be subject to annulment in pursuance of a resolution of either House of Parliament.

b. For the avoidance of doubt it is hereby declared that references in this section to "one person" include references to a partnership.

# APPENDIX II DEFINITION OF CAPITAL BASE

The definition of the capital base is that used for calculating a bank's risk asset ratio except that a bank's holdings of other banks' capital will not be deducted the definition is set out in full in the Bank's paper "The Measurement of Capital " (September 1980) as amended in respect of perpetual debt by the Bank's notice of March 1986 (BSD/1986/2) and in respect of preference shares by the Bank's notice "The Measurement of Capital" (BSD/1986/4).

| | | |
|---|---|---|
| The components of the capital base are summarised below:- | | |
| | Ordinary share capital | X |
| | Preference shares (which are irredeemable or redeemable only at the bank's option) | X |
| | Reserves | X |
| | General provisions | X |
| | Minority interests | X |
| | | X |
| Less Goodwill and other intangible assets | | -X |
| | | A |
| | Primary perpetual subordinated loan stocks | X |
| | Redeemable shares (redeemable at fixed dates with an initial term to maturity of at least 25 years) | X |
| | | B |
| | Other perpetual and term subordinated loan stocks (with an initial term to maturity of at least 5 years and 1 day) | X |
| | Preference shares (redeemable at fixed dates with an initial term to maturity of at least 5 years and less than 25 years) | X |
| | | C |
| Less Investments in subsidiaries and associates and trade investments | | -X |
| | (including loans of a capital nature) Equipment | -X |

EXHIBIT 1

| | | |
|---|---|---|
| | Other fixed assets (1) | -X |
| | | D |

(1) Except premises

The capital base is equal to A + B + C - D provided that B less than 1/2 A, that C less than 1/2 (A+B) and B + C less than A.

If B greater than 1/2 A, the surplus is added to C. *

If C greater than 1/2 (A+B) or B + C greater than A, the surplus is excluded from the capital base.

Exhibit 2

International Tax Law Reports, International Tax Law Reports, VOLUME 7, Re X Bank (Europe) SA

7 ITLR 1

# Re X Bank (Europe) SA

no 02.04601

THE NETHERLANDS

Appeal Court Amsterdam

Judgment date: 25 February 2004

*Double taxation conventions – Netherlands – Attribution of profits to a permanent establishment – Bank branch – Attribution of interest-free capital to the branch – Belgium-Netherlands double taxation convention of 19 October 1970 – Adjustment of the capital of the bank branch by reference to the BIS-ratio – Whether adjustment was consistent with the business profits article of the double taxation convention*

*European Community law – Netherlands – Attribution of profits to a permanent establishment – Bank branch – Attribution of interest-free capital to the branch – Adjustment of the capital of the bank branch by reference to the BIS-ratio – Whether adjustment compatible with Community law – Second Banking Directive, art 6 – EC Treaty, art 6 (now art 12 EC)*

Between 1 July 1994 and 1 April 1996 the taxpayer company, a bank resident in Belgium, operated a branch in the Netherlands. In its accounts for the 31 December 1995, the branch showed a negative figure for capital. In its corporation tax return for that period the branch sought to deduct interest on borrowings from the head office of the bank in Belgium.

Following an examination, the tax inspector sought to adjust the taxable profits by disallowing interest on an amount of capital attributed to the branch; the inspector attributed capital to the branch based upon the BIS (Bank for International Settlements) ratio of the Belgium bank, and the risk-weighted assets of the branch. The taxpayer appealed against the adjustment on the grounds that it was inconsistent with the provisions of the Second Banks Directive and the non-discrimination principle in art 6 (subsequently art 12 EC) of the European Community treaty on grounds that a Netherlands subsidiary would have only

been required to maintain a minimum capital (which was less than the capital notionally allocated to the branch).

**Held**

(rejecting the taxpayer's appeal):

(1) The attribution of part of the capital of the bank to the branch on the basis of the BIS-ratio and risk weighted assets was consistent with the **1** separate enterprise concept (referred to here as the 'fiction of independence') in the business profits article of the double taxation convention. The taxpayer company had failed to bring evidence to show why the activities of the branch should be regarded as financed exclusively by debt (see paras 5.4 and 5.12, post).

(2) The method employed by the inspector to allocate capital to the branch was not contrary to the convention or otherwise unacceptable (see para 5.13, post).

(3) The method of allocation did not infringe the Second Banking Directive which was concerned with ensuring that a bank was only subject to supervision in one member state. Nor did the attribution for tax purposes of more capital than the minimum capital required of a subsidiary for regulatory purposes infringe the non-discrimination principle in the EC Treaty (see paras 5.8 and 5.19, post).

**Editor's Note**

This decision may be contrasted with the decision of the US Court of Claims in *Natwest* (2003) 6 ITLR 292. The Amsterdam court accepted that, in the absence of evidence from the taxpayer showing why its activities should be regarded as funded entirely by (interest-bearing) external debt, it was appropriate to attribute interest-free capital of the bank to the branch based upon the BIS-ratio of the bank as a whole. This approach was consistent with the separate enterprise concept of the double taxation convention. It was also not incompatible with European Community law, even though it meant that more capital was attributed to the branch for tax purposes than would have been required by the Netherlands for regulatory purposes if the bank had operated through a subsidiary in the Netherlands.

This is one of a number of decisions from the Netherlands on the attribution of profits to permanent establishments. It is an approach which is consistent with some of the work recently undertaken by the OECD on the determination of the profits of permanent establishments. It would be very interesting to see whether this decision is appealed to the Hoge Raad and also whether the issue of consistency with Community Law is ultimately referred to the European Court of

Justice (which has not yet considered issues of the attribution of profits to a branch for tax purposes).

**Judgment**

Belastingtijdvak: 1995

**UITSPRAAK**

op het beroep van de naar Belgisch recht opgerichte vennootschap X Bank (Europe) SA, gevestigd te Brussel (België), belanghebbende, tegen een **[2]** uitspraak van het Hoofd van de Belastingdienst Grote ondernemingen te Amsterdam, de inspecteur.

**1. Loop van het geding**

1.1. Van belanghebbende is ter griffie een beroepschrift ontvangen op 16 juli 2002, ingediend door A als haar gemachtigde (hierna: gemachtigde) en door gemachtigde aangevuld bij brief van 2 september 2002. Het beroep is gericht tegen de uitspraak van de inspecteur, gedagtekend 6 juli 2002, betreffende de aan belanghebbende opgelegde aanslag vennootschapsbelasting voor het jaar 1995.

1.2. De met dagtekening 31 december 1999 opgelegde aanslag is berekend naar een belastbaar binnenlands bedrag van ƒ840.776. Na bezwaar is de aanslag verminderd tot een berekend naar een belastbaar binnenlands bedrag van ƒ642.840.

1.3. Het beroep strekt tot vernietiging van de uitspraak van de inspecteur en tot vaststelling van een verlies van ƒ123.000.

1.4. De inspecteur heeft een verweerschrift ingediend. Hij concludeert tot bevestiging van de bestreden uitspraak.

1.5. Gemachtigde heeft een conclusie van repliek ingezonden. De inspecteur heeft een conclusie van dupliek ingezonden.

1.6. Ter zitting van 8 oktober 2003 zijn verschenen en gehoord gemachtigde, tot bijstand vergezeld van B, C en D, alsmede namens de inspecteur E, tot bijstand vergezeld van F, G en H. Van gemachtigde is ter griffie op 2 oktober 2003 een pleitnota ingekomen, welke ter zitting is voorgedragen. Van de inspecteur is op 5 augustus 2003 een pleitnota ingekomen, welke ter zitting als voorgedragen is aangemerkt, en aangevuld met een pleitnota die ter zitting is overgelegd en voorgedragen.

Exhibit 2

Van het ter zitting verhandelde is een proces-verbaal opgemaakt waarvan een afschrift aan deze uitspraak is gehecht.

**2. Tussen partijen vaststaande feiten**

2.1. Belanghebbende oefent het bankbedrijf uit. In de loop van 1994 heeft zij een vestiging in Amsterdam geopend van waaruit in de periode 1 juli 1994 tot 1 april 1996 bancaire activiteiten zijn verricht.

2.2. In 1996 heeft in Japan een fusie plaatsgevonden tussen I Ltd en J Ltd. In het kader van deze fusie zijn de activa en passiva van belanghebbende overgedragen aan de in Nederland gevestigde dochtervennootschap van J Ltd, genaamd K (Holland) NV.

2.3. Belanghebbende beschikt over een vergunning van De Nationale Bank van België tot het uitoefenen van de werkzaamheden van een kredietinstelling, zoals bedoeld in de Tweede Richtlijn 89/646/EEG van de Raad van 15 december 1989 tot coördinatie van de wettelijke en bestuursrechtelijke bepalingen betreffende de toegang tot en de uitoefening **3** van de werkzaam-heden van kredietinstellingen, alsmede tot wijziging van Richtlijn 77/780/EEG (89/646/EEG) (PB L386, 30 december 1989) (hierna: de Tweede Banken Richtlijn).

