EXHIBIT 1

**Case No. 95-758T**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(Judge Nancy B. Firestone)**

**NATIONAL WESTMINSTER BANK PLC,**

**Plaintiff**

**v.**

**THE UNITED STATES**

**Defendant**

---

# U.K. REGULATORY CAPITAL REQUIREMENTS APPLICABLE TO THE OPERATIONS OF U.S. BRANCHES BY U.K. BANKS

---

**Report for the United States Department of Justice**
**Tax Division**
**Washington, DC**
**U.S.A.**

**by**
**Richard Henry Farrant**
**Berkshire, England**

**November 19, 2004**

EXHIBIT 1

## I. INTRODUCTION

I am asked by the U.S. Department of Justice, based on my experience and in relation to the period from 1981 to 1987 [referred to below as "the relevant period"], to:

- identify the regulatory authority(ies) responsible for the regulation of banks in the U.K. and describe the U.K. regulatory process applied to the capital adequacy of U.K. banks operating in the U.S.A. through branch establishments;

- discuss the relevant rules, guidelines, expectations, both formal and practical, regarding the level of capital to be held by U.K. banks with U.S. branches, and the determination of incremental capital attributable to a U.S. or other foreign branch of a U.K. bank, both when a branch begins operations, and thereafter;

- describe the consequences of failure by a U.K. bank to adhere to regulatory requirements or expectations.

## II. MY BANKING SUPERVISORY EXPERIENCE

As discussed in detail below, banking regulation in the United Kingdom during the relevant period was conducted primarily by the Bank of England. I was employed by the Bank of England from 1967 until 1994, and involved in its banking supervision activities from 1976 until 1994, although this included two periods in 1983 and 1984 to 1986 when I was lent to the Isle of Man and Hong Kong respectively to help their governments deal with banking crises. From 1978 until 1983, and from 1986 to 1994 I was directly responsible for the Bank of England's regulatory policy (including in relation to capital adequacy), initially as manager, and subsequently as an Assistant and then Deputy Head of Banking Supervision. I was a member of the Basle Committee of bank supervisors from Group of Ten countries.

In 1994, I became chief executive of the Securities and Futures Authority, the then regulator of U.K. securities business, and in 1997 became managing director of the Financial Services Authority, established to unify U.K. financial regulation, including banking regulation. I resigned from that position in 1999, and from 1999-2000, on behalf of the Hong Kong Government, I led an investigation to identify the causes of the failure of Hong Kong's largest investment bank. At the present time, I am Chairman of the Banking Code Standards Board, an organization composed of more than 150 subscribing banks and building societies, whose purpose is to ensure standards of good practice and to discipline subscribers that breach those standards. I was educated at Oxford University. I have attached my complete Curriculum Vitae as Exhibit A to this Report.

EXHIBIT 1

## III. EXECUTIVE SUMMARY

1. The Bank of England was the bank regulatory authority responsible for supervising the activities of U.K. banks such as National Westminster Bank PLC during the years at issue, including the adequacy of their capital.

2. The Bank of England used a Risk Assets ratio to determine whether clearing banks, such as National Westminster Bank PLC, had adequate capital. The Risk Assets Ratio compared a bank's capital to its risk adjusted worldwide assets. A bank's worldwide assets for purposes of the ratio included the assets of its branches in the United States.

3. The Bank of England determined the Risk Assets Ratio required of each bank based on its individual circumstances. Generally, the necessary Risk Assets ratio imposed ranged between 8% and 15%, with large, risk diversified clearing banks like National Westminster Bank PLC being at or near the 8% level.

4. The Bank of England's determination of adequate capital included capital computed by reference to the risk adjusted assets of a bank's U.S. branches.

5. The Bank of England's capital determination for a specific bank would normally be met by capital held at its U.K. headquarters and recorded on the books of the banking enterprise as a whole. However, it would not object to capital required against a bank's U.S. branch assets being held and recorded on the books of the U.S. branches.

6. Thus, based on Bank of England standards and practice at the time, it is clear that National Westminster Bank PLC held additional capital to support its branch operations in the United States. By "additional capital" I mean an amount of capital over and above the capital it would have had absent its six U.S. branches. In particular, I expect National Westminster Bank PLC had additional capital in the vicinity of 8% of the risk adjusted assets of the six U.S. branches.

7. I cannot be more precise about the capital actually maintained during the years at issue to support the U.S. branches, because the Court's ruling on July 16, 2004 precludes inquiry into this issue.

