EXHIBIT 1

**EXHIBIT B**

**BANK OF ENGLAND**

**POLICY STATEMENTS**

# The measurement of capital

## A Introduction and general considerations

1 In 1975 the Bank of England published the conclusions of a Joint Working Party which had been formed by the Bank and the London and Scottish clearing banks to examine the nature of capital and of liquidity and to develop principles for assessing their adequacy.[1] Two methods of assessing the adequacy of capital were outlined: a 'free resources' ratio and a 'risk asset' ratio. The first broadly relates current liabilities to capital resources, excluding that part of capital which is devoted to financing infrastructure and other non-banking assets. The second broadly relates the risk of losses which are inherent in the assets of the business to the capital which is available to finance such losses. The 1975 paper argued that the risk measure was the more useful, and in recent years the Bank has come to place increasing emphasis on it.

2 Since 1975 the Bank has been able to test the conclusions of the Working Party in the course of supervisory discussions with a wide range of individual banks; and in the summer of 1979 a consultative paper was circulated developing further the principles put forward in 1975. This paper was the subject of further thorough discussion with the banking community. The present paper incorporates the results of this consultation and establishes, for the purpose of the Bank's continuing supervision under the Banking Act, a basis for assessing the adequacy of capital of all deposit-taking institutions as protection against the risk of loss.

3 In general, the Bank's approach to the assessment of capital adequacy rests on the following considerations. It must be flexible, taking account of the particular character of each institution, and should have regard not only to the interests of depositors with individual institutions but also to the maintenance of confidence in the system as a whole. It is concerned essentially with the capital needs of a continuing business. It must also take account of the acknowledged division of responsibilities among supervisory authorities internationally.

4 Thus the Bank considers that to prescribe a precise numerical guideline for the capital needs of all institutions or for groups of institutions would be inappropriately inflexible. Such an approach would endorse overtrading by some companies and be harmfully restrictive to others. Furthermore, it is recognised that a sufficient flow of earnings is essential as a first defence against losses and as a source of fresh capital to allow a business to grow or even to maintain the scope of its operations during a period of inflation. Profitability and other prudential considerations have their place within the assessment of capital adequacy so that, within a common framework for the measurement of capital applying to all institutions, the Bank's final assessment of the capital adequacy of a particular institution will involve qualitative judgments depending on the nature of its business. Within the field of supervised institutions there will therefore be a range of capital ratios regarded as adequate.

5 A broad international consensus has grown up in recent years that the primary responsibility for supervision of a banking institution rests with the authority of the country in which the head office of that institution is based. At the same time, it is also generally agreed that in assessing the capital adequacy and risk exposure of banking groups it is necessary to take account of the business of all the branches at home and abroad and all the wholly-owned and majority-owned subsidiaries engaging in financial business. In the case of UK-incorporated deposit-taking businesses, it is thus the Bank's approach in assessing capital adequacy to take account of their world-wide operations on a consolidated basis. The Bank also considers that deposit-taking subsidiary companies in the United Kingdom should be adequately capitalised in their own right. In addition to a consolidated measure the Bank will thus also have regard for the capital adequacy of individual deposit-taking companies within a group.

### The objectives

6 The following have been identified as the two most important objectives of capital ratios:

(i) to ensure that the capital position of an institution is regarded as acceptable by its depositors and other creditors; and

(ii) to test the adequacy of capital in relation to the risk of losses which may be sustained.

7 The first objective makes it desirable that one of the measures of capital to be employed by the Bank should be constructed of elements as far as possible available to the public. Depositors and other creditors have to form judgments about the capital adequacy of an institution using published information, and their reaction to these judgments will have an important bearing on the stability of each institution. The second objective requires information, an important part of which is likely to be available only to the supervisory authority and the institution itself. And the more sophisticated the testing mechanism, the less likely it is that the information will be available to the public in the necessary detail.

(1) The paper was reproduced in the Bank of England *Quarterly Bulletin*, September 1975, page 240.

