the shareholders to the company; there is normally no contractual obligation to pay dividends—and this characteristic, together with the stability of shareholders' funds, means that they are suited to financing infrastructure.

17 Loan stocks are less suitable for these purposes. They do not provide a reserve against losses for a business which continues to trade. They do not demonstrate to depositors a willingness of the shareholders to put capital at risk on a permanent basis; nor do they provide the same flexibility as that provided by shareholders' funds to pay or not to pay servicing costs. In times of low profitability loan stocks can impose a burden because of their fixed servicing costs. On the other hand, loan stocks, providing they are fully subordinated, do protect depositors against loss in a liquidation. There is, in a going concern, some reassurance to be gained from the presence of loan stocks, provided that they are medium or long-term, during periods of temporary loss: although they cannot be written down to absorb losses, their presence could enable the losses to be absorbed by ordinary capital and reserves with less threat to creditors' confidence in the institution. An incidental advantage of loan stocks is that where they are long-term and denominated in foreign currencies, they may improve the maturity and currency match between a bank's banking assets and liabilities. Thus it is clear that while the characteristics of subordinated loan stocks do not make them a full substitute for share capital, their presence can enhance the level of protection available to depositors.

18 The Bank has concluded that, subject to a limit referred to in the next paragraph, fully-subordinated loan stocks should be included within the capital base provided that they have a minimum initial term of five years and are subject to an 'amortisation' factor applied to loan stocks with less than five years remaining to maturity. This factor would discourage unduly short initial terms, soften the impact on capital ratios when loan stocks mature and are not replaced, and reflect the diminishing comfort afforded. In addition, the Bank will wish to ensure that loan stocks used as capital do not have performance or other unduly restrictive conditions attached to them which might trigger their immediate payment, probably when it could least be tolerated from a prudential standpoint.

19 The extent to which the capital base can prudently be enlarged by loan stock subject to the above conditions defies precise measurement. Clearly an institution with a given gearing and a given continuing rate of loss will survive for less time with positive net worth if its capital base contains a high proportion of loan stocks. How high a proportion is prudent must to a large extent be a matter of judgment. The Bank considers that the probability of losses of a size and a duration to cause real difficulty would not be perceptibly increased if subordinated loans were to form an amount not exceeding one third of the capital base net of outstanding goodwill. Institutions are, of course, not precluded from issuing loan stocks in excess of this figure, but the Bank would not include such excess in the capital base when assessing the adequacy of capital.

Provisions

20 The 1975 paper included specific provisions against advances and provisions for suspended interest within its definition of capital. The Bank has reconsidered this and concluded that amounts set aside to cover possible or probable losses that have already been identified provide no protection against future unidentified losses and they should therefore be excluded from the capital base. By the exclusion of specific provisions the Bank does not wish to penalise the prudent institution. Indeed the Bank attaches great importance to the early identification of bad debts and the creation of adequate provisions against them. Supervision will seek to ensure that all companies employ prudent policies in this regard and apply them consistently.

21 The Bank is aware that opinions differ about the nature of the general provision. Some argue that it is designed to cover latent but as yet unidentified bad debts already in the balance sheet, while others claim that in practice it is an unencumbered resource akin to reserves. The Bank has concluded that, where it is satisfied that a general provision is freely available to absorb future losses, it is appropriate to include it within the Bank's definition of the capital base. This is in line with the 1975 paper.

22 The treatment of deferred tax provisions has recently been clarified by the accounting standard SSAP 15[(1)] which states that, in future, provision should not be made for potential tax liabilities on which there is judged to be no claim in reasonable prospect. In principle the Bank accepts that such additional sums as now accrue to reserves (instead of to deferred tax account) under the standard should form part of the capital base. It follows that where continuing provision is made for this purpose, the Bank would not include this provision in its calculation of capital.

23 However, the Bank has noted that for many institutions a substantial proportion of capital resources is subject to a potential tax liability. It is also apparent that, in their interpretation of the accounting standard, companies and their auditors have adopted widely differing views on the probability of the tax becoming payable. This disparity of treatment appears to arise both from the inherent uncertainty of the judgment directors are required to make as well as from differences in the underlying nature of the business conducted by particular institutions. This means that, for the purpose of assessing capital adequacy, unquestioning acceptance of each institution's practice could penalise those who choose to adopt a more cautious policy. In time and with greater experience, the Bank would hope that a more consistent treatment of deferred tax will develop. Until then the Bank will monitor closely the policies adopted, particularly in those cases where potential tax liabilities are large in relation to other capital and where

(1) 'Accounting for deferred taxation', *Statement of standard accounting practice No. 15*, The Institute of Chartered Accountants in England and Wales, October 1978.

the absence of provision is justified on the assumption that existing timing differences will be replaced by new timing differences in future years. If for any institution the profile of maturing deferred tax suggests that the potential crystallisation of a tax payment in any future year could only be met by a material reduction in reserves rather than from an existing provision, the Bank may wish to deduct a proportion of the unprovided potential tax liability in calculating the appropriate capital base.

