EXHIBIT 1

# BSD Notices

## BSD/1983/1 Notice to recognises banks and licenced deposit-takers (April 1983)

(April 1983)

The implementation of the Banking Act 1979 resulted in the recognition of about 300 banks and the licensing of another 300 deposit-taking institutions; many of the latter were new deposit-takers and others that had not previously been subject to the voluntary arrangements for supervision introduced by the Bank in 1975. In the course of its supervision the Bank has identified a number of matters which it feels should be drawn to the attention of authorised institutions generally. Though most of the points set out in this notice will concern only a minority of institutions, it is being addressed for information to all institutions authorised under the Banking Act. The Bank is ready to discuss with individual institutions the application of these points of guidance.

### 1 Connected lending

Assessment of the risks attaching to loans to companies or persons connected with the lending institution, its managers, directors or controllers, may be obscured by subjective considerations. In the Bank's view such lending can be justified only when undertaken for, the clear commercial advantage of the lending institution and should be negotiated and agreed on an arm's length basis.

The Bank does not normally expect connected business to form a significant proportion of assets. However it does not think it appropriate to set a single threshold figure, applicable in all circumstances, to the total amount of this type of lending since lending can be "connected" in many different ways. In the course of its supervision the Bank has therefore to make a judgement about the degree of connection to be attributed to an institution's loans and its acceptability. In order to do so, it requires full information on all matters relevant to each loan which may be of this kind. When connected lending on any scale exists or is contemplated, institutions should discuss and agree with the Bank the extent of such lending appropriate to their particular circumstances.

As stated in the Measurement of Capital paper, paragraph 26(i), lending to subsidiaries and associated companies which has the character of capital is normally deducted from the capital base of the lending institution. Furthermore, there may be occasions when either under the terms of the lending agreement or by virtue of the financial circumstances of the borrower, connected lending is closer to an injection of risk capital than the provision of a loan of certain value. In such cases the Bank may require the amount of this lending to be deducted from the capital base for prudential calculations.

### 2 Annual accounts and returns to the Bank of England

The Bank expects to receive copies of the annual report and audited accounts of each supervised institution not later than 6 months after the end of the institution's financial year and preferably within 3 months. The Bank also expects to receive regular returns within the time specified for each return, since the Bank's system of supervision depends in large measure on the information shown in these returns. Failure to submit returns on time, or to file accounts within 6 months of its year-end, may lead the Bank to review whether the institution concerned continues to meet the criteria in Schedule 02 to the Act.

EXHIBIT 1

## 3 Large loans to individual customers

If has become clear that some institutions are not sufficiently aware of the need to keep the size of individual exposures within prudent limits.

An important measure of capital adequacy used by the Bank is the Risk Asset Ratio* which calculates the adequacy of capital in relation to the risk of losses which may be incurred. That calculation takes no account of concentration of risk and the Bank in judging the level of the risk asset ratio appropriate for an institution assumes a good spread of assets. However, where it identifies undue concentration of risk, it will expect a higher ratio to be maintained. It follows that an increase in concentration will normally lead to a review of a previously indicated risk asset ratio, with a presumption that a higher ratio will be needed.

* See paragraphs 29, 34 of the Bank's paper. The Measurement of Capital (September 1980)

Experience suggests that exposures (loans, acceptances, guarantees, etc) to one customer or group of customers should not normally exceed around 10% of an institution's capital base.[2] Lending on such a scale should in any case be made only after the most careful credit assessment, against good and sufficient security and if the directors of the lending institution are confident that such exposure can be justified to the Bank. The more an individual exposure exceeds 10% of the capital base, the more rigorous the Bank will be in requiring justification. If loans in excess of 10% of the capital base have been or are to be made, the institution will normally be requested to maintain a level of capital resources significantly higher than that which would otherwise be required.

[2] Adjusted as set out under the heading "Risks Asset Ratio" in Appendix B of The Measurement of Capital paper

## 4 Risk of fraudulent invitations to lend/borrow/intermediate

Institutions appearing on the lists of authorised institutions published by the Bank - particularly smaller institutions in the licensed deposit-taker sector - may find that they are approached by persons unknown to them suggesting participation in very substantial business out of all proportion to their normal scale of activities. These approaches often concern international activities (involving foreign currencies or gold) and are said to be of a confidential nature. Often these approaches are made with the object of committing a fraud. While tactics may vary, the object of the fraud is usually to induce the institution approached either to make payments itself (eg in the form of advance commission or expenses) or to take some action which may lend plausibility to a story to be told to another institution. For this latter purpose any letter using an institution's printed stationery, even a simple letter declining the offer of funds, may be turned to advantage by those perpetrating the fraud.

If business of any substance is offered to an institution without a proper introduction from a trusted customer or financial associate, extreme care should be exercised in authenticating the nature and origins of the transaction and the bona fides of the agent introducing the business. The Bank asks to be informed of all offers which are considered dubious so that appropriate warnings may be given to other institutions. In doing so, the Bank will exercise the greatest care to respect any necessary confidences.

EXHIBIT 1

## ▪ 5 Floating charges

Deposit-taking institutions are reminded that they should not give floating charges over their assets as security for their own borrowing from banks or other sources. Where a lender seeks security in the form of a charge over assets, that charge must either be applied to specific assets or limited to a certain proportion of specified assets, such as hire purchase agreements, in order to ensure that there would always be sufficient unencumbered assets to meet the claims of depositors in a liquidation of the company.

