EXHIBIT 1

o # BSD/1987/1 Large Exposures Undertaken By Institutions Authorised Under the Banking Act 1987 (September 1987)

Large Exposures Undertaken By Institutions Authorised Under the Banking Act 1987

(September 1987)

## I INTRODUCTION

0. This notice sets out the policy of the Bank of England ("the Bank") towards large exposures entered into by institutions ("banks") authorised under the Banking Act 1987 (the "Banking Act") (1). As required by section 38 of the Banking Act this Notice (2) also sets out the principles by which the Bank will determine whether and the extent to which, a UK incorporated bank has an exposure which must be notified to the bank within the terms of that section. Section 38(1) of the Banking Act (3) requires UK-incorporated banks to make a report to the Bank if:-

hh. it has entered into a transaction or transactions relating to any one person as a result of which it is exposed to the risk of incurring losses in excess of 10% of its available capital resources; or

ii. it proposes to enter into a transaction or transactions relating to any one person which, either alone or together with a previous transaction or previous transactions entered into by it in relation to that person, would result in its being exposed to the risk of incurring losses in excess of 25% of those resources.

(1) Other than:-

(i) discount houses the policy for which is set out in a paper which is being circulated to the institutions concerned

(ii) banks whose sole function is to operate a money fund or similar facility. The exposures of such banks are considered separately outside the terms of the policy set out in this notice.

(2) Together with the detailed reporting instructions for the completion of the large exposures reporting forms.

(3) See Appendix I it should be noted that S 38(9) of the Banking Act states that an institution which fails to make a report as required by that section shall be guilty of an offence, and (S 38(10)) liable on summary conviction to a fine.

This requirement also applies where:-

the transaction or transactions relate to different persons if they are connected in such a way that the financial soundness of any of them may affect the financial soundness of the other or others or the same factors may affect the financial soundness of both or all of them [section 38(2) of the Banking Act].

1. The Banking Act's notification requirements relate only to a UK incorporated bank's large exposures which are either undertaken by the bank itself or, at the discretion of the Bank, the bank together with its

EXHIBIT 1

subsidiary or subsidiaries (4). The Bank is however also concerned in the course of its on-going supervision of banks with large exposures in a banking group defined more widely than allowed for by the Act, and exposures entered into by UK branches of overseas banks. The principles set out below (including the definition of an exposure) will therefore also be applied to banking groups, and UK branches of overseas banks (5).

(4) Paragraph 7(ii) of this notice sets out the circumstances in which subsidiaries of a bank may be consolidated for this purpose.

(5) In the case of the latter however, the bank measures exposures in relation to the balance sheet of the branch rather than the capital of the bank as a whole.

2. The large exposures policy is concerned with the size relative to a bank's capital of a bank's individual exposures to credit risk - the risk that claims on others may not be redeemed at the due date because of the inability of the counterparty to meet his obligations. The policy takes into account the form of the exposure (so as to reflect, for example, the actual amount at risk rather than the nominal amount in the case of certain interest rate and foreign exchange rate instruments) and the nature of the counterparty (thus exposures to banks are treated differently from those to non-banks).

3. The Bank's approach to large exposures takes into account the particular characteristics of individual banks, including the nature of their business and the experience of their management. A level of exposure in relation to capital which might be considered prudent for one bank may not be so for another. In particular, although 10% of capital base (6) has been chosen generally as the cut-off level for reporting, purposes, for some banks the Bank will determine it prudent to set a lower percentage. (7)

(6) The Banking Act (section 38) refers to 'available capital resources'. The Bank has determined that available capital resources should be represented by a banks capital base.

(7) In determining the acceptability of a large exposure the Bank will also take into account the number of a bank's large exposures.

4. The remainder of this notice is ordered as follows:-

| | |
|---|---|
| II | Coverage |
| III | Definitions<br><br>hh. An exposure<br><br>ii. Capital base<br><br>jj. Individual (and groupings of closely related) non-bank counterparties |
| IV | Banks' policy statements |
| V | Underwriting exposures |
| VI | Exposures to individual non-bank counterparties |
| VII | Exposures to counterparties connected to the reporting bank |
| VIII | Exposures to banks |
| IX | Exposures to countries |

EXHIBIT 1

| | |
|---|---|
| X | Exposures to economic sectors |
| XI | Exposures undertaken by banks which are subsidiaries of other banks |
| XII | Exposures undertakend by UK branches of overseas banks |
| XIII | Additional capital requirements covering a banks's large exposures |
| IV | Pre-notification reporting requirements in the case of exposures exceeding 25% of capital base |
| XV | Transitional arrangements |
| APPENDIX 1 | Section 38 of the Banking Act |
| APPENDIX 2 | Definition of capital base. |

## II COVERAGE

6. Exposures of UK incorporated banks will be considered, and will require to be reported on both an unconsolidated (solo) and consolidated basis. Exposures calculated on an unconsolidated basis are required to be reported quarterly and those calculated on a consolidated basis six monthly. Exposures will be considered in relation to the capital base (1) of the reporting bank and where appropriate, its capital base calculated on a consolidated basis.

   (1) See paragraphs 19 and 20 below.

7. Included within the coverage of a bank's unconsolidated returns are:-

   . all of its branches (including overseas branches); and

   i. any subsidiaries the Bank has agreed in writing may be consolidated for the purpose of the reporting bank's solo (ie unconsolidated) capital ratio in accordance with the principles set out in the Bank's notice on consolidated supervision (2). The reporting bank's exposures to such subsidiaries will not be separately assessed nor require to be reported.

   (2) "Consolidated supervision of institutions authorised under the Banking Act 1979" BSD/1986/3 (paragraph 26).

