Exhibit 2

**International Tax Law Reports, International Tax Law Reports, VOLUME 7, Re X Bank (Europe) SA**

7 ITLR 1

# Re X Bank (Europe) SA

no 02.04601

THE NETHERLANDS

Appeal Court Amsterdam

Judgment date: 25 February 2004

*Double taxation conventions – Netherlands – Attribution of profits to a permanent establishment – Bank branch – Attribution of interest-free capital to the branch – Belgium-Netherlands double taxation convention of 19 October 1970 – Adjustment of the capital of the bank branch by reference to the BIS-ratio – Whether adjustment was consistent with the business profits article of the double taxation convention*

*European Community law – Netherlands – Attribution of profits to a permanent establishment – Bank branch – Attribution of interest-free capital to the branch – Adjustment of the capital of the bank branch by reference to the BIS-ratio – Whether adjustment compatible with Community law – Second Banking Directive, art 6 – EC Treaty, art 6 (now art 12 EC)*

Between 1 July 1994 and 1 April 1996 the taxpayer company, a bank resident in Belgium, operated a branch in the Netherlands. In its accounts for the 31 December 1995, the branch showed a negative figure for capital. In its corporation tax return for that period the branch sought to deduct interest on borrowings from the head office of the bank in Belgium.

Following an examination, the tax inspector sought to adjust the taxable profits by disallowing interest on an amount of capital attributed to the branch; the inspector attributed capital to the branch based upon the BIS (Bank for International Settlements) ratio of the Belgium bank, and the risk-weighted assets of the branch. The taxpayer appealed against the adjustment on the grounds that it was inconsistent with the provisions of the Second Banks Directive and the non-discrimination principle in art 6 (subsequently art 12 EC) of the European Community treaty on grounds that a Netherlands subsidiary would have only

been required to maintain a minimum capital (which was less than the capital notionally allocated to the branch).

**Held**

(rejecting the taxpayer's appeal):

(1) The attribution of part of the capital of the bank to the branch on the basis of the BIS-ratio and risk weighted assets was consistent with the **1** separate enterprise concept (referred to here as the 'fiction of independence') in the business profits article of the double taxation convention. The taxpayer company had failed to bring evidence to show why the activities of the branch should be regarded as financed exclusively by debt (see paras 5.4 and 5.12, post).

(2) The method employed by the inspector to allocate capital to the branch was not contrary to the convention or otherwise unacceptable (see para 5.13, post).

(3) The method of allocation did not infringe the Second Banking Directive which was concerned with ensuring that a bank was only subject to supervision in one member state. Nor did the attribution for tax purposes of more capital than the minimum capital required of a subsidiary for regulatory purposes infringe the non-discrimination principle in the EC Treaty (see paras 5.8 and 5.19, post).

**Editor's Note**

This decision may be contrasted with the decision of the US Court of Claims in *Natwest* (2003) 6 ITLR 292. The Amsterdam court accepted that, in the absence of evidence from the taxpayer showing why its activities should be regarded as funded entirely by (interest-bearing) external debt, it was appropriate to attribute interest-free capital of the bank to the branch based upon the BIS-ratio of the bank as a whole. This approach was consistent with the separate enterprise concept of the double taxation convention. It was also not incompatible with European Community law, even though it meant that more capital was attributed to the branch for tax purposes than would have been required by the Netherlands for regulatory purposes if the bank had operated through a subsidiary in the Netherlands.

This is one of a number of decisions from the Netherlands on the attribution of profits to permanent establishments. It is an approach which is consistent with some of the work recently undertaken by the OECD on the determination of the profits of permanent establishments. It would be very interesting to see whether this decision is appealed to the Hoge Raad and also whether the issue of consistency with Community Law is ultimately referred to the European Court of

Justice (which has not yet considered issues of the attribution of profits to a branch for tax purposes).

**Judgment**

Belastingtijdvak: 1995

**UITSPRAAK**

op het beroep van de naar Belgisch recht opgerichte vennootschap X Bank (Europe) SA, gevestigd te Brussel (België), belanghebbende, tegen een **2** uitspraak van het Hoofd van de Belastingdienst Grote ondernemingen te Amsterdam, de inspecteur.

**1. Loop van het geding**

1.1. Van belanghebbende is ter griffie een beroepschrift ontvangen op 16 juli 2002, ingediend door A als haar gemachtigde (hierna: gemachtigde) en door gemachtigde aangevuld bij brief van 2 september 2002. Het beroep is gericht tegen de uitspraak van de inspecteur, gedagtekend 6 juli 2002, betreffende de aan belanghebbende opgelegde aanslag vennootschapsbelasting voor het jaar 1995.

1.2. De met dagtekening 31 december 1999 opgelegde aanslag is berekend naar een belastbaar binnenlands bedrag van ƒ840.776. Na bezwaar is de aanslag verminderd tot een berekend naar een belastbaar binnenlands bedrag van ƒ642.840.

1.3. Het beroep strekt tot vernietiging van de uitspraak van de inspecteur en tot vaststelling van een verlies van ƒ123.000.

1.4. De inspecteur heeft een verweerschrift ingediend. Hij concludeert tot bevestiging van de bestreden uitspraak.

1.5. Gemachtigde heeft een conclusie van repliek ingezonden. De inspecteur heeft een conclusie van dupliek ingezonden.

1.6. Ter zitting van 8 oktober 2003 zijn verschenen en gehoord gemachtigde, tot bijstand vergezeld van B, C en D, alsmede namens de inspecteur E, tot bijstand vergezeld van F, G en H. Van gemachtigde is ter griffie op 2 oktober 2003 een pleitnota ingekomen, welke ter zitting is voorgedragen. Van de inspecteur is op 5 augustus 2003 een pleitnota ingekomen, welke ter zitting als voorgedragen is aangemerkt, en aangevuld met een pleitnota die ter zitting is overgelegd en voorgedragen.

Exhibit 2

Van het ter zitting verhandelde is een proces-verbaal opgemaakt waarvan een afschrift aan deze uitspraak is gehecht.

**2. Tussen partijen vaststaande feiten**

2.1. Belanghebbende oefent het bankbedrijf uit. In de loop van 1994 heeft zij een vestiging in Amsterdam geopend van waaruit in de periode 1 juli 1994 tot 1 april 1996 bancaire activiteiten zijn verricht.

2.2. In 1996 heeft in Japan een fusie plaatsgevonden tussen I Ltd en J Ltd. In het kader van deze fusie zijn de activa en passiva van belanghebbende overgedragen aan de in Nederland gevestigde dochtervennootschap van J Ltd, genaamd K (Holland) NV.

2.3. Belanghebbende beschikt over een vergunning van De Nationale Bank van België tot het uitoefenen van de werkzaamheden van een kredietinstelling, zoals bedoeld in de Tweede Richtlijn 89/646/EEG van de Raad van 15 december 1989 tot coördinatie van de wettelijke en bestuursrechtelijke bepalingen betreffende de toegang tot en de uitoefening **3** van de werkzaam-heden van kredietinstellingen, alsmede tot wijziging van Richtlijn 77/780/EEG (89/646/EEG) (PB L386, 30 december 1989) (hierna: de Tweede Banken Richtlijn).

2.4. Door belanghebbende is ter zake van een door haar in 1995 gerealiseerd belastbaar binnenlands bedrag een aangiftebiljet vennootschapsbelasting ingediend. Bijlage 1 bij deze aangifte vermeldt onder meer het volgende:

‘Balans per 31 december 1995

(bedragen in duizenden guldens)

Activa *ƒ*

Kasmiddelen 1.279

Bankiers 78.747

Kredieten

- private sector 336.661

(…)

- Rentedragend waardepapier 21.000

- Onroerende zaken en bedrijfsmiddelen 576

- Overlopende activa 6.355

- Totaal activa 444.618

Passiva

Bankiers 357.135

Toevertrouwde middelen

- spaargelden

- overige 54.739

Overige schulden 26.399

Overlopende passiva 6.476

Resultaat boekjaar – 131

Totaal passiva 444.618’

Bijlage 2 bij de aangifte vennootschapsbelasting vermeldt onder meer het volgende:

‘Winst- en verliesrekening over de periode eindigend op 31 december 1995

(bedragen in duizenden guldens)

(…) *ƒ*

Rente baten 26.760

Rente lasten 24.945

1.815

(…)

Resultaat – 131’

Bijlage 3 vermeldt nog:

4

‘FISCALE TOELICHTINGEN

Exhibit 2

1. Controle berekening (bedragen in duizenden) *f*

Commercieel resultaat – 131

Niet aftrekbare kosten ex art. 8a Wet IB 8

Fiscaal resultaat – 123'

2.5. In 1999 heeft bij belanghebbende een boekenonderzoek plaatsgevonden. Dit onderzoek had betrekking op de hoogte van het eigen vermogen van de Nederlandse vestiging van belanghebbende. Het verslag van dit onderzoek, gedagtekend 10 juli 2000, vermeldt onder meer het volgende:

**'2. Vennootschapsbelasting**

***2.1. Eigen vermogen van een vaste inrichting in het algemeen***

(…)

Het is bij een vaste inrichting van een bank (…) onmogelijk aan te geven in welke mate zij daadwerkelijk gebruik maakt van het totale eigen vermogen van de generale onderneming. Het is immers niet te traceren welk soort vermogen (eigen of vreemd) de generale onderneming heeft aangetrokken voor welke specifieke activiteit. Wel is duidelijk dat binnen de generale onderneming als geheel ook voor de activiteiten van de vaste inrichting eigen vermogen wordt aangehouden.

