**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 95-758T**
**(Judge Nancy B. Firestone)**

**NATIONAL WESTMINSTER BANK PLC,**
**Plaintiff**

**v.**

**THE UNITED STATES,**
**Defendant**

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR RECONSIDERATION**

Pursuant to the Court's Order of December 3, 2004, plaintiff hereby submits its opposition to defendant's November 24, 2004 Motion for Reconsideration. Defendant's motion should be denied. It offers nothing of relevance that the Court did not consider in previously rejecting the same argument and lacks any of the elements necessary to meet defendant's burden under Rule 59(a).

**1. Defendant's Theory Has Already Been Rejected**

Defendant's motion asks the Court to reconsider "the portion of its July 16, 2004 Scheduling Order that limited the scope of the 'capital issue.'" Presumably defendant is referring to the footnote in the Order, which states: "[a]s discussed in the status conference, the 'capital issue' does not include attributing capital to the U.S. branches

from other National Westminster branches or its home office." Defendant is contending that the Court should attribute a portion of NatWest's worldwide capital to its U.S. branches based on U.K. bank regulatory policies, even though defendant concedes that those policies did not themselves require such an apportionment. In support of its motion, defendant cites an opinion of a former U.K. bank regulator to the effect that U.K. regulators would have evaluated the bank's worldwide capital with reference to its worldwide risks and assets, including those of the U.S. branches – a point reflected in NatWest's public filings produced to defendant over eight years ago. In addition, defendant cites a Dutch lower court opinion that applied the Belgium-Netherlands treaty to a Belgian bank's 1995 tax year and attributed capital to its Dutch branch by using the "BIS" ratio of the home country bank regulators – a method defendant previously argued this Court should not adopt.

The argument defendant makes now is the same one the Court recognized at the July 13, 2004 conference as an attempt to reargue the November 14, 2003 opinion. The defendant argued at the July 13, 2004 conference that the capital of the U.S. branches should include an apportionment of the worldwide capital of National Westminster Bank PLC and that the Court should reopen discovery (which had closed in February of 2002) for that purpose. *See* Tr. 7/13/05 at 58:17 to 60:3. Defendant based its argument on NatWest's SEC filings, which stated that NatWest maintained a sufficient amount of capital to cover the size and risks of the worldwide business. *See id.* at 58:21 to 59:24. The Court recognized that worldwide apportionment might be a basis upon which treaty parties could agree to avoid double taxation, but reiterated the conclusion in its opinion

that, unlike the historic separate accounting method, worldwide apportionment did not reflect the shared expectations of the parties to the 1975 U.S.-U.K. Treaty:

> I am not suggesting to you that ultimately there may not be a very good solution to figure out a way to allocate worldwide . . . capital . . . . What I'm suggesting is when I wrote this opinion, what I was willing to accept is the fact…that we have to treat this as though it was a separate entity with its own books and records; that in looking at those books and records, we were to determine whether or not things had been mischaracterized and should be corrected within its own world; but that we were not willing to look at the outside - - outside the confines of these units that make up the U.S. branch, to superimpose additional capital. So if that is what you would be looking for, that would not be consistent with my opinion and that inquiry would not be relevant to the ultimate resolution of the case. So discovery in that area . . . is closed, [and] further inquiry in that area would not be allowed.

*Id.* at 64:1-20.

The Court's statements in July reflected conclusions it had reached about worldwide apportionment theories in both the July 9, 1999 and November 14, 2003 opinions ("NatWest I" and "NatWest II," respectively). In NatWest I, the Court ruled that Treasury Regulations section 1.882-5, which apportions worldwide capital and interest expense to a U.S. branch based on a ratio of U.S. assets to worldwide assets, was inconsistent with the Treaty. In NatWest II, the Court considered the 2001 and 2003 OECD discussion drafts cited by defendant in its briefs, observed that those drafts proposed a risk-weighted worldwide apportionment method, and concluded that the worldwide apportionment method (and other OECD proposals) offered "no insights into the 'genuine shared expectations of the contracting parties'" to the 1975 U.S.-U.K. Treaty. NatWest II, 58 Fed. Cl. 491, 502.

