**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 95-758 T**
**(Judge Nancy B. Firestone)**

**NATIONAL WESTMINSTER BANK PLC,**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR RECONSIDERATION OF COURT'S JULY 16, 2004, ORDER, LIMITING SCOPE OF CAPITAL ISSUE**

Defendant respectfully submits this reply to plaintiff's opposition to defendant's motion for reconsideration.

The issue presented by defendant's motion is whether the legal test announced in the Court's November 14, 2003, Opinion on Partial Summary Judgment includes an inquiry regarding capital actually allotted to a branch but recorded only on the consolidated books of the bank. The matter was discussed only very briefly at a telephonic status conference.[1] On the basis of defendant's very limited

[1] Tr. July 13, 2004 at 58-64.

presentation, the Court ruled that the capital issue, under the test expressed in the November 2003, Opinion, "does not include attributing capital to the U.S. branches from other National Westminster branches or its home office."[2] Defendant filed the pending motion for reconsideration, so that the Court would have before it a more complete picture and would conclude that its Opinion permits an inquiry regarding capital that was actually allotted to a branch, but recorded only on the Bank's consolidated books. Defendant's motion is not, either in form or intent, a motion for reconsideration of the Court's November 2003, Opinion.

Defendant's motion for reconsideration was supported by two exhibits. The first is an expert's report demonstrating that the Bank of England required plaintiff (and other large international banks) to allot a specific amount of capital to the operations of its U.S. branches. Once allotted, the Bank of England did not demand that such capital be recorded on the branches' books – it was permissible to record it on a bank's consolidated books. The specific amount of capital actually allotted to the plaintiff's six U.S. branches during the years at issue cannot be known without further inquiry, but under prevailing Bank of England rules, it is likely to be in the vicinity of 8% of the branches' risk adjusted assets.[3] Defendant's second exhibit is a recent decision by a Dutch court, under a treaty provision similar to Article 7(2) of the U.S.-U.K. Treaty. The court reduced a Belgian bank's interest expenses attributable to its Dutch branch by determining that capital had been allotted to the branch, even though it was recorded only on the books of the bank as a whole. The bank did not explain why the branch had no recorded capital, and offered no evidence to show that capital on the bank's overall books did

---

[2] July 16, 2004, Order at 1 n.1; *see also* Tr. July 13, 2004 at 59-60.

[3] Deft.'s Motion for Reconsideration, Ex. 1 at 3, 7-8.

not serve the branch at all. As a result, the Court determined that the branch in fact had "own" capital.[4] The capital allotted to the branch was computed on the basis of the branch's risk adjusted assets, using the particular regulatory BIS formula then in effect (1995).

The Court's November 2003, Opinion, read with these materials in mind, indicates that its legal test permits an evaluation of the capital NatWest actually allotted to its U.S. branches, but recorded only on NatWest's consolidated books. The Court's Opinion takes great pains to explain that the legal test it contemplates does not give conclusive effect to the amount of capital recorded on a branch's books and records.[5] Thus, "allotted" capital is not limited to items that appear as capital on a branch's books. Rather, citing the (O.E.C.D.) legislative history to the Treaty, the Court observed that branch books may be adjusted based on the "real facts of the situation."[6]

The legal test announced in the Court's November 2003, Opinion also relies heavily on the methodology expressed in the U.K.'s Inland Revenue Banking Manual.[7] As the Court recognized, the Manual draws a distinction between amounts designated as capital on the books of the branch and "amounts treated as allotted capital," which were not designated as capital on the books, but nevertheless should be treated as capital. The task expressed in the Manual is to determine the amount

---

[4] "Own" capital, as expressed by the Dutch court, appears to be essentially similar to this Court's reference to a branch's "allotted" capital.

[5] 58 Fed. Cl 491, 492, 505.

[6] *Id.* at 488; *see also id.* at 500-501.

[7] 58 Fed. Cl. at 505-506.

of capital that *"in reality"* has been provided to a branch.[8] To do so, the Manual offers a non-exhaustive list of factors that may be considered. One of those factors is "other reserves."[9] The Inland Revenue Manual also grants wide discretion and flexibility to its Inspectors, as it also provides that the determination of amounts treated as allotted capital is a "substantially a grey area," that "[n]egotiation will be very much the order of the day," and that a "reasonable result" will have been achieved if "the level of free working capital is approximately correct."[10] Nothing in the Manual prohibits an Inland Revenue Inspector from concluding, and negotiating on the basis, that a branch has amounts that should be treated as allotted capital when the bank of which the branch is a part calculates a specific amount of capital to support the branch's own activities and records that capital only on the bank's consolidated books. Indeed, such capital, even though not recorded on the books of the branch, is available to the branch's creditors, and reasonably may be considered "other reserves" of the branch. If Inland Revenue Inspectors have such leeway, and the Inland Revenue Banking Manual represents, as the Court concluded, "a correct view of the U.S. – U.K. Treaty" and is "an adequate basis for the parties to resolve" the capital issue (58 Fed. Cl at 506), then the United States should have no lesser rights.[11]

---

[8] *Id.* at 506.

