# In the United States Court of Federal Claims

**No. 95-758T**
**(Filed: January 18, 2005)**

* * * * * * * * * * * * * * * * *

**NATIONAL WESTMINSTER BANK PLC,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

* * * * * * * * * * * * * * * * *

## ORDER DENYING RECONSIDERATION

Pending before the court is the government's November 24, 2004 motion for reconsideration of the court's July 16, 2004 order limiting the scope of discovery on the so-called "capital issue."[1] In the July 16, 2004 order the court stated that the "capital issue" does not include attributing capital to the plaintiff's United States branch from other National Westminster PLC ("Nat West PLC") institutions. The government asks the court to reconsider this order.

In support of this request, the government has submitted the expert report of

---

[1] As the government pointed out in its reply, the decision whether to reconsider an interlocutory order falls within the court's discretion. See 12 Moore's Federal Practice, § 59.21[1] (Matthew Bender 3d ed.).

Richard Henry Farrant, an expert in banking regulations in the United Kingdom. Mr. Farrant contends that under U.K. banking regulations in effect during the relevant time period in this case, the plaintiff was required to hold additional capital to "support its branch operations in the United States." Mr. Farrant estimates that Nat West PLC had "additional capital in the vicinity of 8% of the risk adjusted assets of the six U.S. branches." Def. Ex. 1 at 3. The government contends that this "additional capital" should be attributed to the U.S. branch for tax purposes.

In further support of this argument, the government has also submitted a copy of a recent decision by a Dutch court that, in applying a treaty provision similar to the provision at issue in this case, concluded that it would be proper to attribute to a Dutch branch of a bank in Belgium, the amount of capital the Belgian bank held to cover the risk adjusted assets of the Dutch branch. Re X Bank (Europe) SA, 7 Int'l Tax L. Rep. 1, 20 (Netherlands 2004). The Dutch branch's books apparently reflected negative capital that did not adequately support its activities. Id. at 22.

The plaintiff argues in response that the government is seeking to reopen the court's November 2003 partial summary judgment opinion ("November 2003 opinion") and to adopt a position that was expressly rejected by the government in its pleading on motion for partial summary judgment. More specifically, the plaintiff argues that the government has heretofore consistently argued that the court should not attribute capital held by Nat West PLC on behalf of its worldwide branches. Instead, the government

argued that the plaintiff's U.S. branches should be treated as though they were separate subsidiaries, subject to their own capital obligations. The plaintiff argues that in such circumstances, the government's reliance on the Dutch decision, which has no precedential value, is misplaced. Similarly, plaintiff argues that Mr. Farrant has not added anything new to the case. It is apparently undisputed that the government was aware of Nat West PLC's adherence to UK banking regulations for more than 9 years and yet the government never suggested that the capital held by Nat West PLC to cover the risk adjusted assets of the U.S. branch offices should be attributed to the U.S. branch. The plaintiff contends that it is simply too late for the government to change positions.

The court agrees with the plaintiff. At the heart of the November 2003 opinion and the statement in the July 2004 order is the court's conclusion that the focus of the court's inquiry must be on the books and records of the U.S. branch offices and not on the books and records of the home office or other Nat West offices. The government had ample opportunity to present its current theory when the "capital issue" was being briefed on summary judgment in 2003, and failed to do so; it cannot now, so close to trial, present a new theory on the "capital issue."

In its November 2003 opinion, the court adopted the approach followed by the Inland Revenue Banking Manual for the years in question. Importantly, the court relied on the fact that the Manual was modified in 1978 after the Price Waterhouse formula was rejected. The Price Waterhouse formula was designed to attribute a portion of a bank's

total "free capital" to a UK branch based on a ratio attributable to the branch's liabilities. The Queen's Counsel determined that the Inland Revenue did not have the authority under the relevant treaty to "write into branch accounts a level of capital which the branch did not have." See November 2003 Opinion at 32-33. Instead, the Counsel's opinion required that Inland Revenue focus on the books and records of the branch itself. In this connection, Inland Revenue is authorized to scrutinize the branch's books and records to ensure that the amount of "free capital which has in reality been granted to the UK branch" is properly taken into account. November 2003 Opinion at 34 (emphasis added).

Thus, the Banking Manual identifies various items, such as "initial working capital", "retained profits", "depreciation", and "other reserves", which might reflect capital granted to a branch, but which are not treated as such in the branch's books. For example, in this case, plaintiff has indicated that the branch offices automatically repatriated profits, even though profits were earned. Under the approach adopted by the court, the books and records of the U.S. branch offices would have to be corrected for this problem. Contrary to the government's suggestion, however, the Manual did not provide that the capital held by the home bank to cover risks of the branch offices was, in fact, the actual capital of the branch.[2]

---

[2] Although the government goes to great pains to distinguish its new position from the position that was rejected in the court's November 2003 opinion, in fact the government is still proposing a hypothetical attribution of capital to the U.S. branch, albeit under a new theory. While it may be true that Nat West PLC maintained additional capital on its books to cover risks from its branch offices, there is no evidence that that additional capital was ever actually used by the U.S. branch. Therefore, attributing that capital to the U.S. branch would be inconsistent with

The court also rejects the government's reliance on a recent Dutch court decision, Re X Bank (Europe) SA, 7 Int'l Tax L. Rep. 1 (Netherlands 2004). It appeared in that case that the branch's books reflected negative capital and therefore the branch failed to show any independence from its head office because as a matter of fact the branch required capital infusions from the head office. Id. at 22. That is not the case here. The evidence in the pending case has shown that while the U.S. branch offices held limited amounts of capital, the branch offices were not operating with negative capital, as was apparently true in the Dutch case. Moreover, in addition to the fact that the Dutch decision has no precedential value, it is not even clearly relevant here because it does not consider the unique history of the U.S. - U.K. treaty relationship and the various interpretations of those treaty partners to the question at issue.

In view of the foregoing, the government has not provided the court with a reason for changing its opinion. Thus, the court will not allow inquiry into the amount of capital Nat West PLC held on its consolidated books to cover risks posed by its branch offices in the United States. The government's motion for reconsideration of the July 16, 2004 order is **DENIED**.

**IT IS SO ORDERED**.

s/ Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

the court's November 2003 opinion.