**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 95-758T**
**(Judge Nancy B. Firestone)**

**NATIONAL WESTMINSTER BANK PLC,**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

**PLAINTIFF'S MOTION FOR AN ORDER DEEMING ADMITTED PLAINTIFF'S REQUESTS FOR ADMISSIONS UNDER RCFC 36(a)**

Plaintiff hereby moves under RCFC 36(a) for an Order striking certain of Defendant's Responses to Plaintiff's Second Set of Requests for Admissions, and deeming admitted those Requests.[1]

In an effort to prepare this case for efficient trial of any triable issues, Plaintiff served Defendant with a comprehensive set of Requests for Admissions on December 8, 2004. Defendant's Responses to those Requests, dated January 7, 2005, consist almost entirely of baseless claims of lack of information and unfounded objections. From them, Plaintiff is unable

[1] Specifically, Plaintiff moves that Requests 2.05, 2.06, 2.09, 2.11, 2.14, 2.17, 2.18, 2.20, 2.22, 2.24, 2.25, 2.30, 2.33 through 2.42, 2.44 through 2.47, 2.50 through 2.52, 2.54, 2.56 through 2.94, 2.96 through 2.103, 2.105, 2.106, 2.108 through 2.116, 2.119 and 2.124 be deemed admitted. A proposed form of Order is included as an attachment to this Motion. Plaintiff has been unsuccessful in its attempt to meet and confer with Defendant regarding this matter.

to understand what facts and issues are contested or uncontested and is unable to prepare efficiently for trial. Defendant's obstructive Responses would make it necessary for Plaintiff to introduce evidence at trial to prove the most basic and indisputable facts, imposing significant additional burdens and time requirements on Plaintiff and the Court. Moreover, Defendant's Responses seem to envision the July trial of this case as yet another interim proceeding, with further proceedings before the Court to follow thereafter.[2] This subsequent proceeding would extend to matters as fundamental as the question whether the interest expense set forth in Plaintiff's profit and loss statements ties out to the interest expense deducted in its U.S. tax returns.[3] Plaintiff submits that Defendant's Responses violate the letter and spirit of RCFC 36(a). Accordingly, Plaintiff seeks an Order finding Defendant's Responses to the Requests set forth in footnote 1 above deficient as a matter of law and deemed admitted under RCFC 36(a).[4]

Over the decade in which this case has been pending before this Court, Defendant has conducted extensive discovery. It has served and received responses to 179 interrogatories and 84 document requests, conducted 19 depositions, and has had open access since August 2004 to a comprehensive repository of Plaintiff's business records. Defendant also has been provided with a detailed report from Plaintiff assembling and analyzing those records insofar as they relate to the capital issue. Defendant has not yet proposed an adjustment or articulated a position on the issues remaining before the Court, other than to voice vague assertions at the July 13, 2004

---

[2] *See* Defendant's Response to Plaintiff's Request for Admissions 2.44, discussed at II below.

[3] *Id.*

[4] A copy of Defendant's Responses to Plaintiff's Second Set of Requests for Admissions is attached as Exhibit A.

hearing in response to the Court's inquiries. After all this time has passed, Plaintiff still does not know whether Defendant asserts that any amounts on which it deducted interest should be recharacterized as capital in nature, including the "capital loan charges" Plaintiff long ago identified and conceded, or, for that matter, whether Defendant has identified any evidence whatsoever suggesting that Plaintiff's U.S. branch did not pay interest at arm's length rates.

In an effort finally to force Defendant to clarify its position and to create an efficient mechanism for trial of any remaining triable issues, Plaintiff served Defendant with comprehensive requests for admissions covering the facts underlying all issues that ultimately need to be addressed to resolve this case – facts as set forth in Plaintiff's books and records with respect to amounts deducted on Plaintiff's U.S. tax returns, facts identifying the existence of any deductions claimed as interest but in reality reflecting payments on capital, facts identifying the absence of any deductions of interest at non-arm's length rates, and facts that must be determined in order to compute Plaintiff's tax liability under the Court's 2001 and 2003 Opinions. *See* Plaintiff's Second Request for Admissions, attached as Exhibit B.

Defendant's responses are not really "responses" at all – they profess an inability to admit or deny most of the facts relating to the core issues in this case. Plaintiff submits that after ten years of litigation, Defendant's Responses are so inexcusably deficient that at least certain of the most basic Requests should be deemed admitted.

## I. The Legal Standard

The purpose of Requests for Admissions under RCFC 36, which is identical to Rule 36 of the Federal Rules of Civil Procedure,[5] is to reduce trial time by "'eliminating the necessity of

---

[5] *See* RCFC 36, Rules Committee Note; *Wheeler v. United States*, 11 F.3d 156, 157 n.1 (continued...)

proving facts that are not in substantial dispute, to narrow the scope of disputed issues, and to facilitate the presentation of cases to the trier of fact.'" *Concerned Citizens v. Belle Haven Club*, 223 F.R.D. 39, 44 (D. Conn. 2004) (citation omitted). *See also* Fed. R. of Civ. P. 36, Advisory Committee Notes to 1970 Amendments. Defendant's responses flout these purposes.

In 81 instances, often after expressing objections, Defendant responded to Plaintiff's Requests as follows: "Defendant states that it has made reasonable inquiry and the information known or reasonably obtainable by defendant is insufficient to enable it to admit or deny" the request.[6] The Ninth Circuit Court of Appeals has concluded that merely reciting that one has made a reasonable inquiry without actually undertaking such an inquiry is insufficient under Rule 36(a):

> We are not persuaded that an answer to a Request for Admissions necessarily complies with Rule 36(a) merely because it includes a statement that the party has made reasonable inquiry and that the information necessary to admit or deny the matter is not readily obtainable by him. The discovery process is subject to the overriding limitation of good faith. Callous disregard of discovery responsibilities cannot be condoned. *** The abuses of the current discovery rules are well documented. In our view, permitting a party to avoid admitting or denying a proper request for admission simply by tracking the language of Rule 36(a) would encourage additional abuse of the discovery process. Instead of making an evasive or meritless denial, which clearly would result in the matter being deemed admitted, a party could comply with the Rule merely by having his attorney submit the language of the Rule in response to the request. Since a district court may order that a matter is admitted only if an answer does not "comply" with the requirements of the Rule, it could be

---

[5] (...continued)
(Fed. Cir. 1993) ("This court . . . examines the general federal law interpreting the corresponding Federal Rule of Civil Procedure as persuasive.").

[6] *See* Defendant's Responses to Requests 2.11, 2.17, 2.30, 2.33, 2.34, 2.35, 2.36, 2.37, 2.38, 2.39, 2.40, 2.41, 2.42, 2.44, 2.45, 2.46, 2.47, 2.50, 2.51, 2.52, 2.54, 2.56, 2.57, 2.58, 2.59, 2.60, 2.61, 2.62, 2.63, 2.64, 2.65, 2.66, 2.67, 2.68, 2.69, 2.70, 2.71, 2.72, 2.73, 2.74, 2.75, 2.76, 2.77, 2.78, 2.79, 2.80, 2.81, 2.82, 2.83, 2.84, 2.85, 2.86, 2.87, 2.88, 2.89, 2.90, 2.91, 2.92, 2.93, 2.94, 2.96, 2.97, 2.98, 2.99, 2.100, 2.101, 2.102, 2.103, 2.105, 2.106, 2.108, 2.109, 2.110, 2.111, 2.112, 2.113, 2.114, 2.115, 2.116, 2.119 and 2.124.

> argued that the only sanction for a party's willful disregard of its obligation to make reasonable inquiry would be an award of the expenses of proving the matter at trial pursuant to Rule 37(c). Without disparaging the deterrent effect of such a sanction, we believe that restricting the district court's discretion in this manner would reduce a litigant's obligation to make "reasonable inquiry" into a mere semantic exercise, and thus severely undermine the policy embodied in Rule 36(a) of limiting the issues before trial.

*Asea, Inc. v. Southern Pacific Transp. Co.*, 669 F.2d 1242, 1246-47 (9th Cir. 1981) (citation omitted). The *Asea* Court held that a response which fails to admit or deny a proper request for admission does not comply with the requirements of Rule 36(a) "if the answering party has not, in fact, made 'reasonable inquiry,' or if information 'readily obtainable' is sufficient to enable him to admit or deny the matter." *Id.* at 1247. A number of other courts have adopted the *Asea* Court's reasoning.[7]

The case law clearly indicates that the Court should evaluate the reasonableness of Defendant's contention that it lacks information sufficient to express a position on these matters. That evaluation can lead to only one conclusion: Defendant cannot assert in good faith that after

---

[7] *See, e.g.*, *Harris v. Oil Reclaiming Co.*, 190 F.R.D. 674, 679 (D. Kan. 1999) ("Intonation of the words of the Rule that the party has made a 'reasonable inquiry' is not determinative whether the answer is sufficient"); *SEC v. Thrasher*, 1996 U.S. Dist. LEXIS 13016, *9 (S.D.N.Y. 1996) ("if the information is held by the responding party or by an individual or entity with which the responding party maintains a relationship that enables it readily to procure the required information, then that party may be expected to seek out the information and respond substantively to the request for an admission"); *Kuttner Buick, Inc. v. Crum & Foster Corp.*, 1995 U.S. Dist. LEXIS 12524 *6 (E.D.Pa. 1995) ("Contrary to what defendant seems to believe, the words of Rule 36(a) are not to be simply repeated in order to avoid responding to requests"); *Reliance Ins. Co. v. Marathon LeTourneau Co.*, 152 F.R.D. 524, 525 n.4 (D.W.Va. 1994) ("the affirmation of reasonable inquiry is subject to 'the overriding limitation of good faith'") (citing *Asea*, 669 F.2d at 1246); *Barbosa v. Cincinnati Milacron Inc*, 1984 U.S. Dist. LEXIS 16923 *6-7 (D. Mass. 1984) ("defendant has merely tracked the language of Rule 36(a) ... by including the statement that the party has made reasonable inquiry and that the information necessary to admit or deny the matter is not readily obtainable to it. This does not comply with the Rule. The defendant shall be required either to admit or deny the requests or state with specificity the reasons why it cannot truthfully admit or deny the requests, including detailed statement as to the 'reasonable inquiry' which it has made and the results thereof.")

reasonable inquiry it lacks information sufficient to respond. In fact, uncontradicted evidence Plaintiff has submitted to Defendant through interrogatory responses, through deposition testimony, in documents in the repository, and in Plaintiff's October 29, 2004 Report on the Capital Issue, are more than sufficient to enable Defendant to admit the matters set forth in the requests.

RCFC 36(a) provides that "[i]f the Court determines that an answer does not comply with the requirements of this rule, it may order either that the matter is admitted or that an amended answer be served." Although deeming matters admitted is a "severe sanction," it is within the trial court's discretion to do so when circumstances warrant such action. *See Asea Inc. v. Southern Pacific Transp. Co.*, 669 F.2d 1242, 1247 (9th Cir. 1981) ("The general power of the district court to control the discovery process allows for the severe sanction of ordering a matter admitted when it has been demonstrated that a party has intentionally disregarded the obligations imposed by Rule 36(a)"); *United States v. Kenealy,* 646 F.2d 699, 703 (1st Cir. 1981) ("deeming matters admitted is a proper remedy under appropriate circumstances for intransigence during discovery"). *See also S.A. Healy Co./Lodigiani USA v. United States*, 37 Fed. Cl. 204, 207 (1997) (requests were not deemed admitted where "no real prejudice in litigating the action on the merits has accrued as the result of the delay"). Plaintiff submits that in light of the history of this case, the Court should exercise its discretion to determine that Defendant's deficient responses are deemed admitted.

For the Court's convenience, Plaintiff has organized Defendant's objections and responses by category and has addressed each category below.

## II. Requests Relating to Amounts at Issue

In 41 instances, Defendant submitted that it lacked sufficient information to admit or deny requests for admission relating to the basic dollar amounts at issue, amounts plainly set forth in Plaintiff's records and tax returns.[8] It is beyond dispute that Defendant does not lack information necessary to respond to these requests.

For example, in Request for Admissions 2.33, Plaintiff requested the following admission:

> REQUEST FOR ADMISSIONS 2.33. The aggregate amount of interest income recorded on the profit and loss statements of the U.S. branches for each of the years at issue was as follows:

| Tax Year | Aggregate Interest Income |
|---|---|
| 1981 | 701,738,889 |
| 1982 | 635,002,839 |
| 1983 | 486,454,589 |
| 1984 | 635,242,556 |
| 1985 | 529,248,172 |
| 1986 | 498,814,159 |
| 1987 | 584,410,256 |

> (*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim, and supporting schedules thereto; *see also* Def.'s Requests for Admissions 1.53 to 1.58 and Pl.'s Responses thereto.)

[8] *See* Defendant's Responses to Requests for Admissions 2.33 through 2.42, 2.44 through 2.47, 2.50 through 2.52, 2.54, 2.56 through 2.68, 2.108 through 2.110, 2.112 through 2.116, 2.119 and 2.124.

All Defendant needed to do in order to admit this matter was to add up several numbers – numbers Defendant had requested Plaintiff to admit only one month earlier.[9] Instead, Defendant's response consisted of the following:

> RESPONSE TO REQUEST FOR ADMISSIONS 2.33: Plaintiff conducted banking operations in the United States through six separate U.S. branches. The branches engaged in transactions with each other and recorded those transactions, as well as other accounting information, on their separately prepared and maintained books and records. Profit and loss statements for each branch were generated by computer. At the end of each month, each branch was required to make a financial report to plaintiff's head office which included manually prepared profit and loss statements. As a result of the short deadline after the close of a period to submit the reporting package (referred to as a "quick close"), the reports were sent before any detailed analysis could be performed and were not fully corrected and reconciled. A department at PLC's head office was dedicated to making the necessary corrections and the results were used in preparing National Westminster Bank PLC's annual reports. (Tr. Tatz 1/23/2002 at 20: Tr. Samaroo at 41-42, 80; Bandoian Report at 23-24.). See Response to Request for Admissions 2.26.
>
> Under Article 7(1) of the U.S. – U.K. Treaty, plaintiff National Westminster Bank PLC is subject to tax in the United States on the profits attributable to its six U.S. branches. Article 7(2) provides that the profits attributable to a "permanent establishment" (*i.e.*, a branch) are those expected if it were an independent, separate and distinct enterprise. Each of the six branches kept separate books and records and engaged in transactions with each other, and consolidated or combined profit and loss statements of the six U.S. branches were never prepared. Each branch is a permanent establishment for purposes of the Treaty, and, consistent with plaintiff's practice of keeping separate books for each branch, the profits expected on an independent basis must be determined branch by branch. Thus, capital allotted to the branch in accordance with the court's November 14, 2003 Opinion must be determined branch by branch. Likewise, the separate books of each branch, and the transactions between the U.S. branches, require that related party interest income and expense must be tested for arm's length dealing at each branch. While interest income and expense reported on the profit and loss statements of each of the six U.S. branches are relevant, aggregations of those amounts into combined totals is not the basis for applying either the November 14, 2003, Opinion, or the arm's length standard to particular related party transactions. Plaintiff's request is therefore irrelevant, immaterial, and not calculated to lead to the discovery of relevant information and defendant objects to the request on those grounds. The requested admission is an

[9] Those numbers were subject to minor corrections for 1981. *See* Plaintiff's Responses to Defendant's Requests for Admissions 1.53 through 1.58, attached as Exhibit C.

> improper effort to advance plaintiff's argument that the six U.S. branches may be combined in some manner, notwithstanding its own insistence that profits should be determined on the basis of the books and records, and its own practice of keeping separate branch records and not combining them. The requested admission also appears to be an improper effort to use the admission process to substitute for the introduction into evidence and consideration of plaintiff's separately kept branch books and records, which, as defendant will demonstrate at trial, were not pristine and reflect non-arm's length dealing.
>
> In addition, plaintiff's request cites as support documents that are not the contemporaneous books and records of the branch. They are a June 5, 2001, submission prepared by plaintiff's counsel for purposes of this litigation. The June 5, 2001, submission is hearsay, and it is not admissible into evidence under any exception to the hearsay rule. Defendant objects to the request, because it relies on inadmissible documents.
>
> Plaintiff's request also is unduly burdensome and oppressive. Plaintiff's request would require defendant to perform accounting work as a prerequisite to responding. As indicated above, each of the branches prepared separate profit and loss statements, revised them, and plaintiff never prepared combined statements. Plaintiff request is a repetition of its May 4, 2004, Proposed Stipulation 125, which asked defendant to verify aggregations by making calculations using 35 other proposed stipulations, each one of which contained a chart of financial data. The books and records of the branches speak for themselves regarding interest income and expense, without demanding accounting exercises from defendant.
>
> Subject to these objections, defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny the request.

Plaintiff's request merely required determining the sum of the interest figures for the U.S. branches for each year in issue. Defendant has had possession of the profit and loss statements of the U.S. branches since at least 2001, when Plaintiff provided them in response to Defendant's document requests, and each profit and loss statement contains a line providing the aggregate interest income for the branch and year to which it pertains. The admission requested is readily evident from the face of the documents and from information Defendant has demonstrated it possesses.

The response that Defendant lacks information sufficient to admit or deny the request is clearly deficient and simply cannot be a good-faith attempt to respond to Plaintiff's requests. Nor do Defendant's objections have any merit. The fact that Defendant might need the assistance of an accountant to perform computations or that a mathematically undeniable computation might support Plaintiff's position in this case is no excuse for denying the Requests. Defendant's contention that it would be too burdensome to add up a few numbers that were included in Defendant's own Request for Admissions is frivolous and would, if upheld with Defendant's other similar objections, impose an unnecessary burden on Plaintiff and the Court during trial. And even if one could seriously entertain the notion that it is burdensome to require the United States to admit or explain its denial of facts underlying computation of the very tax liability it has challenged, this is work that inevitably needs to be performed to bring this case to closure. Waiting until trial to verify the information would unduly impose upon the resources of this Court and would "likely result in the expenditure of needless time and expense that the requests are intended to eliminate." *See Concerned Citizens v. Belle Haven Club*, 223 F.R.D. 39, 45 (D. Conn. 2004); *Lumpkin v. Meskill*, 64 F.R.D. 673, 677 (D. Conn. 1974) (Rule 36 facilitates "proof at trial by weeding out facts ... which are often difficult and expensive to prove").

In that regard, Defendant's Responses appear to contemplate that the parties will engage in further proceedings after the case is tried and the Court reaches its conclusions on the capital issue and the interest rate issue. For example, in response to Plaintiff's Request 2.44 that Defendant admit that "the items comprising taxable income reported on NatWest's original U.S. federal income tax return were equal to amounts set forth on the profit and loss statements of the New York, Nassau, Grand Cayman, Chicago and San Francisco branches and the IBF, subject to adjustments explained in Schedule M-1 of each of those returns," Defendant stated the following:

> RESPONSE TO REQUEST FOR ADMISSIONS 2.44: This request, and those following, would require defendant to trace the preparation of plaintiff's federal income tax return from the books of the six U.S. branches for the purpose of approving the accuracy of plaintiff's computation of its tax liability under a scenario in which plaintiff's interest income and expense are as it now claims (which varies from the amounts claimed on the returns). ***Of course, the interest income and interest expense to which plaintiff actually is entitled will be determined by the Court after trial of the capital and arm's length issues***. There are far too many possible outcomes to anticipate, and each will result in a different tax liability.
>
> Plaintiff previously agreed with defendant to follow the standard procedure in tax cases for many years under which the Court first would determine the substantive issue in a case, and then the parties would be given a period of time to reach agreement on the resulting tax liability and any refund. The procedure arose because, once the Court determines the substantive issues in a case, the computation of the plaintiff's tax liability, and possible overpayment, is virtually always agreed to without the Court's intervention. This being the case, there is no need to burden the Court at trial with prolonged testimony from both sides by tax computation specialists, regarding the intricacies of the manner in which income, deductions, credits, carryovers, limitations, past adjustments, payments, etc. determine a taxpayer's ultimate tax liability. There likewise is no need to devote trial time to the introduction of exhibits and testimony, such as certificates of assessments and payments, carryover adjustments, previous audit adjustments, etc. to establish the dates and amounts of tax payments and other facts needed to compute any tax overpayment. Moreover, testimony and exhibits to explain computations based on possible alternative resolutions of the issues is inefficient and wasteful of the Court's and the parties' resources. It is far preferable for the Court first to resolve the substantive issues in the case, and then permit the parties to pursue an agreement on tax computations. ***The Court will need to become involved in computations only in the unlikely event the parties fail to reach agreement, and, even then, its involvement will be focused on its actual resolution of the issues, rather than scattered among hypothetical, alternative scenarios***. [emphasis added.]

The requested admissions to which this Motion pertains cover facts on which it will be necessary to reach agreement in order to compute Plaintiff's tax liability, but they do not extend to computation of the liability itself.[10] The notion that Defendant hopes to leave a broad category of factual questions open, to be addressed by the Court in some later proceeding after trial, is, we

[10] Plaintiff's Requests for Admission 2.52, 2.120, 2.122, 2.123 and 2.125 pertain to the computation of Plaintiff's tax liability. Those requests are not the subject of this Motion.

believe, inconsistent with the Court's intention to resolve finally all remaining issues through a trial in July, 2005. In any event, it is certainly not a proper objection to a Request for Admission under RCFC 36(a).

## III. Requests Relating to the Capital Issue

Defendant has refused to admit or deny 37 more requests setting out the core facts relating to the capital issue.[11] Most of these requests set forth the amounts of capital loan charges deducted on Plaintiff's tax returns and request admission that Plaintiff's profit and loss statements do not reflect deduction of any additional capital loan charges. Plaintiff's Request for Admissions 2.80, for example, provides that "[f]or the year ended December 31, 1982, the total capital loan charges paid by the U.S. branches to PLC and deducted on the U.S. federal income tax return was $209,433," and Plaintiff's Request for Admissions 2.81 provides that "[a]part from the amount described in Request for Admissions 2.80, during the year ended December 31, 1982, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets."

---

[11] *See* Defendant's Responses to Requests for Admissions 2.69 through 2.94, 2.96 through 2.103, 2.105, 2.106 and 2.111.

With one exception,[12] Defendant responded to all such requests by referring to its Response to Request for Admissions 2.69, which stated:

> Discovery has not been completed, and defendant's experts are reviewing Mr. Bandoian's report. Defendant's experts' report has not been prepared and is not yet due under the Court's October 5, 2004 [sic], subject to further modification in accordance with defendant's motion for enlargement of the discovery period. Defendant's position on this request will be expressed in and consistent with its experts' report. The request is oppressive and an abuse of the discovery process. See also defendant's Responses to Plaintiff's Interrogatories 4.01 and 4.06. Subject to its objections, defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny the request.[13]

It is impossible for Defendant to assert in good faith that it lacks ready access to information necessary for it to admit or deny these requests. This evidence was provided to Defendant in Plaintiff's June 8, 2001 submission on the capital issue; all corroborating business records have been made available to Defendant in the repository; and the records were organized and explained to Defendant in painstaking detail in Plaintiff's October 29, 2004 Report on the Capital Issue.

---

[12] Plaintiff's Request for Admissions 2.95 requested Defendant to admit that, apart from amounts Plaintiff has identified, "the U.S. branches did not pay or deduct any interest during the years at issue on amounts allotted to the U.S. branches for capital purposes." Defendant denied the request without explanation or qualification. Moreover, Defendant's Response to Plaintiff's Interrogatory 4.12, which requested a full description of the reasons Defendant did not respond with an unqualified admission to any of the requests set forth in Plaintiff's Second Request for Admissions, was as follows: "See defendant's responses to plaintiff's Second Request for Admissions." This refusal to respond demonstrates the crux of the problem on the capital issue: that Defendant refuses to disclose any facts on which it relies as a basis for its refusal to stipulate (and therefore dispense with) the capital issue in accordance with the Court's November 14, 2003 Opinion.

[13] Defendant's responses to Interrogatories 4.01 and 4.06, attached as Exhibit D, express long objections to the request and offer no response, claiming "its experts' report will fully set forth its position ... and will be provided to plaintiff in accordance with its [sic] Order."

Defendant cannot avoid its obligation to admit relevant ascertainable facts under RCFC 36 by deferring to unfinished expert reports. In *Shell Petroleum, Inc. v. United States*, 46 Fed. Cl. 583 (2000), this Court held that discovery relating to facts undergoing analysis by experts must nevertheless be completed during the period established for fact discovery. Plaintiff's inquiries go to the identification of capital loan charges or any other deductions on capital items reflected in its books – facts which Defendant is obliged to admit unless it has identified evidence to the contrary. While its expert reports may offer analysis of those facts, the existence of the facts themselves is properly the subject of fact discovery.

The Court made it clear to both parties in the October 5, 2004 status conference that "we need to bring this thing to closure." (Tr 6:6). Defendant seems determined to avoid exactly that. If Defendant is not in a position to admit or deny these facts even now that the period established by the Court for fact discovery has expired, they should be deemed admitted.

**IV. Other Requests Relating to Basic Facts**

In twelve instances, Defendant declined to admit or deny basic facts relating to this case, such as whether the operations of the I.B.F. commenced in December 1981 or whether NatWest filed a single U.S. tax return.[14] In three such cases, Defendant claimed that it had made reasonable inquiry but lacked information sufficient to admit or deny the requests.[15] These responses are deficient for the reasons discussed above.

In the remaining nine cases, Defendant failed to state whether it admitted, denied, or was unable to admit or deny matters relating to basic facts. Defendant appears to have objected in

---

[14] *See* Defendant's Responses to Requests for Admissions 2.05, 2.06, 2.09, 2.11, 2.14, 2.17, 2.18, 2.20, 2.22, 2.24, 2.25 and 2.30.

[15] *See* Defendant's Responses to Requests for Admissions 2.11, 2.17 and 2.30.

eight of those cases on the ground that Plaintiff had offered similar admissions in response to Defendant's requests.[16] Defendant characterized Plaintiff's requests as "unnecessary and an abuse of the discovery process."[17] Plaintiff's admissions do not bind Defendant, however, and this inherent lack of mutuality in the admission process requires that parties agree on identical or similar admissions. *See Champlin v. Okla. Furniture Mfg. Co.*, 324 F.2d 74, 76 (10th Cir. 1963) ("The submission of requests for admissions by a litigant does not, in and of itself, bind the litigant to the truth or existence of the facts contained in the answers to the requests"); *Brook Village N. Assoc. v. General Elec. Co.*, 686 F.2d 66, 75 (1st Cir. 1982) (a party who requests admissions may introduce evidence at trial more favorable to it than the admitted facts). The objection is therefore groundless.

In the final case,[18] Plaintiff requested Defendant's admission that "[f]or each of the years at issue, NatWest was required to and did file a single U.S. federal income tax return." Defendant objected "on the ground that it calls for a legal conclusion and is not relevant to any issue in the case." The matter requested, of course, involves the application of law to facts, and is clearly proper under RCFC 36. *See Ransom v. United States*, 8 Cl. Ct. 646, 648 (1985) ("Requests for Admissions under RUSCC 36(a) are not objectionable even if they require opinions or conclusions of law, as long as the legal conclusions relate to the facts of the case."). It is also clearly relevant. Defendant's objections are frivolous.

---

[16] *See* Defendant's Responses to Requests for Admissions 2.05, 2.06, 2.14, 2.18, 2.20, 2.22, 2.24 and 2.25.

[17] *See, e.g.*, Defendant's Response to Request for Admissions 2.05.

[18] *See* Request for Admissions 2.09.

When the Court issued its Opinion on November 14, 2003, Defendant either should have stipulated to the relevant facts Plaintiff identified in its February 27, 2004 proposed stipulation of facts, or it should have asserted some contrary position and proffered evidence in support thereof. It did neither, despite Plaintiff's repeated efforts to engage in dialogue.[19] Plaintiff has suffered "real prejudice in litigating the action on the merits," because Defendant's refusal to respond appropriately requires Plaintiff to prepare for trial without knowledge of any specific issues Defendant will raise, if, indeed, there are any issues to raise. *See S.A. Healy Co./Lodigiani USA v. United States*, 37 Fed. C1. 204, 207 (1997). After all of Plaintiff's efforts to assemble and explain the evidence to Defendant, Defendant has, in essence, refused to participate in the orderly resolution of this case. Plaintiff urges the Court to respond accordingly.

[19] *See, e.g.*, Plaintiff's Motion for Leave to file Proposed Order in Connection with Status Report dated December 18, 2003; Plaintiff's Response to Defendant's Motion for Leave to File Proposed Discovery Requests and Cross-Motion for Order in Accordance with RCFC 16(c)(1), dated July 9, 2004.

For the foregoing reasons, Plaintiff moves the Court to order that the matters set forth in footnote 1 of this Motion be deemed admitted under RCFC 36(a).

Dated: February 11, 2005
New York, N.Y.

/s/ D. Scott Wise by Mario J. Verdolini, Jr.

Attorney of Record
Davis Polk & Wardwell
450 Lexington Avenue
New York, N.Y. 10017
(212) 450-4000

Of Counsel:

Mario J. Verdolini, Jr.
Leslie J. Altus
Davis Polk & Wardwell
450 Lexington Avenue
New York, N.Y. 10017
(212) 450-4000

John L. Carr, Jr.
Michael C. Moetell
Thomas M. Buchanan
Winston & Strawn LLP
1400 L Street, N.W.
Washington, D.C. 20005

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 95-758T**
**(Judge Nancy B. Firestone)**

**NATIONAL WESTMINSTER BANK PLC,**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

**ORDER**

In consideration of Plaintiff's February 11, 2005 Motion for an Order Deeming Admitted Plaintiff's Requests for Admissions Under RCFC 36(a), the Court hereby GRANTS Plaintiff's motion and Orders the matters set forth in Appendix A hereto admitted and conclusively established for purposes of this proceeding.

IT IS SO ORDERED

Nancy B. Firestone
Judge

# Appendix A

**Plaintiff's Request for Admission 2.05**: The principal customers of the U.S. Branch were large multinational corporations (including U.S. subsidiaries of U.K. corporations that were customers of PLC in the United Kingdom), other banks and financial institutions, other PLC offices and subsidiaries, and foreign governments.

**Plaintiff's Request for Admission 2.06**: The six U.S. branches loaned funds to, and took deposits from, their corporate customers.

**Plaintiff's Request for Admission 2.09**: For each of the years at issue, NatWest was required to and did file a single U.S. federal income tax return.

**Plaintifff's Request for Admission 2.11**: There were two branches and one agency of NatWest licensed in the United States: (1) the New York branch licensed by the State of New York, (2) the Chicago branch licensed by the State of Illinois, and (3) the San Francisco agency licensed by the State of California.

**Plaintiff's Request for Admission 2.14**: The operations of the IBF commenced in December 1981.

**Plaintiff's Request for Admission 2.17**: NatWest had branches licensed in Nassau and the Grand Cayman Islands.

**Plaintiff's Request for Admission 2.18**: The Grand Cayman branch began operations in June 1985.

**Plaintiff's Request for Admission 2.20**: The Nassau and Grand Cayman branches had no employees or facilities located in Nassau or Grand Cayman.

**Plaintiff's Request for Admission 2.22**: During certain periods prior to September 1983, the results of the IBF were included on the manually prepared and certified balance sheets and profit and loss statements of the New York branch.

