**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 95-758T**
**(Judge Nancy B. Firestone)**

**NATIONAL WESTMINSTER BANK PLC,**
**Plaintiff**

**v.**

**THE UNITED STATES,**
**Defendant**

**DEFENDANT'S RESPONSES TO PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSIONS**

JAN 7 2005

Pursuant to Rules 26 and 36 of the Rules of the United States Court of Federal Claims, the United States responds as follows to plaintiff's Second Set of Requests for Admission.

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

Defendant objects to plaintiff's definitions, as follows:

1. Objects to the definition of "U.S. branches" to the extent it refers to "licensed" branches and agencies, as plaintiff has not produced documentation regarding such licenses.

2. Objects to plaintiff's new references to "agencies," and to a "San Francisco agency," as the Court previously has ruled, in accordance with the parties' filings, that there were six U.S. branches, including the San Francisco branch, not a San Francisco agency.

3. Objects to plaintiff's definition that omits the term "branch" from its references to the International Banking Facility, in an effort, confirmed elsewhere, to newly characterize the IBF Branch as part of the New York branch, and not as itself a branch.

4. Objects to plaintiff's definition of its June 5, 2001, submission to defendant as an "Amended Refund Claim." A refund claim, including an amended refund claim, is an administrative document filed with the Internal Revenue Service that has specified statutory consequences. Plaintiff's June 5, 2001, submission to defendant was pursuant to the Court's April 9, 2001, Order directing plaintiff to prepare a definitive statement of its tax refund claim, including the precise amount sought for each of the seven years in dispute and an explanation of the computation of each amount. The June 5, 2001, submission is therefore nothing more than a statement of plaintiff's position by its counsel.

5. Objects to plaintiff's definition of "NOL Carryback," as it is a legal term and is governed by legal authorities, not plaintiff's effort to define it.

6. Objects to plaintiff's instructions regarding responses to these requests for admissions, to the extent that they vary from or purport to add to the obligations specified in the Rules of the United States Court of Federal Claims.

**RESPONSES TO REQUESTS FOR ADMISSIONS**

REQUEST FOR ADMISSION 2.01. During the years at issue, NatWest was a publicly held United Kingdom corporation engaged in the banking business in the United Kingdom, United States, and elsewhere.

RESPONSE TO REQUEST FOR ADMISSION 2.01: Admits.

REQUEST FOR ADMISSION 2.02. During the years at issue, NatWest's worldwide operations were headquartered in the United Kingdom.

RESPONSE TO REQUEST FOR ADMISSION 2.02: Admits.

REQUEST FOR ADMISSION 2.03. During the years at issue, NatWest was entitled to and did claim benefits under the Treaty as a "resident of the United Kingdom." (*See* Treaty Art. 5.)

RESPONSE TO REQUEST FOR ADMISSION 2.03: Defendant objects to the extent plaintiff is requesting defendant's views regarding matters of law, not fact. Subject to that objection, defendant states that plaintiff's position throughout this litigation has been to claim that its U.S. tax liability should be computed pursuant to the U.S. – U.K. Income Tax Treaty.

REQUEST FOR ADMISSION 2.04. During the years at issue, NatWest operated a banking business in the United States through the U.S. branches.

RESPONSE TO REQUEST FOR ADMISSION 2.04: Denies, as plaintiff's request, read in conjunction with its definitions, seeks admissions regarding the nature and status of certain U.S. branches, as well as whether they should be considered collectively. Defendant admits that plaintiff conducted banking businesses in the United States through six U.S. branches: (1) the New York Branch, (2) the IBF Branch, (3) the Cayman Islands Branch, (4) the Nassau Branch, (5) the Chicago Branch, and (6) the San Francisco Branch.

REQUEST FOR ADMISSION 2.05. The principal customers of the U.S. Branch were large multinational corporations (including U.S. subsidiaries of U.K. corporations that were customers of PLC in the United Kingdom), other banks and financial institutions, other PLC offices and subsidiaries, and foreign governments.

RESPONSE TO REQUEST FOR ADMISSION 2.05: Defendant objects to this request as unnecessary and an abuse of the discovery process. See Defendant's Request for Admission 1.02 and Plaintiff's Response.

REQUEST FOR ADMISSION 2.06. The six U.S. branches loaned funds to, and took deposits from, their corporate customers. (*See* Def.'s Request for Admission 1.03 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.06: Defendant objects to responding to this request on the ground that it is unnecessary and an abuse of the discovery process. See Defendant's Request for Admission 1.03 and Plaintiff's Response.

REQUEST FOR ADMISSION 2.07. The U.S. branches engaged in trading activities in the interbank market, including: taking and placing time deposits in the Eurodollar money market, selling commercial paper issued by NatWest, buying (*i.e.*, borrowing) and selling (*i.e.*, lending) federal funds in the U.S. money market, and buying and selling securities under repurchase agreements, typically called "repos" or "reverse repos."

RESPONSE TO REQUEST FOR ADMISSION 2.07: Denies, except admits that (1) the six U.S. branches engaged in trading activities (both borrowing and lending) on the interbank market, (2) that the trading activities were conducted to obtain additional funds needed to make loans to corporate customers, as well as to provide an independent source of profits, and (3) the trading activities during the years at issue included demand deposits, Fed funds purchased, securities sold under repurchase agreements, negotiable certificates of deposits, Euro commercial paper, and Euro time deposits. See Defendant's Requests for Admissions 1.04 and 1.05 and Plaintiff's Responses.

