IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

No. 95-758T

(Judge Nancy B. Firestone)

---

NATIONAL WESTMINSTER BANK PLC

*Plaintiff*,

v.

THE UNITED STATES,

*Defendant*.

---

# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

D. SCOTT WISE
Attorney of Record for Plaintiff

Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
(212) 450-4000 (telephone)
(212) 450-3800 (facsimile)

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I. NATWEST'S PROFITS ON ITS TAX RETURNS WERE BASED UPON SEPARATE ACCOUNTS THAT WERE PROPERLY MAINTAINED BY THE U.S. BRANCHES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II. ALL OF NATWEST'S U.S. INTERBRANCH AND INTERCOMPANY INTEREST INCOME AND EXPENSE WAS AT ARM'S-LENGTH RATES . . . . . . . . 12

A. *NatWest's Money Market Dealings Were at Arm's-Length Market Rates* . . . . . . 13

B. *NatWest's Clearing Accounts Were at Arm's-Length Market Rates* . . . . . . . . . . 17

III. APART FROM AMOUNTS ALREADY CONCEDED, PLAINTIFF DID NOT DEDUCT ANY INTEREST ON CAPITAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

A. *NatWest Has Identified and Conceded All Interest Deducted on Capital* . . . . . . 23

B. *Defendant Has Proposed No Adjustments on the Capital Issue* . . . . . . . . . . . . . . 28

C. *Contrary to Defendant's Claim, Plaintiff's U.S. Branches Did Not Require Additional Capital to Fund Fixed Assets* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

1. There is No Support for Defendant's Disaggregated Approach to Determining NatWest's Business Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

2. There is No Evidence of Capital Advances Even Under a Disaggregated Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

# TABLE OF AUTHORITIES

## Cases

**Page**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) . . . . . . . . 7

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) . . . . . . . . 8

*Cook v. United States*,
46 Fed. Cl. 110 (2000) . . . . . . . . 8

*Lewis v. Reynolds*,
284 U.S. 281, *modified*, 284 U.S. 599 (1932) . . . . . . . . 8

*LNC Investments, Inc. v. Republic of Nicaragua*,
1999 U.S. Dist. Lexis 1846 (S.D.N.Y. 1999) . . . . . . . . 8

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)... . . . . . . . . 8

*National Westminster Bank PLC v. United States*,
40 Fed. C1. 120 (1999) . . . . . . . . 1, 9, 10

*National Westminster Bank PLC v. United States*,
58 Fed. C1. 491 (2003) . . . . . . . . *passim*

*Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . 8

*Trans Sport, Inc. v. Starter Sportswear*,
964 F.2d 186 (2d Cir. 1992) . . . . . . . . 8

## Statutes & Rules

26 U.S.C. § 884 . . . . . . . . 33, 34

12 C.F.R. § 204.8(a)(1) . . . . . . . . 5, 35

12 C.F.R. § 204.8(d) . . . . . . . . 35

**Page**

Fed. R. Evid. 408 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

RCFC 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

RCFC 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

RCFC 56(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Treas. Reg. § 1.882-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Treas. Reg. §1.6012-2(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**<u>Other Authorities</u>**

1963 OECD Model Treaty and Commentary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 34, 35

Convention for the Avoidance of Double Taxation, Dec. 31, 1975,
U.S.-U.K., 31 U.S.T. 5668, T.I.A.S. No. 9682. . . . . . . . . . . . . . . . . . . . . . . . . . . 1,9,10,31,34

## TABLE OF EXHIBITS

Declaration of Roger Walmsley dated April 28, 2005. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

Affidavit of Scott Payseur dated April 26, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B

Declaration of Anthony Eric Scott dated April 29, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C

Declaration of Kevin D. Bandoian dated April 30, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D

Affidavit of Robert T. Clair dated May 2, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E

Declaration of Edward Jukes dated May 2, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F

Affidavit of Mario J. Verdolini, Jr. dated May 5, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G

Plaintiff's Complaint dated November 17, 1995 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Defendant's Answer to Plaintiff's Complaint dated March 18, 1996 . . . . . . . . . . . . . . . . . . . 2

Plaintiff's First Amended Complaint dated August 28, 1997. . . . . . . . . . . . . . . . . . . . . . . . . 3

Defendant's Answer to Plaintiff's First Amended Complaint dated October 20, 1997 . . . . . 4

Plaintiff's Form 1120F original tax return for tax year 1981 . . . . . . . . . . . . . . . . . . . . . . . . 5

Plaintiff's Form 1120F original tax return for tax year 1982 . . . . . . . . . . . . . . . . . . . . . . . . 6

Plaintiff's Form 1120F original tax return for tax year 1983 . . . . . . . . . . . . . . . . . . . . . . . . 7

Plaintiff's Form 1120F original tax return for tax year 1984 . . . . . . . . . . . . . . . . . . . . . . . . 8

Plaintiff's Form 1120F original tax return for tax year 1985 . . . . . . . . . . . . . . . . . . . . . . . . 9

Plaintiff's Form 1120F original tax return for tax year 1986 . . . . . . . . . . . . . . . . . . . . . . . 10

Plaintiff's Form 1120F original tax return for tax year 1987 . . . . . . . . . . . . . . . . . . . . . . . 11

Plaintiff's Form 1120F first amended tax return for tax year 1981 . . . . . . . . . . . . . . . . . . . . 12

Plaintiff's Form 1120F first amended tax return for tax year 1982 . . . . . . . . . . . . . . . . . . . . 13

Plaintiff's Form 1120F first amended tax return for tax year 1983 . . . . . . . . . . . . . . . . . . . . 14

Plaintiff's Form 1120F first amended tax return for tax year 1984 . . . . . . . . . . . . . . . . . . . . 15

Plaintiff's Form 1120F first amended tax return for tax year 1985 . . . . . . . . . . . . . . . . . . . . 16

Plaintiff's Form 1120F first amended tax return for tax year 1986 . . . . . . . . . . . . . . . . . . . . 17

Plaintiff's Form 1120F first amended tax return for tax year 1987 . . . . . . . . . . . . . . . . . . . . 18

Plaintiff's Form 1120F second amended tax return for tax year 1981 . . . . . . . . . . . . . . . . . 19

Plaintiff's Form 1120F second amended tax return for tax year 1982 . . . . . . . . . . . . . . . . . 20

Plaintiff's Form 1120F second amended tax return for tax year 1983 . . . . . . . . . . . . . . . . . 21

Plaintiff's Form 1120F second amended tax return for tax year 1984 . . . . . . . . . . . . . . . . . 22

Plaintiff's Form 1120F second amended tax return for tax year 1985 . . . . . . . . . . . . . . . . . 23

Plaintiff's Form 1120F second amended tax return for tax year 1986 . . . . . . . . . . . . . . . . . 24

Plaintiff's Form 1120F second amended tax return for tax year 1987 . . . . . . . . . . . . . . . . . 25

Revenue Agent Reports dated May 3, 1995 for tax years 1981-1984 and 1985-1987 . . . . . 26

Letter and the exhibits thereto from M. Carr Ferguson (counsel for the Plaintiff) to Steven I. Frahm (counsel for the Defendant) dated June 5, 2001 prepared pursuant to the Court's Order dated April 9, 2001 and setting forth Plaintiff's definitive statement of its refund claim ("Plaintiff's Revised Refund Claim") . . . . . . . . . . . . . . . . . 27

Certified profit and loss statements of Plaintiff's U.S. branch operations for the periods January 1, 1981 through June 30, 1981 and July 1, 1981 through December 31, 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Year-end certified profit and loss statements of Plaintiff's U.S. branch operations for the year 1982 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Year-end certified profit and loss statements of Plaintiff's U.S. branch operations for the year 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Year-end certified profit and loss statements of Plaintiff's U.S. branch operations for the year 1984 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Year-end certified profit and loss statements of Plaintiff's U.S. branch operations for the year 1985 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Year-end certified profit and loss statements of Plaintiff's U.S. branch operations for the year 1986 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Year-end certified profit and loss statements of Plaintiff's U.S. branch operations for the year 1987 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Year-end B126 or certified balance sheets of Plaintiff's U.S. branch operations for the year 1980 . . . . . 35

Year-end certified balance sheets of Plaintiff's U.S. branch operations for the year 1981 . . . . . 36

Year-end certified balance sheets of Plaintiff's U.S. branch operations for the year 1982 . . . . . 37

Year-end certified balance sheets of Plaintiff's U.S. branch operations for the year 1983 . . . . . 38

Year-end certified balance sheets of Plaintiff's U.S. branch operations for the year 1984 . . . . . 39

Year-end certified balance sheets of Plaintiff's U.S. branch operations for the year 1985 . . . . . 40

Year-end certified balance sheets of Plaintiff's U.S. branch operations for the year 1986 . . . . . 41

Year-end certified balance sheets of Plaintiff's U.S. branch operations for the year 1987 . . . . . 42

Balance sheet of Plaintiff's New York branch dated October 30, 1974 . . . . . 43

Balance sheet dated September 30, 1977 . . . . . 44

Certified balance sheet of Plaintiff's New York branch dated March 31, 1978 . . . . . 45

"Report B133 Limits and Utilizations by L.A. and S.I.C.," for December 31, 1986 . . . . . 46

Notes to a balance sheet of New York, Chicago, and San Francisco and an excerpt from a balance sheet of New York, Chicago and San Francisco dated 1977 . . . . . 47

RET 9 Reports for the U.S. branch operations for the years 1981-1987 . . . . . 48

Letter from Mildred Seidman (counsel for the Defendant) to M. Carr Ferguson (counsel for the Plaintiff) dated August 10, 2000 acknowledging Defendant's partial concessions relating to tax years 1986 and 1987 . . . . . 49

Excerpt from Plaintiff's FRE 1006 Summaries With Respect to 1981 Interbranch Interest Expense of Attachment 1981F: Analysis of Interest paid by Chicago branch to NatWest Moneybook dated June 8, 2001, and supporting documentation . . . . . 50

Microfiche Index Reports prepared by Plaintiff's counsel identifying microfiche records available for the years 1981-1987 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Report by Marcia L. Stigum, Ph.D. dated November 15, 2001 . . . . . . . . . . . . . . . . . . . . . . . . 52

Report of Robert R. Bench, PricewaterhouseCoopers LLP, dated November 15, 2001, and appendices thereto . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Supplemental Report of Robert R. Bench, PricewaterhouseCoopers LLP, dated January 14, 2002 and the exhibits thereto . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Report of Kevin D. Bandoian, Partner, PricewaterhouseCoopers LLP, dated January 14, 2002, and the exhibits thereto . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Plaintiff's Report on the Capital Issue dated October 29, 2004 and the exhibits thereto . . . 56

