IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 95-758T

(Judge Nancy B. Firestone)

NATIONAL WESTMINSTER BANK PLC

*Plaintiff*,

v.

THE UNITED STATES,

*Defendant*.

# PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

D. SCOTT WISE
Attorney of Record for Plaintiff

Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017
(212) 450-4000 (telephone)
(212) 450-3800 (facsimile)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 95-758T

(Judge Nancy B. Firestone)

NATIONAL WESTMINSTER BANK, PLC

Plaintiff,

v.

THE UNITED STATES,

Defendant.

PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(h) of the Rules of the United States Court of Federal Claims, plaintiff respectfully submits the following proposed findings of uncontroverted fact.

*Background*

1. The years at issue in this case are the tax years ending December 31, 1981; December 31, 1982; December 31, 1983; December 31, 1984; December 31, 1985; December 31, 1986; and December 31, 1987 (the "years at issue").[1]

[1] Def.'s Ans. 1st Am. Compl. ¶ 1 (Verdolini Aff., Ex. 4).

2. During the years at issue, NatWest was one of the largest banks in the world and one of the few that had a triple-A credit rating.[2]

3. During the years at issue, NatWest conducted international wholesale money center operations in the United States through offices located in New York, Chicago and San Francisco (the "U.S. branch operations").[3]

4. The U.S. branch operations dealt in wholesale transactions involving low risk and narrow spreads.[4]

5. The U.S. branch operations made short-term, high denomination loans to large corporations.[5]

6. The U.S. branch operations funded their loans by selling money market instruments in U.S. and international markets, by borrowing inter-bank money, and by using funds on deposit in dollar clearing accounts, mainly those maintained for members of NatWest's worldwide group and several foreign central banks, including the Bank of England.[6]

---

[2] Report by Marcia L. Stigum, Ph.D., dated Nov. 15, 2001 ("Stigum Rep.") at 6 (Verdolini Aff., Ex. 52); *see also* Declaration of Anthony Eric Scott dated April 26, 2005 ("Scott Decl.") at ¶5; Payseur Tr. 111:15-23 (Verdolini Aff., Ex. 82).

[3] Declaration of Roger Walmsley dated April 28, 2005 ("Walmsley Decl.") at ¶4; Stigum Rep. at 7-8 (Verdolini Aff., Ex. 52); *see also* Payseur Tr. 31:3-20 (wholesale) (Verdolini Aff., Ex. 82).

[4] *See* Walmsley Decl. at ¶6.

[5] *Id.*

[6] *Id.* at ¶¶6, 33, 39; Affidavit of Robert T. Clair dated May 2, 2005 ("Clair Aff."), App. 1.

7. The U.S. branch operations also traded in domestic and international money markets to manage their interest rate and liquidity risk and, in the case of the New York operations, to make a trading profit.[7]

8. The aggregate assets of the U.S. operations were in the range of three to eight billion dollars during the years at issue, and the daily turnover of funds often exceeded $10 billion.[8]

9. NatWest's original federal income tax returns for the years at issue show an aggregate liability of approximately $62 million in federal income taxes, which NatWest paid.[9]

10. The U.S. branch operations purchased approximately $42 million in premises and equipment during the years at issue.[10]

11. During the years at issue, the U.S. branch operations repaid approximately $12 million in balances due to the head office with respect to fixed assets and capital loans from prior years.[11]

---

[7] Walmsley Decl. at ¶7.

[8] *Id.* at ¶8 (turnover); *see* Balance Sheets (line AZD –"Total Assets" – for each of the years at issue) (assets) (Verdolini Aff., Exs. 12-18).

[9] *See id.*; Revenue Agent Reports for tax years 1981-1984 and 1985-1987, dated May 3, 1995 ("Revenue Agent Reports") (for taxable income and taxes paid) (Verdolini Aff., Ex. 26); see also ¶157 below ($62 million equals sum of rows 1 (Prior Year Overpayment) through 6 (Amount Credited)).

[10] Declaration of Kevin D. Bandoian, PricewaterhouseCoopers, LLP dated May 1, 2005 ("Bandoian Decl."), Ex. C.

[11] *Id.*

12. During the years at issue, NatWest conducted its U.S. branch operations pursuant to a number of banking licenses.[12]

13. During the years at issue, NatWest operated an "agency" in San Francisco which was licensed by the State of California to make loans and take deposits (other than certain domestic deposits).[13]

14. During the years at issue, NatWest operated a "branch" in Chicago which was licensed by the State of Illinois to make loans and take deposits.[14]

15. During the years at issue, NatWest operated a "branch" in New York, which was licensed by the State of New York to make loans and take deposits.[15]

16. The New York branch, like many other U.S. banks and U.S. branches of foreign banks, established an International Banking Facility, or IBF, in 1981 as a "segregated set of asset and liability accounts on [its] books" pursuant to Federal banking regulations.[16]

17. Through its New York office, NatWest managed and controlled branches licensed by the Bahamas (Nassau) and the Cayman Islands.[17]

---

[12] Walmsley Decl. at ¶4.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *See* 12 C.F.R. § 204.8(a)(1) and (d) (Verdolini Aff., Ex. 75); Walmsley Decl. at ¶4.

[17] Walmsley Decl. at ¶¶17, 4.

18. During the years at issue neither the IBF nor the Nassau or Cayman branches had any employees, premises or equipment of their own.[18]

19. For management and operational purposes, NatWest viewed the New York branch operations (*i.e.*, the IBF and New York, Nassau and Cayman branches) as a single unit during the years at issue.[19]

20. The New York branch recorded on its books all of the overhead expenses relating to the IBF and New York, Nassau and Cayman branches.[20]

21. The New York branch recorded on its books all of the U.S. federal, state and local taxes relating to the IBF and New York, Nassau and Cayman branches.[21]

22. No fixed assets were recorded in the balance sheets of the IBF and Nassau and Cayman branches during the years at issue.[22]

---

[18] *Id.*

[19] Walmsley Decl. at ¶17; Scott Decl. at ¶14; Affidavit of Scott Payseur dated April 26, 2005 ("Payseur Aff.") at ¶11; Payseur Tr. 16:6-16:18, 61:14-61:19, 87:17-88:2 (Verdolini Aff., Ex. 82).

[20] *Compare* Profit and Loss Statements of New York branch (showing operating expenses on New York's statement,) *with* Profit and Loss statements of the IBF or Nassau or Cayman branches (showing no operating expenses) (Verdolini Aff., Exs. 28-34).

[21] *Id*. (showing reserve for taxes on New York's statements and no tax reserve on statements for the IBF or Nassau or Cayman branches).

[22] *See* Balance Sheets of the IBF, Nassau and Cayman branches (Verdolini Aff., Exs. 36-42).

23. During the years at issue, the fixed assets of all of the New York branch operations were recorded on the certified balance sheet of the New York branch.[23]

24. In 1985, the fixed assets of the Chicago and San Francisco offices were transferred to the books of the New York branch.[24]

25. The New York branch kept track of credit limits on a combined basis for the IBF and the New York, Nassau and Cayman branches.[25]

26. The New York treasury desk squared the books of Nassau, Cayman and IBF with the New York branch. That is, with respect to the books of each of the IBF and the New York, Nassau and Cayman branches, the New York treasury desk was responsible for (i) advancing funds to each of these books to the extent the funds disbursed from those books exceeded the funds received on those books during the day and (ii) investing any excess funds held by any of these books by the end of each day.[26] The New York branch in turn squared its books with the market.

27. The treasury desk of NatWest's New York operations included a money market desk and a foreign exchange desk.[27]

---

[23] *Compare* Balance Sheets of New York branch (showing fixed asset balances) *with* Balance Sheets of the IBF, Nassau and Cayman branches (showing no fixed asset balances) (Verdolini Aff., Exs. 36-42).

[24] Bandoian Decl. at ¶24.

[25] Walmsley Decl. at ¶17. *See, e.g.*, "Report B133 Limits and Utilizations by L.A. and S.I.C.," for December 31, 1986 (Verdolini Aff., Ex. 46).

[26] Payseur Aff. at ¶¶11, 13.

[27] Payseur Aff. at ¶10.

28. The head of the New York money desk oversaw traders, ranging from about three to five in number during the years at issue, who ran the four money books in the New York office (New York, IBF, Nassau and Cayman).[28]

29. Of the traders supervised by the head of the New York money desk, at any given time there were one or two traders who ran the New York and IBF books, and one or two traders who ran the Nassau and Cayman books.[29]

30. One of the traders supervised by the head of the New York money desk handled all "repo" activity engaged in by the New York operations.[30]

31. All of the traders engaging in money market activities on behalf of the IBF or the New York, Nassau or Cayman branches reported to a single head of the New York money market desk, who was responsible for the combined performance of all four of these books and was evaluated on the basis of their aggregate results.[31]

32. The New York money market desk managed the liquidity and interest rate risk of each of the four New York books (*i.e.*, the books of the IBF and the New York, Nassau and Cayman branches) on a collective basis.[32]

33. The New York office maintained separate accounts for the IBF and New York, Nassau and Cayman branches in order to record transactions that were subject to different bank

---

[28] Payseur Aff. at ¶10; Payseur Tr. 61:14-61:19 (Verdolini Aff., Ex. 82).

[29] Payseur Aff. at ¶10.

[30] *Id.*

[31] *Id.*; *see* Payseur Tr. 61:14-62:22, 87:17-88:2 (Verdolini Aff., Ex. 82).

[32] Payseur Aff. at ¶11; Payseur Tr. 76:3-78:14 (Verdolini Aff., Ex. 82).

regulatory rules and, in the case of the IBF, that were subject to favorable state and local tax treatment. [33]

34. NatWest's management in London evaluated the profitability of the Nassau and Cayman branches and the IBF together with the New York branch.[34]

35. The managers of each of the New York, Chicago and San Francisco branch operations reported to NatWest's Regional General Manager, North America, in New York.[35]

36. The Treasurer in New York was responsible for all Treasury activities conducted in the United States.[36]

37. For each of the years at issue, NatWest was required to and did file a single U.S. federal income tax return for its U.S. branch operations.[37]

38. NatWest's U.S. branch operations maintained separate accounts, including profit and loss statements and balance sheets, in the ordinary course of their banking business as a

[33] Scott Decl. at ¶14; Blessley Tr. at 50:2-51:13, 60:10-61:12 (Verdolini Aff., Ex. 86).

