**No. 95-758 T**
**(Judge Nancy B. Firestone)**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**NATIONAL WESTMINSTER BANK, PLC**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**EILEEN J. O'CONNOR**
***Assistant Attorney General***

**MILDRED L. SEIDMAN**
**STEVEN I. FRAHM**
***Attorneys***
***Tax Division***
***Department of Justice***
***Washington, D.C. 20044***

# TABLE OF CONTENTS

**Page**

**INTRODUCTION** . . . . . 1

**QUESTIONS PRESENTED** . . . . . 6

**STATEMENT OF FACTS** . . . . . 6

1. NatWest's U.S. banking operations and management . . . . . 6

2. NatWest's six separate branches in the United States . . . . . 7

3. NatWest's separate books and records for each branch . . . . . 11

4. NatWest did not allot any capital to its U.S. branches on their balance sheets . . . . . 14

5. The branches' books and records reflect other anomalies . . . . . 17

6. The interest income and expense of the U.S. branches on transactions with related parties . . . . . 18

   a. Current accounts . . . . . 18

   b. Money market trading . . . . . 20

**ARGUMENT** . . . . . 23

**NATWEST IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE CAPITAL ISSUE OR THE ARM'S LENGTH INTEREST ISSUE** . . . . . 23

A. The determination of a branch's free working capital under the Inland Revenue Banking Manual is a flexible factual inquiry, and there are numerous disputes regarding the factors that may be considered and the state of the evidence regarding the factors plaintiff considers . . . . . 23

   1. The Inland Revenue Banking Manual . . . . . 23

2. Permissible factual inquires regarding NatWest's U.S. branches . . . . . 25

**Page**

3. NatWest is not entitled to impose its own, different set of factual inquiries and its disputed factual implementation of those inquiries . . . . . 34

B. The parties' experts dispute whether the U.S. branches' transactions with affiliates reflect arm's length interest rates . . . . . 38

**CONCLUSION** . . . . . 43

## TABLE OF EXHIBITS

**Exhibit No.**

Declaration of Barrie Akin dated July 8, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Declaration of Jeffrey L. Dorfman dated July 6, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Declaration of A. Lawrence Kolbe dated July 12, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Declaration of James A. Read, Jr. dated July 12, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Declaration of Micheline A. Maritz dated July 6, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Declaration of Steven I. Frahm dated July 22, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

Regulatory Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

NatWest's Annual Reports (Forms 20-F) filed with the
Securities and Exchange Commission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Deposition of Scott Payseur (May 13, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Deposition of Harrylall Samaroo (January 23, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Plaintiff's RCFC 30(b)(6) Deposition (Roger Walmsley 1/31/2205–2/1/2005) . . . . . . . . . . 10

Excerpts from Plaintiff's Responses to Defendant's Interrogatories and
Requests for Production and Copying of Documents (Fifth Set) . . . . . . . . . . . . . . . . . . . . . 11

Plaintiff's Description of the Operation of NatWest's U.S.
Money Market Desks 1981-1987 (January 31, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Deposition of Patricia Wharwood (January 28, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Letter from Department of Justice to Davis, Polk & Wardwell (January 11, 2001) . . . . . . . . 14

Letter from Davis, Polk & Wardwell (September 19, 2000) . . . . . . . . . . . . . . . . . . . . . . . . 15

Exemplars of Money Market Reports (M262) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Exemplars of Current Accounts Reports (A220) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Table of Exhibits (continued):**

**Exhibit No.**

Deposition of Timothy Harasek (May 13, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Deposition of Reuben Tatz (January 23, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Exemplar of computer-generated balance sheet (B-126) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 95-758 T**
**(Judge Nancy B. Firestone)**

**NATIONAL WESTMINSTER BANK PLC,**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendant respectfully submits this opposition to plaintiff's motion for summary judgment to fully resolve its suit for a refund of federal income taxes for the years 1981-1987.

## INTRODUCTION

Plaintiff, National Westminster Bank PLC (NatWest) filed this suit for a refund of its federal income tax liability for the years 1981-1987. Under Article 7 of the U.S.–U.K. Income Tax Treaty, NatWest is subject to U.S. tax on the profits attributable to the six branches it operated in the U.S. during those years. The dispute centers on the interest income and interest expenses of the branches, including interest on transactions with affiliates. A critical part of that dispute has been the capital attributable to the branches under the Treaty, as profits are dependent upon the relative portions of a

branch's activities that are funded with interest-bearing debt and interest-free capital. Another issue is whether the branches' interest-bearing transactions with affiliates were engaged in on a third-party, arm's length basis.

On audit, the Internal Revenue Service adjusted the interest income and interest expense NatWest reported on its U.S. Income Tax Return of a Foreign Corporation (Form 1120F) filed for each of the years 1981-1987. The Internal Revenue Service recalculated interest income and expense in accordance with Treasury Regulation § 1.882-5. The regulation uses the branch's books and records to attribute interest -free capital to it under a formula.[1] The regulation then addresses the interest expense attributable to the liabilities that are supporting the branch and, to the extent they are liabilities to affiliates, ensures they reflect arm's length rates.[2] Using data NatWest supplied, the Internal Revenue Service applied the regulation and determined that NatWest owed additional federal income taxes. NatWest paid the additional taxes and filed suit in this Court.

Soon after filing suit, NatWest filed a motion for partial summary judgment, arguing that Treas. Reg. § 1.882-5 was inconsistent with the separate entity principle of Article 7 of the U.S.–U.K. Tax Treaty. Plaintiff's proposed findings of fact filed in connection with that motion included various assertions relating to the separateness of each of its U.S. branches. For example, NatWest asserted that it was engaged in wholesale banking in the United States "[t]hrough branches in the United States, including plaintiff's Nassau and Cayman Islands branches, which, for U.S. tax purposes are treated as

---

[1] In the case of a branch of a bank, interest-free capital is modest – generally 5% of its assets. Treas. Reg. § 1.882-5(b).

[2] Treas. Reg. § 1.882-5(b).

branches situated in the United States . . ."[3] NatWest also asserted that "each branch" maintained separate books and records and accrued interest on its borrowings and loans and accounted for such transactions on its books and records."[4] To illustrate its point, NatWest asserted that "the New York Branch maintained its own books, the Cayman Islands Branch maintained its own books, etc.[5] According to NatWest, the separate books and records were maintained as if each branch were "a separate legal entity."[6] For convenience when referring to its multiple U.S. branches, plaintiff used the collective "U.S. Branch."[7]

Defendant cross-moved for partial summary judgment, maintaining that the Regulation, which undisputably was valid under the Treaty's separate enterprise principle when applied to non-banks, did not violate the same principle when applied to banks. Defendant proposed as an uncontroverted fact that NatWest operated multiple branches in the United States, including branches in New York, Chicago, Nassau, Bahamas, and the Cayman Islands.[8] NatWest's response to this proposed finding was "No dispute."[9]

In 1999, the Court issued an Opinion and Order declaring the Regulation invalid as applied to

---

[3] Pltf.'s 12/8/1997 Amended Proposed Findings ¶ 46.

[4] *Id.* at ¶ 49, 50.

[5] *Id.* at ¶ 50.

[6] *Id.* at ¶ 51.

[7] *See e.g.*, *Id*. at ¶¶ 46.

[8] Deft.'s Proposed Findings of Uncontroverted Fact 4/30/1997 ¶ 5.

[9] Pltf.'s Statement of Genuine Issues 12/8/1997 ¶ 5.

banks under the Treaty.[10] The Court ruled that the profits of a U.S. branch of a U.K. bank should be determined on the basis of a branch's books and records, "maintained as if the branch were a distinct and separate enterprise, dealing wholly independently with the remainder of the foreign corporation," and subject to adjustments as necessary to attribute "adequate capital to the branch" and "to insure use of market rates" in computing interest.[11] The Court further ruled that the regulation was inconsistent with the "separate entity" provision of Treaty Article 7, because it treats each branch "as a unit of a worldwide enterprise" rather than as a "separate entit[y]."[12]

The parties subsequently engaged in discovery and proceeded toward a trial of the capital issue – the first adjustment contemplated in the Court's 1999 Opinion and Order. Proceedings were suspended on the arm's length interest issue. In the course of discovery, defendant learned that the separate books and records of the U.S. branches were never consolidated or combined into an aggregate U.S. Branch, as NatWest had suggested in the earlier proceedings.[13]

In June 2002, the Court decided that, before proceeding to trial of the capital issue, it was appropriate to hold further summary judgment briefing to resolve the parties' different theories regarding the attribution of adequate separate enterprise capital to a branch in accordance with the 1999 Opinion and Order.[14] After such briefing, the Court issued a November 2003 Opinion and a

---

[10] 44 Fed. Cl. 120.

[11] *Id.* at 128.

[12] *Id.* at 130.

[13] Tr. 2/5/2001 Status Conference at 11-12, 51.

[14] 6/12/2002 Status Conference and 6/14/2002 Order.

