**No. 95-758 T**
**(Judge Nancy B. Firestone)**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**NATIONAL WESTMINSTER BANK, PLC**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

# DEFENDANT'S STATEMENT OF GENUINE ISSUES

**EILEEN J. O'CONNOR**
***Assistant Attorney General***

**MILDRED L. SEIDMAN**
**STEVEN I. FRAHM**
***Attorneys***
***Tax Division***
***Department of Justice***
***Washington, D.C. 20044***

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**No. 95-758T**

**(Judge Nancy B. Firestone)**

---

**NATIONAL WESTMINSTER BANK, PLC**

***Plaintiff*,**

**v.**

**THE UNITED STATES,**

***Defendant*.**

---

**DEFENDANT'S STATEMENT OF GENUINE ISSUES**

---

In accordance with RCFC Rule 56(h)(2), defendant submits its Statement of Genuine Issues with respect to plaintiff's Proposed Findings of Uncontroverted Fact.

1. No dispute

2. Object to the proposed finding on the ground that it is not material to the resolution of any issue in this case. Plaintiff's size and credit rating do not have any bearing on the determination under the Inland Revenue Banking Manual (hereinafter the "Manual") of the capital of its six U.S. branches, or whether their interest income and expense on transactions with related parties reflect arm's length dealing. Subject to that objection, no dispute as to NatWest being one of the largest banks in the world, but disputes that its credit rating was

triple-A for the years at issue. NatWest has never produced any source documents reflecting its credit ratings during the years at issue. It relies entirely on testimony, including the testimony of its expert, Marcia Stigum, now deceased, who appears to have been referring to NatWest's credit rating when it entered the U.S. market, which generally was earlier than the years at issue. Plaintiff also cites to an April 26, 2005, Declaration by Anthony Scott. Mr. Scott's Declaration, however, indicates that NatWest had different credit ratings for different purposes, and addresses a time period less than all the years at issue. In addition, at his earlier deposition on May 15, 2002, Mr. Scott testified that NatWest's triple-A rating for long-term debt has been reduced more than once. He stated that he didn't know when the reductions occurred, as he would have to look at the "documents" to know. Exhibit 17 to Deft's 2002 Cross-Motion for Partial Summary Judgment at 22-23. Similarly, John Tugwell testified at his May 17, 2002, deposition that, he believed, NatWest's triple-A credit rating slipped toward the end of the years at issue. Exhibit 15 to Deft.'s 2002 Cross-Motion for Partial Summary Judgment at 87.

3. Disputed. As this Court previously has found (in part on the basis of plaintiff's own representations), NatWest conducted business in the United States through six, separate U.S. branches. The six branches were (1) the New York Branch, (2) the IBF Branch, (3) the Nassau, Bahamas Branch, (4) the Cayman Islands Branch, (5) the Chicago Branch, and (6) the San Francisco Branch.

Since NatWest's tax liability would be higher if those branches continue to be considered as separate, NatWest has now embarked on a revisionist effort, in its current Motion for Summary Judgment and these Proposed Findings, to recharacterize its operations as

a single, combined U.S. Branch, operating through separate "offices." There was, in fact, no single combined U.S. Branch. See Defendant's Opposition to Plaintiff's Motion for Summary Judgment for numerous citations to the record indicating that there were six separate U.S. branches and no combined U.S. Branch or combined "U.S. branch operations" as plaintiff now proposes as a definition. See also Defendant's Responses to numerous Proposed Findings that follow.

Plaintiff does not define its use here of the term "international wholesale money center operations," and it is not known what particular meaning plaintiff intends in the context of this litigation. However, as their separate books and records indicate, and although they each had different kinds of operations and customers, the six branches engaged in transactions with counter parties outside the United States, they engaged in wholesale banking (meaning that their customers included large corporations and institutions, rather than individuals and small businesses), and they engaged in trading of various kinds of money market instruments.

4. Disputed. There were six, separate U.S. branches and no combined U.S. Branch or combined "U.S. branch operations." See Defendant's Response to Proposed Finding 3. The six branches engaged in a wide variety of transactions, involving varying levels of risk, different maturities, and different spreads. See selected books and records of the six branches reproduced by plaintiff as exhibits 28-42. In addition, as Dr. John Mingo discussed in his 2001 Report and 2002 Reply, the U.S. branches did not diversify their operations. As a result, the branches' operations involved substantial risk. In addition, the New York Branch, for example, made significant loans to lesser developed countries, such as Mexico, Argentina,

Brazil, Hungary, as well as a number of companies, well-known and not, that were encountering financial difficulties. Deft.'s Ex. 6 at INT534-008475; 8489-90; 008513-14; 008535-39; 00861-67. Plaintiff also does not identify a metric or definition of the terms it uses, and it therefore is difficult to assess which wholesale transactions it contends are "low risk" which have "narrow spreads" and what portion of the transactions at the six U.S. branches it contends involved low risk and narrow spreads.

5. Disputed. There were six, separate U.S. branches and no combined U.S. Branch or combined "U.S. branch operations." See Defendant's Response to Proposed Finding 3. As indicated above, the six U.S. branches made loans to a variety of customers, including less developed countries, and corporations of all sizes. Some of the branches' customers were smaller subsidiaries of large corporations. See Pltf.'s Exs. 28-42; Exhibit 15 to Deft.'s 2002 Cross-Motion for Partial Summary Judgment (Blessley Dep.) at 87-91. As a general proposition, the six U.S. branches entered into large numbers of interest-bearing transactions with large corporations for terms of less than one year.

6. Disputed. There were six, separate U.S. branches and no combined U.S. Branch or combined "U.S. branch operations." See Defendant's Response to Proposed Finding 3. The six U.S. branches were funded with deposits from both third parties and related parties, and with funds obtained in the course of money market trading, again with both third parties and related parties. See Deft.'s Ex. 4, Appendix. A portion of the funding from related parties should be treated as allotted capital in accordance with the Manual, which the Court in

November 2003 specified as the basis to resolve the capital issue. See Pltf.'s Exs. 28-42; Deft.'s Exs. 1-3.

7. Disputed. There were six, separate U.S. branches and no combined U.S. Branch or combined "U.S. branch operations." See Defendant's Response to Proposed Finding 3. In addition, there were no combined "New York operations"; four of the separate branches were located in New York. See the discussion and numerous record citations in defendant's Opposition to Plaintiff's Motion for Summary Judgment. In addition, there are no contemporaneous books and records that express the purpose of the money market trading by the six U.S. branches. The branches' money market operations have been variously described by plaintiff's expert, its own counsel in a document responding to the Court's order, and at least one former employee. See Pltf.'s Ex. 52; Deft.'s Ex. 7; Pltf.'s Ex. A.