2.4. Door belanghebbende is ter zake van een door haar in 1995 gerealiseerd belastbaar binnenlands bedrag een aangiftebiljet vennootschapsbelasting ingediend. Bijlage 1 bij deze aangifte vermeldt onder meer het volgende:

‘Balans per 31 december 1995

(bedragen in duizenden guldens)

Activa *f*

Kasmiddelen 1.279

Bankiers 78.747

Kredieten

- private sector 336.661

(…)

- Rentedragend waardepapier 21.000

- Onroerende zaken en bedrijfsmiddelen 576

- Overlopende activa 6.355

- Totaal activa 444.618

Passiva

Bankiers 357.135

Toevertrouwde middelen

- spaargelden

- overige 54.739

Overige schulden 26.399

Overlopende passiva 6.476

Resultaat boekjaar – 131

Totaal passiva 444.618’

Bijlage 2 bij de aangifte vennootschapsbelasting vermeldt onder meer het volgende:

‘Winst- en verliesrekening over de periode eindigend op 31 december 1995

(bedragen in duizenden guldens)

(…) *ƒ*

Rente baten 26.760

Rente lasten 24.945

1.815

(…)

Resultaat – 131’

Bijlage 3 vermeldt nog:

4

‘FISCALE TOELICHTINGEN

Exhibit 2

1. Controle berekening (bedragen in duizenden) *f*

Commercieel resultaat – 131

Niet aftrekbare kosten ex art. 8a Wet IB 8

Fiscaal resultaat – 123'

2.5. In 1999 heeft bij belanghebbende een boekenonderzoek plaatsgevonden. Dit onderzoek had betrekking op de hoogte van het eigen vermogen van de Nederlandse vestiging van belanghebbende. Het verslag van dit onderzoek, gedagtekend 10 juli 2000, vermeldt onder meer het volgende:

**'2. Vennootschapsbelasting**

***2.1. Eigen vermogen van een vaste inrichting in het algemeen***

(…)

Het is bij een vaste inrichting van een bank (…) onmogelijk aan te geven in welke mate zij daadwerkelijk gebruik maakt van het totale eigen vermogen van de generale onderneming. Het is immers niet te traceren welk soort vermogen (eigen of vreemd) de generale onderneming heeft aangetrokken voor welke specifieke activiteit. Wel is duidelijk dat binnen de generale onderneming als geheel ook voor de activiteiten van de vaste inrichting eigen vermogen wordt aangehouden.

(…)

De Belastingdienst vergelijkt de kapitalisatie van de vaste inrichting met de kapitalisatie van het hoofdkantoor aan de hand van de zogenaamde BIS-ratio. Internationaal en ook binnen de EU hebben de Centrale Banken afgesproken dat het aanwezige toetsingsvermogen gedeeld door de naar risico gewogen activa en uitzettingen minimaal 8% moet bedragen. Dit percentage wordt de BIS-ratio genoemd.

Het aanwezige toetsingsvermogen bestaat grotendeels uit kapitaal, winstreserves en achtergestelde leningen. Voor de toetsing van de hoogte van het fiscaal vereiste eigen vermogen elimineren wij – zowel bij het hoofdkantoor als de vaste inrichting – de elementen die fiscaal als vreemd vermogen worden beschouwd. Over het algemeen zijn dit de achtergestelde leningen (maar ook eventueel andere elementen die fiscaal als vreemd vermogen moeten worden beschouwd). Door de achtergestelde leningen te elimineren kunnen wij een zuivere vergelijking maken.

Indien het hoofdkantoor een bepaalde hoogte van de BIS-ratio voornamelijk

Exhibit 2

dankt aan achtergestelde leningen (waarover rente in aftrek gebracht wordt), zou het niet reëel zijn van de vaste inrichting te eisen dat zij voor dit bedrag eigen vermogen dient aan te houden. (…)

De hoogte van de risico gewogen activa en uitzettingen wordt **5** bepaald door de wegingsfactoren die de Centrale Banken hieraan toekennen. Deze wegingsfactoren variëren van 0 tot 100%, afhankelijk van het risico. Ook kennen Centrale Banken wegingsfactoren toe aan off-balance sheet items en marktrisico's. In principe zijn deze wegingsfactoren binnen de verschillende landen gelijk.

Door bij de vergelijking aan te sluiten bij de BIS-ratio wordt dus rekening gehouden met de verschillende activiteiten en risico's van een bank. Een bank die voornamelijk interbancaire leningen op zijn balans heeft staat, hoeft hierdoor een lager eigen vermogen aan te houden dan een bank die risicovolle kredieten aan bedrijven heeft uitstaan. Voor beide (…) banken geldt wel dat de BIS-ratio minimaal 8% moet zijn.

Indien naar aanleiding van voorgenoemde toetsing de conclusie is dat de hoogte van het eigen vermogen van de vaste inrichting te laag is, vindt correctie plaats van de naar onze mening te veel in aftrek gebrachte rentelasten. In het geval van een hoger eigen vermogen, zou de vaste inrichting immers minder vreemd vermogen hebben aangetrokken. De beperking van de aftrek van de rentelasten wordt berekend door het tekort aan eigen vermogen te vermenigvuldigen met het 12 maands AIBOR-percentage per 1 juli van het betreffende jaar.

(…)

***2.2 De hoogte van het eigen vermogen van de vaste inrichting van [belanghebbende].***

Belastingplichtige heeft in de onderzochte jaren (…) een gecumuleerd verlies. Deze verliezen bedragen:

1994 f 944.000,–

1995 f 131.000,–

(…)

Afhankelijk van de gewogen activa van de vaste inrichting én de hoogte van de BIS-ratio van het hoofdkantoor, stellen wij (…) eisen aan de hoogte van het eigen vermogen van de vaste inrichting. Hieronder zal de hoogte van de gewogen activa van de vaste inrichting aangegeven worden.

1994 187.005.000 (…)

1995 204.124.000

(…)

De gewogen activa staan vermeld op de maandstaten die naar DNB worden verzonden. Aangezien wij vergelijken met de BIS-ratio van het hoofdkantoor, zijn de gewogen activa van de vaste inrichting gecorrigeerd voor zover deze vorderingen op groepsmaatschappijen betroffen.

(…)

6

***2.3 De BIS-ratio van het hoofdkantoor***

(…) Om de BIS-ratio (…) te kunnen berekenen hebben wij de maandstaat, die naar de Belgische Centrale Bank wordt gezonden, opgevraagd. Hieruit blijkt dat de gewogen activa in 1995 25.989.904.000 Belgische Franc (BEF) bedragen (…).

(…) waardoor het geschoonde toetsingsvermogen 2.646.448.000 BEF bedraagt.

De BIS-ratio van het hoofdkantoor in 1995 kan vervolgens berekend worden door het geschoonde toetsingsvermogen te delen door de gewogen activa. Dit resulteert in een BIS-ratio van 2.646.448 / 25.989.904 * 100% = 10,2%.

(…)

***2.4 Toetsing hoogte eigen vermogen van de vaste inrichting***

In dit onderdeel wordt berekend wat naar onze mening de hoogte van het eigen vermogen van de vaste inrichting moet zijn. Uitgangspunt hierbij is de hoogte van de

gewogen activa van de vaste inrichting en de hoogte van de BIS-ratio van het hoofdkantoor.

jaar gewogen activa BIS-ratio gewenst eigen vermogen

vaste inrichting hoofdkantoor vaste inrichting

1994 (…) (…) (…)

1995 204.124.00010,2 20.820.648

(…)

Het verschil tussen het vereiste eigen vermogen en het aanwezige eigen vermogen is als volgt:

jaar aanwezig eigen gewenst eigen verschil/tekort

vermogen vermogen vaste

inrichting

1994 -/- f 944.000,– (…) (…)

1995 -/- f 131.000,– 20.820.648 20.951.648

(…)

De beperking van de in aftrek te brengen rentelasten is te berekenen door het tekort aan eigen vermogen te vermenigvuldigen met het AIBOR percentage 1 jaar per 1 juli, waarbij rekening wordt gehouden met het aantal maanden dat de vaste inrichting actief was.

jaar verschil/tekort aan AIBOR 1 jaar aantal beperking van de

eigen vermogen per 1 juli maanden aftrek rentelasten

1994 (…) (…) (…) f 740.064,–

1995 f 20.951.648 4,60 % 12 f 963.776,–'

2.6. In een brief aan gemachtigde van 13 mei 2002 schrijft de inspecteur onder meer het volgende:

'Samenvatting

Ik kom gedeeltelijk aan uw bezwaar tegemoet. Het aangegeven belastbaar bedrag in 1995 was negatief ƒ 123.000,-. De in verband met de bovenstaande aangebrachte correctie bedraagt ƒ 963.776,-. Het nieuwe belastbare bedrag komt daarmee op ƒ 840.776,-. Met dit bedrag moet nog worden verrekend het verlies 1994, een verlies dat na correctie is vastgesteld op ƒ 197.936,-. Hierdoor komt het definitieve belastbare bedrag over 1995 uit op ƒ 642.840,-.'

Exhibit 2

**3. Geschil**

In geschil is de vraag of en—zo ja—tot welk bedrag belanghebbende rente in mindering mag brengen op het door haar genoten belastbare binnenlandse inkomen.

**4. Standpunten van partijen**

4.1. Voor de standpunten van partijen verwijst het Hof naar de stukken van het geding, waaronder de pleitnota's als vermeld onder 1.6, en naar het proces-verbaal van de zitting van 8 oktober 2003.