8. The Bank of England mainly relied on informal pressure to ensure large banks maintained their capital requirements, although it had reserve legal powers, which were strengthened in 1986.

EXHIBIT 1

## IV. ANALYSIS

### A. The regulatory process in 1981-1987

Following a crisis of confidence in small U.K. banks in the mid 1970's, requiring emergency liquidity support arranged by the Bank of England (referred to as "the Bank"), the Bank started formal supervision of all U.K. banks, initially without statutory backing. This was replaced by a statute based structure in 1979, when the Banking Act 1979 was implemented. This introduced a 2 tier regulatory structure, administered by the Bank of England. All businesses of taking deposits from the public must be licensed by the Bank as deposit-taking businesses, unless it "recognised" them as banks. National Westminster Bank became a recognised bank. The Bank had formal powers to require information and to direct licensed deposit takers, but no formal powers over recognised banks other than to withdraw recognition and thereby force them to seek licensed deposit taking status, or to apply to the courts to wind up an insolvent recognised bank. The theory underlying this was that the Bank did not wish to disturb its good informal relationship with recognised banks by acquiring formal powers over them, and could rely on its informal persuasive powers to ensure compliance with its wishes. However, the failure of a recognised bank in 1984 (Johnson Matthey) discredited this arrangement, and a new Banking Act was passed in 1986, which in broad terms abolished the category of recognised bank and extended the Bank's statutory powers to cover all deposit taking businesses. National Westminster Bank sought and was granted licensed bank status under the new Act. In reality, the process of supervision in relation to the capital adequacy of the major banks, including National Westminster Bank, remained largely unchanged.

In 1986, the London Stock Exchange agreed with the U.K. competition authorities to open up its membership to banks and banking groups, and this set in train a progressive loosening of previous barriers to entry in different specialised financial activities. The Financial Services Act, passed in 1986 and implemented over the next 2 years, required financial institutions, including banks, to seek separate authorisation for most forms of securities trading, investment management and investment advice from a number of self-regulatory bodies or the Securities and Investments Board (which supervised these self-regulatory bodies). From the end of 1987 these bodies began to impose their own capital requirements on banks' relevant activities within the U.K., which were "carved out" of the Bank of England's requirements, but this would not have had a material effect until 1988 at the earliest. They are in any case not relevant to U.S. branches of U.K. banks in the 1980's, since they did not apply to activities outside the U.K., and such activities were not then permitted in the U.S.A. by U.S. regulation. I conclude that the only relevant regulatory process during the relevant period was that administered by the Bank of England.

### B. Relevant rules, regulations and policies

The Banking Act 1979 and its 1986 successor required licensed deposit taking institutions and recognised banks to be fit and proper. One of the criteria for fit and properness was to have adequate capital for the range and scale of its business activities, including activities conducted outside the U.K., with the Bank empowered to decide how this should be measured and assessed. Following consultations with the banking industry, the Bank issued a series of policy statements describing how it would do this. The policy statements are attached to this Report as Exhibit B and consist of the following:

EXHIBIT 1

- The Measurement of Capital, September 1980 (the general framework)
- BSD/1983/1 (relevant section is treatment of large risk concentrations)
- BSD/1985/2 (treatment of revolving underwriting facilities and note issuance facilities)
- BSD/1986/1 (treatment of very large risk concentrations)
- BSD/1986/2 (further definition of subordinated debt eligible for capital base)
- BSD/1986/3 (general framework for consolidated supervision)
- BSD/1986/4 (eligibility of redeemable preference shares for capital base, and detailed adjustments to some risk asset categories)
- BSD/1987/1 (new general framework for large risk concentrations)

The key document is the Measurement of Capital, September 1980, which sets the basic blueprint that applied throughout the relevant period. (Bracketed references below refer to paragraphs of this document.) The important considerations for the purposes of U.K. capital requirements in relation to the operation of U.S. branches by large U.K. banks are the following:

- In assessing the capital adequacy and risk exposure of banking groups, it is necessary to take account of the business of all the branches at home and abroad (as well as the majority owned subsidiaries engaged in the banking business). (see paragraph 5).

- Two standard capital adequacy measurement techniques were utilized: The Risk Asset Ratio and the Gearing Ratio. Regulatory priority was applied to the Risk Asset Ratio. (see paragraph 8).