8 In the light of the discussions and consultation mentioned earlier, the Bank has reviewed the ratios currently employed and their components to determine to what extent these objectives are met. It has concluded that the first objective is broadly met by relating current liabilities to capital resources (the 'free resources' ratio, which will hereafter be called the 'gearing ratio'); and that for the purpose of supervision the second objective is the more important so that the risk measure of capital adequacy should take precedence. But the gearing measurement will have a place in ensuring that an institution is not running ahead of its probable capacity to sustain its business in normal circumstances.

9 On the construction of the ratios, the Bank has concluded that some modification of its traditional method of calculating the gearing ratio is necessary; and that some amplification of the simple outline of the risk asset ratio presented in the 1975 paper is required in order more adequately to reflect the degree of risk attaching to different classes of asset.

10 The remainder of this paper is concerned with the construction of these ratios: basic definition of capital, definition of capital and liabilities for the gearing ratio, and definition of capital and risk assets for the risk asset ratio. For neither ratio is any specific numerical guideline established. The Bank takes the view that to publish such numbers would allow insufficient flexibility to take account of the different circumstances of particular institutions. Publication could also impair the ability of an institution to raise fresh capital when most in need. The Bank's views on capital adequacy have been discussed with individual banks in confidence for some time past. This will continue. The guidelines that are evolving are not intended to be inflexible. However, the Bank is firmly of the view that over the longer term certain standards must obtain. It will therefore wish to be assured that in planning for expansion all deposit-taking institutions give due weight to maintaining an acceptable margin of capital.

## B The capital base

11 The capital base will comprise the following:

(i) *Share capital*
The amount paid up (whether in full or in part) on the issued ordinary and non-redeemable preference shares. Share premium.
N.B. Authorised but unissued shares or the amount not paid up on any issued shares are *not* included. Redeemable preference shares are treated as subordinated loan capital (see below).

(ii) *Loan capital*
Loan capital which is fully subordinated to other creditors (including depositors), which has a minimum initial term of five years to maturity and incorporates no restrictive covenants: subject to a maximum of one third of the total capital base net of outstanding goodwill and to straight line 'amortisation' in the last five years of life (paragraphs 14–19).

(iii) *Minority interests*
When included in accounts as a result of the consolidation of subsidiary companies not wholly owned (paragraph 24).

(iv) *Reserves*
Balance on profit and loss account. General reserves, however described, including 'inner' reserves (paragraph 12).

(v) *Provisions*
General bad debt provisions, less any associated deferred tax asset (paragraphs 12 and 21).
N.B. Provisions against specific bad debts and for interest suspended, and provisions for deferred and current taxation, are *not* included (paragraphs 20, 22 and 23).

12 This definition of capital does not wholly accord with the objective of enabling depositors and creditors to see fully the position of an individual institution because inner reserves will not, and general bad debt provisions may not, be apparent to the public although their existence may be known. However, in the Bank's view, it would be unreasonable to disregard these important elements of capital in arriving at the gearing ratio; and for the risk asset ratio, it is accepted that the necessary information will not be fully available to the public.

13 This proposed definition of capital differs in its treatment of loan stocks and of provisions from that contained in the 1975 paper. The considerations that have led to these modifications are described below, together with a note on minority interests.

### Loan stocks

14 The 1975 paper considered that the function of loan stocks is not to provide a reserve against losses but to finance part of the infrastructure of the business; and that such loan stocks should be subordinated and medium or long-term. This conclusion rested on the view that loan stocks are an inadequate substitute for shareholders' funds because of their impermanence and inability to absorb losses without precipitating a liquidation. The Bank has reviewed this approach to loan stocks in the context of a fresh look at the purposes for which capital is required and has concluded that the approach in the 1975 paper is too limited.

15 The following have been identified as the important purposes for which capital is required:

(i) to provide a cushion to absorb losses;
(ii) to demonstrate to potential depositors the willingness of the shareholders to put their own funds at risk on a permanent basis;
(iii) to provide resources free of fixed financing costs;
(iv) to be a suitable form of finance for the general infrastructure of the business.

16 Shareholders' funds are suitable for all these purposes. They carry no obligation for repayment and are available to absorb losses; they provide evidence of the commitment of