**Minority interests**

**24** Minority interests are included in the capital base for the assessment of group capital adequacy on the grounds that minority capital in a subsidiary is available to support the proportional part of the liabilities of the subsidiary which is included in the group consolidation. However, the Bank considers that minority interests do not provide support to the group in equal measure to that provided by the parent's own share capital since, unlike that share capital, the minority capital is not available to support losses elsewhere in the group. Accordingly, the Bank would propose to examine carefully all those cases in which minority interests contribute significantly to the consolidated capital base, and to consider whether some part of them should properly be excluded from the base.

## C The gearing measurement

**25** There are several possible gearing measurements, of which the simplest would be the ratio of the capital base to total liabilities (other than capital liabilities). The free resources ratio, however, incorporated some adjustments to the capital base. The Bank has reviewed these for the purpose of calculating the gearing ratio and has concluded that some of them tended to confuse elements of gearing, risk and liquidity in one calculation.

**26** The Bank considers that the following deductions, which were referred to in the 1975 paper, should continue to be made:

(i) *Investments in subsidiaries and associated companies and trade investments*
Such investments are likely to be used as a basis for gearing by the affiliate, and unless some adjustment is made the capital in the parent will therefore be geared on twice. The preferred treatment in this case is to consolidate the business of the subsidiary and the parent, but when this is not done a deduction from the parent's capital is essential. Although not mentioned in the 1975 paper, lending to such companies which has the character of capital should also be deducted in full.

(ii) *Goodwill*
This is justified on the grounds of the uncertainty of the value of that part of the cost of acquiring an asset which exceeds its net asset value.

(iii) *Premises*

(iv) *Equipment and other fixed assets*
The argument for continuing to make a deduction of items (iii) and (iv) is that it is imprudent to employ depositors' funds to finance the offices from which banks operate and the equipment used in the business. The Bank has therefore concluded that a full deduction should continue to be made for the gearing ratio.

**27** On the other hand, the following, which were commonly deducted in the free resources calculation (although not mentioned in the 1975 paper), are not considered appropriate deductions:

(i) *Unquoted investments*
This is one of the elements in which risk and liquidity are confused with gearing potential. These elements should be handled in the risk and/or liquidity measurement. For gearing purposes a total deduction is too harsh, particularly as some unquoted investments may be terminable fixed interest and in credit terms relatively risk-free.

(ii) *Connected lending (other than capital-type lending to subsidiaries)*
In practice it is recognised that connected lending is not homogeneous. The dangers are risk-related rather than gearing-related and are more appropriately observed in that context.

**28** It remains to determine the non-capital liabilities ('public liabilities' in terms of the 1975 paper) to which the capital base, as adjusted, should be related in arriving at the gearing ratio. Past practice has been to take account only of deposit liabilities, although to this the Bank has traditionally added liabilities on acceptances. However, these definitions fail to take account of claims by other creditors. Furthermore acceptances, like other contingent liabilities, are more appropriately considered within the risk measure of capital adequacy; and the inclusion of acceptances (which are not always separately identified in published balance sheets) is inconsistent with the objective that the gearing ratio should, so far as possible, be capable of being calculated from published accounts. Thus for the purpose of the gearing ratio the Bank will measure the adjusted capital base against all other non-capital liabilities apart from contingent liabilities which are incorporated within the balance sheet.(1) This will effectively aggregate the claims of depositors and other creditors.

## D The risk measure

**29** Some of the deductions from the capital base made in the gearing ratio are equally appropriate for the risk asset ratio. Investments in subsidiary and associated companies, trade investments, goodwill, and investment in plant and equipment will be deducted as described in paragraph 26 (i), (ii) and (iv). The 1975 paper suggested, in addition, a full deduction for premises but argued that the ready saleability of the branches of clearing banks justified a lower

(1) The liability of the Scottish and Northern Irish banks for their own note issue will not be included to the extent that it is covered by Bank of England notes and by coin. Subordinated loan stocks, disallowed by the qualifying criteria for the capital base, will also be excluded.