The Bank expects to be informed in advanced of any agreement which would create a charge on an authorised institution's assets.

EXHIBIT 1

# BSD/1985/2 Off-Balance Sheet Risks: Note Issuance Facilities/Revolving Underwriting Facilities (April 1985)

Off-Balance Sheet Risks: Note Issuance Facilities/Revolving Underwriting Facilities

(April 1985)

1. Pressures on banks' capital adequacy ratios in recent years have contributed to a significant growth in off-balance sheet instruments not all of which are currently captured in the prudential measurement of capital and liquidity. This has lead not only to a growth in such new instruments but also to banks taking on such obligations on terms which, in the Bank's view, do not properly reflect the risks involved. The Bank, therefore, wishes to set in train a review, in consultation with banks and other institutions of the range of off-balance sheet risks to which they may be exposed in order to assess those risks more accurately. This review will include the treatment of more traditional and well-established contingent liabilities as well as instruments which have been developed more recently.

2. An area of particular concern arises from the obligations assumed by institutions which act as underwriters of note issuance facilities* or revolving underwriting facilities. The Bank considers that these obligations represent a long-term credit risk for an underwriting bank**, as the bank can be called upon to honour its undertaking to lend at any time during the life of the facility, including circumstances in which the financial position of the borrower has deteriorated and when it might otherwise prefer not to lend. This obligation is different from normal underwriting engagements where, unless the issue has been wrongly priced and is left with the bank, a bank's obligation to the borrower terminates when the issue has been completed.

   * For the purpose of this notice, these facilities are defined as arrangements which enable a borrower to raise funds through the issue of short-term paper, where the availability of funds is in effect guaranteed by a bank or a group of banks underwriting the issue of paper by the borrower. These include facilities arranged for both bank and non-bank borrowers, where the paper is issued in the form of certificates of deposit or promissory notes. They may also include multi-component facilities under which the underwriting institutions may make available alternative funds if the borrower chooses not to make an issue of the notes.

   ** For the purpose of this notice, the term "bank" includes recognised banks and licensed deposit-taking institutions.

3. Although many facilities now include a condition involving any material adverse change in the financial position of the borrower, the Bank considers that an underwriting bank could find itself under strong pressure to provide funds, particularly where there is a long-term relationship between the borrower and the bank.

4. The Bank therefore considers that a bank's underwriting obligations under a note issuance facility should be included in the measurement and assessment of this capital adequacy. The Bank will henceforth, as a provisional measure, treat all such obligations as contingent liabilities for capital adequacy purposes and will include them at a weight of 0.5 in the calculation of the risk asset ratio, whether or not the facility has been drawn down by the borrower. Where an institution holds paper issued under a note issuance facility of which it is an underwriter, its holding of the paper will be weighted as a balance sheet item, and the amount of its underwriting obligations reduced accordingly.

EXHIBIT 1

5. From discussions which the Bank has had with individual institutions, it is clear that many institutions already include underwriting obligations under note issuance facilities within their existing credit limits for individual borrowers. The Bank believes that this is a prudent practice and that it should be adopted by all banks underwriting these facilities. It is important that an underwriting institution makes a full credit assessment of a borrower under a note issuance facility in the same way as it would if it were making an advance, and that it keeps its exposure under continuous review during the life of the facility.

6. An underwriting institution should also ensure that in managing its liquidity it takes account of the possibility that it may be requested to take up at short notice any unsold notes issued by the borrower.

7. Although the Bank does not apply capital adequacy requirements to UK branches of overseas banks, the Bank nevertheless wishes to monitor branches' activities as underwriters of note issuance facilities and to include these obligations in measuring an institution's large exposures to individual customers. Branches of overseas banks should therefore report their underwriting obligations under these facilities to the Bank. Treatment of these obligations of overseas branches for capital adequacy purposes is of course a matter for the authorities in the home countries of these banks. The issues raised in this note have been discussed by the Bank with the authorities in the major industrialised countries who are also considering their own arrangements in respect of this business.

8. A statistical notice to all reporting institutions is being issued at the same time as this notice. In future an institution's underwriting obligations under a note issuance facility should be reported separately, as a contingent liability, under item 13.7 on the form Q7 or under item 7.6 on the form B7, as appropriate. These obligations should also be included where appropriate, under item 20 on the form Q7, or under items 11 and 12 on the form B7.

9. The increasing scale of many banks' obligations under note issuance facilities has prompted the Bank to bring them within the measurement of the risk asset ratio at an early stage. The Bank recognises that some of these facilities may be arranged for a bank borrower. In such cases there will initially be an inconsistency between the weight (0.5) given to all obligations under these facilities and the weight given to market lending to monetary sector institutions (0.2). This matter will, inter alia, be taken up in the broader review of off-balance sheet exposure referred to in paragraph 1.

10. Meanwhile the Bank is willing to discuss the impact of the introduction of this policy with any institution the calculation of whose capital adequacy will be materially affected.

EXHIBIT 1

# o BSD/1986/1 Large Exposures in Relation to Mergers and Acquisitions (February 1986)

Large Exposures in Relation to Mergers and Acquisitions

(February 1986)

0. A number of proposals for large mergers or acquisitions have recently been launched. It appears to the Bank that there has been a significant change in the scale and nature of banks'* traditional involvement in facilitating these transactions. In particular the Bank has noted arrangements or proposals for banks or banking groups:

   * For the purpose of this Notice, references to banks should be taken to include recognised banks and licensed deposit-takers.

   i. to acquire significant strategic shareholdings in companies involved;

   ii. to buy individual subsidiaries from a group involved.