8. In assessing a bank's exposures on a consolidated basis the companies to be consolidated with the bank (which may include sister companies, and holding companies as well as subsidiaries) will be agreed by the Bank in accordance with the principles set out in the Bank's notice on consolidated supervision (3). Where these principals determining that a sub-group of a banking group should be separately assessed (including a requirement for separate consolidated returns to be provided) a bank's large exposures will also be assessed on that basis.

   (3) ibid (paragraphs 9-20). It should be noted (paragraph 6 ibid) that the coverage of a bank's consolidated large exposures returns includes group companies supervised by another UK supervisory body.

9. A bank which is a branch of an overseas bank is also required to report its large exposures. The Bank's policy (set out in paragraph 60 below) towards large exposures in branches of overseas banks takes into account the need for such exposures to be assessed in relation to the capital and exposures of the bank as a whole as well as to the balance sheet of the branch.

EXHIBIT 1

10. The Bank recognises that it may be difficult to obtain information on large exposures from some overseas branches or overseas companies within a group and that in certain cases there may be legal obstacles to branches and companies providing the information. The Bank will wish to discuss such difficulties with individual banking groups.

# III DEFINITIONS

(a) An exposure (1)

(1) Exposures entered into by banks as trustees are not covered by S38 of the Banking Act nor by the policy described in this notice.

11. A large exposures policy is concerned with concentrations of risk. It is therefore appropriate that the measure of exposure should reflect the maximum loss should a counterparty (2) fail. Consistent with this principle an exposure for the purpose of the large exposures policy encompasses the amount at risk arising from the reporting bank's:-

(2) See paragraphs 21 to 28 below.

. claims on a counterparty including actual claims, and potential claims which would arise from the drawing down in full of undrawn advised facilities (whether revocable or irrevocable, conditional or unconditional) which the bank has committed itself to provide, and claims which the bank has committed itself to purchase or underwrite; and

i. contingent liabilities arising in the normal course of business, and those contingent liabilities which would arise from the drawing down in full of undrawn advised facilities (whether revocable or irrevocable, conditional or unconditional) which the bank has committed itself to provide; and

ii. assets, and assets which the bank has committed itself to purchase or underwrite, whose value depends wholly or mainly on a counterparty performing his obligations, or whose value otherwise depends on that counterparty's financial soundness but which do not represent a claim on the counterparty. (3)

(3) This category includes, principally equities and equity warrants which do not represent a claim on the issuer but whose value depends, inter alia on the issuer's financial soundness.

12. The amount of risk under paragraph 11(i), (ii) and (iii) above will be taken as the full amount (book value) of the reporting bank's claims and contingent liabilities to potential claims and liabilities in the case of undrawn facilities (4) unless stated otherwise in the detailed reporting instructions issued by the Bank for the completion of the large exposures returns.

(4) It may be the practice for a bank or banking group to have sub-limits within an overall facility limit for the different types of business or to be advised by different branches or subsidiaries of the bank. These sub-limits may total more than the overall facility limit in such cases the exposure is taken as the overall facility limit rather than the aggregate of the sub-limits provided that the bank or banking group concerned has satisfied the Bank that its systems are adequate to ensure that its actual exposure is at all times contained within the overall limit.

For:-

EXHIBIT 1

. underwriting commitments

the amount at risk, in the case where a bank has underwritten an issue of securities (equities or bonds), should be measured as its credit equivalent amount (5). For:-

i. interest rate contracts (including interest rate swaps, forward rate agreements and interest rate options purchased); and

ii. foreign exchange rate contracts (including cross currency swaps, forward foreign exchange contracts and foreign exchange options purchased)

the basis of measurement is yet to be determined.

(5) The method of calculation is set out in section V.

13. In the case where an asset is being traded, claims on the counterparty to the transaction which occur whilst the transaction is in the course of settlement do not constitute an exposure falling within the large exposures policy. Such claims arise either after payment has been made but before an asset is delivered, or before payment has been received but after an asset has been delivered. However, claims on a counterparty which arise from the failure of the counterparty to settle within 7 days after the due date are deemed to constitute an exposure and are therefore required to be reported.

14. A counterparty's failure to settle may also involve a bank in loss even where the bank itself may not have settled. This potential loss, which represents the net cost of replacing the counterparty in a proposed transaction, is also deemed not to be an exposure falling within the scope of the large exposures policy (1).

(1) Except in the case of interest rate and foreign exchange rate agreements (see paragraph 12 above).

15. Although exposures arising from settlement risk are not presently included within the scope of the large exposures policy the control of such exposures needs to be carefully considered by banks. Inadequate controls could be a cause of substantial loss for a bank. The Bank will therefore pay particular attention during the course of its supervision to how individual banks control such risks.

16. In calculating a bank's exposure from its securities trading operations a bank's exposure is calculated as its net long position in a particular security (a short position in one security issue does not qualify to be offset against a long position in another issue made by the same issuer). The exposure is reportable as an exposure to the issuer.

17. It may be impractical for some banks to introduce systems which would enable them to calculate their exposure (in accordance with the definition of an exposure set out in this section) to individual counterparties at all times. Such banks, which will usually have an extensive branch network or group structure, will typically have adopted a system of limits which are allocated to individual branches or group companies but which ensure that the overall exposure to a counterparty is controlled. For such banks the Bank may agree that, for the purpose of post notification, the maximum exposure to a counterparty occurring during a reporting period is not required to be reported; but they will be required to report their actual exposure at the reporting date and the control limit for that counterparty if either exceeds 10% of their capital base. The bank must have satisfied the Bank that it can control the size of its exposures through the adoption and allocation of counterparty

EXHIBIT 1

limits. The Bank will need to be satisfied that the bank's control systems are such that its exposure to a counterparty may reliably be taken as being no higher than its adopted limit for that counterparty.