(…)

De Belastingdienst vergelijkt de kapitalisatie van de vaste inrichting met de kapitalisatie van het hoofdkantoor aan de hand van de zogenaamde BIS-ratio. Internationaal en ook binnen de EU hebben de Centrale Banken afgesproken dat het aanwezige toetsingsvermogen gedeeld door de naar risico gewogen activa en uitzettingen minimaal 8% moet bedragen. Dit percentage wordt de BIS-ratio genoemd.

Het aanwezige toetsingsvermogen bestaat grotendeels uit kapitaal, winstreserves en achtergestelde leningen. Voor de toetsing van de hoogte van het fiscaal vereiste eigen vermogen elimineren wij – zowel bij het hoofdkantoor als de vaste inrichting – de elementen die fiscaal als vreemd vermogen worden beschouwd. Over het algemeen zijn dit de achtergestelde leningen (maar ook eventueel andere elementen die fiscaal als vreemd vermogen moeten worden beschouwd). Door de achtergestelde leningen te elimineren kunnen wij een zuivere vergelijking maken.

Indien het hoofdkantoor een bepaalde hoogte van de BIS-ratio voornamelijk

Exhibit 2

dankt aan achtergestelde leningen (waarover rente in aftrek gebracht wordt), zou het niet reëel zijn van de vaste inrichting te eisen dat zij voor dit bedrag eigen vermogen dient aan te houden. (…)

De hoogte van de risico gewogen activa en uitzettingen wordt **5** bepaald door de wegingsfactoren die de Centrale Banken hieraan toekennen. Deze wegingsfactoren variëren van 0 tot 100%, afhankelijk van het risico. Ook kennen Centrale Banken wegingsfactoren toe aan off-balance sheet items en marktrisico's. In principe zijn deze wegingsfactoren binnen de verschillende landen gelijk.

Door bij de vergelijking aan te sluiten bij de BIS-ratio wordt dus rekening gehouden met de verschillende activiteiten en risico's van een bank. Een bank die voornamelijk interbancaire leningen op zijn balans heeft staat, hoeft hierdoor een lager eigen vermogen aan te houden dan een bank die risicovolle kredieten aan bedrijven heeft uitstaan. Voor beide (…) banken geldt wel dat de BIS-ratio minimaal 8% moet zijn.

Indien naar aanleiding van voorgenoemde toetsing de conclusie is dat de hoogte van het eigen vermogen van de vaste inrichting te laag is, vindt correctie plaats van de naar onze mening te veel in aftrek gebrachte rentelasten. In het geval van een hoger eigen vermogen, zou de vaste inrichting immers minder vreemd vermogen hebben aangetrokken. De beperking van de aftrek van de rentelasten wordt berekend door het tekort aan eigen vermogen te vermenigvuldigen met het 12 maands AIBOR-percentage per 1 juli van het betreffende jaar.

(…)

***2.2 De hoogte van het eigen vermogen van de vaste inrichting van [belanghebbende].***

Belastingplichtige heeft in de onderzochte jaren (…) een gecumuleerd verlies. Deze verliezen bedragen:

1994 f 944.000,–

1995 f 131.000,–

(…)

Afhankelijk van de gewogen activa van de vaste inrichting én de hoogte van de BIS-ratio van het hoofdkantoor, stellen wij (…) eisen aan de hoogte van het eigen vermogen van de vaste inrichting. Hieronder zal de hoogte van de gewogen activa van de vaste inrichting aangegeven worden.

1994 187.005.000 (…)

1995 204.124.000

(…)

De gewogen activa staan vermeld op de maandstaten die naar DNB worden verzonden. Aangezien wij vergelijken met de BIS-ratio van het hoofdkantoor, zijn de gewogen activa van de vaste inrichting gecorrigeerd voor zover deze vorderingen op groepsmaatschappijen betroffen.

(…)

6

***2.3 De BIS-ratio van het hoofdkantoor***

(…) Om de BIS-ratio (…) te kunnen berekenen hebben wij de maandstaat, die naar de Belgische Centrale Bank wordt gezonden, opgevraagd. Hieruit blijkt dat de gewogen activa in 1995 25.989.904.000 Belgische Franc (BEF) bedragen (…).

(…) waardoor het geschoonde toetsingsvermogen 2.646.448.000 BEF bedraagt.

De BIS-ratio van het hoofdkantoor in 1995 kan vervolgens berekend worden door het geschoonde toetsingsvermogen te delen door de gewogen activa. Dit resulteert in een BIS-ratio van 2.646.448 / 25.989.904 * 100% = 10,2%.

(…)

***2.4 Toetsing hoogte eigen vermogen van de vaste inrichting***

In dit onderdeel wordt berekend wat naar onze mening de hoogte van het eigen vermogen van de vaste inrichting moet zijn. Uitgangspunt hierbij is de hoogte van de

gewogen activa van de vaste inrichting en de hoogte van de BIS-ratio van het hoofdkantoor.

jaar gewogen activa BIS-ratio gewenst eigen vermogen

vaste inrichting hoofdkantoor vaste inrichting

1994 (…) (…) (…)

1995 204.124.00010,2 20.820.648

(…)

Het verschil tussen het vereiste eigen vermogen en het aanwezige eigen vermogen is als volgt:

jaar aanwezig eigen gewenst eigen verschil/tekort

vermogen vermogen vaste

inrichting

1994 -/- f 944.000,– (…) (…)

1995 -/- f 131.000,– 20.820.648 20.951.648

(…)

De beperking van de in aftrek te brengen rentelasten is te berekenen door het tekort aan eigen vermogen te vermenigvuldigen met het AIBOR percentage 1 jaar per 1 juli, waarbij rekening wordt gehouden met het aantal maanden dat de vaste inrichting actief was.

jaar verschil/tekort aan AIBOR 1 jaar aantal beperking van de

eigen vermogen per 1 juli maanden aftrek rentelasten

1994 (…) (…) (…) f 740.064,–

1995 f 20.951.648 4,60 % 12 f 963.776,–'

2.6. In een brief aan gemachtigde van 13 mei 2002 schrijft de inspecteur onder meer het volgende:

'Samenvatting

Ik kom gedeeltelijk aan uw bezwaar tegemoet. Het aangegeven belastbaar bedrag in 1995 was negatief ƒ 123.000,-. De in verband met de bovenstaande aangebrachte correctie bedraagt ƒ 963.776,-. Het nieuwe belastbare bedrag komt daarmee op ƒ 840.776,-. Met dit bedrag moet nog worden verrekend het verlies 1994, een verlies dat na correctie is vastgesteld op ƒ 197.936,-. Hierdoor komt het definitieve belastbare bedrag over 1995 uit op ƒ 642.840,-.'

**3. Geschil**

In geschil is de vraag of en—zo ja—tot welk bedrag belanghebbende rente in mindering mag brengen op het door haar genoten belastbare binnenlandse inkomen.

**4. Standpunten van partijen**

4.1. Voor de standpunten van partijen verwijst het Hof naar de stukken van het geding, waaronder de pleitnota's als vermeld onder 1.6, en naar het proces-verbaal van de zitting van 8 oktober 2003.

**5. Beoordeling van het geschil**

5.1. Vaststaat dat belanghebbende in 1995 met behulp van een vaste inrichting in Nederland het bankbedrijf heeft uitgeoefend. Tussen partijen is niet in geschil dat het eigen vermogen van haar Nederlandse vaste inrichting op de balansdatum, 31 december 1995, negatief ƒ131.000 bedraagt en dat in 1995 ƒ24.945.000 als rente ten laste van het resultaat van de vaste inrichting is gebracht. Het Belgische hoofdkantoor van belanghebbende beschikt over een substantieel eigen vermogen. De omvang hiervan kan worden uitgedrukt in een zogenoemde BIS-ratio, zoals is beschreven in par 2.1 van het onder 2.5 aangehaalde controlerapport. Volgens evenvermeld rapport bedraagt de BIS-ratio van het hoofdkantoor 10,2%. Hierover bestaat tussen partijen evenmin geschil.

5.2. Naar de inspecteur, niet weersproken door belanghebbende, heeft gesteld, bestaat de passiefpost 'Bankiers' als vermeld onder 2.4, ten minste voor een bedrag groot ƒ266.891.000 uit een schuld in rekening-courant aan het hoofdkantoor. Blijkens par 2.4 van het onder 2.5 aangehaalde controlerapport heeft de inspecteur van deze schuld in rekening-courant aan het hoofdkantoor een bedrag van ƒ20.951.648 aangemerkt als 'tekort eigen vermogen' en de daarop betrekking hebbende rente ad ƒ963.776 niet in aftrek op de binnenlandse belastbare winst van belanghebbende toegelaten. Het bedrag van ƒ20.951.648 is door de inspecteur berekend als het verschil tussen het aanwezige eigen vermogen ad -/- ƒ131.000 en het door hem vereiste eigen vermogen van de vaste inrichting ad ƒ20.820.648.