Indeed, in the last round of summary judgment motions, defendant itself advised this Court against applying a "[risk-adjusted] BIS ratio approach" identical to that used by the Dutch court and similar to the one defendant now argues for:

> Since the risk-weighting of assets did not exist as a standard until the Basel Accord in 1988, it would not be appropriate to apply the BIS ratio approach to determine the capital plaintiff's U.S. branch operations would have needed on a separate enterprise basis during the years 1981-1987. In addition, the Court's July 9, 1999 Opinion and Order ruled that a somewhat similar approach to capital in Treas. Reg. § 1.882-5 is inconsistent with the separate enterprise principle. 44 Fed. Cl. at 130. The regulation provided for an allocation of a bank's worldwide capital to a branch based on the proportion that the branch's assets (albeit not risk-weighted) bore to the entity's total assets (also not risk-weighted).

Def.'s Cross Mot. for Partial Summ. J. and Opp'n to Pl.'s Mot. for Partial Summ. J. at 31 n. 24. Defendant's current motion thus effectively contradicts its earlier arguments to the Court and requests that the Court reconsider its opinions and adopt a theory that the Court previously and properly rejected.

**2. Defendant Does Not Attempt to Meet Its Burden Under Rule 59(a)**

Defendant's motion does not even purport to present any of the "reasons established by the rules of common law or equity" that support reconsideration under Rule 59(a):

> The decision to grant a motion for reconsideration lies within the sound discretion of the court. … The movant does not persuade the court to grant such motion by merely reasserting arguments which were previously made and were carefully considered by the court. … Rather, the movant must show: (1) that an intervening change in the controlling law has occurred, (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice. (citations omitted)

*Henderson County Drainage Dist. No. 3, et al., v. United States*, 55 Fed. Cl. 334, 337 (2003) (Hewitt, J.). In its motion for reconsideration, defendant has not shown that there has been an intervening change in controlling law, that evidence previously unavailable has become available, or that its motion is necessary to prevent manifest injustice. Defendant has simply failed to meet its burden on this motion.

*a. There has been no intervening change in "controlling law."*

Defendant cites a decision of a Dutch court relating to the 1995 tax year of the Dutch branch of a Belgian bank involving a Belgium-Netherlands treaty to which neither the United States nor the United Kingdom is a party. Defendant does not assert that the opinion is controlling for purposes of Rule 59(a). Indeed it cannot make such an assertion because the Dutch court's rulings can have no binding effect on this Court. Moreover, the Dutch court is only the first level of appeal from administrative tax decisions and is controlling (to the extent any decision can be considered controlling in a civil law jurisdiction) only in one of a number of regions within the Netherlands. The Dutch opinion has been appealed to the Supreme Court of the Netherlands[1] and remains subject to further consideration by the European Court of Justice, if necessary to avoid double taxation. Even if it were affirmed at the highest levels, it would not be an "intervening change in controlling law" in this case and would not support reconsideration under Rule 59(a).

In any event, the Dutch opinion does not shed light on the questions this Court has considered. It does not state whether Dutch law requires consideration of the "genuine shared expectations" of the treaty parties and does not purport to consider them, as this Court was required to do – and did. *See Maximov v. United States*, 299 F.2d 565, 568 (2d Cir. 1962) *aff'd* 373 U.S. 49 (1963); 58 Fed. Cl. at 496. The Dutch opinion does not consider the intentions of Belgium, its treaty partner, or the potential for double taxation inherent in a ruling inconsistent with the mutual intent of the treaty partners. Nor did the court consider most of the 1963 OECD Model Treaty commentary on which the July 1999 and November 2003 opinions of this Court were based.

---

[1] *See* Hof Amsterdam, Mk III, 25 Feb. 2004, nr 02/461, VN 2004/29.1.3.