[9] *Ibid*.

[10] Manual at ¶ 14.1.

[11] If the Internal Revenue Service were to apply the Inland Revenue Banking Manual to another U.K. bank in the course of an audit to determine interest expense under the Treaty, as this Court's Opinion concludes would be proper, there seems little doubt that the auditor rationally could determine that a branch's allotted capital includes an amount the Bank actually determined should be held to support the branch's activities, even if the amount is recorded on the Bank's consolidated books, and not on the branch's own books.

The Dutch opinion applied analogous concepts to compute a branch's "own" capital under a Treaty provision that plaintiff makes no effort to distinguish from Article 7(2) of the U.S. – U.K. Treaty. The Court did not give conclusive effect to the branch's books. Instead, the Court recognized that, although the branch did not record any items as capital, some capital was maintained for the activities of the branch by the general enterprise. A reasonable computation of the branch's "own" capital, the Court concluded, could be made on the basis of the bank's BIS ratio, applied to the branch's risk adjusted assets.[12] If this Court were to apply its November 2003, Opinion so narrowly that it precludes an evaluation of capital actually allotted to a branch, but recorded only on a bank's consolidated books, it would create a conflict among international decisions, even as the O.E.C.D. has been engaged for several years in a major effort to develop an international consensus.

Plaintiff's Opposition neither comes to grips with the true nature of the inquiry that is the subject of defendant's motion, nor compares that inquiry with the Court's November 2003 description of the legal test. Rather than recognize that defendant is proposing an inquiry into the capital plaintiff ***actually*** allotted to its U.S. branches during the years at issue, but chose to record only on the Bank's consolidated books, plaintiff attempts to recharacterize defendant's inquiry. Plaintiff argues that defendant's motion advances a "worldwide apportionment theory" and suggests defendant is proposing that the U.S. branches be charged with a ***hypothetical*** portion of the Bank's total capital. (*See* Opp. at 1-4, 6, 8-9.) Plaintiff argues that defendant would allocate a portion of the bank's worldwide capital

---

[12] By 1995, the year involved in the litigation, the Basle Accord had become effective, and the computation of the branch's "own" capital was made using the Basle principles that had evolved from earlier methods of computing risk adjusted assets, such as those the U.K. applied during the years at issue in this case.

to the branches based on the "assumption, unwarranted in plaintiff's view" that it actually held additional capital to support its branch. (Opp. at 6). Plaintiff further contends that it is only "conjecture" that the Bank would have had less capital without its U.S. branch operations. (*Id*. at 7.) It is neither an assumption, nor conjecture, however, that there were published Bank of England standards during the years at issue that required large clearing banks such as plaintiff to allocate a specific amount of capital to the operations of each foreign branch. The amount of such capital would ordinarily be a percentage of the branch's risk adjusted assets, but, as defendant's expert Mr. Farrant points out, it would be determined based on an informal discussion process with each bank.[13] (Deft.'s Motion, Ex. 1 at 6-8.) Under the inquiry defendant's motion urges is proper, plaintiff would be free to provide evidence (if it can) that the amount of capital actually allotted to the U.S. branches in this process was zero, but the critical point is that defendant's motion is based on determining the ***actual*** amount of capital allotted to the branches. That such capital, once determined, is then recorded on the consolidated books of the bank, together with the rest of its capital, does not convert the inquiry into a hypothetical allocation of the bank's worldwide capital.

Plaintiff then argues that defendant's motion should be denied by drawing various analogies between prior proceedings in this case and hypothetical allocations of worldwide capital – analogies

[13] Plaintiff incorrectly contends (Opp. at 2, 7-8) that Mr. Farrant and defendant concede that the U.K. did not require an "apportionment" of capital to the branch. What Mr. Farrant actually expressed is that, under U.K. principles, a bank's capital must include a specific amount to reflect the assets and operations of its U.S. branches and that, once that amount is determined, it may be recorded on the books of the enterprise as a whole and need not be recorded on the branches' books. (Deft.'s Motion Ex. 1 at 3, 8.) Thus, the U.K. requires that capital be "allotted" (or perhaps synonymously "apportioned") to its branches, but it does not require that such capital be written onto a branch's books. As this Court has ruled, the branch's books are not conclusive of allotted capital.

that are even farther removed from defendant's inquiry regarding actual capital allotted to a branch. (Opp. at 3-4.) For example, plaintiff argues that this Court's 1999 Opinion rejects "worldwide apportionment theories." (Opp. at 3.) But the Court's 1999 Opinion did not consider capital a Bank actually allots to a branch but records only on the Bank's consolidated books. The 1999 Opinion involved plaintiff's challenge to the vastly different methodology set forth in Treas. Reg. § 1.882-5. The Court ruled that the regulation was inconsistent with the Treaty for two reasons: (1) it disregards interest-bearing interbranch transactions and (2) it computes a branch's interest bearing liabilities "on the basis of worldwide assets and worldwide liabilities of the entire foreign enterprise, rather than determining the interest deduction on the basis of the separate, independent operations of the U.S. branch."[14] Whatever the impact that decision may have on a hypothetical attribution of worldwide capital to a branch, without regard to the branch's specific operations, it has none on whether this Court's 2003 Opinion includes an inquiry regarding capital actually allotted to a branch, based on the branch's particular operations.