**Plaintiff's Request for Admission 2.24**: During the years at issue, the U.S. branches submitted profit and loss statements to PLC's head office on a periodic basis.

**Plaintiff's Request for Admission 2.25**: During the years at issue, the U.S. branches submitted balance sheets to PLC's head office on a periodic basis.

**Plaintiff's Request for Admission 2.30**: NatWest maintained an internal audit process designed to (i) determine if policies, practices, procedures and internal controls were adequate to

assure accurate accounting for the activities of the U.S. branches and (ii) initiate corrective action if any deficiencies were identified.

**Plaintiff's Request for Admission 2.33**: The aggregate amount of interest income recorded on the profit and loss statements of the U.S. branches for each of the years at issue was as follows:

| Tax Year | Aggregate Interest Income |
|---|---|
| 1981 | 701,738,889 |
| 1982 | 635,002,839 |
| 1983 | 486,454,589 |
| 1984 | 635,242,556 |
| 1985 | 529,248,172 |
| 1986 | 498,814,159 |
| 1987 | 584,410,256 |

**Plaintiff's Request for Admission 2.34**: The amounts set forth in Request for Admission 2.33 above include the following amounts of interest income accrued by the U.S. branches from parties unrelated to NatWest:

| Tax Year | Interest Income from third Parties |
|---|---|
| 1981 | 575,881,214 |
| 1982 | 502,953,124 |
| 1983 | 398,210,695 |
| 1984 | 531,088,923 |
| 1985 | 449,801,628 |
| 1986 | 405,279,034 |
| 1987 | 447,495,474 |

**Plaintiff's Request for Admission 2.35**: The amounts set forth in Request for Admission 2.33 above include the following amounts of interest income accrued by the U.S. branches from other group companies:

| Tax Year | Interest Income from Other Group Companies |
|---|---|
| 1981 | 30,962,197 |
| 1982 | 44,606,560 |
| 1983 | 24,471,318 |
| 1984 | 27,299,430 |
| 1985 | 23,977,168 |
| 1986 | 24,705,540 |
| 1987 | 45,142,008 |

**Plaintiff's Request for Admission 2.36**: The amounts set forth in Request for Admission 2.33 above include the following amounts of interest income accrued by the U.S. branches from other branches of NatWest outside the United States:

| Tax Year | Interest Income from non-U.S. Branches |
|---|---|
| 1981 | 12,352,992 |
| 1982 | 6,833,220 |
| 1983 | 6,091,129 |
| 1984 | 6,609,212 |
| 1985 | 6,890,500 |
| 1986 | 10,531,919 |
| 1987 | 13,603,297 |

**Plaintiff's Request for Admission 2.37**: The amounts set forth in Request for Admission 2.33 above include the following aggregate amounts of interest income accrued by the U.S. branches from each other:

| Tax Year | Interest Income from U.S. Branches |
|---|---|
| 1981 | 82,542,486 |
| 1982 | 80,609,935 |
| 1983 | 57,681,447 |
| 1984 | 70,244,991 |
| 1985 | 48,578,877 |
| 1986 | 58,297,666 |
| 1987 | 78,169,477 |

**Plaintiff's Request for Admission 2.38**: The aggregate amount of interest expense recorded on the profit and loss statements of the U.S. branches for each of the years at issue was as follows:

| Tax Year | Aggregate Interest Expense |
|---|---|
| 1981 | 671,036,957 |
| 1982 | 601,557,461 |
| 1983 | 444,832,199 |
| 1984 | 602,794,686 |
| 1985 | 459,184,135 |
| 1986 | 436,383,691 |
| 1987 | 552,888,878 |

**Plaintiff's Request for Admission 2.39**: The amounts set forth in Request for Admission 2.38 above include the following amounts of interest expense accrued by the U.S. branches to parties unrelated to NatWest:

| Tax Year | Interest Expense Accrued with respect to Third Parties |
|---|---|
| 1981 | 505,155,940 |

| Tax Year | Interest Expense Accrued with respect to Third Parties |
|---|---|
| 1982 | 446,769,398 |
| 1983 | 342,193,553 |
| 1984 | 485,235,812 |
| 1985 | 343,395,119 |
| 1986 | 271,113,921 |
| 1987 | 301,921,949 |

**Plaintiff's Request for Admission 2.40**: The amounts set forth in Request for Admission 2.38 above include the following amounts of interest expense accrued by the U.S. branches to other group companies:

| Tax Year | Interest Expense Accrued with respect to Other Group Companies |
|---|---|
| 1981 | 24,926,564 |
| 1982 | 19,754,675 |
| 1983 | 11,934,824 |
| 1984 | 14,662,026 |
| 1985 | 14,624,994 |
| 1986 | 18,237,460 |
| 1987 | 19,386,954 |

**Plaintiff's Request for Admission 2.41**: The amounts set forth in Request for Admission 2.38 above include the following amounts of interest expense accrued by the U.S. branches to other branches of NatWest outside the United States:

| Tax Year | Interest Expense Accrued with respect to Non-U.S. Branches |
|---|---|
| 1981 | 58,446,924 |

| Tax Year | Interest Expense Accrued with respect to Non-U.S. Branches |
|---|---|
| 1982 | 54,399,462 |
| 1983 | 33,102,291 |
| 1984 | 32,420,694 |
| 1985 | 52,546,899 |
| 1986 | 88,738,618 |
| 1987 | 153,338,621 |

**Plaintiff's Request for Admission 2.42**: The amounts set forth in Request for Admission 2.38 above include the following amounts of interest expense accrued by the U.S. branches to each other:

| Tax Year | Interest Expense Accrued with respect to U.S. Branches |
|---|---|
| 1981 | 82,507,529 |
| 1982 | 80,633,926 |
| 1983 | 57,601,531 |
| 1984 | 70,476,154 |
| 1985 | 48,617,123 |
| 1986 | 58,293,692 |
| 1987 | 78,241,354 |

**Plaintiff's Request for Admission 2.44**: For each of the years at issue, the items comprising taxable income reported on NatWest's original U.S. federal income tax return were equal to amounts set forth on the profit and loss statements of the New York, Nassau, Grand Cayman, Chicago and San Francisco branches and the IBF, subject to adjustments explained in Schedule M-1 of each of those returns.

**Plaintiff's Request for Admission 2.45**: Schedule M-1 of the original U.S. federal income tax return filed for each of the years at issue explains the difference between the taxable income and book profit of the U.S. branches.

**Plaintiff's Request for Admission 2.46**: The aggregate interest income included in NatWest's original U.S. federal income tax return for each of the years at issue was equal to the aggregate interest income recorded on the profit and loss statements of the U.S. branches for each of the years at issue, as set forth in Request for Admission 2.33 above, with the following adjustments as shown on Schedule M-1 to such returns:

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1981 | 1980 money market adjustment<br>1980 T-bill accrued interest<br>1981 money market adjustment<br>1981 T-bill accrued interest | 15,699<br>449,284<br>(72,622)<br>(1,986,545) |
| 1982 | 1981 money market adjustment<br>1981 T-bill accrued interest | 72,622<br>1,986,545 |
| 1983 | None | |
| 1984 | T-bill accrual | 1,885,318 |
| 1985 | Net T-bill accrual | (1,884,246) |
| 1986 | Interest Adjustment<br>ESOP interest exclusion<br>Foreign Exchange Income<br>Net T-bill accrual | (486,697)<br>(525,498)<br>103,289<br>(246) |
| 1987 | Income Adjustment<br>Interest Accrual Adjustment<br>Interest Adjustment<br>Foreign Exchange Income<br>Net T-bill accrual | (1,185,000)<br>(846,000)<br>486,697<br>114,736<br>98 |

**Plaintiff's Request for Admission 2.47**: The aggregate interest expense included in NatWest's original U.S. federal income tax return for each of the years at issue was equal to the aggregate interest expense recorded on the profit and loss statements of the U.S. branches for each of the years at issue as set forth in Request for Admission 2.38 above, with the following adjustments as shown on Schedule M-1 to such returns:

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1981 | None | |
| 1982 | None | |
| 1983 | None | |

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1984 | 1976 B 1980 Add'l Int. Ass'd (California) | 360,149 |
| 1985 | None | |
| 1986 | None | |
| 1987 | Interest Accrual Adjustments | 720,000 |

**Plaintiff's Request for Admission 2.50**: In its May 3, 1995 RARs the I.R.S. proposed the following adjustments to the taxable income of NatWest as reported on its original U.S. federal income tax returns:

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1981 | Interest Expense<br>Interest Income | 152,605,551<br>(125,857,675) |
| 1982 | Interest Expense<br>Interest Income | 147,337,977<br>(132,049,714) |
| 1983 | Interest Expense<br>Interest Income<br>Sale of Property (Chrysler Stock Sale) | 101,652,347<br>(88,243,894)<br>7,853,110 |
| 1984 | Interest Expense<br>Interest Income | 126,092,694<br>(104,153,633) |
| 1985 | Interest Expense<br>Interest Income | 93,539,801<br>(79,404,169) |
| 1986 | Interest Expense<br>Interest Income<br>Net Loans<br>Employee Benefits<br>Home Office Allocation | 108,064,089<br>(87,081,845)<br>84,426<br>405,249<br>21,903 |

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1987 | Interest Expense<br>Interest Income<br>Net Loans<br>Employee Benefits<br>Home Office Allocation<br>Other Deductions<br>Net Operating Loss Deduction<br>Bad Debts | 174,292,853<br>(131,596,705)<br>174,309<br>332,710<br>3,534,289<br>(555,350)<br>(12,918,821)<br>(785,311) |

**Plaintiff's Request for Admission 2.51**: The adjustments described in Request for Admission 2.50 include the following amounts to which NatWest has agreed:

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1983 | Sale of Property (Chrysler Stock Sale) | 7,853,110 |
| 1986 | Employee Benefits<br>Home Office Allocation | 405,849<br>21,903 |
| 1987 | Employee Benefits<br>Home Office Allocation<br>Other Deductions<br>Bad Debts | 332,710<br>3,534,289<br>(555,350)<br>(785,311) |

**Plaintiff's Request for Admission 2.52**: The adjustments described in Request for Admission 2.50 include the following amounts that defendant has withdrawn:

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1986 | Net Loans | 84,426 |
| 1987 | Net Loans | 174,309 |

**Plaintiff's Request for Admission 2.54**: The adjustments described in Request for Admission 2.50 include the following amounts asserted by the I.R.S. under Section 882, Treasury Regulations section 1.882-5 and Section 864(c)(4)(D):

| Tax Year | Proposed adjustments to interest income: | Proposed adjustments to interest expense: |
|---|---|---|
| 1981 | (125,857,675) | 152,605,551 |

| Tax Year | Proposed adjustments to interest income: | Proposed adjustments to interest expense: |
|---|---|---|
| 1982 | (132,049,714) | 147,337,977 |
| 1983 | (88,243,894) | 101,652,347 |
| 1984 | (104,153,633) | 126,092,694 |
| 1985 | (79,404,169) | 93,539,801 |
| 1986 | (87,081,845) | 108,064,089 |
| 1987 | (131,596,705) | 174,292,853 |

**Plaintiff's Request for Admission 2.56**: The RAR for the taxable year ended December 31, 1987 proposed an Environmental Tax increase of $38,974, bringing the total tax to $53,771, but did not include a correlative regular tax deduction for Environmental Tax. Both of these figures could change depending upon the final resolution of the years at issue.

**Plaintiff's Request for Admission 2.57**: The adjusted U.S. federal taxable income of NatWest as determined by the I.R.S. for each of the years at issue was as follows:

| Tax Year | Amount |
|---|---|
| 1981 | 31,875,618 |
| 1982 | 28,154,833 |
| 1983 | 38,336,127 |
| 1984 | 29,948,701 |
| 1985 | 54,676,775 |
| 1986 | 64,457,339 |
| 1987 | 46,808,885 |
| Total | 294,258,278 |

**Plaintiff's Request for Admission 2.58**: The U.S. federal income tax liability of NatWest as determined by the I.R.S. for each of the years at issue, excluding interest thereon, was as follows:

| Tax Year | Amount |
|---|---|
| 1981 | 14,154,278 |
| 1982 | 12,546,863 |
| 1983 | 16,105,789 |
| 1984 | 13,084,832 |
| 1985 | 24,937,042 |
| 1986 | 29,528,505 |
| 1987 | 18,620,521 |
| Total | 128,977,830 |

**Plaintiff's Request for Admission 2.59**: The U.S. federal income tax liability shown on NatWest's original Form 1120F U.S. federal income tax return or as adjusted prior to issuance of the RARs for each of the years at issue based on the amounts of U.S. federal taxable income shown on Request for Admission 2.48 was as follows:

| Tax Year | Amount |
|---|---|
| 1981 | 1,850,255 |
| 1982 | 5,514,262 |
| 1983 | 7,759,280 |
| 1984 | 2,992,864 |
| 1985 | 18,434,651 |
| 1986 | 19,641,070 |
| 1987 | 304,302 |
| Total | 56,496,684 |

**Plaintiff's Request for Admission 2.60**: The deficiency in U.S. federal income tax due by NatWest for each of the years at issue as determined by the I.R.S., excluding interest thereon, was as follows:

| Tax Year | Amount |
|---|---|
| 1981 | 12,304,023 |
| 1982 | 7,032,601 |
| 1983 | 8,346,509 |
| 1984 | 10,091,968 |
| 1985 | 6,502,391 |
| 1986 | 9,887,435 |
| 1987 | 18,316,219 |
| Total | 72,481,146 |

**Plaintiff's Request for Admission 2.61**: The U.S. federal income tax payments made by NatWest with respect to all of the U.S. branches to the I.R.S. for each of the years at issue were as follows:

U.S. Federal Income Tax Payments for the Years at Issue

| Tax Year | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|---|
| Prior Year Overpayment | 600,170 | 1,500,000 | 56,411 | 1,600,000 | 257,136 | 0 | 0 |
| Current Year Estimated Payments | 4,250,000 | 4,000,000 | 10,035,000 | 1,650,000 | 16,340,000 | 20,011,000 | 6,953,000 |
| Payment Per Form 7004 | 0 | 0 | 0 | 0 | 1,002,864 | 567,000 | 406,000 |
| Amount Paid Original Return | 0 | 0 | 0 | 0 | 834,651 | 0 | 0 |
| Amount Claimed as Refund on Original Return | (1,594,320) | 0 | (732,131) | 0 | 0 | (936,930) | (1,767,422) |
| Amount Credited to Estimated Tax on Original Return | (1,500,000) | (56,411) | (1,600,000) | (257,136) | 0 | 0 | 0 |
| Refund Per Form 1139 | 0 | 0 | 0 | 0 | 0 | 0 | (5,287,276) |
| Tax Paid Per Form 870 dated 08/23/89 | 94,405 | 70,673 | 0 | 0 | 0 | 0 | 0 |
| Tax Paid in Response to RARs | 12,304,023 | 7,032,601 | 8,346,509 | 10,091,968 | 6,502,391 | 9,887,435 | 18,316,219 |
| Aggregate Tax Payments | 14,154,278 | 12,546,86 | 16,105,789 | 13,084,832 | 24,937,042 | 29,528,505 | 18,620,521 |

**Plaintiff's Request for Admission 2.62.** The interest paid by NatWest to the Internal Revenue Service Center in Philadelphia, PA on May 31, 1995 and June 8, 1995, on the tax deficiencies asserted in the RARs, was as follows:

| Tax Year | Interest Paid |
|---|---|
| 1981 | 28,838,978 |
| 1982 | 13,068,220 |
| 1983 | 14,107,184 |
| 1984 | 15,045,416 |
| 1985 | 7,693,000 |
| 1986 | 11,467,996 |
| 1987 | 17,547,841 |
| **Total** | 107,768,635 |

**Plaintiff's Request for Admission 2.63.** The adjustments proposed under Section 882 and Treasury Regulations section 1.882-5 and Section 864(c)(4)(D) described in Request for Admission 2.54 should be withdrawn in accordance with the Court's July 1999 Opinion and Order.

**Plaintiff's Request for Admission 2.64.** The interest income reported on NatWest's original Form 1120F U.S. federal income tax returns for the years 1981 through 1987 included the amounts of interest income accrued by the U.S. branches from each other as described in Request for Admission 2.37 above.

**Plaintiff's Request for Admission 2.65.** The interest expense reported on NatWest's original Form 1120F U.S. federal income tax returns for the years 1981 through 1987 included the amounts of interest expense accrued by the U.S. branches to each other as described in Request for Admission 2.42 above.

**Plaintiff's Request for Admission 2.66.** If all of the intra-U.S. interest expense described in Request for Admission 2.42 and intra-U.S. interest income described in Request for Admission 2.37 were eliminated from the taxable income of the U.S. branches, the following net additions to, or reductions of, taxable income would result for the years at issue:

| Tax Year | Addition to or (Reduction of) Taxable Income |
|---|---|
| 1981 | (34,957) |
| 1982 | 23,991 |
| 1983 | (79,916) |
| 1984 | 231,163 |
| 1985 | 38,246 |
| 1986 | (3,974) |
| 1987 | 71,877 |

**Plaintiff's Request for Admission 2.67.** In its Amended Refund Claim, NatWest proposed to increase its taxable income by the amounts shown for taxable years 1982, 1984, 1985 and 1987 in Request for Admission 2.66, but did not propose to reduce its taxable income by the amounts shown for years 1981, 1983, and 1986 in Request for Admission 2.66.

**Plaintiff's Request for Admission 2.68.** The amounts of interest expense recorded on the profit and loss statements of the U.S. branches as payable to the Head Office and therefore included in the amounts described in Requests for Admission 2.38 above and reported on NatWest's original Form 1120F federal income tax returns for the tax years at issue included the following net amounts described in U.S. branch books and records as capital loan charges:

| Tax Year | Capital Loan Charge |
|---|---|
| 1981 | 465,868 |
| 1982 | 209,433 |
| 1983 | 202,745 |
| 1984 | 309,459 |
| 1985 | 0 |
| 1986 | 2,336,260 |
| 1987 | 1,936,537 |

**Plaintiff's Request for Admission 2.69.** During the years at issue, any capital loan charges paid by the U.S. branches were calculated on a balance (referred to herein as a "net

capital balance") consisting of the sum of the balances of Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets less the balance of Premises and Equipment, all as of the prior year-end.

**Plaintiff's Request for Admission 2.70.** During all of the years at issue, except with respect to the first quarter of 1981, the net capital balance used to calculate capital loan charges for a given year was adjusted to reflect any reduction in the components of the net capital balance (e.g., by repatriation) within the first quarter of that year.

**Plaintiff's Request for Admission 2.71.** During the years at issue, the capital loan charges paid by the U.S. branches were calculated using a market rate of interest.

**Plaintiff's Request for Admission 2.72.** During the years at issue, the capital loan charges paid or received in any given quarter were calculated using the same rate of interest for each branch, except for one quarter in 1986, when the actual rates used by the U.S. branches were all within 0.5875% of each other.

**Plaintiff's Request for Admission 2.73.** During the years at issue, the capital loan charges and net capital balances on which they were accrued were calculated on a combined basis for the New York branch and IBF.

**Plaintiff's Request for Admission 2.74.** For the years 1981 through 1985, the U.S. branches paid and deducted a capital loan charge only with respect to the New York branch and IBF and only on positive net capital balances.

**Plaintiff's Request for Admission 2.75.** For the taxable year 1986, all of the U.S. branches paid and deducted capital loan charges, but only on positive net capital balances.

**Plaintiff's Request for Admission 2.76.** For the taxable year 1987, all of the U.S. branches paid and deducted capital loan charges on positive net capital balances and received payments (and reduced interest expense accordingly) on negative net capital balances.

**Plaintiff's Request for Admission 2.77.** During the years at issue, the New York branch collected any capital loan charges for the U.S. branches and paid them to the head office.

**Plaintiff's Request for Admission 2.78.** For the year ended December 31, 1981, the total capital loan charges paid by the U.S. branches to PLC and deducted on the U.S. federal tax return was $465,868.

**Plaintiff's Request for Admission 2.79.** Apart from the amount described in Request for Admission 2.78, during the year ended December 31, 1981, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits

or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets.

**Plaintiff's Request for Admission 2.80.** For the year ended December 31, 1982, the total capital loan charges paid by the U.S. branches to PLC and deducted on the U.S. federal tax return was $209,433.

**Plaintiff's Request for Admission 2.81.** Apart from the amount described in Request for Admission 2.80, during the year ended December 31, 1982, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets.

**Plaintiff's Request for Admission 2.82.** For the year ended December 31, 1983, the total capital loan charges paid by U.S. branches to PLC and deducted on the U.S. federal tax return was $202,745.

**Plaintiff's Request for Admission 2.83.** Apart from the amount described in Request for Admission 2.82, during the year ended December 31, 1983, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets.

**Plaintiff's Request for Admission 2.84.** For the year ended December 31, 1984, the total capital loan charges paid by U.S. branches to PLC and deducted on the U.S. federal tax return was $390,459.

**Plaintiff's Request for Admission 2.85.** Apart from the amount described in Request for Admission 2.84, during the year ended December 31, 1984, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets.

**Plaintiff's Request for Admission 2.86.** During the year ended December 31, 1985, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets.

**Plaintiff's Request for Admission 2.87.** For the year ended December 31, 1986, plaintiff conceded capital loan charges in the aggregate amount of $2,603,583.

**Plaintiff's Request for Admission 2.88.** For the year ended December 31, 1986, plaintiff made an over-concession with regard to capital loan charges for the fourth quarter for the Nassau branch in the amount of $266,510.

**Plaintiff's Request for Admission 2.89.** For the year ended December 31, 1986, plaintiff made an over-concession with regard to capital loan charges for the fourth quarter for the San Francisco agency in the amount of $813.

**Plaintiff's Request for Admission 2.90.** For the year ended December 31, 1986, the total capital loan charges paid by the U.S. branches to PLC and deducted on the U.S. federal tax return was $2,336,260.

**Plaintiff's Request for Admission 2.91.** Apart from the amount described in Request for Admission 2.90, during the year ended December 31, 1986, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets.

**Plaintiff's Request for Admission 2.92.** For the year ended December 31, 1987, the total capital loan charges paid by U.S. branches to PLC and deducted on the U.S. federal tax return was $1,936,537.

**Plaintiff's Request for Admission 2.93.** Apart from the amount described in Request for Admission 2.92, during the year ended December 31, 1987, neither the profit and loss statements nor the U.S. federal income tax return of the U.S. branches reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses; Profits and Loss; Balance due to HO re Capital Loan; or Balance due to HO re Fixed Assets.

**Plaintiff's Request for Admission 2.94.** Apart from the amounts identified in Requests for Admission 2.78, 2.80, 2.82, 2.84, 2.90, and 2.92, the U.S. branches did not pay or deduct any interest during the years at issue on amounts designated as capital on their books and records.

**Plaintiff's Request for Admission 2.96**: Plaintiff has conceded all capital loan charges reflected in its books and records.

**Plaintiff's Request for Admission 2.97:** The aggregate amount conceded by plaintiff as capital loan charges exceeded the actual capital loan charges deducted by plaintiff on its U.S. federal income tax returns during the years 1981 through 1987 in the amount of $267,323.

**Plaintiff's Request for Admission 2.98:** Amounts recorded on the balance sheets of the U.S. branches as "Retained Profits" (which were assigned the account code "LZC") constitute amounts that were designated as capital on the balance sheets of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any interest expense accrued thereon was not deductible under the Treaty during the years at issue.

**Plaintiff's Request for Admission 2.99:** Amounts recorded on the balance sheets of the U.S. branches as "Profit and Loss" (which were assigned the account code "LPC") constitute amounts that were designated as capital on the balance sheets of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any interest expense accrued thereon was not deductible under the Treaty during the years at issue.

**Plaintiff's Request for Admission 2.100:** Amounts recorded on the balance sheets of the U.S. branches as "Balance due to HO re Fixed Assets" (which were assigned the account code "LFB") constitute amounts that were designated as capital on the books of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any interest expense accrued thereon was not deductible under the Treaty during the years at issue.

**Plaintiff's Request for Admission 2.101:** Amounts recorded on the balance sheets of the U.S. branches as "Balance due to HO re Capital Loans" (which were assigned the account code "LEB") constitute amounts that were designated as capital on the books of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any interest expense accrued thereon was not deductible under the Treaty during the years at issue.

**Plaintiff's Request for Admission 2.102:** Amounts recorded on the balance sheets of the U.S. branches as "Provision for B&DD ("Bad and Doubtful Debts") – Specific" (which were assigned the account code "LQC") constitute amounts that were designated as capital on the books of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any interest expense accrued thereon was not deductible under the Treaty during the years at issue.

**Plaintiff's Request for Admission 2.103:** Amounts recorded on the balance sheets of the U.S. branches as "Provision for B&DD B – Non-specific" (which were assigned the account code "LRC") constitute amounts that were designated as capital on the books of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any interest expense accrued thereon was not deductible under the Treaty during the years at issue.

**Plaintiff's Request for Admission 2.105:** Apart from amounts described in Requests for Admission 2.98 through 2.103, there were no amounts recorded on the balance sheets of the U.S. branches during the years at issue that were in fact allotted to a U.S. branch or branches for capital purposes.

**Plaintiff's Request for Admission 2.106:** Apart from the capital loan charges described in Requests for Admission 2.78, 2.80, 2.82, 2.84, 2.90, and 2.92 above, all interest expense deducted by the U.S. branches during the years at issue was on advances to the U.S. branches that were used in the ordinary course of the U.S. branches' banking business.

**Plaintiff's Request for Admission 2.108:** The aggregate of the amounts recorded as Fixed Assets on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Fixed Assets |
|---|---|
| 1980 | 9,167,969 |
| 1981 | 11,969,698 |
| 1982 | 15,862,602 |
| 1983 | 16,631,023 |
| 1984 | 25,976,913 |
| 1985 | 23,322,331 |
| 1986 | 26,977,617 |
| 1987 | 29,477,629 |

**Plaintiff's Request for Admission 2.109:** The aggregate of the provisions for "B&DD – Specific" recorded on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Provision for B&DD - Specific |
|---|---|
| 1980 | 4,072,745 |
| 1981 | 3,834,232 |
| 1982 | 6,829,613 |
| 1983 | 11,373,811 |
| 1984 | 4,757,958 |
| 1985 | 7,111,870 |
| 1986 | 7,988,675 |

| Tax Year | Provision for B&DD - Specific |
|---|---|
| 1987 | 55,008,194 |

**Plaintiff's Request for Admission 2.110:** The aggregate of the provisions for "B&DD - Non-Specific" recorded on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Provision for B&DD - Non-Specific |
|---|---|
| 1980 | 10,539,202 |
| 1981 | 10,807,318 |
| 1982 | 10,363,993 |
| 1983 | 13,108,406 |
| 1984 | 11,851,486 |
| 1985 | 12,679,446 |
| 1986 | 20,013,077 |
| 1987 | 20,013,077 |

**Plaintiff's Request for Admission 2.111:** The U.S. branches did not transfer or repatriate to the head office any of their Retained Profits generated during the years at issue.

**Plaintiff's Request for Admission 2.112.** The aggregate of the balances recorded as "Retained Profits" (net of any amounts recorded as "Accumulated Losses") on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Retained Profits |
|---|---|
| 1980 | 15,677,567 |
| 1981 | 2,564,846 |
| 1982 | 4,312,898 |
| 1983 | 19,625,765 |

| Tax Year | Aggregate Retained Profits |
|---|---|
| 1984 | 25,993,019 |
| 1985 | 51,706,718 |
| 1986 | 63,301,445 |
| 1987 | 29,732,486 |

**Plaintiff's Request for Admission 2.113.** The aggregate of the balances recorded as "Balance due to HO re Capital Loans" on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Balance due to HO re Capital Loans |
|---|---|
| 1980 | 3,223,184 |
| 1981 | 869,893 |
| 1982 | 900,770 |
| 1983 | 645,032 |
| 1984 | 42,437 |
| 1985 | 1,085,000 |
| 1986 | 0 |
| 1987 | 0 |

**Plaintiff's Request for Admission 2.114.** The aggregate of the balances recorded as "Balance due to HO re Fixed Assets" on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Balance due to HO re Fixed Assets |
|---|---|
| 1980 | 8,344,816 |
| 1981 | 9,033,064 |
| 1982 | 9,002,188 |
| 1983 | 9,257,926 |

| Tax Year | Aggregate Balance due to HO re Fixed Assets |
|---|---|
| 1984 | 9,860,521 |
| 1985 | 8,817,958 |
| 1986 | 0 |
| 1987 | 0 |

**Plaintiff's Request for Admission 2.115.** The aggregate of the balances recorded as "Profit and Loss" on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Profit & Loss Balance |
|---|---|
| 1980 | 0 |
| 1981 | 0 |
| 1982 | 4,604,145 |
| 1983 | 5,117,386 |
| 1984 | 5,109,745 |
| 1985 | 0 |
| 1986 | 0 |
| 1987 | (6,072,870) |

**Plaintiff's Request for Admission 2.116.** The aggregate of the amounts that either were designated as capital on the books of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes (i.e., the provisions for "B&DD - Specific", "B&DD - Non-Specific", "Retained Profits" (net of any "Accumulated Losses"), "Balance due to HO re Capital Loans", "Balance due to HO re Fixed Assets", and balances recorded as "Profit and Loss") as of December 31st of the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Capital |
|---|---|
| 1980 | 41,857,514 |

| Tax Year | Aggregate Capital |
|---|---|
| 1981 | 27,109,353 |
| 1982 | 36,013,607 |
| 1983 | 59,128,326 |
| 1984 | 57,615,166 |
| 1985 | 81,400,992 |
| 1986 | 91,303,197 |
| 1987 | 98,680,887 |

**Plaintiff's Request for Admission 2.119.** The following table lists all of the adjustments to the U.S. federal taxable income of NatWest as set forth in the RARs with respect to all issues, excluding adjustments that are dependent on the outcome of subsequent years and computational adjustments that are dependent on resolution of all issues relating to the years at issue:

Adjustments to RAR Taxable Income

| Tax Year | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|---|
| Reversal of adjustments to interest income[1] | 125,857,675 | 132,049,714 | 88,243,894 | 104,153,633 | 79,404,169 | 87,081,845 | 131,596,705 |
| Reversal of adjustments to interest expense[1] | (152,605,551) | (147,337,977) | (101,652,347) | (126,092,694) | (93,539,801) | (108,064,089) | (174,292,853) |
| Reversal of Net Loans Adjustment[2] | 0 | 0 | 0 | 0 | 0 | (84,426) | (174,309) |
| Elimination of Net Intra-U.S. Interest Expense[3] | 0 | 23,991 | 0 | 231,163 | 38,246 | 0 | 71,877 |
| Elimination of Capital Loan Charge[4] | 465,868 | 209,433 | 202,745 | 309,459 | 0 | 2,603,584 | 1,936,537 |
| Adjustment to NOL Carryback from 1990[5] | 0 | 0 | 0 | 0 | 0 | 0 | 3,385,279 |
| Aggregate Adjustments to RAR Taxable Income | (26,282,008) | (15,054,839) | (13,205,708) | (21,398,439) | (14,097,386) | (18,463,086) | (37,476,764) |

1 - *See* Request for Admission 2.54, above.
2 - *See* Request for Admission 2.52, above.
3 - *See* Requests for Admission 2.66 and 2.67, above.
4 - *See* Requests for Admission 2.68, 2.87 and 2.88, above.
5 -Two adjustments to the U.S. Branch's NOL Carryback were conceded by NatWest during the audit of its 1990 taxable year, resulting in an addition to income for the 1987 tax year of $3,385,279. *See* $912,566 agreed on Form 870-AD dated June 26, 1998 at 2, and $2,472,713 in closing agreement executed by NatWest on June 14, 1999. The NOL Carryback is subject to further adjustment depending on the resolution of taxable years not at issue here.