REQUEST FOR ADMISSION 2.08. The trading activities of the U.S. branches were conducted to manage exposure to liquidity and interest rate risk, to obtain additional funds, to place excess funds, and to make a profit.

RESPONSE TO REQUEST FOR ADMISSION 2.08: See Defendant's Response to Request for Admission 2.07, Defendant's Request for Admission 1.04 and Plaintiff's Response.

REQUEST FOR ADMISSION 2.09. For each of the years at issue, NatWest was required to and did file a single U.S. federal income tax return.

RESPONSE TO REQUEST FOR ADMISSION 2.09: Defendant objects to this request for admission on the ground that it calls for a legal conclusion and is not relevant to any issue in the case. Under the Article 7(1) of the U.S. – U.K. Treaty, plaintiff National Westminster Bank PLC is subject to tax in the United States on the profits attributable to its six U.S. branches. Article 7(2) provides that the profits attributable to a branch are those expected if it were an independent, separate and distinct enterprise. Each of the six branches kept separate books and records and engaged in transactions with each other. There were no consolidated or combined books and records of the six U.S. branches. As the Court has ruled, the taxable profits should be determined on the basis of contemporaneous books and records, subject to adjustments. In accordance with PLC's own method of keeping books records, its tax liability under Article 7(2) of the Treaty – the profits expected of a branch on an independent basis – therefore must be separately determined branch by branch. Plaintiff, however, despite the absence of books and records combining the six U.S. branches, and having withdrawn its reliance on consolidated balance sheets that its attorneys prepared for this litigation, is attempting to apply the Court's November 14, 2003, Opinion to determine the capital of a combined U.S. branch that did not

exist. The requested admission is an improper effort to establish through the discovery process that such a combined approach is mandated by law.

REQUEST FOR ADMISSION 2.10. During the years at issue, NatWest was an accrual method taxpayer.

RESPONSE TO REQUEST FOR ADMISSION 2.10: Defendant objects to this request, as it is vague and ambiguous. Plaintiff does not specify whether it is requesting an admission that it was an accrual method taxpayer for book, tax, or some other purposes, and does not specify whether it is inquiring about its accounting method in the United States, the United Kingdom, or elsewhere. Construing plaintiff's request as one for an admission that plaintiff was an accrual basis taxpayer for U.S. federal income tax purposes, defendant admits on that basis.

REQUEST FOR ADMISSION 2.11. There were two branches and one agency of NatWest licensed in the United States: (1) the New York branch licensed by the State of New York, (2) the Chicago branch licensed by the State of Illinois, and (3) the San Francisco agency licensed by the State of California.

RESPONSE TO REQUEST FOR ADMISSION 2.11: Defendant objects to this request on the ground that whether any of plaintiff's six branches operating in the United States during the years at issue were separately licensed by regulatory authorities, and where they were licensed, is not relevant to the issues in this case. Under the U.S. – U.K. Treaty, plaintiff is taxed in the United States on the profits attributable to its six U.S. branches, based on the profits expected if each were a distinct, separate, and independent enterprise (although, in fact, all are a part of plaintiff and none is actually a distinct, separate, and independent enterprise). All six U.S. branches kept separate books and records and engaged in transactions with each other. The

Court already has found, in accordance with the parties' submissions, that plaintiff conducted business in the United States through six branches: (1) the New York branch, (2) the Nassau, Bahamas branch, (3) the Cayman Islands branch, (4) the International Banking Facility ("IBF") branch, (5) the Chicago branch, and (6) the San Francisco branch. 58 Fed. Cl. 491 at 495 (2003). Bank regulatory licensing action, or the absence of such action, with respect to the six U.S. branches has no bearing on plaintiff's federal income tax liability. Subject to this objection, defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny.

REQUEST FOR ADMISSION 2.12. The New York, Nassau, Chicago and San Francisco branches were in operation throughout the years at issue.

RESPONSE TO REQUEST FOR ADMISSION 2.12: Admits.

REQUEST FOR ADMISSION 2.13. The New York branch also operated an International Banking Facility (the "IBF").

RESPONSE TO REQUEST FOR ADMISSION 2.13: Denies. The International Banking Facility was a separate branch. Both branches were operated from facilities in New York, as were the Cayman Islands branch and the Nassau branch. All four branches maintained separate books and records and engaged in transactions with each other.

REQUEST FOR ADMISSION 2.14. The operations of the IBF commenced in December 1981. (*See* Def.'s Request for Admission 1.39 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.14: Defendant objects to responding to this request on the ground that it is unnecessary and an abuse of the discovery process. *See* Defendant's Request for Admission 1.39 and Plaintiff's Response. Defendant also objects to the

request to the extent that it suggests, contrary to the Court's findings (58 Fed. Cl. 491 at 495), that the IBF branch was not a separate branch.

REQUEST FOR ADMISSION 2.15. The IBF was not a separately licensed branch but was a set of asset and liability accounts maintained by the New York branch pursuant to Federal Reserve Board regulations. (*See* Def.'s Request for Admission 1.15 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.15: Defendant objects to this request on the ground that whether any of plaintiff's six branches operating in the United States during the years at issue were separately licensed by regulatory authorities, and where they were licensed, is not relevant to the issues in this case. Under the U.S. – U.K. Treaty, plaintiff is taxed in the United States on the profits attributable to its six U.S. branches, based on the profits expected if each were a distinct, separate, and independent enterprise (although, in fact, all are a part of plaintiff and none is actually a distinct, separate, and independent enterprise). All six U.S. branches kept separate books and records and engaged in transactions with each other. The Court already has found, in accordance with the parties' submissions, that plaintiff conducted business in the United States through six branches: (1) the New York branch, (2) the Nassau, Bahamas branch, (3) the Cayman Islands branch, (4) the International Banking Facility ("IBF") branch, (5) the Chicago branch, and (6) the San Francisco branch. 58 Fed. Cl. 491 at 495 (2003). Bank regulatory licensing action, or the absence of such action, with respect to the six U.S. branches has no bearing on plaintiff's federal income tax liability. Subject to this objection, defendant denies the request to the extent it suggests that the IBF branch was not a separate branch, since the Court already has found to the contrary, and none of the six U.S. branches was actually separate, distinct, and independent of plaintiff; they were not entities, but existed as separate sets of accounts. With respect to the remainder of the request, defendant states that it

has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny.