Exhibit 2, *Documents Supporting the Hypothetical Computations of Capital Loan Charges (Binders 1-5)*, to Exhibit C, Report of PricewaterhouseCoopers LLP: *Analysis of Capital Loan Charges*, to Plaintiff's Report on the Capital Issue dated October 29, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Report of Kevin D. Bandoian, PricewaterhouseCoopers LLP, dated March 4, 2005, and the exhibits thereto . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Report of Robert T. Clair, Ph.D. on *The Arm's-Length Nature of National Westminster Bank PLC's Money Market Transactions* dated March 4, 2005, and the exhibits thereto . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Report by Edward Jukes dated March 4, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Defendant's Expert Report of A. Lawrence Kolbe on the Capital Issue dated March 4, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Defendant's Expert Report of James Read on the Interest Rate Issue dated March 4, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Plaintiff's Status Report dated Dec. 12, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Ex. A to Plaintiff's supplemental response to Defendant's Interrogatory 1.03 . . . . . . . . . . . 64

Exhibit B to Plaintiff's Response to Defendant's Interrogatory 1.04 . . . . . . . . . . . . . . . . . . 65

Exhibit F to Plaintiff's Response to Defendant's Interrogatory 1.12 . . . . . . . . . . . . . . . . . . 66

Defendant's Responses to Plaintiff's Second Set of Requests for Admission dated January 7, 2005 . . . . . . . . . . 67

Defendant's Responses to Plaintiff's Fourth Set of Interrogatories dated January 7, 2005 . . . . . . . . . . 68

Excerpts from the transcript of the status conference with the Court dated March 9, 2005 . . . . . . . . . . 69

Convention for the Avoidance of Double Taxation, Dec. 31, 1975, U.S.-U.K., 31 U.S.T. 5668, T.I.A.S. No. 9682 . . . . . . . . . . 70

Excerpts from U.K. DEP'T OF INLAND REVENUE BANKING MANUAL, *Guidance for Staff* (1994) . . . . . . . . . . 71

United States Internal Revenue Code §§ 59A, 164(a)(5) (1987) . . . . . . . . . . 72

United States Internal Revenue Code § 11(b) (1981-1987) (for explanation of 1987 blended rate, *see* H.R. Rep. No. 99-841, at II-159 (1986)) . . . . . . . . . . 73

United States Treasury regulation § 1.6012-2(g) (C.C.H.), effective date March 15, 1981, and United States Treasury regulation § 1.6012-2(g) (C.C.H.), effective date March 7, 1989 . . . . . . . . . . 74

Reserve Requirements for Depository Institutions, 12 C.F.R. §§ 204.1-204.9 (1984) . . . . . 75

Interest on Deposits, 12 C.F.R. §§ 217.1-217.7 (1984) . . . . . . . . . . 76

1978 N.Y. Laws 288 (permitting the establishment of New York-based International Banking Facilities) . . . . . . . . . . 77

Excerpts from the Deposition of Reuben S. Tatz on October 8, 1996 . . . . . . . . . . 78

Excerpts from the Deposition of Marcia L. Stigum on February 13, 2002 . . . . . . . . . . 79

Excerpts from the Deposition of Reuben S. Tatz on January 23, 2002 . . . . . . . . . . 80

Excerpts from the Deposition of Harrylall Samaroo on January 23, 2002 . . . . . . . . . . 81

Excerpts from the Deposition of Scott Payseur on May 13, 2002 . . . . . . . . . . 82

Excerpts from the Deposition of Timothy Harasek on May 13, 2002 . . . . . . . . . . 83

Excerpts from the Deposition of Reuben S. Tatz on May 14, 2002 . . . . . . . . . . 84

Excerpts from the Deposition of Anthony Eric Scott on May 15, 2002 . . . . . . . . . . . . . . . . . 85

Excerpts from the Deposition of Andrew Blessley on May 17, 2002 . . . . . . . . . . . . . . . . . . . 86

Excerpts from the Deposition of John Tugwell on May 17, 2002 . . . . . . . . . . . . . . . . . . . . . 87

Excerpts from the 30(b)(6) Deposition of Roger Walmsley on January 31 - February 1, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

Form 870AD dated June 26, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 95-758T
(Judge Nancy B. Firestone)

NATIONAL WESTMINSTER BANK PLC,

Plaintiff

v.

THE UNITED STATES,

Defendant

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff respectfully submits this Motion for Summary Judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims.

**PRELIMINARY STATEMENT**

This case concerns the amount of profits that should be attributed to the U.S. branch operations of National Westminster Bank PLC ("NatWest") during the years 1981 through 1987 under Article 7 of the U.S.-U.K. income tax treaty[1] (the "Treaty") and whether NatWest overpaid its U.S. federal income taxes on those profits. In view of this Court's prior rulings granting partial summary judgment in favor of NatWest, *National Westminster Bank PLC v. U.S.*, 40 Fed.

[1] *See* Article 7, Convention for the Avoidance of Double Taxation, Dec. 31, 1975, U.S.-U.K., 31 U.S.T. 5668, T.I.A.S. No. 9682 (Affidavit of Mario J. Verdolini, Jr. dated May 5, 2005 ("Verdolini Aff."), Ex. 70).

C1. 120 (1999) ("*NatWest I*") and *National Westminster Bank PLC v. U.S.*, 58 Fed. C1. 491 (2003) ("*NatWest II*"), the only issues that remain to be resolved are:

- whether the interest income and expense reflected in NatWest's U.S. branch profits that are attributable to transactions with non-U.S. branches of NatWest or other NatWest affiliates were incurred on arm's-length terms; and

- whether the interest expense NatWest seeks to deduct in determining its U.S. branch profits was incurred in the ordinary course of NatWest's banking business and not for capital purposes.

As discussed below, the record in this case establishes that NatWest is entitled to the full refund it seeks. The record confirms that the interest paid and received on interbranch and intercompany borrowings and lendings was at arm's-length market rates. In addition, Plaintiff has established that the interest expense deducted from NatWest's profits (as reduced by concessions NatWest has made in this case) was incurred in the ordinary course of NatWest's banking business and was not deducted on amounts designated as capital or in fact allotted to the branch for capital purposes.

Defendant cannot point to evidence to controvert any of these facts, or to support any proposed adjustment to NatWest's profits. Instead, Defendant asserts that, despite the fact that this case has been pending for nearly ten years, it cannot reach a conclusion as to whether NatWest's interbranch money market transactions were arm's-length or as to whether the U.S. branches paid interest to NatWest's head office in respect of capital advances. Moreover, although Defendant raises three specific assertions with respect to interest accrued on clearing accounts, these assertions are completely without merit and do not withstand scrutiny.

Simply put, because Plaintiff has put forward facts sufficient to establish its claim and Defendant can offer nothing but unsupported speculation in response, there is no genuine dispute as to any material fact, and Plaintiff is entitled to summary judgment for a refund of United

States federal income taxes for the taxable years 1981 through 1987 in the aggregate amount of $66,234,336, plus interest.

**BACKGROUND**

During the years at issue, NatWest was one of the largest banks in the world and one of the few that had a triple-A credit rating.[2] It conducted international wholesale money center operations in the United States through branches located in New York, Chicago and San Francisco.[3] The U.S. operations dealt in wholesale transactions involving low risk and narrow spreads. They made short-term, high denomination loans to large corporations and funded those loans by selling money market instruments in U.S. and international markets, by borrowing inter-bank money, and by using funds on deposit in dollar clearing accounts, mainly those maintained for members of NatWest's worldwide group and several foreign central banks, including the Bank of England. (*See* Walmsley Decl. at ¶¶6, 36, 39; Affidavit of Robert T. Clair dated May 2, 2005 ("Clair Aff."), App. 1). The U.S. branches also traded in domestic and international money markets to manage their interest rate and liquidity risk and, in the case of the New York operations, to make a trading profit. (*See* Walmsley Decl. at ¶7). The aggregate assets of the U.S. operations were in the range of three to eight billion dollars during the years at issue, and the daily turnover of funds often exceeded $10 billion. (*Id.* at ¶8 (turnover); *see*

---

[2] Report by Marcia L. Stigum, Ph.D. dated Nov. 15, 2001 ("Stigum Rep.") at 6 (Verdolini Aff., Ex. 52); *see also* Declaration of Anthony Eric Scott dated April 26, 2005 ("Scott Decl.") at ¶5; Transcript of Deposition of Scott Payseur on May 13, 2002 ("Payseur Tr.") 111:15-23 (Verdolini Aff., Ex. 82).

[3] Declaration of Roger Walmsley dated April 28, 2005 ("Walmsley Decl.") at ¶4; Stigum Rep. at 7-8 (Verdolini Aff., Ex. 52); *see also* Payseur Tr. 31:3-20 (wholesale) (Verdolini Aff., Ex. 82).

Balance Sheets (line AZD –"Total Assets" – for each of the years at issue) (assets) (Verdolini Aff., Exs.35-42)).

NatWest's U.S. operations generated substantial profits during the years at issue. (Walmsley Decl. at ¶8). NatWest reported over $140 million of taxable income, an amount that was more than sufficient to enable the U.S. branch operations to pay $62 million in federal income taxes,[4] purchase approximately $42 million in premises and equipment and repay approximately $12 million in balances due to the head office with respect to fixed assets and capital loans from prior years.[5]

NatWest conducted its U.S. branch operations pursuant to a number of banking licenses. NatWest operated an "agency" in San Francisco which was licensed by the State of California to make loans and take deposits (other than certain domestic deposits), a "branch" in Chicago which was licensed by the State of Illinois to make loans and take deposits, and a "branch" in New York, which was licensed by the State of New York to make loans and take deposits. (Walmsley Decl. at ¶4).

The New York branch, like many other U.S. banks and U.S. branches of foreign banks, established an International Banking Facility, or IBF, in 1981 as a "segregated set of asset and liability accounts on [its] books" pursuant to Federal banking regulations. (*See* 12 C.F.R. § 204.8(a)(1) and (d) (Verdolini Aff., Ex. 75); Walmsley Decl. at ¶4). In its offices, the New York

[4] *See* Revenue Agent Reports for tax years 1981-1984 and 1985-1987, dated May 3, 1995 ("Revenue Agent Reports") (for taxable income and taxes paid) (Verdolini Aff., Ex. 26); Plaintiff's Proposed Findings of Uncontroverted Fact dated May 5, 2005 ("Pl.'s Find. Unc. Fact") 157 ($62 million equals sum of rows 1 (Prior Year Overpayment) through 6 (Amount Credited)).