[34] Scott Decl. at ¶14.

[35] Tugwell Tr. at 13:22-14:13, 29:7-31:22, 32:7-33:18 (Verdolini Aff., Ex. 87); Blessley Tr. at 103:12-105:18 (Verdolini Aff., Ex. 86).

[36] Blessley Tr. at 105:24-106:11 (Verdolini Aff., Ex. 86.)

[37] Treas. Reg. §1.6012-2(g)(1) ("every foreign corporation which is engaged in a trade or business in the United States . . . shall make a return on Form 1120-F") (Verdolini Aff., Ex. 74); *see* Form 1120-F for each of the years at issue (Verdolini Aff., Exs. 5-11); *see also* Def.'s Res. Pl.'s Req. Adm. 2.43 (NatWest timely filed its returns) (Verdolini Aff., Ex. 67).

matter of good business practice and banking custom and as required under U.S. bank regulatory law.[38]

39. During the years at issue, NatWest's U.S. branch operations had accurate and reliable records.[39]

40. As required by bank regulation, the branches had extensive internal controls to ensure accurate records.[40]

41. The daily activity of the U.S. branch operations was captured on a computer system, which automatically generated numerous reports each day, including profit and loss statements and balance sheets.[41]

42. There were daily procedures for confirming the accuracy of entries into the computer system.[42]

43. Consistent with common banking practice, the U.S. operations performed ongoing reconciliations of account differences resulting from misdirected payments or from

---

[38] *See* Report of Robert R. Bench, PricewaterhouseCoopers LLP, dated Jan. 14, 2002 ("Bench Supp. Rep") at ¶13 (U.S. bank regulations require separate books and records) (Verdolini Aff., Ex. 54); Walmsley Decl. ¶¶12, 15, 17; Tatz Tr. (1/23/02) at 14:18-14:19 (separate books and records maintained) (Verdolini Aff., Ex. 80).

[39] Walmsley Decl. at ¶12.

[40] Walmsley Decl. at ¶12, ¶14.

[41] *See* Harasek Tr. at 13:22-14:14, 15:15-17:10, 20:8-23:21, 67:14-68:19, 69:16-70:7 (Verdolini Aff., Ex. 83); Samaroo Tr. at 26:8-28:21 (Verdolini Aff., Ex. 81); Walmsley Decl. at ¶14.

[42] *Id.*

items in transit, in clearing, or awaiting settlement, as was typical in a banking operation of NatWest's size and scope.[43]

44. Reconciliation processes are a normal and important aspect of reliable record-keeping in the banking business.[44]

45. NatWest's reconciliation procedures are evidence of its good business practices, not of unreliable or inaccurate records.[45]

46. During the years at issue, NatWest's U.S. branches prepared profit and loss statements, balance sheets and other reports for each branch using data from the computer-generated reports in accordance with detailed internal verification procedures.[46]

47. During the years at issue, NatWest's U.S. branches regularly submitted financial statements and reports for each branch to the head office and certified them to be in accordance with the books and, to the best of their knowledge and belief, to be true and accurate.[47]

---

[43] Scott Decl. at ¶15; Bench Supp. Rep. at ¶¶5, 12 (Verdolini Aff., Ex. 54); *see* Tatz Tr. (1/23/02) at 17:2-18:22, 59:6-17 (Verdolini Aff., Ex. 80); Samaroo Tr. at 36:2-51:2 (Verdolini Aff., Ex. 81); *see also* Tatz Tr. (1/23/02) at 49:18-51:4 (regulators reviewed the reconciliation procedures) (Verdolini Aff., Ex. 80).

[44] *See* Bench Supp. Rep. at ¶¶5, 12 (Verdolini Aff., Ex. 54); Scott Decl. at ¶15.

[45] *See id.*

[46] *See* Walmsley Decl. at ¶15 (detailed verification procedures); Tatz Tr. (1/23/02) at 16:19-17:17 (balance sheets and income statements derived from computer reports) (Verdolini Aff., Ex. 80); Samaroo Tr. at 33:2-44:25, 54:17-54:22 (Verdolini Aff., Ex. 81).

[47] *See* Walmsley Decl. at ¶15.

48. NatWest's head office regularly inspected the U.S. books and records, without advance notice, in order to ensure their compliance with the bank's internal standards, as well as those of the Bank of England, which supervised the bank as a whole.[48]

49. U.S. bank regulators conducted regular examinations of the books and records of the U.S. branches and consistently found them to be satisfactory.[49]

50. The Bank of England cited NatWest's internal controls, which were established on a bankwide basis and therefore applied in the United States as well as in the United Kingdom, as a model for U.K. branches of foreign banks to follow.[50]

51. For each of the years at issue, the U.S. federal income tax return NatWest filed in respect of its U.S. branch operations reported taxable income derived from the separate accounts maintained in the ordinary course of NatWest's U.S. branch operations.[51]

52. For each of the years at issue, the differences between the taxable income shown on the returns and the profit and loss statements of the U.S. branch operations were identified in schedule M-1 of those tax returns.[52]

---

[48] Walmsley Decl. at ¶¶20-21, Tatz Tr. (1/23/02) at 26:15-26:18 (Verdolini Aff., Ex. 80).

[49] Walmsley Decl. at ¶20-21; Tatz Tr. (1/23/02) at 27:22-29:12 (Verdolini Aff., Ex. 80).

[50] Walmsley Decl. at ¶21.

[51] Report of Kevin D. Bandoian, Partner, PricewaterhouseCoopers LLP dated March 4, 2005 ("Bandoian Rep. (3/4/2005)"), Ex. 4 (reconciliation of tax returns with profit and loss statements) (Verdolini Aff., Ex. 58).

[52] *Id.*

*Money Market Transactions*

53. NatWest's U.S. money market desks took and placed Euro time deposits, bought and sold Fed funds, traded government securities subject to repurchase agreements ("repos" and "reverse repos"), bought and sold negotiable certificates of deposit ("CDs"), and sold commercial paper of NatWest PLC.[53]

54. Most of the transactions of NatWest's U.S. money market desks during the years at issue were with third parties, and thus by definition were at arm's-length rates.[54]

55. A minority of the transactions of NatWest's U.S. money market desks during the years at issue occurred with non-U.S. NatWest branches and other NatWest affiliates.[55]

56. During the years at issue, money market transactions between NatWest's U.S. money market desks and non-U.S. NatWest branches and affiliates generally arose as a result of transactions between the non-U.S. NatWest branch or affiliate and one of its own third party customers that desired to deposit or borrow dollars.[56]

57. During years at issue, the rates used by the NatWest U.S. money desks on interbranch and intercompany money market transactions were arm's length market rates.[57]

---

[53] Payseur Aff. at ¶15.

[54] Payseur Aff. at ¶16.

[55] *See* Bandoian Rep. (3/4/05) at 6-7 (Verdolini Aff., Ex. 58).

[56] Walmsley Decl. at ¶9.

[57] Walmsley Tr. 262:25-263:3 (Verdolini Aff., Ex. 88); Walmsley Decl. at ¶11, Payseur Tr. 90:19-90:24 (Verdolini Aff., Ex. 82); Payseur Aff. at ¶22.

58. During the years at issue, NatWest's U.S. money desks were run as independent professional operations.[58]

59. Plaintiff's expert, Dr. Robert T. Clair, concluded that there is no evidence that the pricing on related party money market transactions was other than arm's-length.[59]

60. Defendant is unable at this time to render an opinion as to whether the interest income and interest expense reported by NatWest with respect to money market transactions by its U.S. branches with related parties reflect arm's-length interest rates.[60]

61. Defendant's expert James Read did not develop a sampling methodology to test Plaintiff's business records.[61]

62. The work Mr. Read did to prepare his report was insufficient to support a conclusion one way or the other as to whether the interest rates on U.S. branch borrowing from and lending to related parties were or were not at arm's length.[62]

63. Mr. Read's report did not compare related party rates with the range of unrelated party rates in the records he used.[63]

---

[58] Payseur Tr. 31:3-31:8 (Verdolini Aff., Ex. 82).

[59] *See* Report of Robert T. Clair on the Arm's-Length Nature of National Westminster Bank PLC's Money Market Transactions dated Mar. 4, 2005 ("Clair Rep.") (Verdolini Aff., Ex. 59)); Affidavit of Robert T. Clair dated May 2, 2005 ("Clair Aff.") at ¶9.

[60] Expert Report of James Read on The Interest Rate Issue dated March 4, 2005 ("Read Rep.") at ¶14 (Verdolini Aff., Ex. 62).

[61] *See id.*

[62] *Id.*

[63] *See id.* at ¶54-55.

64. In his report, Mr. Read claimed he used the same approach to analyze the records of NatWest's U.S. money market transactions that was used in a letter from Plaintiff's counsel dated September 19, 2000.[64]

65. The September 19, 2000 letter from plaintiff's counsel to defendant's counsel, as well as the schedules attached thereto, was marked "confidential, for settlement purposes only."

66. In his analysis of NatWest's money market instruments, Mr. Read did not in fact follow the approach described in the September 19, 2000 letter.[65]

67. The pattern Mr. Read observed in the average interest rates of the U.S. branch operations was caused by his inclusion of intra-U.S. interbranch transactions in his computations.[66]

68. The pattern Mr. Read observed in the average interest rates of the U.S. branch operations was consistent with arm's-length pricing of the related party transactions. [67]

69. A direct comparison analysis of Mr. Read's data provides strong evidence of arms-length pricing.[68]

70. Mr. Read's resume does not describe any experience with banks.[69]

---

[64] *Id.* at ¶53.