January 2005 Order Denying Reconsideration.[15] The Court adopted the U.K.'s Inland Revenue Banking Manual as the standard under the Treaty for determining branch capital.[16] The Order Denying Reconsideration also held that branch capital under the Inland Revenue Manual could not include capital specifically held to support a branch and recorded on a bank's worldwide books, because the focus is on a branch's, not the bank's, books and records.[17]

Plaintiff's attorneys attempted to aggregate the six branches into a U.S. Branch for purposes of this litigation by creating consolidated balance sheets (but not consolidated profit and loss statements). However, after defendant moved *in limine* to exclude the consolidated balance sheets from evidence, NatWest advised the Court it no longer would rely on them, and the Court ruled that the motion *in limine* therefore was moot.[18]

After a brief discovery period on the arm's length interest issue, the parties exchanged experts' reports on March 4, 2005. During a telephone conference on March 9, 2005 to resolve a discovery dispute, the Court canceled the scheduled trial and instead scheduled summary judgment briefing to fully resolve the case.[19] On May 5, 2005, NatWest filed its Motion for Summary Judgment, Exhibits, and Proposed Findings of Uncontroverted Fact. Defendant now opposes that motion.

---

[15] The November 2003 Opinion is reported at 58 Fed. Cl. 491.

[16] *Id*. at 506; 1/18/2005 Order Denying Reconsideration at 3.

[17] 1/18/2005 Order Denying Reconsideration at 3-4.

[18] Pltf.'s 12/24/2003 Reply to Deft.'s Opposition to Pltf.'s Proposed Scheduling Order; Court's 1/13/2004 Order.

[19] Tr. 3/9/2005; 3/10/2005 Order.

## QUESTIONS PRESENTED

The questions presented to the Court are as follows:

1. Whether, in applying the flexible facts and circumstances analysis of the Inland Revenue Banking Manual to determine branch capital, plaintiff is entitled to summary judgment to resolve the parties' disputes over the specific factual inquiries that may be made and the facts pertaining to plaintiff's inquiries.

2. Whether there are genuine disputes of material fact precluding summary judgment as to whether the U.S. branches' books reflect arm's length interest income and expense on (1) current accounts with affiliates and (2) money market trading with affiliates.

## STATEMENT OF FACTS

*1. NatWest's U.S. banking operations and management*

The tax years at issue in this case are the calendar years 1981-1987.[20] NatWest is a publicly-held U.K. corporation engaged in a world-wide banking business, managed and controlled within the United Kingdom.[21] In March 2000, NatWest was acquired by The Royal Bank of Scotland, another publicly-held U.K. bank corporation with worldwide activities.[22] During the years at issue, NatWest conducted business in the United States in both branch and subsidiary form.[23] It also did

[20] Complaint ¶ 1.

[21] Deft.'s 4/30/1997 Proposed Findings of Uncontroverted Fact ¶ 1, 3; Pltf.'s 12/8/1997 Statement of Genuine Issues ¶ 1, 3; Pltf.'s 12/8/1997 Amended Proposed Findings ¶ 44.

[22] *See* www.rbs.com.

[23] 58 Fed. Cl. at 494; Deft.'s 4/30/1997 Proposed Findings of Uncontroverted Fact ¶ 4; Pltf.'s 12/8/1997 Statement of Genuine Issues ¶ 4; Ex. 15, Deft.'s 2002 Cross Motion for Partial Summary Judgment (Tugwell Dep.) at 13-16.

business in Canada through a Canadian subsidiary, National Westminster Bank of Canada.[24] NatWest supervised the U.S. and Canadian operations at its Executive Office of North America, located in New York.[25] During the years at issue, NatWest filed an Annual Report (Form 20-F) with the U.S. Securities and Exchange Commission, containing information regarding the bank's operations, financial results, and policies, including its policies regarding capital and capital attributable to its U.S. branches.[26]

*2. NatWest's six separate branches in the United States*

Natwest used six branches during the years at issue to conducts its U.S. branch operations: (1) the New York Branch, (2) the International Banking Facility ("IBF") Branch, (3) the Nassau Branch, (4) the Grand Cayman Islands Branch, (5) the Chicago Branch , and (6) the San Francisco Branch (sometimes referred to as the "San Francisco Overseas Branch" or "San Francisco Depository Agency").[27] The first four of these branches were located in New York, in the same building where the Executive Office North America was located.[28] Through its U.S. branches, NatWest engaged in a wholesale banking business, including borrowing and lending money through receiving deposits and

[24] Deft.'s Ex. 11 at INT524-000078; Ex. 15, Deft.'s 2002 Cross Motion for Partial Summary Judgment (Tugwell Dep.) at 13.

[25] Deft.'s Ex. 11 at INT524-000001 to 000111; Ex. 15, Deft.'s 2002 Cross Motion for Partial Summary Judgment (Tugwell Dep.) at 13-14 deposition testimony; Ex. 16, Deft.'s 2002 Cross Motion for Partial Summary Judgment (Blessley Dep.) at 103-104.

[26] Deft.'s Ex. 7.

[27] 491 Fed. Cl. at 495; Deft.'s Ex. 12; Deft.'s Ex. 11 at INT524000058; Tr. 2/5/2001 Status Conf. at 46-48; *see* Pltf.'s Statement of Genuine Issues 12/8/1997 ¶ 5; Ex. 3, Deft.'s 1997 Cross Motion for Partial Summary Judgment (Tatz 10/9/1996 Dep.) at 48-49;

[28] Ex. 3, Deft.'s 1997 Cross Motion for Partial Summary Judgment (Tatz 10/8/1996 Dep.) at 60-62; Deft.'s Ex. 9 (Samaroo Dep.) at 12.

other advances from NatWest's non-U.S. offices and others.[29]

The branches' customers included each other, NatWest affiliated offices and subsidiaries outside the United States, and NatWest third party customers (including banks, other corporations, and governments of both developed and undeveloped countries).[30]

Each U.S. branch was created for, and served, a specific purpose.[31] The New York Branch was chartered in New York and was a "full-fledged New York chapter" of NatWest.[32] It served primarily as a settlement activity in U.S. dollars for NatWest globally.[33] The Nassau Branch was registered in Nassau, but it was operated out of NatWest's New York offices. As a result of its separate status, it was exempt from New York's reserve requirements and was able to provide NatWest customers with a cheaper source funding.[34] The Cayman Islands Branch was created for the same purpose and was intended to, but never did, replace the Nassau Branch. It was created in 1985 and, like the Nassau Branch, was operated out of NatWest's New York offices.[35] The IBF Branch

---

[29] Pltf.'s 12/8/1997 Amended Proposed Findings ¶ 46.

[30] Pltf.'s Exs. 28-42.

[31] Ex. 15, Deft.'s 2002 Cross Motion for Partial Summary Judgment (Tugwell Dep.) at 25-26; Pltf.'s Ex. 52 at 8.

[32] Ex. 3, Deft.'s 1997 Cross Motion for Partial Summary Judgment (Tatz 10/81996) at 47.

[33] Deft.'s Ex. 10 (Walmsley Dep.) at 18-19.

[34] Ex. 3, Deft.'s 1997 Cross Motion for Partial Summary Judgment (Tatz 10/8/1996 Dep.) at 50-52; Ex. 16, Deft.'s 2002 Cross Motion for Partial Summary Judgment (Blessley Dep.) at 60; Deft.'s Ex. 10 (Walmsley Dep.) at 26-27.

[35] Ex. 3. Deft.'s 1997 Cross Motion for Partial Summary Judgment (Tatz 10/8/1996 Dep.) at 53; Ex. 16, Deft.'s 2002 Cross Motion for Partial Summary Judgment (Blessley Dep.) at 60; Deft.'s Ex. 10 (Walmsley Dep.) at 27.

was created in 1981, because, as a separate operation engaging in exclusively international transactions, it was exempt from New York state taxes.[36] The Chicago and San Francisco branches were separately licensed and focused on serving customers in those geographical areas.[37] The San Francisco Branch could accept international deposits only, but it could make loans to any customers, domestic or international. Most of its customers were in California.[38] It had an expertise in far eastern currencies.[39] NatWest obtained licenses to permit its branches to do business.[40] Different regulators supervised different branches.[41]

Each branch was a separate profit center and each reported separately to the head office and to U.S. bank regulators.[42] Each had a Branch Manager and a staff who were in charge of the daily operations of the branch.[43]

Each of the Branch Managers reported to NatWest supervisory employees in NatWest's

---

[36] Pltf.'s Ex. 52 at 8 n.9.

[37] Ex. 15, Deft.'s 2002 Cross Motion for Partial Summary Judgment (Tugwell Dep.) at 27-28; Pltf.'s Ex. 52 at 8; Ex. 9, Deft.'s 2002 Cross Motion for Partial Summary Judgment (Litan Aff.) ¶ 9.

[38] Ex. 3, Deft.'s 1997 Cross Motion for Partial Summary Judgment (Tatz 10/8/1996 Dep.) at 48-50.