8. Disputed. There were six, separate U.S. branches and no combined U.S. Branch or combined "U.S. operations." See Defendant's Response to Proposed Finding 3. Plaintiff's operations in the United States during the years at issue were composed of the six U.S. branches and also U.S. subsidiaries. All were separate operations, keeping separate books and records. There are no "aggregate" assets or turnover, because there are no combined books and records, either of the branches and subsidiary corporations or the six U.S. branches. Plaintiff does not define turnover or how it may be calculated. While the assets of each of the six U.S. branches are set forth on their separate balance sheets for the years at issue, the branches engaged in transactions with each other, which were recorded as assets and liabilities on their respective balance sheets. Plaintiff attempted to create consolidated balance sheets to reconcile and remove the transactions among the U.S. branches,

so as to present their aggregate assets. Defendant filed a motion *in limine* to exclude those balance sheets from evidence. Plaintiff subsequently advised the Court that it was no longer relying on its consolidated balance sheets and the motion was dismissed as moot. Finally, efforts to aggregate the branches, when they were, in fact, separate, is not material to the resolution of the arm's length interest issue. Neither is it material to the resolution of the capital issue, since plaintiff can't now ignore the separate books and record, and create hypothetical aggregated books, after it has successfully maintained throughout this litigation that the issues must be resolved based on the actual books and records, and actual operations of the branches (including related party transactions). It is inconsistent to now ignore a U.S. branch's transactions with another U.S. branch, as recorded on the books of both branches, while recognizing a U.S. branch's transactions with related parties outside the United States, likewise recorded on their respective books.

9. No dispute that NatWest's original returns report liabilities for the years 1981-1987 that total approximately $62 million (very little of which is for years other than 1985 and 1986) and that NatWest has met the jurisdictional requirement of full payment. Otherwise, as for payments, see Defendant's Response to Proposed Finding 157. If plaintiff's use of "aggregate" is intended to suggest that the six separate U.S. branches were subject to tax on an aggregate basis, defendant disputes such a claim. Plaintiff is liable for tax, not its branches in the United States. Moreover, plaintiff's tax return treats the six branches as separate for tax purposes, as the interest income and expense reported on plaintiff's returns included interest income and expense the U.S. branches separately recorded on their books on transactions with

each other. See Tr. 2/5/2001 Status Conf. at 46; Pltf.'s Proposed Findings 164, 165; Pltf.'s Exs. 28-42.

10. Disputed. There were six, separate U.S. branches and no combined U.S. Branch or combined "U.S. branch operations." See Defendant's Response to Proposed Finding 3. Individual branches made separate acquisitions of fixed assets. No contemporaneous documents exist to reflect aggregated U.S. branch operations or purchases of approximately $42 million in premises and equipment during the years at issue. The document that plaintiff cites to show approximately $42 million in fixed assets purchases was prepared by plaintiff's expert; it is not a contemporaneous business record. The contemporaneous business records are branch specific. The records are in some respects contradictory and do not support the calculations of plaintiff's expert. Deft's Ex. 3, Appendix.

11. Disputed. There were six, separate U.S. branches and no combined U.S. Branch or combined "U.S. branch operations." See Defendant's Response to Proposed Finding 3. Balances due to the head office with respect to fixed assets and capital loans were recorded on the balance sheets of the individual branches. Pltf.'s Exs. 28-42. Any reductions in the balances due to the head office likewise were recorded on each separate branch's books. No contemporaneous documents exist to reflect aggregated U.S. branch operations or repayments of approximately $12 million in balances due to the head office. See Deft.'s Ex. 3, Appendix, which addresses repayments by individual branches.

12. Disputed. There were six, separate U.S. branches and no combined U.S. Branch or combined "U.S. branch operations." See Defendant's Response to Proposed Finding 3. Branches are licensed separately by various jurisdictions and regulatory authorities.

Plaintiff has never produced any licensing documents and does not rely on any now for this Proposed Finding.

13. Disputed. Plaintiff has never produced a licensing document or other documentation to reflect the nomenclature and operating limitation of the San Francisco Branch. The contemporaneous books and records, and one of plaintiff's executives, refer to the San Francisco business operations as the "San Francisco Overseas Branch." See e.g., Pltf.'s Ex. 41; Ex. 3 to Deft.'s 1997 Cross Motion for Partial Summary Judgment, (Tatz Dep.) at 48. Plaintiff's declarant for this proposed finding, Mr. Walmsley, was assigned to New York during some of the years at issue, but was never assigned to the San Francisco branch. His Declaration does not show that he has personal knowledge of the licensing and regulatory limitations applicable to the San Francisco Branch. *See Celanese Corporation v. United States*, 9 Cl. Ct. 45 (1985). Since plaintiff had permanent facilities in San Francisco and conducted operations there that are reflected in its contemporaneous books and records, it also is not material whether, for bank regulatory purposes, the operation was referred to as a branch or an agency. Ex. 3 to Deft's 1997 Cross Motion for Partial Summary Judgment (Tatz Dep.) at 49-50. For tax purposes, it was a permanent establishment, subjecting plaintiff to tax under the U.S.-U.K. Income Tax Treaty. See Articles 5 and 7.

14. No dispute.

15. No dispute that the New York Branch was licensed by the State of New York to make loans and take deposits. Disputes the Proposed Finding to the extent it suggests that the New York Branch was the only branch located in New York. There were three other branches located there during the years at issue: (1) the IBF Branch, (2) (2) the Nassau,

Bahamas Branch, and (3) the Cayman Islands Branch. See Deft's response to Proposed Finding 3.

16. Disputed. The New York branch did not establish the IBF Branch. It was established by plaintiff NatWest. There were six separate U.S. branches, and each conducted different operations, under varying regulatory rules and with different local tax consequences. See Defendant's Response to Proposed Finding 3. Defendant does not dispute that the IBF Branch is a segregated set of books, but that also is true of the other five branches. Each branch kept separate books, although each was an integral part of NatWest and not actually a separate entity. The IBF Branch received New York state tax advantages and other benefits as a result of its separate existence. See e.g., Pltf.'s Ex. 52 at 8 n.9. The IBF branch is a separate branch for federal income tax purposes, one of six branches NatWest created and operated in the United States.