**5. Beoordeling van het geschil**

5.1. Vaststaat dat belanghebbende in 1995 met behulp van een vaste inrichting in Nederland het bankbedrijf heeft uitgeoefend. Tussen partijen is niet in geschil dat het eigen vermogen van haar Nederlandse vaste inrichting op de balansdatum, 31 december 1995, negatief ƒ131.000 bedraagt en dat in 1995 ƒ24.945.000 als rente ten laste van het resultaat van de vaste inrichting is gebracht. Het Belgische hoofdkantoor van belanghebbende beschikt over een substantieel eigen vermogen. De omvang hiervan kan worden uitgedrukt in een zogenoemde BIS-ratio, zoals is beschreven in par 2.1 van het onder 2.5 aangehaalde controlerapport. Volgens evenvermeld rapport bedraagt de BIS-ratio van het hoofdkantoor 10,2%. Hierover bestaat tussen partijen evenmin geschil.

5.2. Naar de inspecteur, niet weersproken door belanghebbende, heeft gesteld, bestaat de passiefpost 'Bankiers' als vermeld onder 2.4, ten minste voor een bedrag groot ƒ266.891.000 uit een schuld in rekening-courant aan het hoofdkantoor. Blijkens par 2.4 van het onder 2.5 aangehaalde controlerapport heeft de inspecteur van deze schuld in rekening-courant aan het hoofdkantoor een bedrag van ƒ20.951.648 aangemerkt als 'tekort eigen vermogen' en de daarop betrekking hebbende rente ad ƒ963.776 niet in aftrek op de binnenlandse belastbare winst van belanghebbende toegelaten. Het bedrag van ƒ20.951.648 is door de inspecteur berekend als het verschil tussen het aanwezige eigen vermogen ad -/- ƒ131.000 en het door hem vereiste eigen vermogen van de vaste inrichting ad ƒ20.820.648.

5.3. Ingevolge artikel 7, §2 van de Overeenkomst tussen de regering van **8** het Koninkrijk der Nederlanden en de regering van het Koninkrijk België tot het vermijden van dubbele belasting op het gebied van belastingen naar het inkomen en naar het vermogen en tot het vaststellen van enige andere regelen verband houdende met de belastingheffing van 19 oktober 1970, Trb 1970, 192 (hierna: het Verdrag), geldt dat aan de vaste inrichting in Nederland van belanghebbende de voordelen dienen te worden toegerekend die zij geacht zou

Exhibit 2

kunnen worden te behalen, indien zij een zelfstandige onderneming zou zijn, die dezelfde of soortgelijke werkzaamheden zou uitoefenen onder dezelfde of soortgelijke omstandigheden en die geheel onafhankelijk zou handelen (de zogeheten zelfstandigheidsfictie).

5.4. Bij de toepassing van de zelfstandigheidsfictie geldt als hoofdregel dat met rentebetalin-gen die verband houden met schuldverhoudingen die uitsluitend bestaan in de interne relatie tussen vaste inrichting en hoofdkantoor geen rekening wordt gehouden. Deze hoofdregel is, naar het Hof verstaat, gebaseerd op de omstandigheid dat een vaste inrichting slechts bij wijze van fictie een zelfstandige onderneming is en als zodanig geen zelfstandig drager van rechten en verplichtingen. In de regel dienen de middelen die het hoofdkantoor aanwendt ter financiering van een vaste inrichting dan ook (indien deze niet zijn verkregen doordat ten behoeve van die vaste inrichting schulden zijn aangegaan) als eigen vermogen van die vaste inrichting te worden beschouwd.

In dit verband gaat het Hof ervan uit dat de aan deze—fiscale—hoofdregel ten grondslag liggende ratio mede is het voorkomen van een op willekeur dan wel uitsluitend fiscale motieven gebaseerde allocatie van (leen)vermogen aan de vaste inrichting. Op deze hoofdregel wordt naar algemeen geldende opvattingen een uitzondering mogelijk geacht als het gaat om ondernemingen die bancaire activiteiten verrichten. Met betrekking tot uitsluitend interne schuldverhoudingen tussen het hoofdkantoor en de vaste inrichting van een belasting-plichtige die het bankbedrijf uitoefent wordt het in aanmerking nemen van rente derhalve wel mogelijk geacht. In dit verband is het Commentaar van belang op artikel 7 van het OESO Modelverdrag, punt 19, welk commentaar onder meer als volgt luidt:

> ‘It is, however, recognised that special considerations apply to payments of interest made by different parts of a financial enterprise (e.g. a bank) to each other on advances etc. (as distinct from capital allotted to them), in view of the fact that making and receiving advances is closely related to the ordinary business of such enterprises.’

5.5. Naar het oordeel van het Hof heeft het onder 5.3 en 5.4 vermelde toetsingskader tevens te gelden bij de vaststelling van het belastbare binnenlandse bedrag op de voet van artikel 17 van de Wet op de 9 vennootschapsbelasting 1969 (hierna: de Wet Vpb) in samenhang met artikel 49, eerste lid, van de Wet op de inkomstenbelasting 1964 (hierna: de Wet IB).

5.6. Belanghebbende heeft zich primair op het standpunt gesteld dat het haar vrijstaat om bij de bepaling van het belastbare binnenlandse inkomen van haar vaste inrichting geen eigen vermogen in aanmerking te nemen, nu de vaste inrichting niet beschikt over een eigen vermogen. Zij beroept zich daarvoor onder meer op de Tweede Banken Richtlijn en op de Richtlijn 93/22/EEG van 10 mei 1993 van de Raad betreffende het verrichten van diensten op het gebied van

beleggingen in effecten, PB L141, 11 juni 1993 (hierna: Investment Services Directive).

5.7. Artikel 6, eerste lid, eerste volzin, van de Tweede Banken Richtlijn luidt als volgt:

> 'De Lidstaten van ontvangst mogen niet langer de in artikel 4 van de Richtlijn 77/ 780/EEG bedoelde vergunning, noch het dotatiekapitaal eisen voor bijkantoren van kredietinstellingen waaraan in andere Lidstaten vergunning is verleend.'

Artikel 14, eerste en tweede lid, van de Investment Services Directive luidt als volgt:

> '1. De Lid-Staten dragen er zorg voor dat de beleggingsdiensten en de andere diensten die genoemd zijn in deel C van de bijlage, op hun grondgebied kunnen worden uitgeoefend overeenkomstig het bepaalde in de artikelen 17, 18 en 19, zowel door middel van het vestigen van een bijkantoor als door middel van het vrij verrichten van diensten, door iedere beleggingsonderneming waaraan door de bevoegde autoriteiten van een andere Lid-Staat vergunning is verleend en waarop door hen toezicht wordt gehouden overeenkomstig het bepaalde in deze richtlijn, mits deze diensten onder de vergunning vallen. Deze richtlijn laat onverlet de bevoegdheden van de Lid-Staten van ontvangst ten aanzien van de rechten van deelneming in instellingen voor collectieve belegging die niet vallen onder Richtlijn 85/611/EEG (14).
>
> 2. De Lid-Staten mogen de vestiging van een bijkantoor of het verrichten van diensten als bedoeld in lid 1, niet afhankelijk stellen van een vergunning, noch onderwerpen aan de verplichting eigen kapitaal te verschaffen of aan maatregelen van gelijke werking.'

Het standpunt van de inspecteur, dat volgt uit de bestreden uitspraak, houdt volgens belang-hebbende in dat in wezen wordt geëist dat de vaste inrichting eigen vermogen aanhoudt. Daardoor worden de hiervoor aangehaalde richtlijnen gefrustreerd en het beoogde doel, het creëren van een gemeenschappelijke markt, niet bereikt. De inspecteur handelt **10** derhalve in strijd met het gemeenschapsrecht, aldus—nog steeds—belanghebbende. De inspecteur heeft zulks gemotiveerd betwist.

5.8. Naar het oordeel van het Hof heeft de hiervoor aangehaalde bepaling van de Tweede Banken Richtlijn betrekking op de vraag welk land bevoegd is toezicht te houden op (onder meer) de solvabiliteit van binnen de EU opererende banken. De verantwoordelijkheid voor dit toezicht is uitsluitend gelegd bij het land van vestiging van de vennootschap die het bankbedrijf uitoefent. In het onderhavige geval is dat België. De Lidstaten waar die vennootschap bijkantoren

heeft, mogen geen eisen omtrent onder meer die solvabiliteit stellen in die zin dat zij niet kunnen eisen dat zo'n bijkantoor een dotatiekapitaal heeft. Aan die exclusieve bevoegdheid van, in casu, België wordt geen afbreuk gedaan, indien voor de toepassing van artikel 7 van het Verdrag respectievelijk artikel 17 van de Wet Vpb in samenhang met artikel 49, eerste lid, van de Wet IB, het eigen vermogen van belanghebbende geacht wordt—zoals de inspecteur voorstaat—gedeeltelijk werkzaam te zijn ten dienste van haar vaste inrichting. Uit de hiervoor vermelde fiscale bepalingen en de daaraan door de inspecteur verbonden gevolgen volgt immers niet dat belanghebbende gehouden zou zijn meer eigen vermogen aan te houden dan waartoe zij verplicht is op grond van bepalingen van de Belgische toezichthouder, dan wel dat de vaste inrichting in Nederland gehouden is de facto eigen vermogen aan te houden. Evenbedoelde bepalingen betreffen de allocatie, ten behoeve van de fiscale winstbepaling, van het eigen vermogen waarover belanghebbende beschikt. De vraag aan welk onderdeel van de onderneming het door de toezichthouder vereiste eigen vermogen door de desbetreffende bank is toe te rekenen, wordt naar het oordeel van het Hof niet door de Tweede Banken Richtlijn bestreken. Het standpunt van de inspecteur houdt derhalve geen schending in van de Tweede Banken Richtlijn. Met betrekking tot de Investment Services Directive geldt mutatis mutandis hetzelfde, voor zover al deze richtlijn ook ten aanzien van belanghebbende van toepassing is.