- The Risk Asset Ratio compared the quantity of capital and certain other liabilities which are capable of being set against losses without detriment to the interest of depositors in the bank (described as "the capital base"), with the total of the bank's assets after pro forma adjustment for their relative riskiness. Assets which were considered on average riskier than a typical loan to a business or individual customer were adjusted to a higher value than their balance sheet value, while assets considered to be less risky were adjusted to a fraction of their balance sheet value. The total of these assets so adjusted was described as the bank's "risk assets". The theory was that there should be a minimum safety margin of funds which could absorb losses against the risk of possible losses inherent in the bank's business measured by its risk assets.

- The Gearing Ratio compared the capital base with the current liabilities of the bank. The theory was that there should be a minimum safety margin of capital which could absorb losses against the total of liabilities which would have to be repaid even if losses were incurred.

- The Bank's approach to the assessment of capital adequacy was intended to be flexible, taking into account the individual circumstances of each bank, and not to

EXHIBIT 1

prescribe a precise numerical guideline for the capital needs of all institutions or groups of institutions. (see paragraphs 3, 4, 10, and 32).

- Capital adequacy of each bank was left to private determination by the Bank of England, after confidential discussions with the bank, according to each bank's circumstances. While the Bank vigorously opposed a bank's disclosure of the capital requirements the Bank determined, I recall that it was generally thought that the range of minimum risk asset ratios applied across the banking system was broadly from 8% for the largest and most risk diversified clearing banks, to 15% or more for small or new banks without a diversified business;

- The Bank placed high priority on tightly defining capital (described as the capital base in the document) in these ratios, since any change of capital has a hugely magnified effect on the ratio compared with a change of similar arithmetic size in risk assets or non-capital liabilities. Although the Risk Asset Ratio featured 8 different categories of risk assets, these were broad brush categories (see Appendix A of the document);

- Capital could include subordinated loans with an initial and remaining term of at least 5 years (and meeting certain other conditions), on which interest would be payable, However, subordinated loans could not provide more than one third of the total capital base (after adjusting for goodwill and other intangible assets). A reducing proportion of such capital would be included as its remaining term fell below 5 years;

- Assets were measured net of any provisions held specifically against their known diminution in value (see paragraph 20 of the document). But reserves and "provisions" which were freely available to absorb future losses not presently identified could be included in the capital base (see paragraph 21). Provisions against known or anticipated tax liabilities were excluded from the capital base (see paragraphs 22 and 23).

- As stated above, the intention was to apply the capital adequacy measures to worldwide assets of U.K. banks, and also on a consolidated basis to the subsidiaries of U.K. banks on a worldwide basis. Since, at that time the routine statistical returns only covered U.K. business, discussions would be held with banks to agree on an appropriate statistical framework for the classification of assets held abroad. (see paragraph 34).

The other documents listed above, and attached to this report, are included for completeness. They introduced more detail to the policy set out in the Measurement of Capital paper of September 1980, but this detail is unlikely to have impacted significantly on the application of capital adequacy to business conducted by the U.S. branches of National Westminster Bank in the relevant period.

EXHIBIT 1

### C. Capital adequacy policy applicable to clearing banks such as National Westminster Bank

The Bank of England's regulation of clearing banks in the relevant period, including National Westminster Bank, reflected their special position in the U.K. banking system. The four English clearing banks dominated U.K. retail banking, and were the key U.K. incorporated banks with large banking operations abroad, including in the U.S.A. Within the Banking Supervision Department in the Bank of England, one division of 6 to 8 people covered them and the four much smaller Scottish and Northern Irish retail banks, supported by a manager and a Deputy Head of Banking Supervision. These banks accounted for almost 10% of the total Banking Supervision staff, although there were then 600 banks recognised or licensed by the Bank at the time. These very large banks were supervised on an annual cycle, based on information specially commissioned from each bank. Once per year, the Bank, following discussions with each bank, would decide a programme of supervisory review tailored for it. This would then be pursued throughout that year. The review might include particular business streams, of which operations in the U.S.A. might be one, or particular aspects of the whole business, such as capital adequacy, or group management structure. The Bank would identify the specific information it needed for these reviews. This was in contrast to the supervision of all other banks, which broadly followed a quarterly (i.e. three monthly) cycle, reflecting their simpler business model and much smaller scale, and was usually based on the routine statistical returns made by that bank.

One reason why the very large banks, such as National Westminster Bank, were supervised on an annual cycle based on specially commissioned information was that until 1986 the Bank's routine statistical returns covered U.K. resident business only. This reflected their original purpose for monetary and economic policy observation. A new set of half-yearly returns on a worldwide single entity and consolidated basis was introduced in 1986, but it would not have been until after the end of the relevant period that reliance would have been placed on it for supervising the largest banks.