   The Bank wishes to make clear its attitude to these arrangements in the light of its responsibilities under the Banking Act 1979.

1. Until further notice the Bank expects banks and banking groups to give it prior notification of their intention to enter into these types of transactions or any similar transactions.

2. The Bank will not normally regard as prudent such acquisitions of shares in a company which, taken together with existing exposures to that company or group, exceed 25% of the bank's or banking group's capital base.

3. Moreover, the bank will in certain circumstances treat acquisitions of such shares as though they were investments in subsidiaries and will deduct the value of the investment from the capital base.

4. The Bank will not give special treatment to vehicle companies which do not have the effect of transferring the risk of the exposure from the bank or banking group.

5. Where a bank or banking group is already committed, the Bank will discuss with these banks arrangements to bring their position into line with the Bank's requirements as soon as possible.

EXHIBIT 1

- # BSD/1986/2 Subordinated loan capital issued by recognised banks and licensed deposit-takers (March 1986)

Subordinated loan capital issued by recognised banks and licensed deposit-takers

(March 1986)

0. On 28 November 1984, the Bank issued a consultative note entitled "Subordinated Loan Capital issued by Recognised Banks and Licensed Deposit-takers". (For the purpose of this Notice, references to banks should be taken to include recognised banks and licensed deposit-takers.) The note addressed various matters relating to issues of loan capital by banks, and formed the basis for detailed discussions with the banking community about the arrangements applying to bank holdings of debt issued by banks for capital adequacy measurement purposes, the inclusion or perpetual subordinated debt in a bank's capital base and the supervisory treatment of all forms of subordinated debt issued by banks.

1. The Bank has since published the text of two letters* addressed to the British Bankers' Association reporting progress on these matters as discussions with the banks have proceeded. This Notice sets out the Bank's policy on these matters and as such is to be regarded as an addendum to the Bank's paper "The Measurement of Capital" (September 1980). References in this Notice to "The Measurement of Capital" are to this paper.

   * 16 May and 8 October 1985

## 2. Bank holdings of subordinated loan capital issued by other banks

3. The Bank is strongly committed to the principle that, in assessing capital adequacy any investment made in the capital of another bank, whether in the UK or overseas. should be deducted from the holder's capital base, to ensure that the same capital is not used by more than one institution to support its operations. Deduction applies to any subordinated loan capital issued by a UK bank authorised under the Banking Act 1979, or by a bank overseas. It also embraces holdings of subordinated and unsubordinated loan capital issued by holding companies of such institutions or financing vehicles within banking groups**.

   ** The principle of deduction applies to equity as well as loan capital but the concessions explained in this Notice apply only to loan capital if necessary - and presently banks holdings of equity are not great - further consideration may need to be given to the treatment of holdings of equity.

4. In recognition of the important role played by a number of banks in making a market for bank capital issues, however, the Bank is prepared to consider applications from primary and or secondary market-makers for concessions from the principle of deduction.

EXHIBIT 1

# 0. Primary market-makers

5. Those banks which can satisfy the Bank that they act as managers or underwriters for new issues of bank capital may qualify to be regarded as primary market-makers.

   The concession will allow such banks to hold such issues for up to 90 days from the date of issue***, after which a full deduction from the capital base will be made (unless the holding is accommodated within a bank's concession as a secondary market-maker). A bank to which a primary market-maker's concession applies will therefore be allowed to trade in issues which it has managed or under written during this 90 day period.

   *** The date of issue is to be taken as the day on which payment is made by the noteholders (and the first such date in the case of a partly paid issue).

# 0. Secondary market-makers

6. Secondary market-makers are those banks which can demonstrate to the bank that they undertake a committed and regular function as market-makers in banks' capital issues. Banks will be required to identify the particular issues for which they act as secondary market-makers.

7. The amount of the concession will be calculated individually for each market-maker and will normally be set within a range up to a maximum of 20% of the bank's adjusted capital base (as explained in the Measurement of Capital paper). In setting the concession for a subsidiary of a bank, which subsidiary is authorised under the Banking Act, some account may be taken of group capital. In the case of subsidiaries of overseas banks the amount agreed will, inter alia, be subject to the agreement of the supervisor of the parent bank.

8. The concession will be set as an absolute figure and notified in writing to the bank concerned. It will apply to a bank's net long position in bank debt held at the end of each working day, including any debt sold under repurchase agreements. Further details of the scope of the concession are given in the notes for completion of a new statistical return (see paragraph 11 below).

# 0. Primary and secondary market-makers

9. Any bank debt held under a primary or a secondary market-maker's concession will be weighted in the usual way at 1.0 in the calculation of the risk asset ratio. Other holdings of banks' capital will de deducted from the holder's capital base.

10. A holding of group paper by any entity within the bank group concerned should be maintained only on a restricted basis, which will be agreed with individual banks, and will be subject to full deduction from the capital base when calculating the capital ratios of the group on a consolidated basis.