18. The reporting instructions, which include the detailed definition of an exposure, may be amended from time to time in order, inter alia, to take into account new forms of risk-taking activities undertaken by banks and changes in market practice.

(b) Capital Base

19. The definition of the capital base is that used for calculating a bank's risk asset ratio with the exception that a bank's holding of another bank's capital is not deducted. The components of the capital base are set out in Appendix II (2).

(2) A full description of the components of the capital base os set out in the Bank's paper. The Measurement of Capital (September 1980) as amended in respect of perpetual debt by the Bank's notice of March 1986 (BSD/1986/2) and in respect of preference shares by the Bank's notice of June 1986 (BSD/1986/4).

20. Banks require a firm figure for their capital base against which they can operate, and the Bank can monitor, their large exposures policies. Therefore the figure for the capital base to be used for this purpose will be agreed by the Bank with the reporting bank on the basis of the bank's audited balance sheet for the latest financial year. The Bank will, however, adjust this figure for new issues of capital during the course of the year and take account of other major changes to the capital base, either upwards or downwards. In either circumstance the amended figure will be agreed with the bank and advised to it in writing.

(c) An individual non bank counterparty and a group of closely related non bank counterparties (3)

(3) The term ‘individual non-bank counterparty’ is subsequently used in this notice to include ‘groups of closely related non bank counterparties’.

21. Exposures are required to be reported and controlled according to the nature of the counterparty (4). For this purpose an individual non-bank counterparty comprises natural and legal persons and includes individual trusts, corporations, unincorporated For further information about the European Regulatory Library, contact Technical Indexes on businesses (whether as sole traders or partnerships) and non-profit making bodies.

(4) The counterparty to an exposure will as a rule be the borrower (customer), the person guaranteed or the issuer of a security in certain cases where the bank has based a credit decision solely (or very largely) on the strength of a guarantee from a third party the exposure may qualify to be reported as an exposure to the guarantor.

22. Exposures to local governments, public corporations and other public sector entities will be generally included within the large exposures policy as exposures to individual non-bank counterparties. An exposure to such a body, whether resident in the United Kingdom or overseas, will however be considered as an exposure to a central government where either -

. the central government has guaranteed all that body's liabilities; or

EXHIBIT 1

i. the central government has guaranteed the exposure and the guarantee is in an acceptable form.

23. In the case of a guarantee under paragraph 22(ii) above the guarantee should be explicit and unconditional, and, in particular should not depend upon the bank meeting or continuing to fulfil its contractual obligations to the counterparty in respect of the exposure, or performance conditions laid down by the guarantor being met either by the bank or the public sector body. Exposures covered by this provision will usually be in the form of market issues made by public sector bodies such as major public utilities which are in effect raising finance on behalf of a government.

24. Whether public sector exposures meet the criteria set out in paragraphs 22 and 23 above will be determined on a case by case basis. (1)

(1) For exposures covered by ECGD bank guarantees see paragraph 38 below.

25. Individual non-bank counterparties exclude overseas central governments. Exposures to overseas central governments will be considered in the context of exposures to countries [see paragraph 53 below (2)].

(2) The Bank will however require such exposures to be reported to it.

26. A group of closely related non-bank counterparties exists where individual non-banks "are connected in such away that the financial soundness of any of them may affect the financial soundness of the other or others or the same factors may affect the financial soundness of both or all of them" (3). In such cases the exposure to these individual non-banks should be aggregated and considered as a single exposure to ‘a group of closely related non-banks’.

(3) S38(2) of the Banking Act.

27. It is not possible to give a comprehensive list of the different types of relationship between individual counterparties which it is reasonable to consider as giving rise to a common risk and therefore which constitutes a group of closely related non-banks. However the detailed reporting instructions identify some illustrative relationships which, prima facie, qualify to be considered in this way.

28. Where there is doubt in a particular case whether a number of individual counterparties constitute a group closely related non-banks or where, notwithstanding that the relationship between a number of counterparties identified in the reporting instructions exist, the counterparties do not share a common risk the circumstances should be discussed with the Banking Supervision Division to determine how the exposure(s) should be reported.

## ▪ IV BANKS' POLICY STATEMENTS

29. The Bank requires each bank to set out its policy on large exposures, including exposures to individual customers, banks, countries and economic sectors, in a policy statement. In the case of UK incorporated banks, this policy should be formally adopted by the bank's board of directors. Moreover, the Bank expects banks not to implement significant changes in their policies without prior notification to, and discussion with, the Bank. Significant departures from a bank's stated policy, in particular those involving breaches of the agreed levels, will lead the Bank to consider whether the bank continues to meet the statutory minimum criteria for authorisation.

EXHIBIT 1

30. The necessary control systems to give effect to a bank's policy on large exposures must be clearly specified and monitored by its board. The Bank will discuss the effectiveness of the control systems in operation during the course of its on-going supervision of banks. The maintenance of adequate accounting and other records and internal control systems throughout a bank's business is an explicit requirement for authorisation under the Banking Act. The Bank will require banks to obtain reports from reporting accountants (normally their auditors) on whether the records and systems meet the Bank's requirements (1). The Bank will, as part of a rolling programme of examinations, require reporting accountants to pay particular attention to the systems for the control and reporting of large exposures.

(1) The Bank' s requirements are set out in a notice "Guidance note on accounting and other records and internal control systems and reporting accountants' reports thereon" (BSD/1987/2)

September 1987.

## V UNDERWRITING EXPOSURES (2)

(2) This section deals only with the underwriting (both lead underwriting and sub-underwriting) of discrete issues of securities. The special treatment for underwriting set out in this section does not extend to any commitments of a continuing or revolving nature.