5.3. Ingevolge artikel 7, §2 van de Overeenkomst tussen de regering van **8** het Koninkrijk der Nederlanden en de regering van het Koninkrijk België tot het vermijden van dubbele belasting op het gebied van belastingen naar het inkomen en naar het vermogen en tot het vaststellen van enige andere regelen verband houdende met de belastingheffing van 19 oktober 1970, Trb 1970, 192 (hierna: het Verdrag), geldt dat aan de vaste inrichting in Nederland van belanghebbende de voordelen dienen te worden toegerekend die zij geacht zou

kunnen worden te behalen, indien zij een zelfstandige onderneming zou zijn, die dezelfde of soortgelijke werkzaamheden zou uitoefenen onder dezelfde of soortgelijke omstandigheden en die geheel onafhankelijk zou handelen (de zogeheten zelfstandigheidsfictie).

5.4. Bij de toepassing van de zelfstandigheidsfictie geldt als hoofdregel dat met rentebetalin-gen die verband houden met schuldverhoudingen die uitsluitend bestaan in de interne relatie tussen vaste inrichting en hoofdkantoor geen rekening wordt gehouden. Deze hoofdregel is, naar het Hof verstaat, gebaseerd op de omstandigheid dat een vaste inrichting slechts bij wijze van fictie een zelfstandige onderneming is en als zodanig geen zelfstandig drager van rechten en verplichtingen. In de regel dienen de middelen die het hoofdkantoor aanwendt ter financiering van een vaste inrichting dan ook (indien deze niet zijn verkregen doordat ten behoeve van die vaste inrichting schulden zijn aangegaan) als eigen vermogen van die vaste inrichting te worden beschouwd.

In dit verband gaat het Hof ervan uit dat de aan deze—fiscale—hoofdregel ten grondslag liggende ratio mede is het voorkomen van een op willekeur dan wel uitsluitend fiscale motieven gebaseerde allocatie van (leen)vermogen aan de vaste inrichting. Op deze hoofdregel wordt naar algemeen geldende opvattingen een uitzondering mogelijk geacht als het gaat om ondernemingen die bancaire activiteiten verrichten. Met betrekking tot uitsluitend interne schuldverhoudingen tussen het hoofdkantoor en de vaste inrichting van een belasting-plichtige die het bankbedrijf uitoefent wordt het in aanmerking nemen van rente derhalve wel mogelijk geacht. In dit verband is het Commentaar van belang op artikel 7 van het OESO Modelverdrag, punt 19, welk commentaar onder meer als volgt luidt:

> ‘It is, however, recognised that special considerations apply to payments of interest made by different parts of a financial enterprise (e.g. a bank) to each other on advances etc. (as distinct from capital allotted to them), in view of the fact that making and receiving advances is closely related to the ordinary business of such enterprises.’

5.5. Naar het oordeel van het Hof heeft het onder 5.3 en 5.4 vermelde toetsingskader tevens te gelden bij de vaststelling van het belastbare binnenlandse bedrag op de voet van artikel 17 van de Wet op de **9** vennootschapsbelasting 1969 (hierna: de Wet Vpb) in samenhang met artikel 49, eerste lid, van de Wet op de inkomstenbelasting 1964 (hierna: de Wet IB).

5.6. Belanghebbende heeft zich primair op het standpunt gesteld dat het haar vrijstaat om bij de bepaling van het belastbare binnenlandse inkomen van haar vaste inrichting geen eigen vermogen in aanmerking te nemen, nu de vaste inrichting niet beschikt over een eigen vermogen. Zij beroept zich daarvoor onder meer op de Tweede Banken Richtlijn en op de Richtlijn 93/22/EEG van 10 mei 1993 van de Raad betreffende het verrichten van diensten op het gebied van

beleggingen in effecten, PB L141, 11 juni 1993 (hierna: Investment Services Directive).

5.7. Artikel 6, eerste lid, eerste volzin, van de Tweede Banken Richtlijn luidt als volgt:

> 'De Lidstaten van ontvangst mogen niet langer de in artikel 4 van de Richtlijn 77/ 780/EEG bedoelde vergunning, noch het dotatiekapitaal eisen voor bijkantoren van kredietinstellingen waaraan in andere Lidstaten vergunning is verleend.'

Artikel 14, eerste en tweede lid, van de Investment Services Directive luidt als volgt:

> '1. De Lid-Staten dragen er zorg voor dat de beleggingsdiensten en de andere diensten die genoemd zijn in deel C van de bijlage, op hun grondgebied kunnen worden uitgeoefend overeenkomstig het bepaalde in de artikelen 17, 18 en 19, zowel door middel van het vestigen van een bijkantoor als door middel van het vrij verrichten van diensten, door iedere beleggingsonderneming waaraan door de bevoegde autoriteiten van een andere Lid-Staat vergunning is verleend en waarop door hen toezicht wordt gehouden overeenkomstig het bepaalde in deze richtlijn, mits deze diensten onder de vergunning vallen. Deze richtlijn laat onverlet de bevoegdheden van de Lid-Staten van ontvangst ten aanzien van de rechten van deelneming in instellingen voor collectieve belegging die niet vallen onder Richtlijn 85/611/EEG (14).
>
> 2. De Lid-Staten mogen de vestiging van een bijkantoor of het verrichten van diensten als bedoeld in lid 1, niet afhankelijk stellen van een vergunning, noch onderwerpen aan de verplichting eigen kapitaal te verschaffen of aan maatregelen van gelijke werking.'

Het standpunt van de inspecteur, dat volgt uit de bestreden uitspraak, houdt volgens belang-hebbende in dat in wezen wordt geëist dat de vaste inrichting eigen vermogen aanhoudt. Daardoor worden de hiervoor aangehaalde richtlijnen gefrustreerd en het beoogde doel, het creëren van een gemeenschappelijke markt, niet bereikt. De inspecteur handelt **10** derhalve in strijd met het gemeenschapsrecht, aldus—nog steeds—belanghebbende. De inspecteur heeft zulks gemotiveerd betwist.

5.8. Naar het oordeel van het Hof heeft de hiervoor aangehaalde bepaling van de Tweede Banken Richtlijn betrekking op de vraag welk land bevoegd is toezicht te houden op (onder meer) de solvabiliteit van binnen de EU opererende banken. De verantwoordelijkheid voor dit toezicht is uitsluitend gelegd bij het land van vestiging van de vennootschap die het bankbedrijf uitoefent. In het onderhavige geval is dat België. De Lidstaten waar die vennootschap bijkantoren

heeft, mogen geen eisen omtrent onder meer die solvabiliteit stellen in die zin dat zij niet kunnen eisen dat zo'n bijkantoor een dotatiekapitaal heeft. Aan die exclusieve bevoegdheid van, in casu, België wordt geen afbreuk gedaan, indien voor de toepassing van artikel 7 van het Verdrag respectievelijk artikel 17 van de Wet Vpb in samenhang met artikel 49, eerste lid, van de Wet IB, het eigen vermogen van belanghebbende geacht wordt—zoals de inspecteur voorstaat—gedeeltelijk werkzaam te zijn ten dienste van haar vaste inrichting. Uit de hiervoor vermelde fiscale bepalingen en de daaraan door de inspecteur verbonden gevolgen volgt immers niet dat belanghebbende gehouden zou zijn meer eigen vermogen aan te houden dan waartoe zij verplicht is op grond van bepalingen van de Belgische toezichthouder, dan wel dat de vaste inrichting in Nederland gehouden is de facto eigen vermogen aan te houden. Evenbedoelde bepalingen betreffen de allocatie, ten behoeve van de fiscale winstbepaling, van het eigen vermogen waarover belanghebbende beschikt. De vraag aan welk onderdeel van de onderneming het door de toezichthouder vereiste eigen vermogen door de desbetreffende bank is toe te rekenen, wordt naar het oordeel van het Hof niet door de Tweede Banken Richtlijn bestreken. Het standpunt van de inspecteur houdt derhalve geen schending in van de Tweede Banken Richtlijn. Met betrekking tot de Investment Services Directive geldt mutatis mutandis hetzelfde, voor zover al deze richtlijn ook ten aanzien van belanghebbende van toepassing is.

5.9. Belanghebbende beroept zich subsidiair op de onder 5.4 vermelde uitzondering. Het be-staan van deze uitzondering wordt door de inspecteur op zichzelf niet betwist. Wat partijen verdeeld houdt is de betekenis van die uitzondering voor het onderhavige geval. Naar het oordeel van het Hof houdt de onder 5.4 vermelde uitzondering niet in dat het belanghebbende vrijstaat de activa van haar vaste inrichting zonder meer geheel te financieren met vreemd vermogen en evenmin dat voor banken als zodanig het 'verbod' op het in aanmerking nemen van rente over schuldverhoudingen tussen vaste inrichting en hoofdhuis in het geheel niet van toepassing is. Naar het oordeel van het Hof houdt de hier bedoelde uitzondering in dat aan dit verbod voorbij moet worden gegaan, indien dat vanwege de bedrijfsuitoefening van het hoofdkantoor en de vaste **11** inrichting geboden is. In dit opzicht volgt de uitzondering de onder 5.4 vermelde ratio van de hoofdregel, welke is gebaseerd op de omstandigheid dat een vaste inrichting niet zelfstandig rechten en verplichtingen kan aangaan.