In fact, it is surprising that defendant would ask the Court to reconsider its July 9, 1999 and November 14, 2003 opinions on the basis of the Dutch opinion given that the Dutch court applied the very risk-weighted BIS worldwide apportionment approach defendant previously advised the Court was "inappropriate" under the July 9, 1999 opinion. Def.'s Cross Mot. for Partial Summ. J. and Opp'n to Pl.'s Mot. for Partial Summ. J. at 31 n. 24.

*b. Defendant has not offered previously unavailable evidence.*

Defendant's reliance on the opinion of Richard Henry Farrant to support a worldwide apportionment is misplaced. Mr. Farrant makes three key points, all reflecting facts which have been available throughout the term of this case:

- During the 1980s, the Bank of England examined a bank's worldwide assets in evaluating the adequacy of its capital (Farrant Rep. at 3);
- The Bank of England used risk asset ratios and gearing ratios as part of its evaluation, but "the Bank's approach to the assessment of capital adequacy was intended to be flexible . . . and not to prescribe a precise numerical guideline" (Farrant Rep. at 3, 5-6); and
- The Bank of England's capital determination for a specific bank would normally be met by capital held at its U.K. headquarters. (Farrant Rep. at 3).

Mr. Farrant moves from these points to the assumption, unwarranted in plaintiff's view, that National Westminster Bank PLC held additional capital to support its branch operations in the United States and would have held less capital without those branch operations. Farrant Rep. at 3.

Defendant cannot plausibly contend that facts relating to the Bank of England's regulatory approach were previously unavailable. Mr. Farrant's points regarding the Bank of England's capital measures are drawn from a paper entitled "The Measurement of Capital" published by the Bank of England in its Quarterly Bulletin, dated September

1980, which is and has been available in the Library of Congress throughout the term of this case. *See* 20 B.E.Q.B. 324, Library of Congress Call No. HG2994.A17. But defendant would not have needed to travel to the Library of Congress to discover these facts. NatWest's SEC filings during the years at issue contain extensive discussion of the U.K. bank regulatory policies to which Mr. Farrant refers. For example, NatWest's Form 20-F for the year ended December 31, 1983 describes:

> supervisory guidelines issued by the Bank of England, which focus upon two measures of capital adequacy: the risk asset ratio and the gearing (leverage) ratio. In computing the risk asset ratio, a weighting is assigned to each class of asset to reflect its relative risk and the weighted total assets are considered in relation to the Group's capital base.

*See* Pl.'s Responses to Def.'s Second Set of Interrog. at H.00035. NatWest's SEC Forms 20-F for the years 1982 through 1987 were provided to defendant in discovery over eight years ago and indeed were cited by defendant in July as a basis for its new position. *See id*. at Exs. H to M; Tr. 7/13/04 at 58:21 to 59:4. In addition, the November 15, 2001 report of plaintiff's expert Robert R. Bench makes clear that during the 1980s the U.K. was using a risk-weighted method of measuring capital and that all other G-10 countries either were using one or were seriously considering one. *See* Bench Rep. App. A at 29, 30. This Court has recognized that a branch relies on the capital of the bank of which it is part. *See* NatWest I, 44 Fed. Cl. at 121 ("Banking operations of the U.S. branch are supported by the worldwide capital of NatWest); NatWest II, 58 Fed. Cl. at 495 ("a branch of a foreign bank relies upon the worldwide capital of the enterprise of which it is a part and does not need its own separate capital").