In addition, contrary to plaintiff's implication (Opp. at 3), the Court's November 2003, Opinion did not reject an inquiry regarding the capital a bank actually allotted to its branch. While the Court ruled that the 2001 and 2003 O.E.C.D.'s Discussion Drafts did not help it to interpret the meaning of the U.S. – U.K. Treaty at the time of its enactment many years earlier, and the drafts, among other matters, discussed a BIS approach to attributing capital to a branch, a BIS approach was not before the Court. The Court had no occasion to opine, and did not opine, on whether a BIS approach to

---

[14] 44 Fed. Cl. 120, 130.

determining branch capital would be permissible under the Treaty. A BIS approach is still not before the Court.

Plaintiff also raises a variety of hurdles under Rule 59 in an effort to foreclose the substantive consideration of defendant's motion. (Opp. at 4-10.) Reconsideration under Rule 59 principally focuses on new trials and motions to amend judgments, and therefore nearly all case law under the rule addresses requirements for such exceptional relief. But other matters may be the subject of Rule 59 motions, as well, and there is no fixed standard applicable to the grant or denial of Rule 59 relief. *See* 12 *Moore's Federal Practice*, § 59.13[1] (Matthew Bender 3d ed.). Instead, the standard to be applied by the trial court "in the exercise of its discretion" varies with the grounds for which relief is sought. *Ibid*; *see Succession of Helis*, 56 Fed. Cl. 544 (2003).

Defendant's motion does not seek to change the law announced by this Court in its November 2003 Opinion. Defendant instead is requesting that the Court reevaluate whether it's July 16, 2004, Order properly foreclosed an inquiry under the November 2003 Opinion. The November 2003 Opinion was the controlling law and remains so. As a result, contrary to plaintiff's claim, the reconsideration of the Court's July 16, 2004, Order does not depend on whether there has since been a change in the controlling law. The Court has discretion to reconsider whether it has too narrowly restricted appropriate inquiries under its preexisting and still controlling Opinion.

Similarly, Rule 59 reconsideration here is not conditioned on whether evidence regarding actual capital allotted to the U.S. branches was previously unavailable. As the Court is aware, the previous stages of this litigation involved summary judgment proceedings that addressed whether capital could be attributed to a branch under the Treaty on the basis of Treas. Reg. § 1.882-5 or corporate capital

standards. Defendant was not advocating the legal test the Court adopted in 2003 and, likewise, plaintiff did not seek to apply either the regulation, or corporate capital standards. At that point, neither party had presented evidence as to how the other's theories might be applied. In 2002, Court determined it would resolve the applicable legal standard, so that the evidence the parties would present at trial would not be "like ships passing in the night."[15] The Court did so in November 2003, so that both parties could present evidence how it should be applied, not so the party that did not prevail would be unable to present appropriate and available evidence. Now, since late 2003, the task facing defendant is to apply the Court's legal test, ***not*** its own. The situation is vastly different than one in which a party has presented evidence at trial on its theory, lost, and then seeks to present new evidence that could have been presented originally. The Court here may consider whether to reconsider the limitation it placed on defendant's efforts by its July 16, 2004, Order, and it may do so without regard to whether evidence was previously available.

Plaintiff finally argues that there would no "manifest injustice" if defendant's motion is not granted. (Opp. at 9-10). The only basis for its conclusion, however, is a repetition of its argument that the matter should have been raised sooner. According to plaintiff, in the years this case has been pending, defendant has had ample opportunity to argue "its current theory." (*Ibid*.). But plaintiff again ignores that it is the Court's test, announced in 2003, that defendant must apply and is seeking to apply. As discussed in our motion and in this reply, the Court's test does not preclude consideration of the capital plaintiff actually allotted to the six U.S. branches during the years at issue, and recorded only on

---

[15] Tr. June 12, 2002 at 30, 52.

plaintiff's consolidated books. It would indeed be a manifest injustice not to reconsider the Court's July 16, 2004, Order, issued on the basis of a very brief discussion.

Respectfully submitted,

s/Steven I. Frahm
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6504

EILEEN J. O'CONNOR
Acting Assistant Attorney General
MILDRED L. SEIDMAN
Chief, Court of Federal Claims Section

December 27, 2004