**Plaintiff's Request for Admission 2.124.** The aggregate U.S. federal income taxes paid by NatWest for each of the tax years at issue is:

| Tax Year | Aggregate Tax Payments |
|---|---:|
| 1981 | 14,154,278 |
| 1982 | 12,546,863 |
| 1983 | 16,105,789 |
| 1984 | 13,084,832 |
| 1985 | 24,937,042 |
| 1986 | 29,528,505 |
| 1987 | 18,620,521 |
| **Total** | 128,977,830 |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**No. 95-758T**
**(Judge Nancy B. Firestone)**

---

**NATIONAL WESTMINSTER BANK PLC,**
**Plaintiff**

**v.**

**THE UNITED STATES,**
**Defendant**

---

**DEFENDANT'S RESPONSES TO PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSIONS**

---

JAN 7 2005

Pursuant to Rules 26 and 36 of the Rules of the United States Court of Federal Claims, the United States responds as follows to plaintiff's Second Set of Requests for Admission.

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

Defendant objects to plaintiff's definitions, as follows:

1. Objects to the definition of "U.S. branches" to the extent it refers to "licensed" branches and agencies, as plaintiff has not produced documentation regarding such licenses.

2. Objects to plaintiff's new references to "agencies," and to a "San Francisco agency," as the Court previously has ruled, in accordance with the parties' filings, that there were six U.S. branches, including the San Francisco branch, not a San Francisco agency.

3. Objects to plaintiff's definition that omits the term "branch" from its references to the International Banking Facility, in an effort, confirmed elsewhere, to newly characterize the IBF Branch as part of the New York branch, and not as itself a branch.

4. Objects to plaintiff's definition of its June 5, 2001, submission to defendant as an "Amended Refund Claim." A refund claim, including an amended refund claim, is an administrative document filed with the Internal Revenue Service that has specified statutory consequences. Plaintiff's June 5, 2001, submission to defendant was pursuant to the Court's April 9, 2001, Order directing plaintiff to prepare a definitive statement of its tax refund claim, including the precise amount sought for each of the seven years in dispute and an explanation of the computation of each amount. The June 5, 2001, submission is therefore nothing more than a statement of plaintiff's position by its counsel.

5. Objects to plaintiff's definition of "NOL Carryback," as it is a legal term and is governed by legal authorities, not plaintiff's effort to define it.

6. Objects to plaintiff's instructions regarding responses to these requests for admissions, to the extent that they vary from or purport to add to the obligations specified in the Rules of the United States Court of Federal Claims.

**RESPONSES TO REQUESTS FOR ADMISSIONS**

REQUEST FOR ADMISSION 2.01. During the years at issue, NatWest was a publicly held United Kingdom corporation engaged in the banking business in the United Kingdom, United States, and elsewhere.

RESPONSE TO REQUEST FOR ADMISSION 2.01: Admits.

REQUEST FOR ADMISSION 2.02. During the years at issue, NatWest's worldwide operations were headquartered in the United Kingdom.

RESPONSE TO REQUEST FOR ADMISSION 2.02: Admits.

REQUEST FOR ADMISSION 2.03. During the years at issue, NatWest was entitled to and did claim benefits under the Treaty as a "resident of the United Kingdom." (*See* Treaty Art. 5.)

RESPONSE TO REQUEST FOR ADMISSION 2.03: Defendant objects to the extent plaintiff is requesting defendant's views regarding matters of law, not fact. Subject to that objection, defendant states that plaintiff's position throughout this litigation has been to claim that its U.S. tax liability should be computed pursuant to the U.S. – U.K. Income Tax Treaty.

REQUEST FOR ADMISSION 2.04. During the years at issue, NatWest operated a banking business in the United States through the U.S. branches.

RESPONSE TO REQUEST FOR ADMISSION 2.04: Denies, as plaintiff's request, read in conjunction with its definitions, seeks admissions regarding the nature and status of certain U.S. branches, as well as whether they should be considered collectively. Defendant admits that plaintiff conducted banking businesses in the United States through six U.S. branches: (1) the New York Branch, (2) the IBF Branch, (3) the Cayman Islands Branch, (4) the Nassau Branch, (5) the Chicago Branch, and (6) the San Francisco Branch.

REQUEST FOR ADMISSION 2.05. The principal customers of the U.S. Branch were large multinational corporations (including U.S. subsidiaries of U.K. corporations that were customers of PLC in the United Kingdom), other banks and financial institutions, other PLC offices and subsidiaries, and foreign governments.

RESPONSE TO REQUEST FOR ADMISSION 2.05: Defendant objects to this request as unnecessary and an abuse of the discovery process. See Defendant's Request for Admission 1.02 and Plaintiff's Response.

REQUEST FOR ADMISSION 2.06. The six U.S. branches loaned funds to, and took deposits from, their corporate customers. (*See* Def.'s Request for Admission 1.03 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.06: Defendant objects to responding to this request on the ground that it is unnecessary and an abuse of the discovery process. See Defendant's Request for Admission 1.03 and Plaintiff's Response.

REQUEST FOR ADMISSION 2.07. The U.S. branches engaged in trading activities in the interbank market, including: taking and placing time deposits in the Eurodollar money market, selling commercial paper issued by NatWest, buying (*i.e.*, borrowing) and selling (*i.e.*, lending) federal funds in the U.S. money market, and buying and selling securities under repurchase agreements, typically called "repos" or "reverse repos."

RESPONSE TO REQUEST FOR ADMISSION 2.07: Denies, except admits that (1) the six U.S. branches engaged in trading activities (both borrowing and lending) on the interbank market, (2) that the trading activities were conducted to obtain additional funds needed to make loans to corporate customers, as well as to provide an independent source of profits, and (3) the trading activities during the years at issue included demand deposits, Fed funds purchased, securities sold under repurchase agreements, negotiable certificates of deposits, Euro commercial paper, and Euro time deposits. See Defendant's Requests for Admissions 1.04 and 1.05 and Plaintiff's Responses.

REQUEST FOR ADMISSION 2.08. The trading activities of the U.S. branches were conducted to manage exposure to liquidity and interest rate risk, to obtain additional funds, to place excess funds, and to make a profit.

RESPONSE TO REQUEST FOR ADMISSION 2.08: See Defendant's Response to Request for Admission 2.07, Defendant's Request for Admission 1.04 and Plaintiff's Response.

REQUEST FOR ADMISSION 2.09. For each of the years at issue, NatWest was required to and did file a single U.S. federal income tax return.

RESPONSE TO REQUEST FOR ADMISSION 2.09: Defendant objects to this request for admission on the ground that it calls for a legal conclusion and is not relevant to any issue in the case. Under the Article 7(1) of the U.S. – U.K. Treaty, plaintiff National Westminster Bank PLC is subject to tax in the United States on the profits attributable to its six U.S. branches. Article 7(2) provides that the profits attributable to a branch are those expected if it were an independent, separate and distinct enterprise. Each of the six branches kept separate books and records and engaged in transactions with each other. There were no consolidated or combined books and records of the six U.S. branches. As the Court has ruled, the taxable profits should be determined on the basis of contemporaneous books and records, subject to adjustments. In accordance with PLC's own method of keeping books records, its tax liability under Article 7(2) of the Treaty – the profits expected of a branch on an independent basis – therefore must be separately determined branch by branch. Plaintiff, however, despite the absence of books and records combining the six U.S. branches, and having withdrawn its reliance on consolidated balance sheets that its attorneys prepared for this litigation, is attempting to apply the Court's November 14, 2003, Opinion to determine the capital of a combined U.S. branch that did not

exist. The requested admission is an improper effort to establish through the discovery process that such a combined approach is mandated by law.

REQUEST FOR ADMISSION 2.10. During the years at issue, NatWest was an accrual method taxpayer.

RESPONSE TO REQUEST FOR ADMISSION 2.10: Defendant objects to this request, as it is vague and ambiguous. Plaintiff does not specify whether it is requesting an admission that it was an accrual method taxpayer for book, tax, or some other purposes, and does not specify whether it is inquiring about its accounting method in the United States, the United Kingdom, or elsewhere. Construing plaintiff's request as one for an admission that plaintiff was an accrual basis taxpayer for U.S. federal income tax purposes, defendant admits on that basis.

REQUEST FOR ADMISSION 2.11. There were two branches and one agency of NatWest licensed in the United States: (1) the New York branch licensed by the State of New York, (2) the Chicago branch licensed by the State of Illinois, and (3) the San Francisco agency licensed by the State of California.

RESPONSE TO REQUEST FOR ADMISSION 2.11: Defendant objects to this request on the ground that whether any of plaintiff's six branches operating in the United States during the years at issue were separately licensed by regulatory authorities, and where they were licensed, is not relevant to the issues in this case. Under the U.S. – U.K. Treaty, plaintiff is taxed in the United States on the profits attributable to its six U.S. branches, based on the profits expected if each were a distinct, separate, and independent enterprise (although, in fact, all are a part of plaintiff and none is actually a distinct, separate, and independent enterprise). All six U.S. branches kept separate books and records and engaged in transactions with each other. The

Court already has found, in accordance with the parties' submissions, that plaintiff conducted business in the United States through six branches: (1) the New York branch, (2) the Nassau, Bahamas branch, (3) the Cayman Islands branch, (4) the International Banking Facility ("IBF") branch, (5) the Chicago branch, and (6) the San Francisco branch. 58 Fed. Cl. 491 at 495 (2003). Bank regulatory licensing action, or the absence of such action, with respect to the six U.S. branches has no bearing on plaintiff's federal income tax liability. Subject to this objection, defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny.

REQUEST FOR ADMISSION 2.12. The New York, Nassau, Chicago and San Francisco branches were in operation throughout the years at issue.

RESPONSE TO REQUEST FOR ADMISSION 2.12: Admits.

REQUEST FOR ADMISSION 2.13. The New York branch also operated an International Banking Facility (the "IBF").

RESPONSE TO REQUEST FOR ADMISSION 2.13: Denies. The International Banking Facility was a separate branch. Both branches were operated from facilities in New York, as were the Cayman Islands branch and the Nassau branch. All four branches maintained separate books and records and engaged in transactions with each other.

REQUEST FOR ADMISSION 2.14. The operations of the IBF commenced in December 1981. (*See* Def.'s Request for Admission 1.39 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.14: Defendant objects to responding to this request on the ground that it is unnecessary and an abuse of the discovery process. *See* Defendant's Request for Admission 1.39 and Plaintiff's Response. Defendant also objects to the

request to the extent that it suggests, contrary to the Court's findings (58 Fed. Cl. 491 at 495), that the IBF branch was not a separate branch.

REQUEST FOR ADMISSION 2.15. The IBF was not a separately licensed branch but was a set of asset and liability accounts maintained by the New York branch pursuant to Federal Reserve Board regulations. (*See* Def.'s Request for Admission 1.15 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.15: Defendant objects to this request on the ground that whether any of plaintiff's six branches operating in the United States during the years at issue were separately licensed by regulatory authorities, and where they were licensed, is not relevant to the issues in this case. Under the U.S. – U.K. Treaty, plaintiff is taxed in the United States on the profits attributable to its six U.S. branches, based on the profits expected if each were a distinct, separate, and independent enterprise (although, in fact, all are a part of plaintiff and none is actually a distinct, separate, and independent enterprise). All six U.S. branches kept separate books and records and engaged in transactions with each other. The Court already has found, in accordance with the parties' submissions, that plaintiff conducted business in the United States through six branches: (1) the New York branch, (2) the Nassau, Bahamas branch, (3) the Cayman Islands branch, (4) the International Banking Facility ("IBF") branch, (5) the Chicago branch, and (6) the San Francisco branch. 58 Fed. Cl. 491 at 495 (2003). Bank regulatory licensing action, or the absence of such action, with respect to the six U.S. branches has no bearing on plaintiff's federal income tax liability. Subject to this objection, defendant denies the request to the extent it suggests that the IBF branch was not a separate branch, since the Court already has found to the contrary, and none of the six U.S. branches was actually separate, distinct, and independent of plaintiff; they were not entities, but existed as separate sets of accounts. With respect to the remainder of the request, defendant states that it

has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny.

REQUEST FOR ADMISSION 2.16. Transactions segregated on the books of the New York IBF could qualify for exemption from certain bank regulatory requirements and could give rise to "IBF eligible net income" which was exempt from New York State and City income taxation. (*See* Def.'s Request for Admission 1.15 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.16: Denies to the extent that plaintiff's reference to New York IBF, and to transactions "segregated" on its books, suggests it is not a separate branch. All six U.S. branches, including the IBF branch, kept separate books and records and engaged in transactions with each other. Subject to this objection, defendant admits that the IBF branch was created to obtain certain tax advantages and to avoid certain regulatory reserve requirements. With respect to the remainder of plaintiff's request, defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny.

REQUEST FOR ADMISSION 2.17. NatWest had branches licensed in Nassau and the Grand Cayman Islands.

RESPONSE TO REQUEST FOR ADMISSION 2.17: Defendant objects to this request. *See* defendant's Responses to Request 2.11 and 2.15. Subject to this objection, defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny.

REQUEST FOR ADMISSION 2.18. The Grand Cayman branch began operations in June 1985. (*See* Def.'s Request for Admission 1.40 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.18: Defendant objects to responding to this request on the ground that it is unnecessary and an abuse of the discovery process. *See* Defendant's Request for Admission 1.40 and Plaintiff's Response.

REQUEST FOR ADMISSION 2.19. During the years at issue, the activities of the New York, Nassau and Grand Cayman branches and the IBF were conducted by personnel of NatWest's New York branch office. (*See* Def.'s Request for Admission 1.12 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.19: Denies, except admits that the New York, Nassau, Grand Cayman Islands and IBF branches were operated from a common facility in New York. Each had separate trading desks, engaged in transactions with each other, and kept separate books and records.

REQUEST FOR ADMISSION 2.20. The Nassau and Grand Cayman branches had no employees or facilities located in Nassau or Grand Cayman. (*See* Def.'s Prop. Findings of Uncontr. Fact (Adequate Cap. Issue) dated Sept. 12, 2002 at ¶41; Def.'s Request for Admission 1.13 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.20: Defendant objects to responding to this request on the ground that it is unnecessary and an abuse of the discovery process. See Defendant's Request for Admission 1.13 and Plaintiff's Response.

REQUEST FOR ADMISSION 2.21. During the years at issue, each of the New York, Nassau, Grand Cayman, Chicago, and San Francisco branches and the IBF maintained separate accounts, including profit and loss statements and balance sheets, in the ordinary course of its banking business. (*See* Def.'s Request for Admission 1.06 and Pl.'s Response thereto; *see also*

Report of John J. Mingo, Ph.D. dated Nov. 15, 2001 at 7; Report of John M. Lacey, Ph.D. dated Nov. 15, 2001 at 1.)

RESPONSE TO REQUEST FOR ADMISSION 2.21: Denies the request to the extent it requests an admission that the IBF branch is not a separate branch and otherwise admits that the six U.S. branches kept separate books and records in the ordinary course of their businesses, including profit and loss statements and balance sheets.

REQUEST FOR ADMISSION 2.22. During certain periods prior to September 1983, the results of the IBF were included on the manually prepared and certified balance sheets and profit and loss statements of the New York branch. (*See* Def.'s Request for Admission 1.39 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.22: Defendant objects to responding to this request on the ground that it is unnecessary and an abuse of the discovery process. See Defendant's Request for Admission 1.39 and Plaintiff's Response.

REQUEST FOR ADMISSION 2.23. For September 1983 and during the remainder of the years at issue, separate manually prepared and certified balance sheets and profit and loss statements were prepared for the IBF. (*See* Def.'s Request for Admission 1.39 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.23: Denies, except admits that the IBF branch, like the other U.S. branches, prepared separate computer generated balance sheets and profit and loss statements and that certain corrections were made to those documents, which were reflected in manually prepared balance sheets and profit and loss statements.

REQUEST FOR ADMISSION 2.24. During the years at issue, the U.S. branches submitted profit and loss statements to PLC's head office on a periodic basis. (*See* Def.'s Request for Admission 1.28 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.24: Defendant objects to responding to this request on the ground that it is unnecessary and an abuse of the discovery process. See Defendant's Request for Admission 1.28 and Plaintiff's Response.

REQUEST FOR ADMISSION 2.25. During the years at issue, the U.S. branches submitted balance sheets to PLC's head office on a periodic basis. (*See* Def.'s Requests for Admission 1.11, 1.28, 1.32-1.33 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.25: Defendant objects to responding to this request on the ground that it is unnecessary and an abuse of the discovery process. See Defendant's Request for Admission 1.11, 1.28, 1.32, and 1.333 and Plaintiff's Responses.

REQUEST FOR ADMISSION 2.26. The profit and loss statements submitted by the U.S. branches to the Head Office included a certification which was required to be signed by the Branch Manager and Branch Accountant.

RESPONSE TO REQUEST FOR ADMISSION 2.26: Denies the request to the extent it is intended to contradict deposition testimony of plaintiff's witnesses and plaintiff's expert that the branches' reports to the Head Office were other than hastily prepared and not entirely accurate. Due to plaintiff's requirement that the branches report to the Head Office within a very short number of days after the end of a period (referred to as a "quick close"), the reports were sent before any detailed analysis could be performed and were not fully corrected and reconciled. A department at PLC's head office was dedicated to making the necessary corrections and the

results were used in preparing National Westminster Bank PLC's annual reports. (Tr. Tatz 1/23/2002 at 20: Tr. Samaroo at 41-42, 80; Bandoian Report at 23-24.). Defendant otherwise states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny whether branch employees were required to sign certifications and that, in fact, they did not always do so. See e.g. Plaintiff's Trial Exhibit PX187 (Nassau branch profit and loss statement January 1, 1984—September 30, 1984).

REQUEST FOR ADMISSION 2.27. The following is a typical example of the certification on profit and loss statements submitted by the U.S. branches to the head office during the years at issue:

> We certify that this Profit and Loss Account is in accordance with the books, and to the best of our knowledge and belief, gives a true and fair value of the profit for the year ended 31 December 1984, and has been prepared on a basis consistent with the Profit and Loss Accounts of previous periods.

(*See* New York branch profit and loss statement for the year ended December 31, 1984.)

RESPONSE TO REQUEST FOR ADMISSION 2.27: See defendant's Response to Request for Admission 2.26. Defendant denies except to admit that printed profit and loss forms, used to manually insert financial results, contain such language.

REQUEST FOR ADMISSION 2.28. The profit and loss statements submitted by the U.S. branches to the Head Office included a schedule entitled "Analysis of Intragroup Interest Paid and Received," which included a certification required to be signed by the Branch Manager.

RESPONSE TO REQUEST FOR ADMISSION 2.28: Denies the request to the extent it is intended to contradict deposition testimony of plaintiff's witnesses and its expert that the branches' reports to the Head Office were other than hastily prepared and not entirely accurate.

Due to plaintiff's requirement that the branches report to it within a very short number of days after the end of a period (referred to as a "quick close"), the reports were sent before any detailed analysis could be performed and were not fully corrected and reconciled. A department at PLC's head office was dedicated to making the necessary corrections and the results were used in preparing National Westminster Bank PLC's annual reports. (Tr. Tatz 1/23/2002 at 20: Tr. Samaroo at 41-42, 80; Bandoian Report at 23-24.). Defendant otherwise states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny whether branch employees were required to sign certifications and further states that, in fact, they did not always do so. See Plaintiff's Trial Exhibit PX187 (Nassau branch profit and loss statement January 1, 1984—September 30, 1984).

REQUEST FOR ADMISSION 2.29. The following is a representative example of the certification on the schedule entitled "Analysis of Intragroup Interest Paid and Received" included in the profit and loss statement submitted by the U.S. branches to the head office during the years at issue:

> We hereby certify that we have agreed all NWB, IWB and Intra-Group Interest with the units/companies concerned. Details and brief explanations of any disagreements are shown overleaf.

(*See* New York branch Analysis of Intragroup Interest Paid and Received schedule for the year ended December 31, 1984.)

RESPONSE TO REQUEST FOR ADMISSION 2.29: See defendant's Response to Request for Admission 2.28. Defendant denies except to admit that printed profit and loss forms, used to manually insert financial results, contain such language.

REQUEST FOR ADMISSION 2.30. NatWest maintained an internal audit process designed to (i) determine if policies, practices, procedures and internal controls were adequate to assure accurate accounting for the activities of the U.S. branches and (ii) initiate corrective action if any deficiencies were identified. (*See* Box 156-5.)

RESPONSE TO REQUEST FOR ADMISSION 2.30: Defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny.

REQUEST FOR ADMISSION 2.31. During the years at issue, the operations and internal controls of the New York branch (including the IBF), the Chicago branch and the San Francisco agency were examined regularly by the Federal Reserve Board and New York, Illinois and California state bank regulatory agencies. (*See* Supplemental Report of Robert R. Bench dated Jan. 14, 2002 at 10-11.)

RESPONSE TO REQUEST FOR ADMISSION 2.31: Defendant denies that the New York branch includes the IBF branch or that the San Francisco branch should be referred to for purposes of this litigation as the San Francisco agency. Defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny the remainder of the request.

REQUEST FOR ADMISSION 2.32. During the years at issue, New York bank regulators reviewed the records of the Nassau branch during the course of their examination of the New York branch. (*See* Pl.'s response to Def.'s Request for Admission 1.10.)

RESPONSE TO REQUEST FOR ADMISSION 2.32: Defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny the remainder of the request.

REQUEST FOR ADMISSION 2.33. The aggregate amount of interest income recorded on the profit and loss statements of the U.S. branches for each of the years at issue was as follows:

| Tax Year | Aggregate Interest Income |
|---|---|
| 1981 | 701,738,889 |
| 1982 | 635,002,839 |
| 1983 | 486,454,589 |
| 1984 | 635,242,556 |
| 1985 | 529,248,172 |
| 1986 | 498,814,159 |
| 1987 | 584,410,256 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim, and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.33: Plaintiff conducted banking operations in the United States through six separate U.S. branches. The branches engaged in transactions with each other and recorded those transactions, as well as other accounting information, on their separately prepared and maintained books and records. Profit and loss statements for each branch were generated by computer. At the end of each month, each branch was required to make a financial report to plaintiff's head office which included manually prepared profit and loss statements. As a result of the short deadline after the close of a period to submit the reporting package (referred to as a "quick close), the reports were sent before any detailed analysis could be performed and were not fully corrected and reconciled. A department

at PLC's head office was dedicated to making the necessary corrections and the results were used in preparing National Westminster Bank PLC's annual reports. (Tr. Tatz 1/23/2002 at 20: Tr. Samaroo at 41-42, 80; Bandoian Report at 23-24.). See Response to Request for Admission 2.26.

Under Article 7(1) of the U.S. – U.K. Treaty, plaintiff National Westminster Bank PLC is subject to tax in the United States on the profits attributable to its six U.S. branches. Article 7(2) provides that the profits attributable to a "permanent establishment" (*i.e.*, a branch) are those expected if it were an independent, separate and distinct enterprise. Each of the six branches kept separate books and records and engaged in transactions with each other, and consolidated or combined profit and loss statements of the six U.S. branches were never prepared. Each branch is a permanent establishment for purposes of the Treaty, and, consistent with plaintiff's practice of keeping separate books for each branch, the profits expected on an independent basis must be determined branch by branch. Thus, capital allotted to the branch in accordance with the Court's November 14, 2003 Opinion must be determined branch by branch. Likewise, the separate books of each branch, and the transactions between the U.S. branches, require that related party interest income and expense must be tested for arm's length dealing at each branch. While interest income and expense reported on the profit and loss statements of each of the six U.S. branches are relevant, aggregations of those amounts into combined totals is not the basis for applying either the November 14, 2003, Opinion, or the arm's length standard to particular related party transactions. Plaintiff's request is therefore irrelevant, immaterial, and not calculated to lead to the discovery of relevant information and defendant objects to the request on those grounds. The requested admission is an improper effort to advance plaintiff's argument that the six U.S. branches may be combined in some manner, notwithstanding its own insistence

that profits should be determined on the basis of the books and records, and its own practice of keeping separate branch records and not combining them. The requested admission also appears to be an improper effort to use the admission process to substitute for the introduction into evidence and consideration of plaintiff's separately kept branch books and records, which, as defendant will demonstrate at trial, were not pristine and reflect non-arm's length dealing.

In addition, plaintiff's request cites as support documents that are not the contemporaneous books and records of the branch. They are a June 5, 2001, submission prepared by plaintiff's counsel for purposes of this litigation. The June 5, 2001, submission is hearsay, and it is not admissible into evidence under any exception to the hearsay rule. Defendant objects to the request, because it relies on inadmissible documents.

Plaintiff's request also is unduly burdensome and oppressive. Plaintiff's request would require defendant to perform accounting work as a prerequisite to responding. As indicated above, each of the branches prepared separate profit and loss statements, revised them, and plaintiff never prepared combined statements. Plaintiff request is a repetition of its May 4, 2004, Proposed Stipulation 125, which asked defendant to verify aggregations by making calculations using 35 other proposed stipulations, each one of which contained a chart of financial data. The books and records of the branches speak for themselves regarding interest income and expense, without demanding accounting exercises from defendant.

Subject to these objections, defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny the request.

REQUEST FOR ADMISSION 2.34. The amounts set forth in Request for Admission 2.33 above include the following amounts of interest income accrued by the U.S. branches from parties unrelated to NatWest:

| Tax Year | Interest Income from Third Parties |
|---|---|
| 1981 | 575,881,214 |
| 1982 | 502,953,124 |
| 1983 | 398,210,695 |
| 1984 | 531,088,923 |
| 1985 | 449,801,628 |
| 1986 | 405,279,034 |
| 1987 | 447,495,474 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.34: Plaintiff conducted banking operations in the United States through six separate U.S. branches. The branches engaged in transactions with each other and recorded those transactions, as well as other accounting information, on their separately prepared and maintained books and records. Profit and loss statements for each branch were generated by computer. At the end of each month, each branch was required to make a financial report to plaintiff's head office which included manually prepared profit and loss statements. As a result of the short deadline after the close of a period to submit the reporting package (referred to as a "quick close), the reports were sent before any detailed analysis could be performed and were not fully corrected and reconciled. A department

at PLC's head office was dedicated to making the necessary corrections and the results were used in preparing National Westminster Bank PLC's annual reports. (Tr. Tatz 1/23/2002 at 20: Tr. Samaroo at 41-42, 80; Bandoian Report at 23-24.). See Response to Request for Admission 2.26.

Under Article 7(1) of the U.S. – U.K. Treaty, plaintiff National Westminster Bank PLC is subject to tax in the United States on the profits attributable to its six U.S. branches. Article 7(2) provides that the profits attributable to a "permanent establishment" (*i.e.*, a branch) are those expected if it were an independent, separate and distinct enterprise. Each of the six branches kept separate books and records and engaged in transactions with each other, and consolidated or combined profit and loss statements of the six U.S. branches were never prepared. Each branch is a permanent establishment for purposes of the Treaty, and, consistent with plaintiff's practice of keeping separate books for each branch, the profits expected on an independent basis must be determined branch by branch. Thus, capital allotted to the branch in accordance with the Court's November 14, 2003 Opinion must be determined branch by branch. Likewise, the separate books of each branch, and the transactions between the U.S. branches, require that related party interest income and expense must be tested for arm's length dealing at each branch. While interest income and expense reported on the profit and loss statements of each of the six U.S. branches are relevant, aggregations of those amounts into combined totals is not the basis for applying either the November 14, 2003, Opinion, or the arm's length standard to particular related party transactions. Plaintiff's request is therefore irrelevant, immaterial, and not calculated to lead to the discovery of relevant information and defendant objects to the request on those grounds. The requested admission is an improper effort to advance plaintiff's argument that the six U.S. branches may be combined in some manner, notwithstanding its own insistence

that profits should be determined on the basis of the books and records, and its own practice of keeping separate branch records and not combining them. The requested admission also appears to be an improper effort to use the admission process to substitute for the introduction into evidence and consideration of plaintiff's separately kept branch books and records, which, as defendant will demonstrate at trial, were not pristine and reflect non-arm's length dealing.

In addition, plaintiff's request cites as support documents that are not the contemporaneous books and records of the branch. They are a June 5, 2001, submission prepared by plaintiff's counsel for purposes of this litigation. The June 5, 2001, submission is hearsay, and it is not admissible into evidence under any exception to the hearsay rule. Defendant objects to the request, because it relies on inadmissible documents.

Plaintiff's request also is unduly burdensome and oppressive. Plaintiff's request would require defendant to perform accounting work as a prerequisite to responding. As indicated above, each of the branches prepared separate profit and loss statements, revised them, and plaintiff never prepared combined statements. The books and records of the branches speak for themselves regarding interest income and expense, without demanding accounting exercises from defendant.

Subject to these objections, defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny the request.

REQUEST FOR ADMISSION 2.35. The amounts set forth in Request for Admission 2.33 above include the following amounts of interest income accrued by the U.S. branches from other group companies:

| Tax Year | Interest Income from Other Group Companies |
|---|---|
| 1981 | 30,962,197 |
| 1982 | 44,606,560 |
| 1983 | 24,471,318 |
| 1984 | 27,299,430 |
| 1985 | 23,977,168 |
| 1986 | 24,705,540 |
| 1987 | 45,142,008 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.35: See Defendant's Response to Request for Admission 2.34.

REQUEST FOR ADMISSION 2.36. The amounts set forth in Request for Admission 2.33 above include the following amounts of interest income accrued by the U.S. branches from other branches of NatWest outside the United States:

| Tax Year | Interest Income from non-U.S. Branches |
|---|---|
| 1981 | 12,352,992 |
| 1982 | 6,833,220 |
| 1983 | 6,091,129 |
| 1984 | 6,609,212 |
| 1985 | 6,890,500 |
| 1986 | 10,531,919 |
| 1987 | 13,603,297 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.36: See Defendant's Response to Request for Admission 2.34.

REQUEST FOR ADMISSION 2.37. The amounts set forth in Request for Admission 2.33 above include the following aggregate amounts of interest income accrued by the U.S. branches from each other:

| Tax Year | Interest Income from U.S. Branches |
|---|---|
| 1981 | 82,542,486 |
| 1982 | 80,609,935 |
| 1983 | 57,681,447 |
| 1984 | 70,244,991 |
| 1985 | 48,578,877 |
| 1986 | 58,297,666 |
| 1987 | 78,169,477 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.37: See Defendant's Response to Request for Admission 2.34.