REQUEST FOR ADMISSION 2.16. Transactions segregated on the books of the New York IBF could qualify for exemption from certain bank regulatory requirements and could give rise to "IBF eligible net income" which was exempt from New York State and City income taxation. (*See* Def.'s Request for Admission 1.15 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.16: Denies to the extent that plaintiff's reference to New York IBF, and to transactions "segregated" on its books, suggests it is not a separate branch. All six U.S. branches, including the IBF branch, kept separate books and records and engaged in transactions with each other. Subject to this objection, defendant admits that the IBF branch was created to obtain certain tax advantages and to avoid certain regulatory reserve requirements. With respect to the remainder of plaintiff's request, defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny.

REQUEST FOR ADMISSION 2.17. NatWest had branches licensed in Nassau and the Grand Cayman Islands.

RESPONSE TO REQUEST FOR ADMISSION 2.17: Defendant objects to this request. *See* defendant's Responses to Request 2.11 and 2.15. Subject to this objection, defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny.

REQUEST FOR ADMISSION 2.18. The Grand Cayman branch began operations in June 1985. (*See* Def.'s Request for Admission 1.40 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.18: Defendant objects to responding to this request on the ground that it is unnecessary and an abuse of the discovery process. *See* Defendant's Request for Admission 1.40 and Plaintiff's Response.

REQUEST FOR ADMISSION 2.19. During the years at issue, the activities of the New York, Nassau and Grand Cayman branches and the IBF were conducted by personnel of NatWest's New York branch office. (*See* Def.'s Request for Admission 1.12 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.19: Denies, except admits that the New York, Nassau, Grand Cayman Islands and IBF branches were operated from a common facility in New York. Each had separate trading desks, engaged in transactions with each other, and kept separate books and records.

REQUEST FOR ADMISSION 2.20. The Nassau and Grand Cayman branches had no employees or facilities located in Nassau or Grand Cayman. (*See* Def.'s Prop. Findings of Uncontr. Fact (Adequate Cap. Issue) dated Sept. 12, 2002 at ¶41; Def.'s Request for Admission 1.13 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.20: Defendant objects to responding to this request on the ground that it is unnecessary and an abuse of the discovery process. See Defendant's Request for Admission 1.13 and Plaintiff's Response.

REQUEST FOR ADMISSION 2.21. During the years at issue, each of the New York, Nassau, Grand Cayman, Chicago, and San Francisco branches and the IBF maintained separate accounts, including profit and loss statements and balance sheets, in the ordinary course of its banking business. (*See* Def.'s Request for Admission 1.06 and Pl.'s Response thereto; *see also*

Report of John J. Mingo, Ph.D. dated Nov. 15, 2001 at 7; Report of John M. Lacey, Ph.D. dated Nov. 15, 2001 at 1.)

RESPONSE TO REQUEST FOR ADMISSION 2.21: Denies the request to the extent it requests an admission that the IBF branch is not a separate branch and otherwise admits that the six U.S. branches kept separate books and records in the ordinary course of their businesses, including profit and loss statements and balance sheets.

REQUEST FOR ADMISSION 2.22. During certain periods prior to September 1983, the results of the IBF were included on the manually prepared and certified balance sheets and profit and loss statements of the New York branch. (*See* Def.'s Request for Admission 1.39 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.22: Defendant objects to responding to this request on the ground that it is unnecessary and an abuse of the discovery process. See Defendant's Request for Admission 1.39 and Plaintiff's Response.

REQUEST FOR ADMISSION 2.23. For September 1983 and during the remainder of the years at issue, separate manually prepared and certified balance sheets and profit and loss statements were prepared for the IBF. (*See* Def.'s Request for Admission 1.39 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.23: Denies, except admits that the IBF branch, like the other U.S. branches, prepared separate computer generated balance sheets and profit and loss statements and that certain corrections were made to those documents, which were reflected in manually prepared balance sheets and profit and loss statements.

REQUEST FOR ADMISSION 2.24. During the years at issue, the U.S. branches submitted profit and loss statements to PLC's head office on a periodic basis. (*See* Def.'s Request for Admission 1.28 and Pl.'s Response thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.24: Defendant objects to responding to this request on the ground that it is unnecessary and an abuse of the discovery process. See Defendant's Request for Admission 1.28 and Plaintiff's Response.

REQUEST FOR ADMISSION 2.25. During the years at issue, the U.S. branches submitted balance sheets to PLC's head office on a periodic basis. (*See* Def.'s Requests for Admission 1.11, 1.28, 1.32-1.33 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.25: Defendant objects to responding to this request on the ground that it is unnecessary and an abuse of the discovery process. See Defendant's Request for Admission 1.11, 1.28, 1.32, and 1.333 and Plaintiff's Responses.

REQUEST FOR ADMISSION 2.26. The profit and loss statements submitted by the U.S. branches to the Head Office included a certification which was required to be signed by the Branch Manager and Branch Accountant.