[5] Declaration of Kevin D. Bandoian, Partner, PricewaterhouseCoopers, LLP dated April 30, 2005 ("Bandoian Decl."), Ex. C (purchases of fixed assets and repayments of balances due to head office).

branch also managed and controlled branches licensed by the Bahamas (Nassau) and the Cayman Islands, neither of which had any employees, premises or equipment of their own. (Walmsley Decl. at ¶¶4, 17).

For management and operational purposes, NatWest viewed the New York branch operations (including the IBF and New York, Nassau and Cayman branches) as a single unit. (Walmsley Decl. at ¶17; Scott Decl. at ¶14; Affidavit of Scott Payseur dated April 26, 2005 ("Payseur Aff.") at ¶11). The New York office maintained separate accounts for the IBF and New York, Nassau and Cayman branches in order to record transactions that were subject to different bank regulatory rules and, in the case of the IBF, state and local tax treatment. (Scott Decl. at ¶14; *see also* Transcript of Deposition of Andrew Blessley on May 17, 2002 ("Blessley Tr.") at 50-3-51:13, 60:10-61:14 (Verdolini Aff., Ex. 86)). NatWest's management in London did not evaluate the profitability of the Nassau or Cayman branches or the IBF separately from the profitability of the New York branch. (Scott Decl. at ¶14).

The managers of each of the New York, Chicago and San Francisco branch operations reported to NatWest's Regional General Manager, North America, in New York. (Transcript of Deposition of John Tugwell on May 17, 2002 ("Tugwell Tr.") at 42:11-44:6 (Verdolini Aff., Ex. 87); Blessley Tr. at 105:11-105:18 (Verdolini Aff., Ex. 86)). The Treasurer in New York was responsible for all Treasury activities conducted in the United States. (Blessley Tr. at 106:3-106:7) (Verdolini Aff., Ex. 86).

For each of the years at issue, NatWest was required to and did file a single U.S. federal income tax return for its U.S. branch operations,[6] and the items of taxable income reported on

[6] Treas. Reg. §1.6012-2(g)(1) ("every foreign corporation which is engaged in a trade or business in the United States . . . shall make a return on From 1120-F") (Verdolini Aff., Ex. 74); (continued...)

those returns were derived from the separate accounts of NatWest's U.S. branch operations.[7] NatWest's U.S. branch operations maintained those separate accounts, including profit and loss statements and balance sheets, in the ordinary course of their banking business as a matter of good business practice and banking custom and as required under U.S. bank regulatory law.[8] The U.S. branches had extensive procedures to ensure the integrity of their records. (Walmsley Decl. at ¶14). Further, U.S. bank regulators and internal inspectors conducted regular audits of the books and records of the U.S. branches and found them satisfactory. (Walmsley Decl. at ¶¶20-21; Transcript of Deposition of Reuben Tatz on Jan. 23, 2002 ("Tatz Tr. (1/23/02)") at 26:15-26:18 (internal inspectors), 27:22-29:12 (bank regulators) (Verdolini Aff., Ex. 80)).

On audit, the Internal Revenue Service asserted that NatWest's profits should be determined using the formulary apportionment in Treasury Regulations section 1.882-5 rather than on the basis of NatWest's separate accounts. (*See* Revenue Agent Reports at 45 (1981-85), 25 (1986-87)) (Verdolini Aff., Ex. 26). Applying this formula, the Service asserted that NatWest owed approximately $72 million of additional federal income taxes. (*See id.*). NatWest paid that amount, with interest, and brought this suit for refund. (*See* Pl.'s Prop. Find Unc. Fact 156-157). Although the Court determined that the application of 1.882-5 violated the Treaty

---

[6] (...continued)
*see* Form 1120-F for each of the years at issue (Verdolini Aff., Exs. 5-11); *see also* Def.'s Res. Pl.'s Req. Adm. 2.43 (NatWest timely filed its returns) (Verdolini Aff., Ex. 67).

[7] Report of Kevin D. Bandoian, PricewaterhouseCoopers LLP dated March 4, 2005 ("Bandoian Rep. (3/4/2005)"), Ex. 4 (reconciliation of tax returns with profit and loss statements) (Verdolini Aff., Ex. 58). The differences between the taxable income shown on the tax returns and the profit and loss statements of the U.S. branch operations were identified in schedule M-1 of those tax returns.

[8] *See* Report of Robert R. Bench, PricewaterhouseCoopers LLP, dated Jan. 14, 2002 ("Bench Supp. Rep") at ¶13 (U.S. bank regulations require separate books and records) (Verdolini Aff., Ex. 54);Walmsley Decl. ¶¶12, 15, 17; Tatz Tr. (1/23/02) at 14:18-14:19 (separate books and records maintained) (Verdolini Aff., Ex. 80).

(*NatWest I*), Defendant has continued to oppose Plaintiff's claim for refund, and after concessions by the parties, the amount of tax now at issue is $66,234,336. (*See* Pl.'s Prop. Find. Unc. Fact 193) (regarding concessions).[9]

**STANDARD OF REVIEW**

It is well settled that summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Under this standard, "the mere existence of *some* alleged factual dispute . . . will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Liberty Lobby, Inc.*, 477 U.S. at 247-48 (emphasis in original); *NatWest II* at 496 (quoting *Liberty Lobby, Inc.*). A fact is material only if it could affect the outcome of the case, *see Liberty Lobby, Inc.*, 477 U.S. at 248, and a factual dispute is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant always bears the initial burden of establishing the absence of any genuine issue of material facts. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). But once the moving party has carried its burden, "its opponent must do more than simply show that there is

[9] As noted in its First Amended Tax Returns, attached as Exhibits 8 and 9 to its Amended Complaint, Plaintiff also contends that Defendant committed several errors in the way in which it applied section 1.882-5 to calculate Plaintiff's deductible interest expense. (*See* Plaintiff's Form 1120F First Amended Tax Returns for tax years 1986 and 1987 (asserting as an alternate ground for refund the fact that the examiner erroneously reduced taxpayer's U.S.-connected assets in the section 1.882-5 computation) (Verdolini Aff., Exs. 17 and 18)). These contentions were identified by the Court as being part of the "Interest Rate Issue" in this case. (Order Memorializing General Status Conference and Setting Dates for Discovery and Exchange of Expert Reports, dated June 27, 2001, at 1). Plaintiff has not addressed Defendant's errors in this summary judgment motion because the refund Plaintiff would claim under a corrected application of section 1.882-5 is not greater than the refund Plaintiff is seeking under the Treaty. However, if Plaintiff does not finally obtain the relief sought in this motion, Plaintiff reserves the right to advance its claims that Defendant did not apply section 1.882-5 correctly.

some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). To counter a properly supported motion, the "non-movant may not rest on its conclusory pleadings but, under Rule 56, must set out . . . what specific evidence could be offered at trial." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562-63 (Fed. Cir. 1987). "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (quoting Fed. R. Civ. Pro. 56(e), which is identical to RCFC 56(e)). "[T]he motion will not be defeated merely . . . on the basis of conjecture or surmise." *LNC Investments, Inc. v. Republic of Nicaragua*, 1999 U.S. Dist. LEXIS 1846, *15 (S.D.N.Y. 1999) *quoting Trans Sport, Inc. v. Starter Sportswear*, 964 F.2d 186, 188 (2d Cir. 1992).

The fact that this is a tax refund claim does not affect the standard of review at this point in the case. A taxpayer in a refund case has the dual burden of first going forward to establish that the Commissioner's assessment is either erroneous or wrongful and then to establish by a preponderance of the evidence that it has overpaid its taxes. *See, e.g.*, *Lewis v. Reynolds*, 284 U.S. 281, 283, *modified*, 284 U.S. 599 (1932). Plaintiff already has met its first burden by establishing that the Commissioner's assessment was erroneous or wrongful. This Court ruled in *NatWest I* that Treasury Regulation § 1.882-5 is inconsistent with the Treaty, and the Commissioner had no other basis for the assessment.

Having established that the Commissioner's assessment is erroneous, Plaintiff now must establish by a preponderance of the evidence that it overpaid its taxes. *Cook v. United States*, 46 Fed. Cl. 110, 117 (2000). It is clear that Plaintiff is entitled to summary judgment under this standard. First, the record firmly establishes that NatWest's branch profits were based on the

properly maintained books and records of its U.S. branch operations. Second, the evidence demonstrates that the borrowing and lending transactions between NatWest's U.S. branches and affiliates and non-U.S. branches of NatWest were on arm's-length terms. Third, the record demonstrates that Plaintiff has identified and conceded any amounts of interest expense deducted on amounts designated as capital or advanced to the U.S. branches for capital purposes, and that no additional adjustments should be made. For its response, Defendant offers only the reports of its experts who express an inability to reach conclusions and raise no genuine issue of fact. Accordingly, Plaintiff has met its burden and is entitled to judgment as a matter of law that it overpaid its United States federal income taxes for the taxable years 1981 through 1987 in the aggregate amount of $66,234,336, plus interest.

## I.

## NATWEST'S PROFITS ON ITS TAX RETURNS WERE BASED UPON SEPARATE ACCOUNTS THAT WERE PROPERLY MAINTAINED BY THE U.S. BRANCHES

Article 7(1) of the Treaty permits the United States to tax "[t]he business profits of [a U.K.] enterprise . . . but only so much of them as is attributable to [a U.S.] permanent establishment." (Verdolini Aff., Ex. 70). Article 7(2) further provides that the business profits to be attributed to a permanent establishment in the U.S. are:

> the profits which it might be expected to make if it were a distinct and separate enterprise engaged in the same or similar activities under the same or similar conditions and dealing wholly independently with the enterprise of which it is a permanent establishment.

The OECD Model Treaty Commentary to Article 7(2) states that "[n]ormally, this would be the same profit that one would expect to be reached by the ordinary processes of good business accountancy." (*NatWest I* at 126) (quoting 1963 OECD Model Treaty at 82, Commentary on Art. 7(2), ¶10). This Court previously has ruled that under Article 7(2) the profits of the U.S.

branch of a U.K. bank should be based on the branch's properly maintained separate accounts. (*NatWest II*).