[65] *See* Clair Aff. at ¶28-29.

[66] Clair Aff. at ¶¶9, 37.

[67] Clair Aff. at ¶37.

[68] Clair Aff. at ¶9.

[69] Read Rep., App. A (Verdolini Aff., Ex.62.)

*Clearing Accounts*

71. The U.S. branches maintained dollar clearing accounts in the ordinary course of their banking business for (i) unrelated non-U.S. banks and (ii) non-U.S. branches of NatWest, NatWest's subsidiary International Westminster Bank ("IWB") and other NatWest affiliates.[70]

72. The clearing accounts at NatWest's U.S. branches worked like checking accounts in that they were accounts into which the U.S. branch's customer could deposit funds and through which it could make and receive payments to or from other parties.[71]

73. In NatWest's records, the clearing accounts were often referred to as "current accounts," the U.K. term for a checking account, because even though use of the accounts differed, the basic function of and record keeping for a clearing account is the same as in the case of a checking account.[72]

74. The U.S. branches charged customers – both related and unrelated – the same fixed per-item commission for processing payments into and out of the clearing accounts.[73]

75. The U.S. branches derived profits from the clearing accounts by (i) charging transaction fees and (ii) investing the funds left on deposit in the accounts in interest-bearing assets.[74]

---

[70] Walmsley Decl. ¶¶22, 25.

[71] Walmsley Decl. at ¶24.

[72] *Id.*

[73] Walmsley Decl. at ¶27.

[74] Walmsley Decl. at ¶27; *see also* Clair Aff. at ¶58.

76. The clearing accounts maintained at the U.S. branches bore a range of terms that correlated with the level of activity in the accounts.[75]

77. The clearing accounts for related and unrelated parties reflected commercial interest rates.[76]

78. The U.S. branches paid interest to the Bank of England, National Bank of Dubai and several other unrelated parties by "cash managing" their clearing account balances. [77]

79. The rates at which the New York branch paid interest to the NatWest London Overseas branch and IWB London clearing accounts were comparable to the rates at which the U.S. branches paid interest on the clearing account balances of the Bank of England and National Bank of Dubai through cash management.[78]

80. During the years at issue, the smaller clearing accounts related and unrelated parties held at NatWest's U.S. branches were treated comparably in that they neither received interest nor were cash managed.[79]

---

[75] Walmsley Decl. at ¶29.

[76] Walmsley Decl. at ¶29.

[77] *See* Walmsley Decl. at ¶¶32-33; Clair Aff. at ¶¶72-81; Payseur Aff. at ¶12.

[78] *See* Walmsley Decl. at ¶¶32-34; Clair Aff. at ¶¶72-81; Payseur Aff. at ¶12.

[79] *See* Walmsley Decl. at ¶30 (interest not paid on positive balances in small accounts); Clair Aff. at ¶¶87, 91-93 (describing pricing terms for low-volume customers).

81. The smaller clearing accounts maintained at NatWest's U.S. branches had lower turnover and a lower number of payments as compared with the high-turnover clearing accounts that received interest directly or through cash management.[80]

82. In the case of some smaller clearing accounts maintained at NatWest's U.S. branches, the interest rate terms were so unimportant that the customer never asked what the terms were.[81]

83. During the years in issue, the fees and commissions received by the New York branch on the clearing account of IWB London exceeded the amount of interest paid by $365,015. The following table accurately summarizes the interest paid by the New York branch to IWB London and the fees and commissions received by the New York branch from IWB London on the clearing account of IWB London at the New York branch:[82]

[80] Clair Aff at ¶91.

[81] Walmsley Decl. at ¶30.

[82] Bandoian Decl. at ¶¶25-28.

| | | 1983 | 1984 | 1985 | 1986 | 1987 | Total |
|---|---|---|---|---|---|---|---|
| Interest paid to IWB London (per Read Report) | $ | 123,335 | 227,782 | 1,370,596 | 124,928 | 328,316 | 2,174,956 |
| Less, interest on money market transactions | $ | 0 | 12,198 | 1,283,673 | | | 1,295,871 |
| Net | $ | 123,335 | 215,584 | 86,923 | 124,928 | 328,316 | 879,085 |
| Fees and commissions received from IWB London | $ | 210,852,852 | 216,576 | 241,662 | 278,049 | 296,961 | 1,244,100 |
| **Difference** (subject to rounding) | $ | (87,517) | (992) | (154,739) | (153,121) | 31,355 | (365,015) |

84. An offset of notional credit interest on a clearing account against commissions otherwise payable by the clearing account customer is the equivalent of payment of interest.[83]

85. Mr. Read's claim that all third-party clearing accounts were credited interest at a rate substantially less than the Federal Funds rate is incorrect.[84]

86. Crédit du Nord, a state-owned French bank, was credited interest on its clearing account at the New York branch at the Federal funds rate.[85]

---

[83] *See* Read Rep. at ¶42 (Verdolini Aff., Ex. 62).

[84] Read Rep. at ¶43 (Verdolini Aff., Ex. 62); Clair Aff. at ¶101.

[85] Clair Aff. at ¶101.

87. A number of unrelated banks, including the National Bank of Dubai and the Bank of England, received interest with respect to balances in their clearing accounts with the New York branch at rates at or close to a Federal funds rate through cash management.[86]

88. The common characteristic of the clearing accounts maintained at the U.S. branches that were credited or paid interest at Federal funds rates was that they had a higher turnover and a larger number of payments running through them.[87]

89. The common characteristic of the clearing accounts maintained at the U.S. branches that were credited interest at substantially lower rates was that they had a much lower turnover and fewer payments running through them.[88]

90. These differences in turnover and number of payments (i.e., entries) in clearing accounts can be determined from records Mr. Read cites in his report.[89]

91. NatWest Singapore's clearing account with the New York branch had an annual turnover of more than $31 billion in 1985.[90]

92. Bank Leumi le Israel's clearing account with the New York branch had an annual turnover of less than $15 million in 1985.[91]

---

[86] Clair Aff. at ¶99.

[87] Clair Aff. at ¶91.

[88] *Id.*

[89] *See* Read Rep. at App. B-2 (citing 12/31/86 A220 reports bearing Doc. Control Nos INT 537-001191 to INT 537-1271) (Verdolini Aff., Ex. 62).

[90] Clair Aff. at App. 1.

[91] Clair Aff. at App. 1.

93. The differences in the rate of interest accrued on overdrafts of various clearing accounts at the U.S. branches were a function of the differing levels of activity in the accounts.[92]

94. In the case of most of the clearing accounts at NatWest's U.S. branches, overdrafts were infrequent during the years at issue.[93]

*Capital Issue*

95. From the inception of NatWest's U.S. branch operations in the 1970s, advances from the head office to branches outside the U.K. that were to be used to purchase fixed assets (or for other capital purposes such as initial working capital for start-up expenses) were separately identified in the books and records.[94]

96. It was NatWest's practice, when it established a branch, to record its initial extension of funding for fixed assets and initial working capital in the form of a "capital loan."[95]

97. Beginning in 1977, NatWest's Financial Control department took the position that branches should not incur interest expense to fund their fixed assets.[96]

---

[92] *See* Walmsley Decl. at ¶29.

[93] *See* Walmsley Decl. at ¶30, 33, 34, 40.

[94] Scott Decl. at ¶11-12.

[95] *See* Scott Decl. at ¶12; Tatz Tr. (1/23/02) 31:7-31:17 (Verdolini Aff., Ex. 80); Tatz Tr. (5/14/02) 12:2-12:14 (Verdolini Aff., Ex. 84).

[96] Scott Decl. at ¶11 and Ex. A attached thereto.

98. A note to a balance sheet for the New York, Chicago and San Francisco branches as of the end of April 1977 states that "In April Financial Control decided that fixed assets should not be funded at the expense of local branches (buying in funds)."[97]

99. The policy adopted in 1977 against charging interest on head office advances in respect of fixed assets continued to be in effect during the years in issue.[98]

100. The profit and loss statements of the U.S. branches did not include any interest expense deducted on the Balance due Head Office re Fixed Assets during the years at issue.[99]

101. The records of the U.S. branches demonstrate that the combined amount of the Balance due Head Office re Capital Loan and Balance due Head Office re Fixed Assets did not increase during the years at issue.[100]

102. The aggregate net cash flow from the U.S. operations during each of the years at issue (excluding proceeds of ordinary course borrowings) was sufficient to pay for the fixed asset acquisitions of the U.S. branches during those years without the use of borrowed funds.[101]

103. During the years at issue, the U.S. branch operations did not seek funding from NatWest's head office for operating expenses or capital expenditures.[102]

---

[97] 1977 balance sheet (Verdolini Aff., Ex. 47).

[98] Scott Decl. at ¶11.

[99] *See* PwC Rep., Ex. 2 (Verdolini Aff., Ex. 57); Scott Decl. at ¶11; Tatz Tr. (5/14/02) 13:7-13:13 (Verdolini Aff., Ex. 84).

[100] *See* PwC Rep., Ex. 2 (Verdolini Aff., Ex. 57).

[101] Bandoian Decl. at ¶¶20-21.

[102] Walmsley Decl. at ¶19; Payseur Aff. at ¶13.

104. The San Francisco operations had sufficient interest-free funds to cover the total of its fixed asset expenditures during each of the years at issue.[103]

105. The New York branch operations (including the New York branch, the IBF, and the Nassau and Cayman branches) had sufficient interest-free funds to cover total fixed asset expenditures during each of the years at issue.[104]

106. The New York operations posted a specific bad debt reserve of approximately $16.3 million relating to "new sovereign risk" on the books of the IBF on December 31, 1987.[105]

107. Prior to the entry on the IBF's books of an addition to the reserve for specific bad debt relating to "new sovereign risk," the interest-free funds available to the New York operations for 1987 exceeded fixed asset purchases in that year.[106]

108. All fixed asset purchases made by the New York operations in 1987 were made prior to December 31, 1987.[107]

109. The Chicago operations had sufficient interest-free funds to cover the total of its fixed asset expenditures during each of the years 1983 through 1987.[108]

---

[103] Bandoian Decl. at ¶¶20, 21.