[39] Ex. 15, Deft.'s 2002 Cross Motion for Partial Summary Judgment (Tugwell Dep.) at 27.

[40] Ex. 9, Deft.'s 2002 Cross Motion for Partial Summary Judgment (Litan Aff.) ¶ 9; *see* Pltf.'s Proposed Findings 15, 16.

[41] Deft.'s Ex. 6.

[42] Tr. 2/5/2001 Status Conf. at 46.

[43] Deft.'s 2002 Cross Motion for Partial Summary Judgment (Blessley Dep.) at 103-104; Deft.'s Ex. 11 (Pltf.'s Response to Rog. 5.24 and INT 524-000001 to INT 524-000111).

Executive Office North America.[44] The Regional Managing Director in the Executive Office North America, in turn, reported to the General Manager of the International Banking Division, who was located in London.[45]

The six U.S. branches loaned funds to, and took deposits from, their customers.[46] Customer accounts at the branches included "current accounts," also referred to as "clearing accounts."[47] These accounts could have either positive or negative balances and in some respects may be analogized to checking accounts.[48]

The six branches also engaged in money market trading through their respective trading desks.[49] Each of the six U.S. branches had its own money market traders.[50] For example, the traders for the IBF Branch were different individuals than the traders for the New York Branch.[51]

Money market trading including buying and selling federal funds in the U.S. money market, buying and selling securities under repurchase agreements, typically called "repos" or "reverse repos",

---

44 Deft.'s Ex. 11 (Pltf.'s Response to Rog. 5.24 and INT 524-000001 to INT 524-000111).

45 Deft.'s Ex. 11 (Pltf's Response to Rog. 5.24).

46 Pltf.'s Exs. 28-42.

47 Pltf's Proposed Findings 71-73.

48 Read Report (March 4, 2005) ¶¶ 37 et seq.; *see* Pltf.'s Proposed Finding 73; Deft.'s Ex. 4, Appendix ¶ 94.

49 Deft.'s Ex. 12.

50 Tr. 2/5/2001 Status Conf. at 46-48; Deft.'s Ex. 12; Pltf.'s Ex. 52 at 8.

51 Tr. 2/5/2001 Status Conf. at 47.

buying and selling commercial paper, and time deposits in the Eurodollar money market.[52] Money market trading had two functions: (1) borrowing money to fund loans to be made by the branch and (2) trading with the goal of making a profit for the branch.[53]

*3. NatWest's separate books and records for each branch*

Each of NatWest's six branches in the United States (including the four branches in New York) kept its own books and records, separate from the books and records of the other U.S. branches.[54] Each branch was required to keep separate books and records to meet the needs of its business.[55]

The six U.S. branches also entered into interest-bearing transactions with each other that were recorded on their separate books.[56] These intra-U.S. transactions included transactions among the four branches located in New York.[57] The interest-bearing transactions among the four branches located in New York included money market trades and interest on "current accounts."[58]

---

[52] Pltf.'s Ex. 52 at 11 et seq.

[53] Deft.'s Ex. 12.

[54] Pltf.'s Exs. 28-42; Tr. 2/5/2001 Status Conf. at 46; Ex. 16, Deft.'s 2002 Cross Motion for Partial Summary Judgment (Blessley Dep.) at 47; Deft.'s Ex. 10 (Walmsley Dep.) at 53; Deft.'s Ex. 13 (Wharwood Dep.) at 26-27; Deft.'s Ex. 9 (Samaroo Dep.) at 12. The IBF Branch began operations in December 1981. Initially, the New York Branch and the IBF Branch prepared a single balance sheet and single profit and loss statement, but separate balance sheets and profit and loss statements were prepared, starting in 1983 and continuing through the rest of the years at issue. Pltf.'s Exs. 28-42.

[55] Tr. 2/5/2001 Status Conf. at 46

[56] Pltf.'s Exs. 28-42; Pltf.'s Proposed Findings 164, 165; Tr. 2/5/2001 Status Conf. at 46, 48-49*; see* e.g., Pltf.'s Ex. 31 at INT504-00133; Pltf.'s Ex. 32 at INT504-00169.

[57] (Ex. 32 at INT504-00169).

[58] Deft.'s Ex. 17 (A220--New York Branch 12/31/1986 current accounts); Deft.'s Ex. 16 (M262s--money market trades).

Since the six U.S. branches were not separate legal entities, they were not required to, and did not, prepare stand-alone financial statements.[59] Instead, each branch prepared only internal financial reports from its separate books and records that were submitted to the Head Office for management purposes and for the preparation of NatWest's worldwide, consolidated financial statements.[60] Mr. Walmsley, designated by plaintiff to speak for it at its RCFC 30(b)(6) deposition, distinguished balance sheets prepared by outside accountants from the balance sheets the branches prepared, referring to the latter as "position papers."[61]

Each branch recorded its individual transactions into a computer system.[62] The computer system generated various reports for each branch, including daily balance sheets (B-126), profit and loss statements (B-118), money market reports (M-262) and current account reports (A220).[63] The computer system at that time, unlike modern systems, did not permit changes to data after the day in which it was entered.[64] As a result, the computer-generated balance sheets and profit and loss statements contained various timing, recording, and other errors.[65]

The computer generated balance sheets and profit and loss statements were not part of the

---

[59] Pltf.'s Ex. 55 at 10.

[60] *Id*. at 11, 23.

[61] Deft.s Ex. 10 (Walmsley Dep.) at 62-64.

[62] Deft.'s Ex. 18 (Harasek Dep.) at 13-14; Deft.'s Ex. 19 (Tatz 1/23/2002 Dep.) at 15.

[63] Deft.'s Ex. 18 (Harasek Dep.) at 77; Deft.'s Ex. 9 (Samaroo Dep.) at 25-28; Deft.'s Ex. 19 (Tatz 1/23/2002 Dep.) at 16-17; Deft.'s Exs. 16, 17.

[64] Deft.'s Ex. 19 (Tatz ½3/2002 Dep.) at 16-17, 59-60.

[65] Deft.'s Ex. 19 (Tatz ½3/2002 Dep.) at 16-18, 59-60; Pltf.'s Ex. 55 at 23-24; Deft.'s Ex. 9 (Samaroo Dep.) at 33, 38-39, 41-43.

branches' regular reports sent to the head office in the U.K. Instead, the package of reports sent to the head office included handwritten balance sheets and profit and loss statements. The handwritten balance sheets and profit and loss statements had to be prepared within a short (approximately five-day) deadline after the end of a period. The short deadline was referred to as a "quick close." Within that limited period, branch personnel were unable to undertake any detailed analysis, but they attempted to identify and correct as many errors as possible from the computer generated reports.[66]

NatWest recognized that, despite the certification by branch personnel that the hand written balance sheets and profit and loss statements were accurate "to the best of" the signers' "knowledge and belief",[67] it was necessary to engage in a further error correction process at the head office. A reconciliation office in the U.K. existed for the specific purpose of fully correcting the branches' books and records and incorporating them into NatWest's worldwide, consolidated books and records.[68]

Plaintiff has not produced any of the reconciliations performed in the U.K., reflecting the review and correction of the branches' books and records.

The separate books and records of the six branches were never consolidated into contemporaneous balance sheets or profits and loss statements of a single U.S. Branch. The separate books and records of the four branches located in New York were never consolidated into contemporaneous balance sheets or profit and loss statements of a combined New York branch

---

[66] Pltf.'s Ex. 55 at 23-24; Deft.'s Ex. 9 (Samaroo Dep.) at 30-31, 33, 38-39, 52; Deft.'s Ex. 19 (Tatz ½3/2002 Dep.) at 15, 16-19, 21, 25, 58-59.

[67] Pltf.'s Exs.28-42.