17. No dispute that NatWest managed and controlled the Nassau and Cayman Islands branches. All six of NatWest's separate branches reported to NatWest's Executive Offices of North America located in New York at the facilities also occupied by those two branches (as well as the New York and IBF branches). Defendant disputes the suggestion by plaintiff's reference in the Proposed Finding to "its New York office" that Nassau and Cayman Islands branches are not separate branches from the New York Branch.

18. Disputed. The employees who conducted the operations of the six U.S. branches were employees of Natwest, as the branches are not separate legal entities. Clearly, NatWest's employees conducted the activities of the IBF, Nassau, and Cayman Islands branches. The branches had separate traders, kept separate books and engaged in their

particular business operations. See e.g., Pltf.'s Ex. B ¶ 10; Deft.'s Ex. 8 (Payseur Dep.) at 27-32, 76; Tr. 2/5/2001 Status Conf. at 46-48. The properly allocable cost of those employees, however, was not recorded on their separate books and records. Deft.'s Ex. 3, Appendix. According to plaintiff's expert, Dr. Stigum, the IBF branch was exempt from New York State and City income taxes. Pltf.'s Ex. 52 at 8 n.9. Apparently, as a consequence, the cost of employees conducting the operations of the IBF, as well as the Nassau and Grand Cayman branches were recorded in their entirety on the books of the New York Branch, so that additional deductions could be taken by the New York Branch to minimize the state and local tax burden.

19. Disputed. The four branches located in New York kept separate books and records and reported separately to the head office in the United Kingdom. See e.g., Pltf.'s Exs. 28-42; Ex. 55 at 10-11, 23-24, 55; Deft.'s Ex. 9 at 30-31, 33, 38-39, 52; Deft.'s Ex. 10 (Walmsley Dep.) at 53. There were no combined books and records that reported the operations of the four branches located in New York as "a single unit." See Deft.'s Ex. 10 at 65. Operationally, the four branches had separate purposes and employees. Deft's Ex. 8 (Payseur Dep.) at 27-29; See deft's response to Proposed Finding 18.

20. No dispute.

21. Disputed. The IBF Branch was exempt from state and local taxes (See response to Proposed Finding 18), and the Nassau and Grand Cayman branches apparently also owed no state and local taxes (See Pltf.'s Exs. 28-32). As a result, NatWest's incentive was to allocate the overhead of the three tax-free branches to the New York branch, where it could reduce the state and local tax liabilities imposed on the activities of the New York

branch. Plaintiff is now seeking to ignore that it created separate branches in New York for state and local tax advantages, and for regulatory benefits, by claiming that they were actually only a single branch for federal income tax purposes alone.

22. No dispute. However, defendant does dispute any suggestion in this Proposed Finding that the IBF, Nassau, and Grand Cayman branches did not utilize fixed assets in the course of their operations. Their operations could not have been conducted without fixed assets. The books of the four branches in New York, allocating the use of fixed assets located their entirely to the New York Branch, and not at all to the IBF, Nassau, and Grand Cayman branches does not reflect economic reality or arm's length dealing. Plaintiff evidently recorded fixed assets as it did to obtain state and local tax advantages. Defendant's Exs. 1, 3, Deft.'s Ex. 3, Appendix; See Defendant's Responses to Proposed Findings 18 and 21.

23. Disputed. There were no combined "New York branch operations." There were four separate branches in New York: (1) the New York Branch, (2) the IBF Branch, (3) the Nassau Bahamas Branch, and (4) the Grand Cayman Islands Branch. See e.g., Defendant's Responses to Proposed Findings 19 and 22.

24. Disputed. Defendant's Ex. 3, Appendix.

25. Disputed. The credit limits for all six separate U.S. branches were determined centrally in the Executive Office North America in New York, not by the New York branch. Deft.'s Ex. 11 at INT 534-008542 and INT 534-001389, INT 534-001396, See Exhibit 15 to Deft.'s 2002 Cross-Motion for Partial Summary Judgment (Tugwell Dep.) at 29.

26. Generally correct, but defendant clarifies that the squaring of the four branches involved a branch with a shortage of funds borrowing from one of the other branches in New

York that had excess funds. Deft.'s Ex. 8 (Payseur Dep.) at 77-78. The borrowing and lending among the four branches in New York was recorded on their separate books and records. Disputes any suggestion that the squaring indicates there was only one branch in New York.

27. Disputed. The treasury desk was the responsibility of NatWest's North American Treasurer. See Response to Proposed Finding 26. The treasury desk was not overseeing only the New York branches, and was not conducted within the New York branch or a combined New York branch. There were four separate branches in New York and six in the United States. No dispute as to money market and foreign exchange functions of treasury desk.

28. Disputed. Each of the four separate branches in New York had its own traders, and each had a specialized role. The four branches kept separate books and records of the trading by their respective traders. The four branches also engaged in money market trading with each other. Tr. 2/5/2001 Status Conf. at 46; Deft.'s Ex. 12 (Pltf.'s 1/31/2001 Description of the Operation of NatWest's U.S. Money Market Desks 1981-1987); Deft.'s Ex. 8 (Payseur Dep.) at 77-78. There was no combined New York branch, as plaintiff implies by its use of the term "New York office." Otherwise, no dispute that traders were centrally managed in New York.

29. No dispute as to approximate number of traders in New York. Dispute to the extent that plaintiff is suggesting that individual traders engaged in trades on behalf of multiple branches. Each branch had its own traders. See Defendant's Response to Proposed Finding 28.

30. Object to the use of the phrase “activity engaged in by the New York operations.” There were four separate branches in New York, and they each engaged in specific kinds of activities. Dispute the Proposed Finding to the extent it suggests or implies that a trader engaged in repo activities on behalf of multiple branches. See Responses to Proposed Findings 28 and 29. When the Court ordered informal discovery in the summer of 2004, defendant inquired about repo activities. Plaintiff represented that all repo activities were engaged in with third parties and were not relevant to the case. For that reason, plaintiff declined to provide information defendant had requested. Defendant therefore objects to this Proposed Finding on the ground that it does not propose a fact that is material.