5.9. Belanghebbende beroept zich subsidiair op de onder 5.4 vermelde uitzondering. Het be-staan van deze uitzondering wordt door de inspecteur op zichzelf niet betwist. Wat partijen verdeeld houdt is de betekenis van die uitzondering voor het onderhavige geval. Naar het oordeel van het Hof houdt de onder 5.4 vermelde uitzondering niet in dat het belanghebbende vrijstaat de activa van haar vaste inrichting zonder meer geheel te financieren met vreemd vermogen en evenmin dat voor banken als zodanig het 'verbod' op het in aanmerking nemen van rente over schuldverhoudingen tussen vaste inrichting en hoofdhuis in het geheel niet van toepassing is. Naar het oordeel van het Hof houdt de hier bedoelde uitzondering in dat aan dit verbod voorbij moet worden gegaan, indien dat vanwege de bedrijfsuitoefening van het hoofdkantoor en de vaste **11** inrichting geboden is. In dit opzicht volgt de uitzondering de onder 5.4 vermelde ratio van de hoofdregel, welke is gebaseerd op de omstandigheid dat een vaste inrichting niet zelfstandig rechten en verplichtingen kan aangaan.

De hiervoor bedoelde ratio houdt in dat aan de bedoeling van partijen ter zake van de verdeling van het eigen vermogen van belanghebbende voor fiscale doeleinden, voorzover al ter zake daarvan aan de bedoeling van achter de vaste inrichting en het hoofdkantoor te veronderstellen partijen enige betekenis zou zijn toe te kennen, geen dan wel een ondergeschikte betekenis toekomt. Voorts doet aan het vorenoverwogene niet af dat in België, naar belanghebbende heeft gesteld, alle geldmiddelen die een buitenlandse bank aan haar Belgische vaste inrichting ter beschikking stelt als (uitsluitend) interne lening plegen te worden gekwalificeerd, wat daarvan ook verder moge zijn.

5.10. Voor de bepaling of en in hoeverre de bedrijfsuitoefening van een bank is gefinancierd met eigen en/of met vreemd vermogen, geldt dat in het algemeen niet is na te gaan op welke wijze een bepaald activum is gefinancierd, en dat derhalve in beginsel enkel aansluiting kan worden gezocht bij de omstandigheid dat ieder activum in zekere mate wordt gedekt door eigen vermogen. Naar het oordeel van het Hof heeft zulks ook voor de bedrijfsuitoefening van een bancaire vaste inrichting te gelden. Dit brengt naar 's Hofs oordeel mee dat in casu dient te worden bezien of en in hoeverre het eigen vermogen van het hoofdkantoor van belang-hebbende geacht moet worden te zijn aangehouden ter dekking van de activa en activiteiten van de Nederlandse vaste inrichting van belanghebbende. De omstandigheid dat de omvang van het eigen vermogen van het hoofdkantoor mede is gebaseerd op de door de locale toezichthouder gestelde vereisten, doet daaraan niet af. Het Hof acht het weinig voor de hand liggend dat het eigen vermogen van het hoofdkantoor van belanghebbende niet mede dienstbaar is aan de bedrijfsuitoefening van de Nederlandse vaste inrichting, nu vaststaat dat het eigen vermogen van het hoofdkantoor van belanghebbende beantwoordt aan een BIS-ratio van 10,2%. Naar het oordeel van het Hof is het immers niet zonder meer aannemelijk te achten dat dit eigen vermogen uitsluitend ten dienste staat van de bedrijfsuitoefening van het hoofdkantoor. Bovendien is, mede gelet op doel en strekking van de Tweede Banken Richtlijn, zonder meer niet aannemelijk te achten dat het ten aanzien van belanghebbende door de Belgische autoriteiten voorgeschreven eigen vermogen van—naar het Hof partijen ter zitting heeft verstaan—ten minste ECU 5.000.000 uitsluitend zou behoeven te fungeren als waarborg voor de bedrijfsuitoefening van belanghebbende in België.

5.11. Naar het oordeel van het Hof ligt het, gelet ook op het vorenoverwogene, primair op de weg van belanghebbende om aannemelijk **12** te maken dat en in welke mate sprake is van interne leningen waarop de onder 5.4 vermelde uitzondering betrekking kan hebben. Het is derhalve aan belanghebbende om, waar het bij bancaire activiteiten in de regel niet goed mogelijk is een relatie te leggen tussen specifieke posten van de actiefzijde en specifieke posten van de passiefzijde van de balans, feiten en omstandigheden aannemelijk te maken die in redelijkheid verklaren waarom in het onderhavige geval het door belanghebbende aan haar vaste inrichting gealloceerde vermogen uitsluitend uit vreemd vermogen bestaat, terwijl het eigen vermogen van belanghebbende in het geheel niet dienstbaar zou zijn aan de bedrijfsuitoefening van de vaste inrichting in Nederland.

5.12. Naar het oordeel van het Hof heeft belanghebbende geen feiten en omstandigheden aannemelijk gemaakt op grond waarvan kan worden geoordeeld dat zij terecht ervan is uitgegaan dat de activa en activiteiten van de onderneming die met behulp van haar Nederlandse vaste inrichting wordt gedreven uitsluitend met vreemd vermogen zijn gefinancierd.

Daar staat tegenover dat de inspecteur door middel van het onder 2.5 vermelde controle-rapport een verband heeft gelegd tussen het eigen vermogen van (het hoofdkantoor van) belanghebbende en dat van haar vaste inrichting, en dat die vaste inrichting volgens dit rapport op balansdatum over ƒ20.820.648 eigen vermogen zou (behoren te) beschikken. Nu belanghebbende met betrekking tot enig ten dienste van de vaste inrichting werkzaam eigen vermogen geen bewijs heeft geleverd, terwijl, mede gelet op de inhoud van evenvermeld controlerapport, zonder meer niet aannemelijk is te achten dat aan de vaste inrichting geen eigen vermogen dienstbaar is, heeft het voorts op de weg van belanghebbende gelegen aannemelijk te maken dat de inspecteur het in de vaste inrichting werkzame eigen vermogen te hoog heeft berekend. Ook op dit punt heeft belanghebbende geen bewijs geleverd. Gelet op het bedrag van ƒ245.939.352 (ƒ266.891.000 – ƒ131.000 – ƒ20.820.648) dat de vaste inrichting volgens de inspecteur in de interne rekening-courantverhouding met het hoofdkantoor als fiscale schuld mag verantwoorden, laat het door de inspecteur als eigen vermogen van de vaste inrichting aangemerkte bedrag van ƒ20.820.648 voldoende ruimte voor de (op het OESO rapport 'The taxation of multinational banking enterprises' uit 1984 gebaseerde) stelling van belanghebbende dat 'bij het bankbedrijf mag worden aangenomen dat veruit het grootste gedeelte van het geld dat wordt in- en uitgeleend tussen het hoofdhuis en vaste inrichting extern wordt ingeleend' (aanvulling beroepschrift, blz 14).

5.13. Belanghebbende heeft gesteld dat de door de inspecteur toegepaste methode van berekening van de door hem in aanmerking genomen rentecorrectie in strijd is met het Verdrag, omdat sprake zou zijn van een niet geoorloofde wijze van winstberekening (winstsplitsing) en/of omdat de **13** inspecteur geen functionele analyse heeft uitgevoerd. Het Hof verwerpt deze stelling. In een geval als het onderhavige, waarin het primair aan belanghebbende is om te bewijzen dat de financiering van de bedrijfsuitoefening van de vaste inrichting functioneel voortvloeit uit de aard en de omvang van die bedrijfsuitoefening en waarin belanghebbende daartoe—anders dan in algemene bewoordingen te stellen dat 'interest bij banken normale bedrijfskosten zijn omdat deze kosten zodanig verweven zijn met de uitoefening van het bankbedrijf' (aanvulling beroepschrift, blz 13)—geen bewijs heeft geleverd, kan van de inspecteur niet meer worden verwacht dan dat hij het eigen vermogen van belanghebbende op een redelijke wijze aan de binnen belanghebbende te onderscheiden ondernemingen toerekent, zich daarbij baserend op de informatie die hem voorhanden is. Het Hof verwijst hiervoor naar de uiteenzetting in het controlerapport van de inspecteur, als vermeld onder 2.5. Dat de inspecteur door dit controlerapport te volgen niet in redelijkheid heeft gehandeld is niet aannemelijk geworden. Evenmin acht het Hof de door de inspecteur gevolgde methode in strijd met het hiervoor vermelde toetsingskader. Door aan te sluiten bij de ten aanzien van belanghebbende gevonden BIS-ratio en de gewogen activa van de vaste inrichting, heeft de inspecteur de zelfstandigheidsfictie op een aanvaardbare wijze toegepast. Dat in dit verband de activiteiten van de vaste inrichting niet voldoende vergelijkbaar zouden zijn met de activiteiten van

het hoofdkantoor is niet aannemelijk geworden. Evenmin doet aan het vorenoverwogene af dat in OESO-verband discussie gaande is over een uniforme methode waarmee door bij de OESO aangesloten landen kan worden vastgesteld in hoeverre (voor fiscale doeleinden) financiering van de vaste inrichting van een bancaire instelling met eigen dan wel met vreemd vermogen geoorloofd is. Deze omstandigheid houdt niet in dat, zolang evenbedoelde discussie niet tot geldend recht heeft geleid, ervan zou moeten worden uitgegaan dat het in aanmerking nemen van rente in de relatie tussen vaste inrichting en hoofdkantoor van een bank geheel ter discretie staat van die bank.