The Bank was keenly interested in promoting international cooperation and coordination of the supervision of internationally active banks: it played a key part in the development of international agreements at Basle in this area; and sought to foster close working relations with supervisors of banks in U.K. headquartered or owned elsewhere, and with foreign supervisors of the activities of U.K. banks abroad. The Bank had very close working relationships with the U.S. Federal Reserve System and the Comptroller of the Currency, and good relationships with the FDIC and New York State banking regulator. The Bank encouraged inspections of foreign banks in U.K. by their parental supervisors, although during the period under review the Bank did not employ on site inspection abroad of U.K. banks. However, it did routinely discuss the outcomes of inspections by U.S. regulators of U.S. branches of U.K. banks (although I believe it did not have direct access to the inspection reports themselves).

The Bank did not apply capital adequacy requirements to branches of foreign banks in the U.K., although where it was clearly dissatisfied with the headquarter supervision of a foreign bank, it would insist on the foreign bank's operations in the U.K. being conducted in a U.K. incorporated subsidiary, subject to full U.K. capital adequacy requirements. It is my understanding that U.S. bank regulators also did not apply capital adequacy requirements to U.S. branches of U.K. banks, and relied instead on the U.K.'s capital adequacy determinations.

EXHIBIT 1

Although there was no specific written policy, the Bank made clear that banks should discuss with it major new business initiatives, notably the commencement of foreign operations by U.K. banks. In some cases, these developments would not be permitted at all, where the Bank considered the risks could not be contained sufficiently. In other cases, they might be permitted within defined parameters, or on the basis that a higher Risk Asset Ratio or additional liquidity safeguards would be imposed. These would later be reviewed after the new business had bedded down, usually after a year or two. Other than the routine coverage of U.S. branch assets by the Risk Assets Ratio, I would judge that it is unlikely that National Westminster Bank would have had any additional capital requirements imposed on it arising from its U.S. branch operations in the 1980's. But I would judge that it is likely that the general business model and management of its U.S. branch business would have been included within the yearly review cycle during the relevant period.

**D. Adherence to capital adequacy policy requirements**

As already described, the Bank set Risk Asset Ratio requirements for each U.K. bank, according to its perception of its circumstances. The process involved discussion, and for recognised banks (such as National Westminster Bank) could be described as a one-sided negotiation, since the Bank had no formal powers to impose its will, other than to withdraw the bank's status as a recognised bank. A similar approach applied to dealing with failures to maintain the agreed requirement. At the start of the relevant period, in 1981, the Bank was still new to statutory supervision, and its approach was softer and more open to persuasion than it was at the end of the period, in 1987. By then, it had more experience and had become less tolerant. The status of recognised bank had been discredited by the failure of one of them, and had been abolished in the 1986 Banking Act. The Bank then acquired comprehensive legal powers over all banks, and was much more disposed to use them rather than rely on persuasion. These powers included all the usual powers to require information, directly inspect and give supervisory directions to any licensed institution, including imposition of new management, temporary cessation and/or termination of parts of the business, and application to the courts for court supervised administration and winding up.

As the Bank's attitude hardened towards the end of the relevant period, capital adequacy requirements increasingly took two forms: (1) a "trigger" ratio, triggering supervisory concern and an agreement on remedial action within a specified time, with subsequent tracking of remedial performance; and (2) a hard limit, where there was clear expectation of formal supervisorily imposed remedial action. (However, these only became an explicit part of policy when the 1988 Basle Accord on the capital adequacy of internationally active banks was implemented, after the end of the relevant period.) The U.K. clearing banks were thought to have trigger ratios of ½ to ¾% above the hard limit applied to them, although I am not confident as to when or how clearly this would have been articulated during the relevant period. It is very unlikely that National Westminster Bank was subject to use of formal powers during the relevant period. Assuming the National Westminster Bank had a hard limit of not less than 8% in the relevant period, it is reasonable to assume that it would have been reluctant to allow its actual Risk Asset Ratio fall below 8 1/2%, using the formulation of the ratio described in the Measurement of Capital policy document of September 1980.

EXHIBIT 1

To the best of my knowledge and belief. I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing statements are true and correct.

Executed in Berkshire. England on this 19th day of November. 2004.