11. Special reporting arrangements will apply in order that the Bank can monitor positions in banks' capital issues. A new quarterly Form MM is

EXHIBIT 1

being introduced for this purpose. The Bank also reserves the right to call from time to time for greater detail of the primary or secondary market portfolios held within either concession.

12. The size of holdings of individual issues held within either a primary or secondary market-maker's concession will be subject to the policy being established on the treatment of large exposures. (A separate consultative document "Large exposures undertaken by institutions authorised under the Banking Act 1979" was issued in July 1985, and a further paper will be issued in due course.)

# 0. Primary perpetual subordinated debt

13. Subordinated debt can be structured so as to bring it close to equity in terms of the protection which it offers to depositors. The principal features which give it this quality of "primary" capital are that it can absorb losses whilst leaving a bank able to continue to trade, that it has no fixed servicing costs (ie that there are circumstances in which the borrower can defer a payment of interest without bringing itself into default) and that the proceeds of the debt issue are made permanently available to the borrower.

14. The following are the conditions which must be satisfied for an issue of perpetual debt by a UK bank to be treated by the Bank as primary capital:

    a. The claims of the lender on the borrowing bank must be fully subordinated to those of all unsubordinated creditors.

    b. The debt agreement must not include any clauses which might trigger repayment of the debt. This will not, however, prejudice any right to petition for the winding-up of the borrower, for example, in the event of non-payment of interest on the debt (other than that which is deferred in accordance with paragraph (d) below).

    c. No repayment of the debt may be made without the prior consent of the Bank (see also paragraph 24 below).

    d. The debt agreement must provide for the bank to have the option to defer an interest payment on the debt (eg if the bank has not paid or declared a dividend payment in a preceding period).

    e. The documents governing the issue of the debt (hereafter referred to as the debt agreement) must provide for the debt and unpaid interest to be able to absorb losses, whilst leaving a bank able to continue trading. This can be achieved by providing for automatic conversion of the perpetual debt, and unpaid interest, into share capital should reserves become negative and where a capital reconstruction has not been undertaken. In such a case the bank will be required to maintain a sufficient margin of authorised but unissued share capital in order to allow a conversion of the debt into equity to be made at any time. Alternatively, instead of providing for automatic conversion, the debt agreement can expressly provide for the principal and interest on the debt to absorb losses, where the bank would not otherwise be solvent, and for the noteholders to be treated as if they were holders of a specified class of share capital in any liquidation of the bank. In this case the debt agreement will provide for the debt to be treated as if it had been converted into share capital either on

EXHIBIT 1

the day immediately preceding the presentation of a petition for the commencement of a winding-up of the borrowing institution or on the date of the creditors' or shareholders' meeting at which the relevant resolution for a winding-up was passed. The debt agreement must contain an explicit warning to noteholders that the debt can be treated in this way.

# 0. Inclusion of primary perpetual subordinated debt in the capital base

15. The amount of perpetual subordinated debt treated as primary capital will be limited to one half of a bank's capital base as defined in the measurement of Capital paper, excluding all loan capital* and after deducting goodwill and other intangible assets. (For example, where the capital base excluding all loan capital and intangible assets is 100, the maximum amount of perpetual subordinated debt which could be treated as primary capital is 50.)

16. The amount of all subordinated debt* which can be included in a bank's total capital base will be subject to an upper limit equal to the capital base excluding all loan capital* and after deducting goodwill and other intangible assets. (Continuing the example given in paragraph 15 above, the maximum amount of all subordinated debt* which could be included in bank's capital base is 100 - for example, 50 of primary perpetual subordinated debt and 50 of term subordinated debt.)

    * Primary perpetual and all other subordinated debt.

17. Term subordinated debt, and perpetual subordinated debt exceeding that allowed as primary capital under paragraph 15 above, will remain restricted to a maximum of one third of the total capital base after deducting goodwill and other intangible assets. (Taking the figure of 100 mentioned in paragraph 15 above and assuming an issue of primary perpetual subordinated debt of 20, term subordinated debt of up to 60 could be included in the capital base - on the basis that the term debt of 60 does not exceed one third of the total capital base of 180.)

18. Any subordinated debt which does not qualify to be included in a bank's capital base, within the limits described in paragraphs 15-17 above, will be treated in the normal way as part of a bank's long term funding.

19. The Bank expects shortly to issue a further Notice to all institutions authorised under the Banking Act, clarifying its treatment of a number of items in the calculation of banks' capital ratios. The Notice will, inter alia, cover the treatment of redeemable shares in a bank's capital base, and this in turn will affect the amount of perpetual subordinated debt which can count as primary capital for banks which have such shares in issue.

# 0. Supervisory treatment of all subordinated debt

20. The Measurement of Capital paper states that subordinated loan capital which is to be included in a bank's capital base (as defined in paragraph 11 of that paper) must, inter alia, have a minimum initial term to maturity of five years, However, the Deposit Protection Scheme offers protection to deposits which have an original term to maturity of not more than five years, so giving rise to the possibility of a loan stock with a term to maturity of exactly five years qualifying both as part of the capital base and for protection under the Deposit Protection Scheme. In order to

EXHIBIT 1

remove this inconsistency, the Bank has for some time required subordinated debt which is to form part of a bank's capital base to have, inter alia, a minimum initial term to maturity of five years and one day. This requirement does not affect loan capital already in issue.

21. The Measurement of Capital paper also states that in order to qualify for inclusion in a bank's capital base, the terms of a loan stock must not contain any restrictive covenants which might trigger immediate repayment.