31. The risks involved in underwriting differs substantially from those involved in ending activities typically undertaken by banks. The likelihood of a bank experiencing a loss from an underwriting commitment is related to the risk of actually having to take up the securities, possibly leading to a subsequent forced sale. Although there is an element of credit risk this is generally low. The former risk is affected by the type of underwriting commitment, and forced sale risk by the nature of the security underwritten. For these reasons the amount at risk on an issue is more reasonably measured in the context of a large exposures policy by some proportion of the amount underwritten rather than by the full amount of the issue. In addition, the Bank recognises that more flexibility is warranted in assessing underwriting proposals which must be notified to it before being entered into.

32. The Securities and Investments Board (‘SIB’) and The Securities Association (‘TSA’) have proposed (3) capital requirements for underwriting positions which reflect an assessment of the relative risks in different types of underwriting deals and different types of securities. These capital requirements (or as subsequently amended) provide a basis for determining the proportions of the amount underwritten to be considered at risk (the 'credit equivalent' amount) for the purpose of this policy. Where a bank has taken a position by underwriting a securities issue, the credit equivalent amount (which should be calculated intra-day including the first day of issue) will be the SIB/TSA's capital requirement (4) for that position multiplied by ten (5). It should be noted that the SIB/TSA's capital requirements can vary during the course of an underwriting and the credit equivalent amount may consequently also vary. A more detailed note setting out the basis of this system of measurement will be available to banks which undertake underwriting transactions.

(3) ‘Proposals for position risk capital requirements’ (Part 4) July 1987.

(4) More formally the IPRR (Investment Position Risk Requirement).

(5) However (i) where these capital requirements do not reflect a

reduction from the SIB/TSA's normal PRFs (Position Risk Factoral or a reduced requirement for the initial period of an underwriting or for an initial period after entering into an underwriting commitment, the initial PRF should be assumed to have been applied for that period (iii) where securities are taken up be a bank under an underwriting commitment the exposure should be taken as their book value.

33. The SIB/TSA's proposals permit the netting of amounts sub-underwritten from the underwriting commitment. This may be done in calculating the credit equivalent amount for the large exposures policy.

34. Where the credit equivalent amount of an underwriting (6) exceeds 10% of the reporting bank's capital base the bank is required to report it as an exposure in the same way as for other forms of exposure. Where the credit equivalent amount of a proposed underwriting (6) exceeds 25% of capital base the exposure is also required to be notified to the Bank before the commitment is entered into. The Bank will seek to minimise the time it takes to assess whether an underwriting exposure which, as measured, exceeds 25% of capital base, is prudent, by agreeing general guidelines with each bank which undertakes this business. Where such a guideline has not been agreed, the minimum prior notification period will be as set out in Section XIV below.

(6) Together with other exposures the bank may have to the same counterparty.

## VI EXPOSURES TO INDIVIDUAL NON-BANK COUNTERPARTIES

35. Each bank will be expected to justify to the Bank its policy on exposures to individual counterparties, including the maximum size of an exposure contemplated, and to satisfy the Bank that excessive risks are not being undertaken. Relevant factors which the Bank will expect a bank to have taken into account when setting its policy and considering the acceptability of particular exposures include, for example, the standing of the counterparty, the nature of the bank's relationship with the counterparty, the nature and extent of security taken against the exposure, the maturity of the exposure, and the bank's expertise in the particular type of transaction. Exposures to counterparties connected with the bank - for example, subsidiaries or sister companies or companies with common directors - will continue to be particularly closely examined. (Exposures to counterparties connected to the reporting bank are considered in section VII)

36. Exposures which exceed 10% of a bank's capital base are required to be reported (1). The more an individual exposure exceeds 10% the more rigorous the Bank will be in requiring a banks management to justify that exposure. Most banks are not expected, however, to adopt policies which lead to 10% being exceeded as a matter of course.

(1) As explained in section 1 above this figure may be set at a lower level for individual banks.

37. The Bank does not expect exposures to an individual counterparty to exceed 25% of a bank's capital base other than in the most exceptional circumstances.

38. While the Bank will take security into account when considering the acceptability of a bank's exposures up to 25% of its capital base, the presence of security taken on its own will generally not be considered by the Bank as an acceptable reason for an exposure to exceed 25%.

However, where the security fully covers the exposure and is in the form of British Government Stock ('BGS'), cash deposits held with the lender or an ECGD bank guarantee the existence of that security will be considered as sufficient justification for an exposure to exceed 25% of the bank's capital base (see also paragraph 63 below). In the case of:-

. an exposure secured by BGS the lender's legal title to the security should be fully protected and the BGS should be located in the same legal jurisdiction as the exposure. An appropriate margin over the amount of the exposure should be maintained to cover fluctuations in the market value of the securities. The margin should inter alia reflect the maturity of the exposure, and the arrangements for marking to market the security and for ensuring that any result deficiency in the margin is made up;

i. an exposure secured by a cash deposit, the lender's legal title to the deposit should be fully protected and the deposit should be located in the same legal jurisdiction, and have identical or longer maturity than the exposure. Where the cash deposit is in a different currency from the exposure an appropriate margin over the amount of the exposure should be maintained to cover fluctuations in the relevant exchange rates. The margin should, reflect the arrangements for ensuring that any resultant deficiency in the margin following an exchange rate change is made up;

ii. an exposure secured by an ECGD bank guarantee, the Bank will require to be fully satisfied that the reporting bank has sufficient expertise and systems in place to ensure that its obligations under the guarantee are met fully (2).

(2) Unless the Bank has notified the reporting bank that it is fully satisfied in this respect such exposures are not expected to exceed 25%.