De hiervoor bedoelde ratio houdt in dat aan de bedoeling van partijen ter zake van de verdeling van het eigen vermogen van belanghebbende voor fiscale doeleinden, voorzover al ter zake daarvan aan de bedoeling van achter de vaste inrichting en het hoofdkantoor te veronderstellen partijen enige betekenis zou zijn toe te kennen, geen dan wel een ondergeschikte betekenis toekomt. Voorts doet aan het vorenoverwogene niet af dat in België, naar belanghebbende heeft gesteld, alle geldmiddelen die een buitenlandse bank aan haar Belgische vaste inrichting ter beschikking stelt als (uitsluitend) interne lening plegen te worden gekwalificeerd, wat daarvan ook verder moge zijn.

5.10. Voor de bepaling of en in hoeverre de bedrijfsuitoefening van een bank is gefinancierd met eigen en/of met vreemd vermogen, geldt dat in het algemeen niet is na te gaan op welke wijze een bepaald activum is gefinancierd, en dat derhalve in beginsel enkel aansluiting kan worden gezocht bij de omstandigheid dat ieder activum in zekere mate wordt gedekt door eigen vermogen. Naar het oordeel van het Hof heeft zulks ook voor de bedrijfsuitoefening van een bancaire vaste inrichting te gelden. Dit brengt naar 's Hofs oordeel mee dat in casu dient te worden bezien of en in hoeverre het eigen vermogen van het hoofdkantoor van belang-hebbende geacht moet worden te zijn aangehouden ter dekking van de activa en activiteiten van de Nederlandse vaste inrichting van belanghebbende. De omstandigheid dat de omvang van het eigen vermogen van het hoofdkantoor mede is gebaseerd op de door de locale toezichthouder gestelde vereisten, doet daaraan niet af. Het Hof acht het weinig voor de hand liggend dat het eigen vermogen van het hoofdkantoor van belanghebbende niet mede dienstbaar is aan de bedrijfsuitoefening van de Nederlandse vaste inrichting, nu vaststaat dat het eigen vermogen van het hoofdkantoor van belanghebbende beantwoordt aan een BIS-ratio van 10,2%. Naar het oordeel van het Hof is het immers niet zonder meer aannemelijk te achten dat dit eigen vermogen uitsluitend ten dienste staat van de bedrijfsuitoefening van het hoofdkantoor. Bovendien is, mede gelet op doel en strekking van de Tweede Banken Richtlijn, zonder meer niet aannemelijk te achten dat het ten aanzien van belanghebbende door de Belgische autoriteiten voorgeschreven eigen vermogen van—naar het Hof partijen ter zitting heeft verstaan—ten minste ECU 5.000.000 uitsluitend zou behoeven te fungeren als waarborg voor de bedrijfsuitoefening van belanghebbende in België.

5.11. Naar het oordeel van het Hof ligt het, gelet ook op het vorenoverwogene, primair op de weg van belanghebbende om aannemelijk **12** te maken dat en in welke mate sprake is van interne leningen waarop de onder 5.4 vermelde uitzondering betrekking kan hebben. Het is derhalve aan belanghebbende om, waar het bij bancaire activiteiten in de regel niet goed mogelijk is een relatie te leggen tussen specifieke posten van de actiefzijde en specifieke posten van de passiefzijde van de balans, feiten en omstandigheden aannemelijk te maken die in redelijkheid verklaren waarom in het onderhavige geval het door belanghebbende aan haar vaste inrichting gealloceerde vermogen uitsluitend uit vreemd vermogen bestaat, terwijl het eigen vermogen van belanghebbende in het geheel niet dienstbaar zou zijn aan de bedrijfsuitoefening van de vaste inrichting in Nederland.

5.12. Naar het oordeel van het Hof heeft belanghebbende geen feiten en omstandigheden aannemelijk gemaakt op grond waarvan kan worden geoordeeld dat zij terecht ervan is uitgegaan dat de activa en activiteiten van de onderneming die met behulp van haar Nederlandse vaste inrichting wordt gedreven uitsluitend met vreemd vermogen zijn gefinancierd.

Daar staat tegenover dat de inspecteur door middel van het onder 2.5 vermelde controle-rapport een verband heeft gelegd tussen het eigen vermogen van (het hoofdkantoor van) belanghebbende en dat van haar vaste inrichting, en dat die vaste inrichting volgens dit rapport op balansdatum over ƒ20.820.648 eigen vermogen zou (behoren te) beschikken. Nu belanghebbende met betrekking tot enig ten dienste van de vaste inrichting werkzaam eigen vermogen geen bewijs heeft geleverd, terwijl, mede gelet op de inhoud van evenvermeld controlerapport, zonder meer niet aannemelijk is te achten dat aan de vaste inrichting geen eigen vermogen dienstbaar is, heeft het voorts op de weg van belanghebbende gelegen aannemelijk te maken dat de inspecteur het in de vaste inrichting werkzame eigen vermogen te hoog heeft berekend. Ook op dit punt heeft belanghebbende geen bewijs geleverd. Gelet op het bedrag van ƒ245.939.352 (ƒ266.891.000 – ƒ131.000 – ƒ20.820.648) dat de vaste inrichting volgens de inspecteur in de interne rekening-courantverhouding met het hoofdkantoor als fiscale schuld mag verantwoorden, laat het door de inspecteur als eigen vermogen van de vaste inrichting aangemerkte bedrag van ƒ20.820.648 voldoende ruimte voor de (op het OESO rapport 'The taxation of multinational banking enterprises' uit 1984 gebaseerde) stelling van belanghebbende dat 'bij het bankbedrijf mag worden aangenomen dat veruit het grootste gedeelte van het geld dat wordt in- en uitgeleend tussen het hoofdhuis en vaste inrichting extern wordt ingeleend' (aanvulling beroepschrift, blz 14).

5.13. Belanghebbende heeft gesteld dat de door de inspecteur toegepaste methode van berekening van de door hem in aanmerking genomen rentecorrectie in strijd is met het Verdrag, omdat sprake zou zijn van een niet geoorloofde wijze van winstberekening (winstsplitsing) en/of omdat de **13** inspecteur geen functionele analyse heeft uitgevoerd. Het Hof verwerpt deze stelling. In een geval als het onderhavige, waarin het primair aan belanghebbende is om te bewijzen dat de financiering van de bedrijfsuitoefening van de vaste inrichting functioneel voortvloeit uit de aard en de omvang van die bedrijfsuitoefening en waarin belanghebbende daartoe—anders dan in algemene bewoordingen te stellen dat 'interest bij banken normale bedrijfskosten zijn omdat deze kosten zodanig verweven zijn met de uitoefening van het bankbedrijf' (aanvulling beroepschrift, blz 13)—geen bewijs heeft geleverd, kan van de inspecteur niet meer worden verwacht dan dat hij het eigen vermogen van belanghebbende op een redelijke wijze aan de binnen belanghebbende te onderscheiden ondernemingen toerekent, zich daarbij baserend op de informatie die hem voorhanden is. Het Hof verwijst hiervoor naar de uiteenzetting in het controlerapport van de inspecteur, als vermeld onder 2.5. Dat de inspecteur door dit controlerapport te volgen niet in redelijkheid heeft gehandeld is niet aannemelijk geworden. Evenmin acht het Hof de door de inspecteur gevolgde methode in strijd met het hiervoor vermelde toetsingskader. Door aan te sluiten bij de ten aanzien van belanghebbende gevonden BIS-ratio en de gewogen activa van de vaste inrichting, heeft de inspecteur de zelfstandigheidsfictie op een aanvaardbare wijze toegepast. Dat in dit verband de activiteiten van de vaste inrichting niet voldoende vergelijkbaar zouden zijn met de activiteiten van

Exhibit 2

het hoofdkantoor is niet aannemelijk geworden. Evenmin doet aan het vorenoverwogene af dat in OESO-verband discussie gaande is over een uniforme methode waarmee door bij de OESO aangesloten landen kan worden vastgesteld in hoeverre (voor fiscale doeleinden) financiering van de vaste inrichting van een bancaire instelling met eigen dan wel met vreemd vermogen geoorloofd is. Deze omstandigheid houdt niet in dat, zolang evenbedoelde discussie niet tot geldend recht heeft geleid, ervan zou moeten worden uitgegaan dat het in aanmerking nemen van rente in de relatie tussen vaste inrichting en hoofdkantoor van een bank geheel ter discretie staat van die bank.