Defendant has had ample opportunity to argue for worldwide apportionment of capital based upon Bank of England regulatory concepts (even though, as Mr. Farrant

concedes, the Bank of England itself did not contemplate such an apportionment). Defendant could have advanced that argument in its cross motion dated September 12, 2002, but instead advised the Court against it. *See* above. When the Court later expressed skepticism regarding defendant's "marketplace" corporate yardstick method and offered defendant the opportunity to argue for a bank regulatory approach (albeit a U.S. one), defendant declined and insisted on its marketplace yardstick. Tr. 05/06/03 at 41:1-8; Order dated May 7, 2003; Def.'s Supp. Summ. J. Brief Regarding Application of Bank Regulatory Minimum Capital Standards Under the U.S.-U.K. Treaty. The Court asked at oral argument what defendant's position would be if it rejected defendant's corporate yardstick [Court to Def.'s Counsel]:

> What is your sense, assuming I would rule against you and I would say you can't attribute capital . . . . [on] your theory of the comparison based upon what an American bank, based upon your expert's analysis. I don't want to phrase it and then find out I've said it not absolutely correct . . . . I'm just curious before we go here today what then do you see as happening next?

*See* Tr. 08/05/03 at 70:3-22. In its response, defendant made no mention of its current U.K. bank regulatory theory. *See id.* at 70-81; *see also* Def.'s Mot. for Leave to Identify Discussions in Its Briefs. Now, as this case embarks upon its tenth year before this Court, defendant seeks to disavow its prior choices.

Plaintiff does not accept Mr. Farrant's conjecture that National Westminster Bank PLC would have had less capital without its U.S. branch operations. Assuming Mr. Farrant were correct, however, defendant has not asserted – nor could it assert – that either of the parties to the U.S.-U.K. Treaty expected the principles of U.K. bank regulatory guidelines to be used to effect an apportionment of capital that the bank regulators themselves did not contemplate.

In its November 14, 2003 opinion, the Court ruled that, consistent with the 1975 U.S.-U.K. Treaty's purpose to minimize double taxation, the profits of its U.S. branch should be determined on the basis of its separate accounts rather than on facts extraneous to the branch. Defendant argues that capital, which its expert admits would not ordinarily be reflected on the U.S. branch books, should be shifted to the U.S. branches from the home office based on a risk-adjusted worldwide apportionment. Defendant's method requires the Court to attribute to the U.S. branches capital already reflected in the accounts of the head office, and thus already treated as capital for U.K. tax purposes. This method is inconsistent with the method described in the U.K. Inland Revenue Manual. As defendant advised this Court, such a method is akin to the Treasury Regulations held inconsistent with the Treaty in the July 9, 1999 opinion. It also is similar to the 2001 and 2003 OECD proposals this Court concluded did not reflect the shared expectations of the parties to the 1975 U.S.-U.K. Treaty. *See* 58 Fed. Cl. 491, 502-3. This lack of mutuality between the U.S. and U.K. would raise the double taxation issues already resolved by this Court.

*c. Defendant's motion is not necessary to prevent "manifest injustice."*

It goes without saying that defendant has not demonstrated that the Court must grant its motion in order to prevent "manifest injustice." *See, e.g., Bannum, Inc. v. United States*, 59 Fed. Cl. 241, 245-46 (2003) (Lettow, J.) (denial of motion for reconsideration where movant has not shown manifest injustice). *Cf. Toro Co. v. White Consol. Indus., Inc.*, 383 F.3d 1326, 1336-37 (Fed. Cir. 2004) (movant failed to show either clear error or manifest injustice warranting reconsideration of the law of the case). In the nine years this case has been before the Court, defendant has had ample

opportunity to argue its current theory to the Court and nothing new has come to light to warrant reconsideration of closed issues. The only injustice here is the burden defendant has placed upon this Court and plaintiff with its repeated motions.

For the foregoing reasons, defendant's motion should be denied.

Dated: New York, N.Y.
December 13, 2004

s/D. Scott Wise by Mario J. Verdolini, Jr.
D. Scott Wise

Attorney of Record
Davis Polk & Wardwell
450 Lexington Avenue
New York, N.Y. 10017
(212) 450-4000

Of Counsel:

Mario J. Verdolini, Jr.
Leslie J. Altus
Davis Polk & Wardwell
450 Lexington Avenue
New York, N.Y. 10017
(212) 450-4000

John L. Carr, Jr.
Michael C. Moetell
Thomas M. Buchanan
Winston & Strawn LLP
1400 L Street, N.W.
Washington, D.C. 20005