REQUEST FOR ADMISSION 2.38. The aggregate amount of interest expense recorded on the profit and loss statements of the U.S. branches for each of the years at issue was as follows:

| Tax Year | Aggregate Interest Expense |
|---|---|
| 1981 | 671,036,957 |
| 1982 | 601,557,461 |
| 1983 | 444,832,199 |
| 1984 | 602,794,686 |
| 1985 | 459,184,135 |
| 1986 | 436,383,691 |
| 1987 | 552,888,878 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.38: See Defendant's Response to Request for Admission 2.33.

REQUEST FOR ADMISSION 2.39. The amounts set forth in Request for Admission 2.38 above include the following amounts of interest expense accrued by the U.S. branches to parties unrelated to NatWest:

| Tax Year | Interest Expense Accrued with respect to Third Parties |
|---|---|
| 1981 | 505,155,940 |
| 1982 | 446,769,398 |
| 1983 | 342,193,553 |

| Tax Year | Interest Expense Accrued with respect to Third Parties |
|---|---|
| 1984 | 485,235,812 |
| 1985 | 343,395,119 |
| 1986 | 271,113,921 |
| 1987 | 301,921,949 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.39: See Defendant's Response to Request for Admission 2.34.

REQUEST FOR ADMISSION 2.40. The amounts set forth in Request for Admission 2.38 above include the following amounts of interest expense accrued by the U.S. branches to other group companies:

| Tax Year | Interest Expense Accrued with respect to Other Group Companies |
|---|---|
| 1981 | 24,926,564 |
| 1982 | 19,754,675 |
| 1983 | 11,934,824 |
| 1984 | 14,662,026 |
| 1985 | 14,624,994 |
| 1986 | 18,237,460 |
| 1987 | 19,386,954 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.40: See Defendant's Response to Request for Admission 2.34.

REQUEST FOR ADMISSION 2.41. The amounts set forth in Request for Admission 2.38 above include the following amounts of interest expense accrued by the U.S. branches to other branches of NatWest outside the United States:

| Tax Year | Interest Expense Accrued with respect to Non-U.S. Branches |
|---|---|
| 1981 | 58,446,924 |
| 1982 | 54,399,462 |
| 1983 | 33,102,291 |
| 1984 | 32,420,694 |
| 1985 | 52,546,899 |
| 1986 | 88,738,618 |
| 1987 | 153,338,621 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.41: See Defendant's Response to Request for Admission 2.34.

REQUEST FOR ADMISSION 2.42. The amounts set forth in Request for Admission 2.38 above include the following amounts of interest expense accrued by the U.S. branches to each other:

| Tax Year | Interest Expense Accrued with respect to U.S. Branches |
|---|---|
| 1981 | 82,507,529 |
| 1982 | 80,633,926 |
| 1983 | 57,601,531 |
| 1984 | 70,476,154 |
| 1985 | 48,617,123 |
| 1986 | 58,293,692 |
| 1987 | 78,241,354 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.42: See Defendant's Response to Request for Admission 2.34.

REQUEST FOR ADMISSION 2.43. NatWest timely filed its U.S. federal income tax return as a calendar year taxpayer for each of the years 1981 through 1987 on I.R.S. Form 1120F. (*See* INT504-00598 to -00633 (1981 Form 1120F); INT504-00634 to -00679 (1982 Form 1120F); INT504-00680 to -00715 (1983 Form 1120F); INT504-000716 to -00741 (1984 Form 1120F); INT504-00742 to -00781 (1985 Form 1120F); INT504-00782 to -00823 (1986 Form 1120F); INT504-00824 to -00861 (1987 Form 1120F); *see also* Pl.'s Supp. Resp. to Def.'s First Set of Interrogs., Supp. Resp. to Interrog. 1.03 and Ex. A (May 9, 1996).)

RESPONSE TO REQUEST FOR ADMISSION 2.43: Admits.

REQUEST FOR ADMISSION 2.44. For each of the years at issue, the items comprising taxable income reported on NatWest's original U.S. federal income tax return were equal to amounts set forth on the profit and loss statements of the New York, Nassau, Grand Cayman, Chicago and San Francisco branches and the IBF, subject to adjustments explained in Schedule M-1 of each of those returns. (*Compare* INT504-00598 to -00633 (1981 Form 1120F) *with* INT504-00001 to -00006, -00030 to -00034, -00009 to -00013, -00037 to -00041, -00023 to -00027, -00044 to -00048, -00016 to -00020, -00049 to -00053; *and compare* INT504-00634 to -00679 (1982 Form 1120F) *with* INT504-00058 to -00062, -00065 to -00069, -00072 to -00076; *and compare* INT504-00680 to -00715 (1983 Form 1120F) *with* INT504-00086 to -00090, -00120A to -00120E, -00107 to -00111, -00093 to -00097; -00100 to -00104; *and compare* INT504-00716 to -00741 (1984 Form 1120F) *with* INT504-00121 to -00125, -00155 to -00159, -00142 to -00146, -00128 to -00132, -00135 to -00139; *and compare* INT504-00742 to -00781 (1985 Form 1120F) *with* INT504-00162 to -000168, -00202 to -00208, -00193 to -00199, -00171 to -00177, -00182 to -00188, -00213 to -00219; *and compare* INT504-00782 to -00823 (1986 Form 1120F) *with* INT504-00222 to -00229, -00232 to -00239, -00272 to -00279, -00262 to -00269, -00252 to -00259, -00242 to -00251; *and compare* INT504-00824 to -00861 (1987 Form 1120F) *with* INT504-00282 to -00289, -00312 to -00319, -00322 to -00330, -00332 to -00340, -00292 to -00299, -00302 to -00309; *see also* 1/1/1987 to 12/31/1987 Profit & Loss Account IBF Branch.)

RESPONSE TO REQUEST FOR ADMISSION 2.44: This request, and those following, would require defendant to trace the preparation of plaintiff's federal income tax return from the

books of the six U.S. branches for the purpose of approving the accuracy of plaintiff's computation of its tax liability under a scenario in which plaintiff's interest income and expense are as it now claims (which varies from the amounts claimed on the returns). Of course, the interest income and interest expense to which plaintiff actually is entitled will be determined by the Court after trial of the capital and arm's length issues. There are far too many possible outcomes to anticipate, and each will result in a different tax liability.

Plaintiff previously agreed with defendant to follow the standard procedure in tax cases for many years under which the Court first would determine the substantive issues in a case, and then the parties would be given a period of time to reach agreement on the resulting tax liability and any refund. The procedure arose because, once the Court determines the substantive issues in a case, the computation of the plaintiff's tax liability, and possible overpayment, is virtually always agreed to without the Court's intervention. This being the case, there is no need to burden the Court at trial with prolonged testimony from both sides by tax computation specialists, regarding the intricacies of the manner in which income, deductions, credits, carryovers, limitations, past adjustments, payments, etc. determine a taxpayer's ultimate tax liability. There likewise is no need to devote trial time to the introduction of exhibits and testimony, such as certificates of assessments and payments, carryover adjustments, previous audit adjustments, etc. to establish the dates and amounts of tax payments and other facts needed to compute any tax overpayment. Moreover, testimony and exhibits to explain computations based on possible alternative resolutions of the issues is inefficient and wasteful of the Court's and the parties' resources. It is far preferable for the Court first to resolve the substantive issues in the case, and then permit the parties to pursue an agreement on tax computations. The Court will need to become involved in computations only in the unlikely event the parties fail to reach

agreement, and, even then, its involvement will be focused on its actual resolution of the issues, rather than scattered among hypothetical, alternative scenarios.

On May 2, 1996, the parties filed their Joint Preliminary Status Report in this case. In response to paragraph 3 of Appendix G, under the heading "Bifurcation of trial," the parties agreed to the standard procedure described above:

> The parties agree that separate proceedings on the question of liability and damages (i.e., the amount of any underpayment or overpayment of tax and interest) should be unnecessary in this case. The parties, however, ask the Court to determine liability first, and, if liability is found, permit them a reasonable period of time within which to attempt to agree on the amount of a money judgment. The parties believe that the calculation of damages will involve objective mathematical computations from the factual record before the Court on which they likely will reach agreement. If the parties are unable to reach such an agreement, the Court may address the procedures to be followed at that time.

When plaintiff reneged on that agreement, by including among its trial exhibits tax computations under various potential scenarios, defendant filed a Motion in Limine. Since the Court decided to engage in additional summary judgment proceedings prior to trial, it did not rule on defendant's motion. Nevertheless, at that time, the Court indicated that tax computations were hypothetical and considerably premature. (Tr. 6/12/2002 at 66.)

Plaintiff's request also would impose an enormous computational burden on defendant and would require the services of a tax computation specialist under the short deadline for responses to requested admissions set forth in the Court's Rules. Defendant's two tax computation specialists are extremely busy preparing computations under pending settlements of other cases. The effectuation of these settlements generally requires timely action and reports to the courts, and it would be unjust and inappropriate for plaintiff's request to catapult it in front of these previously pending matters, particularly since plaintiff's request involves computations under a hypothetical scenario.

Defendant therefore objects to this request on the ground that it is unduly burdensome, oppressive, hypothetical, contrary to the parties' agreement, irrelevant to the substantive issues (capital issue and arm's length issue) to be presented at trial, would impose unnecessarily on the Court's resources, and is an abuse of the discovery process. Subject to those objections, defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny the request.

REQUEST FOR ADMISSION 2.45. Schedule M-1 of the original U.S. federal income tax return filed for each of the years at issue explains the difference between the taxable income and book profit of the U.S. branches. (*See* INT504-00603, 00631 (1981 Form 1120F); INT504-00639, -00676 (1982 Form 1120F); INT504-00685, -00712 (1983 Form 1120F); INT504-00721, -00738 (1984 Form 1120F); INT504-00747, -00773 (1985 Form 1120F); INT504-00788, -00816 (1986 Form 1120F); INT504-00831, -00851 (1987 Form 1120F).)

RESPONSE TO REQUEST FOR ADMISSION 2.45: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.46. The aggregate interest income included in NatWest's original U.S. federal income tax return for each of the years at issue was equal to the aggregate interest income recorded on the profit and loss statements of the U.S. branches for each of the years at issue, as set forth in Request for Admission 2.33 above, with the following adjustments as shown on Schedule M-1 to such returns:

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1981 | 1980 money market adjustment | 15,699 |
| | 1980 T-bill accrued interest | 449,284 |
| | 1981 money market adjustment | (72,622) |
| | 1981 T-bill accrued interest | (1,986,545) |

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1982 | 1981 money market adjustment<br>1981 T-bill accrued interest | 72,622<br>1,986,545 |
| 1983 | None | |
| 1984 | T-bill accrual | 1,885,318 |
| 1985 | Net T-bill accrual | (1,884,246) |
| 1986 | Interest Adjustment<br>ESOP interest exclusion<br>Foreign Exchange Income<br>Net T-bill accrual | (486,697)<br>(525,498)<br>103,289<br>(246) |
| 1987 | Income Adjustment<br>Interest Accrual Adjustment<br>Interest Adjustment<br>Foreign Exchange Income<br>Net T-bill accrual | (1,185,000)<br>(846,000)<br>486,697<br>114,736<br>98 |

(*See* INT504-00631; INT504-00676; INT504-00712; INT504-00738; INT504-00773; INT504-00816; INT504-00851.)

RESPONSE TO REQUEST FOR ADMISSION 2.46: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.47. The aggregate interest expense included in NatWest's original U.S. federal income tax return for each of the years at issue was equal to the aggregate interest expense recorded on the profit and loss statements of the U.S. branches for each of the years at issue as set forth in Request for Admission 2.38 above, with the following adjustments as shown on Schedule M-1 to such returns:

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1981 | None | |
| 1982 | None | |
| 1983 | None | |

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1984 | 1976 – 1980 Add'l Int. Ass'd (California) | 360,149 |
| 1985 | None | |
| 1986 | None | |
| 1987 | Interest Accrual Adjustments | 720,000 |

(*See* INT504-00631; INT504-00676; INT504-00712; INT504-00738; INT504-00773; INT504-00816; INT504-00851.)

RESPONSE TO REQUEST FOR ADMISSION 2.47: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.48. The U.S. federal taxable income of NatWest as originally reported for each of the years at issue (after adjustments with respect to certain employee benefits per IRS Form 870) was as follows:

| Tax Year | Amount |
|---|---|
| 1981 | 5,127,742 |
| 1982 | 12,866,570 |
| 1983 | 17,074,564 |
| 1984 | 8,009,640 |
| 1985 | 40,541,143 |
| 1986 | 42,962,917 |
| 1987 | 14,330,911 |
| **Total** | 140,913,487 |

(*See* RARs.)

RESPONSE TO REQUEST FOR ADMISSION 2.48: Admits

REQUEST FOR ADMISSION 2.49. The I.R.S. examined NatWest's original Form 1120F U.S. federal income tax returns for each of the years at issue. (*See* RARs.)

RESPONSE TO REQUEST FOR ADMISSION 2.49: Admits

REQUEST FOR ADMISSION 2.50. In its May 3, 1995 RARs the I.R.S. proposed the following adjustments to the taxable income of NatWest as reported on its original U.S. federal income tax returns:

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1981 | Interest Expense<br>Interest Income | 152,605,551<br>(125,857,675) |
| 1982 | Interest Expense<br>Interest Income | 147,337,977<br>(132,049,714) |
| 1983 | Interest Expense<br>Interest Income<br>Sale of Property (Chrysler Stock Sale) | 101,652,347<br>(88,243,894)<br>7,853,110 |
| 1984 | Interest Expense<br>Interest Income | 126,092,694<br>(104,153,633) |
| 1985 | Interest Expense<br>Interest Income | 93,539,801<br>(79,404,169) |
| 1986 | Interest Expense<br>Interest Income<br>Net Loans<br>Employee Benefits<br>Home Office Allocation | 108,064,089<br>(87,081,845)<br>84,426<br>405,249<br>21,903 |
| 1987 | Interest Expense<br>Interest Income<br>Net Loans<br>Employee Benefits<br>Home Office Allocation<br>Other Deductions<br>Net Operating Loss Deduction<br>Bad Debts | 174,292,853<br>(131,596,705)<br>174,309<br>332,710<br>3,534,289<br>(555,350)<br>(12,918,821)<br>(785,311) |

(*See* RARs; Pl.'s response to Def.'s Request for Admission 1.23.)

RESPONSE TO REQUEST FOR ADMISSION 2.50: To the extent plaintiff's request duplicates defendant's Request for Admission 1.23, defendant objects to it as unnecessary and an abuse of the discovery process. To the extent it addresses other matters bearing on tax computations, but which are unrelated to the capital or arm's length interest issues, see defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.51. The adjustments described in Request for Admission 2.50 include the following amounts to which NatWest has agreed:

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1983 | Sale of Property (Chrysler Stock Sale) | 7,853,110 |
| 1986 | Employee Benefits<br>Home Office Allocation | 405,849<br>21,903 |
| 1987 | Employee Benefits<br>Home Office Allocation<br>Other Deductions<br>Bad Debts | 332,710<br>3,534,289<br>(555,350)<br>(785,311) |

(*See* RARs.)

RESPONSE TO REQUEST FOR ADMISSION 2.51: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.52. The adjustments described in Request for Admission 2.50 include the following amounts that defendant has withdrawn:

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1986 | Net Loans | 84,426 |
| 1987 | Net Loans | 174,309 |

(*See* RARs.)

RESPONSE TO REQUEST FOR ADMISSION 2.52: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.53. The adjustments described in Request for Admission 2.50 include the following amount which could change depending upon the final resolution of tax years subsequent to the years at issue:

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1987 | Net Operating Loss Deduction | (12,918,821) |

(*See* RARs.)

RESPONSE TO REQUEST FOR ADMISSION 2.53: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.54. The adjustments described in Request for Admission 2.50 include the following amounts asserted by the I.R.S. under Section 882, Treasury Regulations section 1.882-5 and Section 864(c)(4)(D):

| Tax Year | Proposed adjustments to interest income: | Proposed adjustments to interest expense: |
|---|---|---|
| 1981 | (125,857,675) | 152,605,551 |
| 1982 | (132,049,714) | 147,337,977 |
| 1983 | (88,243,894) | 101,652,347 |
| 1984 | (104,153,633) | 126,092,694 |
| 1985 | (79,404,169) | 93,539,801 |
| 1986 | (87,081,845) | 108,064,089 |
| 1987 | (131,596,705) | 174,292,853 |

(See RARs; see also Def.'s Request for Admissions 1.23 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.54: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.55. The I.R.S., in its RARs, offered no basis other than Sections 882, Treasury Regulations section 1.882-5 and Section 864(c)(4)(D) for adjustments to plaintiff's interest expense and interest income. (*See* RARs.)

RESPONSE TO REQUEST FOR ADMISSION 2.55: Defendant objects to this request on the ground that it presents argument and characterization of documents. Subject to that objection, defendant denies the request. The IRS's adjustments provided for the attribution of capital to the branches on an arm's length basis, as if it were an independent, separate enterprise, and to reflect arm's length interest rates.

REQUEST FOR ADMISSION 2.56. The RAR for the taxable year ended December 31, 1987 proposed an Environmental Tax increase of $38,974, bringing the total tax to $53,771, but did not include a correlative regular tax deduction for Environmental Tax. Both of these figures could change depending upon the final resolution of the years at issue. (*See* RARs.)

RESPONSE TO REQUEST FOR ADMISSION 2.56: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.57. The adjusted U.S. federal taxable income of NatWest as determined by the I.R.S. for each of the years at issue was as follows:

| Tax Year | Amount |
|---|---|
| 1981 | 31,875,618 |
| 1982 | 28,154,833 |
| 1983 | 38,336,127 |
| 1984 | 29,948,701 |

| Tax Year | Amount |
|---|---|
| 1985 | 54,676,775 |
| 1986 | 64,457,339 |
| 1987 | 46,808,885 |
| **Total** | 294,258,278 |

(*See* RARs.)

RESPONSE TO REQUEST FOR ADMISSION 2.57: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.58. The U.S. federal income tax liability of NatWest as determined by the I.R.S. for each of the years at issue, excluding interest thereon, was as follows:

| Tax Year | Amount |
|---|---|
| 1981 | 14,154,278 |
| 1982 | 12,546,863 |
| 1983 | 16,105,789 |
| 1984 | 13,084,832 |
| 1985 | 24,937,042 |
| 1986 | 29,528,505 |
| 1987 | 18,620,521 |
| **Total** | 128,977,830 |

(*See* RARs.)

RESPONSE TO REQUEST FOR ADMISSION 2.58: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.59. The U.S. federal income tax liability shown on NatWest's original Form 1120F U.S. federal income tax return or as adjusted prior to issuance of the RARs for each of the years at issue based on the amounts of U.S. federal taxable income shown on Request for Admission 2.48 was as follows:

| Tax Year | Amount |
|---|---|
| 1981 | 1,850,255 |
| 1982 | 5,514,262 |
| 1983 | 7,759,280 |
| 1984 | 2,992,864 |
| 1985 | 18,434,651 |
| 1986 | 19,641,070 |
| 1987 | 304,302 |
| **Total** | 56,496,684 |

(*See* RARs.)

RESPONSE TO REQUEST FOR ADMISSION 2.59: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.60. The deficiency in U.S. federal income tax due by NatWest for each of the years at issue as determined by the I.R.S., excluding interest thereon, was as follows:

| Tax Year | Amount |
|---|---|
| 1981 | 12,304,023 |
| 1982 | 7,032,601 |
| 1983 | 8,346,509 |

| Tax Year | Amount |
|---|---|
| 1984 | 10,091,968 |
| 1985 | 6,502,391 |
| 1986 | 9,887,435 |
| 1987 | 18,316,219 |
| **Total** | 72,481,146 |

(*See* RARs.)

RESPONSE TO REQUEST FOR ADMISSION 2.60: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.61. The U.S. federal income tax payments made by NatWest with respect to all of the U.S. branches to the I.R.S. for each of the years at issue were as follows:

U.S. Federal Income Tax Payments for the Years at Issue

| Tax Year | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|---|
| Prior Year Overpayment[1] | 600,170 | 1,500,000 | 56,411 | 1,600,000 | 257,136 | 0 | 0 |
| Current Year Estimated Payments[2] | 4,250,000 | 4,000,000 | 10,035,000 | 1,650,000 | 16,340,000 | 20,011,000 | 6,953,000 |
| Payment Per Form 7004[3] | 0 | 0 | 0 | 0 | 1,002,864 | 567,000 | 406,000 |
| Amount Paid Original Return[4] | 0 | 0 | 0 | 0 | 834,651 | 0 | 0 |
| Amount Claimed as Refund on Original Return[5] | (1,594,320) | 0 | (732,131) | 0 | 0 | (936,930) | (1,767,422) |
| Amount Credited to Estimated Tax on Original Return[6] | (1,500,000) | (56,411) | (1,600,000) | (257,136) | 0 | 0 | 0 |
| Refund Per Form 1139[7] | 0 | 0 | 0 | 0 | 0 | 0 | (5,287,276) |
| Tax Paid Per Form 870 dated 08/23/89[8] | 94,405 | 70,673 | 0 | 0 | 0 | 0 | 0 |
| Tax Paid in Response to RARs[9] | 12,304,023 | 7,032,601 | 8,346,509 | 10,091,968 | 6,502,391 | 9,887,435 | 18,316,219 |
| Aggregate Tax Payments | 14,154,278 | 12,546,86 | 16,105,789 | 13,084,832 | 24,937,042 | 29,528,505 | 18,620,521 |

1 - *See* INT504-00598 (line 6(a), 1981 Form 1120F); INT504-00634 (line 6(a), 1982 Form 1120F); INT504-00680 (line 6(a), 1983 Form 1120F); INT504-00716 (line 6(a), 1984 Form 1120F); INT504-00742 (line 6(a), 1985 Form 1120F); INT504-00782 (line 6(a), 1986 Form 1120F); INT504-00824 (line 6(a), 1987 Form 1120F).

2, 3, 4, - *See* Def.'s Ans. to 1st Amended Compl. at ¶3; 1st Amended Compl., Ex. 1.

5 - *See* INT504-00598 (line 10, 1981 Form 1120F); INT504-00634 (line 10, 1982 Form 1120F); INT504-00680 (line 10, 1983 Form 1120F); INT504-00716 (line 10, 1984 Form 1120F); INT504-00742 (line 10, 1985 Form 1120F); INT504-00782 (line 10, 1986 Form 1120F); INT504-00824 (line 11, 1987 Form 1120F).

6 - *See* INT504-00598 (line 10, 1981 Form 1120F); INT504-00634 (line 10, 1982 Form 1120F); INT504-00680 (line 10, 1983 Form 1120F); INT504-00716 (line 10, 1984 Form 1120F); INT504-00742 (line 10, 1985 Form 1120F); INT504-00782 (line 10, 1986 Form 1120F); INT504-00824 (line 11, 1987 Form 1120F).

7 - *See* RAR at 28.

8 - *See* Pl.'s Resp. to Def.'s Interrog. 1.04, Ex. B at B0003 (1981), B0004 (1982), and B0005 (copies of checks for $223,518 and $139,781 payable to IRS).

9 - These tax amounts and the deficiency interest thereon were paid by: (1) application of a $50,000,000 deposit in the nature of a cash bond; (2) application of a $40,000,000 deposit in the nature of a cash bond; (3) a payment of $34,446,842; and (4) a payment of $55,802,939. *See* Pl.'s Resp. to Def.'s Interrog. 1.12, Ex. F at F00010 (1981 through 1985) *and* F00020 (1986 and 1987); *see also* F00031 (IRS Receipt for Payment of Taxes in the amount of $50,000,000); F00024-00025 (IRS stamp acknowledging receipt of $40,000,000 check); F00022 (copy of check for $34,446,842.00 payable to IRS); F00023 (copy of check for $55,802,939.00 payable to IRS).

RESPONSE TO REQUEST FOR ADMISSION 2.61: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.62. The interest paid by NatWest to the Internal Revenue Service Center in Philadelphia, PA on May 31, 1995 and June 8, 1995, on the tax deficiencies asserted in the RARs, was as follows:

| Tax Year | Interest Paid |
|---|---|
| 1981 | 28,838,978 |
| 1982 | 13,068,220 |
| 1983 | 14,107,184 |
| 1984 | 15,045,416 |
| 1985 | 7,693,000 |
| 1986 | 11,467,996 |
| 1987 | 17,547,841 |
| **Total** | 107,768,635 |

(*See* Pl.'s Resp. to Def.'s Interrog. 1.12, Ex. F at F00010-00011 (1981 through 1985) *and* F00020 (1986 and 1987); *see also* F00031 (IRS Receipt for Payment of Taxes in the amount of $50,000,000); F00024-00025 (IRS stamp acknowledging receipt of $40,000,000 check); F00022 (copy of check for $34,446,842.00 payable to IRS); F00023 (copy of check for $55,802,939.00 payable to IRS) (sum of check amounts, $180,249,781, less $107,768,635 aggregate interest, *above*, equals $72,481,146 additional taxes paid per RARs); Request for Admission 2.61 above.)

RESPONSE TO REQUEST FOR ADMISSION 2.62: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.63. The adjustments proposed under Section 882 and Treasury Regulations section 1.882-5 and Section 864(c)(4)(D) described in Request for

Admission 2.54 should be withdrawn in accordance with the Court's July 1999 Opinion and Order.

RESPONSE TO REQUEST FOR ADMISSION 2.63: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.64. The interest income reported on NatWest's original Form 1120F U.S. federal income tax returns for the years 1981 through 1987 included the amounts of interest income accrued by the U.S. branches from each other as described in Request for Admission 2.37 above.

RESPONSE TO REQUEST FOR ADMISSION 2.64: See defendant's Responses to Requests for Admission 2.34, 2.37, and 2.44.

REQUEST FOR ADMISSION 2.65. The interest expense reported on NatWest's original Form 1120F U.S. federal income tax returns for the years 1981 through 1987 included the amounts of interest expense accrued by the U.S. branches to each other as described in Request for Admission 2.42 above.

RESPONSE TO REQUEST FOR ADMISSION 2.65: See defendant's Responses to Requests for Admission 2.34, 2.42, and 2.44.

REQUEST FOR ADMISSION 2.66. If all of the intra-U.S. interest expense described in Request for Admission 2.42 and intra-U.S. interest income described in Request for Admission 2.37 were eliminated from the taxable income of the U.S. branches, the following net additions to, or reductions of, taxable income would result for the years at issue:

| Tax Year | Addition to or (Reduction of) Taxable Income |
| --- | --- |

| Tax Year | Addition to or (Reduction of) Taxable Income |
|---|---|
| 1981 | (34,957) |
| 1982 | 23,991 |
| 1983 | (79,916) |
| 1984 | 231,163 |
| 1985 | 38,246 |
| 1986 | (3,974) |
| 1987 | 71,877 |

(*See* Amended Refund Claim, Schedules 1-7.)

RESPONSE TO REQUEST FOR ADMISSION 2.66: See defendant's Responses to Request for Admission 2.33 and 2.44.

REQUEST FOR ADMISSION 2.67. In its Amended Refund Claim, NatWest proposed to increase its taxable income by the amounts shown for taxable years 1982, 1984, 1985 and 1987 in Request for Admission 2.66, but did not propose to reduce its taxable income by the amounts shown for years 1981, 1983, and 1986 in Request for Admission 2.66. (*See* Amended Refund Claim and supporting schedules thereto.).

RESPONSE TO REQUEST FOR ADMISSION 2.67: See defendant's Response to Request for Admission 2.44. In addition, plaintiff's "Amended Refund Claim" is simply a statement by plaintiff's counsel of plaintiff's position, provided to defendant in response to the Court's Order. It is hearsay and is not admissible into evidence under any hearsay exception. The request therefore is irrelevant for this additional reason and is not calculated to lead the discovery of admissible evidence. See defendant's Response to Request for Admission 2.33

REQUEST FOR ADMISSION 2.68. The amounts of interest expense recorded on the profit and loss statements of the U.S. branches as payable to the Head Office and therefore included in the amounts described in Requests for Admission 2.38 above and reported on NatWest's original Form 1120F federal income tax returns for the tax years at issue included the following net amounts described in U.S. branch books and records as capital loan charges:

| Tax Year | Capital Loan Charge |
|---|---|
| 1981 | 465,868 |
| 1982 | 209,433 |
| 1983 | 202,745 |
| 1984 | 309,459 |
| 1985 | 0 |
| 1986 | 2,336,260 |
| 1987 | 1,936,537 |

(*See* Pl.'s Report on the Capital Issue dated October 29, 2004, Ex. C, Report of Kevin D. Bandoian at Ex. 1, Ex. 3 [hereinafter Bandoian Rep.].)

RESPONSE TO REQUEST FOR ADMISSION 2.68: See defendant's responses to Requests for Admission 2.33, 2.38, and 2.44.

REQUEST FOR ADMISSION 2.69. During the years at issue, any capital loan charges paid by the U.S. branches were calculated on a balance (referred to herein as a "net capital balance") consisting of the sum of the balances of Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets less the balance of Premises and Equipment, all as of the prior year-end. (*See* Bandoian Rep. at 4.)

RESPONSE TO REQUEST FOR ADMISSION 2.69: Discovery has not been completed, and defendant's experts are reviewing Mr. Bandoian's report. Defendant's experts' report has not been prepared and is not yet due under the Court's October 5, 2004, subject to further modification in accordance with defendant's motion for enlargement of the discovery period. Defendant's position on this request will be expressed in and consistent with its experts' report. The request is oppressive and an abuse of the discovery process. See also defendant's Responses to Plaintiff's Interrogatories 4.01 and 4.06. Subject to its objections, defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny the request.

REQUEST FOR ADMISSION 2.70. During all of the years at issue, except with respect to the first quarter of 1981, the net capital balance used to calculate capital loan charges for a given year was adjusted to reflect any reduction in the components of the net capital balance (e.g., by repatriation) within the first quarter of that year. (*See* Bandoian Rep. at 4.)

RESPONSE TO REQUEST FOR ADMISSION 2.70: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.71. During the years at issue, the capital loan charges paid by the U.S. branches were calculated using arm's-length rates of interest. (*See* Bandoian Rep. at 4.)

RESPONSE TO REQUEST FOR ADMISSION 2.71: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.72. During the years at issue, the capital loan charges paid or received in any given quarter were calculated using the same rate of interest for each

branch, except for one quarter in 1986, when the actual rates used by the U.S. branches were all within 0.5875% of each other. (*See* Bandoian Rep. at 4.)

RESPONSE TO REQUEST FOR ADMISSION 2.72: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.73. During the years at issue, the capital loan charges and net capital balances on which they were accrued were calculated on a combined basis for the New York branch and IBF. (*See* Bandoian Rep. at 4.)

RESPONSE TO REQUEST FOR ADMISSION 2.73: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.74. For the years 1981 through 1985, the U.S. branches paid and deducted a capital loan charge only with respect to the New York branch and IBF and only on positive net capital balances. (*See* Bandoian Rep. at 4.)

RESPONSE TO REQUEST FOR ADMISSION 2.74: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.75. For the taxable year 1986, all of the U.S. branches paid and deducted capital loan charges, but only on positive net capital balances. (*See* Bandoian Rep. at 4.)