RESPONSE TO REQUEST FOR ADMISSION 2.26: Denies the request to the extent it is intended to contradict deposition testimony of plaintiff's witnesses and plaintiff's expert that the branches' reports to the Head Office were other than hastily prepared and not entirely accurate. Due to plaintiff's requirement that the branches report to the Head Office within a very short number of days after the end of a period (referred to as a "quick close"), the reports were sent before any detailed analysis could be performed and were not fully corrected and reconciled. A department at PLC's head office was dedicated to making the necessary corrections and the

results were used in preparing National Westminster Bank PLC's annual reports. (Tr. Tatz 1/23/2002 at 20: Tr. Samaroo at 41-42, 80; Bandoian Report at 23-24.). Defendant otherwise states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny whether branch employees were required to sign certifications and that, in fact, they did not always do so. See e.g. Plaintiff's Trial Exhibit PX187 (Nassau branch profit and loss statement January 1, 1984—September 30, 1984).

REQUEST FOR ADMISSION 2.27. The following is a typical example of the certification on profit and loss statements submitted by the U.S. branches to the head office during the years at issue:

> We certify that this Profit and Loss Account is in accordance with the books, and to the best of our knowledge and belief, gives a true and fair value of the profit for the year ended 31 December 1984, and has been prepared on a basis consistent with the Profit and Loss Accounts of previous periods.

(*See* New York branch profit and loss statement for the year ended December 31, 1984.)

RESPONSE TO REQUEST FOR ADMISSION 2.27: See defendant's Response to Request for Admission 2.26. Defendant denies except to admit that printed profit and loss forms, used to manually insert financial results, contain such language.

REQUEST FOR ADMISSION 2.28. The profit and loss statements submitted by the U.S. branches to the Head Office included a schedule entitled "Analysis of Intragroup Interest Paid and Received," which included a certification required to be signed by the Branch Manager.

RESPONSE TO REQUEST FOR ADMISSION 2.28: Denies the request to the extent it is intended to contradict deposition testimony of plaintiff's witnesses and its expert that the branches' reports to the Head Office were other than hastily prepared and not entirely accurate.

Due to plaintiff's requirement that the branches report to it within a very short number of days after the end of a period (referred to as a "quick close"), the reports were sent before any detailed analysis could be performed and were not fully corrected and reconciled. A department at PLC's head office was dedicated to making the necessary corrections and the results were used in preparing National Westminster Bank PLC's annual reports. (Tr. Tatz 1/23/2002 at 20: Tr. Samaroo at 41-42, 80; Bandoian Report at 23-24.). Defendant otherwise states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny whether branch employees were required to sign certifications and further states that, in fact, they did not always do so. See Plaintiff's Trial Exhibit PX187 (Nassau branch profit and loss statement January 1, 1984—September 30, 1984).

REQUEST FOR ADMISSION 2.29. The following is a representative example of the certification on the schedule entitled "Analysis of Intragroup Interest Paid and Received" included in the profit and loss statement submitted by the U.S. branches to the head office during the years at issue:

> We hereby certify that we have agreed all NWB, IWB and Intra-Group Interest with the units/companies concerned. Details and brief explanations of any disagreements are shown overleaf.

(*See* New York branch Analysis of Intragroup Interest Paid and Received schedule for the year ended December 31, 1984.)

RESPONSE TO REQUEST FOR ADMISSION 2.29: See defendant's Response to Request for Admission 2.28. Defendant denies except to admit that printed profit and loss forms, used to manually insert financial results, contain such language.

REQUEST FOR ADMISSION 2.30. NatWest maintained an internal audit process designed to (i) determine if policies, practices, procedures and internal controls were adequate to assure accurate accounting for the activities of the U.S. branches and (ii) initiate corrective action if any deficiencies were identified. (*See* Box 156-5.)

RESPONSE TO REQUEST FOR ADMISSION 2.30: Defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny.

REQUEST FOR ADMISSION 2.31. During the years at issue, the operations and internal controls of the New York branch (including the IBF), the Chicago branch and the San Francisco agency were examined regularly by the Federal Reserve Board and New York, Illinois and California state bank regulatory agencies. (*See* Supplemental Report of Robert R. Bench dated Jan. 14, 2002 at 10-11.)

RESPONSE TO REQUEST FOR ADMISSION 2.31: Defendant denies that the New York branch includes the IBF branch or that the San Francisco branch should be referred to for purposes of this litigation as the San Francisco agency. Defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny the remainder of the request.

REQUEST FOR ADMISSION 2.32. During the years at issue, New York bank regulators reviewed the records of the Nassau branch during the course of their examination of the New York branch. (*See* Pl.'s response to Def.'s Request for Admission 1.10.)

RESPONSE TO REQUEST FOR ADMISSION 2.32: Defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny the remainder of the request.

REQUEST FOR ADMISSION 2.33. The aggregate amount of interest income recorded on the profit and loss statements of the U.S. branches for each of the years at issue was as follows:

| Tax Year | Aggregate Interest Income |
|---|---|
| 1981 | 701,738,889 |
| 1982 | 635,002,839 |
| 1983 | 486,454,589 |
| 1984 | 635,242,556 |
| 1985 | 529,248,172 |
| 1986 | 498,814,159 |
| 1987 | 584,410,256 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim, and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.33: Plaintiff conducted banking operations in the United States through six separate U.S. branches. The branches engaged in transactions with each other and recorded those transactions, as well as other accounting information, on their separately prepared and maintained books and records. Profit and loss statements for each branch were generated by computer. At the end of each month, each branch was required to make a financial report to plaintiff's head office which included manually prepared profit and loss statements. As a result of the short deadline after the close of a period to submit the reporting package (referred to as a "quick close), the reports were sent before any detailed analysis could be performed and were not fully corrected and reconciled. A department

at PLC's head office was dedicated to making the necessary corrections and the results were used in preparing National Westminster Bank PLC's annual reports. (Tr. Tatz 1/23/2002 at 20: Tr. Samaroo at 41-42, 80; Bandoian Report at 23-24.). See Response to Request for Admission 2.26.