The profits reported by NatWest easily satisfy this standard: the separate accounts maintained by NatWest's U.S. branch operations during the years at issue reflected good business accountancy and were properly maintained in the ordinary course of their banking business. Specifically, the record establishes the following uncontroverted facts:

- As required by bank regulation, the branches had extensive internal controls to ensure accurate records. (Walmsley Decl. at ¶¶12, 14). The daily activity of the U.S. branch operations was captured on a computer system, which automatically generated numerous reports each day, including profit and loss statements and balance sheets. There were daily procedures for confirming the accuracy of entries into the computer system. (*See* Transcript of Deposition Timothy Harasek on May 13, 2002 at 13:22-14:14, 15:15-17:10, 20:8-23:21, 67:14-68:19, 69:16-70:7 (Verdolini Aff., Ex. 83); Transcript of Deposition of Harrylall Samaroo on Jan. 23, 2002 ("Samaroo Tr.") at 26:8-28:21 (Verdolini Aff., Ex. 81); Walmsley Decl. at ¶14).

- Consistent with common banking practice, the U.S. operations performed ongoing reconciliations of account differences resulting from misdirected payments or from items in transit, in clearing, or awaiting settlement, as was typical in a banking operation of NatWest's size and scope. (Scott Decl. at ¶15; Bench Supp. Rep. at ¶¶5, 12 (Verdolini Aff., Ex. 54); *see* Tatz Tr. (1/23/02) at 17:2-18:22, 59:6-17 (Verdolini Aff., Ex. 80); Samaroo Tr. at 36:2-51:2 (Verdolini Aff., Ex. 81); *see also* Tatz Tr. (1/23/02) at 49:18-51:4 (regulators reviewed the reconciliation procedures) (Verdolini Aff., Ex. 80)).

- NatWest's U.S. branches prepared profit and loss statements, balance sheets and other reports for each branch using data from the computer-generated reports in accordance with detailed internal verification procedures. (*See* Walmsley Decl. at ¶15 (detailed verification procedures); Tatz Tr. (1/23/02) at 16:19-17:17 (balance sheets and income statements derived from computer reports) (Verdolini Aff., Ex. 80); Samaroo Tr. at 33:2-44:25, 54:17-54:22 (Verdolini Aff., Ex. 81)).

- NatWest's U.S. branches regularly submitted those financial statements and reports for each branch to the head office and certified them to be in accordance with the books, and to the best of their knowledge and belief, to be true and accurate. (*See* Walmsley Decl. at ¶15).

- NatWest's head office regularly inspected the U.S. books and records, without advance notice, in order ensure their compliance with the bank's internal

standards, as well as those of the Bank of England, which supervised the bank as a whole. (Walmsley Decl. at ¶¶20-21; Tatz Tr. (1/23/02) at 26:15-26:18) (Verdolini Aff., Ex. 80)).

- U.S. bank regulators conducted regular examinations of the books and records of the U.S. branches and consistently found them to be satisfactory. (Walmsley Decl. at ¶¶20-21; Tatz Tr. (1/23/02) at 27:22-29:12 (Verdolini Aff., Ex. 80)).

- The Bank of England cited NatWest's internal controls, which were established on a bankwide basis and therefore applied in the United States as well as in the United Kingdom, as a model for U.K. branches of foreign banks to follow. (Walmsley Decl. at ¶21).

- For each of the years at issue, the U.S. federal income tax return NatWest filed in respect of its U.S. branch operations reported taxable income derived from the separate accounts maintained in the ordinary course of NatWest's U.S. branch operations. (Bandoian Rep. (3/4/2005), Ex. 4 (tax returns tied out to profit and loss statements with the exception of $701 in 1986) (Verdolini Aff., Ex. 58).

Defendant cannot seriously dispute these facts. Instead, Defendant has resorted to speculating – without any evidentiary basis – that the books and records underlying NatWest's tax returns were inaccurate or unreliable simply because certified profit and loss statements on which NatWest's tax returns were based reflected a "quick close" that was subject to subsequent reconciliation. (*See, e.g.*, Def.'s Res. Pl.'s Req. Adm. 2.26, 2.28, 2.33, 2.34) (Verdolini Aff., Ex. 67). Defendant's speculation is both misleading and plainly insufficient to create a genuine issue of fact. Indeed, there can be no dispute that reconciliation processes are a normal and important aspect of reliable record-keeping in the banking business. When an individual writes a check and balances her checkbook there is a discrepancy between the checkbook and the bank's records as to the amount in the checking account until the check clears. This happens on a larger scale throughout the banking system. NatWest's reconciliation procedures are evidence of its good business practices, not of unreliable or inaccurate records. (*See* Bench Supp. Rep. at ¶¶5, 12 (Verdolini Aff., Ex. 54); Scott Decl. at ¶15).

In sum, Plaintiff has met its burden of establishing that NatWest's profits were based on separate accounts that were properly maintained; Defendant cannot point to any evidence to contradict these facts. Plaintiff is entitled to summary judgment on this issue.

## II.

## ALL OF NATWEST'S U.S. INTERBRANCH AND INTERCOMPANY INTEREST INCOME AND EXPENSE WAS AT ARM'S-LENGTH MARKET RATES

The interbranch and intercompany interest income and interest expense of NatWest's U.S. branch operations at issue in this proceeding fall into two categories: (i) interest on money market transactions and (ii) interest on credit and debit balances in clearing accounts. Fact and expert testimony establish that both of these categories were at arm's-length market rates.

As to the money market transactions, the only position Defendant has offered is the report of an expert who concluded that he is "unable at this time to render an opinion as to whether the interest income and interest expense reported by NatWest with respect to money market transactions by its U.S. branches with related parties reflect arm's-length interest rates." (Expert Report of James Read on The Interest Rate Issue dated March 4, 2005 ("Read Rep.") at ¶14) (Verdolini Aff., Ex. 62). As to the clearing accounts, Defendant's expert makes superficial observations to suggest the possibility of non-arm's-length terms. (*See, e.g.*, Read Rep. at ¶38) (Verdolini Aff., Ex. 62). His observations are readily explained by an examination of the uncontroverted facts and do not suffice to create a genuine issue of fact.

### A. NatWest's Money Market Dealings Were at Arm's-Length Market Rates

NatWest's U.S. money market desks engaged in a variety of business activities that were typical of banks of its size and scope. For example, the money market desks took and placed Euro time deposits, bought and sold Fed funds, traded government securities subject to

repurchase agreements ("repos" and "reverse repos"), bought and sold negotiable certificates of deposit ("CDs"), and sold commercial paper of NatWest PLC. (Payseur Aff. at ¶15). Most of these transactions were with third parties, and thus by definition were at arm's-length rates. (Payseur Aff. at ¶16). A minority of the transactions occurred with non-U.S. NatWest branches and other NatWest affiliates. These transactions generally arose as a result of a transaction between the non-U.S. NatWest branch or affiliate and one of its own third party customers that desired to deposit or borrow dollars. (Walmsley Decl. at ¶9). The non-U.S. NatWest branch or affiliate would accept a dollar deposit from its customer and advance the dollars to a NatWest U.S. branch or, conversely, would make a dollar loan to its customer and borrow the needed dollar funds from a NatWest U.S. branch. (*Id.*).

The record in this case contains unrefuted evidence that when NatWest's U.S. money market operations entered into transactions with non-U.S. branches and affiliates, those dealings were at arm's-length market rates, like all other such transactions. Roger Walmsley, who served in the U.S. branch operations for 11 years, testified that "no favors [were] given by any of the units to another unit" and that "all rates that we used at all times . . . were commercial rates . . . ." (Transcript of Deposition of Roger Walmsley on Jan. 31 to Feb. 1, 2005 ("Walmsley Tr.") 262:25-263:3 (Verdolini Aff., Ex. 88); Walmsley Decl. at ¶11). Mr. Walmsley, who was employed in NatWest's San Francisco branch for several years in the 1970s, was Deputy Manager of the New York branch from 1982 through 1984, and was Manager of the New York branch from 1984 through 1987 (*see* Walmsley Decl. at ¶1), further testified that, in all his years with the U.S. branch operations, he had never heard of money market transactions undertaken with other than market rates of interest. (Walmsley Tr. 263:5-263:9 (Verdolini Aff., Ex. 88); Walmsley Decl. at ¶47).

Scott Payseur, a trader on the money market desks of the U.S. branch operations throughout the years at issue,[10] also testified that the U.S. branch operations were run as "independent professional operations." (Payseur Tr. 31:3-31:8) (Verdolini Aff., Ex. 82). He testified that transactions entered into between the U.S. branches and foreign affiliates and foreign offices were "normal transactions, like any other counterparty might ask." (Payseur Tr. 90:19-90:24, 47:9-14) (Verdolini Aff., Ex. 82). Additionally, Mr. Payseur is unaware of "any instance where money market transactions between the U.S. operations and another NatWest branch or affiliate reflected anything other than arm's-length market interest rates." (Payseur Aff. at ¶22).

The analysis of Plaintiff's expert, Dr. Robert T. Clair, also confirms the arm's-length nature of the money market dealings of the U.S. branches with related parties. (*See* Report of Robert T. Clair on the Arm's-Length Nature of National Westminster Bank PLC's Money Market Transactions dated Mar. 4, 2005 ("Clair Rep.") (Verdolini Aff., Ex. 59)). Dr. Clair, a former senior economist and policy adviser at the Federal Reserve Bank of Dallas who has extensive experience in arm's-length pricing matters affecting U.S. and foreign banks (including U.S. branches of foreign banks), took a statistically random sample of days in the years at issue and examined NatWest's records for all of the money market transactions entered into on those days. After making a direct comparison of related and unrelated party U.S. dollar deposits and placements, Dr. Clair concluded that the "related party transactions were conducted at prices consistent with the arm's-length standard." (Clair Rep. at 35) (Verdolini Aff., Ex. 59). Dr. Clair performed a regression analysis of these transactions which indicated "that there is no

---

[10] Mr. Payseur is currently Chief Trader and Senior Vice President, Money Markets at the Royal Bank of Scotland, New York branch.

statistically significant association between the interest rates on deposits or placements with the identity of the customer as a related or unrelated party." (Clair Rep. at 41) (Verdolini Aff., Ex. 59). Finally, Dr. Clair also concluded that the relatively few related party transactions in categories other than U.S. dollar deposits and placements "do not provide any evidence of non-arm's-length pricing." (Clair Rep. at 37) (Verdolini Aff., Ex. 59).