[104] *Id.* at ¶¶20, 21, 22.

[105] *Id.* at ¶22.

[106] *Id.*

[107] *Id.*

[108] *Id.* at ¶¶20, 21.

110. All of the interest expense paid by the Chicago branch to the head office in 1981 is traceable to specific short-term money market deposits from the head office.[109]

111. The money market deposits that account for all of the interest paid by the Chicago branch to NatWest's head office in 1981 were fully repaid during the year 1981.[110]

112. The Chicago branch did not pay any interest expense to the head office in 1982.[111]

113. During the years at issue, the U.S. branch operations occasionally paid interest ("capital loan charges") on a balance (referred to herein as "net capital balance") consisting of the sum of the Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Assets less the balance of Premises and Equipment, all as of the prior year-end.[112]

114. The capital loan charges paid by the U.S. branches to NatWest's head office during the years at issue were clearly identifiable in branch books and records.[113]

115. The New York branch posted its capital loan charges to account 89072103, entitled "Interest Paid, Capital Funds."[114]

---

[109] *Id.* at ¶23.

[110] *See* Ex. F to Plaintiff's June 8, 2001 FRE 1006 Summaries With Respect to 1981 Interbranch Interest Expense (Verdolini Aff. Ex. 50).

[111] *See* Bandoian Decl. at ¶23.

[112] *See* PwC Rep. at 4 (Verdolini Aff., Ex. 56).

[113] *See id.*

[114] *See*, *e.g.*, documents attached to PwC Rep. at Ex. 2, Binder 4 of 5, 1981 Tab 6 at PwC-NWB 0000420 (Verdolini Aff., Ex. 57).

116. In some years, the capital loan charge was presented on a U.S. branch's certified profit and loss statements as a separate line item bearing the three-letter code PKC and identified as "Capital Funds (i.e., loan charges)."[115]

117. When a capital loan charge was not presented as separate line item on the certified profit and loss statement of a U.S. branch, it was included in interest shown as paid to "IBD Head Office and Participations" on a schedule detailing the breakdown of interbranch interest expense, but it continued to be identified as "interest paid on capital funds" in underlying account statements (for account 89072103 in the case of the New York branch), as well as in daily reports (A207 reports of non-dealing transactions) on the capital loan charge payment dates.[116]

118. The amounts of interest expense recorded on the profit and loss statements of the U.S. branches as an interest expense payable to the head office and therefore reported on NatWest's original 1120F federal income tax returns for the tax years at issue included the following net amounts described in U.S. branch books and records as capital loan charges:[117]

| Tax Year | Capital Loan Charge |
|---|---|
| 1981 | $ 465,868 |
| 1982 | $ 209,433 |

---

[115] *See, e.g.*, New York Profit and Loss Statement dated as of June 30, 1981 (Verdolini Aff., Ex. 28).

[116] *See, e.g.*, documents attached to PwC Rep., Ex. 2, Binder 4 of 5, 1982 Tab 3 at PwC-NWB 00000466 (interest paid to IBD Head Office and Participations); 1982 Tab 5 at PwC-NWB 0000483 (account statement for 89072103) (Verdolini Aff., Ex. 57).

[117] PwC Rep., Summaries of Annual Capital Loan Charges, at Ex. 1(Verdolini Aff., Ex. 56).

| Tax Year | Capital Loan Charge |
|---|---|
| 1983 | $ 202,745 |
| 1984 | $ 390,459 |
| 1985 | $ 0 |
| 1986 | $ 2,336,260 |
| 1987 | $ 1,936,537 |

119. During the years at issue, the New York branch collected any capital loan charges paid by the U.S. branches and paid them on to the head office.[118]

120. Apart from the amounts identified in Proposed Finding of Uncontroverted Fact 118, the U.S. branches did not pay or deduct any interest during the years at issue on Retained Profits, Profits or Loss, Balance due to HO re Capital Loan or Balance due to HO re Fixed Assets.[119]

121. Apart from the amounts identified in Plaintiff's Proposed Finding of Uncontroverted Fact 118, the U.S. branches did not pay or deduct any interest on any amount designated or in fact allotted as capital on their books and records.[120]

122. Plaintiff has conceded the amounts of interest expense identified in Proposed Finding of Uncontroverted Fact 118 that were recorded in the profit and loss statements and described in the U.S. branch books and records as capital loan charges.[121]

---

[118] *See* PwC Rep. at 4 (Verdolini Aff., Ex. 56).

[119] PwC Rep. at 9 (Verdolini Aff., Ex. 56).

[120] *See* PwC Rep. at 12 (Verdolini Aff., Ex. 56).

[121] Letter from M. Carr Ferguson (Plaintiff's counsel) to Steven I. Frahm (Defendant's
(continued...)

123. Plaintiff has conceded all capital loan charges reflected in its books and records.[122]

124. The aggregate amount conceded by plaintiff as capital loan charges exceeded the actual capital loan charges deducted by plaintiff on its U.S. federal income tax returns during the years 1981 through 1987 in the amount of $267,323.[123]

125. For the year ended December 31, 1986, plaintiff made an over-concession with regard to capital loan charges for the fourth quarter for the Nassau branch in the amount of $266,510.[124]

126. For the year ended December 31, 1986, plaintiff made an over-concession with regard to capital loan charges for the fourth quarter for the San Francisco agency in the amount of $813.[125]

127. The amounts recorded on the balance sheets of the U.S. branches as retained profits, profit and loss, balance due to head office re fixed assets, and provision for bad debts constitute all of the amounts that were designated as capital on the books of the U.S. branches or in fact allotted to the U.S. branches for capital purposes.[126]

---

[121] (...continued)
Counsel) dated June 5, 2001 and supporting schedules thereto ("Plaintiff's Revised Refund Claim") (Verdolini Aff., Ex. 27); PwC Rep. at 9 (Verdolini Aff., Ex. 56).

[122] *See* PwC Rep. at 9 (Verdolini Aff., Ex. 56).

[123] *See* PwC Rep. at 9 (Verdolini Aff., Ex. 56).

[124] *See* PwC Rep. at Ex. 1: 1986-4, Ex. 2, Ex. 3 (Verdolini Aff., Exs. 56, 57).

[125] *See* PwC Rep. at Ex. 1: 1986-6, Ex. 2, Ex. 3 (Verdolini Aff., Exs. 56, 57).

[126] *See* Bandoian (1/14/02) Rep at 14-22 (discussing capital on the books of the U.S. branch Operations) (Verdolini Aff., Ex. 55).

128. Apart from the amounts in Proposed Finding of Uncontroverted Fact 127, there were no amounts that were designated as capital on the books of the U.S. branches or in fact allotted to the U.S. branches for capital purposes.

129. Plaintiff has identified and conceded all amounts of interest expense that its U.S. branches paid on amounts designated as capital or in fact allotted to them for capital purposes.

130. Defendant has not proposed any additional adjustments with respect to capital under the Court's November 2003 opinion.[127]

131. Defendant is unable to reach a conclusion on the capital issue under the circumstances in this lawsuit.[128]

132. The Kolbe report does not identify as one of its assignments the question whether Plaintiff identified and conceded all of the capital loan charges included on its original returns.[129]

133. Dr. Kolbe's resume discloses no prior experience with banking or forensic accounting matters or with U.K. tax law.

---

[127] *See, e.g.*, Def.'s Resp. to Pl.'s Req. Adm. 2.69 ("Defendant's position on this request will be expressed in and consistent with its experts' report.") (Verdolini Aff., Ex. 67); Kolbe Report at 4 ("I am unable to identify an economically reasonable approach to determine the amounts to be treated as allotted capital for NatWest's U.S. branches.") (Verdolini Aff., Ex. 61).

[128] *See* Def.'s Res. Pl.'s Req. Adm. 2.69 (Verdolini Aff., Ex. 67); (Expert Report of A. Lawrence Kolbe on the Capital Issue date of March 4, 2005 at 4 (the "Kolbe Rep.") (Verdolini Aff., Ex. 61).

[129] *See, e.g.*, Def.'s Resp. to Pl.'s Req. Adm. 2.69 ("Defendant's position on this request will be expressed in and consistent with its experts' report.") (Verdolini Aff., Ex. 67); Kolbe Report at 4 ("I am unable to identify an economical reasonable approach to determine the amounts to be treated as allocated capital for NatWest's U.S. branches.") (Verdolini Aff., Ex. 61).

*Tax Liability*

134. During the years at issue, the profit and loss statements and balance sheets of the U.S. Branch accurately recorded the profits and losses, and assets and liabilities, of the U.S. branch operations.[130]

135. The U.S. federal income tax returns filed by NatWest during the years at issue agree to the certified profit and loss statements with only one *de minimis* exception of $701 in 1986.[131]

136. The aggregate amount of interest income recorded on the profit and loss statements of the U.S. Branch for each of the years at issue was as follows:[132]

| Tax Year | Aggregate Interest Income |
|---|---|
| 1981 | $ 701,738,887 |
| 1982 | $ 635,002,839 |
| 1983 | $ 486,454,589 |
| 1984 | $ 635,242,556 |
| 1985 | $ 529,248,172 |
| 1986 | $ 498,814,159 |
| 1987 | $ 584,410,256 |

[130] Bandoian Rep. (3/4/05) at 7 (Verdolini Aff., Ex. 58).

[131] Bandoian Rep. (3/4/05) at 6 (Verdolini Aff., Ex. 58).

[132] *See* Profit and Loss Statements (Verdolini Aff., Ex. 28-34).