[68] Deft.'s Ex. 9 (Samaroo Dep.) at 41-43, 82; Deft.'s Ex. 19 (Tatz ½3/2002 Dep.) at 20; Plft.s Ex. 55 at 2-24.

operation.[69]

NatWest's federal income tax returns were prepared on the basis that its six U.S. branches were separate from each other. The interest income and interest expense NatWest reported on its tax returns included the interest income and expense the six U.S. branches accrued on transactions with each other, as recorded on their separate books and records.[70] Thus, NatWest reported more interest income, and more interest expense, on its tax returns than if there had been a single, combined U.S. Branch.[71]

*4. NatWest did not allot any capital to its U.S. branches on their balance sheets.*

At the outset of this case, Michael Crow, NatWest's Head of Group Taxation in London, testified on deposition that there was no allocation of capital from the head office to the U.S. branch operations ("None whatsoever").[72] He explained that there was no allocation of capital to a branch because "it can borrow from us in London or in the market. It's capital worth is in the parent."[73] Likewise, Reuben Tatz, the Chief Financial Officer of NatWest's Executive Office North America, testified at his 1996 deposition that, as there were no regulatory requirements requiring U.S. branches to have their own capital, NatWest did not "maintain a separate capital bucket for its branch

---

69 Deft.'s Ex. 9 (Samaroo Dep.) at 82; Deft.'s Ex. 10 (Walmsley Dep.) at 53, 63-65.

70 Pltf.'s Proposed Findings 164, 165; Tr. 2/5/2001 Status Conf. at 46-49.

71 Tr. 2/5/2001 Status Conf. at 46.

72 Ex. 2, Deft.'s 1997 Cross Motion for Partial Summary Judgment (Crow Dep.) at 34.

73 *Id.* at 35.

operations."[74]

The branches' balance sheets – both the computer generated B-126 and the handwritten balance sheets sent to the head office in the U.K. – confirm this testimony.[75] They do not identify any amount as capital. On the handwritten balance sheets, all line items are identified as either "Assets," or "Liabilities." Each line item is identified by a three-letter code, beginning either with an "L," identifying the line item as a liability, or an "A," identifying it as an asset. There are no three-letter codes for capital. Total Assets of a branch equal its Total Liabilities.[76]

Line items that were identified as liabilities (and included in "Total Liabilities" (code LDD)) include the following:[77]

- Balance due to HO re Capital Loans (code LEB)
- Balance due to HO re Fixed Assets (code LFB)
- Provision for B&DD – specific (code LOC)
- Provision for B&DD (bad and doubtful debts) – Non-specific (code LRC)
- Profit and Loss (Total Income) (code LPC)
- Retained Profits (LZC)

In a number of instances, branches operated at a loss, and there were current year losses and/or accumulated losses. Current and accumulated losses were identified on the branch's balance

---

[74] Ex. 3, Deft.'s 1997 Cross Motion for Partial Summary Judgment (Tatz 10/8/1996 Dep.) at 10-11, 107-108.

[75] Deft.'s Ex. 20; Pltf.'s Exs. 35-42.

[76] Pltf.'s Exs. 25-42.

[77] *See e.g.,* Pltf.'s Ex. 39 at CH-BS-8412-05 and 06.

sheets as assets. Current year losses were an account entitled "Profit and Loss (Total Expenditure)" and carried the associated three-letter asset code "ABD". "Accumulated Losses" carried the three-letter asset code "ACD".[78] Including these losses as assets increased Total Assets, which could then balance the increased Total Liabilities necessary to support the branch's operations and cover its losses.

The New York Branch had steadily increasing accumulated losses for the years 1983-1987.[79] The Grand Cayman Branch had an accumulated loss in 1985.[80] The Chicago Branch had increasing accumulated losses in 1980-1982.[81]

The six U.S. branches were subject to regulation by state and federal bank regulators, but there was no regulatory requirement that a branch maintain any separate capital.[82] Each branch could and did rely on NatWest's worldwide capital, reflected on NatWest's consolidated books.[83] Although the bank regulatory authorities reviewed the operations the six U.S. branches, there is no evidence that they ever evaluated whether the books of the branches reflected an appropriate amount of capital for tax or any other purposes.[84]

---

[78] *See e.g.*, Pltf.'s Ex. 41 at NY-BS-8612-04.

[79] Pltf.'s Exs. 38-42; *see also* Deft.'s Ex. 3 ¶ 50.

[80] Pltf.'s Ex. 40; *see also* Deft.'s Ex. 3 ¶ 50.

[81] Pltf.'s Exs. 35-37; *see also* Deft.'s Ex. 3 ¶ 50.

[82] Deft.'s Ex. 6; Ex. 9, Deft.'s 2002 Cross Motion for Partial Summary Judgment ¶¶ 9, 12; 58 Fed. Cl. at 494.

[83] 58 Fed. Cl. at 495; Deft.'s Ex. 7.

[84] *See* Deft.'s Ex. 7.

5. *The branches' books and records reflect other anomalies*.

Although plaintiff contends (as a matter of uncontroverted fact) that the branches' books and records were properly maintained,[85] those that are relied on here reflect a number of anomalies (in addition to their partially corrected, interim nature, the absence of capital, and the identification of accumulated losses as an asset).

Obviously, the four branches located in New York conducted their respective activities through employees, and they used the premises there and various items of equipment. Nevertheless, the books unrealistically allocate 100% of the four branches' collective personnel costs, occupation (building) costs, equipment and other overhead costs to the New York Branch alone.[86]

As for the Chicago and San Francisco branches, their balance sheets indicate they had premises and equipment for their operations in those cities during the years 1981-1984, but that all their premises and equipment disappear in 1985-1987.[87] Plaintiff's accounting expert reports that the assets were transferred to the books of the New York Branch during 1985.[88] He does not explain why. In addition, there is no indication that the Chicago and San Francisco branches received any compensation for the transfer of their property, as plaintiff's Accounting Manual specified should occur.[89] Even more odd is that the Chicago and San Francisco branches continued to claim depreciation and repair expenses on their profit and loss statements in 1986 and 1987 with respect to

---

[85] Pltf.'s Motion at 9 et seq. and Pltf.'s Proposed Finding 39.

[86] Pltf.'s Exs. 28-34; Deft.'s Ex. 3 ¶ 5.

[87] Pltf.'s Exs. 35-42; Deft.'s Ex. 3 ¶ 5.

[88] Pltf.'s Ex. D, ¶ 24.

[89] Deft.'s Ex. 3, ¶ 5 n.8.

premises and equipment, although their balance sheets for those years no longer show such assets.[90]

*6. <u>The interest income and expense of the U.S. branches on transactions with related parties</u>*

The related party interest income and expense of the six U.S. branches largely appears to have been incurred with respect to either current accounts, or money market transactions.[91]

a. Current Accounts

On nearly all of its current accounts with third parties and related parties, the U.S. branches charged transaction fees for each deposit and withdrawal, and the fees were reduced by notional interest computed on the customers' positive balances. If the fees exceeded interest, the customer paid the difference; if notional interest exceeded the commissions, no fees were charged.[92] Current account customers could also have a debit (negative) balance and as a result pay interest to the branches.

There were two interest rate structures applied to these accounts. One, a more favorable structure (from the perspective of the customer), applied to nearly half of the related party current accounts and only a few of the largest and most active third party accounts.[93] The other, less favorable

[90] Deft.'s Ex. 3, ¶ 5; Compare Pltf.'s Exs. 33 and 34 with Exs. 41 and 42 (Chicago and San Francisco branches).

[91] The profit and loss statements reflect interest intra group income and expense according to components of NatWest's organization, but do not indicate the amounts attributable to current account, money market trades, and perhaps other types of transactions. The A-220 and M-262 current account and money market reports also do not total the interest income and expense in such transactions, either generally, or with related parties. Pltf.'s Exs. 35-42; Deft.'s Exs. 16-17.

[92] Deft.'s Ex. 4 ¶ 16; Read Report March 4, 2005 ¶¶ 42-44.

[93] Deft.'s Ex. 4 ¶¶ 15-23 and Exhibits; *see* Read Report March 4, 2005 ¶¶ 43-44.

interest rate structure applied to the rest of the current accounts.[94] Under the more favorable interest rate structure, the customer received more (notional) interest income and paid less interest on negative current account balances, as compared to the less favorable interest rate structure. Plaintiff's expert concedes that there were two interest rate structures.[95]

The parties' experts disagree, however, over the circumstances in which the U.S. branches applied the more favorable interest rate structure. According to plaintiff's expert, the application of the more favorable rate structure was made on the basis of an account's higher activity level (measured by the daily $ turnover and the number of transactions), not whether the customer was a related party or a third party.[96] But, as defendant's expert's detailed analysis of the data reveals, while the very largest and most active related party and third party current accounts received the more favorable structure (and the least active accounts were under the less favorable structure), the great middle ground of activity levels paints a very different picture. As defendant's expert found, in "the wide range of intermediate activity levels, *none* of the third-party accounts but *many* of the related party accounts "were under the more favorable federal funds regime."[97] The data also show that many related-party accounts receiving the more favorable rate structure had lower activity levels than third party accounts under the less favorable structure. The opposite was not true – there were no third-party accounts receiving the move favorable interest rate structure with lower activity levels than related party accounts

---

[94] *Ibid*.

[95] Deft.'s Ex. 4 ¶¶ 14; Pltf.'s Ex. E. ¶ 87-88.

[96] Deft.'s Ex. 4 ¶ 17; Pltf.'s Ex. E ¶ 91.

[97] Deft.'s Ex. 4 ¶ 22.

under the less favorable structure.[98]

In sum, defendant's expert disputes plaintiff's expert's conclusion that account activity levels explain which rate structure applied. Defendant's expert concludes there is evidence that interest rates on many related party current accounts do not meet the arm's length standard.[99]

Defendant's expert went on to estimate the amount by which the U.S. branches understated their profits due to the application of interest rates that do not meet the arm's length standard.[100] Averaging results across data, his estimate is $10,553,577.[101]

b. Money Market Trading

The volume of money market trades entered into by the six U.S. branches during the years at issue is quite large. Defendant's expert estimates the total to be over 250,000 transactions.[102] As indicated above, there are a variety of types of money market trades – federal funds, Eurodollars, "Repos.", etc.