31. See Defendant’s Responses to Proposed Findings 27-30.

32. See Defendant’s Responses to Proposed Findings 7 and 27-30.

33. Disputed. Deft.’s Ex. 3, Appendix.

34. Disputed. Exhibit 17 to Deft.’s 2002 Cross-Motion for Partial Summary Judgment (Scott Dep.) at 94-97. The six branches kept their books separately, engaged in transactions with each other that were reported on their separate books, and reported separately to the head office in the United Kingdom. Pltf.’s Exs. 28-32. No consolidated books and records or financial reports of the four branches in New York were ever prepared.

35. No dispute, but clarifies that in response to defendant’s Interrogatory 5.24, plaintiff stated that the branch manager for the New York, Nassau. IBF, and Grand Cayman branches reported to the Regional Managing Director in New York. Plaintiff continued, explaining that the Regional Managing Director reported to the General Manager of the

International Banking Division (in London). Plaintiff also stated that each branch had a branch manager who was in charge of the daily operations of the branch.

36. No dispute, but clarifies that the Treasurer in New York was assigned to NatWest's Executive Office North America, not the New York Branch, and he had responsibility for all treasury activities in North America, including Canada. Deft.'s Ex. 11 at INT524-000001 to 000111; Exhibit 16 to Deft.'s 2002 Cross-Motion for Partial Summary Judgment at 105-106.

37. Object to the Proposed Finding to the extent it inquires as to a matter of law, not fact. Subject to that objection, defendant states as follows: Under U.S. federal income tax law, and the U.S.-U.K. Income Tax Treaty, plaintiff NatWest, the U.K. company, was liable for tax in the United States and was required to file a tax return reporting its liability. Since NatWest is one corporation, it naturally files one income tax return for each tax period. U.S. federal income tax law, and the U.S.-U.K. Income Tax Treaty do not impose taxes on a branch/permanent establishment, or any office or facility of NatWest, since none is a separate entity. None of plaintiff's six U.S. branches was required to file a return and none was subject to tax as a unique taxpayer. There were no unified "U.S. branch operations" – there were, as a factual matter, six separate U.S. branches. They each kept separate books and records, and they entered into transactions with each other that were recorded on their books and used to compute profit and loss statements and balance sheets. There are no contemporaneous books and records that reconciled the transactions among the six branches and combined their financial results into a single, consolidated U.S. branch. As a factual matter, plaintiff's tax

returns treated the branches as separate, since the interest income and expense reported on the returns included income and expense on transactions with each other.

38. Disputed. The six branches were separate and therefore kept separate books and records. See Defendant's Response to Proposed Finding 3; Deft.'s Ex. 3, Appendix; Pltf.'s Ex. 54, ¶ 13.

39. Disputed. Deft.'s Ex. 3, Appendix.

40. Disputed. Deft.'s Ex. 3, Appendix. In addition, there were no controls to ensure that the books and records of the six U.S. branches recorded any of the capital that must be recognized for tax purposes under the U.S.–U.K. Income Tax Treaty. In fact, no such capital was recorded on any of the books and records of the six U.S. branches. Pltf.'s Exs. 35-42..

41. No dispute, except defendant's continuing dispute with plaintiff's use of the term U.S. branch operations to suggest a single, unified U.S. branch. There were six, separate U.S. branches and no combined U.S. Branch or combined "U.S. branch operations." See Defendant's Response to Proposed Finding 3. Deft.'s Ex. 3, Appendix.

42. No dispute. However, as clarification, not all mistakes were caught by the daily procedures. As plaintiff's expert, Robert Bench acknowledged, it is commonplace for interbranch transactions to be recorded inconsistently, requiring subsequent correction. Pltf.'s Ex. 54 ¶¶ 5, 12. Additional abbreviated searches for error were conducted in preparation of the branches' periodic reports under the "quick close." More extensive error checking was conducted in the course of reconciliations performed in the United Kingdom (by an office devoted to that purpose). Plaintiff has not produced any documents reflecting the

reconciliations in the United Kingdom. Deft.'s Ex. 4, Appendix. There were no procedures regarding recording capital of any of the six U.S. branches. Defendant's Response to Proposed Finding 40.

43. Disputes plaintiff's reference to "U.S. operations" to the extent it is suggesting there was a single, unified U.S. Branch, rather than six separate U.S. branches. See Defendant's Response to Proposed Finding 3. Otherwise, no dispute that plaintiff performed ongoing corrections of errors in the branches' books, but clarifies that none of the documents plaintiff is relying on in this litigation reflect the corrections made by its reconciliation office in the United Kingdom. See Defendant's Response to Proposed Finding 42.

44. No dispute.

45. Dispute the connection plaintiff is suggesting between its reconciliation procedures and the books and records it is actually relying on in this case. As indicated in response to Proposed Findings 40-43, none of the books and records plaintiff is relying upon reflect the corrections made by its reconciliation office in the United Kingdom. Moreover, there were no controls to ensure that the books and records of the six U.S. branches recorded any of the capital that must be recognized for tax purposes under the U.S.–U.K. Income Tax Treaty. That is, there were no procedures addressing the accuracy of that which is at issue in this case. In fact, no such capital was recorded on any of the books and records of the six U.S. branches. Pltf.'s Exs. 35-42. See Deft.'s Ex. 3, Appendix and Ex. 4, Appendix.

46. No dispute, except the reference to "detailed internal verification procedures." Plaintiff has produced no contemporaneous documents describing such verification procedures. Moreover, plaintiff does not specify which profit and loss statements and balance sheets it is

referring to. If it is referring to the reports that are generated automatically by the computer, they contain admitted errors that required further reconciliation. If plaintiff is referring to the subsequent handwritten balance sheets and profit and loss statements prepared under the quick close before a detailed analysis could be performed, errors remained to be found by the reconciliation office in the U.K. See e.g., Deft.'s Ex. 9 (Samaroo Dep.) at 30-31, 33, 38-39, 41-42, 52, 80. None of the documentation prepared by the reconciliation office in the U.K. has been produced in this case. Moreover, there were no verification procedures to ensure that the books and records of the six U.S. branches recorded any of the capital that must be recognized for tax purposes under the U.S.–U.K. Income Tax Treaty. That is, there were no procedures addressing the accuracy of that which is at issue in this case. In fact, no such capital was recorded on any of the books and records of the six U.S. branches. Pltf.'s Exs. 35-42. See Deft.'s Ex. 3, Appendix.