5.14. Belanghebbende heeft zich voorts beroepen op een Resolutie van 7 mei 1930, nr 44, B nr 4904. Deze Resolutie luidt onder meer als volgt:

> ‘Aangezien in het bankbedrijf in het algemeen de kapitaalsplitsing uitgangspunt moet zijn voor de winstsplitsing, behoort allereerst te worden bepaald, welk gedeelte van het eigen kapitaal in elk land is vastgelegd of werkt. Gesplitst moet dus worden: het gestorte kapitaal van de geheele onderneming, vermeerderd met de reserves. Bij dit splitsen moet worden aangenomen, dat het vaste bedrijfskapitaal (gebouwen, meubilair, deelnemingen in andere bedrijven) in de eerste plaats wordt gefinancierd door de eigen middelen der onderneming. In het bankwezen blijft dan, naar men kan aannemen, altijd nog een **14** gedeelte van het eigen kapitaal als “eigen werkkapitaal” over.
>
> Nadat het eigen kapitaal is verdeeld in “vastgelegde middelen” en “eigen werkkapitaal” en de toewijzing van de “vastgelegde middelen” aan de verschillende landen heeft plaats gevonden, moet het totaal van het “eigen werkkapitaal” over de verschillende landen worden verdeeld. In verband met het verschil in munteenheid en in rentestand tusschen de onderscheidene landen mag worden aangenomen, dat de in eenig land uitgezette gelden (wissels, beleeningen, prolongatiën, debiteuren in rekening-courant en andere credieten) in de eerste plaats voortkomen uit de in hetzelfde land opgenomen vreemde middelen (deposito’s, enz.). Indien in eenig land de uitgezette gelden minder bedragen dan de opgenomen gelden, dient te worden aangenomen, dat in dat land geen ‘eigen werkkapitaal’ aanwezig is, doch dat door het in dat land gevestigde kantoor vreemd werkkapitaal gesteld wordt ter beschikking van kantoren in andere landen.
>
> Beloopen daarentegen de in eenig land uitgezette gelden meer dan de aldaar opgenomene, dan moet dit het gevolg zijn van de omstandigheid, dat werkkapitaal van elders is verkregen. Het is dan slechts de vraag, hoe dit werkkapitaal moet worden gesplitst in “vreemd werkkapitaal” en “eigen werkkapitaal”.’

5.15. De inspecteur heeft gesteld dat de Resolutie uit 1930 is ingetrokken bij de Resolutie van 3 mei 1971, nr B71/3809, BNB 1971/144. Deze Resolutie luidt onder meer als volgt:

> ‘(1) Hierbij deel ik u mede dat ik aanleiding heb gevonden enige ook voor de toepassing van de Wet VpB. ’69 van belang te achten aanschrijvingen, c.q. gedeelten van aanschrijvingen uit het Boekwerk Ve.B. ’42 in een aanschrijving voor het Boekwerk Ve.B. ’69 samen te vatten.
>
> Daarnaast zullen enige (blauwe) aanschrijvingen met behoud van hun oorspronkelijke datum, doch waar nodig gecorrigeerd afzonderlijk in laatstbedoeld boekwerk worden opgenomen. (…)
>
> Aangenomen kan worden dat de niet op een dezer wijzen overgebrachte blauwe aanschrijvingen op het terrein van de wetstoepassing voor de Wet VeB. ’69 niet van belang zijn, behoudens voor zover zij in de op grond van art. 5 van de Wet uit te vaardigen algemene maatregel van bestuur zullen worden verwerkt.’

Tot de kwesties die in de Resolutie BNB 1971/144 zijn samengevat behoort niet die van de allocatie van vermogen aan de vaste inrichting van een bank.

5.16. Naar het oordeel van het Hof kan uit de tekst van de Resolutie BNB 1971/144 niet zonder meer worden afgeleid dat aan de Resolutie B **15** nr 4904 niet meer een in rechte te beschermen vertrouwen kan worden ontleend. Vermoedelijk heeft het wel in de bedoeling van de Staatssecretaris van Financiën gelegen om met de Resolutie BNB 1971/144 aan te geven welke Resoluties van vóór de invoering van de Wet Vpb voor de toepassing van die wet nog gelding hadden, maar deze bedoeling komt in de tekst van de Resolutie niet voldoende duidelijk tot uiting. Mitsdien is aan te nemen dat belanghebbende in beginsel nog enig vertrouwen kan ontlenen aan het in de Resolutie B nr 4904 geformuleerde beleid, al was het maar doordat bij belanghebbende redelijkerwijs de indruk kan zijn gewekt dat de Resolutie nog geldt.

5.17. Voorts heeft de inspecteur gesteld dat, zo al belanghebbende aan de Resolutie B nr 4904 nog rechten zou kunnen ontlenen, zij ook op grond van deze Resolutie niet over uitsluitend vreemd vermogen kan beschikken. In dat kader heeft de inspecteur gesteld dat op grond van de Resolutie geen ‘eigen werkkapitaal’ aanwezig is, indien in enig land, in het onderhavige geval Nederland, de uitgezette gelden minder bedragen dan de in dat land opgenomen gelden, en voorts dat niet aannemelijk is dat de door belanghebbende in Nederland uitgezette gelden minder bedragen dan de aldaar opgenomen gelden. In zijn verweerschrift schrijft de inspecteur hierover onder meer:

> ‘In de situatie van belanghebbende overtreft het bedrag van de uitgezette gelden het bedrag van de opgenomen gelden. De meeste opgenomen

> gelden zijn immers afkomstig van het hoofdhuis ("Bankiers") en vormen het creditsaldo van de sluitrekening (…). Het ter plaatse ingeleende bedrag (hoogstens ruim ƒ 80. mio) zinkt in het niet bij het locaal uitgezette bedrag (ruim ƒ 357 mio.)'

Het Hof acht de uitleg van de Resolutie die in deze stelling van de inspecteur besloten ligt juist, en is voorts van oordeel dat belanghebbende, bezien ook in het licht van hetgeen de inspecteur in dit verband heeft gesteld, niet aannemelijk heeft gemaakt dat aan de daaruit voortvloeiende voorwaarde voor het niet aanwezig achten van 'eigen werkkapitaal' is voldaan. Op deze grond wijst het Hof de stelling van belanghebbende af.

5.18. Meer subsidiair heeft belanghebbende gesteld dat de toepassing van de zelfstandigheids-fictie ook inhoudt dat ten laste van het belastbare binnenlandse inkomen van belanghebbende vergoedingen dienen te worden gebracht ter zake van garantstellingen door het hoofdkantoor en voor het gebruik van de naam. Naar het oordeel van het Hof heeft belanghebbende deze stelling tegenover de gemotiveerde weerspreking daarvan door de inspecteur niet voldoende met feiten onderbouwd, zodat daaraan verder wordt voorbijgegaan.

5.19. Ter zitting heeft belanghebbende nog gesteld dat het standpunt van de inspecteur ertoe leidt dat een vaste inrichting van een bank slechter **16** wordt behandeld dan een met die vaste inrichting vergelijkbare dochtervennootschap. In dit verband stelt belanghebbende dat sprake is van discriminatie in de zin van artikel 6 (thans 12) van het Verdrag tot oprichting van de Europese Gemeenschappen van 25 maart 1957, zoals gewijzigd bij het Verdrag betreffende de Europese Unie van 7 februari 1992 (hierna: het EG Verdrag) dan wel strijd met de vrijheid van vestiging in de zin van artikel 52 (thans artikel 43) van het EG Verdrag, omdat de inspecteur aan de vaste inrichting van belanghebbende vermogenseisen stelt terwijl hij zulks ten aanzien van in Nederland gevestigde dochtervennootschappen van binnen de EU gevestigde banken niet doet, dan wel omdat het volgens de inspecteur aan de vaste inrichting van belanghebbende toe te rekenen eigen vermogen hoger is dan het eigen vermogen dat een in Nederland gevestigde dochtervennootschap die het bankbedrijf uitoefent ten minste dient aan te houden. Het Hof kan belanghebbende in deze stelling niet volgen. Hetgeen hiervoor is overwogen betreft immers de toepassing van de zelfstandigheidsfictie, welke fictie juist ten doel heeft een gelijke fiscale behandeling van de vaste inrichting en een daarmee vergelijkbare dochtervennootschap te bewerkstelligen. De omstandigheid dat de inspecteur aan de vaste inrichting van belanghebbende vermogenseisen stelt, vloeit juist voort uit die zelfstandigheidsfictie. Het eigen vermogen dat een 'bankdochter' in Nederland dient aan te houden—op grond van regels van De Nederlandsche Bank ECU 5.000.000 (verweerschrift, noot 24)—heeft het karakter van een minimum ten behoeve van de solvabiliteit aan te houden eigen vermogen. Bij dit minimum houdt de vergelijking tussen een vaste inrichting en een dochtervennootschap echter niet op. Zoals er 'bankdochters'

kunnen bestaan waarvan het eigen vermogen het door de locale autoriteiten voorgeschreven minimum te boven gaat, zo zullen er ook vaste inrichtingen van banken kunnen zijn waarvoor dat geldt. Of en in hoeverre dat het geval heeft te zijn, zal afhangen van de omstandigheden in het concrete geval. De omstandigheid dat in het onderhavige geval aan de Nederlandse vaste inrichting van belanghebbende een hoger eigen vermogen wordt toegerekend dan door De Nederlandsche

Bank (voor 'bankdochters') als minimum is voorgeschreven, houdt op zichzelf dan ook niet in dat sprake is van een slechtere behandeling van vaste inrichtingen dan van 'bankdochters'. Mitsdien is geen sprake van een door het gemeenschapsrecht verboden discriminatie of strijd met de vrijheid van vestiging.