Richard Farrant

Richard Henry Farrant

EXHIBIT 1

**EXHIBIT A**

**CURRICULUM VITAE**

**OF**

**RICHARD HENRY FARRANT**

EXHIBIT 1

# RICHARD HENRY FARRANT

Lane Farm,
Cherry Garden Lane,
Maidenhead,
Berkshire, SL6 3 QG,
England

**Phone / fax** +44 (0) 1628 822729
**Email** Richard.Farrant@btconnect.com

Date of birth: 20 May 1945

Married with two sons

Education: 11 'O' Levels: 3 'A' Levels; 1 'S' Level; Honours BA in Politics, Philosophy and Economics (Oxford University)

## CURRENT ACTIVITIES

1. **Banking Code Standards Board. Chairman.** The BCSB is a company, established by the banking and building societies industry to promote good standards and practice in banks' services for personal and small business customers, as a better alternative to statutory regulation by the Financial Services Authority. Its remit is to police two Banking Codes, to ensure they set minimum standards of good practice, and discipline subscribers who breach it. There are now over 150 subscribing banks and building societies.

2. **United Financial Japan International plc. Vice-Chairman and Chairman of the Audit and Compliance Committee**. A UK investment bank (£450 mns issued capital and reserves ) with two businesses: proprietary trading in a number of different security markets; and acting as an international securities brokerage and advisory house for Japan related customers. As the Chairman is resident in Japan, I act as de facto day to day Chairman.

3. **Institute of Chartered Accountants of England and Wales Investigation Committee. Chairman.** This Committee supervises investigations into malpractice by chartered accountants and acts as a disciplinary tribunal for all offences not involving expulsion from membership. I am a lay (ie. non-accountant) member.

4. **Sustrans**. **Chairman and senior trustee.** Sustrans is a company and charity which initiated and co-ordinates development of the 10,000 mile National Cycle Network and the national Safe Routes to Schools programme in UK, as part of its role to promote sustainable transport. It has 40,000 financial supporters, and spends approximately £12 mns per year.

5. Occasional **consultancy and lecturing assignments.** The consultancies have been in the financial business area, covering a range of financial regulatory, banking and governance issues, in Hong Kong, New Zealand, Russia, South Africa and Argentina. The lecturing has been mainly associated with the Toronto International Leadership Centre for Financial Sector Supervision.

EXHIBIT 1

**PAST POSITIONS AND CAREER**

**2000 – 2003. Gas and Electricity Markets Authority**. **Non-executive director and member of the Audit Committee**. GEMA was established on 1st December 2000 to unify and administer the regulation of the gas and electricity industry. I retired following completion of two terms of office.

**1997 - 2002. City Financial Law Panel. Panel member.** The FLP's purpose was to find practical solutions for problems which affect the wholesale financial markets resulting from legal uncertainty. The Panel acted as a test bed for professional analyses of suggested solutions. The panel was composed of a Law Lord, a senior judge, senior practicing lawyers, senior public officials, and industry practitioners. It was absorbed into the Bank of England's Financial Stability Division in 2002.

**1999 – 2000. Hong Kong Government. Companies Ordinance Inspector into the affairs of Peregrine Investments.** Peregrine Investments was Hong Kong's biggest investment bank until its collapse in 1998. The terms of reference called for me to identify the causes of its failure, judge the culpability of directors and senior managers, and identify lessons and possible public policy reforms. This required establishing a team of five persons and an office in Hong Kong. Large quantities of data had to be researched, analysed, and judged. My Report was published, and disqualification proceedings against the directors I criticised are in train.

**1997 – 1999. Financial Services Authority. Chief Operating Officer and Managing Director.** I was responsible to the Executive Chairman and Board for managing the merger of 10 existing financial regulators into the FSA, while not permitting day to day regulatory standards to slip. This included responsibility for finance, accommodation, human resources, information technology, overall day to day executive management, and relations (including service level standards) with the Boards and Commissions of the existing regulators.

I resigned following the successful completion of the merger on time and under budget, in order to broaden my interests.

**1993 – 1997. Securities and Futures Authority. Chief Executive and Director,** responsible for the regulation under the Financial Services Act of 1,360 firms involved in the securities, commodities and derivative markets.

I resigned following appointment to the Financial Services Authority, which took over the functions of the Securities and Futures Authority.

**1967 – 1993. Bank of England.** I followed a varied career path, including periods of overseas secondment to Washington DC, the Isle of Man and Hong Kong. My last role in the Bank of England was Deputy Head of Banking Supervision.

I resigned from the Bank of England following appointment to the SFA.