22. The bank reaffirms that there should be no clauses in the loan agreement which can trigger early repayment of the debt. This includes cross-default clauses and negative pledges. Issues made before 28 November 1984* which contain such clauses will, however, continue to be included in banks' capital bases (although such clauses will not be allowed in respect of any extension of the redemption date or increase in the amount issued).

* This is the date of the Bank's consultative note referred to in paragraph 1 of this Notice when the Bank formally clarified its policy towards clauses which can trigger early repayment of debt.

23. As a further condition, the debt agreement must normally be subject to English law. Where an overseas operating subsidiary is issuing capital in its local market, the Bank will accept foreign law, although the subordination clause contained in the debt agreement or supporting guarantee must still generally be subject to English law. In certain circumstances, however, the Bank will accept foreign law throughout if this is necessary for the success of the issue in the local market. In all cases, however, the Bank must give its prior consent where foreign law is to apply.

24. The Bank requires that no early repayment of any subordinated loan capital may be made without its prior consent: such repayment will be permitted only where the Bank is satisfied that the bank's capital is adequate after repayment. A letter to the Bank, giving effect to this condition and undertaking to seek the Bank's prior consent to any material variation in the terms and conditions of an issue, will be required from the bank concerned. The Bank considers it essential that noteholders should be made aware of the restriction on early repayment, either via the loan agreement or in the offer documents or through other information sources commonly used in the markets.

25. Where it is proposed to make an issue of loan capital which is designed to be included in a bank's capital base, the Bank requires that it should be given prior notice of the issue and sufficient opportunity to consider and agree the loan documentation in advance. However, in order to facilitate the timing of issues, the Bank will accept "shelf documentation" so that only changes from this documentation need be discussed with the Bank before an issue.

EXHIBIT 1

- # BSD/1986/3 Consolidated Supervision of Institutions Authorised under the Banking Act 1979 (March 1986)

Consolidated Supervision of Institutions Authorised under the Banking Act 1979

(March 1986)

0. In a discussion paper published in May 1985, the Bank of England ("the Bank") described its proposed approach to the consolidated supervision of institutions authorised under the Banking Act 1979 (banks and licensed deposit-takers, which are hereafter referred to as "banks"). Following consultations with the banking community and other interested parties, the Bank is now issuing this statement of its policy. The policy has been agreed with H.M. Treasury and its implementation will fulfil, inter alia, the United Kingdom's obligation to comply with the European Communities' Consolidated Supervision Directive (1). (The supervision of financial conglomerates raises broader issues which are not addressed in this paper; the principles to be followed were set out in the answer to a Parliamentary Question on 21 January.)

   (1) Council Directive of 13 June 1983 on the supervision of credit institutions on a consolidated basis (83 350 EEC).

## Introduction

2. The Bank is committed to the principle that the supervision of institutions authorised under the Banking Act 1979 should be conducted on a consolidated basis and indeed the Bank has been carrying this out wherever banks are members of a wider group, although the particular approach adopted has inevitably depended on the nature of each group. The Bank has reviewed the way in which it conducts consolidated supervision of banks in the light of the European Communities' Consolidated Supervision Directive, the revised Basle Concordat (2), and developments in the financial system.

   (2) Committee on Banking Regulations and Supervisory Practices "Principles for the supervision of banks' foreign establishments" (Basle May 1983).

3. The terms "consolidated supervision" and "supervision on a consolidated basis" must be distinguished from the term "consolidation". "Consolidated supervision" essentially involves an assessment of the overall strength of a banking group together with an assessment of the impact on a bank of the operations of other parts of the group to which it belongs. "Consolidation" is used in this paper to mean the preparation of consolidated statistical returns covering a group, or part of a group. Consolidated supervision will often, but not always, require consolidated financial statements to be provided to the Bank.

4. The European Communities' Consolidated Supervision Directive was adopted in 1983 following consultations with the banking community. Although the Bank's previous, practice was already in line with the requirements of the Directive, there were areas where the Bank considered its procedures still needed to be developed further. The Directive itself is generally worded and only relates to subsidiaries of credit institutions which are themselves credit or financial institutions. However, the Bank believes that consolidated supervision, to be effective, needs to go some what further than the requirements of the Directive to include not only companies within a group which have

assets carrying a banking type risk but also, in particular cases, other companies.

5. In order to minimise duplication an possibly conflicting supervisory requirements the banking supervisors will have regard to the supervision carried out by other UK supervisory authorities. These include the Department of Trade and Industry, and a Designated Agency or a Self-Regulating Organisation under the proposals contained in the Financial Services Bill. The presumption must be that the supervisor of, for example, a securities company is the best judge of the adequacy of its capital. The Bank will to generally expect to have to make an independent quantitative assessment of the capital adequacy of group companies which are subject to detailed supervision by other UK supervisory authorities. The Bank's approach will, however, depend on the overall nature of the business of a company which is authorised to do investment or insurance business and the systems of supervision adopted by other UK supervisory authorities.

6. The Bank will not, therefore, normally require group companies undertaking an investment or insurance business and supervised by another UK supervisory body to be included within banks' consolidated statistical returns (except in relation to the country exposure return Form C1, and large exposures). Nevertheless all such companies will be included within the Bank's consolidated supervision of banking groups. To this end the Bank will wish to discuss with group management, inter alia, the organisational structure of the group as a whole and its plans for individual group companies, especially those which might have a significant impact on the financial position of the bank in the group. In addition, the Bank will maintain close relations with the supervisory bodies concerned so as to ensure that both they and the Bank are aware of significant developments in the group which may affect the companies for which they have responsibility.