# ▪ VII EXPOSURES TO COUNTERPARTIES CONNECTED TO THE REPORTING BANK

39. Exposures to companies or persons connected with the lending bank, its managers, directors or controllers require to be given particular consideration since the decision to undertake such exposures may be influenced by subjective considerations which prevent a proper credit assessment of the bank's counterparty from being carried out. Such exposures can be justified only when undertaken for the clear commercial advantage of the lending bank, and when it is negotiated and agreed on an arm's length basis.

40. It is recognised that lending can be "connected" in many different ways, and that each such exposure, therefore, requires to be considered individually.

41. Exposures to subsidiaries which are regarded, within the Bank's policy on consolidated supervision, as, in effect, divisions of the parent bank (1), and are consolidated with the parent bank in the calculation of the bank's capital ratio on a solo basis, are excluded from the scope of the large exposures policy.

(1) The consolidated supervision paper (paragraph 26) sets out the

EXHIBIT 1

criteria for determining which subsidiaries may be treated as divisions of the parent bank viz(i) the subsidiary should be at least 75% owned (ii) the management should be provided by the parent bank, (iii) there should be no obstacles to the payment of surplus capital up to the parent, (iv) there should be sufficient capital in the bank to fund the fixed assets in its own balance sheet and its investment in the subsidiary, and (v) the subsidiary should be wholly funded by the bank.

42. Exposures to group companies which are themselves authorised under the Banking Act other than one which controls, directly or indirectly, the lending bank, will be generally considered on a case by case basis.

43. In respect of exposures to other group companies the Bank's policy allows a bank to take on a treasury role on behalf of the group as a whole. Although by borrowing in order to on lend to group companies a bank will increase its exposure to those companies, a centralised treasury operation which is properly conducted may reduce the overall risks for the bank and bank group as a whole. Thus the central treasury function of a bank in a group strengthens the bank's control over the operations (including risk taking) of the other group companies and facilitates the efficient management of group finance so as to reduce financing costs.

44. Thus where it is considered by the Bank appropriate for a bank to undertake a group treasury role, exposures of a maturity of up to one year to:-

. group non-bank financial (2) companies (3) included in the bank's (or its UK parent bank's) consolidated supervisory returns;

(2) The definition of 'financial' is set out in paragraph 10 of the Bank's notice BSD/1986/3 and the annex to that notice (The definition embraces activities listed in A of the annex but other activities may be considered as qualifying if appropriate).

(3) Which may include sister companies as well as subsidiaries.

i. group companies supervised by another UK financial supervisor;

ii. a group company authorised under the Banking Act which controls directly or indirectly the lending bank; and

iii. connected overseas banks

will be reviewed with the bank's management. Appropriate levels for such exposures will be agreed on a case by case basis (see also paragraph 62 below). It will be for the bank to satisfy the Bank that it should fulfil such a role and has appropriate management and other group control systems in place to ensure that risk-taking in those group companies is properly monitored and controlled.

45. Exposures to group banks, financial and non-financial companies, not covered by paragraphs 41 to 44 above will be aggregated and considered as an exposure to an individual non-bank counterparty.

46. Exposures to connected gilt-edged market makers and Stock Exchange money brokers will be treated in the same way as exposures to banks for the reasons set out in paragraph 52 below.

47. Other forms of connected exposure, in particular, to companies with which directors are associated, will be considered on a case by case basis. Where the link with the connected company is fairly remote, for example, where a non-executive director of a large bank is a director of the borrowing company, the exposure may be considered as acceptable up to the normal level for that bank. If, however, there is a particularly close connection, the exposure will be aggregated within the 25% level for connected lending set out in the preceding paragraph.

48. The Bank will continue to examine particularly closely all exposures to companies or persons connected to a lending bank and will continue to deduct them from the bank's capital base if they are of the nature of a capital investment or are made on particularly concessionary terms.

## ▪ VIII EXPOSURES TO BANKS

49. The Bank will review with each bank at least once a year its policy on, and limits for, lending to other banks, including banks overseas. In addition, a bank's large exposures to other banks will require to be reported quarterly to the Bank. Although the Bank will not apply common maximum percentages to interbank exposures with a maturity of 1 year and under, all such exposures of more than 10% of capital base will be monitored. Exposures of over 1 year maturity to banks will be considered in the same way as exposures to individual non bank counterparties. In considering the acceptability of an exposure to a bank, account will be taken of exposures to counterparties connected to that bank.

50. The difference in treatment between short-term inter-bank exposures and non-bank exposures is justified because short-term lending to banks is normally liquid and loans of this kind are generally likely to involve a lower degree of risk than lending to other borrowers. For smaller banks, depositing large amounts with major banks will often be an entirely prudent way of employing depositors' funds. Lending short-term to banks, however, involves some risk. The bank will therefore, expect banks to adopt appropriate policies covering all their exposures to banks.

51. The risks arising from some forms of exposure which may be nominally short-term may, however, be significantly different in degree from the risks involved in traditional short-term interbank lending. The Bank will expect banks to take account of different types of exposure when considering their limits for other banks and, if necessary, to set separate sub-limits.

52. For the purpose of its policy on large exposures, the Bank will treat exposures to gilt-edged market-makers and Stock Exchange money brokers in the same way as interbank exposures (1). Such treatment is justified because of the nature of the markets in which the forms operate and their role in these markets.

(1) Overseas central banks other central monetary institutions, and state owned banks, are also considered as banks except that exposures to such counterparties will be considered as exposures to central governments where guarantee arrangements are in place which meet the same qualifying criteria as apply for public sector bodies (see paragraphs 22 and 23 above).