5.14. Belanghebbende heeft zich voorts beroepen op een Resolutie van 7 mei 1930, nr 44, B nr 4904. Deze Resolutie luidt onder meer als volgt:

> ‘Aangezien in het bankbedrijf in het algemeen de kapitaalsplitsing uitgangspunt moet zijn voor de winstsplitsing, behoort allereerst te worden bepaald, welk gedeelte van het eigen kapitaal in elk land is vastgelegd of werkt. Gesplitst moet dus worden: het gestorte kapitaal van de geheele onderneming, vermeerderd met de reserves. Bij dit splitsen moet worden aangenomen, dat het vaste bedrijfskapitaal (gebouwen, meubilair, deelnemingen in andere bedrijven) in de eerste plaats wordt gefinancierd door de eigen middelen der onderneming. In het bankwezen blijft dan, naar men kan aannemen, altijd nog een **14** gedeelte van het eigen kapitaal als “eigen werkkapitaal” over.
>
> Nadat het eigen kapitaal is verdeeld in “vastgelegde middelen” en “eigen werkkapitaal” en de toewijzing van de “vastgelegde middelen” aan de verschillende landen heeft plaats gevonden, moet het totaal van het “eigen werkkapitaal” over de verschillende landen worden verdeeld. In verband met het verschil in munteenheid en in rentestand tusschen de onderscheidene landen mag worden aangenomen, dat de in eenig land uitgezette gelden (wissels, beleeningen, prolongatiën, debiteuren in rekening-courant en andere credieten) in de eerste plaats voortkomen uit de in hetzelfde land opgenomen vreemde middelen (deposito’s, enz.). Indien in eenig land de uitgezette gelden minder bedragen dan de opgenomen gelden, dient te worden aangenomen, dat in dat land geen ‘eigen werkkapitaal’ aanwezig is, doch dat door het in dat land gevestigde kantoor vreemd werkkapitaal gesteld wordt ter beschikking van kantoren in andere landen.
>
> Beloopen daarentegen de in eenig land uitgezette gelden meer dan de aldaar opgenomene, dan moet dit het gevolg zijn van de omstandigheid, dat werkkapitaal van elders is verkregen. Het is dan slechts de vraag, hoe dit werkkapitaal moet worden gesplitst in “vreemd werkkapitaal” en “eigen werkkapitaal”.’

Exhibit 2

5.15. De inspecteur heeft gesteld dat de Resolutie uit 1930 is ingetrokken bij de Resolutie van 3 mei 1971, nr B71/3809, BNB 1971/144. Deze Resolutie luidt onder meer als volgt:

> ‘(1) Hierbij deel ik u mede dat ik aanleiding heb gevonden enige ook voor de toepassing van de Wet VpB. ’69 van belang te achten aanschrijvingen, c.q. gedeelten van aanschrijvingen uit het Boekwerk Ve.B. ’42 in een aanschrijving voor het Boekwerk Ve.B. ’69 samen te vatten.
>
> Daarnaast zullen enige (blauwe) aanschrijvingen met behoud van hun oorspronkelijke datum, doch waar nodig gecorrigeerd afzonderlijk in laatstbedoeld boekwerk worden opgenomen. (…)
>
> Aangenomen kan worden dat de niet op een dezer wijzen overgebrachte blauwe aanschrijvingen op het terrein van de wetstoepassing voor de Wet VeB. ’69 niet van belang zijn, behoudens voor zover zij in de op grond van art. 5 van de Wet uit te vaardigen algemene maatregel van bestuur zullen worden verwerkt.’

Tot de kwesties die in de Resolutie BNB 1971/144 zijn samengevat behoort niet die van de allocatie van vermogen aan de vaste inrichting van een bank.

5.16. Naar het oordeel van het Hof kan uit de tekst van de Resolutie BNB 1971/144 niet zonder meer worden afgeleid dat aan de Resolutie B **15** nr 4904 niet meer een in rechte te beschermen vertrouwen kan worden ontleend. Vermoedelijk heeft het wel in de bedoeling van de Staatssecretaris van Financiën gelegen om met de Resolutie BNB 1971/144 aan te geven welke Resoluties van vóór de invoering van de Wet Vpb voor de toepassing van die wet nog gelding hadden, maar deze bedoeling komt in de tekst van de Resolutie niet voldoende duidelijk tot uiting. Mitsdien is aan te nemen dat belanghebbende in beginsel nog enig vertrouwen kan ontlenen aan het in de Resolutie B nr 4904 geformuleerde beleid, al was het maar doordat bij belanghebbende redelijkerwijs de indruk kan zijn gewekt dat de Resolutie nog geldt.

5.17. Voorts heeft de inspecteur gesteld dat, zo al belanghebbende aan de Resolutie B nr 4904 nog rechten zou kunnen ontlenen, zij ook op grond van deze Resolutie niet over uitsluitend vreemd vermogen kan beschikken. In dat kader heeft de inspecteur gesteld dat op grond van de Resolutie geen ‘eigen werkkapitaal’ aanwezig is, indien in enig land, in het onderhavige geval Nederland, de uitgezette gelden minder bedragen dan de in dat land opgenomen gelden, en voorts dat niet aannemelijk is dat de door belanghebbende in Nederland uitgezette gelden minder bedragen dan de aldaar opgenomen gelden. In zijn verweerschrift schrijft de inspecteur hierover onder meer:

> ‘In de situatie van belanghebbende overtreft het bedrag van de uitgezette gelden het bedrag van de opgenomen gelden. De meeste opgenomen

> gelden zijn immers afkomstig van het hoofdhuis ("Bankiers") en vormen het creditsaldo van de sluitrekening (…). Het ter plaatse ingeleende bedrag (hoogstens ruim ƒ 80. mio) zinkt in het niet bij het locaal uitgezette bedrag (ruim ƒ 357 mio.)'

Het Hof acht de uitleg van de Resolutie die in deze stelling van de inspecteur besloten ligt juist, en is voorts van oordeel dat belanghebbende, bezien ook in het licht van hetgeen de inspecteur in dit verband heeft gesteld, niet aannemelijk heeft gemaakt dat aan de daaruit voortvloeiende voorwaarde voor het niet aanwezig achten van 'eigen werkkapitaal' is voldaan. Op deze grond wijst het Hof de stelling van belanghebbende af.

5.18. Meer subsidiair heeft belanghebbende gesteld dat de toepassing van de zelfstandigheids-fictie ook inhoudt dat ten laste van het belastbare binnenlandse inkomen van belanghebbende vergoedingen dienen te worden gebracht ter zake van garantstellingen door het hoofdkantoor en voor het gebruik van de naam. Naar het oordeel van het Hof heeft belanghebbende deze stelling tegenover de gemotiveerde weerspreking daarvan door de inspecteur niet voldoende met feiten onderbouwd, zodat daaraan verder wordt voorbijgegaan.

5.19. Ter zitting heeft belanghebbende nog gesteld dat het standpunt van de inspecteur ertoe leidt dat een vaste inrichting van een bank slechter **16** wordt behandeld dan een met die vaste inrichting vergelijkbare dochtervennootschap. In dit verband stelt belanghebbende dat sprake is van discriminatie in de zin van artikel 6 (thans 12) van het Verdrag tot oprichting van de Europese Gemeenschappen van 25 maart 1957, zoals gewijzigd bij het Verdrag betreffende de Europese Unie van 7 februari 1992 (hierna: het EG Verdrag) dan wel strijd met de vrijheid van vestiging in de zin van artikel 52 (thans artikel 43) van het EG Verdrag, omdat de inspecteur aan de vaste inrichting van belanghebbende vermogenseisen stelt terwijl hij zulks ten aanzien van in Nederland gevestigde dochtervennootschappen van binnen de EU gevestigde banken niet doet, dan wel omdat het volgens de inspecteur aan de vaste inrichting van belanghebbende toe te rekenen eigen vermogen hoger is dan het eigen vermogen dat een in Nederland gevestigde dochtervennootschap die het bankbedrijf uitoefent ten minste dient aan te houden. Het Hof kan belanghebbende in deze stelling niet volgen. Hetgeen hiervoor is overwogen betreft immers de toepassing van de zelfstandigheidsfictie, welke fictie juist ten doel heeft een gelijke fiscale behandeling van de vaste inrichting en een daarmee vergelijkbare dochtervennootschap te bewerkstelligen. De omstandigheid dat de inspecteur aan de vaste inrichting van belanghebbende vermogenseisen stelt, vloeit juist voort uit die zelfstandigheidsfictie. Het eigen vermogen dat een 'bankdochter' in Nederland dient aan te houden—op grond van regels van De Nederlandsche Bank ECU 5.000.000 (verweerschrift, noot 24)—heeft het karakter van een minimum ten behoeve van de solvabiliteit aan te houden eigen vermogen. Bij dit minimum houdt de vergelijking tussen een vaste inrichting en een dochtervennootschap echter niet op. Zoals er 'bankdochters'

kunnen bestaan waarvan het eigen vermogen het door de locale autoriteiten voorgeschreven minimum te boven gaat, zo zullen er ook vaste inrichtingen van banken kunnen zijn waarvoor dat geldt. Of en in hoeverre dat het geval heeft te zijn, zal afhangen van de omstandigheden in het concrete geval. De omstandigheid dat in het onderhavige geval aan de Nederlandse vaste inrichting van belanghebbende een hoger eigen vermogen wordt toegerekend dan door De Nederlandsche

Bank (voor 'bankdochters') als minimum is voorgeschreven, houdt op zichzelf dan ook niet in dat sprake is van een slechtere behandeling van vaste inrichtingen dan van 'bankdochters'. Mitsdien is geen sprake van een door het gemeenschapsrecht verboden discriminatie of strijd met de vrijheid van vestiging.

5.20. Al het vorenstaande leidt ertoe dat het beroep ongegrond is.

**6. Proceskosten**

Nu de bestreden uitspraak in stand blijft en van bijzondere omstandigheden niet is gebleken, acht het Hof geen termen aanwezig voor **17** een veroordeling van een der partijen in de proceskosten als bedoeld in artikel 8:75 van de Algemene wet bestuursrecht.