RESPONSE TO REQUEST FOR ADMISSION 2.75: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.76. For the taxable year 1987, all of the U.S. branches paid and deducted capital loan charges on positive net capital balances and received payments

(and reduced interest expense accordingly) on negative net capital balances. (*See* Bandoian Rep. at 4.)

RESPONSE TO REQUEST FOR ADMISSION 2.76: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.77. During the years at issue, the New York branch collected any capital loan charges for the U.S. branches and paid them to the head office. (*See* Bandoian Rep. at 4.)

RESPONSE TO REQUEST FOR ADMISSION 2.77: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.78. For the year ended December 31, 1981, the total capital loan charges paid by the U.S. branches to PLC and deducted on the U.S. federal tax return was $465,868. (*See* Bandoian Rep. at Ex. 1: 1981-1 to 1981-6, Ex. 2, Ex. 3.)

RESPONSE TO REQUEST FOR ADMISSION 2.78: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.79. Apart from the amount described in Request for Admission 2.78, during the year ended December 31, 1981, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets.

RESPONSE TO REQUEST FOR ADMISSION 2.79: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.80. For the year ended December 31, 1982, the total capital loan charges paid by the U.S. branches to PLC and deducted on the U.S. federal tax return was $209,433. (*See* Bandoian Rep. at Ex. 1: 1982-1 to 1982-5, Ex. 2, Ex. 3.)

RESPONSE TO REQUEST FOR ADMISSION 2.80: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.81. Apart from the amount described in Request for Admission 2.80, during the year ended December 31, 1982, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets.

RESPONSE TO REQUEST FOR ADMISSION 2.81: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.82. For the year ended December 31, 1983, the total capital loan charges paid by U.S. branches to PLC and deducted on the U.S. federal tax return was $202,745. (*See* Bandoian Rep. at Ex. 1: 1983-1 to 1983-5, Ex. 2, Ex. 3.)

RESPONSE TO REQUEST FOR ADMISSION 2.82: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.83. Apart from the amount described in Request for Admission 2.82, during the year ended December 31, 1983, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or

Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets.

RESPONSE TO REQUEST FOR ADMISSION 2.83: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.84. For the year ended December 31, 1984, the total capital loan charges paid by U.S. branches to PLC and deducted on the U.S. federal tax return was $390,459. (*See* Bandoian Rep. at Ex. 1: 1984-1 to 1984-5, Ex. 2, Ex. 3.)

RESPONSE TO REQUEST FOR ADMISSION 2.84: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.85. Apart from the amount described in Request for Admission 2.84, during the year ended December 31, 1984, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets.

RESPONSE TO REQUEST FOR ADMISSION 2.85: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.86. During the year ended December 31, 1985, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital

Loan, and Balance due to HO re Fixed Assets. (*See* Bandoian Rep. at Ex. 1: 1985-1 to 1985-6, Ex. 2, Ex. 3.)

RESPONSE TO REQUEST FOR ADMISSION 2.86: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.87. For the year ended December 31, 1986, plaintiff conceded capital loan charges in the aggregate amount of $2,603,583. (*See* Bandoian Rep. at Ex. 1: 1986-1, Ex. 3.)

RESPONSE TO REQUEST FOR ADMISSION 2.87: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.88. For the year ended December 31, 1986, plaintiff made an over-concession with regard to capital loan charges for the fourth quarter for the Nassau branch in the amount of $266,510. (*See* Bandoian Rep. at Ex. 1: 1986-4, Ex. 2, Ex. 3.)

RESPONSE TO REQUEST FOR ADMISSION 2.88: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.89. For the year ended December 31, 1986, plaintiff made an over-concession with regard to capital loan charges for the fourth quarter for the San Francisco agency in the amount of $813. (*See* Bandoian Rep. at Ex. 1: 1986-6, Ex. 2, Ex. 3.)

RESPONSE TO REQUEST FOR ADMISSION 2.89: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.90. For the year ended December 31, 1986, the total capital loan charges paid by the U.S. branches to PLC and deducted on the U.S. federal tax return was $2,336,260. (*See* Bandoian Rep. at Ex. 1: 1986-1 to 1986-6, Ex. 2, Ex. 3.)

RESPONSE TO REQUEST FOR ADMISSION 2.90: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.91. Apart from the amount described in Request for Admission 2.90, during the year ended December 31, 1986, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets.

RESPONSE TO REQUEST FOR ADMISSION 2.91: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.92. For the year ended December 31, 1987, the total capital loan charges paid by U.S. branches to PLC and deducted on the U.S. federal tax return was $1,936,537. (*See* Bandoian Rep. at Ex. 1: 1987-1 to 1987-6, Ex. 2, Ex. 3.)

RESPONSE TO REQUEST FOR ADMISSION 2.92: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.93. Apart from the amount described in Request for Admission 2.92, during the year ended December 31, 1987, neither the profit and loss statements nor the U.S. federal income tax return of the U.S. branches reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses; Profits and Loss; Balance due to HO re Capital Loan; or Balance due to HO re Fixed Assets.

RESPONSE TO REQUEST FOR ADMISSION 2.93: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.94. Apart from the amounts identified in Requests for Admission 2.78, 2.80, 2.82, 2.84, 2.90, and 2.92, the U.S. branches did not pay or deduct any interest during the years at issue on amounts designated as capital on their books and records.

RESPONSE TO REQUEST FOR ADMISSION 2.94: See defendant's Response to Request for Admission 2.69. In addition, since the six U.S. branches did not designate any amounts as capital on their books and records, it is nonsensical to ask whether interest was deducted on such amounts.

REQUEST FOR ADMISSION 2.95. Apart from the amounts identified in Requests for Admission 2.78, 2.80, 2.82, 2.84, 2.90, and 2.92, the U.S. branches did not pay or deduct any interest during the years at issue on amounts allotted to the U.S. branches for capital purposes.

RESPONSE TO REQUEST FOR ADMISSION 2.95: Denied.

REQUEST FOR ADMISSION 2.96. Plaintiff has conceded all capital loan charges reflected in its books and records. (*See* Bandoian Rep. at 9.)

RESPONSE TO REQUEST FOR ADMISSION 2.96: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.97. The aggregate amount conceded by plaintiff as capital loan charges exceeded the actual capital loan charges deducted by plaintiff on its U.S. federal income tax returns during the years 1981 through 1987 in the amount of $267,323. (*See* Bandoian Rep. at 9).

RESPONSE TO REQUEST FOR ADMISSION 2.97: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.98. Amounts recorded on the balance sheets of the U.S. branches as "Retained Profits" (which were assigned the account code "LZC") constitute amounts that were designated as capital on the balance sheets of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any interest expense accrued thereon was not deductible under the Treaty during the years at issue. (*See* Pl.'s response to Def.'s Request for Admission 1.46.)

RESPONSE TO REQUEST FOR ADMISSION 2.98: Denies that any line items were designated as capital on the balance sheets of the U.S. branches. Discovery has not been completed, and defendant's experts have not yet prepared their report. See defendant's Responses to Request for Admission 2.69 and Interrogatory 4.01.

REQUEST FOR ADMISSION 2.99. Amounts recorded on the balance sheets of the U.S. branches as "Profit and Loss" (which were assigned the account code "LPC") constitute amounts that were designated as capital on the balance sheets of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any interest expense accrued thereon was not deductible under the Treaty during the years at issue. (*See* Pl.'s response to Def.'s Request for Admission 1.46.)

RESPONSE TO REQUEST FOR ADMISSION 2.99: Denies that any line items were designated as capital on the balance sheets of the U.S. branches. Discovery has not been completed, and defendant's experts have not yet prepared their report. See defendant's Responses to Request for Admission 2.69 and Interrogatory 4.01.

REQUEST FOR ADMISSION 2.100. Amounts recorded on the balance sheets of the U.S. branches as "Balance due to HO re Fixed Assets" (which were assigned the account code "LFB") constitute amounts that were designated as capital on the books of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any interest expense accrued thereon was not deductible under the Treaty during the years at issue. (*See* Pl.'s response to Def.'s Request for Admission 1.46.)

RESPONSE TO REQUEST FOR ADMISSION 2.100: Denies that any line items were designated as capital on the balance sheets of the U.S. branches. Discovery has not been completed, and defendant's experts have not yet prepared their report. See defendant's Responses to Request for Admission 2.69 and Interrogatory 4.01.

REQUEST FOR ADMISSION 2.101. Amounts recorded on the balance sheets of the U.S. branches as "Balance due to HO re Capital Loans" (which were assigned the account code "LEB") constitute amounts that were designated as capital on the books of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any interest expense accrued thereon was not deductible under the Treaty during the years at issue. (*See* Pl.'s response to Def.'s Request for Admission 1.46.)

RESPONSE TO REQUEST FOR ADMISSION 2.101: Denies that any line items were designated as capital on the balance sheets of the U.S. branches. s, and defendant's experts have not yet prepared their report. See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.102. Amounts recorded on the balance sheets of the U.S. branches as "Provision for B&DD ("Bad and Doubtful Debts") – Specific" (which were assigned the account code "LQC") constitute amounts that were designated as capital on the

books of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any interest expense accrued thereon was not deductible under the Treaty during the years at issue. (*See* Pl.'s response to Def.'s Request for Admission 1.46.)

RESPONSE TO REQUEST FOR ADMISSION 2.102: Denies that any line items were designated as capital on the balance sheets of the U.S. branches. Discovery has not been completed, and defendant's experts have not yet prepared their report. See defendant's Responses to Request for Admission 2.69 and Interrogatory 4.01.

REQUEST FOR ADMISSION 2.103. Amounts recorded on the balance sheets of the U.S. branches as "Provision for B&DD – Non-specific" (which were assigned the account code "LRC") constitute amounts that were designated as capital on the books of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any interest expense accrued thereon was not deductible under the Treaty during the years at issue. (*See* Pl.'s response to Def.'s Request for Admission 1.46.)

RESPONSE TO REQUEST FOR ADMISSION 2.103: Denies that any line items were designated as capital on the balance sheets of the U.S. branches. Discovery has not been completed, and defendant's experts have not yet prepared their report. See defendant's Responses to Request for Admission 2.69 and Interrogatory 4.01.

REQUEST FOR ADMISSION 2.104. Apart from amounts described in Requests for Admission 2.98 through 2.103, there were no amounts recorded on the balance sheets of the U.S. branches during the years at issue that were designated as capital of a U.S. branch or branches.

RESPONSE TO REQUEST FOR ADMISSION 2.104: See defendant's Responses to Requests for Admission 2.98-2.103. Otherwise admits, since no line items were designated as capital on the balance sheets of any of the six U.S. branches.

REQUEST FOR ADMISSION 2.105. Apart from amounts described in Requests for Admission 2.98 through 2.103, there were no amounts recorded on the balance sheets of the U.S. branches during the years at issue that were in fact allotted to a U.S. branch or branches for capital purposes.

RESPONSE TO REQUEST FOR ADMISSION 2.105: See defendant's Responses to Requests for Admission 2.98-2.103. Defendant's experts have not yet prepared their report. See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.106. Apart from the capital loan charges described in Requests for Admission 2.78, 2.80, 2.82, 2.84, 2.90, and 2.92 above, all interest expense deducted by the U.S. branches during the years at issue was on advances to the U.S. branches that were used in the ordinary course of the U.S. branches' banking business.

RESPONSE TO REQUEST FOR ADMISSION 2.106: Discovery has not been completed, and defendant's experts have not completed their analysis or prepared their report. See Defendant's Responses to Request for Admission 2.69 and Interrogatory 4.01.

REQUEST FOR ADMISSION 2.107. Accounts recorded in the U.S. branch balance sheets as "Freehold Premises" (ARD), "Leasehold Premises" (ASD), "Furniture and fittings" (ATD), and "Computer and other equipment" (AUD), represent the U.S. branches' "Fixed Assets."

RESPONSE TO REQUEST FOR ADMISSION 2.107: Admits.

REQUEST FOR ADMISSION 2.108. The aggregate of the amounts recorded as Fixed Assets on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Fixed Assets |
|---|---|
| 1980 | 9,167,969 |
| 1981 | 11,969,698 |
| 1982 | 15,862,602 |
| 1983 | 16,631,023 |
| 1984 | 25,976,913 |
| 1985 | 23,322,331 |
| 1986 | 26,977,617 |
| 1987 | 29,477,629 |

(*See* 1980: NY-BS-8012-04, CH-BS-8012-04, SF-BS-8012-10; 1981: NY-BS-8112-04, CH-BS-8112-04, SF-BS-8112-04; 1982: NY-BS-8212-04, CH-BS-8212-04, SF-BS-8212-04; 1983: NY-BS-8312-04, CH-BS-8312-04, SF-BS-8312-05; 1984: NY-BS-8412-04, CH-BS-8412-02, SF-BS-8412-04; 1985: NY-BS-8512-04, CH-BS-8512-04, SF-BS-8512-04; 1986: NY-BS-8612-04, CH-BS-8612-04, SF-BS-8612-04; 1987: NY-BS-8712-04, CH-BS-8712-07, SF-BS-8712-06.)

RESPONSE TO REQUEST FOR ADMISSION 2.108: Plaintiff conducted banking operations in the United States through six separate U.S. branches. The branches engaged in transactions with each other and recorded those transactions, as well as other accounting information, on their separately prepared and maintained books and records. Profit and loss statements for each branch were generated by computer. At the end of each month, each branch

was required to make a financial report to plaintiff's head office which included manually prepared profit and loss statements. As a result of the short deadline after the close of a period to submit the reporting package (referred to as a "quick close), the reports were sent before any detailed analysis could be performed and were not fully corrected and reconciled. A department at PLC's head office was dedicated to making the necessary corrections and the results were used in preparing National Westminster Bank PLC's annual reports. (Tr. Tatz 1/23/2002 at 20: Tr. Samaroo at 41-42, 80; Bandoian Report at 23-24.). See Response to Request for Admission 2.26.

Under Article 7(1) of the U.S. – U.K. Treaty, plaintiff National Westminster Bank PLC is subject to tax in the United States on the profits attributable to its six U.S. branches. Article 7(2) provides that the profits attributable to a "permanent establishment" (*i.e.*, a branch) are those expected if it were an independent, separate and distinct enterprise. Each of the six branches kept separate books and records and engaged in transactions with each other, and consolidated or combined profit and loss statements of the six U.S. branches were never prepared. Each branch is a permanent establishment for purposes of the Treaty, and, consistent with plaintiff's practice of keeping separate books for each branch, the profits expected on an independent basis must be determined branch by branch. Thus, capital allotted to the branch in accordance with the Court's November 14, 2003 Opinion must be determined branch by branch. Likewise, the separate books of each branch, and the transactions between the U.S. branches, require that related party interest income and expense must be tested for arm's length dealing at each branch. While interest income and expense reported on the profit and loss statements of each of the six U.S. branches are relevant, aggregations of those amounts into combined totals is not the basis for applying either the November 14, 2003, Opinion, or the arm's length standard to particular

related party transactions. Plaintiff's request is therefore irrelevant, immaterial, and not calculated to lead to the discovery of relevant information and defendant objects to the request on those grounds. The requested admission is an improper effort to advance plaintiff's argument that the six U.S. branches may be combined in some manner, notwithstanding its own insistence that profits should be determined on the basis of the books and records, and its own practice of keeping separate branch records and not combining them. The requested admission also appears to be an improper effort to use the admission process to substitute for the introduction into evidence and consideration of plaintiff's separately kept branch books and records, which, as defendant will demonstrate at trial, were not pristine and reflect non-arm's length dealing.

Plaintiff's request also is unduly burdensome and oppressive. Plaintiff's request would require defendant to perform accounting work as a prerequisite to responding. As indicated above, each of the branches prepared separate profit and loss statements, revised them, and plaintiff never prepared combined statements. The books and records of the branches speak for themselves regarding interest income and expense, without demanding accounting exercises from defendant.

Subject to these objections, defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny the request.

REQUEST FOR ADMISSION 2.109. The aggregate of the provisions for "B&DD - Specific" recorded on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Provision for B&DD - Specific |
|---|---|

| Tax Year | Provision for B&DD - Specific |
|---|---|
| 1980 | 4,072,745 |
| 1981 | 3,834,232 |
| 1982 | 6,829,613 |
| 1983 | 11,373,811 |
| 1984 | 4,757,958 |
| 1985 | 7,111,870 |
| 1986 | 7,988,675 |
| 1987 | 55,008,194 |

(*See* 1980: NY-BS-8012-02, CH-BS-8012-02, SF-BS-8012-04, NS-BS-8012-06; 1981: NY-BS-8112-02, CH-BS-8112-02, SF-BS-8112-02, NS-BS-8112-02. 1982: NY-BS-8212-02, CH-BS-8212-02, SF-BS-8212-02, NS-BS-8212-02; 1983: NY-BS-8312-02, CH-BS-8312-02, SF-BS-8312-02, NS-BS-8312-02; 1984: NY-BS-8412-02, CH-BS-8412-06, SF-BS-8412-02, IBF-BS-8412-02, NS-BS-8412-02; 1985: NY-BS-8512-02, CH-BS-8512-02, SF-BS-8512-02, IBF-BS-8512-02, NS-BS-8512-02; 1986: NY-BS-8612-02, CH-BS-8612-02, SF-BS-8612-02, IBF-BS-8612-02, NS-BS-8612-02, GC-BS-8612-02; 1987: NY-BS-8712-02, CH-BS-8712-03, SF-BS-8712-02, IBF-BS-8712-02, NS-BS-8712-02, GC-BS-8712-02.)

RESPONSE TO REQUEST FOR ADMISSION 2.109: See defendant's Response to Request for Admission 2.108.

REQUEST FOR ADMISSION 2.110. The aggregate of the provisions for "B&DD - Non-Specific" recorded on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Provision for B&DD - Non-Specific |
|---|---|

| Tax Year | Provision for B&DD - Non-Specific |
|---|---|
| 1980 | 10,539,202 |
| 1981 | 10,807,318 |
| 1982 | 10,363,993 |
| 1983 | 13,108,406 |
| 1984 | 11,851,486 |
| 1985 | 12,679,446 |
| 1986 | 20,013,077 |
| 1987 | 20,013,077 |

(*See* 1980: NY-BS-8012-02, CH-BS-8012-02, SF-BS-8012-05, NS-BS-8012-06; 1981: NY-BS-8112-02, CH-BS-8112-02, SF-BS-8112-02, NS-BS-8112-02; 1982: NY-BS-8212-02, CH-BS-8212-02, SF-BS-8212-02, NS-BS-8212-02; 1983: NY-BS-8312-02, CH-BS-8312-02, SF-BS-8312-02, NS-BS-8312-02; 1984: NY-BS-8412-02, CH-BS-8412-06, SF-BS-8412-02, IBF-BS-8412-02, NS-BS-8412-02; 1985: NY-BS-8512-02, CH-BS-8512-02, SF-BS-8512-02, IBF-BS-8512-02, NS-BS-8512-02; 1986: NY-BS-8612-02, CH-BS-8612-02, SF-BS-8612-02, IBF-BS-8612-02, NS-BS-8612-02, GC-BS-8612-02; 1987: NY-BS-8712-02, CH-BS-8712-03, SF-BS-8712-02, IBF-BS-8712-02, NS-BS-8712-02, GC-BS-8712-02.)

RESPONSE TO REQUEST FOR ADMISSION 2.110: See defendant's Response to Request for Admission 2.108.

REQUEST FOR ADMISSION 2.111. The U.S. branches did not transfer or repatriate to the head office any of their Retained Profits generated during the years at issue. (*See* Report of Kevin Bandoian dated Jan. 14, 2002, Ex. 6.)

RESPONSE TO REQUEST FOR ADMISSION 2.111: See defendant's Response to Request for Admission 2.69.

REQUEST FOR ADMISSION 2.112. The aggregate of the balances recorded as "Retained Profits" (net of any amounts recorded as "Accumulated Losses") on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Retained Profits |
|---|---|
| 1980 | 15,677,567 |
| 1981 | 2,564,846 |
| 1982 | 4,312,898 |
| 1983 | 19,625,765 |
| 1984 | 25,993,019 |
| 1985 | 51,706,718 |
| 1986 | 63,301,445 |
| 1987 | 29,732,486 |

(*See* 1980: NY-BS-8012-02, CH-BS-8012-04, SF-BS-8012-05, NS-BS-8012-06, 1981: NY-BS-8112-02, CH-BS-8112-04, SF-BS-8112-02, NS-BS-8112-02; 1982: NY-BS-8212-02, CH-BS-8212-04, SF-BS-8212-02, NS-BS-8212-02; 1983: NY-BS-8312-04, CH-BS-8312-02, SF-BS-8312-02, NS-BS-8312-02, IBF-BS-8312-02; 1984: NY-BS-8412-04, CH-BS-8412-06, SF-BS-8412-02, NS-BS-8412-02, IBF-BS-8412-02; 1985: NY-BS-8512-04, CH-BS-8512-02, SF-BS-8512-02, NS-BS-8512-02, IBF-BS-8512-02, GC-BS-8512-09; 1986: NY-BS-8612-02, CH-BS-8612-04, SF-BS-8612-02, NS-BS-8612-02, IBF-BS-8612-02, Box 156-17 (GC); 1987: NY-BS-8712-04, CH-BS-8712-03, SF-BS-8712-02, NS-BS-8712-02, IBF-BS-8712-02, GC-BS-8712-02.)

RESPONSE TO REQUEST FOR ADMISSION 2.112: See defendant's Response to Request for Admission 2.108.

REQUEST FOR ADMISSION 2.113. The aggregate of the balances recorded as "Balance due to HO re Capital Loans" on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Balance due to HO re Capital Loans |
|---|---|
| 1980 | 3,223,184 |
| 1981 | 869,893 |
| 1982 | 900,770 |
| 1983 | 645,032 |
| 1984 | 42,437 |
| 1985 | 1,085,000 |
| 1986 | 0 |
| 1987 | 0 |

(*See* 1980: NY-BS-8012-01, CH-BS-8012-01, SF-BS-8012-02, NS-BS-8012-05; 1981: NY-BS-8112-01, CH-BS-8112-01, SF-BS-8112-01, NS-BS-8112-01; 1982: NY-BS-8212-01, CH-BS-8212-01, SF-BS-8212-01, NS-BS-8212-01; 1983: NY-BS-8312-01, CH-BS-8312-01, SF-BS-8312-01, NS-BS-8312-01, IBF-BS-8312-01; 1984: NY-BS-8412-01, CH-BS-8412-05, SF-BS-8412-01, NS-BS-8412-01, IBF-BS-8412-01; 1985: NY-BS-8512-01, CH-BS-8512-01, SF-BS-8512-01, NS-BS-8512-01, IBF-BS-8512-01; 1986: NY-BS-8612-01, CH-BS-8612-01, SF-BS-8612-01, NS-BS-8612-01, IBF-BS-8612-01, GC-BS-8612-01; 1987: NY-BS-8712-01, CH-BS-8712-01, SF-BS-8712-01, NS-BS-8712-01, IBF-BS-8712-01, GC-BS-8712-01.)

RESPONSE TO REQUEST FOR ADMISSION 2.113: See defendant's Response to Request for Admission 2.108.

REQUEST FOR ADMISSION 2.114. The aggregate of the balances recorded as "Balance due to HO re Fixed Assets" on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Balance due to HO re Fixed Assets |
|---|---|
| 1980 | 8,344,816 |
| 1981 | 9,033,064 |
| 1982 | 9,002,188 |
| 1983 | 9,257,926 |
| 1984 | 9,860,521 |
| 1985 | 8,817,958 |
| 1986 | 0 |
| 1987 | 0 |

(*See* 1980: NY-BS-8012-01, CH-BS-8012-01, NS-BS-8012-05, SF-BS-8012-02; 1981: NY-BS-8112-01, CH-BS-8112-01, SF-BS-8112-01, NS-BS-8112-01; 1982: NY-BS-8212-01, CH-BS-8212-01, SF-BS-8212-01, NS-BS-8212-01; 1983: NY-BS-8312-01, CH-BS-8312-01, SF-BS-8312-01, NS-BS-8312-01, IBF-BS-8312-01; 1984: NY-BS-8412-01, CH-BS-8412-05, SF-BS-8412-01, NS-BS-8412-01, IBF-BS-8412-01; 1985: NY-BS-8512-01, CH-BS-8512-01, SF-BS-8512-01, NS-BS-8512-01, IBF-BS-8512-01; 1986: NY-BS-8612-01, CH-BS-8612-01, SF-BS-8612-01, NS-BS-8612-01, IBF-BS-8612-01, GC-BS-8612-01; 1987: NY-BS-8712-01, CH-BS-8712-01, SF-BS-8712-01, NS-BS-8712-01, IBF-BS-8712-01, GC-BS-8712-01.)

RESPONSE TO REQUEST FOR ADMISSION 2.114: See defendant's Response to Request for Admission 2.108.

REQUEST FOR ADMISSION 2.115. The aggregate of the balances recorded as "Profit and Loss" on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Profit & Loss Balance |
|---|---|
| 1980 | 0 |
| 1981 | 0 |
| 1982 | 4,604,145 |
| 1983 | 5,117,386 |
| 1984 | 5,109,745 |
| 1985 | 0 |
| 1986 | 0 |
| 1987 | (6,072,870) |

(*See* 1982: NS-BS-8212-02; 1983: CH-BS-8312-02, NS-BS-8312-02; 1984: NS-BS-8412-02; 1987: NY-BS-8712-04.)

RESPONSE TO REQUEST FOR ADMISSION 2.115: See defendant's Response to Request for Admission 2.108.

REQUEST FOR ADMISSION 2.116. The aggregate of the amounts that either were designated as capital on the books of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes (i.e., the provisions for "B&DD - Specific", "B&DD - Non-Specific", "Retained Profits" (net of any "Accumulated Losses"), "Balance due to HO re Capital Loans", "Balance due to HO re Fixed Assets", and balances recorded as "Profit and Loss") as of December 31st of the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Capital |
|---|---|
| 1980 | 41,857,514 |
| 1981 | 27,109,353 |
| 1982 | 36,013,607 |
| 1983 | 59,128,326 |
| 1984 | 57,615,166 |
| 1985 | 81,400,992 |
| 1986 | 91,303,197 |
| 1987 | 98,680,887 |

*See* Requests for Admission 2.109 through 2.115.

RESPONSE TO REQUEST FOR ADMISSION 2.116: See defendant's Responses to Request for Admission 2.108.

REQUEST FOR ADMISSION 2.117. All of the interest income received and included in income by the U.S. branches during the years at issue reflected arm's-length market rates.

RESPONSE TO REQUEST FOR ADMISSION 2.117: Discovery has not been completed, and defendant's experts have not completed their analysis of this issue. Defendant's experts' report has not been prepared and is not yet due under the Court's October 5, 2004, subject to further modification in accordance with defendant's motion for enlargement of the discovery period. Defendant's position on this request will be expressed in and consistent with its experts' report. The request is oppressive and an abuse of the discovery process. See also defendant's Response to Plaintiff's Interrogatory 4.01. Subject to its objections, defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny the request.

REQUEST FOR ADMISSION 2.118. All of the interest expense paid and deducted by the U.S. branches during the years at issue reflected arm's-length market rates.

RESPONSE TO REQUEST FOR ADMISSION 2.118: See defendant's Response to Request for Admission 2.117.

REQUEST FOR ADMISSION 2.119. The following table lists all of the adjustments to the U.S. federal taxable income of NatWest as set forth in the RARs with respect to all issues, excluding adjustments that are dependent on the outcome of subsequent years and computational adjustments that are dependent on resolution of all issues relating to the years at issue:

Adjustments to RAR Taxable Income

| Tax Year | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|---|
| Reversal of adjustments to interest income[1] | 125,857,675 | 132,049,714 | 88,243,894 | 104,153,633 | 79,404,169 | 87,081,845 | 131,596,705 |
| Reversal of adjustments to interest expense[1] | (152,605,551) | (147,337,977) | (101,652,347) | (126,092,694) | (93,539,801) | (108,064,089) | (174,292,853) |
| Reversal of Net Loans Adjustment[2] | 0 | 0 | 0 | 0 | 0 | (84,426) | (174,309) |
| Elimination of Net Intra-U.S. Interest Expense[3] | 0 | 23,991 | 0 | 231,163 | 38,246 | 0 | 71,877 |
| Elimination of Capital Loan Charge[4] | 465,868 | 209,433 | 202,745 | 309,459 | 0 | 2,603,584 | 1,936,537 |
| Adjustment to NOL Carryback from 1990[5] | 0 | 0 | 0 | 0 | 0 | 0 | 3,385,279 |
| Aggregate Adjustments to RAR Taxable Income | (26,282,008) | (15,054,839) | (13,205,708) | (21,398,439) | (14,097,386) | (18,463,086) | (37,476,764) |

1 – *See* Request for Admission 2.54, above.
2 - *See* Request for Admission 2.52, above.
3 - *See* Requests for Admission 2.66 and 2.67, above.
4 - *See* Requests for Admission 2.68, 2.87 and 2.88, above.
5 -Two adjustments to the U.S. Branch's NOL Carryback were conceded by NatWest during the audit of its 1990 taxable year, resulting in an addition to income for the 1987 tax year of $3,385,279. *See* $912,566 agreed on Form 870-AD dated June 26, 1998 at 2, and $2,472,713 in closing agreement executed by NatWest on June 14, 1999. The NOL Carryback is subject to further adjustment depending on the resolution of taxable years not at issue here.

RESPONSE TO REQUEST FOR ADMISSION 2.119: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.120. The U.S. federal taxable income of NatWest for each of the tax years at issue after adjustments described in Request for Admission 2.119 is:

| Tax Year | Taxable Income per RARs[1] ("A") | Aggregate Adjustments to RAR Taxable Income[2]("B") | Taxable Income After Adjustments (=A+B ) |
|---|---|---|---|
| 1981 | 31,875,618 | (26,282,008) | 5,593,610 |
| 1982 | 28,154,833 | (15,054,839) | 13,099,994 |
| 1983 | 38,336,127 | (13,205,708) | 25,130,419 |
| 1984 | 29,948,701 | (21,398,439) | 8,550,262 |
| 1985 | 54,676,775 | (14,097,386) | 40,579,389 |
| 1986 | 64,457,339 | (18,463,086) | 45,994,253 |
| 1987 | 46,808,885 | (37,476,764) | 9,332,121 |

1 - *See* Request for Admission 2.57, above.
2 - *See* Request for Admission 2.119, above.
3 - These adjustments do not reflect any adjustment for the deduction for Environmental Tax allowed under Section 164(a)(5)

RESPONSE TO REQUEST FOR ADMISSION 2.120: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.121. The applicable effective federal income tax rates for the years at issue are:

| Tax Year | Effective Federal Income Tax Rate |
|---|---|
| 1981 | 46% |
| 1982 | 46% |
| 1983 | 46% |

| Tax Year | Effective Federal Income Tax Rate |
|---|---|
| 1984 | 46% |
| 1985 | 46% |
| 1986 | 46% |
| 1987 | 39.95068% |

(*See* Code §11(b) (1981-1987) (for explanation of 1987 blended rate *see* H.R. Rep. No. 99-841, at II - 159 (1986) (Conference Report to accompany H.R. 3838, the Tax Reform Act of 1986) (46% maximum corporate rate switches to 34% maximum rate for income taxable on or after July 1, 1987)).)