Under Article 7(1) of the U.S. – U.K. Treaty, plaintiff National Westminster Bank PLC is subject to tax in the United States on the profits attributable to its six U.S. branches. Article 7(2) provides that the profits attributable to a "permanent establishment" (*i.e.*, a branch) are those expected if it were an independent, separate and distinct enterprise. Each of the six branches kept separate books and records and engaged in transactions with each other, and consolidated or combined profit and loss statements of the six U.S. branches were never prepared. Each branch is a permanent establishment for purposes of the Treaty, and, consistent with plaintiff's practice of keeping separate books for each branch, the profits expected on an independent basis must be determined branch by branch. Thus, capital allotted to the branch in accordance with the Court's November 14, 2003 Opinion must be determined branch by branch. Likewise, the separate books of each branch, and the transactions between the U.S. branches, require that related party interest income and expense must be tested for arm's length dealing at each branch. While interest income and expense reported on the profit and loss statements of each of the six U.S. branches are relevant, aggregations of those amounts into combined totals is not the basis for applying either the November 14, 2003, Opinion, or the arm's length standard to particular related party transactions. Plaintiff's request is therefore irrelevant, immaterial, and not calculated to lead to the discovery of relevant information and defendant objects to the request on those grounds. The requested admission is an improper effort to advance plaintiff's argument that the six U.S. branches may be combined in some manner, notwithstanding its own insistence

that profits should be determined on the basis of the books and records, and its own practice of keeping separate branch records and not combining them. The requested admission also appears to be an improper effort to use the admission process to substitute for the introduction into evidence and consideration of plaintiff's separately kept branch books and records, which, as defendant will demonstrate at trial, were not pristine and reflect non-arm's length dealing.

In addition, plaintiff's request cites as support documents that are not the contemporaneous books and records of the branch. They are a June 5, 2001, submission prepared by plaintiff's counsel for purposes of this litigation. The June 5, 2001, submission is hearsay, and it is not admissible into evidence under any exception to the hearsay rule. Defendant objects to the request, because it relies on inadmissible documents.

Plaintiff's request also is unduly burdensome and oppressive. Plaintiff's request would require defendant to perform accounting work as a prerequisite to responding. As indicated above, each of the branches prepared separate profit and loss statements, revised them, and plaintiff never prepared combined statements. Plaintiff request is a repetition of its May 4, 2004, Proposed Stipulation 125, which asked defendant to verify aggregations by making calculations using 35 other proposed stipulations, each one of which contained a chart of financial data. The books and records of the branches speak for themselves regarding interest income and expense, without demanding accounting exercises from defendant.

Subject to these objections, defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny the request.

REQUEST FOR ADMISSION 2.34. The amounts set forth in Request for Admission 2.33 above include the following amounts of interest income accrued by the U.S. branches from parties unrelated to NatWest:

| Tax Year | Interest Income from Third Parties |
|---|---|
| 1981 | 575,881,214 |
| 1982 | 502,953,124 |
| 1983 | 398,210,695 |
| 1984 | 531,088,923 |
| 1985 | 449,801,628 |
| 1986 | 405,279,034 |
| 1987 | 447,495,474 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.34: Plaintiff conducted banking operations in the United States through six separate U.S. branches. The branches engaged in transactions with each other and recorded those transactions, as well as other accounting information, on their separately prepared and maintained books and records. Profit and loss statements for each branch were generated by computer. At the end of each month, each branch was required to make a financial report to plaintiff's head office which included manually prepared profit and loss statements. As a result of the short deadline after the close of a period to submit the reporting package (referred to as a "quick close), the reports were sent before any detailed analysis could be performed and were not fully corrected and reconciled. A department

at PLC's head office was dedicated to making the necessary corrections and the results were used in preparing National Westminster Bank PLC's annual reports. (Tr. Tatz 1/23/2002 at 20: Tr. Samaroo at 41-42, 80; Bandoian Report at 23-24.). See Response to Request for Admission 2.26.

Under Article 7(1) of the U.S. – U.K. Treaty, plaintiff National Westminster Bank PLC is subject to tax in the United States on the profits attributable to its six U.S. branches. Article 7(2) provides that the profits attributable to a "permanent establishment" (*i.e.*, a branch) are those expected if it were an independent, separate and distinct enterprise. Each of the six branches kept separate books and records and engaged in transactions with each other, and consolidated or combined profit and loss statements of the six U.S. branches were never prepared. Each branch is a permanent establishment for purposes of the Treaty, and, consistent with plaintiff's practice of keeping separate books for each branch, the profits expected on an independent basis must be determined branch by branch. Thus, capital allotted to the branch in accordance with the Court's November 14, 2003 Opinion must be determined branch by branch. Likewise, the separate books of each branch, and the transactions between the U.S. branches, require that related party interest income and expense must be tested for arm's length dealing at each branch. While interest income and expense reported on the profit and loss statements of each of the six U.S. branches are relevant, aggregations of those amounts into combined totals is not the basis for applying either the November 14, 2003, Opinion, or the arm's length standard to particular related party transactions. Plaintiff's request is therefore irrelevant, immaterial, and not calculated to lead to the discovery of relevant information and defendant objects to the request on those grounds. The requested admission is an improper effort to advance plaintiff's argument that the six U.S. branches may be combined in some manner, notwithstanding its own insistence

that profits should be determined on the basis of the books and records, and its own practice of keeping separate branch records and not combining them. The requested admission also appears to be an improper effort to use the admission process to substitute for the introduction into evidence and consideration of plaintiff's separately kept branch books and records, which, as defendant will demonstrate at trial, were not pristine and reflect non-arm's length dealing.