In sum, the record contains uncontradicted evidence that NatWest's money market transactions with related parties bore arm's-length interest rates. Defendant cannot seriously challenge this conclusion and, not surprisingly, has never attempted to do so. Defendant's expert, James Read, has taken the position that testing Plaintiff's business records to determine if related party transactions were done at arm's-length rates "would entail substantial time and effort." (*See* Read Rep. at ¶14) (Verdolini Aff., Ex. 62). For that reason, Mr. Read did not develop a sampling methodology to test Plaintiff's business records. (*Id.*). As noted above, however, Dr. Clair was able to develop and apply a sampling methodology, using the same information made available to the Defendant, in the time allotted by the Court. Defendant's decision not to present an appropriate analysis of Plaintiff's business records with respect to interest rates cannot create an issue of fact. The record stands uncontradicted, with both testimony from fact witnesses and confirmation by an independent expert, that NatWest used arm's-length market interest rates in its related party transactions.

Moreover, the issues raised by Mr. Read's report are plainly insufficient to defeat summary judgment. As the Court is aware, Mr. Read, who has extensive experience in matters involving public utilities but no apparent experience with banks, stated that his work was insufficient to support a conclusion one way or the other "as to whether the interest income and interest expense reported by Nat West with respect to money market transactions by its U.S.

branches with related parties reflect arm's-length interest rates." (Read Rep. at ¶14) (Verdolini Aff., Ex. 62). He nevertheless offered limited observations – based on records he selected from 5 of the 23 days for which he had obtained records – about the average interest rates on related party and third party transactions without even considering how the related party rates compared with the range of unrelated party rates in the records he used. (*See* Read Rep. at ¶¶54-55) (Verdolini Aff., Ex. 62).

Mr. Read attempted to excuse the superficiality of his analysis by claiming that the same approach was used in a letter from Plaintiff's counsel dated September 19, 2000. (Read Rep. at ¶53) (Verdolini Aff., Ex. 62). However, that letter – a confidential settlement communication that is inadmissible under Fed. Rul. Evid. 408 – did not purport to present a comprehensive analysis of interbranch pricing or to represent the only method of testing interbranch prices, and Mr. Read did not even follow the approach described in that letter. (*See* Clair Aff. at ¶¶28-29). Finally, the few discrepancies Mr. Read purported to observe in the average interest rates vanish once the individual related party transactions are compared directly to unrelated party transactions on the same dates. (*See* Clair Aff. at ¶39). Indeed, a direct comparison analysis of Mr. Read's data provides "strong evidence of arms-length pricing." (*Id.*). Thus, what questions he has raised have been definitively answered, and there is no genuine issue of fact on this issue.

### B. NatWest's Clearing Accounts Were at Arm's-Length Market Rates

As with NatWest's money market transactions, the record is uncontroverted that the terms of NatWest's clearing accounts were at arm's-length rates.

The U.S. branches maintained dollar clearing accounts in the ordinary course of their banking business for (i) unrelated non-U.S. banks and (ii) non-U.S. branches of NatWest, NatWest's subsidiary International Westminster Bank ("IWB") and other NatWest affiliates.

(Walmsley Decl. ¶22; *see also id.* at ¶25). These non-U.S. banks or branches needed dollar clearing accounts in the United States because transactions in dollars outside the United States (other than those conducted in coins or paper currency) generally had to be effected by transferring funds within the United States between U.S. banks (or U.S. branches of foreign banks) that have access to accounts at the Federal Reserve. (Walmsley Decl. at ¶23; *see also* Clair Aff. at ¶56). The clearing accounts worked like checking accounts in that they were accounts into which the U.S. branch's customer could deposit funds and through which it could make and receive payments to or from other parties. (Walmsley Decl. at ¶24).[11]

The U.S. branches charged customers – both related and unrelated – the same fixed per-item commission for processing payments into and out of the accounts.[12] Thus, the greater the number of payments in and out of an account, the greater the commission income generated. The U.S. branches also charged interest ("debit interest") on negative overnight balances in the accounts (i.e., overdrafts). Finally, the U.S. branches calculated interest ("credit interest") on positive overnight balances in the accounts. As explained below, depending on the circumstances, credit interest was either paid to the customer or used to offset charges on the account.

In addition to commission income, the U.S. branches derived profits from the clearing accounts by investing the funds left on deposit in the accounts in interest-bearing assets.

---

[11] In NatWest's records, the clearing accounts were often referred to as "current accounts," the U.K. term for a checking account, because even though use of the accounts differed, the basic function of and record keeping for a clearing account is the same as in the case of a checking account. (Walmsley Decl. at ¶24).

[12] The standard per-item commission was $2 at the beginning of the years at issue and increased to $3 during the years at issue. (Walmsley Decl. at ¶27).

(Walmsley Decl. at ¶27; *see also* Clair Aff. at ¶58).[13] Even though the clearing accounts were primarily used by accountholders to make and receive dollar payments in matching amounts, in many cases there was a time lag between the receipt of funds in the clearing account and the corresponding payment of funds out of the clearing account. (Walmsley Decl. at ¶27). Banks refer to the positive balance in the account during this time lag as a "float." (*Id.*). The U.S. branches could use the float, particularly the large float from very active accounts, to fund short-term assets on which the branches received income. (*See id*.; Clair Aff. at ¶58).

As noted above, Roger Walmsley, the Deputy Manager of the New York branch from 1982 through 1984 and Manager of the New York branch from 1984 through 1987, testified that "no favors [were] given by any of the units to another unit," and that "all rates that we used at all times . . . were commercial rates . . ." (Walmsley Tr. 262:25-263:3 (Verdolini Aff., Ex. 88); Walmsley Decl. at ¶11), and that, in all his years with the U.S. branch operations, he had never heard of transactions undertaken with other than a market rate of interest. (Walmsley Tr. 263:5-263:9 (Verdolini Aff., Ex. 88); Walmsley Decl. at ¶47). In addition, Mr. Walmsley confirmed that the clearing accounts maintained by the U.S. branches bore a range of terms that correlated with the level of activity in the accounts; that he always insisted on terms that would yield a commercially reasonable profit to the U.S. branch operations for their services; and that these terms reflected commercial interest rates. (Walmsley Decl. at ¶29).

Defendant cannot cite any evidence in the record to controvert Mr. Walmsley's statements. Moreover, as explained below, the assertions made by Defendant's expert, Mr.

[13] Overdrafts were generally discouraged and were not sought after as a source of profit. (Walmsley Decl. at ¶28).

Read, regarding the clearing accounts are erroneous and plainly insufficient to create a triable issue of fact.

First, Mr. Read's assertion that the New York branch was not acting at arm's length when it paid $33 million of interest on the clearing accounts of NatWest London Overseas and IWB London branch, because it allegedly did not pay interest on the clearing accounts of unrelated counterparties, is plainly and simply wrong. (*See* Read Rep. at ¶38) (Verdolini Aff., Ex. 62). Mr. Read completely fails to acknowledge that the U.S. branches *did* pay interest – indeed, at comparable rates and without commission charges – to the Bank of England, National Bank of Dubai and several other unrelated parties by "cash managing" their accounts. (*See* Walmsley Decl. at ¶¶32-34; Clair Aff. at ¶¶72-81; Payseur Aff. at ¶12).[14] This cash management process, which entailed transferring overnight balances to the IBF or Nassau branch, was necessary because Federal Reserve Regulation Q prohibited the New York branch, but not the IBF or the Nassau branch, from paying interest to those parties on short-term balances. (*See* 12 C.F.R. § 217.2) (Verdolini Aff., Ex 76)). Because this regulation did not preclude the New York branch from paying interest directly to London Overseas (Walmsley Decl. at ¶40; *see also* Clair Aff. at ¶82), there was no reason to cash manage the London Overseas account.

Regardless of whether the New York branch cash managed accounts or paid interest directly, the record is clear that NatWest did pay interest with respect to clearing account balances of third parties whose accounts were substantial enough to warrant such treatment. The smaller clearing accounts of related and unrelated parties also were treated comparably in that

[14] In any event, Mr. Read's bizarre suggestion – that London Overseas should have advanced very large sums to New York without asking for any interest – could not possibly be an arm's-length result. (*See* Walmsley Decl. at ¶¶35, 39) ("the London Overseas account at the New York branch generally had a very large positive balance").

they neither received interest nor were cash managed. (*See* Walmsley Decl. at ¶30 (interest not paid on positive balances in small accounts); Clair Aff. at ¶¶87, 91-93 (describing pricing terms for low-volume customers)). These smaller accounts were not comparable to the high-turnover accounts that received interest directly or through cash management. In some of them, the interest rate terms were so unimportant that the customer never asked what the debit rate terms were. (Walmsley Decl. at ¶30).

Mr. Read's analysis of IWB London's clearing account is also flawed in that a large portion of the interest Mr. Read asserted was paid on the clearing account was in fact paid on money market transactions. (Bandoian Decl. at ¶¶27-28) ($1.3 million of the $2.2 million Mr. Read identified is attributable to money market transactions). The remaining interest paid to IWB London in connection with its clearing account was less, on an aggregate basis, than the commissions the New York branch received from IWB on the account. (*Id.*). Mr. Read concedes that this is "equivalent" to an offset of notional interest against commissions, which NatWest generally applied even to accounts much smaller than the IWB account. (*See* Read Rep. at ¶42) (Verdolini Aff., Ex. 62). Thus, the payment of interest to IWB London confirms, rather than contradicts, the fact that it was treated comparably to similarly situated unrelated parties.

Mr. Read's claim that NatWest should have decreased the credit interest rate on certain related party accounts similarly misses the mark. This claim is based on the erroneous assertion that "roughly half of the accounts with related customers were credited interest at the federal funds rate, whereas the other related-party accounts and all third-party accounts were credited interest at a rate substantially less than the federal funds rate." (Read Rep. at ¶43) (Verdolini Aff., Ex. 62). It is simply not true that all third-party accounts were credited interest at a rate

substantially less than the Federal funds rate. Crédit du Nord, a state-owned French bank, was credited interest at the Federal funds rate. (Clair Aff. at ¶100). Moreover, Mr. Read failed to recognize that a number of other unrelated banks, including the National Bank of Dubai and the Bank of England, received interest at rates at or close to a Federal funds rate through cash management. (Clair Aff. at ¶101).