137. The amounts set forth in Proposed Finding of Uncontroverted Fact 136 above include the following aggregate amounts of interest income received or accrued by the constituent offices of the U.S. Branch from each other:[133]

| Tax Year | Interest Income from Constituent Offices of the U.S. Branch |
|---|---|
| 1981 | $ 82,542,486 |
| 1982 | $ 80,609,935 |
| 1983 | $ 57,681,447 |
| 1984 | $ 70,244,991 |
| 1985 | $ 48,578,877 |
| 1986 | $ 58,297,666 |
| 1987 | $ 78,169,477 |

138. The aggregate amount of interest expense recorded on the profit and loss statements of the U.S. Branch for each of the years at issue was as follows:[134]

| Tax Year | Aggregate Interest Expense |
|---|---|
| 1981 | $ 671,036,957 |
| 1982 | $ 601,557,461 |
| 1983 | $ 444,832,199 |
| 1984 | $ 602,794,686 |
| 1985 | $ 459,184,135 |

[133] *See* Profit and Loss Statements (Verdolini Aff., Exs. 28-34); Interest Income and Expense Details (on an annual basis for 1981-1987) *in* Plaintiff's Revised Refund Claim (Verdolini Aff., Ex. 27).

[134] *See* Profit and Loss Statements (Verdolini Aff., Ex. 28-34).

| Tax Year | Aggregate Interest Expense |
|---|---|
| 1986 | $ 436,383,691 |
| 1987 | $ 552,888,878 |

139. The amounts set forth in Proposed Finding of Uncontroverted Fact 138 above include the following amounts of interest expense paid or accrued by the constituent offices of the U.S. Branch to each other:[135]

| Tax Year | Interest Expense with respect to Constituent Offices of the U.S. Branch |
|---|---|
| 1981 | $ 82,507,529 |
| 1982 | $ 80,633,926 |
| 1983 | $ 57,601,531 |
| 1984 | $ 70,476,154 |
| 1985 | $ 48,617,123 |
| 1986 | $ 58,293,692 |
| 1987 | $ 78,241,354 |

140. NatWest timely filed its U.S. federal income tax return as a calendar year, accrual method taxpayer for each of the years 1981 through 1987 on Internal Revenue Service ("IRS") Form 1120F.[136]

---

[135] *See* Profit and Loss Statements (Verdolini Aff., Ex. 28-34).

[136] Def's Resp. to Pl.'s Req. for Ad. 2.10, 2.43 (Verdolini Aff., Ex. 67); *see* Plaintiff's Form 1120F original tax returns for tax years 1981-1987 (Verdolini Aff., Exs. 5-11); *see also* Pl.'s Supp. Resp. to Def.'s First Set of Interrogs., Supp. Resp. to Interrog. 1.03 *and* Ex. A (Verdolini Aff., Ex. 64).

141. For each of the years at issue, the total net profit (loss) set forth on the manually prepared and certified profit and loss statements for all of the U.S. branch operations agree to the net income shown on Schedule M-1 of NatWest original federal income tax return reported on IRS Form 1120F, with only one minor exception ($701) in 1986.[137]

142. For each of the years at issue, the total net profit (loss) set forth on the manually prepared and certified profit and loss statements for all of the U.S. branch operations agree to the taxable income shown on the original federal income tax returns on IRS Form 1120F, adjusting for all reconciling items on Schedule M-1 of those returns, with only one minor exception ($701) in 1986.[138]

143. The aggregate interest income included in NatWest's original U.S. federal income tax return for each of the years at issue was equal to the aggregate interest income recorded on the profit and loss statements of the U.S. Branch for each of the years at issue, as set forth in Proposed Finding of Uncontroverted Fact 136 above, with the following adjustments as shown on Schedule M-1 to such returns:[139]

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1981 | 1980 money market adjustment | $ 15,699 |
| | 1980 T-bill accrued interest | $ 449,284 |
| | 1981 money market adjustment | $ (72,622) |
| | 1981 T-bill accrued interest | $ (1,986,545) |

[137] Bandoian Rep. (3/4/05) at 8 (Verdolini Aff., Ex. 58).

[138] Bandoian Rep. (3/4/05) at 8 (Verdolini Aff., Ex.58).

[139] *See* Bandoian Rep. (3/4/05) at 6-7, Ex. 4 (Verdolini Aff., Ex. 58); Plaintiff's Form 1120F original tax returns for tax years 1981-1987 (Verdolini Aff., Exs. 5-11).

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1982 | 1981 money market adjustment<br>1981 T-bill accrued interest | $ 72,622<br>$ 1,986,545 |
| 1983 | None | |
| 1984 | T-bill accrual | $ 1,885,318 |
| 1985 | Net T-bill accrual | $ (1,884,246) |
| 1986 | Interest Adjustment<br>ESOP interest exclusion<br>Foreign Exchange Income<br>Net T-bill accrual | $ (486,697)<br>$ (525,498)<br>$ 103,289<br>$ (246) |
| 1987 | Income Adjustment<br>Interest Accrual Adjustment<br>Interest Adjustment<br>Foreign Exchange Income<br>Net T-bill accrual | $ (1,185,000)<br>$ (846,000)<br>$ 486,697<br>$ 114,736<br>$ 98 |

144. The aggregate interest expense included in NatWest's original U.S. federal income tax return for each of the years at issue was equal to the aggregate interest expense recorded on the profit and loss statements of the U.S. branch for each of the years at issue, as set forth in Proposed Finding of Uncontroverted Fact 138 above, with the following adjustments as shown on Schedule M-1 to such returns:[140]

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1981 | None | |
| 1982 | None | |
| 1983 | None | |
| 1984 | 1976 - 1980 Add'l Int. Ass'd (California) | $ 360,149 |

[140] *See* Bandoian Rep. (3/4/05) at 6-7, Ex. 4 (Verdolini Aff., Ex. 58); Plaintiff's Form 1120F original tax returns for tax years 1981-1987 (Verdolini Aff., Exs. 5-11).

| Tax Year | Description of Schedule M-1 Adjustment | Amount |
|---|---|---|
| 1985 | None | |
| 1986 | None | |
| 1987 | Interest Accrual Adjustments | $ 720,000 |

145. The U.S. federal taxable income of NatWest as originally reported for each of the years at issue (after adjustments with respect to certain employee benefits per IRS Form 870) was as follows:[141]

| Tax Year | Amount |
|---|---|
| 1981 | $ 5,127,742 |
| 1982 | $ 12,866,570 |
| 1983 | $ 17,074,564 |
| 1984 | $ 8,009,640 |
| 1985 | $ 40,541,143 |
| 1986 | $ 42,962,917 |
| 1987 | $ 14,330,911 |
| Total -> | $ 140,913,487 |

146. The IRS examined NatWest's original Form 1120F U.S. federal income tax returns for each of the years at issue.[142]

147. The IRS proposed the following adjustments to the taxable income of NatWest as reported on its original U.S. federal income tax returns:[143]

---

[141] *See* Revenue Agent Reports (Verdolini Aff., Ex. 26).

[142] *See* Revenue Agent Reports (Verdolini Aff., Ex. 26).

[143] *See* Revenue Agent Reports (Verdolini Aff., Ex. 26).

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1981 | Interest Expense: | $ 152,605,551 |
| | Interest Income: | $ (125,857,675) |
| 1982 | Interest Expense: | $ 147,337,977 |
| | Interest Income: | $ (132,049,714) |
| 1983 | Interest Expense: | $ 101,652,347 |
| | Interest Income: | $ (88,243,894) |
| | Sale of Property (Chrysler Stock Sale): | $ 7,853,110 |
| 1984 | Interest Expense: | $ 126,092,694 |
| | Interest Income: | $ (104,153,633) |
| 1985 | Interest Expense: | $ 93,539,801 |
| | Interest Income: | $ (79,404,169) |
| 1986 | Interest Expense: | $ 108,064,089 |
| | Interest Income: | $ (87,081,845) |
| | Net Loans: | $ 84,426 |
| | Employee Benefits: | $ 405,849 |
| | Home Office Allocation: | $ 21,903 |
| 1987 | Interest Expense: | $ 174,292,853 |
| | Interest Income: | $ (131,596,705) |
| | Net Loans: | $ 174,309 |
| | Employee Benefits: | $ 332,710 |
| | Home Office Allocation: | $ 3,534,289 |
| | Other Deductions: | $ (555,350) |
| | Net Operating Loss Deduction: | $ (12,918,821) |
| | Bad Debts: | $ (785,311) |

148. The adjustments described in Proposed Finding of Uncontroverted Fact 147 include the following amounts to which NatWest has agreed:[144]

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1983 | Sale of Property (Chrysler Stock Sale): | $ 7,853,110 |
| 1986 | Employee Benefits: | $ 405,849 |
| | Home Office Allocation: | $ 21,903 |

[144] *See* Revenue Agent Reports (Verdolini Aff., Ex. 26).

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1987 | Employee Benefits: | $ 332,710 |
| | Home Office Allocation: | $ 3,534,289 |
| | Other Deductions: | $ (555,350) |
| | Bad Debts: | $ (785,311) |

149. The adjustments described in Proposed Finding of Uncontroverted Fact 147 include the following amounts that defendant has withdrawn:[145]

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1986 | Net Loans: | $ 84,426 |
| 1987 | Net Loans: | $ 174,309 |

150. The adjustments described in Proposed Finding of Uncontroverted Fact 147 include the following amount which could change depending upon the final resolution of tax years subsequent to the years at issue:[146]

| Tax Year | Proposed Adjustment | Amount |
|---|---|---|
| 1987 | Net Operating Loss Deduction: | $ (12,918,821) |

[145] *See* Letter from M. Seidman to M. Carr Ferguson dated August 10, 2000 (Verdolini Aff., Ex. 49).

[146] *See* Revenue Agent Reports (Verdolini Aff., Ex. 26).