In March 2005, plaintiff abandoned the evidence it relied on since 2000-2001 to show that the U.S. branches' related party money market trading was at arm's length. That evidence consisted primarily of calculations of the average rates the branches paid to related parties on all money market transactions throughout the year and a comparison of those rates either to third party averages or broad benchmark rates. Plaintiff's counsel described this evidence to the Court as having been the product of

---

[98] *Ibid.*

[99] *Id.* at ¶ 23.

[100] *Id.* at ¶ 24.

[101] *Id.* at ¶ 27.

[102] *Id.* at ¶ 8.

"substantial effort" and that Price Waterhouse Coopers "spent more than 2,000 hours reviewing documents, entering data, and creating spreadsheets."[103] Plaintiff's counsel contended that its evidentiary summaries "demonstrate that the U.S. branches' borrowings were entered into at arms length market rates."[104]

Since interest rates are sensitive to the date (and even the time) of a trade, as well as the particular instrument being traded and its amount, defendant advised plaintiff and the Court that it considered plaintiff's broad averages essentially meaningless. Defendant contended that the appropriate way of determining whether related party money market trading was conducted at arm's length was to evaluate comparable related party and third party transactions – *i.e.*, "apples to apples."[105] In that connection, we also stated that we were willing to consider a sampling methodology.[106]

Nevertheless, plaintiff has continuously and recently relied on its previously submitted evidence.[107] Consequently, when discovery began on the arm's length interest issue in the summer of 2004, defendant's experts conducted their analysis against the background of the evidence on which plaintiff was relying. As plaintiff's evidence was not a sampling methodology, and because defendant's experts's report was due only 30 days after an expedited discovery schedule, defendant's experts did

---

[103] Tr. Status Conf. 6/6/2001 at 14-15.

[104] *Id.* at 15.

[105] Tr. Status Conf. 2/5/2001 at 79-81; Tr. Status Conf. 6/26/2001 at 41-44.

[106] Tr. Status Conf. 2/5/2001 at 79-81.

[107] *See e.g.*. Pltf.'s Status Report 12/12/2003 ¶ 4.; Pltf.'s Status Report 5/14/2004 ¶ 5.

not conduct a full sampling methodology.[108] The sampling that defendant's experts conducted suggested that related party money market trading may not have been conducted at arm's length.[109]

In March 2005, after discovery had ended, plaintiff jettisoned its earlier evidence. In its place, plaintiff now offers a sampling methodology through a new expert, Dr. Clair.[110] Dr. Clair sampled a somewhat larger sample than defendant's expert, but still quite small.[111] Without justifying the statistical adequacy of his sample, Dr. Clair treats it as sufficient to reach reliable conclusions.[112] Dr. Clair concludes that "there is no evidence that related party interest rates on money market transactions were other than arm's length."[113]

Defendant's expert, Mr. Read, disagrees. He disputes that Dr. Clair's sample size is sufficient and noted Dr. Clair's failure to examine standard regression diagnostics when evaluating the results he had obtained.[114] Defendant's expert concludes that Dr. Clair's sample and methods are insufficient to prove "that the U.S. branch money market transactions with related parties during the seven tax years

---

[108] Such a sampling study also would have been extremely expensive. Defendant's experts retrieved sufficient data to conduct a limited sampling from plaintiff's microfiche before the discovery period ended.

[109] Read Report (March 4, 2005) ¶¶ 13-14; Deft.'s Ex. 4 ¶¶ 7-8.

[110] Pltf.'s Ex. 59.

[111] *Id.* ¶ 5.

[112] Pltf.'s Ex. 59; Deft.'s Ex. 4 ¶ 31.

[113] Pltf.'s Ex. E ¶ 13.

[114] Deft.'s Ex. 4 ¶ 32, 36-37.

at issue were executed at arm's length interest rates."[115]

## ARGUMENT

### NATWEST IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE CAPITAL ISSUE OR THE ARM'S LENGTH INTEREST ISSUE

**A. The determination of a branch's free working capital under the Inland Revenue Banking Manual is a flexible factual inquiry, and there are numerous disputes regarding the factors that may be considered and the state of the evidence regarding the factors plaintiff considers.**

*1. The Inland Revenue Banking Manual*

The Inland Revenue Banking Manual[116] utilizes two key terms in the determination of a branch's "Free Working Capital"[117] on which no interest expense is allowed. The first is "allotted capital." Allotted capital is "an identifiable sum of capital given to the branch."[118] It is not an "amount calculated by reference to assets or other criteria," but is instead a "sum perceived and properly termed capital by Head Office."[119]

The second key term is "amounts treated as allotted capital." This term calls for an inquiry beyond amounts termed as capital by the branch; it permits amounts to be "treated" as capital (even if

---

[115] *Id.* at ¶ 39.

[116] References to the Inland Revenue Banking Manual are to the Manual as published in 1994, which is cited and adopted in the Court's November 2003 Opinion and January 2005 Order Denying Motion for Reconsideration.

[117] Appendix 9.A ¶ 2.

[118] Appendix 9.A ¶ 5.1.

[119] *Ibid*.

otherwise characterized on the books, *e.g.*, a loan).[120] Amounts may be treated as allotted capital by reference to the "separate entity hypothesis"and the "arm's length standard."[121] A variety of factors may be evaluated, and "the emphasis is therefore very much on the facts of the case."[122]

In making the necessary factual inquiry to determine amounts treated as allotted capital, the Manual provides a list of factors that may be considered, but cautions that the list is not exhaustive.[123] The list includes the following factors: (1) premises and fixed assets, (2) initial working capital, (3) retained profits, (4) depreciation, and (5) other reserves.[124] Whether branch losses also should be considered as having been funded from capital requires a "detailed examination" of questions such as whether underlying documentation reveals that funds came into the branch from the head office to cover the losses.[125]

The branch's Free Working Capital is the larger of its allotted capital and amounts treated as allotted capital.[126] Based on the Free Working Capital so determined, interest expense and the tax computation are determined, making adjustments to the accounts as necessary. [127]

The determination of a branch's capital under the Inland Revenue Banking Manual is thus an

---

[120] Appendix 9.A ¶ 6

[121] Chapter 9.2332; Appendix 9.A. ¶¶ 9 and 10.

[122] Appendix 9.A ¶¶ 4.4 and 10.

[123] Appendix 9.A ¶ 10.

[124] Appendix 9.A. ¶ 10.1.

[125] Appendix 9.A ¶ 11.

[126] Appendix 9.A ¶ 6.3.

[127] Appendix 9.A ¶ 12.

inherently factual inquiry and a decidedly flexible one (emphasis added):

> To sum up, this is substantially a grey area where ***each case will depend on its particular facts***. Negotiation will be very much the order of the day, and if the District feels that the level of free working capital is approximately correct then a reasonable result will have been achieved. To date, all cases have been successfully concluded by way of negotiation and hopefully this will continue to be the case.[128]

*2. Permissible factual inquiries regarding NatWest's U.S. branches*

Applying the Inland Revenue Banking Manual to NatWest's six U.S. branches, the first inquiry is determining the capital "allotted" to them. As the Manual provides, the search is for an "identifiable sum" given to a branch as capital.

The books of NatWest's six U.S. branches do not reveal that any capital has been allotted to them by the head office. The branches' balance sheets – really just internal reporting documents ("position papers" as plaintiff's RCFC 30(b)(6) witness, Roger Walmsley, referred to them) – show no formal allotment of capital. Every line item on the balance sheets is "identified" as either an "Asset" or a "Liability."[129] Quite apart from whether some of line items on the balance sheets might be included in "amounts treated as allotted capital" (the second inquiry under the Manual), the facts before the Court indicate that NatWest's U.S. branches had no "allotted" capital.

That brings us to considering "amounts treated as allotted capital" under the Manual. An important consideration in this inquiry certainly is the fixed assets purchases by NatWest's branches.[130] The assumption under the Manual is that, when a branch purchases fixed assets, it does so with funds

---

[128] Appendix 9.A ¶ 14.

[129] Pltf.'s Exs. 35-42.

[130] Appendix 9.A ¶ 10.1a.

provided to it by the head office as capital. The presumption is not irrebuttable. An established branch may show, *by a tracing of funds*, that a purchase of fixed assets was undertaken with a branch's retained profits, rather than capital from the head office.[131] The Manual places this tracing burden squarely on the bank, recognizing that it is a difficult one to meet, but that there are instances where tracing has been possible.[132]

If it is determined that the cost of fixed assets is to be treated as free working capital, then depreciation will not affect the amount. Depreciation is a separate matter, which affects retained profits.[133] In other words, the gross amount of a branch's expenditures over the years for fixed assets is the amount presumed to be treated as allotted capital, while the depreciation claimed with respect to the assets affects capital elsewhere through reductions in retained profits.