47. No dispute, but as clarification, despite the certification, plaintiff's employee, Harrylall Samaroo, admitted that the reports were prepared under a very short deadline after the close of a period, before a detailed analysis could be performed, and errors remained. See Defendant's Response to Proposed Finding 46.

48. Plaintiff asserts this matter for the first time in this litigation in this Proposed Finding. Plaintiff offers no contemporaneous document to support its claim. Instead, it relies solely on the newly created Declaration of Roger Walmsley. Mr. Walmsley did not so testify at his deposition early this year, although plaintiff's counsel directed questions to him. Defendant objects to this Proposed Finding on this basis and because it is immaterial. Plaintiff is not claiming that any such checks, if they took place, included determining whether the branches'

books reflected and recorded capital necessary for tax purposes under the U.S.-U.K. Income Tax Treaty. If the Court wishes to give this Proposed Finding any consideration, defendant requests discovery pursuant to RCFC 56(f).

49. Disputed. Deft.'s Ex. 11.

50. Objection, plaintiff does not cite any statement by the Bank of England as support for this Proposed Finding. Instead, plaintiff relies on its declarant, a retired employee, who attributes this view to the Bank of England. The statement is inadmissible hearsay. Plaintiff's declarant does even assert that he has personal knowledge of this matter, much less show that he has personal knowledge. *Celanese Corporation. v. United States*, 9 Cl. Ct. 45 (1985). Subject to these objections, defendant disputes the Proposed Finding. The statement in Mr. Walmsley's Declaration is far more limited than plaintiff's Proposed Finding and says nothing about the Bank of England's view regarding the internal controls of the U.S. branches or with respect to any transactions other than foreign exchange (which is not even at issue in this case) and money market transactions.

51. No dispute that NatWest's U.S. federal income tax returns reported taxable income based on the separate books and records of its six U.S. branches, which were kept in the ordinary course of their respective businesses. As discussed above, the tax return treated those six branches as separate. Defendant disputes that the tax return reflects a combined or unified U.S. Branch, as plaintiff suggests by its reference to "U.S. branch operations." See Defendant's Response to Proposed Finding 3.

52. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2)

to address matters bearing on tax computations only after the Court has determined the substantive issues. Subject to that objection, no dispute that the schedules M-1 on the tax returns purport to link the books of the six U.S. branches to taxable income. Disputes reference to U.S. branch operations. See Defendant's Response to Proposed Findings 3 and 51.

53. No dispute.

54. No dispute that transactions with third parties reflect arm's length rates. Whether "most" money market trades were with third parties is not a material fact and defendant therefore objects to the Proposed Finding to that extent. Undisputably, the six U.S. branches engaged in many money market trades with third parties and many money market trades with related parties, including each other. Whether most were third party trades does not affect whether the related party trades were at arm's length. Subject to its objection, defendant disputes whether "most" money market trades were with third parties, as the source documents, such as M262s do not total trades, much less subtotal them according to whether they were with related or third parties. As plaintiff's employee, Harrylall Samaroo, represented to defendant in August 2004 during an informal interview at plaintiff's counsel's offices, there is no way, other than individually counting many thousands of trades, to total the number of money market trades or determine the relative proportions of third party and related party trading.

55. See Defendant's Response to Proposed Finding 54.

56. Disputed. The cited Declaration stands for a slightly different proposition. The money market transactions of the U.S. branches were conducted either directly with third

parties or with related parties, as a result of a dollar transaction between the related party and its own third party customer.

57. Disputed. Deft.'s Ex. 4 and Appendix.

58. Disputed. Deft.'s Ex. 4, Appendix.

59. Objection. Dr. Clair's report and affidavit are exhibits to plaintiff's Motion for Summary Judgment. Likewise, Dr. Read's report has been filed with the Court, and his Declaration is an exhibit to defendant's Opposition to Plaintiff's Motion for Summary Judgment. The contents of these exhibits are a matter of record. While plaintiff may wish to emphasize certain aspects of its experts' reports and defendant's experts' reports, in an effort to increase the weight of the former and diminish the weight of the latter, it is inappropriate to attempt to do so through Proposed Findings of Uncontroverted Fact and in the context of summary judgment proceedings. Dr. Clair's conclusions are set forth in his report and affidavit, and Dr. Read's conclusions and responses to Dr. Clair are contained in his report and declaration. The analysis and opinions they express are what they are, as reflected in those documents, and they constitute the evidence before the Court. Exploring and emphasizing the particulars of that evidence is a matter for direct and cross examination at trial, not proposed findings and summary judgment.

60. Objection. See Defendant's Response to Proposed Finding 59.

61. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 4, Appendix.

62. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 4, Appendix.

63. Objection. See Defendant's Response to Proposed Finding 59.

64. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 4, Appendix.

65. Disputes that any settlement discussions relating to the arm's length interest issue were taking place at that time or that plaintiff's communications were in any way confidential. Plaintiff ignores that defendant wrote to plaintiff on January 11, 2001, advising it to cease stamping its letters as confidential, since the parties were not engaged in settlement discussions of the arm's length interest rate issue. A copy of that letter is attached as Exhibit 14 to Defendant's Opposition to Plaintiff's Motion for Summary Judgment. The September 19, 2000, letter was not part of any settlement discussion. Plaintiff does not attach its letter and the schedules as an exhibit, as they would make it clear that (1) no settlement discussions were ongoing and (2) that plaintiff was submitting certain evidence to convince defendant that related party lending was at arm's length, but that such evidence is not now before the Court, since plaintiff has abandoned it. The September 19, 2000, letter (attached as defendant's Exhibit 15), in fact, was the product of the Court's June 8, 2000 Order, directing plaintiff to submit to defendant summaries of its evidence on the capital and arm's length interest issues. As the Court's order also contemplated an agreement of the parties regarding the format of the summaries, the parties had met to discuss them on September 7, 2000. Plaintiff's September 19, 2000, letter followed up on that meeting and submitted schedules it wished defendant to consider and then discuss at a subsequent meeting held on September 21, 2000. The meetings were reported on by the parties to the Court in a Joint Status Report, filed on October 9, 2000. Contrary to the suggestion in plaintiff's Motion for Summary Judgment (at 16) and this

Proposed Finding, nothing about the September 19, 2000, letter and attached schedules was confidential. It was entirely proper for defendant to submit that information to its experts for their evaluation, particularly since plaintiff appeared to be relying on it until plaintiff silently abandoned it when it filed the pending motion for summary judgment.

66. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 4, Appendix.

67. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 4, Appendix. Defendant also states that plaintiff has throughout this litigation emphasized that the related party transactions recorded on its branch books and records must be respected. It is inconsistent for plaintiff to argue that the recorded transactions with related parties across the Atlantic must be treated as real, while the recorded transactions with related parties within the United States should be ignored.

68. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 4, Appendix.

69. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 4, Appendix.

70. Objection. See Defendant's Response to Proposed Finding 59. See Deft.'s Ex. 4, Appendix.

71. Disputed. See Deft.'s Ex. 4, Appendix.

72. No dispute.

73. No dispute.

74. Disputed. See Deft.'s Ex. 4, Appendix.

75. See Deft.'s Ex. 4, Appendix.

76. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 4, Appendix.

77. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 4, Appendix.

78. No dispute.

79. Disputed. Interest was not paid to the Bank of England and National Bank of Dubai on their clearing account balances. Doing so would have violated a banking regulation. The balances in those clearing accounts were swept and then separately invested and paid interest through cash management. See Deft.'s Ex. 4.

80. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 4, Appendix.

81. Objection. See Defendant's Response to Proposed Finding 59. Disputed. See Deft.'s Ex. 4, Appendix.

82. Objection. See Defendant's Response to Proposed Finding 59. See Deft.'s Ex. 4, Appendix.

83. Objection. Plaintiff has not produced the contemporaneous documents underlying the schedule that its asks defendant to admit is accurate. See Deft.'s Ex. 4, Appendix.

84. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 4, Appendix.

85. Objection. See Defendant's Response to Proposed Finding 59.

86. No dispute.

87. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 4, Appendix and Defendant's Response to Proposed Finding 79.

88. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 4, Appendix.

89. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 4, Appendix.

90. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 4, Appendix.

91. No dispute.

92. No dispute.

93. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 4, Appendix.

94. Disputed. See Deft.'s Ex. 4, Appendix.

95. Disputed. Deft.'s Ex. 3, Appendix. See also Deft.'s Ex. 8 at 65-78; Defendant's 1997 Cross Motion for Partial Summary Judgment, Ex. 3 at 81-85.

96. Disputed. Deft.'s Ex. 3, Appendix.

97. Disputed. Deft.'s Ex. 3, Appendix.

98. No dispute.

99. Disputed. Deft.'s Ex. 3, Appendix.

100. Disputed. Deft.'s Ex. 3, Appendix.

101. Object to the Proposed Finding on the ground that the "combined amount" is not a material fact. There were six separate U.S. branches that kept separate books and records that were never combined or consolidated. A "combined amount" reflects an effort to consider a hypothetical combined U.S. Branch that did not, in fact, exist. See Defendant's Response to Proposed Finding 3. What is material with respect to Balances due Head Office re Capital Loan and Balance due Head Office re Fixed Assets is the amounts recorded by each branch, how those balances were determined and how they relate, if at all, to each branch's purchases of fixed assets and each branch's infusion of initial working capital, funds to cover losses, and the repatriation of retained earnings. Plaintiff has not made the documents available to fully address those material questions. See Deft.'s Ex. 3, Appendix.

102. Objection. The Proposed Finding does not propose a fact that is material. The Inland Revenue Banking Manual makes no inquiry regarding net cash flow. See e.g., Deft.'s Ex. 1-3. In addition, plaintiff's effort to aggregate the financial position of the six separate U.S. branches into a hypothetical, consolidated U.S. Branch is not a material inquiry in this case, as there was not, in fact, a combined or consolidated U.S. Branch. See Defendant's Response to Proposed Finding 3. Subject to that objection, disputed. Deft.'s Ex. 3, Appendix.

103. Objection. The Proposed Finding does not propose a fact that is material. Plaintiff's reference to "U.S. branch operations" represents an effort to aggregate the financial position of the six separate U.S. branches into a hypothetical, consolidated U.S. Branch that did not, in fact, exist. See Defendant's Response to Proposed Finding 3. Whether any of the six U.S. branches *sought* funding from the head office for operating expenses or capital

expenditures is not material; it attempts to divert attention away from what is material–whether any of the six U.S. branches *obtained* funding from the head office that may be treated as allotted capital under the Inland Revenue Banking Manual. As to that material question, see Deft.'s Exs. 1-3. Subject to that objection, disputed. None of the contemporaneous business records that plaintiff has produced address this question.

104. Objection. The Proposed Finding does not propose a fact that is material. Under the Inland Revenue Banking Manual, amounts treated as allotted capital of a branch presumptively include the amount of its fixed assets purchases; it is a bank's burden to prove otherwise by actually tracing other funds used to purchase the fixed assets. Thus, even if a branch had other funds that *might* have been used to purchase fixed assets, but also could have been used to fund interest bearing loans or for other purposes, proposing such a fact does not constitute a tracing of funds used to acquire fixed assets and overcome the presumption. See Deft.'s Exs. 1-3. See also Deft.'s Ex. 3, Appendix.

105. Objection. The Proposed Finding does not propose a fact that is material. See Defendant's Response to Proposed Finding 104. Subject to that objection, disputed. There were six separate U.S. branches. Four of those branches were located in New York. There were no combined "New York branch operations (including the New York branch, the IBF, and the Nassau and Cayman branches)." See Defendant's Response to Proposed Finding 3. Positing a hypothetical combined New York branch and hypothetical combined books to offer conclusions regarding the sufficiency of interest-free funds to acquired fixed asset purchases on a combined basis ignores the separateness of the branches and their books and records. Subject to that objection, disputed. See Deft.'s Ex. 3, Appendix.

106. Objection. See Defendant's Response to Proposed Finding 104. Subject to that objection, disputed. See Defendant's Response to Proposed Finding 105 and Deft.'s Ex. 3, Appendix.

107. Objection. See Defendant's Response to Proposed Finding 104. Subject to that objection, disputed. See Defendant's Response to Proposed Finding 105 and Deft.'s Ex. 3, Appendix.

108. Objection. See Defendant's Response to Proposed Finding 104. Subject to that objection, disputed. See Defendant's Response to Proposed Finding 105 and Deft.'s Ex. 3, Appendix.

109. Objection. See Defendant's Response to Proposed Finding 104. Subject to that objection, disputed. See Deft.'s Ex. 3, Appendix.