5.20. Al het vorenstaande leidt ertoe dat het beroep ongegrond is.

**6. Proceskosten**

Nu de bestreden uitspraak in stand blijft en van bijzondere omstandigheden niet is gebleken, acht het Hof geen termen aanwezig voor **17** een veroordeling van een der partijen in de proceskosten als bedoeld in artikel 8:75 van de Algemene wet bestuursrecht.

**7. Beslissing**

Het Hof verklaart het beroep ongegrond.

De uitspraak is vastgesteld op 25 februari 2004 door mrs Faase, voorzitter, Van der Ouderaa, Hamer, leden, in tegenwoordigheid van mr Van Rijn als griffier. De beslissing is op dezelfde dag ter openbare zitting uitgesproken.

**Unofficial translation**

Period of assessment: 1995

**DECISION**

In the appeal by company X Bank (Europe) SA, established at Brussels according to Belgian law, the taxpayer company against a decision by the Head of Revenue Department Large Enterprises, the inspector.

**1. Procedure**

1.1. On 16 July 2002 an appeal in writing was received from A as attorney of the taxpayer company (hereafter: the attorney) … against a decision by the

inspector, dated 6 July 2002, as respects an assessment to corporation tax issued to the taxpayer company for 1995.

1.2. The assessment, dated 31 December 1999, was calculated on a taxable domestic sum of ƒ840,776. Following objection the assessment was reduced to one calculated on a taxable domestic sum of ƒ642,840.

1.3. The appeal claims that the inspector’s decision be quashed and a loss of ƒ123,000 established.

1.4. The inspector has entered a defence. His conclusion is that the decision under attack should be confirmed.

1.5. The attorney replied in writing. The inspector replied to the reply.

1.6. [This paragraph contains procedural details]

**2. Facts not in dispute between the parties**

2.1. The taxpayer company is in the banking business. In the course of 1994 the taxpayer company opened a branch in Amsterdam from which banking activities took place between 1 July 1994 and 1 April 1996.

2.2. In 1996 a merger took place in Japan between I Ltd and J Ltd. In the course of that merger the assets and liabilities of the taxpayer company were transferred to K (Holland) NV, the subsidiary of J Ltd established in the Netherlands.

2.3. The taxpayer company has been licensed by The National Bank of Belgium to conduct the activities of a credit institution within the meaning **18** assigned to that expression in [there follows a detailed reference to the relevant document].

2.4. The taxpayer company has made a corporation tax return in respect of a domestic profit obtained by it in 1995. Attachment 1 to that return mentions inter alia the following:

‘Balance sheet as per 31st December 1995

(amounts in thousands of guilders)

Assets ƒ

Cash 1,279

Bankers 78,747

Credits

- private sector 336,661

- (…)

- Interest bearing documents of value 21,000

- Real estate and business premises 576

- Other assets 6,355

- Total assets 444,618

Liabilities

Bankers 357,135

Monies held for others

- savings

- other 54,379

Other debts 26,399

other liabilities 6,476

Result for the year of account -131

Total liabilities 444,618'

Attachment 2 to the corporation tax return contains inter alia the following information:

'Profit and loss account for the period ending 31st December 1995

(amounts in thousands of guilders)

(…) *ƒ*

Interest assets 26,760

Interest liabilities 24,945

1,815

Result -131'

Attachment 3 mentions:

'FISCAL EXPLANATIONS

1. Check on calculation (amounts in thousands of guilders) ƒ

Commercial result -131

Non-deductible expenditure ex article 8a Income Tax Act 8

19

Fiscal result -123'

2.5. In 1999 the books of the taxpayer company were examined as respects the amount of the capital of the Netherlands establishment of the taxpayer company. The report of that examination, dated 10 July 2000, contains inter alia the following:

**'2 Corporation tax**

***2.1 Own capital of a permanent establishment in general***

(…)

In the case of a permanent establishment of a bank (…) it is impossible to indicate the extent to which it makes use of the total own capital of the general enterprise: one cannot trace what kind of capital (own or outside) the general enterprise attracted for what specific activity. What is clear is that within the general enterprise as a whole some own capital is maintained for the activities of the permanent establishment.

(…)

The Revenue compares the capitalisation of the permanent establishment with that of the head office on the basis of what is termed the BIS-ratio. Central Banks have agreed internationally, and also within the EU, that the percentage found by dividing the available capital (as adjusted for comparison purposes) by the risk-weighted assets should be at least 8%. This percentage is called the BIS-ratio.

The available capital (as adjusted for comparison purposes) consists mainly of capital, profit reserves and subordinated loans. For testing the level of

own capital required by the Revenue we eliminate – in the case of a head office as well as a permanent establishment – such elements as are fiscally considered as outside capital. Generally speaking those are subordinated loans (but possibly also other elements that fiscally should be considered to be outside capital). By eliminating the subordinated loans we are able to make a proper comparison.

If in respect of a head office a particular level of the BIS-ratio is mainly attributable to subordinated loans (interest on which is deducted), it would not be realistic to require the permanent establishment to maintain its own capital for that sum. (…)

The level of risk-bearing assets is determined by the factors applied by Central Banks in weighing the extent of risk. These factors vary from 0 to 100%, depending on the risk. The Central Banks attribute also factors to off-balance sheet items and market risks. In principle those factors are the same from one country to another.

It follows that by bringing the BIS-ratio into the comparison account is taken of the various activities and risks of a bank. In consequence, a **20** bank that has mainly inter-bank loans on its balance sheet need maintain a lower own capital than one that has outstanding risk-bearing credits to enterprises. The requirement that the BIS-ratio should be at least 8% applies to both (…) banks.

If the aforementioned testing leads to the conclusion that the level of own capital of the permanent establishment is too low, a correction is applied to the interest deducted which in our view was excessive: if the permanent establishment had had a higher level of own capital, it would have employed less outside capital. The limitation of the interest deduction is calculated by multiplying the shortfall in own capital by the 12-months' AIBOR-percentage [the Amsterdam Inter-Bank Offered Rate, the interest rate charged by one Netherlands bank to another] on 1st July of the year concerned.

(…)

2.2 As to the level of own capital of the taxpayer company's permanent establishment: the taxpayer company suffered in the years examined (…) an accumulated loss, as follows:

1994 f 944,000. =

1995 f 131,000. =

(…)

We require a level of the permanent establishment's own capital, depending on the weighted assets of the permanent establishment and the level of the BIS-ratio of head office. The level of weighted assets of the permanent establishment is as follows:

1994 187,005,000 (…)

1995 204,124,000

(…)

The weighted assets appear on the monthly statements sent to The Netherlands Bank [the Dutch Central Bank]. As our comparison is with head office's BIS-ratio, the weighted assets of the permanent establishment have been corrected insofar as they consisted of claims against group companies.

***2.3 The BIS-ratio of head office***

(…) For the purpose of enabling us to calculate head office's BIS-ratio we have asked for the monthly statement that is sent to the Belgian Central Bank. It appears therefrom that the weighted assets in 1995 amount to 25,989,904,000 Belgian Franks (BEF) … so that the net available capital adjusted for testing purposes equals 2.646.448.000 BEF. Head office's BIS-ratio in 1995 can then be calculated by dividing that capital by the weighted assets. This results in a BIS-ratio of 2,646,448 / 25,989,904 * 100% = 10.2%.

(…)

21

***2.4 Checking the amount of own capital of the permanent establishment***

In this part we calculate what in our view should be the amount of own capital of the permanent establishment. The starting point is the amount of weighted assets of the permanent establishment and the level of the BIS-ratio of head office.

Year weighted assets of BIS-ratio required own capital

permanent establishment head office permanent establishment

1994 (…) (…) (…)

1995 204,124,00010.2 20,820,648

The difference between required and actual own capital is as follows:

Year Own capital in f of Difference/

permanent establishment shortfall

actual required

1994 -/-944,000 (…) (…)

1995 -/-131,00020,820,648 20,951,648

The limitation of the interest charges to be deducted can be calculated by multiplying the shortfall in own capital by the AIBOR-percentage for 1 year on 1st July, taking into account the number of months during which the permanent establishment was active.

Year difference/ AIBOR 1 year number Limitation of

shortfall in on 1st July of months deduction of

own capital interest charges

in f in f

1994 (…) (…) (…) 740.0640.=

1995 20.951.648 4.6% 12 963,776.='

2.6. In a letter to the attorney dated 13 May 2002 the inspector writes inter alia:

'Summary

I am meeting your objection in part. The returned taxable sum in 1995 was a negative ƒ123,000.-. The correction applied in connection with the foregoing amounts to ƒ963,776.-. The new taxable sum amounts thus to ƒ840.776. The loss for 1994, after correction established at ƒ197,936.-, is to be set against that sum. In consequence, the definitive taxable sum for 1995 amounts to ƒ642,840.-.'

**3 Dispute**

The question in dispute is whether, and if so to what amount, the taxpayer company may deduct interest from the taxable domestic income obtained.