7. Consolidated supervision of banks does not replace supervision on an unconsolidated basis, but is complementary to it. In some cases steps may have been taken to isolate the bank from the remainder of the group so that developments elsewhere in the group will have little, if any, effect upon it. In such a situation consolidated supervision may not serve any useful purpose.

## ▪ Objective

8. The bank will seek to examine the capital adequacy and risk concentration of banks on a consolidated basis where this is appropriate. This will include large exposures to individual borrowers, countries and other sectoral risks. At this stage the measurement of liquidity and foreign exchange exposure on a consolidated basis for all banks is not contemplated. The assessment of interest rate risk on a consolidated basis is not covered in this paper: the general subject of interest rate risk raises some complex questions which are under study. This paper sets out principles of general applicability which will govern the extent and manner in which consolidated supervision will be applied.

## ▪ Scope of consolidation

9. There are two main considerations in deciding which parts of a group should be included in consolidated statistical returns:

   i. the nature of the activities being undertaken; and

ii. the position of each company within the overall structure of the group.

In respect of those group companies which are not included in consolidated returns, the Bank will wish to obtain information separately about such individual companies which could have a significant impact on the health of the bank or banks within the group.

## ▪ Activities

10. In principle, for the purposes of supervision, figures for all companies which undertake financial business within a group or sub-group headed by a bank should be included in consolidated returns. Financial companies are easier to recognise then to capture within a straightforward definition. The European Communities' Consolidated Supervision Directive defines a financial institution as "an undertaking, not being a credit institution, whose principal activity is to grant credit facilities (including guarantees), to acquire participations or to make investments" (1). However, some other businesses not covered by this definition are financial in nature and these, and possibly others, should be included within the scope of a bank's consolidated returns. The annex to this paper lists the principal activities currently undertaken within banking groups. These may be divided into two groups:

(1) A credit institution is defined as "an undertaking whose business is to receive deposits or other repayable funds from the public and to grant credits for its own account"

a. those which should generally be included in consolidated returns unless there are special circumstances where it can be demonstrated that to do so would be undesirable or misleading; or

b. where inclusion in the consolidated returns will depend on the particular circumstances of the institution concerned.

Activities not included in the annex will need to be considered case by case.

## ▪ Group structures

11. The most important factors to consider before deciding whether inclusion of a particular company in consolidated returns is appropriate are:

i. the management structure;

ii. the size of the company in relation to the bank;

iii. the extent of any funding provided by the bank;

iv. potential calls on, or other adverse consequences for, the bank which may arise from the activities of the company.

Any one of these factors may be sufficient on its own to justify consolidation.

12. A key factor in any approach to consolidated supervision is the nature of the management control of the various companies in a group.

EXHIBIT 1

Accordingly, the Bank will normally accept for the purposes of consolidated statistical returns, and of consolidated supervision more generally, the coverage of banks' existing management and/or financial accounts, unless it has strong grounds for doing otherwise. The additional burden of consolidated supervision in terms of additional coverage and collection of statistics will therefore generally be rather limited.

13. If the companies whose activities the Bank wishes to capture in consolidated returns are all effectively managed from a particular company within a group, its approach will go with the grain of the group's own management control. Thus, if the Bank seeks consolidated statistics on this basis, the group's own management will probably also already require similar information.

14. If the Bank's approach to consolidated returns does not match the group's own management structure, the Bank will wish to discuss with the relevant group management whether the existing group control arrangements represent an acceptable basis on which to build the Bank's consolidated supervision or what mutually acceptable modifications can be devised.

15. As a general rule, all credit and financial companies owned by a bank, either directly or through intermediate holding companies, will be included in the consolidation. Sister companies owned by an ultimate non-bank parent and the ultimate parent itself will only be captured in the consolidation if there are particular reasons for doing so. The appropriate treatment in particular cases will be discussed with the management of the individual group.

16. The Bank accepts that practical considerations should determine the inclusion or exclusion of subsidiaries which do not have a significant effect on the overall picture. In some cases, banks will undoubtedly find it easier to consolidate all the companies in a group or sub-group. It is recognised that some of the companies to be consolidated will add little to the size of the balance sheet, but could have a significant impact on the profit and loss account and the reserves.

17. In some instances consolidation of a subsidiary's assets with those of its parent may not be meaningful because of significant differences in the nature of the assets and/or activities of the two institutions. In this case the companies will need to be considered separately. Although it is normally neither desirable nor appropriate to consolidate non-financial companies, the potential impact of such companies on the viability of a bank within the same group needs to be considered. The bank will not seek to extend its supervision to such companies, but it must be recognised that a major difficulty elsewhere in a widely diversified group may have some impact on the fortunes of a bank and the Bank must take account of this.

18. In conducting supervision on a consolidated basis, the Bank expects to have regular discussions with those members of the group's management who are familiar with, and have responsibility for, the overall group position. these discussions will be complementary to those held with the management of individual banks. The bank will also need to have discussions with the supervisors of companies within the group which are subject to separate supervision (for example, in respect of investment and insurance businesses).