EXHIBIT 1

## ▪ IX EXPOSURES TO COUNTRIES

53. The Bank does not believe that a common guideline exposure limit should be applied to banks' exposures to countries; nor does it consider it appropriate to publish guideline percentages for the acceptable level of exposure to particular countries. Banks will, however, be expected to set limits for country exposures on the basis of their own risk assessments. The nature of the exposure (for example, whether it is trade finance or longer term balance of payments finance) will be relevant in considering an acceptable level of exposure. The Bank will continue to monitor closely banks' country risk exposures, and discuss them with banks' managements. Banks and banking groups will continue to be required to report their country exposures on the S1 (claims), S2 (claims) and C1 forms. Branches of overseas banks will continue to be required to report their country exposures in the B1 form. Banks will also be required to report separately any exposures to central governments other than HMG (2) which exceed 10% of their capital base.

(2) For a UK bank or UK banking group, exposures to HMG are not considered to carry risks which fall within the scope of the large exposures policy.

## ▪ X EXPOSURES TO ECONOMIC SECTORS

54. The extent to which a bank may be prudently exposed to a particular industrial sector or geographical region will vary considerably depending upon the characteristics of the bank and the sector or region concerned. Sectors and regions are difficult to define and the definitions for one bank may not be appropriate for another. The Bank will not therefore apply common maximum percentages to banks' sectoral exposures. At present, banks which report monthly provide an analysis of their lending and acceptances to UK residents based upon the Standard Industrial Classification (Form Q3). These analyses, which do not cover all exposures, arecarried out for general statistical purposes and continue to be required (together with Form Q1 which provides information on the basis of the sectors used for National Accounts purposes). In addition some banks report for supervisory purposes largely on the basis of the sectoral classification used for their own management reports.

55. The Bank will continue to monitor banks' exposures to sectors and regions and will wish to discuss with all banks their internal monitoring systems and the appropriateness of the sectors identified in their internal management reports. The Bank will wish to ensure that banks have prudent lending policies which take into account the dangers from over-exposure to particular economic sectors both within the United Kingdom and worldwide. the same applies to regional concentrations. Such policies will need to be adjusted from time to time in order to take account of changing market conditions and economic trends, the Bank will wish to obtain information on sectoral and regional exposures from banks' internal monitoring systems but the Bank does not intend to introduce a new standardised reporting system for all banks.

# XI EXPOSURES UNDERTAKEN BY BANKS WHICH ARE SUBSIDIARIES OF OTHER BANKS

56. When a bank is a subsidiary of another bank (1), the bank may be prepared to accept a policy on large exposures to individual borrowers unconnected with the bank which allows exposures which exceed 25% of the subsidiary bank's capital base. However, the Bank considers that such subsidiaries should take on exposures exceeding 25% of their own capital base only if they are entered into within the terms of a policy agreed by the parent bank and provided that there are entered into within the terms of a policy agreed by the parent bank and provided that there are arrangements (2) in place acceptable to the Bank for the parent bank to protect the subsidiary should the exposure become non performing or require to be written off. The Bank will require written confirmation from the parent bank that the exposure is retained in the subsidiary's balance sheet at the parent banks request in order to meet group objectives and will need to be satisfied as to the nature of the exposure concerned. These requirements recognise that it may be the policy in some bank groups to concentrate particular types of lending or other facilities in one subsidiary.

    (1) The definition of ‘subsidiary’ will normally be that used in the Companies Act 1985 (section 736) but the Bank may be prepared to extend the definition to banks which are otherwise effectively controlled by another bank and where the latter has undertaken to stand fully behind the related bank. The Bank does not intend that the concession should apply to consortium banks unless there is one major shareholding bank which can be said effectively to control the consortium bank and which is prepared to stand fully behind it as if it was its own subsidiary.

    (2) An acceptable arrangement should prevent a bank's capital from becoming deficient as a result of experiencing a loss on such an exposure. It may take a number of forms and may where appropriate include for example a formal guarantee or refinancing agreement to cover the whole of the exposure or an undertaking to make up any resultant deficiency in the subsidiary's capital. The arrangement should be legally enforceable by the subsidiary.

57. In the case of authorised bank subsidiaries of UK banks, in order for an exposure exceeding 25% of capital base to be acceptable in the subsidiary bank, the parent bank must at all times have room to take over the exposure without itself exceeding the 25% of capital base level. Also the total exposure of the bank group to the customer must be within 25% of the group's capital base. The Bank will need to be satisfied that adequate control systems are in place to ensure that counterparty risk taken in the group as a whole is properly monitored and controlled.

58. In the case of authorised banks which are subsidiaries of overseas banks the Bank will wish to agree with the supervisory authority of the parent bank the size of exposures which can be undertaken by the subsidiary within the terms of this policy. It will also require written assurance from the overseas supervisor that he is content for the subsidiary to undertake the level of exposure in question. In agreeing, the level for the subsidiary the Bank will take into account the degree and extent of the consolidated supervision of the banking group exercised by the parent supervisory authority.

EXHIBIT 1

59. Overseas bank subsidiaries of UK banks will be expected to conform to the regulatory requirements of the country in which they are located. The Bank's policy on large exposures applies directly only to banks authorised under the Banking Act and to UK banking groups taken as a whole, including their overseas subsidiaries and associated companies. But as a part of its consolidated supervision of banking groups, the Bank will continue to identify subsidiaries other than UK banks within the group which undertake significant exposures in order to monitor large exposures within the group overall.