**7. Beslissing**

Het Hof verklaart het beroep ongegrond.

De uitspraak is vastgesteld op 25 februari 2004 door mrs Faase, voorzitter, Van der Ouderaa, Hamer, leden, in tegenwoordigheid van mr Van Rijn als griffier. De beslissing is op dezelfde dag ter openbare zitting uitgesproken.

**Unofficial translation**

Period of assessment: 1995

**DECISION**

In the appeal by company X Bank (Europe) SA, established at Brussels according to Belgian law, the taxpayer company against a decision by the Head of Revenue Department Large Enterprises, the inspector.

**1. Procedure**

1.1. On 16 July 2002 an appeal in writing was received from A as attorney of the taxpayer company (hereafter: the attorney) … against a decision by the

inspector, dated 6 July 2002, as respects an assessment to corporation tax issued to the taxpayer company for 1995.

1.2. The assessment, dated 31 December 1999, was calculated on a taxable domestic sum of ƒ840,776. Following objection the assessment was reduced to one calculated on a taxable domestic sum of ƒ642,840.

1.3. The appeal claims that the inspector's decision be quashed and a loss of ƒ123,000 established.

1.4. The inspector has entered a defence. His conclusion is that the decision under attack should be confirmed.

1.5. The attorney replied in writing. The inspector replied to the reply.

1.6. [This paragraph contains procedural details]

**2. Facts not in dispute between the parties**

2.1. The taxpayer company is in the banking business. In the course of 1994 the taxpayer company opened a branch in Amsterdam from which banking activities took place between 1 July 1994 and 1 April 1996.

2.2. In 1996 a merger took place in Japan between I Ltd and J Ltd. In the course of that merger the assets and liabilities of the taxpayer company were transferred to K (Holland) NV, the subsidiary of J Ltd established in the Netherlands.

2.3. The taxpayer company has been licensed by The National Bank of Belgium to conduct the activities of a credit institution within the meaning **18** assigned to that expression in [there follows a detailed reference to the relevant document].

2.4. The taxpayer company has made a corporation tax return in respect of a domestic profit obtained by it in 1995. Attachment 1 to that return mentions inter alia the following:

'Balance sheet as per 31st December 1995

(amounts in thousands of guilders)

Assets ƒ

Cash 1,279

Bankers 78,747

Credits

- private sector 336,661

- (…)

- Interest bearing documents of value 21,000

- Real estate and business premises 576

- Other assets 6,355

- Total assets 444,618

Liabilities

Bankers 357,135

Monies held for others

- savings

- other 54,379

Other debts 26,399

other liabilities 6,476

Result for the year of account -131

Total liabilities 444,618'

Attachment 2 to the corporation tax return contains inter alia the following information:

'Profit and loss account for the period ending 31st December 1995

(amounts in thousands of guilders)

(…) *ƒ*

Interest assets 26,760

Interest liabilities 24,945

1,815

Result -131'

Attachment 3 mentions:

'FISCAL EXPLANATIONS

1. Check on calculation (amounts in thousands of guilders) ƒ

Commercial result -131

Non-deductible expenditure ex article 8a Income Tax Act 8

19

Fiscal result -123'

2.5. In 1999 the books of the taxpayer company were examined as respects the amount of the capital of the Netherlands establishment of the taxpayer company. The report of that examination, dated 10 July 2000, contains inter alia the following:

**'2 Corporation tax**

***2.1 Own capital of a permanent establishment in general***

(…)

In the case of a permanent establishment of a bank (…) it is impossible to indicate the extent to which it makes use of the total own capital of the general enterprise: one cannot trace what kind of capital (own or outside) the general enterprise attracted for what specific activity. What is clear is that within the general enterprise as a whole some own capital is maintained for the activities of the permanent establishment.

(…)

The Revenue compares the capitalisation of the permanent establishment with that of the head office on the basis of what is termed the BIS-ratio. Central Banks have agreed internationally, and also within the EU, that the percentage found by dividing the available capital (as adjusted for comparison purposes) by the risk-weighted assets should be at least 8%. This percentage is called the BIS-ratio.

The available capital (as adjusted for comparison purposes) consists mainly of capital, profit reserves and subordinated loans. For testing the level of

Exhibit 2

own capital required by the Revenue we eliminate – in the case of a head office as well as a permanent establishment – such elements as are fiscally considered as outside capital. Generally speaking those are subordinated loans (but possibly also other elements that fiscally should be considered to be outside capital). By eliminating the subordinated loans we are able to make a proper comparison.

If in respect of a head office a particular level of the BIS-ratio is mainly attributable to subordinated loans (interest on which is deducted), it would not be realistic to require the permanent establishment to maintain its own capital for that sum. (…)

The level of risk-bearing assets is determined by the factors applied by Central Banks in weighing the extent of risk. These factors vary from 0 to 100%, depending on the risk. The Central Banks attribute also factors to off-balance sheet items and market risks. In principle those factors are the same from one country to another.

It follows that by bringing the BIS-ratio into the comparison account is taken of the various activities and risks of a bank. In consequence, a **20** bank that has mainly inter-bank loans on its balance sheet need maintain a lower own capital than one that has outstanding risk-bearing credits to enterprises. The requirement that the BIS-ratio should be at least 8% applies to both (…) banks.

If the aforementioned testing leads to the conclusion that the level of own capital of the permanent establishment is too low, a correction is applied to the interest deducted which in our view was excessive: if the permanent establishment had had a higher level of own capital, it would have employed less outside capital. The limitation of the interest deduction is calculated by multiplying the shortfall in own capital by the 12-months' AIBOR-percentage [the Amsterdam Inter-Bank Offered Rate, the interest rate charged by one Netherlands bank to another] on 1st July of the year concerned.

(…)

2.2 As to the level of own capital of the taxpayer company's permanent establishment: the taxpayer company suffered in the years examined (…) an accumulated loss, as follows:

1994 f 944,000. =

1995 f 131,000. =

(…)

We require a level of the permanent establishment's own capital, depending on the weighted assets of the permanent establishment and the level of the BIS-ratio of head office. The level of weighted assets of the permanent establishment is as follows:

1994 187,005,000 (…)

1995 204,124,000

(…)

The weighted assets appear on the monthly statements sent to The Netherlands Bank [the Dutch Central Bank]. As our comparison is with head office's BIS-ratio, the weighted assets of the permanent establishment have been corrected insofar as they consisted of claims against group companies.

***2.3 The BIS-ratio of head office***

(…) For the purpose of enabling us to calculate head office's BIS-ratio we have asked for the monthly statement that is sent to the Belgian Central Bank. It appears therefrom that the weighted assets in 1995 amount to 25,989,904,000 Belgian Franks (BEF) … so that the net available capital adjusted for testing purposes equals 2.646.448.000 BEF. Head office's BIS-ratio in 1995 can then be calculated by dividing that capital by the weighted assets. This results in a BIS-ratio of 2,646,448 / 25,989,904 * 100% = 10.2%.

(…)

21

***2.4 Checking the amount of own capital of the permanent establishment***

In this part we calculate what in our view should be the amount of own capital of the permanent establishment. The starting point is the amount of weighted assets of the permanent establishment and the level of the BIS-ratio of head office.

Year weighted assets of BIS-ratio required own capital

permanent establishment head office permanent establishment

1994 (…) (…) (…)

1995 204,124,00010.2 20,820,648

The difference between required and actual own capital is as follows:

Year Own capital in f of Difference/

permanent establishment shortfall

actual required

1994 -/-944,000 (…) (…)

1995 -/-131,00020,820,648 20,951,648

The limitation of the interest charges to be deducted can be calculated by multiplying the shortfall in own capital by the AIBOR-percentage for 1 year on 1st July, taking into account the number of months during which the permanent establishment was active.

Year difference/ AIBOR 1 year number Limitation of

shortfall in on 1st July of months deduction of

own capital interest charges

in f in f

1994 (…) (…) (…) 740.0640.=

1995 20.951.648 4.6% 12 963,776.=’

2.6. In a letter to the attorney dated 13 May 2002 the inspector writes inter alia:

‘Summary

I am meeting your objection in part. The returned taxable sum in 1995 was a negative ƒ123,000.-. The correction applied in connection with the foregoing amounts to ƒ963,776.-. The new taxable sum amounts thus to ƒ840.776. The loss for 1994, after correction established at ƒ197,936.-, is to be set against that sum. In consequence, the definitive taxable sum for 1995 amounts to ƒ642,840.-.’

**3 Dispute**

The question in dispute is whether, and if so to what amount, the taxpayer company may deduct interest from the taxable domestic income obtained.

22

**4 Positions of the parties**

4.1. For a summary of the respective positions of the parties the court refers to the documents of the dispute …

**5 Judging the dispute**

5.1. It is an established fact that the taxpayer company carried out a banking business in the Netherlands by means of a permanent establishment. It is not in dispute that at the balance sheet date of 31 December 1995 the Netherlands permanent establishment's own capital amounted to a negative ƒ131,000 and that in 1995 the sum of ƒ24,945,000 was charged to the permanent establishment by way of interest. The Belgian head office of the taxpayer company has a substantial own capital. Its size may be expressed in a BIS-ratio so called, as described in para 2.1 of the examination report referred to in 2.5. According to that report the BIS-ratio of head office amounts to 10.2%. That is not in dispute between the parties either.