RESPONSE TO REQUEST FOR ADMISSION 2.121: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.122. The tax effect of the adjustments described in Request for Admission 2.119 is:

| Tax Year | Effective Federal Income Tax Rate[1] ("A") | Aggregate Adjustments to RAR Taxable Income[2] ("B") | Tax Effect of Adjustments (=A*B ) |
|---|---|---|---|
| 1981 | 46% | (26,282,008) | (12,089,724) |
| 1982 | 46% | (15,054,839) | (6,925,226) |
| 1983 | 46% | (13,205,708) | (6,074,626) |
| 1984 | 46% | (21,398,439) | (9,843,282) |
| 1985 | 46% | (14,097,386) | (6,484,798) |
| 1986 | 46% | (18,463,086) | (8,493,020) |
| 1987 | 39.95068% | (37,476,764) | (15,020,710) |
| **Total** | | | (64,931,386) |

1 - *See* Request for Admission 2.121, above.
2 - *See* Request for Admission 2.119, above.
3 - Note that the tax effect for 1987 reflects (i) the imposition of the Environmental Tax under Section 59A and (ii) the deductibility of that tax for regular tax purposes under Section 164(a)(5).

RESPONSE TO REQUEST FOR ADMISSION 2.122: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.123. The reduction in tax liability is:

| Tax Year | Tax Effect of Adjustments[1] ("A") | Tax Liability per RARs[2] ("B") | Revised Tax Liability (=A+B ) |
|---|---|---|---|
| 1981 | (12,089,724) | 14,154,278 | 2,064,554 |
| 1982 | (6,925,226) | 12,546,863 | 5,621,637 |
| 1983 | (6,074,626) | 16,105,789 | 10,031,163 |
| 1984 | (9,843,282) | 13,084,832 | 3,241,550 |
| 1985 | (6,484,798) | 24,937,042 | 18,452,244 |
| 1986 | (8,493,020) | 29,528,505 | 21,035,485 |
| 1987 | (15,020,710) | 18,620,521 | 3,599,811 |
| **Total** | (64,931,386) | 128,977,830 | 64,046,444 |

1 - *See* Request for Admission 2.122, above.
2 - *See* Request for Admission 2.58, above.

RESPONSE TO REQUEST FOR ADMISSION 2.123: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.124. The aggregate U.S. federal income taxes paid by NatWest for each of the tax years at issue is:

| Tax Year | Aggregate Tax Payments |
|---|---|

| Tax Year | Aggregate Tax Payments |
|---|---|
| 1981 | 14,154,278 |
| 1982 | 12,546,863 |
| 1983 | 16,105,789 |
| 1984 | 13,084,832 |
| 1985 | 24,937,042 |
| 1986 | 29,528,505 |
| 1987 | 18,620,521 |
| **Total** | 128,977,830 |

*See* Request for Admission 2.61, above.

RESPONSE TO REQUEST FOR ADMISSION 2.124: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.125. The amount of tax overpayment by NatWest, excluding interest thereon, is:

| Tax Year | Aggregate Tax Payments[1] ("A") | Revised Tax Liability[2] ("B") | Tax Overpayment (=A-B) |
|---|---|---|---|
| 1981 | 14,154,278 | 2,064,554 | 12,089,724 |
| 1982 | 12,546,863 | 5,621,637 | 6,925,226 |
| 1983 | 16,105,789 | 10,031,163 | 6,074,626 |
| 1984 | 13,084,832 | 3,241,550 | 9,843,282 |
| 1985 | 24,937,042 | 18,452,244 | 6,484,798 |
| 1986 | 29,528,505 | 21,035,485 | 8,493,020 |
| 1987 | 18,620,521 | 3,599,811 | 15,020,710 |
| Total | 128,977,830 | 64,046,444 | 64,931,386 |

1 - *See* Request for Admission 2.124, above.

2 - *See* Request for Admission 2.123, above.

RESPONSE TO REQUEST FOR ADMISSION 2.125: See defendant's Response to Request for Admission 2.44.

Respectfully submitted,

STEVEN I. FRAHM
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6440

EILEEN J. O'CONNOR
Assistant Attorney General
MILDRED L. SEIDMAN
Chief, Court of Federal Claims Section

Of Counsel

January 7, 2005

CERTIFICATE OF SERVICE

I certify that service of this Response to Plaintiff's Second Set of Requests for Admission has been made on opposing counsel this 7th day of January 2005 by mailing a copy thereof, in a postage paid envelope, to the following address:

D. Scott Wise
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017

Katie M. Stevens

U.S. Department of Justice (Tax)
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20004
(202) 307-6440

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 95-758T
(Judge Nancy B. Firestone)

NATIONAL WESTMINSTER BANK PLC,
Plaintiff

v.

THE UNITED STATES,
Defendant

# PLAINTIFF'S SECOND REQUESTS FOR ADMISSIONS

Pursuant to Rules 26 and 36 of the Rules of the United States Court of Federal Claims, plaintiff requests that defendant admit the facts set forth in the following requests separately and fully, in writing, and within thirty days after service of this document.

## DEFINITIONS

The following definitions apply to each of the requests herein:

1. All "Section" references are to the Internal Revenue Code ("Code") or Treasury Regulations, as in effect during the years at issue.

2. "NatWest" or "PLC" shall mean National Westminster Bank PLC.

3. All "Treaty" references are to the Convention for the Avoidance of Double Taxation, Dec. 31, 1975, U.S.-U.K., 31 U.S.T. 5668, T.A.I.S. No. 9682.

4. "U.S. branches" shall mean NatWest's U.S. licensed branches and agencies, including the New York and Chicago branches and the San Francisco agency; its foreign licensed branches operated from the United States, consisting of the Nassau and Grand Cayman branches; and the New York International Banking Facility ("IBF").

5. "San Francisco branch" or "San Francisco agency" shall mean NatWest's licensed San Francisco agency.

6. "Cayman branch" shall mean NatWest's licensed Grand Cayman branch.

7. "IBF" or "New York IBF" shall mean the New York International Banking Facility.

8. "Head Office" shall mean NatWest's head office in London, England.

9. "Fixed Assets" shall mean real and personal tangible property and equipment, including freehold premises, leasehold premises, furniture and fittings, computer and other equipment.

10. "Years at issue" shall mean the tax years ended December 31, 1981; December 31, 1982; December 31, 1983; December 31, 1984; December 31, 1985; December 31, 1986; and December 31, 1987.

11. "Amended Refund Claim" shall mean NatWest's Amended Refund Claim and attachments thereto submitted to Defendant on June 5, 2001.

12. "NOL Carryback" refers to the carryback of net operating losses from a trade or business to apply as a deduction against prior income permitted under Section 172(b).

13. "Other group companies" refers to the companies listed on the schedules entitled "Analysis of Intra Group Interest Paid & Received" in the profit and loss statements and the schedules entitled "Analysis of Intra Group Lines" in the balance sheets of the U.S. branches

during the years at issue. *See, e.g.*, INT504-00141, INT504-00113, SF-BS-8609-07, GC-BS-8609-08.

14. "I.R.S." shall mean the United States Internal Revenue Service.

15. "RARs" shall mean the I.R.S. Revenue Agent's Reports dated May 3, 1995.

**INSTRUCTIONS**

The relevant rules of construction set forth in the Rules of the United States Court of Federal Claims are incorporated as if set forth fully herein. In addition, the following instructions shall apply:

1. Pursuant to Rule 36 of the Rules of the United States Court of Federal Claims, in responding to these Requests, you are required to make reasonable inquiry into the truth of the Request. You may not give lack of information or knowledge as a basis for failing to admit or deny a Request unless, after making reasonable inquiry into the truth of the Request, you are unable to determine from the information that is known or readily available to you whether the Request is true. If you fail to respond to any Request with an admission or denial, you are required to set forth in detail the reasons you cannot admit or deny the Request. If you know that any part of a Request is true, you are required to admit that portion of the request that you know is true. To the extent that a Request is denied, you are required to state the specific reasons for the denial.

2. This is a continuing request for information. If, after making your initial response, you obtain or become aware of any further information responsive to this request or if you become aware that a response is inaccurate, incomplete or misleading, you are required to amend your response pursuant to Rule 26(e) of the Rules of the United States Court of Federal Claims.

3. Pursuant to paragraph 9 of Appendix A to the Rules of the United States Court of Federal Claims, the responses to the requests for admission are to be signed by counsel for the

defendant as certification that counsel has made diligent effort to provide answers to all of the requests for admission or to the portions of any requests for admission to which counsel has not specifically objected.

4. Any citations in the Requests are provided for convenience and are not part of the Request. Your responses to the Requests will not be considered admissions or denials with respect to the citations.

**REQUESTS FOR ADMISSIONS**

You are requested to admit that the following statements are true:

REQUEST FOR ADMISSION 2.01. During the years at issue, NatWest was a publicly held United Kingdom corporation engaged in the banking business in the United Kingdom, United States, and elsewhere.

REQUEST FOR ADMISSION 2.02. During the years at issue, NatWest's worldwide operations were headquartered in the United Kingdom.

REQUEST FOR ADMISSION 2.03. During the years at issue, NatWest was entitled to and did claim benefits under the Treaty as a "resident of the United Kingdom." (*See* Treaty Art. 5.)

REQUEST FOR ADMISSION 2.04. During the years at issue, NatWest operated a banking business in the United States through the U.S. branches.

REQUEST FOR ADMISSION 2.05. The principal customers of the U.S. Branch were large multinational corporations (including U.S. subsidiaries of U.K. corporations that were customers of PLC in the United Kingdom), other banks and financial institutions, other PLC offices and subsidiaries, and foreign governments.

REQUEST FOR ADMISSION 2.06. The six U.S. branches loaned funds to, and took deposits from, their corporate customers. (*See* Def.'s Request for Admission 1.03 and Pl.'s Response thereto.)

REQUEST FOR ADMISSION 2.07. The U.S. branches engaged in trading activities in the interbank market, including: taking and placing time deposits in the Eurodollar money market, selling commercial paper issued by NatWest, buying (*i.e.*, borrowing) and selling (*i.e.*, lending) federal funds in the U.S. money market, and buying and selling securities under repurchase agreements, typically called "repos" or "reverse repos."

REQUEST FOR ADMISSION 2.08. The trading activities of the U.S. branches were conducted to manage exposure to liquidity and interest rate risk, to obtain additional funds, to place excess funds, and to make a profit.

REQUEST FOR ADMISSION 2.09. For each of the years at issue, NatWest was required to and did file a single U.S. federal income tax return.

REQUEST FOR ADMISSION 2.10. During the years at issue, NatWest was an accrual method taxpayer.

REQUEST FOR ADMISSION 2.11. There were two branches and one agency of NatWest licensed in the United States: (1) the New York branch licensed by the State of New York, (2) the Chicago branch licensed by the State of Illinois, and (3) the San Francisco agency licensed by the State of California.

REQUEST FOR ADMISSION 2.12. The New York, Nassau, Chicago and San Francisco branches were in operation throughout the years at issue.

REQUEST FOR ADMISSION 2.13. The New York branch also operated an International Banking Facility (the "IBF").

REQUEST FOR ADMISSION 2.14. The operations of the IBF commenced in December 1981. (*See* Def.'s Request for Admission 1.39 and Pl.'s Response thereto.)

REQUEST FOR ADMISSION 2.15. The IBF was not a separately licensed branch but was a set of asset and liability accounts maintained by the New York branch pursuant to Federal Reserve Board regulations. (*See* Def.'s Request for Admission 1.15 and Pl.'s Response thereto.)

REQUEST FOR ADMISSION 2.16. Transactions segregated on the books of the New York IBF could qualify for exemption from certain bank regulatory requirements and could give rise to "IBF eligible net income" which was exempt from New York State and City income taxation. (*See* Def.'s Request for Admission 1.15 and Pl.'s Response thereto.)

REQUEST FOR ADMISSION 2.17. NatWest had branches licensed in Nassau and the Grand Cayman Islands.

REQUEST FOR ADMISSION 2.18. The Grand Cayman branch began operations in June 1985. (*See* Def.'s Request for Admission 1.40 and Pl.'s Response thereto.)

REQUEST FOR ADMISSION 2.19. During the years at issue, the activities of the New York, Nassau and Grand Cayman branches and the IBF were conducted by personnel of NatWest's New York branch office. (*See* Def.'s Request for Admission 1.12 and Pl.'s Response thereto.)

REQUEST FOR ADMISSION 2.20. The Nassau and Grand Cayman branches had no employees or facilities located in Nassau or Grand Cayman. (*See* Def.'s Prop. Findings of Uncontr. Fact (Adequate Cap. Issue) dated Sept. 12, 2002 at ¶41; Def.'s Request for Admission 1.13 and Pl.'s Response thereto.)

REQUEST FOR ADMISSION 2.21. During the years at issue, each of the New York, Nassau, Grand Cayman, Chicago, and San Francisco branches and the IBF maintained separate accounts, including profit and loss statements and balance sheets, in the ordinary course of its banking business. (*See* Def.'s Request for Admission 1.06 and Pl.'s Response thereto; *see also* Report of John J. Mingo, Ph.D. dated Nov. 15, 2001 at 7; Report of John M. Lacey, Ph.D. dated Nov. 15, 2001 at 1.)

REQUEST FOR ADMISSION 2.22. During certain periods prior to September 1983, the results of the IBF were included on the manually prepared and certified balance sheets and profit and loss statements of the New York branch. (*See* Def.'s Request for Admission 1.39 and Pl.'s Response thereto.)

REQUEST FOR ADMISSION 2.23. For September 1983 and during the remainder of the years at issue, separate manually prepared and certified balance sheets and profit and loss statements were prepared for the IBF. (*See* Def.'s Request for Admission 1.39 and Pl.'s Response thereto.)

REQUEST FOR ADMISSION 2.24. During the years at issue, the U.S. branches submitted profit and loss statements to PLC's head office on a periodic basis. (*See* Def.'s Request for Admission 1.28 and Pl.'s Response thereto.)

REQUEST FOR ADMISSION 2.25. During the years at issue, the U.S. branches submitted balance sheets to PLC's head office on a periodic basis. (*See* Def.'s Requests for Admission 1.11, 1.28, 1.32-1.33 and Pl.'s Responses thereto.)

REQUEST FOR ADMISSION 2.26. The profit and loss statements submitted by the U.S. branches to the Head Office included a certification which was required to be signed by the Branch Manager and Branch Accountant.

REQUEST FOR ADMISSION 2.27. The following is a typical example of the certification on profit and loss statements submitted by the U.S. branches to the head office during the years at issue:

> We certify that this Profit and Loss Account is in accordance with the books, and to the best of our knowledge and belief, gives a true and fair value of the profit for the year ended 31 December 1984, and has been prepared on a basis consistent with the Profit and Loss Accounts of previous periods.

(*See* New York branch profit and loss statement for the year ended December 31, 1984.)

REQUEST FOR ADMISSION 2.28. The profit and loss statements submitted by the U.S. branches to the Head Office included a schedule entitled "Analysis of Intragroup Interest Paid and Received," which included a certification required to be signed by the Branch Manager.

REQUEST FOR ADMISSION 2.29. The following is a representative example of the certification on the schedule entitled "Analysis of Intragroup Interest Paid and Received" included in the profit and loss statement submitted by the U.S. branches to the head office during the years at issue:

> We hereby certify that we have agreed all NWB, IWB and Intra-Group Interest with the units/companies concerned. Details and brief explanations of any disagreements are shown overleaf.

(*See* New York branch Analysis of Intragroup Interest Paid and Received schedule for the year ended December 31, 1984.)

REQUEST FOR ADMISSION 2.30. NatWest maintained an internal audit process designed to (i) determine if policies, practices, procedures and internal controls were adequate to assure accurate accounting for the activities of the U.S. branches and (ii) initiate corrective action if any deficiencies were identified. (*See* Box 156-5.)

REQUEST FOR ADMISSION 2.31. During the years at issue, the operations and internal controls of the New York branch (including the IBF), the Chicago branch and the San Francisco agency were examined regularly by the Federal Reserve Board and New York, Illinois and California state bank regulatory agencies. (*See* Supplemental Report of Robert R. Bench dated Jan. 14, 2002 at 10-11.)

REQUEST FOR ADMISSION 2.32. During the years at issue, New York bank regulators reviewed the records of the Nassau branch during the course of their examination of the New York branch. (*See* Pl.'s response to Def.'s Request for Admission 1.10.)

REQUEST FOR ADMISSION 2.33. The aggregate amount of interest income recorded on the profit and loss statements of the U.S. branches for each of the years at issue was as follows:

| Tax Year | Aggregate Interest Income |
|---|---|
| 1981 | 701,738,889 |
| 1982 | 635,002,839 |
| 1983 | 486,454,589 |
| 1984 | 635,242,556 |
| 1985 | 529,248,172 |
| 1986 | 498,814,159 |
| 1987 | 584,410,256 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim, and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

REQUEST FOR ADMISSION 2.34. The amounts set forth in Request for Admission 2.33 above include the following amounts of interest income accrued by the U.S. branches from parties unrelated to NatWest:

| Tax Year | Interest Income from Third Parties |
|---|---|
| 1981 | 575,881,214 |
| 1982 | 502,953,124 |
| 1983 | 398,210,695 |
| 1984 | 531,088,923 |
| 1985 | 449,801,628 |
| 1986 | 405,279,034 |
| 1987 | 447,495,474 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

REQUEST FOR ADMISSION 2.35. The amounts set forth in Request for Admission 2.33 above include the following amounts of interest income accrued by the U.S. branches from other group companies:

| Tax Year | Interest Income from Other Group Companies |
|---|---|
| 1981 | 30,962,197 |
| 1982 | 44,606,560 |
| 1983 | 24,471,318 |
| 1984 | 27,299,430 |
| 1985 | 23,977,168 |
| 1986 | 24,705,540 |

| Tax Year | Interest Income from Other Group Companies |
|---|---|
| 1987 | 45,142,008 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

REQUEST FOR ADMISSION 2.36. The amounts set forth in Request for Admission 2.33 above include the following amounts of interest income accrued by the U.S. branches from other branches of NatWest outside the United States:

| Tax Year | Interest Income from non-U.S. Branches |
|---|---|
| 1981 | 12,352,992 |
| 1982 | 6,833,220 |
| 1983 | 6,091,129 |
| 1984 | 6,609,212 |
| 1985 | 6,890,500 |
| 1986 | 10,531,919 |
| 1987 | 13,603,297 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

REQUEST FOR ADMISSION 2.37. The amounts set forth in Request for Admission 2.33 above include the following aggregate amounts of interest income accrued by the U.S. branches from each other:

| Tax Year | Interest Income from U.S. Branches |
|---|---|
| 1981 | 82,542,486 |
| 1982 | 80,609,935 |
| 1983 | 57,681,447 |
| 1984 | 70,244,991 |
| 1985 | 48,578,877 |
| 1986 | 58,297,666 |
| 1987 | 78,169,477 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

REQUEST FOR ADMISSION 2.38. The aggregate amount of interest expense recorded on the profit and loss statements of the U.S. branches for each of the years at issue was as follows:

| Tax Year | Aggregate Interest Expense |
|---|---|
| 1981 | 671,036,957 |
| 1982 | 601,557,461 |
| 1983 | 444,832,199 |
| 1984 | 602,794,686 |
| 1985 | 459,184,135 |
| 1986 | 436,383,691 |
| 1987 | 552,888,878 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

REQUEST FOR ADMISSION 2.39. The amounts set forth in Request for Admission 2.38 above include the following amounts of interest expense accrued by the U.S. branches to parties unrelated to NatWest:

| Tax Year | Interest Expense Accrued with respect to Third Parties |
|---|---|
| 1981 | 505,155,940 |
| 1982 | 446,769,398 |
| 1983 | 342,193,553 |
| 1984 | 485,235,812 |
| 1985 | 343,395,119 |
| 1986 | 271,113,921 |
| 1987 | 301,921,949 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

REQUEST FOR ADMISSION 2.40. The amounts set forth in Request for Admission 2.38 above include the following amounts of interest expense accrued by the U.S. branches to other group companies:

| Tax Year | Interest Expense Accrued with respect to Other Group Companies |
|---|---|
| 1981 | 24,926,564 |
| 1982 | 19,754,675 |
| 1983 | 11,934,824 |
| 1984 | 14,662,026 |
| 1985 | 14,624,994 |
| 1986 | 18,237,460 |
| 1987 | 19,386,954 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

REQUEST FOR ADMISSION 2.41. The amounts set forth in Request for Admission 2.38 above include the following amounts of interest expense accrued by the U.S. branches to other branches of NatWest outside the United States:

| Tax Year | Interest Expense Accrued with respect to Non-U.S. Branches |
|---|---|
| 1981 | 58,446,924 |
| 1982 | 54,399,462 |
| 1983 | 33,102,291 |
| 1984 | 32,420,694 |
| 1985 | 52,546,899 |
| 1986 | 88,738,618 |
| 1987 | 153,338,621 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

REQUEST FOR ADMISSION 2.42. The amounts set forth in Request for Admission 2.38 above include the following amounts of interest expense accrued by the U.S. branches to each other:

| Tax Year | Interest Expense Accrued with respect to U.S. Branches |
|---|---|
| 1981 | 82,507,529 |
| 1982 | 80,633,926 |
| 1983 | 57,601,531 |
| 1984 | 70,476,154 |
| 1985 | 48,617,123 |
| 1986 | 58,293,692 |
| 1987 | 78,241,354 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

REQUEST FOR ADMISSION 2.43. NatWest timely filed its U.S. federal income tax return as a calendar year taxpayer for each of the years 1981 through 1987 on I.R.S. Form 1120F. (*See* INT504-00598 to -00633 (1981 Form 1120F); INT504-00634 to -00679 (1982 Form 1120F); INT504-00680 to -00715 (1983 Form 1120F); INT504-000716 to -00741 (1984 Form 1120F); INT504-00742 to -00781 (1985 Form 1120F); INT504-00782 to -00823 (1986

Form 1120F); INT504-00824 to -00861 (1987 Form 1120F); *see also* Pl.'s Supp. Resp. to Def.'s First Set of Interrogs., Supp. Resp. to Interrog. 1.03 and Ex. A (May 9, 1996).)

REQUEST FOR ADMISSION 2.44. For each of the years at issue, the items comprising taxable income reported on NatWest's original U.S. federal income tax return were equal to amounts set forth on the profit and loss statements of the New York, Nassau, Grand Cayman, Chicago and San Francisco branches and the IBF, subject to adjustments explained in Schedule M-1 of each of those returns. (*Compare* INT504-00598 to -00633 (1981 Form 1120F) *with* INT504-00001 to -00006, -00030 to -00034, -00009 to -00013, -00037 to -00041, -00023 to -00027, -00044 to -00048, -00016 to -00020, -00049 to -00053; *and compare* INT504-00634 to -00679 (1982 Form 1120F) *with* INT504-00058 to -00062, -00065 to -00069, -00072 to -00076; *and compare* INT504-00680 to -00715 (1983 Form 1120F) *with* INT504-00086 to -00090, -00120A to -00120E, -00107 to -00111, -00093 to -00097; -00100 to -00104; *and compare* INT504-00716 to -00741 (1984 Form 1120F) *with* INT504-00121 to -00125, -00155 to -00159, -00142 to -00146, -00128 to -00132, -00135 to -00139; *and compare* INT504-00742 to -00781 (1985 Form 1120F) *with* INT504-00162 to -000168, -00202 to -00208, -00193 to -00199, -00171 to -00177, -00182 to -00188, -00213 to -00219; *and compare* INT504-00782 to -00823 (1986 Form 1120F) *with* INT504-00222 to -00229, -00232 to -00239, -00272 to -00279, -00262 to -00269, -00252 to -00259, -00242 to -00251; *and compare* INT504-00824 to -00861 (1987 Form 1120F) *with* INT504-00282 to -00289, -00312 to -00319, -00322 to -00330, -00332 to -00340, -00292 to -00299, -00302 to -00309; *see also* 1/1/1987 to 12/31/1987 Profit & Loss Account IBF Branch.)

REQUEST FOR ADMISSION 2.45. Schedule M-1 of the original U.S. federal income tax return filed for each of the years at issue explains the difference between the taxable income and book profit of the U.S. branches. (*See* INT504-00603, 00631 (1981 Form 1120F); INT504-00639, -00676 (1982 Form 1120F); INT504-00685, -00712 (1983 Form 1120F); INT504-00721, -00738 (1984 Form 1120F); INT504-00747, -00773 (1985 Form 1120F); INT504-00788, -00816 (1986 Form 1120F); INT504-00831, -00851 (1987 Form 1120F).)

REQUEST FOR ADMISSION 2.46. The aggregate interest income included in NatWest's original U.S. federal income tax return for each of the years at issue was equal to the aggregate interest income recorded on the profit and loss statements of the U.S. branches for each of the years at issue, as set forth in Request for Admission 2.33 above, with the following adjustments as shown on Schedule M-1 to such returns:

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1981 | 1980 money market adjustment<br>1980 T-bill accrued interest<br>1981 money market adjustment<br>1981 T-bill accrued interest | 15,699<br>449,284<br>(72,622)<br>(1,986,545) |
| 1982 | 1981 money market adjustment<br>1981 T-bill accrued interest | 72,622<br>1,986,545 |
| 1983 | None | |
| 1984 | T-bill accrual | 1,885,318 |
| 1985 | Net T-bill accrual | (1,884,246) |
| 1986 | Interest Adjustment<br>ESOP interest exclusion<br>Foreign Exchange Income<br>Net T-bill accrual | (486,697)<br>(525,498)<br>103,289<br>(246) |

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1987 | Income Adjustment<br>Interest Accrual Adjustment<br>Interest Adjustment<br>Foreign Exchange Income<br>Net T-bill accrual | (1,185,000)<br>(846,000)<br>486,697<br>114,736<br>98 |

(*See* INT504-00631; INT504-00676; INT504-00712; INT504-00738; INT504-00773; INT504-00816; INT504-00851.)

REQUEST FOR ADMISSION 2.47. The aggregate interest expense included in NatWest's original U.S. federal income tax return for each of the years at issue was equal to the aggregate interest expense recorded on the profit and loss statements of the U.S. branches for each of the years at issue as set forth in Request for Admission 2.38 above, with the following adjustments as shown on Schedule M-1 to such returns:

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1981 | None | |
| 1982 | None | |
| 1983 | None | |
| 1984 | 1976 – 1980 Add'l Int. Ass'd (California) | 360,149 |
| 1985 | None | |
| 1986 | None | |
| 1987 | Interest Accrual Adjustments | 720,000 |

(*See* INT504-00631; INT504-00676; INT504-00712; INT504-00738; INT504-00773; INT504-00816; INT504-00851.)

REQUEST FOR ADMISSION 2.48. The U.S. federal taxable income of NatWest as originally reported for each of the years at issue (after adjustments with respect to certain employee benefits per IRS Form 870) was as follows:

| Tax Year | Amount |
|---|---|
| 1981 | 5,127,742 |
| 1982 | 12,866,570 |
| 1983 | 17,074,564 |
| 1984 | 8,009,640 |
| 1985 | 40,541,143 |
| 1986 | 42,962,917 |
| 1987 | 14,330,911 |
| **Total** | 140,913,487 |

(*See* RARs.)

REQUEST FOR ADMISSION 2.49. The I.R.S. examined NatWest's original Form 1120F U.S. federal income tax returns for each of the years at issue. (*See* RARs.)

REQUEST FOR ADMISSION 2.50. In its May 3, 1995 RARs the I.R.S. proposed the following adjustments to the taxable income of NatWest as reported on its original U.S. federal income tax returns:

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1981 | Interest Expense<br>Interest Income | 152,605,551<br>(125,857,675) |
| 1982 | Interest Expense<br>Interest Income | 147,337,977<br>(132,049,714) |

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1983 | Interest Expense<br>Interest Income<br>Sale of Property (Chrysler Stock Sale) | 101,652,347<br>(88,243,894)<br>7,853,110 |
| 1984 | Interest Expense<br>Interest Income | 126,092,694<br>(104,153,633) |
| 1985 | Interest Expense<br>Interest Income | 93,539,801<br>(79,404,169) |
| 1986 | Interest Expense<br>Interest Income<br>Net Loans<br>Employee Benefits<br>Home Office Allocation | 108,064,089<br>(87,081,845)<br>84,426<br>405,249<br>21,903 |
| 1987 | Interest Expense<br>Interest Income<br>Net Loans<br>Employee Benefits<br>Home Office Allocation<br>Other Deductions<br>Net Operating Loss Deduction<br>Bad Debts | 174,292,853<br>(131,596,705)<br>174,309<br>332,710<br>3,534,289<br>(555,350)<br>(12,918,821)<br>(785,311) |

(*See* RARs; Pl.'s response to Def.'s Request for Admission 1.23.)

REQUEST FOR ADMISSION 2.51. The adjustments described in Request for Admission 2.50 include the following amounts to which NatWest has agreed:

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1983 | Sale of Property (Chrysler Stock Sale) | 7,853,110 |
| 1986 | Employee Benefits<br>Home Office Allocation | 405,849<br>21,903 |
| 1987 | Employee Benefits<br>Home Office Allocation<br>Other Deductions<br>Bad Debts | 332,710<br>3,534,289<br>(555,350)<br>(785,311) |

(*See* RARs.)

REQUEST FOR ADMISSION 2.52. The adjustments described in Request for Admission 2.50 include the following amounts that defendant has withdrawn:

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1986 | Net Loans | 84,426 |
| 1987 | Net Loans | 174,309 |

(*See* RARs.)

REQUEST FOR ADMISSION 2.53. The adjustments described in Request for Admission 2.50 include the following amount which could change depending upon the final resolution of tax years subsequent to the years at issue:

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1987 | Net Operating Loss Deduction | (12,918,821) |

(*See* RARs.)

REQUEST FOR ADMISSION 2.54. The adjustments described in Request for Admission 2.50 include the following amounts asserted by the I.R.S. under Section 882, Treasury Regulations section 1.882-5 and Section 864(c)(4)(D):

| Tax Year | Proposed adjustments to interest income: | Proposed adjustments to interest expense: |
|---|---|---|
| 1981 | (125,857,675) | 152,605,551 |
| 1982 | (132,049,714) | 147,337,977 |
| 1983 | (88,243,894) | 101,652,347 |
| 1984 | (104,153,633) | 126,092,694 |
| 1985 | (79,404,169) | 93,539,801 |
| 1986 | (87,081,845) | 108,064,089 |

| Tax Year | Proposed adjustments to interest income: | Proposed adjustments to interest expense: |
|---|---|---|
| 1987 | (131,596,705) | 174,292,853 |

(See RARs; see also Def.'s Request for Admissions 1.23 and Pl.'s Response thereto.)

REQUEST FOR ADMISSION 2.55. The I.R.S., in its RARs, offered no basis other than Sections 882, Treasury Regulations section 1.882-5 and Section 864(c)(4)(D) for adjustments to plaintiff's interest expense and interest income. (*See* RARs.)

REQUEST FOR ADMISSION 2.56. The RAR for the taxable year ended December 31, 1987 proposed an Environmental Tax increase of $38,974, bringing the total tax to $53,771, but did not include a correlative regular tax deduction for Environmental Tax. Both of these figures could change depending upon the final resolution of the years at issue. (*See* RARs.)