In addition, plaintiff's request cites as support documents that are not the contemporaneous books and records of the branch. They are a June 5, 2001, submission prepared by plaintiff's counsel for purposes of this litigation. The June 5, 2001, submission is hearsay, and it is not admissible into evidence under any exception to the hearsay rule. Defendant objects to the request, because it relies on inadmissible documents.

Plaintiff's request also is unduly burdensome and oppressive. Plaintiff's request would require defendant to perform accounting work as a prerequisite to responding. As indicated above, each of the branches prepared separate profit and loss statements, revised them, and plaintiff never prepared combined statements. The books and records of the branches speak for themselves regarding interest income and expense, without demanding accounting exercises from defendant.

Subject to these objections, defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny the request.

REQUEST FOR ADMISSION 2.35. The amounts set forth in Request for Admission 2.33 above include the following amounts of interest income accrued by the U.S. branches from other group companies:

| Tax Year | Interest Income from Other Group Companies |
|---|---|
| 1981 | 30,962,197 |
| 1982 | 44,606,560 |
| 1983 | 24,471,318 |
| 1984 | 27,299,430 |
| 1985 | 23,977,168 |
| 1986 | 24,705,540 |
| 1987 | 45,142,008 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.35: See Defendant's Response to Request for Admission 2.34.

REQUEST FOR ADMISSION 2.36. The amounts set forth in Request for Admission 2.33 above include the following amounts of interest income accrued by the U.S. branches from other branches of NatWest outside the United States:

| Tax Year | Interest Income from non-U.S. Branches |
|---|---|
| 1981 | 12,352,992 |
| 1982 | 6,833,220 |
| 1983 | 6,091,129 |
| 1984 | 6,609,212 |
| 1985 | 6,890,500 |
| 1986 | 10,531,919 |
| 1987 | 13,603,297 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.36: See Defendant's Response to Request for Admission 2.34.

REQUEST FOR ADMISSION 2.37. The amounts set forth in Request for Admission 2.33 above include the following aggregate amounts of interest income accrued by the U.S. branches from each other:

| Tax Year | Interest Income from U.S. Branches |
|---|---|
| 1981 | 82,542,486 |
| 1982 | 80,609,935 |
| 1983 | 57,681,447 |
| 1984 | 70,244,991 |
| 1985 | 48,578,877 |
| 1986 | 58,297,666 |
| 1987 | 78,169,477 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.37: See Defendant's Response to Request for Admission 2.34.

REQUEST FOR ADMISSION 2.38. The aggregate amount of interest expense recorded on the profit and loss statements of the U.S. branches for each of the years at issue was as follows:

| Tax Year | Aggregate Interest Expense |
|---|---|
| 1981 | 671,036,957 |
| 1982 | 601,557,461 |
| 1983 | 444,832,199 |
| 1984 | 602,794,686 |
| 1985 | 459,184,135 |
| 1986 | 436,383,691 |
| 1987 | 552,888,878 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.38: See Defendant's Response to Request for Admission 2.33.

REQUEST FOR ADMISSION 2.39. The amounts set forth in Request for Admission 2.38 above include the following amounts of interest expense accrued by the U.S. branches to parties unrelated to NatWest:

| Tax Year | Interest Expense Accrued with respect to Third Parties |
|---|---|
| 1981 | 505,155,940 |
| 1982 | 446,769,398 |
| 1983 | 342,193,553 |

| Tax Year | Interest Expense Accrued with respect to Third Parties |
|---|---|
| 1984 | 485,235,812 |
| 1985 | 343,395,119 |
| 1986 | 271,113,921 |
| 1987 | 301,921,949 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.39: See Defendant's Response to Request for Admission 2.34.

REQUEST FOR ADMISSION 2.40. The amounts set forth in Request for Admission 2.38 above include the following amounts of interest expense accrued by the U.S. branches to other group companies:

| Tax Year | Interest Expense Accrued with respect to Other Group Companies |
|---|---|
| 1981 | 24,926,564 |
| 1982 | 19,754,675 |
| 1983 | 11,934,824 |
| 1984 | 14,662,026 |
| 1985 | 14,624,994 |
| 1986 | 18,237,460 |
| 1987 | 19,386,954 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.40: See Defendant's Response to Request for Admission 2.34.

REQUEST FOR ADMISSION 2.41. The amounts set forth in Request for Admission 2.38 above include the following amounts of interest expense accrued by the U.S. branches to other branches of NatWest outside the United States:

| Tax Year | Interest Expense Accrued with respect to Non-U.S. Branches |
|---|---|
| 1981 | 58,446,924 |
| 1982 | 54,399,462 |
| 1983 | 33,102,291 |
| 1984 | 32,420,694 |
| 1985 | 52,546,899 |
| 1986 | 88,738,618 |
| 1987 | 153,338,621 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.41: See Defendant's Response to Request for Admission 2.34.