The common characteristic of the accounts that were credited or paid interest at Federal funds rates was that they had a higher turnover and a larger number of payments running through them. (*See* Clair Aff. at ¶91). The common characteristic of the accounts that were credited interest at substantially lower rates was that they had a much lower turnover and fewer payments. (*See id.*). These differences are evident in the records Mr. Read cites in his report. (*See* Read Rep. at App. B-2 (citing 12/31/86 A220 reports bearing Doc. Control Nos INT 537-001191 to INT 537-1271) (Verdolini Aff., Ex. 62). It should have been no surprise to Mr. Read that a clearing account having an annual turnover of more than $31 billion (NatWest Singapore) should have different terms than an account with an annual turnover of less than one-thousandth that amount (Bank Leumi with $14 million). (*See* Clair Aff. at ¶¶98-99, App. 1).

Finally, Mr. Read observed that the rate of interest accrued on overdrafts of some related parties was lower than the rate of interest accrued on overdrafts of unrelated parties. (Read Rep. at ¶45) (Verdolini Aff., Ex. 62). Mr. Read appears to have assumed - incorrectly - that the rate difference was attributable to the fact that the counterparty was related. In fact, the record shows that such a rate difference was a function of the differing levels of activity in the accounts. (*See* Walmsley Decl. at ¶29). He also overlooked the fact that in the case of most of the accounts, overdrafts were infrequent. (*See* Walmsley Decl. at ¶30, 33, 34, 40).

In sum, Mr. Read's report fails to raise issues that withstand examination. He does not appear to have considered the testimony of bank employees or to have sought answers to his questions in the records made available and produced to him. In light of the total record on this issue, there simply is no genuine issue as to the arm's-length nature of the rates actually utilized by NatWest in the ordinary course of its business.

## III.

## APART FROM AMOUNTS ALREADY CONCEDED, PLAINTIFF DID NOT DEDUCT ANY INTEREST ON CAPITAL

In 2003, the Court ruled that the Treaty requires the profits of NatWest's U.S. operations to be determined from the properly maintained books of account of the branch, and that the government could examine those books and adjust them where "interest expense was deducted on amounts designated as capital on its books or on amounts that were in fact allotted to it for capital purposes, such as funding capital infrastructure." (*NatWest II* at 505).

As the Court is aware, Plaintiff has identified and conceded all amounts of interest expense that its U.S. branches paid on amounts designated as capital or in fact allotted to them for capital purposes. (*See* Report of PricewaterhouseCoopers LLP dated Oct. 29, 2004 (the "PwC Rep.") at 9, attached as Ex. C to Plaintiff's Report on the Capital Issue dated Oct. 29, 2004, (Verdolini Aff., Ex. 56). Notably, after ten years of litigation, Defendant has not proposed any additional adjustments. Instead, Defendant has offered the report of an expert who states that he is unable to reach a conclusion "under the circumstances in this lawsuit." (Expert Report of A. Lawrence Kolbe on the Capital Issue date of March 4, 2005 at 4 (the "Kolbe Rep.")) (Verdolini Aff., Ex. 61). Given the state of the record on this issue, such a statement cannot create a genuine issue of fact requiring a trial. Plaintiff is entitled to summary judgment on the capital issue.

A. NatWest Has Identified and Conceded
All Interest Expense Deducted on Capital

As discussed in Part I, *supra*, the record establishes that NatWest's books and records were properly maintained and can be used reliably to determine whether all proper adjustments have been made. The evidence demonstrates that NatWest has identified and conceded all interest expense that was deducted on amounts designated as capital or in fact allotted to the U.S. branches as capital during the years at issue.

First, the record demonstrates that if NatWest had advanced funds for capital purposes, those advances would have been separately stated in its books and records. (Scott Decl. ¶13). From the inception of NatWest's U.S. branch operations in the 1970s, advances from the head office to branches outside the U.K. that were to be used to purchase fixed assets (or for other capital purposes such as initial working capital for start-up expenses) were separately identified in the books and records. (Scott Decl. at ¶¶11-12). The evidence demonstrates that it was NatWest's practice, when it established a branch, to record its initial extension of funding for fixed assets and initial working capital in the form of a "capital loan." (*See* Scott Decl. at ¶12; Tatz Tr. (1/23/02) 31:7-31:17 (Verdolini Aff., Ex. 80); Transcript of Deposition of Reuben Tatz on May 14, 2002 ("Tatz Tr. (5/14/02)") 12:2-12:14 (Verdolini Aff., Ex. 84)). The balance sheets of the U.S. branches during the 1970s included a line item for either "Capital Loan" or "Balance due H.O re. Capital Loan." (*See, e.g.*, Balance sheets from 1974, 1977, 1978) (Verdolini Aff., Exs. 43-45). The NatWest group continued this practice of separately designating advances for capital during the years at issue, and any such advances to the U.S. branch operations during the years in issue would have been readily identifiable in its books and records. (Scott Decl. at ¶12).

The record also demonstrates that, if NatWest had advanced funds for fixed asset purchases during the years at issue, those advances would not have borne interest. NatWest

maintained a policy throughout the years at issue that its branches should not incur interest-bearing liabilities to fund fixed asset expenditures. Beginning in 1977, NatWest's Financial Control department decided that branches should not incur interest expense to fund their fixed assets. (Scott Decl. at ¶11 and Ex. A attached thereto). A note to a balance sheet for the New York, Chicago and San Francisco branches as of 1977 states that "In April Financial Control decided that fixed assets should not be funded at the expense of local branches (buying in funds)," meaning that branches should not pay interest on funds borrowed from the head office or any other party to finance fixed assets. (Scott Decl., Ex. A, attached). From 1977, the balance sheets of the U.S. branches show, under the line for the Balance due Head Office re Capital Loan, an added line item for "Balance due Head Office re Fixed Assets." (*See, e.g.*, Balance sheets from 1977 and 1978) (Verdolini Aff., Exs. 44, 45). NatWest's policy against charging interest on head office advances in respect of fixed assets continued to be in effect during the years in issue. (Scott Decl. at ¶11).

In addition, Mr. Bandoian's forensic accounting work confirms that the profit and loss statements of the U.S. branches did not include any interest expense deducted on the Balance due Head Office re Fixed Assets during the years at issue. (*See* PwC Rep., Ex. 2 (Verdolini Aff., Ex. 57); Scott Decl. at ¶11; Tatz Tr. (5/14/02) 13:7-13:13 (Verdolini Aff., Ex. 84)).

Finally, the evidence demonstrates that during the years at issue the U.S. branch operations did not receive capital advances and had sufficient profits and cash flow to fund their fixed asset purchases without the use of borrowed funds. The records of the U.S. branches demonstrate that the combined amount of the Balance due Head Office re Capital Loan and Balance due Head Office re Fixed Assets did not increase during the years at issue. (*See* PwC Rep., Ex. 2) (Verdolini Aff., Ex. 57). Roger Walmsley, Deputy Branch Manager of the New

York branch from 1982 through 1984 and Manager of the New York branch from 1984 through 1987, states that during the years at issue, the New York operations had sufficient retained profits and cash flow to fund their own operating expenses and capital expenditures without subsidy from the head office. He states that "we did not seek funding from the home office for those types of expenditures." (Walmsley Decl. at ¶19). Moreover, Mr. Bandoian's analysis confirms that the aggregate net cash flow from the U.S. operations during each of the years at issue (excluding proceeds of ordinary course borrowings) was sufficient to pay for the fixed asset acquisitions of the U.S. branches during those years without the use of borrowed funds. (Bandoian Decl. at ¶¶20-21).

NatWest reported over $140 million in taxable income to the Internal Revenue Service with respect to its U.S. operations during the years at issue, an amount that was more than sufficient for the U.S. branch operations to pay $62 million in federal income taxes, purchase over $41 million in fixed assets, and repay over $12 million in Balances due Head Office re Capital Loans and Balance due Head Office re Fixed Assets relating to prior years. There is no evidence that the head office actually allotted any capital to the U.S. branch operations during the years at issue, apart from the amounts already identified, and there is no reason to infer that such an advance would have been made to the profitable U.S. branch operations.

Although NatWest's U.S. branch operations did not deduct interest on advances to fund fixed asset purchases, it did pay an interest charge, called a "capital loan charge," to the head office with respect to unrepatriated profits. When capital loan charges were paid they were calculated only on the excess of retained profits (plus any Balances Due to Head Office re Capital or Fixed Assets) over fixed assets. (PwC Rep. at 4) (Verdolini Aff., Ex. 56). The

charges were clearly identifiable in branch books and records.[15] (*See* PwC Rep. Ex. 2) (Verdolini Aff., Ex. 57). Based on his extensive analysis of the original business records underlying the profit and loss statements and U.S. federal income tax returns of the U.S. branch operations for the years at issue, Mr. Bandoian concluded that "all capital loan charges have been identified and accounted for. Consequently, there are no capital loan charges that exist in interest expense accounts that have not been included in the June 5, 2001 Submission . . . ." (PwC Rep. at 9) (Verdolini Aff., Ex. 56).

Plaintiff's expert Edward Jukes confirms that no additional adjustments are necessary. Mr. Jukes, who was employed at the U.K. Inland Revenue from 1974 through 2001, participated in the committees that drafted the Inland Revenue Banking Manual, and served as head of that portion of the International Division of Inland Revenue which was responsible for advising Inland Revenue Inspectors on questions regarding the application of U.K. income tax treaties to U.K. branches of foreign banks. (Jukes Decl. at ¶¶1-10). He also directly worked on a number of cases involving Inland Revenue's approach to the determination of branch capital. (Jukes Decl. at ¶¶4-9).

---

[15] The New York branch posted these charges to the same account, 89072103, to which it had previously posted its interest payments on the Balance due Head Office re Capital Loan. (*See*, *e.g.*, documents attached to PwC Rep., Ex. 2, Binder 4 of 5, 1981 Tab 6 at PwC-NWB 0000420) (Verdolini Aff., Ex. 57)). In some years, the capital loan charge was presented on the certified profit and loss statements as a separate line item bearing the three-letter code PKC and identified as "Capital Funds (i.e., loan charges)." (*See, e.g.,* New York Profit and Loss Statement dated as of June 30, 1981) (Verdolini Aff., Ex. 28)). In other years, it was included in interest shown as paid to "IBD Head Office and Participations" ("IBD HO & Parts Book") on a schedule detailing the breakdown of interbranch interest expense, but it continued to be identified as "interest paid on capital funds" in underlying account statements for 89072103, as well as in daily reports (A207 reports of non-dealing transactions) on the capital loan charge payment dates. (*See, e.g.*, documents attached to PwC Rep., Ex. 2, Binder 4 of 5, 1982 Tab 3 at PwC-NWB 00000466 (interest paid to IBD Head Office and Participations), 1982 Tab 5 at PwC-NWB 0000483 (account statement for 89072103)) (Verdolini Aff., Ex. 57).