151. The adjustments described in Proposed Finding of Uncontroverted Fact 147 include the following amounts asserted by the IRS under Section 882 and Treasury Regulations section 1.882-5:[147]

| Tax Year | Proposed adjustments to interest income: | Proposed adjustments to interest expense: |
|---|---|---|
| 1981 | (125,857,675) | $ 152,605,551 |
| 1982 | (132,049,714) | $ 147,337,977 |
| 1983 | (88,243,894) | $ 101,652,347 |
| 1984 | (104,153,633) | $ 126,092,694 |
| 1985 | (79,404,169) | $ 93,539,801 |
| 1986 | (87,081,845) | $ 108,064,089 |
| 1987 | (131,596,705) | $ 174,292,853 |

152. The Revenue Agent Reports dated May 3, 1995 for the taxable year ended December 31, 1987 proposed an Environmental Tax increase of $53,771, but did not include a correlative regular tax deduction for Environmental Tax.[148] Both of these figures could change depending upon the final resolution of the years at issue.

153. The adjusted U.S. federal taxable income of NatWest as determined by the IRS for each of the years at issue was as follows:[149]

| Tax Year | Amount |
|---|---|
| 1981 | $ 31,875,618 |

[147] *See* Revenue Agent Reports (Verdolini Aff., Ex. 26).

[148] *See* Revenue Agent Reports (Verdolini Aff., Ex. 26); IRC §§59A, 164(a)(5) (1987) (Verdolini Aff., Ex. 72).

[149] *See* Revenue Agent Reports (Verdolini Aff., Ex. 26).

| Tax Year | Amount |
|---|---|
| 1982 | $ 28,154,833 |
| 1983 | $ 38,336,127 |
| 1984 | $ 29,948,701 |
| 1985 | $ 54,676,775 |
| 1986 | $ 64,457,339 |
| 1987 | $ 46,808,885 |
| Total -> | $ 294,258,278 |

154. The U.S. federal income tax liability of NatWest as determined by the IRS for each of the years at issue, excluding interest thereon, was as follows:[150]

| Tax Year | Amount |
|---|---|
| 1981 | $ 14,154,278 |
| 1982 | $ 12,546,863 |
| 1983 | $ 16,105,789 |
| 1984 | $ 13,084,832 |
| 1985 | $ 24,937,042 |
| 1986 | $ 29,528,505 |
| 1987 | $ 18,620,521 |
| Total -> | $ 128,977,830 |

155. The U.S. federal income tax liability shown on NatWest's original Form 1120F U.S. federal income tax return or as adjusted prior to issuance of the Revenue Agent Report for each of the years at issue based on the amounts of U.S. federal taxable income shown on Proposed Finding of Uncontroverted Fact 145 was as follows:[151]

[150] *See* Revenue Agent Reports (Verdolini Aff., Ex. 26).

[151] *See* Revenue Agent Reports (Verdolini Aff., Ex. 26).

| Tax Year | Amount |
|---|---|
| 1981 | $ 1,850,255 |
| 1982 | $ 5,514,262 |
| 1983 | $ 7,759,280 |
| 1984 | $ 2,992,864 |
| 1985 | $ 18,434,651 |
| 1986 | $ 19,641,070 |
| 1987 | $ 304,302 |
| Total -> | $ 56,496,684 |

156. The deficiency in U.S. federal income tax due by NatWest for each of the years at issue as determined by the IRS, excluding interest thereon, was as follows:[152]

| Tax Year | Amount |
|---|---|
| 1981 | $ 12,304,023 |
| 1982 | $ 7,032,601 |
| 1983 | $ 8,346,509 |
| 1984 | $ 10,091,968 |
| 1985 | $ 6,502,391 |
| 1986 | $ 9,887,435 |
| 1987 | $ 18,316,219 |
| Total -> | $ 72,481,146 |

157. The U.S. federal income tax payments made by NatWest to the IRS for each of the years at issue were as follows:

---

[152] *See* Revenue Agent Reports (Verdolini Aff., Ex. 26).

U.S. Federal Income Tax Payments for the Years at Issue

| Tax Year ⇒ | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|---|
| Prior Year Overpayment[1] | 600,170 | 1,500,000 | 56,411 | 1,600,000 | 257,136 | 0 | 0 |
| Current Year Estimated Payments[2] | 4,250,000 | 4,000,000 | 10,035,000 | 1,650,000 | 16,340,000 | 20,011,000 | 6,953,000 |
| Payment Per Form 7004[3] | 0 | 0 | 0 | 0 | 1,002,864 | 567,000 | 406,000 |
| Amount Paid Original Return[4] | 0 | 0 | 0 | 0 | 834,651 | 0 | 0 |
| Amount Claimed as Refund on Original Return[5] | (1,594,320) | 0 | (732,131) | 0 | 0 | (936,930) | (1,767,422) |
| Amount Credited to Estimated Tax on Original Return[6] | (1,500,000) | (56,411) | (1,600,000) | (257,136) | 0 | 0 | 0 |
| Refund Per Form 1139 Due to NOL Carryback[7] | 0 | 0 | 0 | 0 | 0 | 0 | (5,287,276) |
| Tax Paid Per Form 870 dated 08/23/89[8] | 94,405 | 70,673 | 0 | 0 | 0 | 0 | 0 |
| Tax Paid in Response to Revenue Agent Report[9] | 12,304,023 | 7,032,601 | 8,346,509 | 10,091,968 | 6,502,391 | 9,887,435 | 18,316,219 |
| Tax Paid Due to Adjustment of NOL Carryback[10] | 0 | 0 | 0 | 0 | 0 | 0 | 350,564 |
| Aggregate Tax Payments | 14,154,278 | 12,546,863 | 16,105,789 | 13,084,832 | 24,937,042 | 29,528,505 | 18,971,085 |

1 - *See* Plaintiff's Form 1120F for tax years 1981-1987 (Verdolini Aff., Exs. 5-11).

2, 3, 4 - *See* Def.'s Ans. to 1st Amended Compl. at ¶3 (Verdolini Aff., Ex. 4).

5 - *See* Plaintiff's Form 1120F for tax years 1981-1987 (Verdolini Aff., Exs. 5-11).

6 - *See* Plaintiff's Form 1120F for tax years 1981-1987 (Verdolini Aff., Exs. 5-11).

7 - *See* Revenue Agent Reports (Verdolini Aff., Ex. 26).

8 - *See* Pl.'s Resp. to Def.'s Interrog. 1.04, Ex. B at B0001 (Form 870AD), B0003 (1981), B0004 (1982), and B0005 (copies of checks for $223,518 and $139,781 payable to IRS) (Verdolini Aff., Ex. 65).

9 - These tax amounts and the deficiency interest thereon were paid by: (1) application of a $50,000,000 deposit in the nature of a cash bond; (2) application of a $40,000,000 deposit in the nature of a cash bond; (3) a payment of $34,446,842; and (4) a payment of $55,802,939. *See* Pl.'s Resp. to Def.'s Interrog. 1.12, Ex. F at F00010 (1981 through 1985) *and* F00020 (1986 and 1987); *see also* F00031 (IRS Receipt for Payment of Taxes in the amount of $50,000,000); F00024-00025 (IRS stamp acknowledging receipt of $40,000,000 check); F00022 (copy of check for $34,446,842.00 payable to IRS); F00023 (copy of check for $55,802,939.00 payable to IRS) (Verdolini Aff., Ex. 66).

10 - *See* Form 870-AD dated June 26, 1998 at 3 (Verdolini Aff., Ex. 89) ($350,564 in additional tax due to adjustment of NOL carryback to 1987).

158. The interest paid by the U.S. Branch to the Internal Revenue Service Center in Philadelphia, PA on May 31, 1995 and June 8, 1995, on the tax deficiencies asserted in the Revenue Agent Report, was as follows:[153]

| Tax Year | Interest Paid |
|---|---|
| 1981 | $ 28,838,978 |
| 1982 | $ 13,068,220 |
| 1983 | $ 14,107,184 |
| 1984 | $ 15,045,416 |
| 1985 | $ 7,693,000 |
| 1986 | $ 11,467,996 |
| 1987 | $ 17,547,841 |
| Total -> | $ 107,768,635 |

159. On July 11, 1995, NatWest filed amended returns ("Refund Claims") for the years at issue and on April 24, 1996, NatWest filed second amended returns ("Second Refund Claims") for the years at issue with the Internal Revenue Service Center in Philadelphia, Pennsylvania claiming refunds of federal income tax, including interest.[154]

---

[153] *See* Pl.'s Resp. to Def.'s Interrog. 1.12, Ex. F at F00010-00011 (1981 through 1985) and F00020 (1986 *and* 1987) (Verdolini Aff., Ex. 66); *see also* F00031 (Internal Revenue Service ("IRS") Receipt for Payment of Taxes in the amount of $50,000,000); F00024-00025 (IRS stamp acknowledging receipt of $40,000,000 check); F00022 (copy of check for $34,446,842.00 payable to IRS); F00023 (copy of check for $55,802,939.00 payable to IRS) (Verdolini Aff., Ex. 66) (sum of check amounts, $180,249,781, less $107,768,635 aggregate interest, *above*, equals $72,481,146 additional taxes paid per Revenue Agent Reports.) (Verdolini Aff., Ex. 26).

[154] Def.'s Ans. to 1st Am. Compl. ¶ 15 (Verdolini Aff., Ex. 4).

160. By virtue of a series of agreements timely executed pursuant to Section 6501(c)(4) (Forms 872), the statute of limitations on assessment and collection for the years at issue had not expired as of the dates of filing the Refund Claims and the Second Refund Claims and, consequently, the Refund Claims and Second Refund Claims and the refunds themselves were timely filed and sought pursuant to Section 6511(c)(1) and (2).[155]

161. On September 7, 1995, the Internal Revenue Service Center in Philadelphia, Pennsylvania mailed to NatWest Notices of Disallowance denying the Refund Claims.[156]

162. NatWest brought this action for a refund on November 17, 1995 following receipt of the Notice of Disallowance denying its Refund Claim.[157]

163. The adjustments proposed under Section 882 and Treasury Regulations section 1.882-5 described in Proposed Finding of Uncontroverted Fact 155 should be withdrawn in accordance with the Court's July 1999 Opinion and Order.[158]

164. The interest income reported on NatWest's original Form 1120F U.S. federal income tax returns for the years 1981 through 1987 included the amounts of interest income received or accrued by the U.S. branches from each other.[159]

---

[155] Def.'s Ans. to 1st Am. Compl. ¶ 17 (Verdolini Aff., Ex. 4).