All the relevant facts, including the total cost of the assets, must be presented.[134] The Manual indicates in this connection that NatWest is obliged to retain its records.[135]

NatWest has not retained (or at least has not made available) records of the amounts its U.S. branches spent on fixed assets over the years. Without records of the branches' total cost of fixed assets, it is impossible to determine how much to presume (in the absence of tracing) should be treated as allotted capital. Without records, NatWest can't trace the funding of fixed assets purchases in an effort to meet its heavy burden of showing that funds other than capital from the head office were

---

[131] *Ibid*.

[132] *Ibid*.

[133] *Ibid*.

[134] *Ibid*. and Appendix 9.A, Examples 3-5.

[135] Appendix 9.A, Example 4.

actually used in the acquisitions. Without records to conduct this plainly permissible inquiry under the Manual, plaintiff certainly is not entitled to summary judgment, and it is impossible for defendant to determine the particular amount attributable to the purchases of fixed assets that should be treated as allotted capital.

The Manual does not limit the inquiry regarding amounts treated as allotted capital of the NatWest branches to one involving the purchases and funding sources of fixed assets. Among the other inquiries the Manual contemplates with respect to NatWest's branches are (1) the amounts given to the branches by the head office as an initial extension of funding, (2) projected losses (3) repatriations, (4) retained profits and (5) accumulated losses.[136]

Thus, amounts initially given to the New York Branch, the Nassau Branch, and the Chicago and San Francisco Branch when each began operations prior to the years at issue could be considered as amounts treated as allotted capital.[137] As the Manual provides, "[i]t is reasonable to suppose that initially this [working capital] will be met out of capital."[138] Likewise, if a branch projected losses in its early years, those projections "may assist in providing a measure of initial capital requirements."[139] Although the Manual provides that the best time to "tackle the issue" will normally be when the branch is being established, it does not suggest that such capital disappears and should not be considered

---

[136] Appendix 9.A ¶¶ 10, 11 and Appendix 9.A. Examples 1-5; January 18, 2005, Order Denying Motion for Reconsideration at 4.

[137] Appendix 9.A ¶ 10.1b.

[138] Appendix 9.A. ¶ 10.1b; *see also* Appendix 9.A, Example 1.

[139] Appendix 9.A. ¶ 10.1b; *see also* Appendix 9.A, Example 2

later.[140] Future branch profitability and retained earnings would merely add to capital, but not eliminate, capital given to the branch at the outset to fund initial capital requirements and projected losses. Thus, a permissible inquiry under the Manual is amounts that should be treated as allotted capital to reflect the initial working capital requirements and projected losses of NatWest's U.S. branches.

Once again, plaintiff has not made records regarding its branches' early years available. Even if it were true, as plaintiff alleges (motion at 23) that funds for initial working capital were recorded as "capital loans" on the books of the branches, plaintiff does not produce the records to show the original amounts of such loans.[141] The branches' initial working capital amounts normally would be treated as allotted capital.[142] Payments over the years that reduce the balance of the branches' so-called "capital loans" could be considered repatriations which, as the Court has indicated, are a problem that require adjustments to the books.[143] But all plaintiff has produced is the current, reduced balances of the "capital loans." The Court therefore is without records to determine the amounts extended to the branches as initial working capital that should be treated as allotted capital or the amounts of repatriations over the years that also should be evaluated.

---

[140] Appendix 9.A. ¶ 10.1b.

[141] Plaintiff's claim that the initial capital extended to a branch is recorded as a capital loan is belied by the balance sheet of the Grand Cayman Islands Branch, which commenced operations in 1985. Its balance sheet for that year does not indicate that the funds it needed for initial working capital were recorded as a capital loan. Pltf.'s Ex. 40 at NWP-KPMG 000047. In any event, the branches' balances due to the head office that plaintiff refers to as "capital loans" bear no discernible relationship (nor has plaintiff shown any) with the intermingled cost of fixed assets and any advances for initial working capital.

[142] Appendix 9.A ¶ 10.1b.

[143] January 18, 2005, Order Denying Motion for Reconsideration at 4; *see also* Appendix 9.A, Example 4.

It plainly is permissible to examine the initial working capital requirements and projected losses of NatWest's branches as an element in determining the amounts treated as allotted capital. Since plaintiff has not produced records that permit such an inquiry, it cannot be entitled to summary judgment.[144]

Another permissible inquiry under the Manual regarding amounts treated as allotted capital is retained profits; specifically here, a proper computation of retained profits. NatWest has taken the position that certain balance sheet items (discussed below) are capital and, *for the years at issue,* has conceded interest deducted on those line items. Interest deductions on those line items in previous years, obviously, had the effect of reducing each branch's retained profits. If, as plaintiff claims, those line items may be considered to be capital, then interest deductions in prior years were improper and retained earnings must be recalculated upward. The effect of increasing retained earnings is to increase the total amount treated as allotted capital of a branch and further increase interest expense adjustments.

Since plaintiff has not produced records for earlier years, this necessary adjustment cannot be evaluated. On this additional ground, plaintiff is not entitled to summary judgment.

The Inland Revenue Banking Manual addresses losses, another permissible inquiry in determining amounts treated as allotted capital of NatWest's U.S. branches. During the years at issue, the New York Branch, the Chicago Branch, and the Grand Cayman Islands Branch had losses that resulted in negative accumulated earnings. The New York Branch had negative accumulated earnings as of year-end 1983-1987. The Chicago Branch had negative accumulated earnings as of year-end

[144] Likewise, defendant is unable to determine a particular amount to be treated as allotted capital to reflect initial working capital requirements and projected losses.

1980-1982. The Grand Cayman Islands Branch had negative accumulated earnings as of year-end 1985.[145]

When a branch has losses, the Manual advises that "there are grounds for detailed examination."[146] The "underlying documentation may reveal that funds have come into the branch from Head Office to cover losses or bad debts."[147] Indeed, the head office made substantial advances in all the years at issue to the U.S. branches, either directly to each branch or using another U.S. branch as a conduit. These advances exceeded the accumulated losses of each branch.[148]

Thus, amounts treated as allotted capital of the New York, Chicago, and Grand Cayman Islands branches may include their accumulated losses. NatWest has not done so, and therefore is not entitled to summary judgment.

Under the facts presented, it also is permissible (and appropriate) to determine branch capital under the Manual by making the above inquiries with respect to each of NatWest's six U.S. branches. Under the U.S.-U.K. Treaty, a U.K. corporation such as NatWest is taxed in the United States on the profits attributable to a "permanent establishment."[149] Obviously, it is entirely possible for a U.K. corporation to conduct business in the United States through multiple permanent establishments.[150] The

---

[145] Deft.'s Ex. 3 ¶ 50.

[146] Appendix 9.A. ¶ 11.1.

[147] *Ibid.*

[148] Pltf.'s Exs. 35-42, 61; *see also* Deft.'s Ex. 3.

[149] Treaty Article 7(1). The measure of those profits is those that would be expected if the permanent establishment were an independent, distinct, and separate enterprise. Treaty Article 7(2).

[150] A permanent establishment is defined as fixed place through which the business of corporation is
(continued...)

multiple permanent establishments might be in similar businesses, or wholly unrelated businesses. It also is possible for a U.K. corporation to conduct business in the United States through a single permanent establishment, with multiple locations. The particular facts are controlling.

If there were a single permanent establishment at multiple locations, then even if there were records for each location, one would expect there to be a combined set of books and financial reports, eliminating any transactions among the locations. A single permanent establishment would have a combined profit and loss statement, showing the combined profit or loss at all the offices, after eliminating items of income and expense on transactions among them. Such a single permanent establishment also would have a combined balance sheet, reflecting any capital "allotted" to the permanent establishment and providing the information to determine "amounts treated as allotted capital" on a combined basis.

The Inland Revenue Banking Manual could be appropriately applied to such a permanent establishment, rather than to the separate locations. Since the operations were financially combined and accounted for, the actual, existing combined books and records could be used to determine the capital "allotted" to the permanent establishment, and, since the offices were combined for financial purposes, it would be appropriate to consider amounts given to the combined operations that should be "treated as allotted capital."

The situation is factually quite different when there are no combined books and records. When offices are accounted for separately, and never combined, the head office may be advancing funds to one office that should be treated as allotted capital under the Manual. For example, if such an office

---

[150] (...continued)
carried on, specifically, a "branch" or an "office". Treaty Article 5.

were losing money, the head office could have provided that office with funds to cover its losses and such funds could be treated as allotted capital. Evaluating whether that has occurred should be done on the basis of that office's existing, separate books and records.

But it would be misleading to attempt to assess whether the head office advanced funds to the money-losing office that should be treated as allotted capital by creating a fictional set of combined books with another office. Since the books were never combined, the profits at one office were not, in fact, used to cover the losses at the other office. Yet, if fictional combined books were created, the losses of one branch would be offset by the profits of another, such that funds actually given to the money-losing branch to cover its losses could be concealed as an ordinary loan and not treated as allotted capital. It would be especially misleading to hypothetically combine the books of offices that engaged in transactions with each other that were recorded on their separate books and records and used to determine their separate profits and losses.