110. Disputed. See Deft.'s Exs. 1-3; Deft.'s Ex. 3, Appendix.

111. Disputed. See Defendant's Response to Proposed Finding 110.

112. Disputed. See Defendant's Response to Proposed Finding 110.

113. Object to the phrase "U.S. branch operations" as an effort to posit a hypothetical, combined U.S. Branch that did not, in fact, exist. There were six separate U.S. branches. See Defendant's Response to Proposed Finding 3. The payment of interest by reference to Retained Profits or Accumulated Losses, Profit and Loss, Balance due to HO re Capital Loan, and Balance due to HO re Fixed Asset and the current balance of premises and equipment was determined on a branch-by-branch, not a combined basis. There was no consistent policy applied either among the branches, or by a particular branch, year-by-year.

See Pltf.'s Exs. 28-42; Exhibit 3 to Defendant's 1997 Cross Motion for Partial Summary Judgment (Tatz Dep. 10/8/96) at 81-85.

114. Disputed. The books of the six U.S. branches do not identify any amount as capital. Therefore, there is no "allotted" capital to the branches, as that term is defined in the Inland Revenue Banking Manual. Plaintiff has not attempted to identify "amounts treated as allotted capital" in accordance with the Manual, but has assumed a level of branch capital that is plainly insufficient under the Manual. See Deft.'s Exs. 1-3. Therefore, the books and records of the six U.S. branches do no clearly identify interest on capital. Also disputes that interest on the (inadequate) amounts plaintiff has assumed constitute branch capital are clearly identified on its books. See Deft.'s Ex. 3, Appendix; see also Proposed Findings 115-117.

115. Disputed. See Defendant's Response to Proposed Finding 114. See Deft.'s Ex. 3, Appendix.

116. Disputed. See Defendant's Response to Proposed Finding 114. See Deft.'s Ex. 3, Appendix.

117. Disputed. See Defendant's Response to Proposed Finding 114. See Deft.'s Ex. 3, Appendix.

118. No dispute that plaintiff's federal income tax returns for the years at issue claimed as interest expense the amounts shown on plaintiff's chart, and more. Otherwise disputes that the chart is accurate. See Deft.'s Ex. 3, Appendix.

119. Disputed. See Defendant's Response to Proposed Finding 114. See Deft.'s Ex. 3, Appendix.

120. Disputed. See Defendant's Response to Proposed Findings 114 and 118. See Deft.'s Ex. 3, Appendix.

121. Objection. The Proposed Finding does not propose a material fact. The Inland Revenue Banking Manual specifies that the determination of free working capital is made on the basis of the greater of "allotted" capital and "amounts treated as allotted capital." It does not make an inquiry or contain the phrase "amount designated or in fact allotted as capital." Disputes that plaintiff has properly determined free working capital under the Inland Revenue Banking Manual or identified all the interest it has deducted on such free working capital. See Deft.'s Exs. 1-3; See Deft.'s Ex. 3, Appendix.

122. No dispute that plaintiff has conceded the amounts specified in Proposed Finding 118, but disputes that such amounts constitute the interest on free working capital in accordance with the Inland Revenue Banking Manual. See Deft.'s Exs. 1-3; Deft.'s Ex. 3, Appendix; Defendant's Response to Proposed Finding 121.

123. Disputed. See Defendant's Response to Proposed Finding 114. See Deft.'s Ex. 3, Appendix.

124. Disputed. See Defendant's Response to Proposed Finding 114. See Deft.'s Ex. 3, Appendix.

125. Disputed. See Defendant's Response to Proposed Finding 114. See Deft.'s Ex. 3, Appendix.

126. Disputed. See Defendant's Response to Proposed Finding 114. See Deft.'s Ex. 3, Appendix.

127. Disputed. See Defendant's Response to Proposed Findings 114 and 121. See Deft.'s Ex. 3, Appendix.

128. Disputed. See Defendant's Response to Proposed Findings 114, 121, and 127.

129. Disputed. See Defendant's Response to Proposed Findings 114, 121, 127, and 128.

130. Disputed. See Deft.'s Ex. 3, Appendix.

131. Disputed. See Deft.'s Ex. 3, Appendix.

132. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 3, Appendix.

133. Objection. See Defendant's Response to Proposed Finding 59. Subject to that objection, disputed. See Deft.'s Ex. 3, Appendix.

134. Disputed. See Deft.'s Exs. 1-4; Deft.'s Ex. 3, Appendix. Also there was no U.S. Branch. See Defendant's Response to Proposed Finding 3.

135. Disputed. See Deft.'s Ex. 3, Appendix.

136. Disputed. There was no U.S. Branch, and there were no profit and loss statements of a U.S. Branch. There were six separate U.S. branches and they each kept separate books and records which recorded their transactions, including transactions with each other. See Defendant's Response to Proposed Finding 3. See also Deft.'s Ex. 3, Appendix.

137. Disputed. There was no U.S. Branch, and there were no "constituent offices" of such a U.S. Branch. See Defendant's Response to Proposed Findings 3 and 136. See also Deft.'s Ex. 3, Appendix. In addition, plaintiff relies on an inadmissible document to support its

Proposed Finding. Plaintiff's "Revised Refund Claim" is not a refund claim filed with the Internal Revenue Service. Rather is a document prepared by plaintiff's attorneys in response to an order of the Court and is solely a statement of plaintiff's position in this litigation.

138. Disputed. There was no U.S. Branch, and there were no profit and loss statements of a U.S. Branch. See Defendant's Response to Proposed Findings 3 and 136. See also Deft.'s Ex. 3, Appendix.

139. Disputed. There was no U.S. Branch, and there were no profit and loss statements of a U.S. Branch. There were no "constituent offices of such a U.S. Branch." See Defendant's Response to Proposed Findings 3, 136, and 137. See also Deft.'s Ex. 3, Appendix.

140. No dispute.

141. Disputed. Plaintiff's reference to U.S. branch operations reflects an effort to posit a combined U.S. Branch which did not, in fact, exist. See Defendant's Response to Proposed Findings 3 and 135; see Deft.'s Ex. 3, Appendix.

142. See Defendant's Response to Proposed Finding 141.

143. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, No dispute. See Deft.'s Ex. 5, ¶ 12A.

144. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2)

to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, No dispute. See Deft.'s Ex. 5, ¶ 12A.

145. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, no dispute. See Deft.'s Ex. 5, ¶ 12A.

146. No dispute.

147. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, no dispute. See Deft.'s Ex. 5, ¶ 12B.

148. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. Subject to that objection, no dispute. See Deft.'s Ex. 5, ¶ 12B.

149. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the

substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, no dispute. See Deft.'s Ex. 5, ¶ 12B.

150. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, no dispute. See Deft.'s Ex. 5, ¶ 12B.

151. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, no dispute. See Deft.'s Ex. 5, ¶ 12B.

152. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, no dispute. See Deft.'s Ex. 5, ¶ 12B.

153. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, no dispute. See Deft.'s Ex. 5, ¶ 12B.

154. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, no dispute. See Deft.'s Ex. 5, ¶ 12B.

155. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, disputed. See Deft.'s Ex. 5, ¶ 12C.

156. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, no dispute. See Deft.'s Ex. 5, ¶ 12D.

157. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, disputed. See Deft.'s Ex. 5, ¶ 12E.

158. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2)

to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, disputed. There was no U.S. Branch, and no U.S. Branch paid interest to the Internal Revenue Service. Plaintiff, not a branch, is the taxpayer subject to tax and interest in the United States. See also Deft.'s Ex. 5, ¶ 12F

159. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, no dispute.

160. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, no dispute.

161. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, no dispute.

162. No dispute.

163. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, defendant reserves its right to appeal the Court's final judgment.

164. No dispute.

165. No dispute.

166. Objection. Plaintiff's proposed finding does not propose a fact that is material. Plaintiff, throughout this litigation has claimed that the books and records of its U.S. branches are reliable and represent real transactions which should be respected, including transactions with affiliates. It is inconsistent to now propose to disregard those affiliated transactions that a U.S. branch entered into with another U.S. branch, but not those with an affiliate in another country. Subject to that objection, disputed. There is no U.S. Branch; there were six separate U.S. branches. See Defendant's Response to Proposed Finding 3. Plaintiff is attempting to create a hypothetical U.S. branch, which did not, in fact, exist, and is attempting to create hypothetical books of such a branch, eliminating transactions among the six U.S. branches that were recorded on their existing and actual books and records. See also Deft.'s Ex. 3, Appendix.

167. Objection. The "Revised Refund Claim" is not an admissible document and therefore can't support a finding of fact. See Defendant's Response to Proposed Finding 137. Further objection, plaintiff is attempting to create a hypothetical set of books for a consolidated U.S. Branch that did not exist. See Defendant's Responses to Proposed Findings 3 and 166.

In addition, plaintiff withdrew its reliance on the consolidated balance sheets its attorneys created for this litigation.

168. Disputed. See Defendant's Response to Proposed Finding 123, which is the identical Proposed Finding.

169. Disputed. See Deft.'s Exs. 1-3.

170. Disputed. See Defendant's Response to Proposed Finding 124, which is the identical Proposed Finding.

171. Dispute that there was a combined U.S. branch or that there were balance sheets of a combined U.S. branch. See Defendant's Response to Proposed Finding 3; Pltf.'s Exs. 35-42. Defendant does not dispute that those line items on the balance should of each of the six U.S. branches should constitute and record the fixed assets used by each of those branches.

172. Disputed. See Deft.'s Exs. 1-3.

173. Disputed. See Defendant's Response to Proposed Finding 10, which is the identical Proposed Finding.

174. Disputed. There was no combined U.S. branch operation, and there were no balance sheets of such an aggregated U.S. branch operation. See Defendant's Response to Proposed Finding 3; Deft.'s Exs. 1-3; Deft.'s Ex. 3, Appendix; Pltf.'s Exs. 35-42.

175. Disputed. See Defendant's Response to Proposed Finding 174; Deft.'s Exs. 1-3; Deft.'s Ex. 3, Appendix.

176. Disputed. There were no combined U.S. branch operations. See Defendant's Response to Proposed Finding 3. Disputes that the individual branches did not transfer or repatriate earnings to the head office. See Deft.'s Ex. 3, Appendix.

177. Disputed. There was no combined U.S. branch operation, and there were no balance sheets of such an aggregated U.S. branch operation. See Defendant's Response to Proposed Finding 3; Deft.'s Exs. 1-3; Deft.'s Ex. 3, Appendix; Pltf.'s Exs. 35-42..

178. Disputed. There was no combined U.S. branch operation, and there were no balance sheets of such an aggregated U.S. branch operation. See Defendant's Response to Proposed Finding 3; Deft.'s Exs. 1-3; Deft.'s Ex. 3, Appendix; Pltf.'s Exs. 35-42.

179. Disputed. Deft.'s Ex. 3, Appendix.

180. Disputed. Deft.'s Ex. 3, Appendix.

181. Disputed. There was no combined U.S. branch operation, and there were no balance sheets of such an aggregated U.S. branch operation. See Defendant's Response to Proposed Finding 3; Deft.'s Exs. 1-3; Deft.'s Ex. 3, Appendix; Pltf.'s Exs. 35-42.

182. Disputed. Deft..s Ex. 3, Appendix.

183. Disputed. There was no combined U.S. branch operation, and there were no balance sheets of such an aggregated U.S. branch operation. See Defendant's Response to Proposed Finding 3; Deft.'s Exs. 1-3; Deft.'s Ex. 3, Appendix; Pltf.'s Exs. 35-42.

184. Objection. See Defendant's Responses to Proposed Findings 3 and 121. Disputed. Deft.'s Exs. 1-3, Deft.'s Ex. 3, Appendix.

185. Disputed. Deft.'s Ex. 4 and Appendix.

186. Disputed. Deft.'s Ex. 4 and Appendix.

187. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, disputed. Deft.'s Ex. 1-4.

188. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, and to Defendant's Response to Proposed Finding 187, no dispute.

189. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, no dispute.

190. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, disputed. Deft.'s Exs.1-5.

191. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2)

to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, disputed. Deft.'s Exs. 1-5.

192. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, no dispute.

193. Objection, plaintiff's Proposed Finding violates its agreement with defendant and its representation to the Court set forth in the parties' Joint Preliminary Status Report (at 2) to address matters bearing on tax computations only after the Court has determined the substantive issues. See also Defendant's Response to Proposed Finding 52. Subject to that objection, disputed. Deft.'s Exs. 1-5.

Respectfully submitted,

s/Steven I. Frahm
STEVEN I. FRAHM
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6504

EILEEN J. O'CONNOR
Assistant Attorney General
MILDRED L. SEIDMAN
Chief, Court of Federal Claims Section

July 22, 2005