Exhibit 2

22

**4 Positions of the parties**

4.1. For a summary of the respective positions of the parties the court refers to the documents of the dispute …

**5 Judging the dispute**

5.1. It is an established fact that the taxpayer company carried out a banking business in the Netherlands by means of a permanent establishment. It is not in dispute that at the balance sheet date of 31 December 1995 the Netherlands permanent establishment's own capital amounted to a negative ƒ131,000 and that in 1995 the sum of ƒ24,945,000 was charged to the permanent establishment by way of interest. The Belgian head office of the taxpayer company has a substantial own capital. Its size may be expressed in a BIS-ratio so called, as described in para 2.1 of the examination report referred to in 2.5. According to that report the BIS-ratio of head office amounts to 10.2%. That is not in dispute between the parties either.

5.2. As the inspector submits and the taxpayer company does not dispute, the item 'Bankers' appearing in 2.4 above under the heading 'liabilities' consists to the extent of at least ƒ266,891,000 of a debt in current account to head office. As is shown in para 2.4 of the examination report quoted in 2.5 above, the inspector has earmarked the sum of ƒ20,951,648 as 'shortfall in own capital' and disallowed the deduction of the interest relating thereto, in the sum of ƒ963,776, from the taxable profit of the taxpayer company in the Netherlands. The sum of ƒ20,951,648 was calculated by the inspector as being the difference between the permanent establishment's actual own capital of -/- ƒ131,000 and the own capital required by him of ƒ20,820,648.

5.3. Pursuant to art 7(2) of the [double taxation treaty] of 19 October 1970 between the governments of the Kingdom of the Netherlands and the Kingdom of Belgium, Treaties Gazette 1970 192 (hereafter: the treaty), the same advantages should be attributed to the taxpayer company's permanent establishment in the Netherlands which it could be considered to be able to obtain if it were an independent enterprise conducting the same or similar activities in the same or similar circumstances and acting entirely independently (the fiction of independence so called).

5.4. The principal rule in applying the fiction of independence is that interest payments connected with debts which feature exclusively in the internal relationship between permanent establishment and head office are left out of account. As the court understands the position, this principal rule is based on the circumstance that the independence of a permanent establishment is but fictional and a permanent establishment is accordingly not the independent carrier of

Exhibit 2

rights and obligations. It follows that as a rule the moneys used by head office to finance a permanent establishment **23** should be treated as the latter's own capital (as long as they were not acquired by incurring debts for the benefit of the permanent establishment).

In this connection the court takes as its starting point that the rationale which forms the basis for this—fiscal—principal rule is at least in part the prevention of the allocation of (borrowed) capital to the permanent establishment on the basis of a whim or of purely fiscal motives. According to generally accepted opinions an exception is considered possible in the case of enterprises engaged in bankers' activities. Accordingly, as respects purely internal debts between head office and permanent establishment of a taxpayer company engaged in the banking business it is considered possible to take interest into account. The commentary on art 7 of the OECD model treaty is in this context of importance. It is (inter alia) as follows:

> 'It is, however, recognised that special considerations apply to payments of interest made by different parts of a financial enterprise (e.g. a bank) to each other on advances etc. (as distinct from capital allotted to them), in view of the fact that making and receiving advances is closely related to the ordinary business of such enterprises.'

5.5. In the judgment of the court the test mentioned in 5.3 and 5.4 above should also apply in establishing taxable domestic income on the basis of s 17 Corporation Tax Act 1969 (CTA) together with s 49(1) Income Tax Act 1964 (ITA).

5.6. The taxpayer company has primarily taken the stand that it is at liberty to take no account of own capital in determining the taxable domestic income of its permanent establishment, as the latter does not have its own capital. For that it prays in aid (inter alia) the Second Banks Directive and on Directive 93/22/EEC of 10 May 1993 (hereafter: Investment Services Directive).

5.7. The first sentence of art 6(1) of the Second Banks Directive reads:

> 'Receiving Member States may no longer require branches of credit institutions licensed in other Member States to possess the licence referred to in Article 4 of Directive 77/780/EEC, or the endowment capital.'

Article 14(1) and (2) Investment Services Directive reads:

> '(1) Member States shall procure that the investment services and other services mentioned in part C of the appendix can be carried out in accordance with articles 17,18 and 19, both by means of establishing a branch office and by means of freely rendering services, by any investment

> enterprise which has been licensed by the competent **24** authorities of another Member State and which is supervised by them in accordance with this Directive, provided that those services are within the terms of the licence. This Directive is without prejudice to the powers of receiving Member States as respects rights of participation in institutions for collective investment not falling within Directive 85/611/EEC (14).
>
> (2) Member States may not subject the establishment of a branch office or the rendering of services referred to in (1) to the grant of a licence or to the obligation to provide own capital or to similar measures.'

According to the taxpayer company, the position of the inspector that follows from the decision in dispute implies that in essence the permanent establishment is required to maintain own capital. Thereby the directives quoted above are frustrated and the desired aim of creating a common market is not achieved. Accordingly, the inspector is acting in conflict with Community law, says the taxpayer company. The inspector has disputed that, giving reasons.

5.8. In the judgment of the court the above-quoted provision of the Second Banks Directive is directed at the question of which country is competent to supervise (inter alia*)* the solvency of banks operating within the EU. The responsibility for this supervision is placed exclusively with the country where the corporation that carries out the banking operation was established. In the present case that is Belgium. The member states where that corporation has branch offices may not impose requirements as respects (inter alia) that solvency, in the sense that they may not require such a branch office to have an endowment capital. The exclusive competence of (in this case) Belgium is not being violated if for the purpose of applying art 7 of the treaty and s 17 CTA the own capital of the taxpayer company is deemed partially to be working for the permanent establishment—as the inspector argues: it does not follow from the aforementioned fiscal provision and the consequences ascribed thereto by the inspector that the taxpayer company would be required to maintain more own capital than it is obliged to maintain pursuant to the determinations of the Belgian supervising authority, or that the permanent establishment in the Netherlands would as a matter of fact be required to maintain own capital. The provisions just referred to concern the allocation, for the purpose of determining the taxable profit, of own capital available to the taxpayer company. The question of the part of the enterprise to which the capital required by the supervising authority is to be attributed by the bank concerned is not in the judgment of the court within the purview of the Second Banks Directive. It follows that the position of the inspector does not imply a violation of the Second Banks

**25**

Directive. As respects the Investment Services Directive the same applies mutatis mutandis, to the extent that this directive applies to the taxpayer company.

5.9. The taxpayer company alternatively prays in aid the exception mentioned in 5.4. The inspector does not dispute the existence of this exception. What keeps the parties apart is the meaning of the exception in this particular case. In the judgment of the court the exception mentioned in 5.4 does not imply that it is open to the taxpayer company to finance the assets of its permanent establishment entirely out of outside capital, nor that the 'prohibition' against interest on debts between permanent establishment and head office being taken into account never applies to banks as such. In the judgment of the court the exception referred to means that this prohibition should be ignored if that is required because of the exercise of the business by head office and permanent establishment. In that respect the exception follows the rationale of the primary rule mentioned in 5.4, which is based on the proposition that a permanent establishment cannot itself enter into rights and obligations.

The rationale referred to implies that no, or a subsidiary, meaning would fall to be attributed to the intention of the parties as respects the division of the taxpayer's own capital for tax purposes, even if any meaning at all were to be attributed to the intention of parties supposedly behind the head office and the permanent establishment. In addition, the fact that in Belgium, as the taxpayer company has submitted, all moneys which a foreign bank puts at the disposal of its Belgian permanent establishment will normally be treated as (exclusively) internal loans is of no influence on the considerations set out in the foregoing.

5.10. In general it is impossible to find out, for the purpose of determining whether and if so to what extent the business of a bank is financed with own or alternatively with outside capital, how a particular asset was financed, and accordingly one can in principle but refer to the fact that every asset to an extent is covered by own capital. In the judgment of the court this must apply also to the business of a banker's permanent establishment. The result is in the court's judgment that in this case there falls to be established whether and if so to what extent own capital of the taxpayer company's main office should be taken to have been maintained to cover the assets and activities of its Netherlands permanent establishment. The fact that the size of the main office's own capital is in part based on the requirements formulated by the local supervisor does not detract from the principle. The court considers it unlikely that the own capital of the taxpayer company's main office would play no part in servicing the conduct of the business of the Netherlands permanent establishment as well, now that it has been established that the own capital of the taxpayer company's head office corresponds to a

**26**

BIS-ratio of 10.25%. In the judgment of the court it is not plausible that this own capital should serve exclusively the business conducted by head office. In addition, also bearing in mind the purpose and extent of the Second Banks Directive, it is not plausible that the own capital prescribed by the Belgian authorities as respects the taxpayer company in the sum of ECU 5,000,000 would have to serve only as surety for the conduct of the business of the taxpayer company in Belgium.

5.11. In the judgment of the court, and also bearing in mind the considerations expressed in the foregoing, it is primarily up to the taxpayer company to show plausibly that, and the extent to which, there are internal borrowings to which the exception mentioned in 5.4 can refer. Thus, as in the case of bankers' activities it is generally not really possible to establish a relation between specific items on the assets side and specific items on the liabilities side, it is up to the taxpayer company to adduce facts and circumstances which reasonably explain why in the present case the capital allocated by the taxpayer company to its permanent establishment should be exclusively outside capital, while the taxpayer company's own capital should not serve at all for the business of the Netherlands permanent establishment.

5.12. In the judgment of the court the taxpayer company has not proved facts and circumstances on the basis of which the taxpayer company can be considered to have rightly assumed that the assets and activities of the enterprise conducted with the assistance of the Netherlands permanent establishment were financed exclusively by outside capital.