19. Where the ultimate parent in a group is itself a bank, it is reasonable to assume that the management control starts with that company and can encompass all the subsidiaries which the Bank will wish to include within its consolidated supervision. The only issue to be considered in these circumstances is whether there are any sub-groups, incorporating

a separately authorised institution, which might be looked at separately as well as being incorporated in the overall consolidated supervision.

20. Where the ultimate parent is an overseas bank, the normal approach will be to include in the consolidated supervision only subsidiaries of the United Kingdom bank. There may, however, be circumstances where supervision on such a basis is of little real value and, subject to the terms of the European Communities' Consolidated Supervision Directive (1), need not be undertaken because of the nature of the supervision of the parent. On the other hand, there may be circumstances in which the Bank might wish to consider wider consolidation.

(1) The European Communities Directive allows supervisory authorities to forego supervision on a consolidated basis where the parent is subject to supervision on a consolidated basis by the supervisory authority of a Member State. It also provides for bilateral agreements to be reached with the authorities in non-member countries.

## Type of consolidation

21. The Bank's basic approach is to require full consolidation for all majority shareholdings in credit or financial institutions. Full consolidation of minority holdings may also be carried out where any one of the following applies:

a. the management is provided by the bank concerned;

b. the name of the bank is used and/or the bank is strongly identified with the institution;

c. there are no other substantial shareholders;

d. the associate is substantially funded by the bank.

Consolidation of a minority holding will not normally be required unless the holding is a material one in a company of significance. This will be determined on a case-by-case basis.

22. Even in cases where (a) to (d) above do not apply, the full consolidation of minority holdings in banks may still need to be considered. This is because even a relatively small shareholding in another bank may be seen to carry responsibilities which go beyond the capital invested. It is, therefore, necessary to capture this additional risk in assessing the position of a banking group. In other cases, namely where there is a good reason for the responsibilities, and therefore risks, to be limited to the shareholding, pro rata consolidation may be justified.

## Distribution of capital resources within a group

23. In determining the level of the risk assets ratios for each bank and each banking group, the Bank takes into account a range of factors which cannot be incorporated within the simple structure of risk weightings applied to assets in the calculation of risk asset ratios. these factors include, for example, the general nature of the business of a bank or banking group including the degree of diversification and the experience of management. An additional factor is the amount of capital held elsewhere in the group to which a bank belongs. The Bank also has

EXHIBIT 1

regard to the implications of particular group structures for banks' consolidated capital ratios.

24. In determining the balance between ratios calculated on a consolidated and unconsolidated basis for a group including a bank or banks, the following broad principles will govern the Bank's approach:

a. Consolidated risk assets and gearing ratios will be calculated to assess the capital adequacy of the group as a whole.

b. In assessing the adequacy, or otherwise, of consolidated capital ratios it will be necessary to examine the location of capital within the group to ensure that reliance is not being placed on surplus capital which is locked into particular countries, or indeed companies, and therefore which is not available to support the group more widely. Tax considerations are relevant, and the Bank may wish to make a notional deduction for the tax which might be payable if funds were to be transferred to another company within the group.

c. Adequate capital ratios are required in each bank but, to avoid double counting, loans to group companies which are incorporated in the United Kingdom, and are separately authorised under the Banking Act, will be ignored. These funds will only be weighted in the company which lends them to a borrower which is not another UK incorporated group bank. (Similarly, intra-group contingent liabilities will also be excluded from the ratio calculations.)

d. The Bank expects bank members of a group to maintain capital ratios in line with those expected of entirely independent banks undertaking the same range and scale of business. However, certain amendments to the calculation of the ratios, described in paragraphs 24(c) and 26 will be made: namely removing the double counting of certain intra-group lending and allowing non-bank subsidiaries which are effectively divisions of the parent to be included when calculating "solo" (ie unconsolidated) ratios.

25. As a matter of principle, the Bank will therefore assess and ensure capital adequacy both on a consolidated and unconsolidated basis. The Banking Act requires banks to maintain net assets which, together with other available financial resources, are considered appropriate by the Bank. However, this does not rule out the possibility that a bank may hold some of its own capital other than on its own balance sheet, particularly downstream where it is under the bank's control.

26. The Bank is prepared to consolidate certain subsidiaries in computing the "solo" ratios, specifically where all of the following apply:

i. the subsidiary is at least 75% owned - to ensure complete control (and tax grouping) in most circumstances;

ii. the management is undertaken by the parent company's own staff;

iii. it is clear that there are no potential obstacles to the payment of surplus capital up to the bank, in particular taking account of overseas exchange controls, potential legal problems and taxation;

iv. there is sufficient capital in the bank to fund the fixed assets in its own balance sheet and its investment in its own subsidiaries (this is to ensure that such assets are not funded by deposits);

EXHIBIT 1

v. the subsidiary is wholly funded by the bank itself.

## Large exposures

27. The bank believes that individual exposure should be monitored and controlled both at the group and the individual bank level. In a consultative paper (1) setting out proposals for its policy towards large exposures undertaken by banks, the Bank proposed a limit of 25% of capital base (2). This limit would apply, except in the most exceptional circumstances, for exposures to individual borrowers and groups of closely related borrowers which are undertaken either by a bank or a bank group. The paper also proposed that banks which are subsidiaries of other banks may be allowed to undertake exposures of up to 50% of capital base provided that, for groups headed by a UK incorporated bank, the exposure to the borrower remains overall within the 25% of capital base limits for the group and the parent bank.