## XII EXPOSURES UNDERTAKEN BY UK BRANCHES OF OVERSEAS BANKS

60. Large exposures can only properly be assessed by the supervisor in relation to the capital and the exposures of the bank as a whole. It is accepted that it is the home supervisor's responsibility to carry out such an assessment. Knowledge of large exposures in a branch is, however, important for a host supervisor, particularly, but not solely, in order to carry out a full assessment of the branch's liquidity. The Bank therefore wishes to continue to examine and discuss with the management of each branch its largest exposures measured in relation to the balance sheet of the branch and reserves the right to discuss with the home supervisory authority the size of exposures undertaken by the UK branch. The Bank will also give particular consideration to the exposure of branches of overseas banks to the country of incorporation of the bank.

## XIII ADDITIONAL CAPITAL REQUIREMENTS COVERING A BANK'S LARGE EXPOSURES

61. Where a UK incorporated bank has a number of exposures to a non bank counterparty of more than 10% of capital base the Bank will generally require higher capital ratios to be maintained than would otherwise be the case. The amount of additional capital will depend, inter alia, upon the acceptability of the exposures when considered against the bank's policy agreed with the Bank; the criteria set out in paragraph 4 above; and the number of such exposures, their individual size and nature. These requirements will also be applied in the case of exposures to banks with a maturity of over one year.

62. Additional capital will not normally be required to cover exposures exceeding 10% to group financial companies which arise as a result of the reporting bank fulfilling a group treasury role within the terms of paragraphs 43 and 44 above.

63. In those cases where an exposure exceeds 25% the Bank will require additional capital cover which will be significantly higher than would be required for an exposure of less than 25%. Additional capital will not be required to cover exposures secured by cash, BGS or an ECGD bank guarantee which meet the criteria set out in paragraph 38 above. An additional requirement for capital will otherwise generally apply whether or not the Bank agrees that the exposure has been incurred in the most exceptional circumstances. The undertaking of an exposure in excess of 25% by a bank in other than the most exceptional circumstances will also call into question whether the bank fulfils the criteria set out in the

Banking Act. In all such cases the Bank would consider whether the bank's authorisation should be revoked.

64. Additional capital will also generally be required where a bank subsidiary of a bank has a number of exposures to non-bank counterparties of more than 10% of capital base. However, where an exposure exceeds 25% of the subsidiary's capital base and the parent bank has made arrangements (within the terms of the policy set out in paragraph 56) to protect the subsidiary if problems occur, the additional capital cover, if any, may be held in the parent bank rather than the subsidiary. The additional capital cover will be determined by the size of the exposure (together with other exposures to the same counterparty entered into by the parent bank) in relation to the parent bank's capital base.

65. In the case of exposures to banks of 1 year and under, and country and sectoral exposures the Bank may require banks to maintain higher capital ratios in cases where there are particular concentrations of risk.

## XIV PRE-NOTIFICATION REPORTING REQUIREMENTS IN THE CASE OF EXPOSURES EXCEEDING 25% OF CAPITAL BASE

66. Exposures not covered by the circumstances set out in paragraph 67 below to individual non-bank counterparties, banks, and central governments which a UK incorporated bank proposes to enter into, and which either alone or together with other exposures to that counterparty would exceed 25% of the bank's capital base, are required to be notified to the Bank before the bank becomes committed to the counterparty (1). If the Bank is to come to a considered view about whether it would be prudent for the bank to undertake such a commitment, adequate notice is necessary. The period of notice will depend principally upon the complexity of the proposed transaction but should normally be at least two clear business days before the commitment is to be finalised. The formal notice should be given in writing, although the Bank will expect oral notice of the proposed transaction to take place at the earliest practical date. Written notice of the proposed transaction should include the size of the exposure, the purpose of the exposure, its maturity, the name and nature of the counterparty, and details of security. Where appropriate, statements from the bank's professional advisers evidencing the nature and risks of the transaction, and other supporting material may also be required.

(1) In the case of an exposure denominated in foreign currency or in the form of a marketable security the size of the exposure may be less than 25% of the bank's capital base when entered into, but may exceed 25% solely as a result of a subsequent exchange rate change or a change in this market price. Such exposures should be notified at the quarterly reporting date and not at the time the exposure first exceeds 25%.

67. Where a bank has previously notified to, and agreed with, the Bank its limits for lending of a maturity of up to one year to banks, and for exposures to overseas central governments, exposures of over 25% to individual counterparties covered by the limits are not required to be pre-notified to the Bank providing they do not exceed those limits.

68. Exposures to overseas countries, and economic sectors, which exceed 25% of the bank's capital are also not covered by the pre-notification

requirements. However, where a proposed transaction will result in an exposure which represents a significant departure from the bank's statement of policy on its large exposures agreed with the Bank (see Section IV above), the Bank will expect the proposed transaction to be notified to and discussed with it.

## XV TRANSITIONAL ARRANGEMENTS

69. Most banks already have an asset structure which is consistent with the policy outlined in this paper and have adopted and applied lending policies which require little or no alteration. However, some banks have, for example, exposures exceeding the 25% level which are not justified on exceptional circumstances grounds set out in paragraph 38 above, and the eventual inclusion (paragraph 12 above) of certain off-balance sheet risks not previously included in the definition of exposure will initially increase that number. Commercial realities may mean that such exposures For further information about the European Regulatory Library, contact Technical Indexes on cannot be reduced quickly, though some may be capable of being reduced through a negotiated agreement between the bank and the borrower. Where necessary, and taking into account banks' legal commitments, the Bank will agree a transitional period with individual banks during which they will be expected to reduce any large exposures which currently exceed the levels agreed with the Bank. During that period, however, the Bank will continue to take into account such large exposures in assessing the adequacy of the bank's capital (see section XIII above).