5.2. As the inspector submits and the taxpayer company does not dispute, the item 'Bankers' appearing in 2.4 above under the heading 'liabilities' consists to the extent of at least ƒ266,891,000 of a debt in current account to head office. As is shown in para 2.4 of the examination report quoted in 2.5 above, the inspector has earmarked the sum of ƒ20,951,648 as 'shortfall in own capital' and disallowed the deduction of the interest relating thereto, in the sum of ƒ963,776, from the taxable profit of the taxpayer company in the Netherlands. The sum of ƒ20,951,648 was calculated by the inspector as being the difference between the permanent establishment's actual own capital of -/- ƒ131,000 and the own capital required by him of ƒ20,820,648.

5.3. Pursuant to art 7(2) of the [double taxation treaty] of 19 October 1970 between the governments of the Kingdom of the Netherlands and the Kingdom of Belgium, Treaties Gazette 1970 192 (hereafter: the treaty), the same advantages should be attributed to the taxpayer company's permanent establishment in the Netherlands which it could be considered to be able to obtain if it were an independent enterprise conducting the same or similar activities in the same or similar circumstances and acting entirely independently (the fiction of independence so called).

5.4. The principal rule in applying the fiction of independence is that interest payments connected with debts which feature exclusively in the internal relationship between permanent establishment and head office are left out of account. As the court understands the position, this principal rule is based on the circumstance that the independence of a permanent establishment is but fictional and a permanent establishment is accordingly not the independent carrier of

rights and obligations. It follows that as a rule the moneys used by head office to finance a permanent establishment **23** should be treated as the latter's own capital (as long as they were not acquired by incurring debts for the benefit of the permanent establishment).

In this connection the court takes as its starting point that the rationale which forms the basis for this—fiscal—principal rule is at least in part the prevention of the allocation of (borrowed) capital to the permanent establishment on the basis of a whim or of purely fiscal motives. According to generally accepted opinions an exception is considered possible in the case of enterprises engaged in bankers' activities. Accordingly, as respects purely internal debts between head office and permanent establishment of a taxpayer company engaged in the banking business it is considered possible to take interest into account. The commentary on art 7 of the OECD model treaty is in this context of importance. It is (inter alia) as follows:

> 'It is, however, recognised that special considerations apply to payments of interest made by different parts of a financial enterprise (e.g. a bank) to each other on advances etc. (as distinct from capital allotted to them), in view of the fact that making and receiving advances is closely related to the ordinary business of such enterprises.'

5.5. In the judgment of the court the test mentioned in 5.3 and 5.4 above should also apply in establishing taxable domestic income on the basis of s 17 Corporation Tax Act 1969 (CTA) together with s 49(1) Income Tax Act 1964 (ITA).

5.6. The taxpayer company has primarily taken the stand that it is at liberty to take no account of own capital in determining the taxable domestic income of its permanent establishment, as the latter does not have its own capital. For that it prays in aid (inter alia) the Second Banks Directive and on Directive 93/22/EEC of 10 May 1993 (hereafter: Investment Services Directive).

5.7. The first sentence of art 6(1) of the Second Banks Directive reads:

> 'Receiving Member States may no longer require branches of credit institutions licensed in other Member States to possess the licence referred to in Article 4 of Directive 77/780/EEC, or the endowment capital.'

Article 14(1) and (2) Investment Services Directive reads:

> '(1) Member States shall procure that the investment services and other services mentioned in part C of the appendix can be carried out in accordance with articles 17,18 and 19, both by means of establishing a branch office and by means of freely rendering services, by any investment

Exhibit 2

> enterprise which has been licensed by the competent 24 authorities of another Member State and which is supervised by them in accordance with this Directive, provided that those services are within the terms of the licence. This Directive is without prejudice to the powers of receiving Member States as respects rights of participation in institutions for collective investment not falling within Directive 85/611/EEC (14).
>
> (2) Member States may not subject the establishment of a branch office or the rendering of services referred to in (1) to the grant of a licence or to the obligation to provide own capital or to similar measures.'

According to the taxpayer company, the position of the inspector that follows from the decision in dispute implies that in essence the permanent establishment is required to maintain own capital. Thereby the directives quoted above are frustrated and the desired aim of creating a common market is not achieved. Accordingly, the inspector is acting in conflict with Community law, says the taxpayer company. The inspector has disputed that, giving reasons.

5.8. In the judgment of the court the above-quoted provision of the Second Banks Directive is directed at the question of which country is competent to supervise (inter alia) the solvency of banks operating within the EU. The responsibility for this supervision is placed exclusively with the country where the corporation that carries out the banking operation was established. In the present case that is Belgium. The member states where that corporation has branch offices may not impose requirements as respects (inter alia) that solvency, in the sense that they may not require such a branch office to have an endowment capital. The exclusive competence of (in this case) Belgium is not being violated if for the purpose of applying art 7 of the treaty and s 17 CTA the own capital of the taxpayer company is deemed partially to be working for the permanent establishment—as the inspector argues: it does not follow from the aforementioned fiscal provision and the consequences ascribed thereto by the inspector that the taxpayer company would be required to maintain more own capital than it is obliged to maintain pursuant to the determinations of the Belgian supervising authority, or that the permanent establishment in the Netherlands would as a matter of fact be required to maintain own capital. The provisions just referred to concern the allocation, for the purpose of determining the taxable profit, of own capital available to the taxpayer company. The question of the part of the enterprise to which the capital required by the supervising authority is to be attributed by the bank concerned is not in the judgment of the court within the purview of the Second Banks Directive. It follows that the position of the inspector does not imply a violation of the Second Banks

25

Directive. As respects the Investment Services Directive the same applies mutatis mutandis, to the extent that this directive applies to the taxpayer company.

5.9. The taxpayer company alternatively prays in aid the exception mentioned in 5.4. The inspector does not dispute the existence of this exception. What keeps the parties apart is the meaning of the exception in this particular case. In the judgment of the court the exception mentioned in 5.4 does not imply that it is open to the taxpayer company to finance the assets of its permanent establishment entirely out of outside capital, nor that the 'prohibition' against interest on debts between permanent establishment and head office being taken into account never applies to banks as such. In the judgment of the court the exception referred to means that this prohibition should be ignored if that is required because of the exercise of the business by head office and permanent establishment. In that respect the exception follows the rationale of the primary rule mentioned in 5.4, which is based on the proposition that a permanent establishment cannot itself enter into rights and obligations.

The rationale referred to implies that no, or a subsidiary, meaning would fall to be attributed to the intention of the parties as respects the division of the taxpayer's own capital for tax purposes, even if any meaning at all were to be attributed to the intention of parties supposedly behind the head office and the permanent establishment. In addition, the fact that in Belgium, as the taxpayer company has submitted, all moneys which a foreign bank puts at the disposal of its Belgian permanent establishment will normally be treated as (exclusively) internal loans is of no influence on the considerations set out in the foregoing.

5.10. In general it is impossible to find out, for the purpose of determining whether and if so to what extent the business of a bank is financed with own or alternatively with outside capital, how a particular asset was financed, and accordingly one can in principle but refer to the fact that every asset to an extent is covered by own capital. In the judgment of the court this must apply also to the business of a banker's permanent establishment. The result is in the court's judgment that in this case there falls to be established whether and if so to what extent own capital of the taxpayer company's main office should be taken to have been maintained to cover the assets and activities of its Netherlands permanent establishment. The fact that the size of the main office's own capital is in part based on the requirements formulated by the local supervisor does not detract from the principle. The court considers it unlikely that the own capital of the taxpayer company's main office would play no part in servicing the conduct of the business of the Netherlands permanent establishment as well, now that it has been established that the own capital of the taxpayer company's head office corresponds to a

**26**

BIS-ratio of 10.25%. In the judgment of the court it is not plausible that this own capital should serve exclusively the business conducted by head office. In addition, also bearing in mind the purpose and extent of the Second Banks Directive, it is not plausible that the own capital prescribed by the Belgian authorities as respects the taxpayer company in the sum of ECU 5,000,000 would have to serve only as surety for the conduct of the business of the taxpayer company in Belgium.

5.11. In the judgment of the court, and also bearing in mind the considerations expressed in the foregoing, it is primarily up to the taxpayer company to show plausibly that, and the extent to which, there are internal borrowings to which the exception mentioned in 5.4 can refer. Thus, as in the case of bankers' activities it is generally not really possible to establish a relation between specific items on the assets side and specific items on the liabilities side, it is up to the taxpayer company to adduce facts and circumstances which reasonably explain why in the present case the capital allocated by the taxpayer company to its permanent establishment should be exclusively outside capital, while the taxpayer company's own capital should not serve at all for the business of the Netherlands permanent establishment.

5.12. In the judgment of the court the taxpayer company has not proved facts and circumstances on the basis of which the taxpayer company can be considered to have rightly assumed that the assets and activities of the enterprise conducted with the assistance of the Netherlands permanent establishment were financed exclusively by outside capital.