REQUEST FOR ADMISSION 2.57. The adjusted U.S. federal taxable income of NatWest as determined by the I.R.S. for each of the years at issue was as follows:

| Tax Year | Amount |
|---|---|
| 1981 | 31,875,618 |
| 1982 | 28,154,833 |
| 1983 | 38,336,127 |
| 1984 | 29,948,701 |
| 1985 | 54,676,775 |
| 1986 | 64,457,339 |
| 1987 | 46,808,885 |
| **Total** | 294,258,278 |

(*See* RARs.)

REQUEST FOR ADMISSION 2.58. The U.S. federal income tax liability of NatWest as determined by the I.R.S. for each of the years at issue, excluding interest thereon, was as follows:

| Tax Year | Amount |
|---|---|
| 1981 | 14,154,278 |
| 1982 | 12,546,863 |
| 1983 | 16,105,789 |
| 1984 | 13,084,832 |
| 1985 | 24,937,042 |
| 1986 | 29,528,505 |
| 1987 | 18,620,521 |
| **Total** | 128,977,830 |

(*See* RARs.)

REQUEST FOR ADMISSION 2.59. The U.S. federal income tax liability shown on NatWest's original Form 1120F U.S. federal income tax return or as adjusted prior to issuance of the RARs for each of the years at issue based on the amounts of U.S. federal taxable income shown on Request for Admission 2.48 was as follows:

| Tax Year | Amount |
|---|---|
| 1981 | 1,850,255 |
| 1982 | 5,514,262 |
| 1983 | 7,759,280 |
| 1984 | 2,992,864 |
| 1985 | 18,434,651 |
| 1986 | 19,641,070 |
| 1987 | 304,302 |

| Tax Year | Amount |
|---|---|
| **Total** | 56,496,684 |

(*See* RARs.)

REQUEST FOR ADMISSION 2.60. The deficiency in U.S. federal income tax due by NatWest for each of the years at issue as determined by the I.R.S., excluding interest thereon, was as follows:

| Tax Year | Amount |
|---|---|
| 1981 | 12,304,023 |
| 1982 | 7,032,601 |
| 1983 | 8,346,509 |
| 1984 | 10,091,968 |
| 1985 | 6,502,391 |
| 1986 | 9,887,435 |
| 1987 | 18,316,219 |
| **Total** | 72,481,146 |

(*See* RARs.)

REQUEST FOR ADMISSION 2.61. The U.S. federal income tax payments made by NatWest with respect to all of the U.S. branches to the I.R.S. for each of the years at issue were as follows:

U.S. Federal Income Tax Payments for the Years at Issue

| Tax Year | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|---|
| Prior Year Overpayment[1] | 600,170 | 1,500,000 | 56,411 | 1,600,000 | 257,136 | 0 | 0 |
| Current Year Estimated Payments[2] | 4,250,000 | 4,000,000 | 10,035,000 | 1,650,000 | 16,340,000 | 20,011,000 | 6,953,000 |
| Payment Per Form 7004[3] | 0 | 0 | 0 | 0 | 1,002,864 | 567,000 | 406,000 |
| Amount Paid Original Return[4] | 0 | 0 | 0 | 0 | 834,651 | 0 | 0 |
| Amount Claimed as Refund on Original Return[5] | (1,594,320) | 0 | (732,131) | 0 | 0 | (936,930) | (1,767,422) |
| Amount Credited to Estimated Tax on Original Return[6] | (1,500,000) | (56,411) | (1,600,000) | (257,136) | 0 | 0 | 0 |
| Refund Per Form 1139[7] | 0 | 0 | 0 | 0 | 0 | 0 | (5,287,276) |
| Tax Paid Per Form 870 dated 08/23/89[8] | 94,405 | 70,673 | 0 | 0 | 0 | 0 | 0 |
| Tax Paid in Response to RARs[9] | 12,304,023 | 7,032,601 | 8,346,509 | 10,091,968 | 6,502,391 | 9,887,435 | 18,316,219 |
| Aggregate Tax Payments | 14,154,278 | 12,546,86 | 16,105,789 | 13,084,832 | 24,937,042 | 29,528,505 | 18,620,521 |

1 - *See* INT504-00598 (line 6(a), 1981 Form 1120F); INT504-00634 (line 6(a), 1982 Form 1120F); INT504-00680 (line 6(a), 1983 Form 1120F); INT504-00716 (line 6(a), 1984 Form 1120F); INT504-00742 (line 6(a), 1985 Form 1120F); INT504-00782 (line 6(a), 1986 Form 1120F); INT504-00824 (line 6(a), 1987 Form 1120F).

2, 3, 4, - *See* Def.'s Ans. to 1st Amended Compl. at ¶3; 1st Amended Compl., Ex. 1.

5 - *See* INT504-00598 (line 10, 1981 Form 1120F); INT504-00634 (line 10, 1982 Form 1120F); INT504-00680 (line 10, 1983 Form 1120F); INT504-00716 (line 10, 1984 Form 1120F); INT504-00742 (line 10, 1985 Form 1120F); INT504-00782 (line 10, 1986 Form 1120F); INT504-00824 (line 11, 1987 Form 1120F).

6 - *See* INT504-00598 (line 10, 1981 Form 1120F); INT504-00634 (line 10, 1982 Form 1120F); INT504-00680 (line 10, 1983 Form 1120F); INT504-00716 (line 10, 1984 Form 1120F); INT504-00742 (line 10, 1985 Form 1120F); INT504-00782 (line 10, 1986 Form 1120F); INT504-00824 (line 11, 1987 Form 1120F).

7 - *See* RAR at 28.

8 - *See* Pl.'s Resp. to Def.'s Interrog. 1.04, Ex. B at B0003 (1981), B0004 (1982), and B0005 (copies of checks for $223,518 and $139,781 payable to IRS).

9 - These tax amounts and the deficiency interest thereon were paid by: (1) application of a $50,000,000 deposit in the nature of a cash bond; (2) application of a $40,000,000 deposit in the nature of a cash bond; (3) a payment of $34,446,842; and (4) a payment of $55,802,939. *See* Pl.'s Resp. to Def.'s Interrog. 1.12, Ex. F at F00010 (1981 through 1985) *and* F00020 (1986 and 1987); *see also* F00031 (IRS Receipt for Payment of Taxes in the amount of $50,000,000); F00024-00025 (IRS stamp acknowledging receipt of $40,000,000 check); F00022 (copy of check for $34,446,842.00 payable to IRS); F00023 (copy of check for $55,802,939.00 payable to IRS).

REQUEST FOR ADMISSION 2.62. The interest paid by NatWest to the Internal Revenue Service Center in Philadelphia, PA on May 31, 1995 and June 8, 1995, on the tax deficiencies asserted in the RARs, was as follows:

| Tax Year | Interest Paid |
|---|---|
| 1981 | 28,838,978 |
| 1982 | 13,068,220 |
| 1983 | 14,107,184 |
| 1984 | 15,045,416 |
| 1985 | 7,693,000 |
| 1986 | 11,467,996 |
| 1987 | 17,547,841 |
| **Total** | 107,768,635 |

(*See* Pl.'s Resp. to Def.'s Interrog. 1.12, Ex. F at F00010-00011 (1981 through 1985) *and* F00020 (1986 and 1987); *see also* F00031 (IRS Receipt for Payment of Taxes in the amount of $50,000,000); F00024-00025 (IRS stamp acknowledging receipt of $40,000,000 check); F00022 (copy of check for $34,446,842.00 payable to IRS); F00023 (copy of check for $55,802,939.00 payable to IRS) (sum of check amounts, $180,249,781, less $107,768,635 aggregate interest, *above*, equals $72,481,146 additional taxes paid per RARs); Request for Admission 2.61 above.)

REQUEST FOR ADMISSION 2.63. The adjustments proposed under Section 882 and Treasury Regulations section 1.882-5 and Section 864(c)(4)(D) described in Request for Admission 2.54 should be withdrawn in accordance with the Court's July 1999 Opinion and Order.

REQUEST FOR ADMISSION 2.64. The interest income reported on NatWest's original Form 1120F U.S. federal income tax returns for the years 1981 through 1987 included the amounts of interest income accrued by the U.S. branches from each other as described in Request for Admission 2.37 above.

REQUEST FOR ADMISSION 2.65. The interest expense reported on NatWest's original Form 1120F U.S. federal income tax returns for the years 1981 through 1987 included the amounts of interest expense accrued by the U.S. branches to each other as described in Request for Admission 2.42 above.

REQUEST FOR ADMISSION 2.66. If all of the intra-U.S. interest expense described in Request for Admission 2.42 and intra-U.S. interest income described in Request for Admission 2.37 were eliminated from the taxable income of the U.S. branches, the following net additions to, or reductions of, taxable income would result for the years at issue:

| Tax Year | Addition to or (Reduction of) Taxable Income |
|---|---|
| 1981 | (34,957) |
| 1982 | 23,991 |
| 1983 | (79,916) |
| 1984 | 231,163 |
| 1985 | 38,246 |
| 1986 | (3,974) |
| 1987 | 71,877 |

(*See* Amended Refund Claim, Schedules 1-7.)

REQUEST FOR ADMISSION 2.67. In its Amended Refund Claim, NatWest proposed to increase its taxable income by the amounts shown for taxable years 1982, 1984, 1985 and 1987

in Request for Admission 2.66, but did not propose to reduce its taxable income by the amounts shown for years 1981, 1983, and 1986 in Request for Admission 2.66. (*See* Amended Refund Claim and supporting schedules thereto.)

REQUEST FOR ADMISSION 2.68. The amounts of interest expense recorded on the profit and loss statements of the U.S. branches as payable to the Head Office and therefore included in the amounts described in Requests for Admission 2.38 above and reported on NatWest's original Form 1120F federal income tax returns for the tax years at issue included the following net amounts described in U.S. branch books and records as capital loan charges:

| Tax Year | Capital Loan Charge |
|---|---:|
| 1981 | 465,868 |
| 1982 | 209,433 |
| 1983 | 202,745 |
| 1984 | 309,459 |
| 1985 | 0 |
| 1986 | 2,336,260 |
| 1987 | 1,936,537 |

(*See* Pl.'s Report on the Capital Issue dated October 29, 2004, Ex. C, Report of Kevin D. Bandoian at Ex. 1, Ex. 3 [hereinafter Bandoian Rep.].)

REQUEST FOR ADMISSION 2.69. During the years at issue, any capital loan charges paid by the U.S. branches were calculated on a balance (referred to herein as a "net capital balance") consisting of the sum of the balances of Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets less the balance of Premises and Equipment, all as of the prior year-end. (*See* Bandoian Rep. at 4.)

REQUEST FOR ADMISSION 2.70. During all of the years at issue, except with respect to the first quarter of 1981, the net capital balance used to calculate capital loan charges for a given year was adjusted to reflect any reduction in the components of the net capital balance (e.g., by repatriation) within the first quarter of that year. (*See* Bandoian Rep. at 4.)

REQUEST FOR ADMISSION 2.71. During the years at issue, the capital loan charges paid by the U.S. branches were calculated using arm's-length rates of interest. (*See* Bandoian Rep. at 4.)

REQUEST FOR ADMISSION 2.72. During the years at issue, the capital loan charges paid or received in any given quarter were calculated using the same rate of interest for each branch, except for one quarter in 1986, when the actual rates used by the U.S. branches were all within 0.5875% of each other. (*See* Bandoian Rep. at 4.)

REQUEST FOR ADMISSION 2.73. During the years at issue, the capital loan charges and net capital balances on which they were accrued were calculated on a combined basis for the New York branch and IBF. (*See* Bandoian Rep. at 4.)

REQUEST FOR ADMISSION 2.74. For the years 1981 through 1985, the U.S. branches paid and deducted a capital loan charge only with respect to the New York branch and IBF and only on positive net capital balances. (*See* Bandoian Rep. at 4.)

REQUEST FOR ADMISSION 2.75. For the taxable year 1986, all of the U.S. branches paid and deducted capital loan charges, but only on positive net capital balances. (*See* Bandoian Rep. at 4.)

REQUEST FOR ADMISSION 2.76. For the taxable year 1987, all of the U.S. branches paid and deducted capital loan charges on positive net capital balances and received payments (and reduced interest expense accordingly) on negative net capital balances. (*See* Bandoian Rep. at 4.)

REQUEST FOR ADMISSION 2.77. During the years at issue, the New York branch collected any capital loan charges for the U.S. branches and paid them to the head office. (*See* Bandoian Rep. at 4.)

REQUEST FOR ADMISSION 2.78. For the year ended December 31, 1981, the total capital loan charges paid by the U.S. branches to PLC and deducted on the U.S. federal tax return was $465,868. (*See* Bandoian Rep. at Ex. 1: 1981-1 to 1981-6, Ex. 2, Ex. 3.)

REQUEST FOR ADMISSION 2.79. Apart from the amount described in Request for Admission 2.78, during the year ended December 31, 1981, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets.

REQUEST FOR ADMISSION 2.80. For the year ended December 31, 1982, the total capital loan charges paid by the U.S. branches to PLC and deducted on the U.S. federal tax return was $209,433. (*See* Bandoian Rep. at Ex. 1: 1982-1 to 1982-5, Ex. 2, Ex. 3.)

REQUEST FOR ADMISSION 2.81. Apart from the amount described in Request for Admission 2.80, during the year ended December 31, 1982, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of

interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets.

REQUEST FOR ADMISSION 2.82. For the year ended December 31, 1983, the total capital loan charges paid by U.S. branches to PLC and deducted on the U.S. federal tax return was $202,745. (*See* Bandoian Rep. at Ex. 1: 1983-1 to 1983-5, Ex. 2, Ex. 3.)

REQUEST FOR ADMISSION 2.83. Apart from the amount described in Request for Admission 2.82, during the year ended December 31, 1983, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets.

REQUEST FOR ADMISSION 2.84. For the year ended December 31, 1984, the total capital loan charges paid by U.S. branches to PLC and deducted on the U.S. federal tax return was $390,459. (*See* Bandoian Rep. at Ex. 1: 1984-1 to 1984-5, Ex. 2, Ex. 3.)

REQUEST FOR ADMISSION 2.85. Apart from the amount described in Request for Admission 2.84, during the year ended December 31, 1984, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets.

REQUEST FOR ADMISSION 2.86. During the year ended December 31, 1985, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled

Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets. (*See* Bandoian Rep. at Ex. 1: 1985-1 to 1985-6, Ex. 2, Ex. 3.)

REQUEST FOR ADMISSION 2.87. For the year ended December 31, 1986, plaintiff conceded capital loan charges in the aggregate amount of $2,603,583. (*See* Bandoian Rep. at Ex. 1: 1986-1, Ex. 3.)

REQUEST FOR ADMISSION 2.88. For the year ended December 31, 1986, plaintiff made an over-concession with regard to capital loan charges for the fourth quarter for the Nassau branch in the amount of $266,510. (*See* Bandoian Rep. at Ex. 1: 1986-4, Ex. 2, Ex. 3.)

REQUEST FOR ADMISSION 2.89. For the year ended December 31, 1986, plaintiff made an over-concession with regard to capital loan charges for the fourth quarter for the San Francisco agency in the amount of $813. (*See* Bandoian Rep. at Ex. 1: 1986-6, Ex. 2, Ex. 3.)

REQUEST FOR ADMISSION 2.90. For the year ended December 31, 1986, the total capital loan charges paid by the U.S. branches to PLC and deducted on the U.S. federal tax return was $2,336,260. (*See* Bandoian Rep. at Ex. 1: 1986-1 to 1986-6, Ex. 2, Ex. 3.)

REQUEST FOR ADMISSION 2.91. Apart from the amount described in Request for Admission 2.90, during the year ended December 31, 1986, neither the profit and loss statements of the U.S. branches nor the U.S. federal income tax return of NatWest reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets.

REQUEST FOR ADMISSION 2.92. For the year ended December 31, 1987, the total capital loan charges paid by U.S. branches to PLC and deducted on the U.S. federal tax return was $1,936,537. (*See* Bandoian Rep. at Ex. 1: 1987-1 to 1987-6, Ex. 2, Ex. 3.)

REQUEST FOR ADMISSION 2.93. Apart from the amount described in Request for Admission 2.92, during the year ended December 31, 1987, neither the profit and loss statements nor the U.S. federal income tax return of the U.S. branches reflected any deduction of interest with respect to any balance in any of the accounts entitled Retained Profits or Accumulated Losses; Profits and Loss; Balance due to HO re Capital Loan; or Balance due to HO re Fixed Assets.

REQUEST FOR ADMISSION 2.94. Apart from the amounts identified in Requests for Admission 2.78, 2.80, 2.82, 2.84, 2.90, and 2.92, the U.S. branches did not pay or deduct any interest during the years at issue on amounts designated as capital on their books and records.

REQUEST FOR ADMISSION 2.95. Apart from the amounts identified in Requests for Admission 2.78, 2.80, 2.82, 2.84, 2.90, and 2.92, the U.S. branches did not pay or deduct any interest during the years at issue on amounts allotted to the U.S. branches for capital purposes.

REQUEST FOR ADMISSION 2.96. Plaintiff has conceded all capital loan charges reflected in its books and records. (*See* Bandoian Rep. at 9.)

REQUEST FOR ADMISSION 2.97. The aggregate amount conceded by plaintiff as capital loan charges exceeded the actual capital loan charges deducted by plaintiff on its U.S. federal income tax returns during the years 1981 through 1987 in the amount of $267,323. (*See* Bandoian Rep. at 9).

REQUEST FOR ADMISSION 2.98. Amounts recorded on the balance sheets of the U.S. branches as "Retained Profits" (which were assigned the account code "LZC") constitute amounts that were designated as capital on the balance sheets of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any interest expense accrued thereon was not deductible under the Treaty during the years at issue. (*See* Pl.'s response to Def.'s Request for Admission 1.46.)

REQUEST FOR ADMISSION 2.99. Amounts recorded on the balance sheets of the U.S. branches as "Profit and Loss" (which were assigned the account code "LPC") constitute amounts that were designated as capital on the balance sheets of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any interest expense accrued thereon was not deductible under the Treaty during the years at issue. (*See* Pl.'s response to Def.'s Request for Admission 1.46.)

REQUEST FOR ADMISSION 2.100. Amounts recorded on the balance sheets of the U.S. branches as "Balance due to HO re Fixed Assets" (which were assigned the account code "LFB") constitute amounts that were designated as capital on the books of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any interest expense accrued thereon was not deductible under the Treaty during the years at issue. (*See* Pl.'s response to Def.'s Request for Admission 1.46.)

REQUEST FOR ADMISSION 2.101. Amounts recorded on the balance sheets of the U.S. branches as "Balance due to HO re Capital Loans" (which were assigned the account code "LEB") constitute amounts that were designated as capital on the books of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any interest expense accrued thereon was not deductible under the Treaty during the years at issue. (*See* Pl.'s response to Def.'s Request for Admission 1.46.)

REQUEST FOR ADMISSION 2.102. Amounts recorded on the balance sheets of the U.S. branches as "Provision for B&DD ("Bad and Doubtful Debts") – Specific" (which were assigned the account code "LQC") constitute amounts that were designated as capital on the books of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any

interest expense accrued thereon was not deductible under the Treaty during the years at issue. (*See* Pl.'s response to Def.'s Request for Admission 1.46.)

REQUEST FOR ADMISSION 2.103. Amounts recorded on the balance sheets of the U.S. branches as "Provision for B&DD – Non-specific" (which were assigned the account code "LRC") constitute amounts that were designated as capital on the books of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes, such that any interest expense accrued thereon was not deductible under the Treaty during the years at issue. (*See* Pl.'s response to Def.'s Request for Admission 1.46.)

REQUEST FOR ADMISSION 2.104. Apart from amounts described in Requests for Admission 2.98 through 2.103, there were no amounts recorded on the balance sheets of the U.S. branches during the years at issue that were designated as capital of a U.S. branch or branches.

REQUEST FOR ADMISSION 2.105. Apart from amounts described in Requests for Admission 2.98 through 2.103, there were no amounts recorded on the balance sheets of the U.S. branches during the years at issue that were in fact allotted to a U.S. branch or branches for capital purposes.

REQUEST FOR ADMISSION 2.106. Apart from the capital loan charges described in Requests for Admission 2.78, 2.80, 2.82, 2.84, 2.90, and 2.92 above, all interest expense deducted by the U.S. branches during the years at issue was on advances to the U.S. branches that were used in the ordinary course of the U.S. branches' banking business.

REQUEST FOR ADMISSION 2.107. Accounts recorded in the U.S. branch balance sheets as "Freehold Premises" (ARD), "Leasehold Premises" (ASD), "Furniture and fittings"

(ATD), and "Computer and other equipment" (AUD), represent the U.S. branches' "Fixed Assets."

REQUEST FOR ADMISSION 2.108. The aggregate of the amounts recorded as Fixed Assets on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Fixed Assets |
|---|---|
| 1980 | 9,167,969 |
| 1981 | 11,969,698 |
| 1982 | 15,862,602 |
| 1983 | 16,631,023 |
| 1984 | 25,976,913 |
| 1985 | 23,322,331 |
| 1986 | 26,977,617 |
| 1987 | 29,477,629 |

(*See* 1980: NY-BS-8012-04, CH-BS-8012-04, SF-BS-8012-10; 1981: NY-BS-8112-04, CH-BS-8112-04, SF-BS-8112-04; 1982: NY-BS-8212-04, CH-BS-8212-04, SF-BS-8212-04; 1983: NY-BS-8312-04, CH-BS-8312-04, SF-BS-8312-05; 1984: NY-BS-8412-04, CH-BS-8412-02, SF-BS-8412-04; 1985: NY-BS-8512-04, CH-BS-8512-04, SF-BS-8512-04; 1986: NY-BS-8612-04, CH-BS-8612-04, SF-BS-8612-04; 1987: NY-BS-8712-04, CH-BS-8712-07, SF-BS-8712-06.)

REQUEST FOR ADMISSION 2.109. The aggregate of the provisions for "B&DD - Specific" recorded on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Provision for B&DD - Specific |
|---|---|
| 1980 | 4,072,745 |
| 1981 | 3,834,232 |
| 1982 | 6,829,613 |
| 1983 | 11,373,811 |
| 1984 | 4,757,958 |
| 1985 | 7,111,870 |
| 1986 | 7,988,675 |
| 1987 | 55,008,194 |

(*See* 1980: NY-BS-8012-02, CH-BS-8012-02, SF-BS-8012-04, NS-BS-8012-06; 1981: NY-BS-8112-02, CH-BS-8112-02, SF-BS-8112-02, NS-BS-8112-02. 1982: NY-BS-8212-02, CH-BS-8212-02, SF-BS-8212-02, NS-BS-8212-02; 1983: NY-BS-8312-02, CH-BS-8312-02, SF-BS-8312-02, NS-BS-8312-02; 1984: NY-BS-8412-02, CH-BS-8412-06, SF-BS-8412-02, IBF-BS-8412-02, NS-BS-8412-02; 1985: NY-BS-8512-02, CH-BS-8512-02, SF-BS-8512-02, IBF-BS-8512-02, NS-BS-8512-02; 1986: NY-BS-8612-02, CH-BS-8612-02, SF-BS-8612-02, IBF-BS-8612-02, NS-BS-8612-02, GC-BS-8612-02; 1987: NY-BS-8712-02, CH-BS-8712-03, SF-BS-8712-02, IBF-BS-8712-02, NS-BS-8712-02, GC-BS-8712-02.)

REQUEST FOR ADMISSION 2.110. The aggregate of the provisions for "B&DD - Non-Specific" recorded on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Provision for B&DD - Non-Specific |
|---|---|
| 1980 | 10,539,202 |
| 1981 | 10,807,318 |

| Tax Year | Provision for B&DD - Non-Specific |
|---|---|
| 1982 | 10,363,993 |
| 1983 | 13,108,406 |
| 1984 | 11,851,486 |
| 1985 | 12,679,446 |
| 1986 | 20,013,077 |
| 1987 | 20,013,077 |

(*See* 1980: NY-BS-8012-02, CH-BS-8012-02, SF-BS-8012-05, NS-BS-8012-06; 1981: NY-BS-8112-02, CH-BS-8112-02, SF-BS-8112-02, NS-BS-8112-02; 1982: NY-BS-8212-02, CH-BS-8212-02, SF-BS-8212-02, NS-BS-8212-02; 1983: NY-BS-8312-02, CH-BS-8312-02, SF-BS-8312-02, NS-BS-8312-02; 1984: NY-BS-8412-02, CH-BS-8412-06, SF-BS-8412-02, IBF-BS-8412-02, NS-BS-8412-02; 1985: NY-BS-8512-02, CH-BS-8512-02, SF-BS-8512-02, IBF-BS-8512-02, NS-BS-8512-02; 1986: NY-BS-8612-02, CH-BS-8612-02, SF-BS-8612-02, IBF-BS-8612-02, NS-BS-8612-02, GC-BS-8612-02; 1987: NY-BS-8712-02, CH-BS-8712-03, SF-BS-8712-02, IBF-BS-8712-02, NS-BS-8712-02, GC-BS-8712-02.)

REQUEST FOR ADMISSION 2.111. The U.S. branches did not transfer or repatriate to the head office any of their Retained Profits generated during the years at issue. (*See* Report of Kevin Bandoian dated Jan. 14, 2002, Ex. 6.)

REQUEST FOR ADMISSION 2.112. The aggregate of the balances recorded as "Retained Profits" (net of any amounts recorded as "Accumulated Losses") on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Retained Profits |
|---|---|
| 1980 | 15,677,567 |
| 1981 | 2,564,846 |
| 1982 | 4,312,898 |
| 1983 | 19,625,765 |
| 1984 | 25,993,019 |
| 1985 | 51,706,718 |
| 1986 | 63,301,445 |
| 1987 | 29,732,486 |

(*See* 1980: NY-BS-8012-02, CH-BS-8012-04, SF-BS-8012-05, NS-BS-8012-06, 1981: NY-BS-8112-02, CH-BS-8112-04, SF-BS-8112-02, NS-BS-8112-02; 1982: NY-BS-8212-02, CH-BS-8212-04, SF-BS-8212-02, NS-BS-8212-02; 1983: NY-BS-8312-04, CH-BS-8312-02, SF-BS-8312-02, NS-BS-8312-02, IBF-BS-8312-02; 1984: NY-BS-8412-04, CH-BS-8412-06, SF-BS-8412-02, NS-BS-8412-02, IBF-BS-8412-02; 1985: NY-BS-8512-04, CH-BS-8512-02, SF-BS-8512-02, NS-BS-8512-02, IBF-BS-8512-02, GC-BS-8512-09; 1986: NY-BS-8612-02, CH-BS-8612-04, SF-BS-8612-02, NS-BS-8612-02, IBF-BS-8612-02, Box 156-17 (GC); 1987: NY-BS-8712-04, CH-BS-8712-03, SF-BS-8712-02, NS-BS-8712-02, IBF-BS-8712-02, GC-BS-8712-02.)

REQUEST FOR ADMISSION 2.113. The aggregate of the balances recorded as "Balance due to HO re Capital Loans" on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Balance due to HO re Capital Loans |
|---|---|
| 1980 | 3,223,184 |

| Tax Year | Aggregate Balance due to HO re Capital Loans |
|---|---|
| 1981 | 869,893 |
| 1982 | 900,770 |
| 1983 | 645,032 |
| 1984 | 42,437 |
| 1985 | 1,085,000 |
| 1986 | 0 |
| 1987 | 0 |

(*See* 1980: NY-BS-8012-01, CH-BS-8012-01, SF-BS-8012-02, NS-BS-8012-05; 1981: NY-BS-8112-01, CH-BS-8112-01, SF-BS-8112-01, NS-BS-8112-01; 1982: NY-BS-8212-01, CH-BS-8212-01, SF-BS-8212-01, NS-BS-8212-01; 1983: NY-BS-8312-01, CH-BS-8312-01, SF-BS-8312-01, NS-BS-8312-01, IBF-BS-8312-01; 1984: NY-BS-8412-01, CH-BS-8412-05, SF-BS-8412-01, NS-BS-8412-01, IBF-BS-8412-01; 1985: NY-BS-8512-01, CH-BS-8512-01, SF-BS-8512-01, NS-BS-8512-01, IBF-BS-8512-01; 1986: NY-BS-8612-01, CH-BS-8612-01, SF-BS-8612-01, NS-BS-8612-01, IBF-BS-8612-01, GC-BS-8612-01; 1987: NY-BS-8712-01, CH-BS-8712-01, SF-BS-8712-01, NS-BS-8712-01, IBF-BS-8712-01, GC-BS-8712-01.)

REQUEST FOR ADMISSION 2.114. The aggregate of the balances recorded as "Balance due to HO re Fixed Assets" on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Balance due to HO re Fixed Assets |
|---|---|
| 1980 | 8,344,816 |
| 1981 | 9,033,064 |
| 1982 | 9,002,188 |

| Tax Year | Aggregate Balance due to HO re Fixed Assets |
|---|---|
| 1983 | 9,257,926 |
| 1984 | 9,860,521 |
| 1985 | 8,817,958 |
| 1986 | 0 |
| 1987 | 0 |

(*See* 1980: NY-BS-8012-01, CH-BS-8012-01, NS-BS-8012-05, SF-BS-8012-02; 1981: NY-BS-8112-01, CH-BS-8112-01, SF-BS-8112-01, NS-BS-8112-01; 1982: NY-BS-8212-01, CH-BS-8212-01, SF-BS-8212-01, NS-BS-8212-01; 1983: NY-BS-8312-01, CH-BS-8312-01, SF-BS-8312-01, NS-BS-8312-01, IBF-BS-8312-01; 1984: NY-BS-8412-01, CH-BS-8412-05, SF-BS-8412-01, NS-BS-8412-01, IBF-BS-8412-01; 1985: NY-BS-8512-01, CH-BS-8512-01, SF-BS-8512-01, NS-BS-8512-01, IBF-BS-8512-01; 1986: NY-BS-8612-01, CH-BS-8612-01, SF-BS-8612-01, NS-BS-8612-01, IBF-BS-8612-01, GC-BS-8612-01; 1987: NY-BS-8712-01, CH-BS-8712-01, SF-BS-8712-01, NS-BS-8712-01, IBF-BS-8712-01, GC-BS-8712-01.)

REQUEST FOR ADMISSION 2.115. The aggregate of the balances recorded as "Profit and Loss" on the year-end balance sheets of the U.S. branches for the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Profit & Loss Balance |
|---|---|
| 1980 | 0 |
| 1981 | 0 |
| 1982 | 4,604,145 |
| 1983 | 5,117,386 |
| 1984 | 5,109,745 |

| Tax Year | Aggregate Profit & Loss Balance |
|---|---|
| 1985 | 0 |
| 1986 | 0 |
| 1987 | (6,072,870) |

(*See* 1982: NS-BS-8212-02; 1983: CH-BS-8312-02, NS-BS-8312-02; 1984: NS-BS-8412-02; 1987: NY-BS-8712-04.)