REQUEST FOR ADMISSION 2.42. The amounts set forth in Request for Admission 2.38 above include the following amounts of interest expense accrued by the U.S. branches to each other:

| Tax Year | Interest Expense Accrued with respect to U.S. Branches |
|---|---|
| 1981 | 82,507,529 |
| 1982 | 80,633,926 |
| 1983 | 57,601,531 |
| 1984 | 70,476,154 |
| 1985 | 48,617,123 |
| 1986 | 58,293,692 |
| 1987 | 78,241,354 |

(*See* Interest Income and Expense Details (on an annual basis for 1981-1987) included in June 5, 2001 Amended Refund Claim and supporting schedules thereto; *see also* Def.'s Requests for Admission 1.53 to 1.58 and Pl.'s Responses thereto.)

RESPONSE TO REQUEST FOR ADMISSION 2.42: See Defendant's Response to Request for Admission 2.34.

REQUEST FOR ADMISSION 2.43. NatWest timely filed its U.S. federal income tax return as a calendar year taxpayer for each of the years 1981 through 1987 on I.R.S. Form 1120F. (*See* INT504-00598 to -00633 (1981 Form 1120F); INT504-00634 to -00679 (1982 Form 1120F); INT504-00680 to -00715 (1983 Form 1120F); INT504-000716 to -00741 (1984 Form 1120F); INT504-00742 to -00781 (1985 Form 1120F); INT504-00782 to -00823 (1986 Form 1120F); INT504-00824 to -00861 (1987 Form 1120F); *see also* Pl.'s Supp. Resp. to Def.'s First Set of Interrogs., Supp. Resp. to Interrog. 1.03 and Ex. A (May 9, 1996).)

RESPONSE TO REQUEST FOR ADMISSION 2.43: Admits.

REQUEST FOR ADMISSION 2.44. For each of the years at issue, the items comprising taxable income reported on NatWest's original U.S. federal income tax return were equal to amounts set forth on the profit and loss statements of the New York, Nassau, Grand Cayman, Chicago and San Francisco branches and the IBF, subject to adjustments explained in Schedule M-1 of each of those returns. (*Compare* INT504-00598 to -00633 (1981 Form 1120F) *with* INT504-00001 to -00006, -00030 to -00034, -00009 to -00013, -00037 to -00041, -00023 to -00027, -00044 to -00048, -00016 to -00020, -00049 to -00053; *and compare* INT504-00634 to -00679 (1982 Form 1120F) *with* INT504-00058 to -00062, -00065 to -00069, -00072 to -00076; *and compare* INT504-00680 to -00715 (1983 Form 1120F) *with* INT504-00086 to -00090, -00120A to -00120E, -00107 to -00111, -00093 to -00097; -00100 to -00104; *and compare* INT504-00716 to -00741 (1984 Form 1120F) *with* INT504-00121 to -00125, -00155 to -00159, -00142 to -00146, -00128 to -00132, -00135 to -00139; *and compare* INT504-00742 to -00781 (1985 Form 1120F) *with* INT504-00162 to -000168, -00202 to -00208, -00193 to -00199, -00171 to -00177, -00182 to -00188, -00213 to -00219; *and compare* INT504-00782 to -00823 (1986 Form 1120F) *with* INT504-00222 to -00229, -00232 to -00239, -00272 to -00279, -00262 to -00269, -00252 to -00259, -00242 to -00251; *and compare* INT504-00824 to -00861 (1987 Form 1120F) *with* INT504-00282 to -00289, -00312 to -00319, -00322 to -00330, -00332 to -00340, -00292 to -00299, -00302 to -00309; *see also* 1/1/1987 to 12/31/1987 Profit & Loss Account IBF Branch.)

RESPONSE TO REQUEST FOR ADMISSION 2.44: This request, and those following, would require defendant to trace the preparation of plaintiff's federal income tax return from the

books of the six U.S. branches for the purpose of approving the accuracy of plaintiff's computation of its tax liability under a scenario in which plaintiff's interest income and expense are as it now claims (which varies from the amounts claimed on the returns). Of course, the interest income and interest expense to which plaintiff actually is entitled will be determined by the Court after trial of the capital and arm's length issues. There are far too many possible outcomes to anticipate, and each will result in a different tax liability.

Plaintiff previously agreed with defendant to follow the standard procedure in tax cases for many years under which the Court first would determine the substantive issues in a case, and then the parties would be given a period of time to reach agreement on the resulting tax liability and any refund. The procedure arose because, once the Court determines the substantive issues in a case, the computation of the plaintiff's tax liability, and possible overpayment, is virtually always agreed to without the Court's intervention. This being the case, there is no need to burden the Court at trial with prolonged testimony from both sides by tax computation specialists, regarding the intricacies of the manner in which income, deductions, credits, carryovers, limitations, past adjustments, payments, etc. determine a taxpayer's ultimate tax liability. There likewise is no need to devote trial time to the introduction of exhibits and testimony, such as certificates of assessments and payments, carryover adjustments, previous audit adjustments, etc. to establish the dates and amounts of tax payments and other facts needed to compute any tax overpayment. Moreover, testimony and exhibits to explain computations based on possible alternative resolutions of the issues is inefficient and wasteful of the Court's and the parties' resources. It is far preferable for the Court first to resolve the substantive issues in the case, and then permit the parties to pursue an agreement on tax computations. The Court will need to become involved in computations only in the unlikely event the parties fail to reach

agreement, and, even then, its involvement will be focused on its actual resolution of the issues, rather than scattered among hypothetical, alternative scenarios.