Mr. Jukes reviewed the Court's opinion, as well as Plaintiff's October 29, 2004 Report on the Capital Issue, including the PwC analysis. He concluded that the Court's opinion is consistent with Inland Revenue's actual practice in the years 1981 through 1987 and that based on the facts described in the October 29, 2004 report, Inland Revenue "would not have sought any further adjustment in respect of capital, including working capital." (Jukes Decl. at ¶15).

B. Defendant Has Proposed No Adjustments on the Capital Issue

Plaintiff submits that it has identified and conceded all interest expense deducted on amounts designated as capital or in fact allotted to the U.S. branches for capital purposes. Defendant has not offered any evidence to challenge this conclusion.[16] Instead, Defendant's expert attempts to criticize and reargue the Court's previous rulings while purporting to interpret the Inland Revenue Manual. None of this raises a triable issue.

Plaintiff has repeatedly asked Defendant to confirm that Plaintiff has identified and conceded all the capital loan charges deducted on its returns and to identify any other adjustments Defendant proposes to make under the Court's opinion. (*See, e.g.*, Pl.'s Status Rep. dated Dec. 12, 2003, at 4) (Verdolini Aff., Ex. 63). Most recently, following submission of its

---

[16] The closest Dr. Kolbe comes to addressing this question is in footnote 30 of his report, where he purports to identify "one potential anomaly in Plaintiff's revised claim," asserting that the $3,996,578 shown on the profit and loss statement of the Nassau branch as having been paid to "IBD HO and Parts" is higher than the amount of the capital loan charges Plaintiff has conceded in respect of Nassau for 1986. In fact, the $3,996,578 consists of (i) $1,815,277 specifically identified as capital loan charges in Nassau's account statements and A207 reports (copies of which were included in the October 29, 2004 submission) and (ii) $2,181,301 of interest on three money market transactions which were clearly identified on the daily M262 reports that were available to Defendant and Defendant's experts. (*See* Doc. control nos. PwC-NWB 0000322 through 0000349 with respect to capital loan charges (PwC Rep., Ex. 2, Binder 3 of 5, 1986 Tab 6) (Verdolini Aff., Ex. 57); Bandoian Decl. ¶¶27-28; Microfiche Index Reports (identifying microfiche and paper records available for the years at issue) (Verdolini Aff., Ex. 51)). Dr. Kolbe may be "presently unaware of the basis for" the amount of the capital loan charge identified by Plaintiff, but his lack of awareness (as well as Defendant's) is not justified and does not create a "genuine" issue of fact that requires a trial in this case.

comprehensive October 29, 2004 report, Plaintiff sought admissions from Defendant confirming its findings regarding the capital loan charges on the Plaintiff's books and records. (*See* Def.'s Resp. to Pl.'s Req. Adm. 2.69 (Verdolini Aff., Ex. 67). Defendant responded that "Defendant's position on this request will be expressed in and consistent with its experts' reports."

The only report Defendant submitted on March 4, 2005 with respect to the capital issue was the report of Dr. A. Lawrence Kolbe, whose resume, like Mr. Read's, discloses no prior experience with banking or forensic accounting matters or with U.K. tax law. Dr. Kolbe does not identify as one of his assignments the question whether Plaintiff identified and conceded all of the capital loan charges included on its original returns. Nor does he attempt to ascertain whether Plaintiff's U.S. branches otherwise deducted interest on amounts designated as capital or in fact allotted to them for capital purposes.

Instead, Dr. Kolbe discusses whether Plaintiff has identified what he considers to be an "economically reasonable" amount of NatWest's worldwide capital to support the income-producing assets of the U.S. branches, a test he purports to find in the Inland Revenue Banking Manual. He concludes that "while adhering to the legal test described in the Court's 2003 Opinion, the Court's 2004 Transcript, and the Court's 2005 Order, I am unable to identify an economically reasonable approach to determine the amounts to be treated as allotted capital for NatWest's U.S. branches." (Kolbe Rep. at 4) (Verdolini Aff., Ex. 61).

The Inland Revenue Banking Manual provides no support for Defendant's previously rejected worldwide apportionment theory. Contrary to Dr. Kolbe's assertions, the Inland Revenue Manual did not contemplate looking for capital that was "somewhere on the worldwide books of NatWest." (Kolbe Rep. at 33) (Verdolini Aff., Ex. 61). As this Court observed, the Inland Revenue's approach was based upon a Queen's Counsel opinion that the 1945 U.S.-U.K.

Treaty "did not give the U.K. the authority to look to the bank's worldwide capital and then 'write into branch accounts a level of capital which the branch did not have.'" (*NatWest II* at 505). The Queen's Counsel opinion rejects the notion that the branch "must be given a notional capital base (proportional to the size of its business and carved out of capital of its 'parent')." (U.K. DEPARTMENT OF INLAND REVENUE BANKING MANUAL, Guidance for Staff (1994) ("Inland Revenue Banking Manual") (Queen's Counsel's Opinion attached) (Verdolini Aff., Ex. 71).

Plaintiff's expert Edward Jukes, who participated in drafting the Inland Revenue Manual, has confirmed that Dr. Kolbe's reading of the Inland Revenue Banking Manual is "at odds with the Banking Manual's approach" (Jukes Decl. at ¶¶24-26):

> In particular, Dr. Kolbe seems to read into Paragraph 2.1 of the Banking Manual Appendix 9A an expectation by the Inland Revenue that a UK branch of a foreign bank would receive free capital to fund its acquisition of income-producing assets. That inference is incorrect. Paragraph 2.1 merely observes that when interest-free capital is in fact used to fund income-producing assets, the branch will earn a greater profit than when borrowed funds are used to fund income-producing assets. There is no suggestion that any portion of income-producing assets must be funded with interest-free capital; in fact, Inland Revenue recognized that the business of banking involves making and receiving advances and expected that income-producing assets ordinarily would be funded with borrowed money. The answer should accord with the facts; *i.e.*, the actual conditions under which the bank traded.

As before, the Court should reject Defendant's attempt to reassert its previously rejected theory imputing capital based on facts extraneous to the U.S. branch operation, a theory in violation of the shared expectations of the Treaty partners.

C. Contrary to Defendant's Claim, Plaintiff's U.S. Branches <u>Did Not Require Additional Capital to Fund Fixed Assets</u>

In its March 10, 2005 Order, the Court directed Plaintiff to address in this motion whether, for purposes of the Treaty, "plaintiff's profits should be calculated for each individual

U.S. branch office, as a separate branch, or in the aggregate."[17] As the Court is aware, the Defendant has developed an attachment to the proposition that NatWest's U.S. branch profits must be evaluated on an office-by-office basis. (Status Conf. Tr. (3/9/05) 27:14-28:14) (Verdolini Aff., Ex. 69). The reason for Defendant's approach is clear. If NatWest's U.S. operations are considered in the aggregate, consistent with the way they were managed by the bank and taxed by both the United States and the United Kingdom, Defendant has no choice but to concede that no borrowings from the head office were necessary to support the fixed asset purchases of the U.S. branch operations. Specifically, the U.S. branch operations always had interest-free funds sufficient to cover the total of their fixed asset expenditures. Only by separating NatWest's U.S. profits from the related expenses can Defendant muster an argument that NatWest's capital was, in some way, insufficient.

A brief review of how NatWest accounted for its U.S. operations will demonstrate the artificiality of Defendant's approach. As noted above, the New York branch conducted the operations recorded on the books of the IBF, Nassau branch and Cayman branch, as well as those reported on its own books. The New York branch therefore naturally recorded all of the overhead expenses relating to all four sets of books on its own branch books. (*Compare* Profit and Loss Statements of New York Branch (showing operating expenses on New York's statement) *with* Profit and Loss Statements of the IBF or Nassau or Cayman branches showing no operating expenses) (Verdolini Aff., Exs. 28-34). The New York branch also recorded on its

---

[17] In connection with this question, the Court in its Order dated March 10, 2005 also directed that "to the extent relevant here, the plaintiff should also explain what approach has been followed for post-1987 'closed' tax years." For each of the years at issue, Plaintiff reported all of the profits from its U.S. operations on a single tax return, and this practice continued in subsequent years, including years that have been closed by agreement with the Internal Revenue Service.

books all of the U.S. federal, state and local taxes for those sets of books, including the taxes on the substantial profits reflected on the Nassau and Cayman books. There was no accounting, tax or regulatory reason to do otherwise. (*Id*.). Moreover, beginning in 1985, for reasons of accounting convenience the fixed assets of all three physical locations – New York, Chicago and San Francisco – were transferred to the books of the New York branch. (Bandoian Decl. at ¶24). As a result, the New York branch books, if looked at in isolation, show (i) the income from assets booked in the New York branch, but (ii) the overhead expenses and taxes incurred in generating the combined income of the New York, IBF, Nassau and Cayman branches and, from 1985 forward, the fixed asset expenditures of all of NatWest's U.S. branch operations.

Defendant therefore would like to consider the New York branch's books in isolation, and ignore in particular the IBF and Nassau branch retained profits that far exceeded fixed assets, in order to claim that NatWest had insufficient capital. There is no support whatsoever in the Treaty or the Code for this approach. Moreover, Mr. Jukes has confirmed that Inland Revenue would not have adopted such an approach. (Jukes Aff. at ¶27). Finally, the records show that the U.S. branch operations had sufficient interest-free funds to make their fixed asset purchases, even if each of the three U.S. branch locations are considered separately.

1. There is No Support for Defendant's Disaggregated Approach to Determining NatWest's Business Profits

Although not expressly stated, Defendant's position apparently is that each set of books maintained by NatWest in the U.S. should be treated as a separate "permanent establishment" under the Treaty. Using this approach Defendant would then require that the business profits of NatWest be determined on a book-by-book basis. Defendant's position reflects a fundamental misunderstanding of the taxation of business profits under the Treaty, and it is directly contrary to the IRS's own approach to the taxation of foreign corporations. In any event, it is hard to see

how this position can be reconciled with Defendant's previous admission that NatWest's U.S. branch operations constituted "a" permanent establishment. (1st Am. Comp. ¶9; Ans. 1st Am. Comp ¶9 (emphasis added) (Verdolini Aff., Exs. 3, 4).