[156] Def.'s Ans. to 1st Am. Compl. ¶ 18 (Verdolini Aff., Ex. 4).

[157] 1st Am. Compl. (Verdolini Aff., Ex. 3).

[158] *See Nat'l Westminster Bank PLC v. U.S.*, 40 Fed. Cl. 120 (1999).

[159] *See* Profit and Loss Statements (Verdolini Aff., Exs. 28-34).

165. The interest expense reported on NatWest's original Form 1120F U.S. federal income tax returns for the years 1981 through 1987 included the amounts of interest expense paid or accrued by the U.S. branches to each other.[160]

166. If all of the intra-U.S. interest expense and intra-U.S. interest income were eliminated from NatWest's U.S. taxable income, the following net additions to, or reductions of, taxable income would result for the years at issue:[161]

| Tax Year | Addition to or (Reduction of) Taxable Income |
|---|---|
| 1981 | $ (34,957) |
| 1982 | $ 23,991 |
| 1983 | $ (79,916) |
| 1984 | $ 231,163 |
| 1985 | $ 38,246 |
| 1986 | $ (3,974) |
| 1987 | $ 71,877 |

167. In NatWest's Revised Refund Claim and attachments thereto submitted to Defendant on June 5, 2001 ("Revised Refund Claim"), NatWest proposed to increase its taxable income by the amounts shown for taxable years 1982, 1984, 1985 and 1987 in Proposed Finding

[160] *See* Profit and Loss Statements (Verdolini Aff., Exs. 28-34).

[161] *See* Profit and Loss Statements (Verdolini Aff., Exs. 28-34).

of Uncontroverted Fact 166, but did not propose to reduce its taxable income by the amounts shown for years 1981, 1983, and 1986 in Proposed Finding of Uncontroverted Fact 166.[162]

168. Plaintiff has conceded all capital loan charges reflected in its books and records.[163]

169. There is no basis for further concessions by plaintiff with respect to the capital issue.[164]

170. The aggregate amount conceded by plaintiff as capital loan charges exceeded the actual capital loan charges deducted by plaintiff on its U.S. federal income tax returns during the years 1981 through 1987 in the amount of $267,323.[165]

171. Accounts recorded in the U.S. branch balance sheets as "Freehold Premises" (ARD), "Leasehold Premises" (ASD), "Furniture and fittings" (ATD), and "Computer and other equipment" (AUD), represent the U.S. branches' "Fixed Assets."[166]

172. During the years at issue, the U.S. branches did not fund Fixed Assets with interest-bearing liabilities.[167]

---

[162] *See* Profit and Loss Statements (Verdolini Aff., Exs. 28-34); Plaintiff's Revised Refund Claim, and supporting schedules thereto (Verdolini Aff., Ex. 27).

[163] PwC Rep. at 9, 12 (concluding "all capital loan charges have been identified and accounted for.") (Verdolini Aff., Ex. 56).

[164] *See* PwC Rep. at 9, 12 (Verdolini Aff., Ex. 56); Expert Report of Edward Jukes dated March 4, 2005 at 3 ("Jukes Rep.") (Verdolini Aff., Ex. 60).

[165] PwC Rep. at 9 (Verdolini Aff., Ex. 56); Bandoian Decl. at ¶¶15-17.

[166] Def.'s Resp. to Pl.'s Req. for Ad. 2.107 (Verdolini Aff., Ex. 67).

[167] Scott Decl. at ¶13.

173. During the years in issue, NatWest's U.S. branches purchased approximately $42 million in premises and equipment.[168]

174. The aggregate of the amounts recorded as Fixed Assets on the year-end balance sheets of the U.S. branch operation for the taxable year ended December 31, 1980 and each of the years at issue was:[169]

| Tax Year | Aggregate Fixed Assets |
|---|---|
| 1980 | $ 9,167,969 |
| 1981 | $ 11,969,698 |
| 1982 | $ 15,862,602 |
| 1983 | $ 16,631,023 |
| 1984 | $ 25,976,913 |
| 1985 | $ 23,322,331 |
| 1986 | $ 26,977,617 |
| 1987 | $ 29,477,629 |

175. The aggregate of the provisions for "B&DD - Non-Specific" recorded on the year-end balance sheets of the U.S. branch operation for the taxable year ended December 31, 1980 and each of the years at issue was:[170]

| Tax Year | Provision for B&DD - Non-Specific |
|---|---|
| 1980 | $ 10,539,202 |
| 1981 | $ 10,807,318 |

[168] *See* Bandoian Decl. at Ex. C (purchases of fixed assets).

[169] *See* Balance Sheets (Verdolini Aff., Exs. 35-42).

[170] *See* Balance Sheets (Verdolini Aff., Exs. 35-42).

| Tax Year | Provision for B&DD - Non-Specific |
|---|---|
| 1982 | $ 10,363,993 |
| 1983 | $ 13,108,406 |
| 1984 | $ 11,851,486 |
| 1985 | $ 12,679,446 |
| 1986 | $ 20,013,077 |
| 1987 | $ 20,013,077 |

176. During the years at issue, the U.S. branch operations did not transfer or repatriate to the head office any of their Retained Profits generated during the years at issue.[171]

177. The aggregate of the balances recorded as "Retained Profits" (net of any amounts recorded as "Accumulated Losses") on the year-end balance sheets of the U.S. branch operation for the taxable year ended December 31, 1980 and each of the years at issue was:[172]

| Tax Year | Aggregate Retained Profits |
|---|---|
| 1980 | $ 15,677,567 |
| 1981 | $ 2,564,846 |
| 1982 | $ 4,312,898 |
| 1983 | $ 19,625,765 |
| 1984 | $ 25,993,019 |
| 1985 | $ 51,706,718 |
| 1986 | $ 63,301,445 |
| 1987 | $ 29,732,486 |

[171] *See* Bandoian Rep. (1/14/02) at Ex. 6 (Verdolini Aff., Ex. 55).

[172] *See* Balance Sheets (Verdolini Aff., Exs. 35-42).

178. The aggregate of the balances recorded as "Balance due to HO re Capital Loans" on the year-end balance sheets of the U.S. branch operations for the taxable year ended December 31, 1980 and each of the years at issue was:[173]

| Tax Year | Aggregate Balance due to HO re Capital Loans |
|---|---|
| 1980 | $ 3,223,184 |
| 1981 | $ 869,893 |
| 1982 | $ 900,770 |
| 1983 | $ 645,032 |
| 1984 | $ 42,437 |
| 1985 | $ 1,085,000 |
| 1986 | $ 0 |
| 1987 | $ 0 |

179. During the year 1981, NatWest's U.S. branches repaid $1,665,042 in balances due to the head office with respect to capital loans from prior years.[174]

180. During the year 1986, the U.S. branches repaid the outstanding balance of the Balance due Head Office re Capital Loan, i.e., $1,085,000.[175]

[173] *See* Balance Sheets (Verdolini Aff., Exs. 35-42).

[174] Bandoian Decl. at Ex. C (repayment of Balance due to HO re: Capital Loans).

[175] Bandoian Decl. at Ex. C (repayment of Balance due to HO re: Capital Loans).

181. The aggregate of the balances recorded as "Balance due to HO re Fixed Assets" on the year-end balance sheets of the U.S. branch operations for the taxable year ended December 31, 1980 and each of the years at issue was:[176]

| Tax Year | Aggregate Balance due to HO re Fixed Assets |
|---|---|
| 1980 | $ 8,344,816 |
| 1981 | $ 9,033,064 |
| 1982 | $ 9,002,188 |
| 1983 | $ 9,257,926 |
| 1984 | $ 9,860,521 |
| 1985 | $ 8,817,958 |
| 1986 | $ 0 |
| 1987 | $ 0 |

182. During the year 1986, the U.S. branches repaid the outstanding Balance due HO re Fixed Assets, i.e., $8,817,958.[177]

183. The aggregate of the balances recorded as "Profit and Loss" on the year-end balance sheets of the U.S. branch operations for the taxable year ended December 31, 1980 and each of the years at issue was:[178]

| Tax Year | Aggregate Profit & Loss Balance |
|---|---|
| 1980 | $ 0 |

---

[176] *See* Balance Sheets (Verdolini Aff., Exs. 35-42).

[177] Bandoian Decl. at Ex. C (repayment of Balance due to HO re: Fixed Assets).

[178] *See* Balance Sheets (Verdolini Aff., Exs. 35-42).

| Tax Year | Aggregate Profit & Loss Balance |
|---|---|
| 1981 | $ 0 |
| 1982 | $ 4,604,145 |
| 1983 | $ 5,117,386 |
| 1984 | $ 5,109,745 |
| 1985 | $ 0 |
| 1986 | $ 0 |
| 1987 | $ (6,072,870) |

184. The aggregate of the amounts that either were designated as capital on the books of the U.S. branches or were in fact allotted to the U.S. branches for capital purposes (i.e., "B&DD - Non-Specific", "Retained Profits" (net of any "Accumulated Losses"), "Balance due to HO re Capital Loans", "Balance due to HO re Fixed Assets", and balances recorded as "Profit and Loss") as of December 31st of the taxable year ended December 31, 1980 and each of the years at issue was:[179]

| Tax Year | Aggregate Capital |
|---|---|
| 1980 | $ 41,857,514 |
| 1981 | $ 27,109,353 |
| 1982 | $ 36,013,607 |
| 1983 | $ 59,128,326 |
| 1984 | $ 57,615,166 |
| 1985 | $ 81,400,992 |
| 1986 | $ 91,303,197 |

[179] *See* Balance Sheets (Verdolini Aff., Exs. 35-42) .

| Tax Year | Aggregate Capital |
| --- | --- |
| 1987 | $ 98,680,887 |

185. All of the interest income received and included in income by the U.S. branches during the years at issue reflected arm's-length market rates.[180]

186. All of the interest expense paid and deducted by the U.S. branches during the years at issue reflected arm's-length market rates.[181]

187. The following table lists all of the adjustments to the U.S. federal taxable income of NatWest as set forth in the Revenue Agent Reports with respect to all issues, excluding adjustments that are dependent on the outcome of subsequent years and computational adjustments that are dependent on resolution of all issues relating to the years at issue:

[180] Walmsley Decl. at ¶47; Payseur Aff. at ¶22; Scott Decl. at ¶16; Clair Aff. at ¶7; Clair Rep. at 44 (Verdolini Aff., Ex. 59); *see also* Payseur Tr. 90:19-90:24; *cf.* Walmsley Decl. at ¶¶20-21 (discussing audits of arm's-length rates).