Indeed, here, there were six separate U.S. branches that were never combined for accounting purposes. NatWest's six U.S. branches had separate books, separate business purposes, different operating licenses, were regulated differently and were subjected to different local tax regimes. Some branches sustained losses, according to their separate books and records, while others were profitable.

The U.S. branches also entered into transactions with each other, generating items of income and expense, that were recorded on their separate books and records and became elements in their yearly, and accumulated, profits (or losses). Since there are no contemporaneous books and records that combined the six U.S. branches into one, these intra-U.S. transactions were accounted for as real transactions; no less real than transactions the U.S. branches entered into with other non-U.S.

branches, offices, and affiliated NatWest companies. It would be inconsistent to ignore intra-U.S. related party transactions, by creating fictional combined books, while recognizing transactions with related parties abroad. Moreover, since combined books were never created, the retained profits of each of the six branches reflect intra-U.S. transactions over the years. Eliminating intra-U.S. transactions during the years at issue would do nothing to accurately reconcile and combine the retained accumulated profits of the six branches together. The branches' respective accumulated retained profits can't simply be added together.

The actual facts and circumstances here, which the Court ruled are controlling, are those of separate permanent establishments. There is ample factual justification to determine allotted capital and amounts treated as allotted capital separately for each of NatWest's six U.S. branches.

The Inland Revenue Banking Manual, as applicable to NatWest's U.S. branches, provides for a flexible, facts and circumstances based determination of allotted capital and amounts treated as allotted capital. Mr. Barrie Akin is an English barrister specializing in U.K. taxation, and a former partner at Ernst and Whinney in London, where he represented foreign banks with U.K. branches before Inland Revenue in connection with the determination of branch capital. He is uniquely situated and qualified to discuss the U.K.'s approach to the determination of branch capital during the years at issue. Mr. Akin's Declaration is supportive of the inquiries defendant has described above to determine capital of NatWest's U.S. branches under the Inland Revenue Manual.[151]

[151] Deft.'s Ex. 1. Mr. Akin also disagrees with plaintiff's witness, Mr. Jukes, who purports to speak for every Inland Revenue Inspector that plaintiff's approach here would be accepted by Inland Revenue without question. Deft.'s Ex. 1 ¶¶ 45 et seq. In any event, whatever approach, or approaches, Inland Revenue accepted in the course of negotiations in the 1980s can not limit here the flexible factual inquiries that are available and expressed in the Manual.

Since Inland Revenue Inspectors had great flexibility under the Manual to determine branch capital, International Examiners at the Internal Revenue Service should have no less flexibility and discretion if they are to apply the Manual under the Treaty to U.S. branches of other U.K. banks. The Internal Revenue Service official at the National Office who would be responsible for advising International Examiners in the field has outlined the approach he would recommend to those examiners, if the Manual applies. His Declaration also is supportive of the inquiries defendant has described above to determine capital of NatWest's U.S. branches.[152] If the Internal Revenue Service can make these factual inquiries under the Manual in administrative proceedings, NatWest is not entitled to summary judgment to preclude them here.

*3. NatWest is not entitled to summary judgment, to impose its own, different set of factual inquiries and its disputed factual implementation of those inquiries.*

In its Motion for Summary Judgment, plaintiff offers its own set of factual inquiries for determining branch capital that is starkly different than the inquiries defendant has described above. While defendant repeatedly cites to and relies heavily on the specific terms of the Inland Revenue Banking Manual, plaintiff gives the Manual almost no mention. Since the Inland Revenue Manual provides for a flexible factual analysis, and does not prescribe precisely and mechanically which factors can, and cannot be considered, plaintiff is not entitled to a summary judgment that would do exactly that. Moreover, defendant disputes plaintiff's factual implementation of the factors it does consider.

Plaintiff begins by nearly ignoring that the task under the Inland Revenue Banking Manual is to determine the *amounts* that constitute branch capital. Instead, plaintiff assumes that certain line items

---

[152] Deft.'s Ex. 2.

on the balance sheets of its U.S. branches constitute capital and that the issue in the case is largely one of identifying the interest it erroneously deducted on such capital.[153] Plaintiff's remaining analysis is limited to inquiring whether additional capital was required to fund fixed assets.[154]

Moreover, although the Court directed plaintiff on March 9, 2005, to compare in its Motion the calculation of branch profits under the Treaty based on (1) plaintiff's view that there is a single, aggregated branch and (2) defendant's view that there are six separate U.S. branches, plaintiff failed to do so. Plaintiff offers no analysis of capital under the Manual by treating each of the six U.S. branches as a separate branch. Instead, just as plaintiff contends it is entitled to aggregate the six, separate U.S. branches into one branch, it contends that it may aggregate the four separate branches located in New York into a single New York Branch. Plaintiff therefore conducts it alternative analysis of capital under the Manual for only three branches–New York, Chicago, and San Francisco.[155] Plaintiff does so because if it were to apply its own analysis of capital to six branches, it would not be able to avoid significant adjustments as a result of the enormous accumulated losses reflected on the books of the New York branch.[156]

Plaintiff's capital analysis also does not proceed at all by reference to the two key terms provided in the Manual – "allotted capital" and "amounts treated as allotted capital." Substituting for

[153] Pltf.'s Motion at 23 et seq. ("NatWest has Identified and Conceded All Interest Expenses Deducted on Capital").

[154] Pltf.'s Motion at 30 et seq.

[155] Pltf.'s Motion at 31-32, 35 et seq.

[156] Plaintiff also is contradicting its representations to the Court earlier in this litigation that there were six separate U.S. branches.

these two terms, plaintiff offers a phrase not found in the Manual and which it does not define. Plaintiff refers to "amounts designated as capital or in fact allotted to [the branches] for capital purposes."[157] Without acknowledging that the branches' balance sheets identify all line items as either "Assets" or "Liabilities", plaintiff simply assumes, without analysis or explanation, that various line items from the balance sheets constitute all the amounts "designated as capital on the books of the U.S. branches or in fact allotted to the U.S. branches for capital purposes." Plaintiff also offers two conflicting views regarding which line items are designated or in fact allotted as capital."[158] Plaintiff's phraseology, emphasizing amounts "designated or in fact allotted" as capital, rather than the Manual's "amounts treated as allotted capital" language, suggests plaintiff is excluding an inquiry the Manual clearly contemplates – whether funds the head office provides to a branch as a loan nevertheless should be "treated" as capital.[159]

Having assumed that some amount of capital has been designated or in fact allotted to the branches as capital, plaintiff's sole inquiry regarding the adequacy of that capital under the Treaty and the Inland Revenue Banking Manual is whether the branches "require" additional capital to purchase fixed assets.[160] While the Inland Revenue Banking Manual addresses a branch's fixed asset purchases, the factual inquiry expressed in the Manual is not nearly so favorable to a bank. As discussed

---

[157] Pltf.'s Motion at 22.

[158] Compare Proposed Findings 127-128 ("retained profits, profit and loss, balance due to head office re fixed assets, and provision for bad debts") and 184 ("B&DD–Non-Specific," "Retained Profits (net of any "Accumulated Losses", "Balance due to HO re Capital Loans", "Balance due to HO re Fixed Assets", and balances recorded as Profit and Loss").

[159] Appendix 9.A ¶ 6.2.

[160] Pltf.'s Motion at 30

above, the inquiry expressed in the Manual assumes that a branch's fixed asset purchases were funded with capital coming from the head office. A bank may overcome that assumption if it meets a heavy burden of *tracing* the acquisition to the branch's retained profits (or a specific other borrowing).[161] Plaintiff's inquiry whether capital was "required" to fund fixed assets purchases relieves it of any tracing obligation and turns the presumption against it into one in its favor. That is, under plaintiff's inquiry, if it is possible that cash flow, retained earnings, or any other funds *might* have been used to acquire fixed assets *during the years at issue*, the assets will not be considered to have been purchased with capital from the head office. Plaintiff makes no inquiry at all with respect to how fixed assets acquired in earlier years might have been funded and whether those purchases might give rise to amounts treated as allotted capital that would still be on the branches' books.

Although the Manual specifically permits, if not demands, additional factual inquiries regarding initial working capital requirements, projected losses, retained profits, depreciation, other reserves, and losses, plaintiff makes no other inquiries in its determination of branch capital. Mr. Akin, the U.K. barrister, expresses serious concerns regarding plaintiff's factual evaluation of branch capital – whether it must be accepted under the Manual and, indeed, whether aspects of it are even consistent with the Manual.[162] Similarly, the Internal Revenue Service official with responsibility to advise International Examiners advises that he would not recommend that examiners accept the limited inquiries plaintiff offers here and would instead recommend that the Manual be followed more closely and completely.[163]

---

[161] Appendix 9.A ¶ 10.1a.

[162] Deft.'s Ex. 1.

[163] Deft.'s Ex. 2.