On the other hand, the inspector has, by means of the report mentioned in 2.5, established a link between the taxpayer company's (head office's) own capital and that of its permanent establishment, and [shown] that according to that report that permanent establishment should (have to) have available to it an own capital of ƒ20,820,648. Now that the taxpayer company has adduced no evidence as to any own capital serving the permanent establishment, and it is not plausibly acceptable that no own capital serves the permanent establishment, it would have been up to the taxpayer company to show that the inspector calculated the own capital at work in the permanent establishment at too high a figure. On this point, also, the taxpayer company has adduced no evidence. Bearing in mind the sum of ƒ245,939,352 (ƒ266.891.000 – 131.000 – 20,820,648) which the permanent establishment is allowed by the inspector to justify as a fiscal debt in the internal current-account relationship with head office, the sum of ƒ20,820,648 leaves enough room for the taxpayer company's proposition that 'in the banking business one may assume that by far the larger part of the moneys that are lent and borrowed between head office and permanent establishment is borrowed from third parties' (supplement to notice of appeal, p 14). (The proposition is based on the 1984 OECD **27** report 'The taxation of multinational banking enterprises'.)

Exhibit 2

5.13. The taxpayer company has submitted that the inspector's method of calculating the interest correction applied by him is contrary to the treaty, because this would be an unauthorised method of calculating profit (profit split) and (or in the alternative) because the inspector did not carry out a functional analysis. The court rejects this submission. In a case such as this one, where it is primarily up to the taxpayer company to show that the financing of the business of the permanent establishment results functionally from the nature and size of that business, and where the taxpayer company has adduced no evidence—other than to say generally that 'interest are normal business costs to banks, interwoven as they are with the conduct of banking business' (supplement to notice of appeal p 13)—no more can be expected from the inspector than that he attributes the taxpayer company's own capital reasonably among the enterprises discernible within the taxpayer company, on the basis of the information available to him. The court refers for this proposition to the explanation in the examination report by the inspector, as set out in 2.5. It has not been shown that by following that examination report the inspector did not act reasonably. Nor does the court consider that the method applied by the inspector is contrary to the test referred to earlier. By applying the BIS-ratio found in respect of the taxpayer company and the weighted assets of the permanent establishment the inspector has implemented the fiction of independence in an acceptable manner. In this connection it has not become plausible that the activities of the permanent establishment would not be sufficiently comparable to the activities of head office. Nor is the foregoing influenced by the fact that within the OECD a discussion is under way about a uniform method by which the countries connected to the OECD would be able to establish the extent to which (for tax purposes) financing of a permanent establishment of a banking institution with own or alternatively outside capital is permissible. This circumstance does not mean that, as long as the said discussion has not resulted in applicable law, it should be accepted as a starting point that the taking into account of interest in the relationship between permanent establishment and head office of a bank should be entirely at the bank's discretion.

5.14. The taxpayer company has also prayed in aid a Resolution dated 7 May 1930 … no B 4904. This Resolution contains the following:

> 'As in the banking business the division of capital should generally be the starting point for the division of profit, one should begin by determining which part of own capital has been placed or is active in each country. It follows that what falls to be divided is the capital of the entire enterprise plus the reserves. In doing so it should be assumed **28** that the fixed capital (real estate, furniture, participation in other businesses) is primarily financed out of the enterprise's own means. One may assume that in banking there will always remain a part of own capital by way of "own working capital".
>
> Once own capital has been divided into "fixed means" and "own working

> capital" and the allocation of "fixed means" to the various countries has taken place, the total of "own working capital" is to be similarly allocated. In connection with the differences in currencies and interest rates between the different countries it may be assumed that the moneys employed in any particular country (bills of exchange, loans, loans guaranteed by securities, debtors in current account and other credit items) find their origin primarily in outside means (deposits etcetera) taken up in the same country. If in any particular country the moneys employed are less than the moneys taken up, it should be assumed that no "own working capital" exists in that country but that the office in that country makes outside working capital available to offices abroad.
>
> However, if in any country the moneys employed exceed those taken up there, that must be in consequence of working capital having been acquired elsewhere. In that case there remains only the question of how that working capital is to be divided into "outside" and "own" working capital.'

5.15. The inspector has submitted that the 1930 Resolution was revoked by the Resolution of 3 May 1971 no … BNB 1971/4. That Resolution contains the following:

> '(1) This is to inform you that I have found reasons for summarising certain instructions or parts thereof, which appear in the book VeB '42 but are of importance for the implementation of CTA '69 as well, in an instruction for the book VeB '69.
>
> In addition, some (…) documents will be included separately in that book under their original date, corrected where necessary.
>
> It may be assumed that any (…) document not transferred by any of those methods are of no importance to the implementation of Act VeB '69, except to the extent that they are to be included in the executive decree to be issued pursuant to s 5 of the Act.'

The question of allocating capital to the permanent establishment of a bank is not among those summarised in Resolution BNB 1971/144.

5.16. In the judgment of the court it is not possible to conclude decisively from the text of Resolution BNB 1971/144 that Resolution B no 4904 can no longer be trusted to provide protection in law. Presumably the Secretary of State for Finance intended to indicate in

**29**

Resolution BNB 1971/144 which of the Resolutions dating from before the introduction of CTA continued in force for the purpose of implementing that Act, but that intention does not appear clearly enough from the text of the Resolution.

It is accordingly to be assumed that the taxpayer company could in principle rely to some extent on the governmental policy set out in Resolution B no 4904, even if only to the extent of being reasonably under the impression that the Resolution is still in force.

5.17. The inspector has also submitted that even if the taxpayer company could still rely on Resolution B no 4904, it would not on the basis of that Resolution be entitled to have nothing but outside capital available to it. In that connection the inspector has submitted that according to the Resolution there is no 'own working capital' if in any country, in this case the Netherlands, the moneys employed are less than the moneys taken up in that country, and furthermore that it is not plausibly acceptable that the moneys employed in the Netherlands by the taxpayer company are less than the moneys taken up there. In his defence the inspector writes on that subject:

> 'In the case of the taxpayer company the moneys employed exceed the moneys taken up.: Most of the moneys taken up come from the main office ("Bankers") and are the credit balance of the final account (…) The locally borrowed amount (at most somewhat more than ƒ80 million) pales into insignificance against the sum locally employed (more than ƒ357 million).'

The court considers the explanation of the Resolution implied in the inspector's submission to be correct, and is furthermore of the opinion, also in the light of the inspector's submission in this connection, that the taxpayer company has not shown that the condition, requisite for the absence of 'own working capital' which follows therefrom, has been satisfied. On that ground the court rejects the taxpayer company's submission.

5.18. On a secondary level the taxpayer company has also submitted that it is implied in an application of the fiction of independence that payments made in respect of guarantees provided by head office and in respect of the use of the name are to be charged against the domestic income of the taxpayer company. In the judgment of the court the taxpayer company did not sufficiently support this submission by facts, against the reasoned contradiction thereof by the inspector, with the result that it will be passed over.

5.19. During the hearing the taxpayer company submitted that the inspector's position results in a worse treatment of a permanent establishment of a bank than of a comparable subsidiary company. In this **30** connection the taxpayer company submits that there is either discrimination within the meaning of art 6 (now 12 EC) of the treaty for the creation of the European Communities of 25 March 1957, as modified (…) [in] 1992 (hereafter: the EC Treaty), or conflict with the freedom of establishment within the meaning of art 52 (now 43 EC) of the EC Treaty, either because the inspector imposes capital requirements on the permanent establishment of the taxpayer company while he does not do so as respects Netherlands subsidiary companies of banks established within the

Exhibit 2

EU, or alternatively because the own capital that according to the inspector is to be allocated to the permanent establishment of the taxpayer company is higher than the minimum own capital to be maintained by a Netherlands subsidiary company in the banking business. The court cannot follow this submission by the taxpayer company: What has been considered in the foregoing concerns the application of the fiction of independence, the purpose of which is precisely to achieve equal fiscal treatment of a permanent establishment and a comparable subsidiary company. The fact that the inspector imposes requirements as to capital on the permanent establishment of the taxpayer company is actually the result of that fiction of independence. The own capital to be maintained by a 'banking subsidiary' in the Netherlands— pursuant to rules by the Netherlands Bank amounting to ECU 5,000,000 (…)—has the character of a minimum own capital to be maintained in the interest of solvency. However, the comparison between permanent establishment and subsidiary company does not stop at that minimum. Just as there may be 'banking subsidiaries' whose own capital exceeds the minimum prescribed by the local authorities, there may also be permanent establishments of banks to which that applies. Whether and if so to what extent that is the case depends on the circumstances in any particular case. It follows that the circumstance in the present case that a higher own capital is allocated to the Netherlands permanent establishment of the taxpayer company than the minimum prescribed by the Netherlands Bank for 'banking subsidiaries' does not by itself mean a worse treatment of permanent establishments than of 'banking subsidiaries'. Accordingly there is no question of discrimination or conflict with the freedom of establishment contrary to community law.

5.20. All of the foregoing leads to the conclusion that the appeal is without foundation.

**6. Costs**

As the decision appealed against remains in force and there appear to be no special circumstances, the court considers that there are no grounds for ordering one of the parties to pay the costs of the proceedings within the meaning of s 8:75 of the General Act of administrative law.

**31**

**7. Decision**

The court declares the appeal without foundation.

**Acknowledgment**

The editor and publishers would like to express their thanks to Edo de Vries for his translation of this decision.