(1) "Large exposures undertaken by institutions authorised under the Banking Act 1979" (July 1985)

(2) Adjusted capital base as defined in "The Measurement of Capital" 1980.

28. Following consultations with the banking industry and other interested parties, the Bank will issue a paper setting out its detailed policies (including the definition of an exposure) for the monitoring and control of large exposures. These will be applied both to the solo and consolidated positions of a bank.

## Foreign exchange exposure

29. In principle it is necessary to supervise the foreign exchange exposure of a group on a consolidated basis in addition to the exposure of an individual bank. The Bank's principal objective initially is to take account of the consolidated foreign exchange exposure in computing consolidated capital ratios rather than to monitor on a day to day basis the consolidated dealing position of a group. The Bank recognises, however, that it is often difficult to obtain all the necessary statistics to carry out a full consolidation. For the present therefore, it will concentrate on identifying all foreign exchange exposures - trading and structural - throughout a group, but will not require these to be regularly reported in the form of consolidated returns.

## Liquidity

30. The Bank recognises that group operations may be carried out in a number of markets which can differ in their legal, regulatory and institutional characteristics, in the stability of deposits and in the range of marketable instruments available to form a stock of liquid assets. A number of these markets may overlap to varying degrees, but the distinctive characteristics of each market mean that they cannot simply be aggregated. Neither a fully centralised nor a fully decentralised approach to the monitoring of liquidity is adequate for all purposes.

31. The Bank believes that the supervision of group liquidity should start from an assessment of the adequacy of liquidity by reference to each market in which a group operates, and with particular regard to the way in which management operates. Once an assessment of each market has been made, an overview can be taken on the extent to which

EXHIBIT 1

surplus liquidity in some markets can cover possible problems in others, and on the capacity of the central reserve (if any) to provide a breathing space in a crisis. The Bank will wish to discuss with each bank during the course of prudential interviews its liquidity position and policies on a consolidated basis. It is not intended at present to collect consolidated statistical returns for liquidity.

## Statistical issues

### Risk asset weightings

32. The weightings applied by the Bank to a bank's assets for the purpose of the risk assets ratio are set out in the Bank's paper "The Measurement of Capital". These weightings make little distinction between overseas assets of different kinds, for example, claims on governments or the private sector. Such an approach is less justifiable when considering the consolidated position of a group, a substantial part of whose capital and assets is held abroad.

33. In assessing the adequacy of capital on such a basis, therefore, differences in the risk associated with the assets held locally by each subsidiary need to be considered from the point of view of that institution rather than that of the parent company. A distinction between local and non-local assets needs to be applied to the existing weightings on calculating the risk assets of overseas subsidiaries. Accordingly, claims for example on the government of a country held by a subsidiary which is located in that country will be weighted in the same way as are claims on the United Kingdom government by a United Kingdom bank.

### Reporting requirements

34. Institutions will be required to provide consolidated data half-yearly. the consolidated returns will be additional to the unconsolidated returns already collected from banks on a monthly and quarterly basis.

35. Initially, the reporting arrangements for most institutions will require the completion of two forms - a new consolidated balance sheet (form CBS), and the existing Q7 form, which was designed for completion on either a consolidated or unconsolidated basis. At this stage the provision of data regarding foreign exchange exposure or the maturity structure of assets and liabilities will not be required on a consolidated basis.

36. The preparation of consolidated returns raises numerous technical problems of an accounting nature as the choice between alternative accounting practices, such as the valuation rules for assets and liabilities denominated in foreign currencies, can have a significant effect on the assessment of group capital. The accounting problems associated with the consolidation of overseas subsidiaries and associates may be especially acute. The bank will, therefore, with to discuss with a bank the accounting policies adopted where these could substantially effect its consolidated returns

EXHIBIT 1

- # Annex Activities within Banking Groups

A Activities which will normally be included in consolidated returns:

bullion trading

business expansion funds management (1)

cheque and voucher trading

commodity broking and trading (2)

provision of executor/trustee services (1)

factoring & invoice discounting

financial/investment advice (1) (2)

hire purchase lending

house mortgage lending

insurance broking (1) (2)

investment/fund management (1) (2)

lease management (1)

leasing

money broking (1)

provision of pension services (1) (2)

securities trading (2)

securities underwriting (2)

trade finance

unit trust management (1) (2)

provision of venture/development capital

(1) It will only be appropriate to consolidate the balance sheet and profit and loss account of the management company, not the activities or funds managed.

(Premises beneficially owned and occupied by a bank but held in a subsidiary company should also be brought within the consolidation, as should subsidiaries whose only activity is to hold accrued profits, usually off-shore.)

B Activities where inclusion in the consolidated returns will depend on the circumstances of the institution concerned (3):

EXHIBIT 1

(3) These and other non-financial activities will generally only be included in consolidated returns if they are very small in relation to the balance sheet and business of the parent bank and it would be inconvenient to exclude them.

provision of computer services

diamond dealing/broking

estate agency

general insurance (2)

life assurance (2)

management services

plant hire services

property development/management

shipping agency services

travel agency services

(2) Banks' investment and insurance activities which are carried on through non-bank UK supervised subsidiaries will not normally be included in consolidated returns but will be taken into account, qualitatively, during the course of consolidated supervision.