## APPENDIX I BANKING ACT 1987 S38. REPORTS OF LARGE EXPOSURES

S38

69. An authorised institution, other than one whose principal place of business of outside the United Kingdom, shall make a report to the Bank if:-

   . it has entered into a transaction or transactions relating to any one person as a result of which it is exposed to the risk of incurring losses in excess of 10 per cent, of its available capital resources; or

   a. it proposes to enter into a transaction or transactions relating to any one person which, either alone or together with a previous transaction or previous transactions entered into by it in relation to that person, would result in its being exposed to the risk of incurring losses in excess of 25 per cent, of those resources.

70. Subsection (1) above applies also where the transaction or transactions relate to different persons if they are connected in such a way that the financial soundness of any of them may affect the financial soundness of the other or others or the same factors may affect the financial soundness of both or all of them.

71. If an authorised institution to which subsection (1) above applies has one or more subsidiaries which are not authorised institutions the Bank may by notice in writing to that institution direct that that subsection shall apply to it as if the transactions and available capital resources of the subsidiary or subsidiaries, or such of them as are specified in the notice, were included in those of the institution.

EXHIBIT 1

72. The reports required to be made by an institution under subsection (1) above shall be made, in a case within paragraph (a) of that subsection, in respect of such period or periods and, in a case within paragraph (b) of that subsection, at such time before the transaction or transactions are entered into, as may be specified by notice in writing given to the institution by the Bank; and those reports shall be in such form and contain such particulars as the Bank may reasonably require.

73. For the purposes of this section a transaction entered into by an institution relates to a person if it is:-

   . a transaction under which that person incurs an obligation to the institution or as a result of which he may incur such an obligation;

   a. a transaction under which the institution will incur, or as a result of which it may incur, an obligation in the event of that person defaulting on an obligation to a third party; or

   b. a transaction under which the institution acquires or incurs an obligation to acquire, or as a result of which it may incur an obligation to acquire, an asset the value of which depends wholly or mainly on that person performing his obligations or otherwise on his financial soundness;

   and the risk of loss attributable to a transaction is, in a case within paragraph (a) or (b) above, the risk of the person concerned defaulting on the obligation there mentioned and, in a case within paragraph (c) above, the risk of the person concerned defaulting on the obligations there mentioned or of a deterioration in his financial soundness.

74. Any question whether an institution is or would be exposed to risk as mentioned in subsection (1) above (or in that subsection as extended by subsection (2)) shall be determined in accordance with principles published by the Bank or notified by it to the institution concerned; and those principles may in particular make provision for determining the amount at risk in particular circumstances or the extent to which any such amount is to be taken into account for the purpose of this section.

75. For the purpose of his section the available capital resources of an institution (or, in a case within subsection (3) above, or an institution and its relevant subsidiary or subsidiaries) and the value of those resources at any time shall be determined by the Bank and notified by it to the institution by notice in writing; and any such determination, which may be varied from time to time, shall be made by the Bank after consultation with the institution concerned and in accordance with principles published by the Bank.

76. The principles referred to in subsections (6) and (7) above may make different provisions for different cases and those referred to in subsection (6) may, in particular, exclude from consideration, either wholly or in part, risks resulting from transactions of a particular description or entered in to in particular circumstances or with persons of particular descriptions.

77. An institution which fails to make a report as required by this section shall be guilty of an offence; but where an institution shows that at the time the report was required to be made it did not know that the facts were such as to require the making of the report it shall not be guilty of an offence by reason of this failure to make a report at that time but shall be guilty of an offence unless it makes the report within seven days of becoming aware of those facts.

EXHIBIT 1

78. An institution guilty of an offence under this section shall be liable on summary conviction to a fine not exceeding the fifth level on the standard scale.

79. The Treasury may after consultation with the Bank by order:-

. amend subsection (1) above so as to substitute for either of the percentages for the time being specified in that subsection such other percentage as may be specified in the order;

a. make provision, whether by amending subsection (5) above or otherwise, with respect to the transactions and risks to be taken into account for the purposes of this section,

but any such order shall be subject to annulment in pursuance of a resolution of either House of Parliament.

b. For the avoidance of doubt it is hereby declared that references in this section to "one person" include references to a partnership.

# APPENDIX II DEFINITION OF CAPITAL BASE

The definition of the capital base is that used for calculating a bank's risk asset ratio except that a bank's holdings of other banks' capital will not be deducted the definition is set out in full in the Bank's paper "The Measurement of Capital " (September 1980) as amended in respect of perpetual debt by the Bank's notice of March 1986 (BSD/1986/2) and in respect of preference shares by the Bank's notice "The Measurement of Capital" (BSD/1986/4).

| | | |
|---|---|---|
| The components of the capital base are summarised below:- | | |
| | Ordinary share capital | X |
| | Preference shares (which are irredeemable or redeemable only at the bank's option) | X |
| | Reserves | X |
| | General provisions | X |
| | Minority interests | X |
| | | X |
| Less Goodwill and other intangible assets | | -X |
| | | A |
| | Primary perpetual subordinated loan stocks | X |
| | Redeemable shares (redeemable at fixed dates with an initial term to maturity of at least 25 years) | X |
| | | B |
| | Other perpetual and term subordinated loan stocks (with an initial term to maturity of at least 5 years and 1 day) | X |
| | Preference shares (redeemable at fixed dates with an initial term to maturity of at least 5 years and less than 25 years) | X |
| | | C |
| Less Investments in subsidiaries and associates and trade investments | | -X |
| | (including loans of a capital nature) Equipment | -X |

EXHIBIT 1

| | | |
|---|---|---|
| | Other fixed assets (1) | -X |
| | | D |

(1) Except premises

The capital base is equal to A + B + C - D provided that B less than 1/2 A, that C less than 1/2 (A+B) and B + C less than A.

If B greater than 1/2 A, the surplus is added to C. *

If C greater than 1/2 (A+B) or B + C greater than A, the surplus is excluded from the capital base.