On the other hand, the inspector has, by means of the report mentioned in 2.5, established a link between the taxpayer company's (head office's) own capital and that of its permanent establishment, and [shown] that according to that report that permanent establishment should (have to) have available to it an own capital of ƒ20,820,648. Now that the taxpayer company has adduced no evidence as to any own capital serving the permanent establishment, and it is not plausibly acceptable that no own capital serves the permanent establishment, it would have been up to the taxpayer company to show that the inspector calculated the own capital at work in the permanent establishment at too high a figure. On this point, also, the taxpayer company has adduced no evidence. Bearing in mind the sum of ƒ245,939,352 (ƒ266.891.000 – 131.000 – 20,820,648) which the permanent establishment is allowed by the inspector to justify as a fiscal debt in the internal current-account relationship with head office, the sum of ƒ20,820,648 leaves enough room for the taxpayer company's proposition that 'in the banking business one may assume that by far the larger part of the moneys that are lent and borrowed between head office and permanent establishment is borrowed from third parties' (supplement to notice of appeal, p 14). (The proposition is based on the 1984 OECD **27** report 'The taxation of multinational banking enterprises'.)

5.13. The taxpayer company has submitted that the inspector's method of calculating the interest correction applied by him is contrary to the treaty, because this would be an unauthorised method of calculating profit (profit split) and (or in the alternative) because the inspector did not carry out a functional analysis. The court rejects this submission. In a case such as this one, where it is primarily up to the taxpayer company to show that the financing of the business of the permanent establishment results functionally from the nature and size of that business, and where the taxpayer company has adduced no evidence—other than to say generally that 'interest are normal business costs to banks, interwoven as they are with the conduct of banking business' (supplement to notice of appeal p 13)—no more can be expected from the inspector than that he attributes the taxpayer company's own capital reasonably among the enterprises discernible within the taxpayer company, on the basis of the information available to him. The court refers for this proposition to the explanation in the examination report by the inspector, as set out in 2.5. It has not been shown that by following that examination report the inspector did not act reasonably. Nor does the court consider that the method applied by the inspector is contrary to the test referred to earlier. By applying the BIS-ratio found in respect of the taxpayer company and the weighted assets of the permanent establishment the inspector has implemented the fiction of independence in an acceptable manner. In this connection it has not become plausible that the activities of the permanent establishment would not be sufficiently comparable to the activities of head office. Nor is the foregoing influenced by the fact that within the OECD a discussion is under way about a uniform method by which the countries connected to the OECD would be able to establish the extent to which (for tax purposes) financing of a permanent establishment of a banking institution with own or alternatively outside capital is permissible. This circumstance does not mean that, as long as the said discussion has not resulted in applicable law, it should be accepted as a starting point that the taxpayer company of interest in the relationship between permanent establishment and head office of a bank should be entirely at the bank's discretion.

5.14. The taxpayer company has also prayed in aid a Resolution dated 7 May 1930 … no B 4904. This Resolution contains the following:

> 'As in the banking business the division of capital should generally be the starting point for the division of profit, one should begin by determining which part of own capital has been placed or is active in each country. It follows that what falls to be divided is the capital of the entire enterprise plus the reserves. In doing so it should be assumed **28** that the fixed capital (real estate, furniture, participation in other businesses) is primarily financed out of the enterprise's own means. One may assume that in banking there will always remain a part of own capital by way of "own working capital".
>
> Once own capital has been divided into "fixed means" and "own working

capital" and the allocation of "fixed means" to the various countries has taken place, the total of "own working capital" is to be similarly allocated. In connection with the differences in currencies and interest rates between the different countries it may be assumed that the moneys employed in any particular country (bills of exchange, loans, loans guaranteed by securities, debtors in current account and other credit items) find their origin primarily in outside means (deposits etcetera) taken up in the same country. If in any particular country the moneys employed are less than the moneys taken up, it should be assumed that no "own working capital" exists in that country but that the office in that country makes outside working capital available to offices abroad.

However, if in any country the moneys employed exceed those taken up there, that must be in consequence of working capital having been acquired elsewhere. In that case there remains only the question of how that working capital is to be divided into "outside" and "own" working capital.'

5.15. The inspector has submitted that the 1930 Resolution was revoked by the Resolution of 3 May 1971 no … BNB 1971/4. That Resolution contains the following:

'(1) This is to inform you that I have found reasons for summarising certain instructions or parts thereof, which appear in the book VeB '42 but are of importance for the implementation of CTA '69 as well, in an instruction for the book VeB '69.

In addition, some (…) documents will be included separately in that book under their original date, corrected where necessary.

It may be assumed that any (…) document not transferred by any of those methods are of no importance to the implementation of Act VeB '69, except to the extent that they are to be included in the executive decree to be issued pursuant to s 5 of the Act.'

The question of allocating capital to the permanent establishment of a bank is not among those summarised in Resolution BNB 1971/144.

5.16. In the judgment of the court it is not possible to conclude decisively from the text of Resolution BNB 1971/144 that Resolution B no 4904 can no longer be trusted to provide protection in law. Presumably the Secretary of State for Finance intended to indicate in

**29**

Resolution BNB 1971/144 which of the Resolutions dating from before the introduction of CTA continued in force for the purpose of implementing that Act, but that intention does not appear clearly enough from the text of the Resolution.

It is accordingly to be assumed that the taxpayer company could in principle rely to some extent on the governmental policy set out in Resolution B no 4904, even if only to the extent of being reasonably under the impression that the Resolution is still in force.

5.17. The inspector has also submitted that even if the taxpayer company could still rely on Resolution B no 4904, it would not on the basis of that Resolution be entitled to have nothing but outside capital available to it. In that connection the inspector has submitted that according to the Resolution there is no 'own working capital' if in any country, in this case the Netherlands, the moneys employed are less than the moneys taken up in that country, and furthermore that it is not plausibly acceptable that the moneys employed in the Netherlands by the taxpayer company are less than the moneys taken up there. In his defence the inspector writes on that subject:

> 'In the case of the taxpayer company the moneys employed exceed the moneys taken up.: Most of the moneys taken up come from the main office ("Bankers") and are the credit balance of the final account (…) The locally borrowed amount (at most somewhat more than ƒ80 million) pales into insignificance against the sum locally employed (more than ƒ357 million).'

The court considers the explanation of the Resolution implied in the inspector's submission to be correct, and is furthermore of the opinion, also in the light of the inspector's submission in this connection, that the taxpayer company has not shown that the condition, requisite for the absence of 'own working capital' which follows therefrom, has been satisfied. On that ground the court rejects the taxpayer company's submission.

5.18. On a secondary level the taxpayer company has also submitted that it is implied in an application of the fiction of independence that payments made in respect of guarantees provided by head office and in respect of the use of the name are to be charged against the domestic income of the taxpayer company. In the judgment of the court the taxpayer company did not sufficiently support this submission by facts, against the reasoned contradiction thereof by the inspector, with the result that it will be passed over.

5.19. During the hearing the taxpayer company submitted that the inspector's position results in a worse treatment of a permanent establishment of a bank than of a comparable subsidiary company. In this **30** connection the taxpayer company submits that there is either discrimination within the meaning of art 6 (now 12 EC) of the treaty for the creation of the European Communities of 25 March 1957, as modified (…) [in] 1992 (hereafter: the EC Treaty), or conflict with the freedom of establishment within the meaning of art 52 (now 43 EC) of the EC Treaty, either because the inspector imposes capital requirements on the permanent establishment of the taxpayer company while he does not do so as respects Netherlands subsidiary companies of banks established within the

EU, or alternatively because the own capital that according to the inspector is to be allocated to the permanent establishment of the taxpayer company is higher than the minimum own capital to be maintained by a Netherlands subsidiary company in the banking business. The court cannot follow this submission by the taxpayer company: What has been considered in the foregoing concerns the application of the fiction of independence, the purpose of which is precisely to achieve equal fiscal treatment of a permanent establishment and a comparable subsidiary company. The fact that the inspector imposes requirements as to capital on the permanent establishment of the taxpayer company is actually the result of that fiction of independence. The own capital to be maintained by a 'banking subsidiary' in the Netherlands— pursuant to rules by the Netherlands Bank amounting to ECU 5,000,000 (…)—has the character of a minimum own capital to be maintained in the interest of solvency. However, the comparison between permanent establishment and subsidiary company does not stop at that minimum. Just as there may be 'banking subsidiaries' whose own capital exceeds the minimum prescribed by the local authorities, there may also be permanent establishments of banks to which that applies. Whether and if so to what extent that is the case depends on the circumstances in any particular case. It follows that the circumstance in the present case that a higher own capital is allocated to the Netherlands permanent establishment of the taxpayer company than the minimum prescribed by the Netherlands Bank for 'banking subsidiaries' does not by itself mean a worse treatment of permanent establishments than of 'banking subsidiaries'. Accordingly there is no question of discrimination or conflict with the freedom of establishment contrary to community law.

5.20. All of the foregoing leads to the conclusion that the appeal is without foundation.

**6. Costs**

As the decision appealed against remains in force and there appear to be no special circumstances, the court considers that there are no grounds for ordering one of the parties to pay the costs of the proceedings within the meaning of s 8:75 of the General Act of administrative law.

**31**

**7. Decision**

The court declares the appeal without foundation.

**Acknowledgment**

The editor and publishers would like to express their thanks to Edo de Vries for his translation of this decision.