REQUEST FOR ADMISSION 2.116. The aggregate of the amounts that either were designated as capital on the books of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes (i.e., the provisions for "B&DD - Specific", "B&DD - Non-Specific", "Retained Profits" (net of any "Accumulated Losses"), "Balance due to HO re Capital Loans", "Balance due to HO re Fixed Assets", and balances recorded as "Profit and Loss") as of December 31st of the taxable year ended December 31, 1980 and each of the years at issue was:

| Tax Year | Aggregate Capital |
|---|---|
| 1980 | 41,857,514 |
| 1981 | 27,109,353 |
| 1982 | 36,013,607 |
| 1983 | 59,128,326 |
| 1984 | 57,615,166 |
| 1985 | 81,400,992 |
| 1986 | 91,303,197 |
| 1987 | 98,680,887 |

*See* Requests for Admission 2.109 through 2.115.

REQUEST FOR ADMISSION 2.117. All of the interest income received and included in income by the U.S. branches during the years at issue reflected arm's-length market rates.

REQUEST FOR ADMISSION 2.118. All of the interest expense paid and deducted by the U.S. branches during the years at issue reflected arm's-length market rates.

REQUEST FOR ADMISSION 2.119. The following table lists all of the adjustments to the U.S. federal taxable income of NatWest as set forth in the RARs with respect to all issues, excluding adjustments that are dependent on the outcome of subsequent years and computational adjustments that are dependent on resolution of all issues relating to the years at issue:

Adjustments to RAR Taxable Income

| Tax Year | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|---|
| Reversal of adjustments to interest income[1] | 125,857,675 | 132,049,714 | 88,243,894 | 104,153,633 | 79,404,169 | 87,081,845 | 131,596,705 |
| Reversal of adjustments to interest expense[1] | (152,605,551) | (147,337,977) | (101,652,347) | (126,092,694) | (93,539,801) | (108,064,089) | (174,292,853) |
| Reversal of Net Loans Adjustment[2] | 0 | 0 | 0 | 0 | 0 | (84,426) | (174,309) |
| Elimination of Net Intra-U.S. Interest Expense[3] | 0 | 23,991 | 0 | 231,163 | 38,246 | 0 | 71,877 |
| Elimination of Capital Loan Charge[4] | 465,868 | 209,433 | 202,745 | 309,459 | 0 | 2,603,584 | 1,936,537 |
| Adjustment to NOL Carryback from 1990[5] | 0 | 0 | 0 | 0 | 0 | 0 | 3,385,279 |
| Aggregate Adjustments to RAR Taxable Income | (26,282,008) | (15,054,839) | (13,205,708) | (21,398,439) | (14,097,386) | (18,463,086) | (37,476,764) |

1 – *See* Request for Admission 2.54, above.
2 - *See* Request for Admission 2.52, above.
3 - *See* Requests for Admission 2.66 and 2.67, above.
4 - *See* Requests for Admission 2.68, 2.87 and 2.88, above.
5 -Two adjustments to the U.S. Branch's NOL Carryback were conceded by NatWest during the audit of its 1990 taxable year, resulting in an addition to income for the 1987 tax year of $3,385,279. *See* $912,566 agreed on Form 870-AD dated June 26, 1998 at 2, and $2,472,713 in closing agreement executed by NatWest on June 14, 1999. The NOL Carryback is subject to further adjustment depending on the resolution of taxable years not at issue here.

REQUEST FOR ADMISSION 2.120. The U.S. federal taxable income of NatWest for each of the tax years at issue after adjustments described in Request for Admission 2.119 is:

| Tax Year | Taxable Income per RARs[1] ("A") | Aggregate Adjustments to RAR Taxable Income[2]("B") | Taxable Income After Adjustments (=A+B ) |
|---|---|---|---|
| 1981 | 31,875,618 | (26,282,008) | 5,593,610 |
| 1982 | 28,154,833 | (15,054,839) | 13,099,994 |
| 1983 | 38,336,127 | (13,205,708) | 25,130,419 |
| 1984 | 29,948,701 | (21,398,439) | 8,550,262 |
| 1985 | 54,676,775 | (14,097,386) | 40,579,389 |
| 1986 | 64,457,339 | (18,463,086) | 45,994,253 |
| 1987 | 46,808,885 | (37,476,764) | 9,332,121 |

1 - *See* Request for Admission 2.57, above.
2 - *See* Request for Admission 2.119, above.
3 - These adjustments do not reflect any adjustment for the deduction for Environmental Tax allowed under Section 164(a)(5)

REQUEST FOR ADMISSION 2.121. The applicable effective federal income tax rates for the years at issue are:

| Tax Year | Effective Federal Income Tax Rate |
|---|---|
| 1981 | 46% |
| 1982 | 46% |
| 1983 | 46% |
| 1984 | 46% |
| 1985 | 46% |
| 1986 | 46% |
| 1987 | 39.95068% |

(*See* Code §11(b) (1981-1987) (for explanation of 1987 blended rate *see* H.R. Rep. No. 99-841, at II - 159 (1986) (Conference Report to accompany H.R. 3838, the Tax Reform Act of 1986) (46% maximum corporate rate switches to 34% maximum rate for income taxable on or after July 1, 1987)).)

REQUEST FOR ADMISSION 2.122. The tax effect of the adjustments described in Request for Admission 2.119 is:

| Tax Year | Effective Federal Income Tax Rate[1] ("A") | Aggregate Adjustments to RAR Taxable Income[2] ("B") | Tax Effect of Adjustments (=A*B ) |
|---|---|---|---|
| 1981 | 46% | (26,282,008) | (12,089,724) |
| 1982 | 46% | (15,054,839) | (6,925,226) |
| 1983 | 46% | (13,205,708) | (6,074,626) |
| 1984 | 46% | (21,398,439) | (9,843,282) |
| 1985 | 46% | (14,097,386) | (6,484,798) |
| 1986 | 46% | (18,463,086) | (8,493,020) |
| 1987 | 39.95068% | (37,476,764) | (15,020,710) |
| **Total** | | | (64,931,386) |

1 - *See* Request for Admission 2.121, above.
2 - *See* Request for Admission 2.119, above.
3 - Note that the tax effect for 1987 reflects (i) the imposition of the Environmental Tax under Section 59A and (ii) the deductibility of that tax for regular tax purposes under Section 164(a)(5).

REQUEST FOR ADMISSION 2.123. The reduction in tax liability is:

| Tax Year | Tax Effect of Adjustments[1] ("A") | Tax Liability per RARs[2] ("B") | Revised Tax Liability (=A+B ) |
|---|---|---|---|
| 1981 | (12,089,724) | 14,154,278 | 2,064,554 |
| 1982 | (6,925,226) | 12,546,863 | 5,621,637 |
| 1983 | (6,074,626) | 16,105,789 | 10,031,163 |

| Tax Year | Tax Effect of Adjustments[1] ("A") | Tax Liability per RARs[2] ("B") | Revised Tax Liability (=A+B ) |
|---|---|---|---|
| 1984 | (9,843,282) | 13,084,832 | 3,241,550 |
| 1985 | (6,484,798) | 24,937,042 | 18,452,244 |
| 1986 | (8,493,020) | 29,528,505 | 21,035,485 |
| 1987 | (15,020,710) | 18,620,521 | 3,599,811 |
| **Total** | (64,931,386) | 128,977,830 | 64,046,444 |

1 - *See* Request for Admission 2.122, above.
2 - *See* Request for Admission 2.58, above.

REQUEST FOR ADMISSION 2.124. The aggregate U.S. federal income taxes paid by NatWest for each of the tax years at issue is:

| Tax Year | Aggregate Tax Payments |
|---|---|
| 1981 | 14,154,278 |
| 1982 | 12,546,863 |
| 1983 | 16,105,789 |
| 1984 | 13,084,832 |
| 1985 | 24,937,042 |
| 1986 | 29,528,505 |
| 1987 | 18,620,521 |
| **Total** | 128,977,830 |

*See* Request for Admission 2.61, above.

REQUEST FOR ADMISSION 2.125. The amount of tax overpayment by NatWest, excluding interest thereon, is:

| Tax Year | Aggregate Tax Payments[1] ("A") | Revised Tax Liability[2] ("B") | Tax Overpayment (=A-B) |
|---|---|---|---|

| Tax Year | Aggregate Tax Payments[1] ("A") | Revised Tax Liability[2] ("B") | Tax Overpayment (=A-B) |
|---|---|---|---|
| 1981 | 14,154,278 | 2,064,554 | 12,089,724 |
| 1982 | 12,546,863 | 5,621,637 | 6,925,226 |
| 1983 | 16,105,789 | 10,031,163 | 6,074,626 |
| 1984 | 13,084,832 | 3,241,550 | 9,843,282 |
| 1985 | 24,937,042 | 18,452,244 | 6,484,798 |
| 1986 | 29,528,505 | 21,035,485 | 8,493,020 |
| 1987 | 18,620,521 | 3,599,811 | 15,020,710 |
| Total | 128,977,830 | 64,046,444 | 64,931,386 |

1 - *See* Request for Admission 2.124, above.
2 - *See* Request for Admission 2.123, above.

Dated: December __, 2004

Respectfully submitted,

D Scott Wise by: [signature]

D. Scott Wise

Attorney of Record
Davis Polk & Wardwell
450 Lexington Avenue
New York, N.Y. 10017

CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2004, I caused a copy of the foregoing to be served by hand on the attorneys for Defendant as follows:

Steven I. Frahm
Attorney of Record
U.S. Department of Justice, Tax Division
Court of Federal Claims Section
555 4th Street N.W., 8th Floor
Washington, D.C. 2004

Winston & Strawn LLP
1400 L Street, N.W.
Washington, D.C. 20005

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 95-758T

(Judge Nancy B. Firestone)

NATIONAL WESTMINSTER BANK PLC,

Plaintiff

v.

THE UNITED STATES,

Defendant

# PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSIONS

Pursuant to RCFC 26 and 36, plaintiff, National Westminster Bank PLC ("NatWest" or "PLC") hereby makes its responses and objections to Defendant's First Set of Requests for Admissions (the "Requests for Admissions"). The responses and objections pursuant to the Requests for Admissions are made without in any way waiving or intending to waive, but on the contrary reserving and intending to reserve:

1. The right to object on the grounds of competency, relevance, materiality, privilege and admissibility as evidence for any purpose of any of the information produced hereunder or the subject matter thereof, including objections that any information requested is not reasonably calculated to lead to the discovery of admissible evidence.

**Request 1.53.** The interest income and expense reflected on the profit and loss statements of the New York branch for the years ended December 31, 1981 through December 31, 1987 are as follows (Pltf.s 5/4/2004 Proposed Stipulations 55-61):

| | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|---|
| **Interest Income:** | | | | | | | |
| Third Party | 358,189,091 | 294,769,819 | 157,544,606 | 188,222,744 | 191,308,714 | 149,901,661 | 120,180,786 |
| Intra Group | 21,875,235 | 55,801,647 | 9,298,633 | 12,519,514 | 12,001,469 | 12,549,476 | 15,950,922 |
| Total Interest Income | 380,064,326 | 350,571,466 | 166,843,239 | 200,742,258 | 203,310,183 | 162,451,137 | 136,131,708 |
| | | | | | | | |
| **Interest Expense:** | | | | | | | |
| Third Party | 252,456,950 | 230,249,221 | 138,049,019 | 185,016,860 | 158,775,987 | 119,170,195 | 104,377,700 |
| Intra Group | 112,999,252 | 95,274,892 | 12,293,057 | 9,641,174 | 8,040,437 | 8,100,127 | 28,610,334 |
| Total Interest Expense | 365,456,202 | 325,524,113 | 150,342,076 | 194,658,034 | 166,816,424 | 127,270,322 | 132,988,034 |

**Response to Request 1.53.** Plaintiff denies the matter stated in this request except to admit that the interest income and expense reflected on the profit and loss statements of the New York branch for the years ended December 31, 1981 through December 31, 1987 are as follows (differences from figures in defendant's request shown in bold):

| | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|---|
| **Interest Income:** | | | | | | | |
| Third Party | **368,210,551** | 294,769,819 | 157,544,606 | 188,222,744 | 191,308,714 | 149,901,661 | 120,180,786 |
| Intra Group | 21,875,235 | 55,801,647 | 9,298,633 | 12,519,514 | 12,001,469 | 12,549,476 | 15,950,922 |
| Total Interest Income | **390,085,786** | 350,571,466 | 166,843,239 | 200,742,258 | 203,310,183 | 162,451,137 | 136,131,708 |
| | | | | | | | |
| **Interest Expense:** | | | | | | | |
| Third Party | 252,456,950 | 230,249,221 | 138,049,019 | 185,016,860 | 158,775,987 | 119,170,195 | 104,377,700 |
| Intra Group | 112,999,252 | 95,274,892 | 12,293,057 | 9,641,174 | 8,040,437 | 8,100,127 | 28,610,334 |
| Total Interest Expense | 365,456,202 | 325,524,113 | 150,342,076 | 194,658,034 | 166,816,424 | 127,270,322 | 132,988,034 |

**Request 1.54.** The interest income and expense reflected on the profit and loss statements of the IBF branch for the years ended December 31, 1983 through December 31, 1987 are as follows (Pltf.'s 5/4/2004 Proposed Stipulations 62-66):

| | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|
| **Interest Income:** | | | | | |
| Third Party | 89,212,751 | 126,895,342 | 79,146,747 | 57,085,225 | 80,175,624 |
| Intra Group | 20,607,405 | 25,407,933 | 18,249,148 | 30,954,547 | 38,244,349 |
| Total Interest Income | 109,820,156 | 152,303,275 | 97,395,895 | 88,039,772 | 118,419,973 |
| | | | | | |
| **Interest Expense:** | | | | | |
| Third Party | 42,984,641 | 85,982,676 | 43,024,081 | 29,069,228 | 46,205,786 |
| Intra Group | 51,713,455 | 49,720,029 | 35,722,591 | 45,691,728 | 63,890,133 |
| Total Interest Expense | 94,698,096 | 135,702,705 | 78,746,672 | 74,760,956 | 110,095,919 |

**Response to Request 1.54.** Plaintiff admits the matter stated in this request.

**Request 1.55.** The interest income and expense reflected on the profit and loss statements of the Nassau branch for the years ended December 31, 1981 through December 31,1987 are as follows (Pltf.'s 5/4/2004 Proposed Stipulations 67-73):

| | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|---|
| **Interest Income:** | | | | | | | |
| Third Party | 151,863,155 | 161,091,990 | 114,883,106 | 175,261,225 | 133,388,261 | 150,049,269 | 200,566,718 |
| Intra Group | 82,436,496 | 51,294,299 | 35,612,680 | 40,510,724 | 26,163,866 | 22,049,585 | 55,215,452 |
| Total Interest Income | 234,299,651 | 212,386,289 | 150,495,786 | 215,771,949 | 159,552,127 | 172,098,854 | 255,782,170 |
| | | | | | | | |
| **Interest Expense:** | | | | | | | |
| Third Party | 218,324,456 | 182,292,696 | 135,328,467 | 185,356,153 | 111,903,599 | 90,715,494 | 123,955,846 |
| Intra Group | 12,869,708 | 24,825,493 | 9,283,117 | 24,448,637 | 37,740,138 | 72,874,752 | 116,965,840 |
| Total Interest Expense | 231,194,164 | 207,118,189 | 144,611,584 | 209,804,790 | 149,643,737 | 163,590,246 | 240,921,686 |

**Response to Request 1.55.** Plaintiff admits the matter stated in this request.

**Request 1.56.** The interest income and expense reflected on the profit and loss statements of the Grand Cayman Island branch for the years ended December 31, 1985 through December 31, 1987 are as follows (Pltf.'s 5/4/2004 Proposed Stipulations 74-76):

| | 1985 | 1986 | 1987 |
|---|---|---|---|
| **Interest Income:** | | | |
| Third Party | 1,042,703 | 1,389,743 | 1,480,387 |
| Intra Group | 42,374 | 88,423 | 1,827,110 |
| Total Interest Income | 1,085,077 | 1,478,166 | 3,307,497 |
| | | | |
| **Interest Expense:** | | | |
| Third Party | 0 | 67,708 | 1,813,987 |
| Intra Group | 1,065,884 | 1,355,022 | 1,395,348 |
| Total Interest Expense | 1,065,884 | 1,422,730 | 3,209,335 |

**Response to Request 1.56.** Plaintiff admits the matter stated in this request.

**Request 1.57.** The interest income and expense reflected on the profit and loss statements of the Chicago branch for the years ended December 31, 1981 through December 31, 1987 are as follows (Pltf.'s 5/4/2004 Proposed Stipulations 77-83):

| | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|---|
| **Interest Income:** | | | | | | | |
| Third Party | 34,669,822 | 27,782,082 | 22,897,219 | 26,278,417 | 28,056,633 | 29,255,073 | 31,970,560 |
| Intra Group | 58,265 | 2,838,008 | 403,325 | 11,550 | 219,508 | 226,872 | 253,039 |
| Total Interest Income | 34,728,087 | 30,620,090 | 23,300,544 | 26,289,967 | 28,276,141 | 29,481,945 | 32,223,599 |
| | | | | | | | |
| **Interest Expense:** | | | | | | | |
| Third Party | 294,481 | 52,638 | 12,737 | 18,150 | 110,086 | 94,132 | 37,595 |
| Intra Group | 33,426,382 | 29,083,163 | 20,817,013 | 23,827,602 | 25,037,067 | 25,772,528 | 28,657,385 |
| Total Interest Expense | 33,720,863 | 29,135,801 | 20,829,750 | 23,845,752 | 25,147,153 | 25,866,660 | 28,694,980 |

**Response to Request 1.57.** Plaintiff admits the matter stated in this request.

**Request 1.58.** The interest income and expense reflected on the profit and loss statements of the San Francisco branch for the years ended December 31, 1981 through December 31, 1987 are as follows (Pltf's 5/4/2004 Proposed Stipulations 84-90):

| | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|---|
| **Interest Income:** | | | | | | | |
| Third Party | 21,059,749 | 19,309,233 | 13,673,011 | 14,431,195 | 16,858,570 | 17,598,063 | 13,121,399 |
| Intra Group | 21,487,679 | 22,115,761 | 22,321,853 | 25,703,912 | 22,770,179 | 27,666,222 | 25,423,910 |
| Total Interest Income | 42,547,428 | 41,424,994 | 35,994,864 | 40,135,107 | 39,628,749 | 45,264,285 | 38,545,309 |
| | | | | | | | |
| **Interest Expense:** | | | | | | | |
| Third Party | 34,080,053 | 34,174,843 | 25,818,689 | 28,861,973 | 29,581,366 | 31,997,164 | 25,531,035 |
| Intra Group | 6,585,677 | 5,604,515 | 8,532,004 | 9,921,432 | 8,182,899 | 11,475,613 | 11,447,889 |
| Total Interest Expense | 40,665,730 | 39,779,358 | 34,350,693 | 38,783,405 | 37,764,265 | 43,472,777 | 36,978,924 |

**Response to Request 1.58.** Plaintiff denies the matter stated in this request except to admit that the interest income and expense reflected on the profit and loss statements of the San Francisco agency for the years ended December 31, 1981 through December 31, 1987 are as follows (differences from figures in defendant's request shown in bold):

| | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|---|
| **Interest Income:** | | | | | | | |
| Third Party | **21,137,686** | 19,309,233 | 13,673,011 | 14,431,195 | 16,858,570 | 17,598,063 | 13,121,399 |
| Intra Group | 21,487,679 | 22,115,761 | 22,321,853 | 25,703,912 | 22,770,179 | 27,666,222 | 25,423,910 |
| Total Interest Income | **42,625,365** | 41,424,994 | 35,994,864 | 40,135,107 | 39,628,749 | 45,264,285 | 38,545,309 |
| | | | | | | | |
| **Interest Expense:** | | | | | | | |
| Third Party | 34,080,053 | 34,174,843 | 25,818,689 | 28,861,973 | 29,581,366 | 31,997,164 | 25,531,035 |
| Intra Group | 6,585,677 | 5,604,515 | 8,532,004 | 9,921,432 | 8,182,899 | 11,475,613 | 11,447,889 |
| Total Interest Expense | 40,665,730 | 39,779,358 | 34,350,693 | 38,783,405 | 37,764,265 | 43,472,777 | 36,978,924 |

Dated:

November 22, 2004

By: D. Scott Wise by Melissa Clark

CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2004, I caused a copy of the foregoing to be served by hand on the attorneys for Defendant as follows:

Steven I. Frahm
Attorney of Record
U.S. Department of Justice, Tax Division
555 Fourth Street, N.W.
Washington, D.C. 20001

Winston & Strawn LLP
1400 L Street, N.W.
Washington, D.C. 20005

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 95-758 T**

**(Judge Nancy B. Firestone)**

**NATIONAL WESTMINSTER BANK, PLC,**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

**DEFENDANT'S RESPONSES TO PLAINTIFF'S FOURTH SET OF INTERROGATORIES**

JAN 7 2005

Pursuant to Rules 26 and 33 of the Rules of the Court of Federal Claims, defendant, the United States, hereby responds to plaintiff's fourth set of interrogatories as follows:

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

Defendant objects to plaintiff's definitions, as follows:

1. Objects to the definition of "U.S. branches" to the extent it refers to "licensed" branches and agencies, as plaintiff has not produced documentation regarding such licenses.

2. Objects to plaintiff's new reference to "the San Francisco agency," as the Court previously has ruled, in accordance with the parties' filings, that there were six U.S. branches, including the San Francisco branch, not a San Francisco agency.

3. Objects to plaintiff's definition that omits the term "branch" from its references to the International Banking Facility, in an effort, confirmed elsewhere in plaintiff's discovery requests, to newly characterize the IBF Branch as part of the New York branch, and not as itself a branch.

4. Objects to plaintiff's instructions regarding responses to these interrogatories, to the extent that they vary from or purport to add to the obligations specified in the Rules of the United States Court of Federal Claims.

INTERROGATORY 4.01. Does defendant contend that any interest expense paid or incurred by the U.S. branches to other branches of NatWest PLC, including the Head Office, during the years at issue did not reflect arm's length interest rates? If so, identify any such amounts and describe in detail the basis for any such contention (including branch, year, account number and document (with line reference)). Identify all documents that form a basis for defendant's response, and identify all persons with knowledge that forms a basis for defendant's response.

RESPONSE:

Plaintiff's interrogatory seek the conclusions and reasoning of defendant's experts with respect to the arm's length interest issue. As plaintiff is aware, defendant presently is engaged in document review and discovery to obtain the information needed to conduct a thorough, objective analysis of that issue. When discovery is completed, defendant's experts will evaluate the information obtained and reach conclusions. Defendant's experts will fully discuss their analysis and conclusions in their experts' report.

The Court's October 5, 2004, Order provides that the parties shall exchange initial expert

reports by Friday, March 4, 2005, and supplemental expert reports by Monday, May 2, 2005.[1] The Court's Order also provides for a Pre-Trial Conference, which, under the Court's Rules, sets the due dates for the parties' Memorandum of Contentions of Fact and Law. RCFC Appendix A, ¶ 14. Thus, the Court already has provided a procedure under which both parties will be fully advised of their respective contentions prior to trial.

Plaintiff's request is unnecessary, oppressive, unduly burdensome, and an abuse of the discovery process. Plaintiff is aware that defendant's experts cannot possibly have reached conclusions while they are in the process of collecting information in the course of discovery. This interrogatory, and those following, appear calculated to consume defendant's time during the short period available for discovery and to frustrate defendant's efforts to make productive use of the discovery period.[2] Moreover, since plaintiff's experts' reports will not be provided to defendant for some months, plaintiff's request seeks to accelerate, as to defendant alone, the due date for its experts' conclusions. Plaintiff would thereby obtain information regarding defendant's experts work before its own experts would disclose their work, and such information could be used to tailor the matters addressed by plaintiff's experts. Plaintiff, not defendant, bears

---

[1] Defendant's motion for a 30-day enlargement of the discovery period, and a concomitant adjustment of the other pretrial dates, including exchanges of experts' reports, is pending.

[2] The same is true for plaintiff's 125 requests for admission served simultaneously with its interrogatories. The requests for admission principally address (1) tax computations that plaintiff previously agreed need not be addressed until after trial (and which are exceedingly likely to be the subject of agreement by the parties, without need for Court intervention), (2) stipulations that plaintiff previously proposed and to which defendant did not agree, for reasons that were made clear to plaintiff at the time, and (3) defendant's experts' conclusions with respect to plaintiff's October 29, 2004, report discussing plaintiff's 1990 memorandum and plaintiff's present contentions regarding interest on certain accounts.

the burden of proof in this case; plaintiff has not yet disclosed its contentions regarding the basis for a conclusion that the U.S. branches' interest income and interest expense reflects arm's length dealing.

Plaintiff engaged in this tactic previously, when it served its Second Set of Interrogatories, seeking details regarding the analysis and conclusions of defendant's experts on other issues, which plaintiff knew had not been completed and which already were covered by a Court Order providing for the reciprocal exchanges of experts' reports. Plaintiff filed a Motion to Compel in that instance, which the Court denied by Order dated September 25, 2001.

Defendant therefore objects to this interrogatory. Subject to its objections, defendant states that its experts' report will fully set forth its position in response to this interrogatory and will be provided to plaintiff in accordance with its Order.

INTERROGATORY 4.02. Does defendant contend that any interest expense paid or incurred by the U.S. branches to other group companies during the years at issue did not reflect arm's length interest rates? If so, identify any such amounts and describe in detail the basis for any such contention (including branch, year, account number and document (with line reference)). Identify all documents that form a basis for defendant's response, and identify all persons with knowledge that forms a basis for defendant's response.

RESPONSE:

See defendant's Response to Interrogatory 4.01.

INTERROGATORY 4.03. Does defendant contend that any interest income accrued or received by the U.S. branches from other branches of NatWest PLC, including the Head Office, during the years at issue did not reflect arm's length interest rates? If so, identify any such amounts and describe in detail the basis for any such contention (including branch, year, account number and document (with line reference)). Identify all documents that form a basis for defendant's response, and identify all persons with knowledge that forms a basis for defendant's response.

RESPONSE:

See defendant's Response to Interrogatory 4.01.

INTERROGATORY 4.04. Does defendant contend that any interest income accrued or received by the U.S. branches from other group companies during the years at issue did not reflect arm's length interest rates? If so, identify any such amounts and describe in detail the basis for any such contention (including branch, year, account number and document (with line reference)). Identify all documents that form a basis for defendant's response, and identify all persons with knowledge that forms a basis for defendant's response.

RESPONSE:

See defendant's Response to Interrogatory 4.01.

INTERROGATORY 4.05. Excluding the capital loan charge amounts that plaintiff conceded in its June 5, 2001, revised claim, does defendant contend that plaintiff's United States federal income tax returns for the years at issue reflect deductions for payments made by the U.S. branches in respect of amounts designated on the books of the U.S. branches as capital? If so, identify all such amounts, and describe in detail the basis for any such contention. Identify all documents that form a basis for defendant's response, and identify all persons with knowledge that forms a basis for defendant's response.

RESPONSE:

No amounts were designated on the books of the U.S. branches as capital. The contemporaneous balance sheets of each of the six branches contain line items that are designated as either assets or liabilities.

INTERROGATORY 4.06. Excluding the capital loan charge amounts that plaintiff conceded in its June 5, 2001, revised claim, does defendant contend that plaintiff's United States federal income tax returns for the years at issue reflect deductions for payments made by the U.S. branches in respect of amounts in fact allotted to the U.S. branches as capital for capital purposes? If so, identify all such amounts, and describe in detail the basis for any such contention. Identify all documents that form a bsis for defendant's response, and identify all persons with knowledge that forms a basis for defendant's response.

RESPONSE:

As is true of the earlier interrogatories addressing arm's length interest issue, this interrogatory seek the conclusions and reasoning of defendant's experts with respect to the capital issue. Defendant therefore asserts the same objections as expressed in response to Interrogatory 4.01. Subject to those objections, defendant states that its experts' report will fully set forth its position in response to this interrogatory and will be provided to plaintiff in accordance with its Order.

INTERROGATORY 4.07. Does defendant dispute any of the statements set forth in plaintiff's Report on the Capital Issue dated October 29, 2004, including any of the statements set forth in Exhibit C thereto? If so identify each statement defendant disputes, and describe in detail the basis for defendant's position. Identify all documents that form a basis for defendant's response, and identify all persons with knowledge that forms a basis for defendant's response.

RESPONSE:

Defendant objects to this interrogatory on the grounds that it is unduly burdensome, oppressive, vague, and ambiguous to request defendant's position with respect to "any of the statements" set forth in lengthy documents, containing numerous exhibits, subexhibits, and accounting calculations and schedules. See also defendant's Response to Interrogatory 4.06 and Responses to Requests for Admission 2.69 through 2.106.

INTERROGATORY 4.08. Describe defendant's contentions, both verbally and numerically, with respect to the effect of the U.S. branches' purchases of Fixed Assets during the years at issue on the computation of plaintiff's taxable income for the years at issue in accordance with the Court's November 14, 2003 opinion in this case. Identify all documents that form a basis for defendant's response, and identify all persons with knowledge that forms a basis for defendant's response.

RESPONSE:

See defendant's Response to Interrogatory 4.06 and Response to Request for Admission 2.44. See also Defendant's Motion to Clarify Scope of Inquiries Re Capital Issue, filed July 26, 2004.

INTERROGATORY 4.09. Describe defendant's contentions, both verbally and numerically, with respect to the effect of the U.S. branches' purchases of Fixed Assets during any years prior to the years at issue on the computation of plaintiff's taxable income for the years at issue in accordance with the Court's November 14, 2003 opinion in this case. Identify all documents that form a basis for defendant's response, and identify all persons with knowledge that forms a basis for defendant's response.

RESPONSE:

See defendant's Response to Interrogatory 4.09.

INTERROGATORY 4.10. Does defendant contend that any adjustments should be made to the taxable income of the U.S. branches as set forth in the RARs, that differ from those described in plaintiff's Request for Admission 2.119? If so, identify any such adjustments and describe in detail the basis for any such adjustments. Identify all documents that form a basis for defendant's response, and identify all persons with knowledge that forms a basis for defendant's response.

RESPONSE:

See defendant's Responses to Requests for Admission 2.44 and 2.119.

INTERROGATORY 4.11. Identify each person who participated in the preparation of defendant's response to these interrogatories and each person who was consulted in formulating any of the responses to these interrogatories.

RESPONSE:

Defendant's counsel.

INTERROGATORY 4.12. If any of the requests set forth in plaintiff's Second Request for Admissions, submitted herewith, are denied or responded to in any manner other than an unqualified admission, describe fully with respect to each such request the reasons defendant did not respond with an unqualified admission and identify any documents that support defendant's failure to provide an unqualified admission.

RESPONSE:

See defendant's responses to plaintiff's Second Request for Admissions.

Respectfully submitted,

STEVEN I. FRAHM
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6504

EILEEN J. O'CONNOR
Assistant Attorney General
MILDRED L. SEIDMAN
Chief, Court of Federal Claims Section

(SF)
Of Counsel

January 7, 2005

CERTIFICATE OF SERVICE

I certify that service of this Response to Plaintiff's Fourth Set of Interrogatories has been made on opposing counsel this 7th day of January 2005 by mailing a copy thereof, in a postage paid envelope, to the following address:

D. Scott Wise
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017

Katie M. Stevens

U.S. Department of Justice (Tax)
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20004
(202) 307-6440