On May 2, 1996, the parties filed their Joint Preliminary Status Report in this case. In response to paragraph 3 of Appendix G, under the heading "Bifurcation of trial," the parties agreed to the standard procedure described above:

> The parties agree that separate proceedings on the question of liability and damages (i.e., the amount of any underpayment or overpayment of tax and interest) should be unnecessary in this case. The parties, however, ask the Court to determine liability first, and, if liability is found, permit them a reasonable period of time within which to attempt to agree on the amount of a money judgment. The parties believe that the calculation of damages will involve objective mathematical computations from the factual record before the Court on which they likely will reach agreement. If the parties are unable to reach such an agreement, the Court may address the procedures to be followed at that time.

When plaintiff reneged on that agreement, by including among its trial exhibits tax computations under various potential scenarios, defendant filed a Motion in Limine. Since the Court decided to engage in additional summary judgment proceedings prior to trial, it did not rule on defendant's motion. Nevertheless, at that time, the Court indicated that tax computations were hypothetical and considerably premature. (Tr. 6/12/2002 at 66.)

Plaintiff's request also would impose an enormous computational burden on defendant and would require the services of a tax computation specialist under the short deadline for responses to requested admissions set forth in the Court's Rules. Defendant's two tax computation specialists are extremely busy preparing computations under pending settlements of other cases. The effectuation of these settlements generally requires timely action and reports to the courts, and it would be unjust and inappropriate for plaintiff's request to catapult it in front of these previously pending matters, particularly since plaintiff's request involves computations under a hypothetical scenario.

Defendant therefore objects to this request on the ground that it is unduly burdensome, oppressive, hypothetical, contrary to the parties' agreement, irrelevant to the substantive issues (capital issue and arm's length issue) to be presented at trial, would impose unnecessarily on the Court's resources, and is an abuse of the discovery process. Subject to those objections, defendant states that it has made reasonable inquiry and the information known or readily obtainable by defendant is insufficient to enable it to admit or deny the request.

REQUEST FOR ADMISSION 2.45. Schedule M-1 of the original U.S. federal income tax return filed for each of the years at issue explains the difference between the taxable income and book profit of the U.S. branches. (*See* INT504-00603, 00631 (1981 Form 1120F); INT504-00639, -00676 (1982 Form 1120F); INT504-00685, -00712 (1983 Form 1120F); INT504-00721, -00738 (1984 Form 1120F); INT504-00747, -00773 (1985 Form 1120F); INT504-00788, -00816 (1986 Form 1120F); INT504-00831, -00851 (1987 Form 1120F).)

RESPONSE TO REQUEST FOR ADMISSION 2.45: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.46. The aggregate interest income included in NatWest's original U.S. federal income tax return for each of the years at issue was equal to the aggregate interest income recorded on the profit and loss statements of the U.S. branches for each of the years at issue, as set forth in Request for Admission 2.33 above, with the following adjustments as shown on Schedule M-1 to such returns:

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1981 | 1980 money market adjustment | 15,699 |
| | 1980 T-bill accrued interest | 449,284 |
| | 1981 money market adjustment | (72,622) |
| | 1981 T-bill accrued interest | (1,986,545) |

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1982 | 1981 money market adjustment<br>1981 T-bill accrued interest | 72,622<br>1,986,545 |
| 1983 | None | |
| 1984 | T-bill accrual | 1,885,318 |
| 1985 | Net T-bill accrual | (1,884,246) |
| 1986 | Interest Adjustment<br>ESOP interest exclusion<br>Foreign Exchange Income<br>Net T-bill accrual | (486,697)<br>(525,498)<br>103,289<br>(246) |
| 1987 | Income Adjustment<br>Interest Accrual Adjustment<br>Interest Adjustment<br>Foreign Exchange Income<br>Net T-bill accrual | (1,185,000)<br>(846,000)<br>486,697<br>114,736<br>98 |

(*See* INT504-00631; INT504-00676; INT504-00712; INT504-00738; INT504-00773; INT504-00816; INT504-00851.)

RESPONSE TO REQUEST FOR ADMISSION 2.46: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.47. The aggregate interest expense included in NatWest's original U.S. federal income tax return for each of the years at issue was equal to the aggregate interest expense recorded on the profit and loss statements of the U.S. branches for each of the years at issue as set forth in Request for Admission 2.38 above, with the following adjustments as shown on Schedule M-1 to such returns:

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1981 | None | |
| 1982 | None | |
| 1983 | None | |

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1984 | 1976 – 1980 Add'l Int. Ass'd (California) | 360,149 |
| 1985 | None | |
| 1986 | None | |
| 1987 | Interest Accrual Adjustments | 720,000 |

(*See* INT504-00631; INT504-00676; INT504-00712; INT504-00738; INT504-00773; INT504-00816; INT504-00851.)

RESPONSE TO REQUEST FOR ADMISSION 2.47: See defendant's Response to Request for Admission 2.44.

REQUEST FOR ADMISSION 2.48. The U.S. federal taxable income of NatWest as originally reported for each of the years at issue (after adjustments with respect to certain employee benefits per IRS Form 870) was as follows:

| Tax Year | Amount |
|---|---|
| 1981 | 5,127,742 |
| 1982 | 12,866,570 |
| 1983 | 17,074,564 |
| 1984 | 8,009,640 |
| 1985 | 40,541,143 |
| 1986 | 42,962,917 |
| 1987 | 14,330,911 |
| **Total** | 140,913,487 |

(*See* RARs.)

RESPONSE TO REQUEST FOR ADMISSION 2.48: Admits