Under the Internal Revenue Code, it is clear that a foreign corporation is required to calculate, report, and pay tax on its U.S. effectively connected income on an aggregate basis. The Code provides that a foreign corporation is not subject to the corporate income tax imposed by section 882 unless it is engaged in a "trade or business" in the United States. However, once this threshold jurisdictional requirement is met, the foreign corporation is taxed on the total amount of its effectively connected income without regard to either the number of U.S. trades or businesses or the number of books reflecting such effectively connected income. The fundamental point is that the foreign corporation is the taxpayer, not the trades or businesses in the United States. A foreign corporation receives one employer identification number and, using that EIN, files one tax return reporting all of its effectively connected income regardless of how many separate offices or businesses it may maintain in the United States.

When it is necessary under the Code to calculate the capital of a foreign corporation's U.S. operations, this is done on a combined basis. For example, in calculating a foreign corporation's liability for the branch profits tax imposed by section 884 of the Internal Revenue Code,[18] it is necessary to calculate the corporation's "U.S. net equity" in order to identify the portion of the corporation's U.S. earnings that are deemed repatriated and therefore subject to the tax. For this purpose, U.S. net equity is defined as "the aggregate adjusted bases of property" of a foreign corporation treated as effectively connected with the conduct of a trade or business in

---

[18] By virtue of the Treaty, NatWest was exempt from the Section 884 branch profits tax, which was enacted in 1986. (I.R.C. § 844(e)).

the United States.[19] Thus, the Code requires an aggregate approach to determine a foreign corporation's U.S. branch capital.

Neither is a disaggregated approach authorized by the Treaty. Under general OECD guidelines and specifically under the terms of the Treaty, neither the U.S. nor the U.K. can tax the business profits of an enterprise from the other country unless that enterprise satisfies a threshold jurisdictional requirement which provides the necessary nexus for host country taxation. Under the Treaty, this jurisdictional requirement is that the enterprise have a "permanent establishment" in the host country.[20] If the enterprise does not have a permanent establishment in the host country, then the host country cannot tax any of the enterprise's business profits. If a permanent establishment does exist, then the host country may tax the business profits of the enterprise, but only so much of those profits as are "attributable to" the permanent establishment.

The OECD has unequivocally stated that "the main use of the concept of a permanent establishment is to determine the right of a Contracting State to tax the profits of an enterprise of the other Contracting State." That is, the permanent establishment concept is a jurisdictional concept. It does not purport to prescribe how an enterprise, once it meets this jurisdictional requirement, should be taxed. Accordingly, the permanent establishment concept provides no

[19] 26 U.S.C. §884(c)(2) [1987], as enacted in 1986 (emphasis supplied).

[20] A permanent establishment is generally defined under the Treaty as "a fixed place of business through which the business of an enterprise is wholly or partly carried on." (Treaty, Art 5(1)) (Verdolini Aff., Ex. 70). The OECD Commentary to Article 5 states (in paragraph 1) that "the main use of the concept of a permanent establishment is to determine the right of a Contracting State to tax the profits of an enterprise of the other Contracting State. Under Article 7 a Contracting State cannot tax the profits of an enterprise of the other Contracting State unless it carried on its business through a permanent establishment situated therein."

support for the proposition that a taxpayer with more than one fixed place of business in a country should parse its activities into separate taxable units.

In this regard, it is not uncommon for corporations, particularly banks, to have more than one physical place of business in a host country. However, to Plaintiff's knowledge there is not a single reference in cases, rulings, or the OECD Commentary to the proposition that a corporation with more than one place of business in a country should be regarded as having multiple permanent establishments that should be separately taxed. To the contrary, Mr. Jukes has stated that when Inland Revenue encountered the issue in practice, it permitted banks to determine capital on an aggregate basis, and "would not have used separate underlying records reflecting a loss in one physical location in the United Kingdom to create an adjustment to capital when there were adequate profits in another U.K. location reported on the same U.K. income tax return." (Jukes Decl. at ¶27).

2. There is No Evidence of Capital Advances Even Under a Disaggregated Approach

The only way the Treaty can be construed to permit NatWest's U.S. branch operations to be taxed on a disaggregated basis is by interpreting Articles 5 and 7 as allowing the separate taxation of each "permanent establishment." Under this approach, NatWest's U.S. operations could be parsed into at most three "permanent establishments," corresponding to the three locations at which NatWest carried on its licensed branch or agency operations. However, NatWest's U.S. branch operations had sufficient interest-free funds to cover fixed asset expenditures even if each of these three locations were treated as a separate permanent establishment, the profits of which should be evaluated separately.

In this regard, the Treaty defines a "permanent establishment" as "a fixed place of business through which the business of an enterprise is wholly or partly carried on." (Treaty,

Art. 5(1)) (Verdolini Aff., Ex. 70). As explained below, the IBF and the New York, Nassau and Cayman branches were managed and operated together from a single "fixed place of business" in New York. Thus, under the Treaty, the U.S. branch operations can be parsed into no more than three permanent establishments: New York (including the IBF, Nassau and Cayman), San Francisco and Chicago.

Although the banking assets and liabilities generated by the New York operations were segregated into four sets of books for bank regulatory and state tax reasons, neither the IBF nor the Nassau or Grand Cayman branches had any employees or facilities separate from those of the New York branch. (Walmsley Decl. at ¶4). As a matter of law the IBF was merely a "set of asset and liability accounts" maintained by the New York branch pursuant to Federal Reserve regulations.[21] The profit and loss statements and balance sheets of the New York branch reflected all of the fixed assets, all of the taxes, and almost all of the general and administrative expenses of the New York operations, including those of the IBF and Nassau and Cayman branches. (*See, e.g.*, Balance Sheets and Profit and Loss Statements for 1985 (Verdolini Aff., Exs. 32, 40). The New York branch kept track of credit limits on a combined basis. (Walmsley Decl. at ¶17)). The New York treasury desk squared all of the books and managed all of the maturity ladders and interest rate risk of those New York operations. (Payseur Aff. at ¶13). Roger Walmsley, who was Deputy Manager or Manager of the New York branch for six of the seven years at issue, stated with respect to the New York operations that viewing the profit and

[21] According to 12 C.F.R. § 204.8(a)(1), an International Banking Facility "means a set of asset and liability accounts segregated on the books and records of a ... United States branch or agency of a foreign bank...." (Verdolini Aff., Ex. 75). A U.S. branch or foreign agency of a foreign bank "may establish an IBF in any location where it is legally authorized to engage in IBF business." 12 C.F.R. § 204.8(d) (Verdolini Aff., Ex. 75).

loss statements and balance sheets of the New York branch in isolation from the IBF, Nassau and Grand Cayman does not fully reflect its profits. (Walmsley Decl. at ¶18).

If the U.S. branches are evaluated by permanent establishment, the New York and San Francisco locations had sufficient interest-free funds to cover the total of their fixed asset expenditures during each of the years at issue.[22] With respect to the Chicago location, Mr. Bandoian's analysis shows that branch operations had a deficiency in cumulative cash flows during the years 1981 and 1982. However, this does not mean that Chicago received advances from the head office to cover its fixed asset purchases. Rather, as the Inland Revenue Manual observes, the presence of a deficit raises a question whether any such advances were made. (*See* Inland Revenue Banking Manual at ¶11.1) (Verdolini Aff., Ex.71). It is always necessary to look at the specific facts of the situation. (Jukes Decl. at ¶¶16, 22).

Here the record demonstrates that the Chicago branch did not pay any interest expense to the head office in 1981 or 1982, apart from interest expense traceable to specific short-term money market transactions. (*See* Bandoian Decl. at ¶23). Those money market transactions were fully repaid during the year 1981 and thus could not have been used to fund purchases of fixed assets in 1981 and 1982. (*See also* Ex. F to Plaintiff's June 8, 2001, FRE 1006 Summaries With Respect to 1981 Interbranch Interest Expense) (Verdolini Aff. Ex. 50). Thus, even if the branches are evaluated on the basis of physical location, there is no evidence that these locations received interest-bearing advances from the home office to fund fixed asset expenditures.

---

[22] As explained in Mr. Bandoian's declaration, an apparent cash flow deficiency of $8.8 million for the New York operations in 1987 was attributable to the posting of a $16.3 million specific bad debt reserve relating to "new sovereign risk" on December 31, 1987. Because all of the U.S. branches' fixed asset purchases were made before this date, the bad debt reserve addition does not affect the fact that the U.S. branches had sufficient interest-free funds to make those purchases. (Bandoian Decl. at ¶22). Mr. Jukes confirms that Inland Revenue would not have proposed an adjustment to capital in these circumstances. (Jukes Decl. at ¶¶20, 21, 23).

Plaintiff's expert Edward Jukes confirms that in these circumstances the Inland Revenue would not have had grounds for asserting that any amounts should be disallowed as interest paid on allotted capital or amounts treated as allotted capital, apart from those amounts already identified and conceded by Plaintiff. (Jukes Decl. at ¶23).

* * *

In sum, uncontroverted evidence establishes that: (i) NatWest adopted a policy in 1977 that it would not fund fixed assets with interest-bearing obligations; (ii) throughout the years at issue, the only capital loan charges that were in fact paid were paid on capital balances in excess of fixed asset accounts; (iii) Plaintiff has identified and conceded all of the deductions for capital loan charges that were reflected on its original federal income tax returns; and (iv) the U.S. branches had sufficient interest-free cash flow to make all of their fixed asset purchases during the years at issue without any need to borrow from the head office.

## CONCLUSION

For the foregoing reasons, the record establishes that there is no genuine issue of fact requiring a trial in this case. Plaintiff's motion for summary judgment on the remaining issues should be granted, and final judgment should be entered for a refund of $66,234,336, plus interest.

Dated: May 5, 2005

Respectfully submitted,

s/D. Scott Wise by Mario J. Verdolini, Jr.
D. Scott Wise
Attorney of Record

Davis Polk & Wardwell
450 Lexington Avenue
New York, N.Y. 10017
(212) 450-4000

Of counsel:

Mario J. Verdolini, Jr.
Leslie J. Altus

Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

John L. Carr, Jr.
Michael C. Moetell
Thomas M. Buchanan

Winston & Strawn LLP
1700 K Street, NW
Washington, DC 20006

**CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2005 in connection with the electronic filing of the foregoing, I caused a copy of the exhibits to the foregoing to be served both on CD-ROM and paper copy by hand delivery on the attorneys for the Defendant as follows:

Steven I Frahm
Attorney of Record
U.S. Department of Justice, Tax Division
Court of Federal Claims Section
555 4th Street N.W., 8th Floor
Washington, D.C. 20001
(202) 307-6440 (tel.)
Steven.I.Frahm@usdoj.gov

s/Michael C. Moetell
Winston & Strawn
1700 K Street, N.W.
Washington, D.C. 20006