[181] Walmsley Decl. at ¶47; Payseur Aff. at ¶22; Scott Decl. at ¶16; Clair Aff. at ¶7; Clair Rep. at 44 (Verdolini Aff., Ex. 59); *see also* Payseur Tr. 90:19-90:24; *cf.* Walmsley Decl. at ¶¶20-21 (discussing audits of arm's-length rates).

Adjustments to RAR Taxable Income

| Tax Year | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|---|
| Reversal of adjustments to interest income[1] | $ 125,857,675 | $ 132,049,714 | $ 88,243,894 | $ 104,153,633 | $ 79,404,169 | $ 87,081,845 | $ 131,596,705 |
| Reversal of adjustments to interest expense[1] | $(152,605,551) | $(147,337,977) | $(101,652,347) | $(126,092,694) | $ (93,539,801) | $(108,064,089) | $(174,292,853) |
| Reversal of Net Loans Adjustment[2] | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ (84,426) | $ (174,309) |
| Elimination of Net Intra-U.S. Interest Expense[3] | $ 0 | $ 23,991 | $ 0 | $ 231,163 | $ 38,246 | $ 0 | $ 71,877 |
| Elimination of Capital Loan Charge[4] | $ 465,868 | $ 209,433 | $ 202,745 | $ 390,459 | $ 0 | $ 2,603,584 | $ 1,936,537 |
| Adjustment to NOL Carryback from 1990[5] | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 912,566 |
| Aggregate Adjustments to RAR Taxable Income | $ (26,282,008) | $ (15,054,839) | $ (13,205,708) | $ (21,317,439) | $ (14,097,386) | $ (18,463,086) | $ (39,949,477) |

1 - See Proposed Finding of Uncontroverted Fact 151, above.

2 - See Proposed Finding of Uncontroverted Fact 149, above.

3 - See Proposed Finding of Uncontroverted Fact 166 and 167, above.

4 - See Proposed Finding of Uncontroverted Fact 118, above.

5 -An adjustment to the U.S. Branch's NOL Carryback was conceded by NatWest during the audit of its 1990 taxable year, resulting in an addition to income for the 1987 tax year of $912,566. *See* $912,566 agreed on Form 870-AD dated June 26, 1998 at 2 (Verdolini Aff., Ex. 89). NOL Carryback is subject to further adjustment depending on the resolution of taxable years not at issue here.

188. The U.S. federal taxable income of NatWest for each of the tax years at issue after adjustments described in Proposed Finding of Uncontroverted Fact 187 is:

| Tax Year | Taxable Income per Revenue Agent Report[1] ("A") | Aggregate Adjustments to RAR Taxable Income[2] ("B") | Taxable Income After Adjustments[3] (=A+B ) |
|---|---|---|---|
| 1981 | $ 31,875,618 | $ (26,282,008) | $ 5,593,610 |
| 1982 | $ 28,154,833 | $ (15,054,839) | $ 13,099,994 |
| 1983 | $ 38,336,127 | $ (13,205,708) | $ 25,130,419 |
| 1984 | $ 29,948,701 | $ (21,317,439) | $ 8,631,262 |
| 1985 | $ 54,676,775 | $ (14,097,386) | $ 40,579,389 |
| 1986 | $ 64,457,339 | $ (18,463,086) | $ 45,994,253 |
| 1987 | $ 46,808,885 | $ (39,949,477) | $ 6,859,408 |

1 - See Proposed Finding of Uncontroverted Fact 153, above.

2 - See Proposed Finding of Uncontroverted Fact 187, above.

3 - These adjustments do not reflect any adjustment for the deduction for Environmental Tax allowed under Section 164(a)(5) (1987) (Verdolini Aff., Ex. 72).

189. The applicable effective federal income tax rates for the years at issue are:[182]

| Tax Year | Effective Federal Income Tax Rate |
|---|---|
| 1981 | 46% |
| 1982 | 46% |
| 1983 | 46% |
| 1984 | 46% |

[182] *See* I.R.C. §11(b) (1981-1987) (for explanation of 1987 blended rate, see H.R. Rep. No. 99-841, at II - 159 (1986) (Conference Report to accompany H.R. 3838, the Tax Reform Act of 1986) (46% maximum corporate rate switches to 34% maximum rate for income taxable on or after July 1, 1987)) (Verdolini Aff., Ex. 73).

| Tax Year | Effective Federal Income Tax Rate |
|---|---|
| 1985 | 46% |
| 1986 | 46% |
| 1987 | 39.95068% |

190. The tax effect of the adjustments described in Proposed Finding of Uncontroverted Fact 187 is:

| Tax Year | Effective Federal Income Tax Rate[1](“A”) | Aggregate Adjustments to RAR Taxable Income[2] (“B”) | Tax Effect of Adjustments[3] (=A*B ) |
|---|---|---|---|
| 1981 | 46% | $ (26,282,008) | $ (12,089,724) |
| 1982 | 46% | $ (15,054,839) | $ (6,925,226) |
| 1983 | 46% | $ (13,205,708) | $ (6,074,626) |
| 1984 | 46% | $ (21,317,439) | $ (9,806,022) |
| 1985 | 46% | $ (14,097,386) | $ (6,484,798) |
| 1986 | 46% | $ (18,463,086) | $ (8,493,020) |
| 1987 | 39.95068% | $ (39,949,477) | $ (16,010,358) |
| Total | | | $ (65,883,772) |

1 - *See* Proposed Finding of Uncontroverted Fact 189, above.

2 - *See* Proposed Finding of Uncontroverted Fact 187, above.

3 - Note that the tax effect for 1987 reflects (i) the imposition of the Environmental Tax under Section 59A and (ii) the deductibility of that tax for regular tax purposes under Section 164(a)(5) (Verdolini Aff., Ex. 72).

191. The reduced tax liability is:

| Tax Year | Tax Effect of Adjustments[1] ("A") | | Tax Liability per Revenue Agent Reports[2] ("B") | | Revised Tax Liability (=A+B ) | |
|---|---|---|---|---|---|---|
| 1981 | $ | (12,089,724) | $ | 14,154,278 | $ | 2,064,554 |
| 1982 | $ | (6,925,226) | $ | 12,546,863 | $ | 5,621,637 |
| 1983 | $ | (6,074,626) | $ | 16,105,789 | $ | 10,031,163 |
| 1984 | $ | (9,806,022) | $ | 13,084,832 | $ | 3,278,810 |
| 1985 | $ | (6,484,798) | $ | 24,937,042 | $ | 18,452,244 |
| 1986 | $ | (8,493,020) | $ | 29,528,505 | $ | 21,035,485 |
| 1987 | $ | (16,010,358) | $ | 18,620,521 | $ | 2,610,163 |
| Total | $ | (65,883,772) | $ | 128,977,830 | $ | 63,094,058 |

1 - *See* Proposed Finding of Uncontroverted Fact 190, above.

2 - *See* Proposed Finding of Uncontroverted Fact 154, above.

192. The aggregate U.S. federal income taxes paid by NatWest for each of the tax years at issue is:[183]

| Tax Year | Aggregate Tax Payments | |
|---|---|---|
| 1981 | $ | 14,154,278 |
| 1982 | $ | 12,546,863 |
| 1983 | $ | 16,105,789 |
| 1984 | $ | 13,084,832 |
| 1985 | $ | 24,937,042 |
| 1986 | $ | 29,528,505 |
| 1987 | $ | 18,971,085 |
| Total | $ | 129,328,394 |

[183] *See* Proposed Finding of Uncontroverted Fact 157, above.

193. For the years at issue, the amount of tax overpayment by NatWest, excluding interest thereon, is:

| Tax Year | Aggregate Tax Payments[1] ("A") | Revised Tax Liability[2] ("B") | Tax Overpayment (=A-B) |
|---|---|---|---|
| 1981 | $ 14,154,278 | $ 2,064,554 | $ 12,089,724 |
| 1982 | $ 12,546,863 | $ 5,621,637 | $ 6,925,226 |
| 1983 | $ 16,105,789 | $ 10,031,163 | $ 6,074,626 |
| 1984 | $ 13,084,832 | $ 3,278,810 | $ 9,806,022 |
| 1985 | $ 24,937,042 | $ 18,452,244 | $ 6,484,798 |
| 1986 | $ 29,528,505 | $ 21,035,485 | $ 8,493,020 |
| 1987 | $ 18,971,085 | $ 2,610,163 | $ 16,360,922 |
| Total | $ 129,328,394 | $ 63,094,058 | $ 66,234,336 |

1 - See Proposed Finding of Uncontroverted Fact 192, above.

2 - Proposed Finding of Uncontroverted Fact 191, above.

Dated: May 5, 2005

Respectfully submitted,

s/D. Scott Wise by Mario J. Verdolini Jr.
D. Scott Wise

Attorney of Record
Davis Polk & Wardwell
450 Lexington Avenue
New York, N.Y. 10017

Of counsel:

Mario J. Verdolini, Jr.
Leslie J. Altus

Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

John L. Carr, Jr.
Michael C. Moetell
Thomas M. Buchanan

Winston & Strawn LLP
1700 K Street, NW
Washington, DC 20006