Defendant's financial expert, Dr. Kolbe, likewise views plaintiff's evaluation of capital as incomplete, inconsistent with the Manual, and plainly insufficient.[164] Dr. Kolbe also disputes many of the specific facts that plaintiff proposes under even the limited inquiries regarding branch capital that it does make.[165] Plaintiff is not entitled to summary judgment on the capital issue based on such a limited and disputed factual analysis.

**B. The parties' experts dispute whether the U.S. branches' transactions with affiliates reflect arm's length interest rates.**

The arm's length interest issue presents the question whether NatWest's U.S. branches provided more favorable interest rates to related parties, as compared to third parties, on current accounts and in money market transactions. The parties' experts disagree. As a result of these factual disputes, the issue cannot be resolved by summary judgment.

The parties exchanged experts' reports on March 4, 2005. Defendant's expert on the arm's length interest issue, James Read, addressed both current accounts and money market transactions in his report. Plaintiff's expert, Robert Clair, addressed only money market transactions in his report.

Current accounts at the branches allow customers to make deposits and payments in U.S. dollars. They may have positive or negative balances. If a current account balance was negative, the branch charged the customer interest. Few current accounts involved the actual payment of interest to customers if the balance was positive. Instead, for nearly all current accounts, when the balance was positive, the branch computed notional interest that reduced the transactions fees imposed on the

---

[164] Deft.'s Ex. 3.

[165] Deft.'s Ex. 3 and Appendix; Deft.'s Statement of Genuine Issues

accounts. The notional interest is the economic equivalent of paying interest.[166]

In his March 4, 2005, Report, Mr. Read concluded that NatWest's U.S. branches computed notional interest on many current accounts with related parties at a higher interest rate than they used for current accounts with third parties.[167] He also found that the U.S. branches charged many related parties lower interest rates on negative balances in their current accounts than they charged third parties.[168] These practices, Mr. Read concluded, appeared to violate the arm's length standard of the Treaty and understated the profits of the U.S. branches.[169]

Plaintiff's expert first addresses current accounts in his May 2, 2005, affidavit, filed with plaintiff's Motion for Summary Judgment. Dr. Clair concedes that the U.S. branches computed interest on current accounts with customers, using two price structures, one of which was more favorable to the customer.[170] But he contends that the more favorable interest rates on the accounts that received them may be explained by their higher activity levels.[171] He concludes that Mr. Read failed to identify a "valid basis" for concluding that the U.S. branches' current accounts did not reflect arm's length rates.[172]

Mr. Read studied the data thoroughly, and he disagrees that the more favorable interest rates

---

[166] Read Report (March 4, 2005) ¶ 10.

[167] *Ibid*.; Deft.'s Ex. 4 ¶ 6.

[168] Read Report (March 4, 2005) ¶ 11; Deft.'s Ex. 4 ¶ 6.

[169] Read Report (March 4, 2005) ¶¶ 10-11; Deft.'s Ex. 4 ¶ 6.

[170] Pltf.'s Ex. E ¶¶ 87-88.

[171] Pltf.'s Ex. E ¶¶ 91-95.

[172] Pltf.'s Ex. E ¶ 105.

structure is explained by higher account activity levels. At the extremes, the least active accounts were under the less favorable rate regime and the most active accounts received the more favorable rate structure. But, as Mr. Read explains, there is a wide intermediate range of account activity and, within that range, related parties received more favorable treatment. That is, many related party accounts under the more favorable rate structure had lower activity levels than third party accounts under the less favorable rate structure. But there are no third party accounts under the more favorable rate structure that have lower activity levels than related party accounts that were under the less favorable rate structure.[173] Mr. Read concludes that this is evidence that "interest rates on many related-party current accounts do not meet the arm's length standard of the U.S.–U.K. Tax Treaty."[174] Mr. Read estimates that the amount by which the books of NatWest's U.S. branches understated current account profits due to non-arm's length interest rates is $10,553,577.[175]

In sum, the parties' experts agree that NatWest's U.S. branches provided many current account customers with a more favorable interest rate structure. They sharply disagree, however, regarding whether related party customers were treated better than third party customers with similar or greater account activity levels. Summary judgment is inappropriate to resolve this factual dispute.

The parties' experts also disagree over whether the evidence establishes that NatWest's U.S. branches utilized arm's length interest rates on money market transactions with related parties.

Until March 4, 2005, plaintiff was relying on evidence it presented in 2000 and 2001 in an

---

[173] Deft.'s Ex. 4 ¶¶ 15-24.

[174] *Id.* ¶ 23.

[175] *Id.* ¶¶ 25-27.

effort to meet its burden of proving that rates on related party transactions were at arm's length. That evidence consisted primarily of the computation of an annual average interest rate for all related party money market transactions that was compared to a computed annual average rate on all third party money market transactions (or a benchmark rate of some sort). But since the interest rate on money market transactions is sensitive to the date and time of the transaction, as well as its size and the particular money market instrument being traded, defendant regarded plaintiff's composite annual averages as essentially meaningless. In defendant's view, an appropriate analysis would be a comparison of similar third party and related party transactions – both time and type.

In his March 2004, report, defendant's expert made such a comparison of similar third party and related party transactions from a small data sample. The comparison suggested that NatWest's U.S. branches were treating related parties more favorably, but defendant's expert acknowledged that the limited sampling did not allow him to reach that conclusion with confidence.[176] He was unable to perform a larger study that would justify a firm conclusion, because (1) his report was due only 30 days after the close of discovery, (2) the data from approximately 250,000 transactions was not on a computer, and the cost of a full sampling study would be extremely high,[177] and (3) plaintiff was not

---

[176] Read Report (March 4, 2005) ¶ 55; Deft.'s Ex. 4 ¶ 7.

[177] Even obtaining enough data to conduct a limited sampling analysis was an extremely labor intensive, painstaking, and expensive proposition. The data is contained in microfiche reports kept at the offices of plaintiff's counsel. Retrieving it involved sending defendant's representatives to New York to request and review microfiche sheets, locating individual reports with a microfiche reader, and then printing pages of the reports, one page at a time, on the slow printer that was combined with the reader. The copied documents stayed with plaintiff's counsel, who then bates stamped and copied them, before mailing a copy to defendant's counsel and keeping a copy for plaintiff. Upon receiving the copies, defendant's experts had to then manually enter data into a computer program, before being able to conduct any analysis of the data.

relying on a sampling study to meet its burden of proof.[178]

Plaintiff has now abandoned the evidence it relied on since 2001. Without explanation, plaintiff does not include any of that evidence among the exhibits it now offers. Instead, all of the evidence plaintiff is relying on was created and disclosed after discovery ended, and plaintiff claims this new evidence entitles it to summary judgment on the arm's length interest issue. Plaintiff's new evidence consists of a March 4, 2005, report by Dr. Clair and his May 2, 2005, affidavit which is to the same effect as his report with respect to money market trading.

The parties' experts simply disagree regarding the state of the evidence and the conclusions to be drawn regarding interest rates on related party money market transactions. Plaintiff's expert did some sampling and, without any explanation or an examination of standard statistical diagnostics, treated his small sample as sufficient to reach meaningful conclusions.[179] Based on his sample, plaintiff's expert concluded there was "no evidence" that related party money market transactions was other than arm's length.[180] Defendant's expert also did some sampling and found evidence of non-arm's length rates. He views his sample as too small, but he also considers plaintiff's expert's somewhat larger sample as still too small.[181] Mr. Read states, "I dispute that Dr. Clair's sample is sufficient to establish that the money market transactions of the U.S. branches were at arm's length."[182] Summary judgment is not appropriate to resolve this disagreement among the experts.

---

[178] *See* Deft.'s Ex. 4 ¶ 8; Read Report (March 4, 2005) ¶¶ 51-52.

[179] Deft.'s Ex. 4 ¶¶ 31, 35-37; Pltf.'s Ex. E ¶¶ 43, 46.

[180] Pltf.'s Ex. E ¶ 4.

[181] Deft.'s Ex. 4 ¶¶ 31-32

[182] *Id.* ¶ 32.

**CONCLUSION**

Plaintiff's Motion for Summary Judgment should be denied as to both the capital issue and the arm's length interest issue.

Respectfully submitted,

s/Steven I. Frahm

STEVEN I. FRAHM
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6504 (telephone)
(202) 514-9440 (facsimile)

EILEEN J. O'CONNOR
Assistant Attorney General
MILDRED L. SEIDMAN
Chief, Court of Federal Claims Section

July 22, 2005

CERTIFICATE OF SERVICE

In accordance with the Court's Rules, General Order 42A, and its July 13, 2005, Order, I certify that service of a CD copy and a courtesy paper copy of Defendant's Exhibits in Opposition to Plaintiff's Motion for Summary Judgment, has been sent to opposing counsel this 22nd day of July 2005, by mailing a copy thereof, postage prepaid, to the following address:

D. Scott Wise, Esquire
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York 10017

s/Steven I. Frahm
U.S. Department of Justice (Tax)
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20004
(202) 307-6440