IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 95-758T
(Judge Nancy B. Firestone)

NATIONAL WESTMINSTER BANK PLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

SUPPLEMENTAL AFFIDAVIT OF ROBERT T. CLAIR, Ph.D.

I, ROBERT T. CLAIR, Ph.D. do solemnly swear that the following facts are true to the best of my knowledge and belief:

## Overview

1. KPMG LLP ("KPMG") has been engaged by The Royal Bank of Scotland on behalf of National Westminster Bank PLC ("NatWest") in connection with the case, National Westminster Bank PLC v. the United States, No. 95-758T (Judge Firestone), in the United States Court of Federal Claims ("NatWest Case"). The NatWest Case concerns the dispute between the United States ("US") government and NatWest over whether some part of the interest expense of NatWest's US branches ("NatWest US Branches") during the tax years 1981 through 1987 ("Tax Years") should be disallowed.

2. My report, *Report of Robert T. Clair on the Arm's-Length Nature of National Westminster Bank PLC's Money Market Transactions*, dated March 4, 2005 ("my March 4 report") focused on the issue as to whether the money market transactions conducted between NatWest US Branches and non-US branches or affiliates were conducted at interest rates or yields that would meet the arm's-length standard.

3. In that report I concluded that there is no evidence that interest rates paid for deposits or received on loans or placements by NatWest US Branches during the Tax Years were other than arm's-length. My conclusion was based on an examination of money market transactions of NatWest US Branches for a sample of 21 randomly selected days from the Tax Years.

4. In the report *The Expert Report of James Read on the Interest Rate Issue* ("Read Expert Report") prepared by the Government's expert James Read, dated March 4, 2005, Mr. Read examined some of the money market transactions of NatWest US Branches but failed to draw a conclusion regarding them. He also advanced several assertions regarding NatWest U.S. branches' clearing accounts.

5. My affidavit dated May 2, 2005 ("my May 2 affidavit") addressed Mr. Read's assertions in the Read Expert Report. In that affidavit I concluded that Mr. Read's analysis did not change the conclusion in my March 4 report that there is no evidence that the pricing on related party money market transactions was other than arm's-length.

6. I also argued that the Read Expert Report failed to identify a valid basis for concluding that NatWest US Branches' clearing accounts did not reflect arm's-length interest rates since 1) Mr. Read's assertion that interest paid on the clearing

accounts of NatWest London and IWB London was not at arm's length was based on the incorrect observation that NatWest did not pay interest with respect to third-party clearing accounts and 2) in the case of NatWest Singapore's clearing account, Mr. Read compared that clearing account relationship to a clearing account that was not comparable.

7. In Mr. Read's declaration dated July 12, 2004 ("Read Declaration") Mr. Read made the following assertions about my analysis in my March 4 report and my May 2 affidavit:

Money Market Transactions

- Mr. Read accepted that there was no evidence of pricing being other than arm's-length in my sample of money market transactions but questioned the adequacy of my sample to draw conclusions regarding NatWest US Branches' money market transactions during the Tax Years. He also questioned the sampling of trading days instead of transactions;
- Mr. Read identified two conditions that need to be met for classical regression analyses and stated that if those conditions were not met, it could bias my inference from the regression analysis;
- Mr. Read reiterated that the pattern of more favorable interest rates for related parties on overnight deposits that he noted in the Read Expert Report remained when intra-US branch transactions are dropped from the set of transactions underlying the average interest rate calculations, although he no longer maintained that his observed pattern for overnight placements remains.

Clearing Accounts

- Based on a rule he devised, namely that customers with an average turnover and number of entries lower than those of the Bank of England must receive prime rate pricing, Mr. Read computed adjustments to the income received from related party customers that had lower activity levels than the Bank of England and received Fed Funds pricing;
- Mr. Read estimated an adjustment to NatWest US Branches' profits for the Tax Years of $10,553,577.

8. I have now been asked to address Mr. Read's assertions in the Read Declaration.

***Summary of Conclusions***

Money Market Transactions

9. None of Mr. Read's objections to the money market analysis in my March 4 report or my May 2 affidavit withstand closer scrutiny:
   - The strong results observed in my sample of 21 days do extend to the entire population of transactions during the Tax Years with a high level of certainty, contrary to Mr. Read's assertion;
   - The two conditions identified by Mr. Read regarding my regression analysis make no difference to my conclusion that there is no statistically significant association between the interest rates on deposits or placements and the identity of the customer as a related or unrelated party;
   - Mr. Read's interpretation of the average rates when intra-US branch observations are excluded is flawed.

10. Hence, I maintain that there is no evidence that interest rates charged to or received from related parties are significantly different from those charged to or received from unrelated parties.

Clearing Accounts

11. Mr. Read's analysis of the clearing accounts, including his adjustment computation, is flawed in many respects.

- Mr. Read's adjustment computation is almost entirely (96.6 percent) attributable to one entity – NatWest Commercial Services, Inc. – whose account is not a clearing account but a revolving borrowing facility for funding its factoring business. The imposition of the prime rate pricing regime applicable to overdrafts on some of NatWest's clearing accounts to NatWest Commercial Services' loan facility is not a justifiable exercise.
- Mr. Read's analysis is flawed in various other ways that I discuss in this affidavit, including his unjustified extrapolation from a non-random sample of three months to the Tax Years.

12. Hence, I conclude that there is no valid basis for the income adjustment Mr. Read computed for NatWest US Branches' clearing accounts.

## Professional Background and Qualifications of Robert T. Clair

13. I am a graduate of the University of Pennsylvania, from which I received a Ph.D. in Economics in 1984. From 1982 until mid-year 1995, I was employed by the Federal Reserve Bank of Dallas. When I left the Dallas Fed, my position was Senior Economist and Policy Advisor. While at the Federal Reserve, I published research on the payments system and commercial banking. I received the Abram's

Scroll from the National Association of Business Economists for outstanding research for work I conducted jointly with my colleague, Harvey Rosenblum.

14. In 1995, I joined KPMG in their Economic Consulting Services unit (which is now known as Economic and Valuation Services). My current title is Managing Director. My work at KPMG has been primarily focused on establishing arm's-length prices for transactions between related entities (more commonly referred to as related parties) within the financial services industry or between a bank's head office and its branches. This is more commonly referred to as transfer pricing. I have published articles on the subject of transfer pricing in general and establishing arm's-length interest rates for related party loans, specifically. I have given presentations on the subject, including a presentation entitled, "Related-Party Loans, Credit Guarantees, and Thin Capitalization," that was presented to the staff of the Advance Pricing Agreement Office of the Internal Revenue Service on August 2, 2004.

15. I have also published research in the area of clearing accounts and in particular the large value dollar based payment systems. I authored an article on CHIPS titled "The Clearing House Interbank Payment System" in Research in Financial Services: Private and Public, Volume III, edited by George G. Kaufman, in 1991. An earlier version of this paper was published in Large-Value Funds Transfer Systems in The Group of Ten Countries, Bank of International Settlement in May 1990 without attribution. I authored an article on the Federal Reserve System's Fedwire titled "Daylight Overdrafts: Who Really Bears the Risk?" which was published in Governing Banking's Future, edited by Catherine England, in 1991.

## Money Market Transactions

16. I address the issues raised by Mr. Read regarding the analysis of NatWest US Branches' money market transactions in my March 4 report and my May 2 affidavit below:

***Sample Size*** [1]

17. Sampling consists of selecting some part of a population to observe in order to estimate parameters related to the whole population. In stratified sampling, the population is partitioned into regions or strata, and a sample is selected by some design within each stratum. Then, even though one stratum may differ markedly from another, a stratified sample with the desired number of units from each stratum in the population will tend to be "representative" of the population as a whole.

18. Since converting all the paper and microfiche records from the Tax Years into electronic format would have been prohibitively costly, I devised a sampling method to draw a representative sample of NatWest US Branches' transactions during the Tax Years that I could analyze and draw meaningful conclusions from about the arm's-length nature of NatWest US Branches' related party transactions.

19. In order to have a sufficiently large sample, I decided to sample at least one percent of the total trading days in the Tax Years. Since there could be variations in the economic and regulatory conditions, and internal NatWest policies across the years, I decided to stratify my sample so that each year was represented in my final sample. Since each year has approximately 252 trading days, one percent of the

[1] Some paragraphs in this section are based on "Sampling" by Steven K. Thompson, John Wiley & Sons, Inc., 1992, Chapters 1, 3 and 11.

trading days in a year amounts to approximately 2.5 trading days. I, therefore, drew a stratified random sample of three days from each of the Tax Years. My March 4 report describes my sampling technique in detail.[2]

20. I performed a stratified random sampling of trading days rather than of transactions since in order to select a random sample of transactions I would have needed to first list all the related party transactions in the Tax Years, which would have been prohibitively costly. I took special care to ensure that the sample of days I selected was a representative random sample – I took care not to include days for which it was known that information was missing, and I reviewed the sample dates to make sure that the dates that I drew were representative of the Tax Years. Further, I tested all the testable related party transactions in the sample days so that I did not bias my tests.

21. In cases where the volume of transactions is high, it is not uncommon to draw a sample based on trading days or some other such unit, instead of individual transactions.

22. Having selected a sample and used the sample data to make an estimate of the population mean or total, it is possible to make an assessment regarding the accuracy of the estimate. This is most often done by constructing a "confidence interval" within which one is sufficiently sure the true population value lies or, equivalently, placing a bound on the probable error of the estimate. This means that with a properly drawn sample it is possible to make statements about the properties and characteristics of the total population within certain specified limits of certainty and sampling variability.

---

[2] My March 4 report, Section 5.

23. Using the Direct Comparison Method ("DCM")[3], I showed in my March 4 report that of the 204 testable[4] related party deposits and placements, 195 trades or 95.6 percent were within the range of interest rates from comparable unrelated trades. Based on the DCM analysis, along with corroborating evidence from the regression analysis, I concluded that there is no evidence that interest rates charged to or received from related parties are significantly different from those charged to or received from unrelated parties.

24. Mr. Read disputes that my "sample is sufficient to establish that the money market transactions of the U.S. branches were at arm's length." He states that I should have instead said that, "*In the sample of transactions I examined* there is no statistically significant association between the interest rates on deposits or placements with the identity of the customer as a related or unrelated party."

25. The objective of drawing a sample is to draw inferences regarding the entire population, not just the sample as Mr. Read states. Once a representative sample is drawn that provides sufficiently strong estimates of the population parameters, there is no further need to increase the sample size. I include here a quotation from a popular statistics textbook that aptly summarizes this principle: "the idea is to take a small sample, and if the result is unambiguous...the job is done; but if the sample result is ambiguous...a second, and perhaps even further stage of sampling is required until the ambiguity is resolved. This procedure is justified if the advantage

---

[3] I defined the Direct Comparison Method as a comparison of the prices on related trades to a range of prices on comparable unrelated trades.
[4] My March 4 report defined testable related party trades as those with at least four comparable unrelated party trades. See my March 4 report for a definition of comparability.

of the smaller average sample size exceeds the disadvantage of having to sample several times."[5]

26. The high proportion of related party prices that were within the range of comparable unrelated party prices (95.6 percent) and the relatively large sample size (204 transactions) led me to conclude that my sample results provide a good approximation for the population's proportion of related party trades within the range of unrelated party trades.

27. As discussed in paragraph 22, it is also possible to quantify the accuracy of the sample results statistically using confidence intervals. In other words, we can determine at any desired confidence level the bounds on the population estimates based on the sample results. A confidence level of 95 percent is common in econometric and statistical analyses.

28. Thus, I have computed the bounds on the estimated proportion of related trades within the range of unrelated party trades during the Tax Years at the 95 percent confidence level. I have computed the confidence interval around my estimate at the 95 percent confidence level[6] to be 92.8 percent to 98.4 percent. In other words, I am 95 percent certain that between 92.8 percent and 98.4 percent of related party trades *in the population* are definitively at arm's-length prices. To state it in yet another way, the sampling error of my estimate of the proportion of related party trades that are within the range of unrelated party trades is not more than 2.8 percent at the 95 percent confidence level.

---

[5] "Introductory Statistics for Business and Economics" by Thomas H. Wonnacott and Ronald J. Wonnacott, John Wiley & Sons, Inc. 1972.

[6] These numbers are based on the normal approximation for a confidence interval for a proportion. See "Sampling" by Steven K. Thompson, John Wiley & Sons, Inc., 1992, Chapter 5 for a discussion.

29. Being outside the range of the daily high and low of the unrelated party trades is not necessarily evidence that the remaining trades over all the Tax Years were not arm's-length. The actual number of arm's-length trades is expected to be higher since the test I consider is a conservative one. In the normal course of trading, we would expect the daily high or low to be distributed between related and unrelated trades.

30. To conclude, the strong results observed in my sample of 21 days do extend to the entire population of transactions during the Tax Years with a high level of certainty, contrary to Mr. Read's assertion.

***Regression Tests***

31. The DCM is sufficient to draw conclusions regarding the arm's-length nature of NatWest US Branches' related-party transactions. However, in order to obtain further support I conducted regression analysis, which corroborated the results I obtained from the DCM.

32. Regarding my regression analysis, Mr. Read questions whether two additional statistical tests (for collinearity and heteroscedasticity)[7] ought to have been performed. His contention is that if these tests produced positive results then my regression results could lead to faulty inferences.

33. The tests Mr. Read mentions are likely to have an impact on statistical inference when the regression results are relatively ambiguous. With the kind of strong results that I reported in my regression analysis, I did not anticipate that the issues

[7] Collinearity refers to the existence of a strong relationship between some of the explanatory variables in a regression. Heteroscedasticity refers to the existence of error terms in a regression that have different variances.

raised by Mr. Read would influence my results. Hence, I did not consider it necessary to perform these tests.

34. Since Mr. Read raises the issue of the two tests, I performed standard statistical tests to discern the presence of either of these conditions in my data.[8] As expected, neither collinearity nor heteroscedasticity affects any of my conclusions from the regression analysis in my March 4 report.

35. Thus, I reaffirm my prior conclusion that the regression analysis shows that there is no statistically significant association between the interest rates on deposits or placements with the identity of the customer as a related or unrelated party.

***Replication of Mr. Read's Method without Intra-Branch Transactions***

36. In my May 2 affidavit I reported that I was unable to replicate Mr. Read's analysis of money market transactions in the Read Expert Report. Unlike Mr. Read, I found no consistent relationship between average related party interest rates and average unrelated party interest rates.

---

[8] I found very little collinearity between the explanatory variables by examining correlation coefficients between all the explanatory variables. None of the correlation coefficients were greater than 0.2 (collinearity would exist if the correlation coefficients were high, for instance 0.8 or more; perfect collinearity would give a correlation coefficient of 1.0). I also computed the Condition Index, a standard method for detecting collinearity between multiple variables. A high condition index, for instance 30 or more, detects the presence of collinearity. The condition index for the deposits regression is 1.4 and the condition index of the placements regression is 1.2 – both are very small indicating an absence of collinearity among the variables.

I also performed the standard Breusch-Pagan test for heteroscedasticity in my base case deposits and placements regressions. The Breusch-Pagan test discerned some heteroscedasticity in the regressions. Hence, I reran both regressions using the standard Huber-White correction for heteroscedasticity. The coefficient on the variable indicating the identity of a counterparty as related or unrelated has an estimated value of 2.8 basis points before and after the correction for heteroscedasticity in the deposits regression and an estimated value of 5.8 basis points before and after the correction for heteroscedasticity in the placements regression. The p-value, which indicates how statistically significant the variable is, was 0.439 in the deposits regression before the correction and 0.448 after the correction – both strongly indicating a coefficient not significantly different from zero at the 95 percent confidence level. The p-value in the placements regression was 0.421 before the correction and 0.163 after the correction – again both strongly indicating a coefficient not significantly different from zero at the 95 percent confidence level even though the p-value is much lower after the correction.

37. My investigation into the causes of differences in results led me to believe that Mr. Read included intra-US branch transactions in his analysis, which should have been excluded since intra-US branch transactions do not impact NatWest US Branches' tax returns and including both sides of a transaction can lead to mathematical distortions.

38. In paragraph 67 of the Read Declaration, Mr. Read states that, "When intra-U.S. branch observations are dropped from the set of transactions underlying the average interest rate calculations I presented in my Report, the observed pattern (i.e., more favorable interest rates for related parties) for overnight deposits remains."

39. I note here that Mr. Read no longer maintains that his observed pattern for overnight placements remains.

40. A re-creation of Mr. Read's averages, but excluding intra-US branch transactions, shows that for three out of the five days analyzed by Mr. Read, the average overnight deposit rates for related parties were higher than the average rates for unrelated parties and for the remaining two days were lower on average. Mr. Read interprets these results as the average rates on overnight deposits being more favorable to related parties.

41. The observed pattern that Mr. Read refers to is in 3 out of 5 days examined in a population of approximately 1,750 days. From this sample of less than 0.3 percent of the population, Mr. Read observed what is in his opinion a pattern of favorable interest rates for related parties. This "pattern" is similar to flipping a coin 5 times and getting heads 3 times, which is just as probable as getting 2 heads when the coin is fair.

42. Appropriately, neither Mr. Read nor I have drawn any conclusions from Mr. Read's method for analyzing money market transactions.

*Conclusion*

43. None of Mr. Read's objections to the money market analysis in my March 4 report or my May 2 affidavit withstand closer scrutiny. Hence, I maintain that there is no evidence that interest rates charged to or received from related parties are significantly different from those charged to or received from, unrelated parties.

## Clearing Accounts

44. Mr. Read now agrees with the argument in my March 4 report that cash-managed accounts are comparable in economic substance to paying interest on clearing accounts.

45. However, in the Read Declaration, Mr. Read turns his attention to some of the related party clearing accounts that received Fed Funds pricing. Based on a rule he devised, namely that customers with an average turnover and number of entries lower than those of the Bank of England must receive prime rate pricing, Mr. Read computes adjustments to the income received from related party customers that had activity levels lower than the Bank of England and had Fed Funds pricing. He computes the adjustments for a sample of three months – December 1986, July 1986 and August 1985. The adjustments are computed as a difference in interest income using prime rate pricing versus the actual charges. Mr. Read then extrapolates the average adjustment computed for the three months to the Tax Years by first annualizing the adjustment and then multiplying by seven, which is the number of years in Tax Years.

46. An overwhelming fraction of Mr. Read's adjustment is attributable to just one customer – NatWest Commercial Services, Inc. ("NatWest Commercial Services"). On average, over the months December 1986, July 1986 and August 1985, NatWest Commercial Services accounted for 96.6 percent of Mr. Read's adjustment. This average is comprised of a proportion of 93.3 percent in December 1986, 99.4 percent in July 1986, and 96.7 percent in August 1985.

47. Given the overwhelming contribution of this one customer to Mr. Read's adjustment number, I examined its account in greater detail. My investigations have led me to the conclusion that this customer's account is not comparable to other NatWest clearing accounts and, hence, should not be included in a computation of income adjustments.

48. NatWest Commercial Services' account with NatWest's New York branch did not function as a clearing account. Rather it was an account maintained with NatWest's New York branch to obtain revolving borrowings to fund NatWest Commercial Services' factoring operations.[9]

49. According to Mr. Walmsley, NatWest Commercial Services' account with NatWest's New York branch would have been an approved line of credit.[10] This description of NatWest Commercial Services' account is consistent with the large debit balances in its account seen on its A220 reports. See Appendix 1 for sample A220 reports for NatWest Commercial Services.

---

[9] Factoring refers to the purchase or sale of accounts receivable at a discount. Note 4 in the 1986 and 1987 financial statements of NatWest Commercial Services describes the related party transactions including revolving borrowing to fund factoring operations. The financial statements are attached in Appendix 1. Mr. Walmsley also recalls NatWest Commercial Services' account being a revolving loan facility to fund its factoring operations in paragraph 3 of his supplemental declaration dated August 15, 2005, attached in Appendix 2.
[10] Supplemental Declaration of Roger Walmsley, dated August 15, 2005.

50. As Mr. Walmsley notes in his supplemental declaration, a line of credit is very different from a clearing account, on which overdrafts were generally discouraged. In the case of NatWest Commercial Services, the extension of credit would have been approved by the NatWest credit department in New York.

51. Mr. Walmsley's statement is consistent with the data presented by Mr. Read in his declaration. Other than NatWest Commercial Services all the other accounts in his analysis had small charges because their debit balances were low, if they existed at all. These differences are evident in the tables appended to Mr. Read's declaration.[11]

52. Hence, any analysis of NatWest US Branches' clearing accounts must exclude NatWest Commercial Services since its account with NatWest US Branches was not a clearing account.

53. In addition, Mr. Read imposes a different pricing regime on the related parties without considering whether an unrelated party transacting at arm's-length might have modified its behavior in response to different prices. For example, my willingness to occasionally run a debit position and incur interest charges is to some extent under my control. When interest rate charges are lower, I may manage my position more liberally. If the interest rate were increased from the Federal Funds rate to the prime rate plus 1.5 percentage points, then I would take action to reduce the likelihood of having a debit balance. Mr. Read's calculation ignores the impact of price on the quantity demanded. It calculates the adjustment as though the demand for funding is completely insensitive to interest rates. Consistent with this observation, Mr. Walmsley states in his declaration that, "If Natwest PLC had

[11] See the Read Declaration, Exhibits G1 – G3.

attempted to charge the overdraft rate on a loan like the one to Natwest Commercial Services, Inc., Natwest Commercial Services, Inc. would surely have declined the loan and would have had no trouble opening lines of credit at other banks at rates similar to those actually charged by Natwest."[12]

54. Further, without regard to whether NatWest Commercial Services is included in Mr. Read's adjustment, Mr. Read provides no justification for his choice of the sample of three months as evidence of a possible understatement of profit in all seven years of the Tax Years. Mr. Read's selection does not appear to be random and hence cannot be considered representative of the population of clearing account transactions. Further, it is unclear that Mr. Read performed any analysis to determine the adequacy of his sample in inferring adjustments for all the Tax Years. Given Mr. Read's objections to my money market sample, which I drew such that I would have a sufficiently large number of observations and went to great lengths to ensure was random, his choice of sample would not pass the unwarranted criticisms he himself leveled at my money market sample.

55. By choosing three months late in the period of the Tax Years, Mr. Read has likely biased his estimate upward. As the bank grew over time, the adjustment in the later months could be much larger than in the earlier months. If a random sample of 84 months in the Tax Years had been drawn then it would have been as likely to include months early in the period. This is one of the reasons why drawing a random sample is so important in attempting to project from a sample to the total population.

[12] Supplemental Declaration of Roger Walmsley, paragraph 5.

56. To summarize, Mr. Read's adjustment computation is flawed due to various reasons, and hence is not valid.

## Conclusions

57. Nothing in the Read Declaration leads me to change any of my conclusions in my March 4 report or my May 2 affidavit.

58. With regard to money market transactions, I maintain that there is no evidence that interest rates charged to or received from related parties were significantly different from those charged to or received from unrelated parties. I can say with a high degree of confidence that the strong results I observed in my sample of 21 days extend to the entire population of NatWest US Branches' money market transactions.

59. Regarding the clearing accounts, Mr. Read's analysis in the Read Declaration is flawed in many respects.

60. Mr. Read's adjustment computation is almost entirely (96.6 percent) attributable to one entity – NatWest Commercial Services, Inc. – whose account was not a clearing account but a revolving borrowing facility for funding its factoring business. Given that in the case of NatWest Commercial Services extension of credit would have been approved, whereas overdrafts were generally discouraged in clearing accounts, the imposition of the prime rate pricing regime for clearing accounts to NatWest Commercial Services is not justifiable.

61. I also present various other reasons why Mr. Read's analysis is flawed, including his unjustified extrapolation from a non-random sample of three months to the Tax Years.

62. Thus, Mr. Read's adjustment computation is not valid.

Robert T. Clair Ph.D.

Robert T. Clair, Ph.D.

Sworn to before me this
16th day of August, 2005

Diane F. Gruberger

Notary Public

**DIANE F. GRUBERGER**
**Notary Public, State of New York**
**No. 0GR4769436**
**Qualified in Richmond County**
**Certificate Filed in New York County**
**Commission Expires Nov. 30, 2006**

# Appendix 1

## 1986 and 1987 Consolidated Financial Statements for NatWest Commercial Services, Inc.

KPMG Peat Marwick

NATWEST COMMERCIAL SERVICES, INC.
(a wholly owned subsidiary of
NatWest Holdings Inc.)

Consolidated Financial Statements

December 31, 1987 and 1986

(With Accountant's Report Thereon)

KPMG Peat Marwick

Certified Public Accountants

Peat Marwick Main & Co.
345 Park Avenue
New York, NY 10154

To the Stockholder and Board of Directors of
NatWest Commercial Services, Inc.:

We have examined the consolidated balance sheets of NatWest Commercial Services, Inc. (a wholly owned subsidiary of NatWest Holdings Inc.) as of December 31, 1987 and 1986 and the related consolidated statements of operations, changes in stockholder's equity and changes in financial position for the years then ended. Our examinations were made in accordance with generally accepted auditing standards and, accordingly, included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances.

In our opinion, the aforementioned consolidated financial statements present fairly the financial position of NatWest Commercial Services, Inc. at December 31, 1987 and 1986 and the results of its operations and the changes in its financial position for the years then ended, in conformity with generally accepted accounting principles applied on a consistent basis.

Peat Marwick Main & Co.

January 19, 1988

NATWEST COMMERCIAL SERVICES, INC.
(a wholly owned subsidiary of
NatWest Holdings Inc.)

Consolidated Balance Sheets

December 31, 1987 and 1986

| Assets | 1987 | 1986 |
|---|---|---|
| Cash and due from banks | $ 3,520,688 | $ 7,156,238 |
| Accounts and loans receivable (notes 2 and 4): | | |
| Factored accounts receivable, net of trade discounts of $1,242,767 and $1,119,122 | 111,249,283 | 138,652,346 |
| Loans and advances to factoring clients | 30,399,548 | 17,329,821 |
| | 141,648,831 | 155,982,167 |
| Less allowance for doubtful accounts | (2,824,958) | (1,750,000) |
| | 138,823,873 | 154,232,167 |
| Due from customers on acceptances | 1,109,085 | 1,553,001 |
| Income tax benefit (note 5) | 951,710 | 462,645 |
| Premises and equipment, net (note 3) | 639,860 | 510,307 |
| Cost of factoring business acquired (note 1) | 466,082 | 819,114 |
| Due from affiliates (note 1) | 1,271,233 | - |
| Other assets | 171,474 | 248,789 |
| | $146,954,005 | $164,982,261 |

| Liabilities and Stockholder's Equity | 1987 | 1986 |
|---|---|---|
| Due to National Westminster Bank PLC (note 4) | $ 72,719,915 | $ 78,924,364 |
| Due to factoring clients: | | |
| On demand | 41,964,345 | 45,353,036 |
| At maturity | 18,365,753 | 28,830,834 |
| | 60,330,098 | 74,183,870 |
| Acceptances outstanding | 1,109,085 | 1,553,001 |
| Deferred interest income | 375,487 | 211,696 |
| Accounts payable and accrued liabilities | 2,366,064 | 1,307,345 |
| Total liabilities | 136,900,649 | 156,180,276 |
| Stockholder's equity: | | |
| Common stock, par value $100 per share. Authorized, issued and outstanding 10 shares | 1,000 | 1,000 |
| Capital surplus | 12,613,274 | 12,613,274 |
| Accumulated deficit | (2,560,918) | (3,812,289) |
| Total stockholder's equity | 10,053,356 | 8,801,985 |
| Commitments and contingencies (notes 6 and 7) | | |
| | $146,954,005 | $164,982,261 |

See accompanying notes to consolidated financial statements.

NATWEST COMMERCIAL SERVICES, INC.
(a wholly owned subsidiary of
NatWest Holdings Inc.)

Consolidated Statements of Operations

Years ended December 31, 1987 and 1986

| | 1987 | 1986 |
|---|---|---|
| Revenues: | | |
| Commission income | $ 8,321,800 | $ 6,229,961 |
| Interest income | 11,063,253 | 8,177,908 |
| | 19,385,053 | 14,407,869 |
| Expenses: | | |
| Interest on borrowings from National Westminster Bank PLC (note 4) | 5,529,400 | 3,680,781 |
| Provision for losses on doubtful accounts (note 2) | 1,330,524 | 2,951,648 |
| Operating expenses: | | |
| Salaries and benefits | 5,155,419 | 4,541,481 |
| Occupancy | 792,432 | 666,043 |
| Data processing (note 4) | 721,542 | 317,836 |
| Amortization of cost of factoring business acquired | 353,032 | 443,032 |
| Other (notes 3 and 4) | 2,616,233 | 1,921,633 |
| CFIL charges (note 4) | 689,100 | 445,000 |
| | 17,187,682 | 14,967,454 |
| Income (loss) before income tax expense (benefit) | 2,197,371 | (559,585) |
| Income tax expense (benefit) (note 5) | 946,000 | (221,439) |
| Net income (loss) | $ 1,251,371 | $ (338,146) |

See accompanying notes to consolidated financial statements.

NATWEST COMMERCIAL SERVICES, INC.
(a wholly owned subsidiary of
NatWest Holdings Inc.)

Consolidated Statements of Changes
in Stockholder's Equity

Years ended December 31, 1987 and 1986

| | Common stock | Capital surplus | Accumulated deficit |
|---|---|---|---|
| Balance at December 31, 1985 | $1,000 | 12,613,274 | (3,474,143) |
| Net loss | - | - | (338,146) |
| Balance at December 31, 1986 | 1,000 | 12,613,274 | (3,812,289) |
| Net income | - | - | 1,251,371 |
| Balance at December 31, 1987 | $1,000 | 12,613,274 | (2,560,918) |

See accompanying notes to consolidated financial statements.

NATWEST COMMERCIAL SERVICES, INC.
(a wholly owned subsidiary of
NatWest Holdings Inc.)

Consolidated Statements of Changes
in Financial Position

Years ended December 31, 1987 and 1986

| | 1987 | 1986 |
|---|---|---|
| Sources of funds: | | |
| Net income (loss) | $ 1,251,371 | (338,146) |
| Add (deduct) non-fund items: | | |
| Depreciation and amortization of premises and equipment | 108,154 | 87,800 |
| Amortization of cost of factoring business acquired | 353,032 | 443,032 |
| Deferred income taxes | (426,143) | (417,469) |
| Provision for loan losses | 1,330,524 | 2,951,648 |
| Charge-offs, net | (255,566) | (1,981,824) |
| Funds provided from operations | 2,361,372 | 745,041 |
| Increases in: | | |
| Due to affiliates | - | 62,737,359 |
| Accounts payable and accrued liabilities and deferred interest income | 1,222,510 | 574,044 |
| Current income taxes | - | 111,810 |
| Decreases in: | | |
| Accounts and loans receivable, net | 14,333,336 | - |
| Cash and due from banks | 3,635,550 | - |
| Other assets | 77,315 | - |
| | $21,630,083 | $64,168,254 |
| Uses of funds: | | |
| Increases in: | | |
| Accounts and loans receivable, net | - | 57,475,322 |
| Cash and due from banks | - | 4,356,136 |
| Premises and equipment | 237,707 | 35,724 |
| Other assets | - | 77,494 |
| Due from affiliates | 1,271,233 | - |
| Decreases in: | | |
| Due to factoring clients | 13,853,772 | 2,223,578 |
| Due to affiliates | 6,204,449 | - |
| Current income taxes | 62,922 | - |
| | $21,630,083 | $64,168,254 |

See accompanying notes to consolidated financial statements.

NATWEST COMMERCIAL SERVICES, INC.
(a wholly owned subsidiary of
NatWest Holdings Inc.)

Notes to Consolidated Financial Statements

December 31, 1987 and 1986

(1) Summary of Significant Accounting Policies and Related Matters

Basis of Presentation

NatWest Commercial Services, Inc. (Company) is a wholly owned subsidiary of NatWest Holdings, Inc. (Holdings); Holdings is a wholly owned United States subsidiary of National Westminster Bank PLC (NatWest), a London-based international bank. The Company commenced operations May 1, 1982, and presently maintains offices in Philadelphia, Pennsylvania; Los Angeles, California; and New York, New York.

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiary CF International, Inc. (CFI). All significant intercompany balances and transactions have been eliminated in consolidation. CFI collects factoring receivables for customers of NatWest affiliates (outside the Holdings group) and such affiliates make collections for CFI customers. At December 31, 1987, CFI was owed $1,271,233 from such affiliates which represented the net collections receivable.

The following are the significant accounting policies of the Company and its subsidiary. These policies conform with generally accepted accounting principles and to general practices within the finance industry.

Factoring Commissions

Commissions charged on factored accounts receivable are taken into income in the month the receivables are purchased from factoring clients.

Interest Income

Interest earned on advances, overadvances, and on term loans is accrued monthly and charged to the factoring clients' accounts. Interest charged to clients before having been earned is deferred and taken into income ratably over the applicable period of the advance.

Allowance for Doubtful Accounts

Allowance for doubtful accounts represents the amount which, in management's judgment, is necessary to absorb potential losses inherent in the accounts and loans receivable portfolio. This judgment is based on past charge-off experience, current delinquencies, the nature and characteristics of the accounts and loans receivable portfolios, and general economic conditions and trends. Accounts are charged off as soon as probability of loss is established, taking into consideration such factors as the customer or client's financial condition, underlying collateral and guarantees.

NATWEST COMMERCIAL SERVICES, INC.
(a wholly owned subsidiary of
NatWest Holdings Inc.)

Notes to Consolidated Financial Statements

(1), Continued

Premises and Equipment

Premises and equipment are stated at cost, less accumulated depreciation and amortization computed on the straight-line method over the estimated useful lives of the assets.

Cost of Factoring Business Acquired

The cost of factoring business acquired represents the original cost of $2,750,000, related to the Company's purchase of the factoring business of First Pennsylvania Bank, N.A. in 1982, assigned to tangible and identifiable intangible assets as well as goodwill. The allocation of cost related to such assets and the periods over which they are being amortized are as follows:

| | Amount | Amortization period (years) |
|---|---|---|
| Computer software | $1,500,000 | 5 |
| Customer and client credit files | 450,000 | 10 |
| Factoring client list | 262,000 | 10 |
| Covenant not to compete | 300,000 | 5 |
| Miscellaneous assets | 88,000 | 2 to 10 |
| Goodwill | 150,000 | 20 |
| | ========= | |

Income Taxes

The Company files a consolidated Federal income tax return with Holdings, with each subsidiary providing taxes or, in the case of losses, tax benefits at current corporate rates on its separately computed taxable income or loss as reported in its respective financial statements. New York State and City, Pennsylvania and Philadelphia, and California tax returns are filed separately by the Company. Deferred income taxes are provided for timing differences between the period in which certain income and expense items are recognized for financial reporting purposes and the period in which they affect taxable income.

Retirement and Other Benefit Plans

There is a non-contributory retirement benefit plan maintained by National Westminster Bank USA (a wholly owned subsidiary of Holdings) (NWBUSA) covering substantially all employees of the Company. The Company's contribution to this plan is determined by the Company's percentage of total covered payroll of the plan and is charged to expense. The Company's employees also participate in NWBUSA's Savings and Investment Plan.



(Continued)

NATWEST COMMERCIAL SERVICES, INC.
(a wholly owned subsidiary of
NatWest Holdings Inc.)

Notes to Consolidated Financial Statements

(2) Accounts and Loans Receivable

Factored accounts receivable are generally due within six months. Loans and advances to factoring clients are revolving in nature and are contractually due on demand.

The Company, through CFI, offers factoring services to clients conducting multinational businesses from the United States. This service involves the extension of credit to customers of clients domiciled in foreign countries.

At December 31, 1987 and 1986, approximately $13,892,817 and $10,435,798, respectively (12.5% and 7.5% of the respective total factored accounts receivable outstanding balances), are from customers domiciled outside the United States (primarily in Europe).

An analysis of the allowance for doubtful accounts for the years ended December 31, 1987 and 1986 is as follows:

| | 1987 | 1986 |
|---|---|---|
| Balance at beginning of year | $1,750,000 | $ 780,176 |
| Add provision for losses on doubtful accounts | 1,330,524 | 2,951,648 |
| Deduct charge-offs, net | (255,566) | (1,981,824) |
| Balance at end of year | $2,824,958 | $1,750,000 |

(3) Premises and Equipment

A summary of premises and equipment at December 31, 1987 and 1986 is as follows:

| | Estimated Useful Life | Cost 1987 | Cost 1986 |
|---|---|---|---|
| Furniture and fixtures | 10 years/7 years | $ 451,295 | $385,538 |
| Equipment/automobiles | 7 years/5 years | 358,142 | 234,884 |
| Leasehold improvements | Life of Lease | 231,985 | 189,725 |
| | | 1,041,442 | 810,147 |
| Accumulated depreciation and amortization | | (401,562) | (299,840) |
| Net Book Value | | $639,860 | $510,307 |

Included in operating expenses in 1987 and 1986 were amortization and depreciation expenses of $108,154 and $87,800, respectively. Rental expense on premises and equipment amounted to $648,828 in 1987 and $601,522 in 1986.



(Continued)

NATWEST COMMERCIAL SERVICES, INC.
(a wholly owned subsidiary of
NatWest Holdings Inc.)

Notes to Consolidated Financial Statements

(4) Related Party Transactions

Interest-bearing advances due to NatWest represent revolving borrowings necessary to fund the factoring operations. For the years ended December 31, 1987 and 1986, daily average borrowings approximated $79,358,000 and $52,890,000 at weighted average interest rates of 7.0% for each year. The maximum amount outstanding during 1987 and 1986 was $97,700,000 and $99,000,000, respectively.

In the normal course of operations, CFI insures as to collectibility substantially all of its factored receivables from foreign-based customers with an affiliate, Credit Factoring International Limited (CFIL), a wholly owned subsidiary of NatWest. Total fees of $265,000 and $180,000, for the years ended December 31, 1987 and 1986, respectively, have been paid to such affiliate for this guarantee service, which amount is included in other operating expenses. The weighted average fees in effect as a percentage of factored sales were .343% during 1987 and .341% during 1986.

In addition, CFIL provides CFI with operating factoring services at contractually agreed-upon rates. Total fees paid for such services were approximately $424,100 and $265,000, respectively, for the years ended December 31, 1987 and 1986.

NWBUSA provides data processing services to the Company. Fees for such services amounted to approximately $721,542 in 1987 and $317,836 in 1986 and are included in data processing expenses.

(5) Income Taxes

The provision for income tax expense (benefit) for 1987 and 1986 consist of current and deferred taxes as follows (The allocation between current and deferred income taxes is based on estimates. Prior years have been restated, where necessary, to conform to the tax returns as filed):

| | 1987 | 1986 |
|---|---|---|
| Current: | | |
| Federal | $1,312,143 | $ 148,030 |
| State and local | 60,000 | 48,000 |
| | 1,372,143 | 196,030 |
| Deferred: Federal | (426,143) | (417,469) |
| | $ 946,000 | $(221,439) |

The primary source of Federal deferred taxes is the provision for losses on doubtful accounts.

(Continued)

NATWEST COMMERCIAL SERVICES, INC.
(a wholly owned subsidiary of
NatWest Holdings Inc.)

Notes to Consolidated Financial Statements

5), Continued

The recorded income tax expense (benefit) varied from the tax expense (benefit) computed by applying the statutory Federal income tax rates of 40% and 46% for 1987 and 1986, respectively. The reasons for the difference between these amounts are as follows:

| | 1987 | 1986 |
|---|---|---|
| Federal income tax expense (benefit) at statutory rates | $878,948 | $(257,409) |
| Increase (decrease) in expense (benefit) due to: | | |
| State and local income taxes, net of Federal income tax benefit | 36,000 | 25,920 |
| Non-deductible portion of amortization of cost of factoring business acquired | 21,000 | 31,050 |
| Tax exempt interest | (5,322) | (6,900) |
| Investment tax credit | - | (14,100) |
| Other | 15,374 | - |
| Income tax expense (benefit) | $946,000 | $(221,439) |

6) Lease Commitments

Various long-term operating leases have been entered into covering premises and equipment. A summary of minimum future rental obligations under noncancellable operating leases follows:

| Period | |
|---|---|
| 1988 | $ 727,728 |
| 1989 | 681,974 |
| 1990 | 482,555 |
| 1991 | 475,856 |
| 1992 | 475,856 |
| 1993 and thereafter | 73,152 |
| Total | $2,917,121 |

Certain leases on premises provide for rental escalation based on increased real estate taxes and property service costs.

(Continued)

NATWEST COMMERCIAL SERVICES, INC.
(a wholly owned subsidiary of
NatWest Holdings Inc.)

Notes to Consolidated Financial Statements

) Commitments and Contingencies

In the normal course of business, the Company arranges for banks to extend letters of credit in favor of certain factoring clients. Commitments under letters of credit outstanding aggregated approximately $9,280,000 at December 31, 1987. Management does not anticipate any losses as a result of these transactions.

# Appendix 2

## Supplemental Declaration of Roger Walmsley

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 95-758T
(Judge Nancy B. Firestone)

NATIONAL WESTMINSTER BANK PLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

SUPPLEMENTAL DECLARATION OF ROGER WALMSLEY

United Kingdom)
)
County of Essex) ss

7 Grosvenor Gardens
Upminster
Essex,
United Kingdom

I, ROGER WALMSLEY, of 7 Grosvenor Gardens, Upminster, Essex, in accordance with 28 U.S.C. § 1746 (2000), hereby DECLARE as follows:

1. I have previously provided testimony in connection with this litigation in a deposition on January 31, 2005 and February 1, 2005 as well as in a declaration dated April 28, 2005. I submit this supplemental declaration in order to provide information relating to transactions entered into between National Westminster Bank PLC's New York branch and Natwest Commercial Services, Inc., an indirect United States subsidiary of Natwest PLC.

2. I understand that Mr. James Read has proposed an adjustment to Natwest's U.S. branch income by comparing Natwest's overdraft charges on its U.S. dollar clearing accounts with the interest it charged on an account of Natwest Commercial Services, Inc. held at the New York branch. Mr. Read suggests that the interest rate the New York branch charged Natwest Commercial Services, Inc., which was based on the interbank Federal funds rate, should have been set at the Prime Rate plus 1.5%, the rate applied to overdrafts on smaller clearing accounts.

3. I recall that the account of NatWest Commercial Services, Inc. was a revolving loan facility to fund its factoring operations. The facility would have been sanctioned and approved by the NatWest Advances Department of New York. My recollection is consistent with the substantial debit balances reflected on the A220s relating to the NatWest Commercial Services account on which Mr. Read based his adjustment and with a document located by NatWest in the files of NatWest Commercial Services, Inc. See the attached A220s for the NatWest Commercial Services account for certain months during the years at issue and the attached copy of 1986 and 1987 Consolidated Financial Statements for Natwest Commercial Services, Inc. with KPMG Report theron.

4. A line of credit is very different from a clearing account, on which, as I noted in my April 28, 2005 Declaration, overdrafts were generally discouraged. Because the computer system required data to be entered into an interest rate field, all accounts had to have an interest rate allocated to them when opened in the books of New York. Such rate cannot be interpreted when looking

at the computer print-outs as an indicator that the customer had approval to overdraw the account or even that the customer had any knowledge that a rate of interest had been allocated to it.

5. I understand that Mr. Read attempts to impose the overdraft rate from the Prime Rate accounts onto the sanctioned extension of credit to Natwest Commercial Services. Charging the Prime Rate on that extension of credit would not have been commercially feasible. If Natwest PLC had attempted to charge the overdraft rate on a loan like the one to Natwest Commercial Services, Inc., Natwest Commercial Services, Inc. would surely have declined the loan and would have had no trouble opening lines of credit at other banks at rates similar to those actually charged by Natwest.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON AUGUST 15 2005.

Roger Walmsley

# Appendix 3

## Sample A220 Reports of NatWest Commercial Services, Inc.

.J19

NEW YORK A220 INTEREST LADDERS TO 31DEC86 BY 31DEC86 1126
***** 140 USA DOLLAR 00153338 00 NATWEST COMM SER INC NWB/INB GROUP.

| V/DATE | DEBITS | CREDITS | TRUE BALANCE | DAYS | DEBIT INTEREST | CREDIT INTEREST |
|---|---|---|---|---|---|---|
| 30NOV86 | FED. FUND RATE 6.250000% | | | | | |
| | B/F BALANCE | | 61,179,450.36- | 1 | 10,621.43 | |
| 1DEC86 | FED. FUND RATE 6.250000% | | | | | |
| | 5,435,000.00 | 396,709.31 | 66,217,741.05- | 1 | 11,496.13 | |
| 2DEC86 | FED. FUND RATE 6.625000% | | | | | |
| | 10,000.00 | 981,229.11 | 65,246,511.94- | 1 | 12,007.17 | |
| 3DEC86 | FED. FUND RATE 6.750000% | | | | | |
| | 65,000.00 | 1,391,523.63 | 63,919,988.31- | 1 | 11,984.99 | |
| 4DEC86 | FED. FUND RATE 6.250000% | | | | | |
| | 1,560,000.00 | | 65,479,988.31- | 1 | 11,368.05 | |
| 5DEC86 | FED. FUND RATE 6.000000% | | | | | |
| | | | 65,479,988.31- | 3 | 32,739.99 | |
| 8DEC86 | FED. FUND RATE 5.875000% | | | | | |
| | 500,000.00 | | 65,979,988.31- | 1 | 10,767.56 | |
| 9DEC86 | FED. FUND RATE 5.937500% | | | | | |
| | 225,000.00 | 3,000,000.00 | 63,204,988.31- | 1 | 10,424.43 | |
| 10DEC86 | FED. FUND RATE 5.750000% | | | | | |
| | 5,025,000.00 | | 69,229,988.31- | 1 | 11,057.56 | |
| 11DEC86 | FED. FUND RATE 5.875000% | | | | | |
| | 161,000.00 | 5,000,000.00 | 64,390,988.31- | 1 | 10,508.25 | |
| 12DEC86 | FED. FUND RATE 6.000000% | | | | | |
| | 10,000.00 | 1,150,000.00 | 63,250,988.31- | 3 | 31,625.49 | |
| 15DEC86 | FED. FUND RATE 6.500000% | | | | | |
| | 1,662,000.00 | 280,000.00 | 64,632,988.31- | 1 | 11,669.84 | |
| 16DEC86 | FED. FUND RATE 6.375000% | | | | | |
| | 1,476,089.51 | | 66,109,077.82- | 1 | 11,706.81 | |
| 17DEC86 | FED. FUND RATE 7.625000% | | | | | |
| | | 6,500,000.00 | 59,609,077.82- | 1 | 12,625.53 | |
| 18DEC86 | FED. FUND RATE 6.500000% | | | | | |
| | 2,600,000.00 | | 62,209,077.82- | 1 | 11,232.19 | |
| 19DEC86 | FED. FUND RATE 6.125000% | | | | | |
| | | 1,000,000.00 | 61,209,077.82- | 3 | 31,242.13 | |
| 22DEC86 | FED. FUND RATE 6.250000% | | | | | |
| | 16,870,000.00 | | 78,079,077.82- | 1 | 13,555.39 | |
| 23DEC86 | FED. FUND RATE 6.312500% | | | | | |
| | 10,000.00 | 5,000,000.00 | 73,089,077.82- | 1 | 12,815.96 | |
| 24DEC86 | FED. FUND RATE 6.125000% | | | | | |
| | 180,000.00 | | 73,269,077.82- | 2 | 24,931.83 | |
| 26DEC86 | FED. FUND RATE 6.250000% | | | | | |
| | | 1,600,000.00 | 71,669,077.82- | 3 | 37,327.64 | |
| 29DEC86 | FED. FUND RATE 7.812500% | | | | | |
| | 13,003,974.15 | | 84,673,051.97- | 1 | 18,375.22 | |
| 30DEC86 | FED. FUND RATE 14.000000% | | | | | |
| | 12,000.00 | 230,000.00 | 84,455,051.97- | 1 | 32,843.63 | |
| 31DEC86 | FED. FUND RATE 8.000000% | | | | | |
| | | 9,000,000.00 | 75,455,051.97- | | | |

INT537-001121

.K19

| V/DATE | DEBITS | CREDITS | TRUE BALANCE | DAYS | DEBIT INTEREST |
|---|---|---|---|---|---|
| | | 1,000,000.00 | 81,209,077.82- | 3 | 31,292.13 |
| 22DEC86 FED. FUND RATE 6.250000% | | | | | |
| | 16,870,000.00 | | 78,079,077.82- | 1 | 13,555.39 |
| 23DEC86 FED. FUND RATE 6.312900% | | | | | |
| | 10,000.00 | 5,000,000.00 | 73,089,077.82- | 1 | 12,815.96 |
| 24DEC86 FED. FUND RATE 6.125000% | | | | | |
| | 180,000.00 | | 73,269,077.82- | 2 | 24,931.83 |
| 26DEC86 FED. FUND RATE 6.250000% | | | | | |
| | | 1,600,000.00 | 71,669,077.82- | 3 | 37,327.64 |
| 29DEC86 FED. FUND RATE 7.812500% | | | | | |
| | 13,003,974.15 | | 84,673,051.97- | 1 | 18,375.22 |
| 30DEC86 FED. FUND RATE 14.000000% | | | | | |
| | 12,000.00 | 230,000.00 | 84,455,051.97- | 1 | 32,843.63 |
| 31DEC86 FED. FUND RATE 8.000000% | | | | | |
| | | 5,000,000.00 | 79,455,051.97- | | |

K14

NEW YORK A220 INTEREST LADDERS TO 31DEC86 BY 31DEC86 1127

***** 140 USA DOLLAR 00153338 00 NATWEST COMM SER INC NWB/IWB GROUP.

| V/DATE | DEBITS | CREDITS | TRUE BALANCE | DAYS | DEBIT INTEREST | CREDIT INTEREST |
|---|---|---|---|---|---|---|

**************************************************

| SUMMARY - | DEBIT | CREDIT | | DEBIT | CREDIT |
|---|---|---|---|---|---|
| AVERAGE BALANCE | 67,389,408 | 0 | INT ADJ PREVIOUS | 0.00 | 0.00 |
| NO OF DAYS | 31 | 0 | INTEREST CURRENT | 382,927.22- | 0.00 |
| HIGHEST DR BAL | 84,673,051 | | COMM RE HIGH D/D | 0.00 | |
| TURNOVER | 49,805,063 | | COMM CODE 1 | 165.00- | |
| NUMBER OF ENTRIES | 55 | | | | |
| NO AUTOMATIC POSTING - R1 | | | NET INT COMM | 383,092.22- | |
| | | | ANC CHARGES | 0.00 | |
| - LADDER REQUESTED | | | LOCAL TAXES | 0.00 | 0.00 |
| | | | UNPAID INTEREST | | 0.00 |
| | | | TOTALS | 383,092.22- | 0.00 |
| | | | NET CHARGE | 383,092.22- | |

INT537-001122

L14

NEW YORK A220 INTEREST LADDERS TO 31JUL86 BY 31JUL86 186
***** 140 USA DOLLAR 00153338 00 NATWEST COMM SER INC NWB/IWB GROUP.

| V/DATE | | DEBITS | CREDITS | TRUE BALANCE | DAYS | DEBIT INTEREST | CREDIT INTEREST |
|---|---|---|---|---|---|---|---|
| 30JUN86 | FED. FUND RATE 7.250000% B/F BALANCE | | | 59,423,195.82- | 1 | 11,967.17 | |
| 1JUL86 | FED. FUND RATE 6.812500% | 1,875,000.00 | | 61,298,195.82- | 1 | 11,599.83 | |
| 2JUL86 | FED. FUND RATE 7.000000% | | 2,320,000.00 | 58,978,195.82- | 1 | 11,467.98 | |
| 3JUL86 | FED. FUND RATE 6.812500% | 2,540,000.00 | 520,000.00 | 60,998,195.82- | 4 | 46,172.24 | |
| 7JUL86 | FED. FUND RATE 6.875000% | 2,500,000.00 | | 63,498,195.82- | 1 | 12,126.39 | |
| 8JUL86 | FED. FUND RATE 6.875000% | 1,130,000.00 | 3,000,000.00 | 61,628,195.82- | 1 | 11,769.27 | |
| 9JUL86 | FED. FUND RATE 6.875000% | | | 61,628,195.82- | 1 | 11,769.27 | |
| 10JUL86 | FED. FUND RATE 6.875000% | | 500,000.00 | 61,128,195.82- | 1 | 11,673.78 | |
| 11JUL86 | FED. FUND RATE 6.437500% | 750,000.00 | 170,000.00 | 61,708,195.82- | 3 | 33,103.87 | |
| 14JUL86 | FED. FUND RATE 6.437500% | 5,000,000.00 | 400,000.00 | 66,308,195.82- | 1 | 11,857.19 | |
| 15JUL86 | FED. FUND RATE 6.375000% | 155,000.00 | 1,400,000.00 | 65,063,195.82- | 1 | 11,521.60 | |
| 16JUL86 | FED. FUND RATE 6.500000% | 660,970.28 | 5,000,000.00 | 60,724,166.10- | 1 | 10,964.08 | |
| 17JUL86 | FED. FUND RATE 6.437500% | 1,810,000.00 | | 62,534,166.10- | 1 | 11,182.32 | |
| 18JUL86 | FED. FUND RATE 6.375000% | 1,000.00 | 3,000,000.00 | 59,535,166.10- | 3 | 31,628.05 | |
| 21JUL86 | FED. FUND RATE 6.375000% | 1,260,000.00 | | 60,795,166.10- | 1 | 10,785.81 | |
| 22JUL86 | FED. FUND RATE 6.312500% | 378,000.00 | 1,500,000.00 | 59,673,166.10- | 1 | 10,463.52 | |
| 23JUL86 | FED. FUND RATE 6.312500% | 1,170,000.00 | 120,000.00 | 60,723,166.10- | 1 | 10,647.63 | |
| 24JUL86 | FED. FUND RATE 6.312500% | 4,130,000.00 | | 64,853,166.10- | 1 | 11,371.82 | |
| 25JUL86 | FED. FUND RATE 6.250000% | 540,000.00 | 1,000,000.00 | 64,393,166.10- | 3 | 33,538.10 | |
| 28JUL86 | FED. FUND RATE 6.312500% | | | 64,393,166.10- | 1 | 11,291.16 | |
| 29JUL86 | FED. FUND RATE 6.250000% | 13,974.15 | 3,000,000.00 | 61,407,140.25- | 1 | 10,660.96 | |
| 30JUL86 | FED. FUND RATE 6.187500% | 10,000.00 | 1,230,000.00 | 60,187,140.25- | 1 | 10,344.66 | |
| 31JUL86 | FED. FUND RATE 6.250000% | 5,931,000.00 | 100,000.00 | 66,018,140.25- | | | |

.G16

NWM 0012045

58-1 CP11 LP16 132 x 64

NEW YORK A220 INTEREST LADDERS TD 31JUL86 BY 31JUL86 187

*****. 140 USA DOLLAR 00153338 00 NATWEST COMM SER INC NWB/IWB GROUP.

| V/DATE | DEBITS | CREDITS | TRUE BALANCE | DAYS | DEBIT INTEREST | CREDIT INTEREST |
|---|---|---|---|---|---|---|

**************************************************

| SUMMARY - | DEBIT | CREDIT | | DEBIT | CREDIT |
|---|---|---|---|---|---|
| AVERAGE BALANCE | 61,778,921 | 0. | INT ADJ PREVIOUS | 0.00 | 0.00 |
| NO OF DAYS | 31 | 0 | INTEREST CURRENT | 347,886.70- | 0.00 |
| HIGHEST DR BAL | 66,308,195 | | COMM RE HIGH O/D | 0.00 | |
| TURNOVER | 29,854,944 | | COMM CODE 1 | 162.00- | |
| NUMBER OF ENTRIES : | 54 | | | | |
| NO AUTOMATIC POSTING - RI | | | NET INT COMM | 348,048.70- | |
| | | | ANC CHARGES | 0.00 | |
| | | | LOCAL TAXES | 0.00 | 0.00 |
| | - LADDER REQUESTED | | UNPAID INTEREST | | 0.00 |
| | | | TOTALS | 348,048.70- | 0.00 |
| | | | NET CHARGE | 348,048.70- | |

NWM 0012046

.H16

SR-1 CP11 LP16 132 X 64

NEW YORK A220 INTEREST LADDERS TO 31AUG85 BY 30AUG85 186
***** 140 USA DOLLAR 00153338 00 NATWEST COMM SER INC NWB/IWB GROUP.

| V/DATE | DEBITS | CREDITS | TRUE BALANCE | DAYS | DEBIT INTEREST | CREDIT INTEREST |
|---|---|---|---|---|---|---|
| 31JUL85 | FED. FUND RATE 8.187500% B/F BALANCE | | 22,363,904.38- | 1 | 5,086.23 | |
| 1AUG85 | FED. FUND RATE 8.000000% | 350,000.00 | 22,013,904.38- | 1 | 4,891.97 | |
| 2AUG85 | FED. FUND RATE 7.687500% 1,500,000.00 | | 23,513,904.38- | 3 | 15,063.59 | |
| 5AUG85 | FED. FUND RATE 7.687500% | | 23,513,904.38- | 1 | 5,021.19 | |
| 6AUG85 | FED. FUND RATE 7.625000% 6,000.00 | | 23,519,904.38- | 1 | 4,981.64 | |
| 7AUG85 | FED. FUND RATE 7.687500% | 100,000.00 | 23,419,904.38- | 1 | 5,001.12 | |
| 8AUG85 | FED. FUND RATE 7.562500% 1,007,000.00 | 100,000.00 | 24,326,904.38- | 1 | 5,110.33 | |
| 9AUG85 | FED. FUND RATE 7.500000% 900,000.00 | 200,000.00 | 25,026,904.38- | 3 | 15,641.81 | |
| 12AUG85 | FED. FUND RATE 7.687500% | | 25,026,904.38- | 1 | 5,344.28 | |
| 13AUG85 | FED. FUND RATE 7.875000% 402,906.82 | 500,000.00 | 24,929,811.20- | 1 | 5,453.39 | |
| 14AUG85 | FED. FUND RATE 8.500000% | 1,100,000.00 | 23,829,811.20- | 1 | 5,626.48 | |
| 15AUG85 | FED. FUND RATE 8.500000% | 500,000.00 | 23,329,811.20- | 1 | 5,508.42 | |
| 16AUG85 | FED. FUND RATE 8.500000% 207,000.00 | 1,000,000.00 | 22,536,811.20- | 3 | 15,963.57 | |
| 19AUG85 | FED. FUND RATE 7.812500% | 2,125,000.00 | 20,411,811.20- | 1 | 4,429.64 | |
| 20AUG85 | FED. FUND RATE 7.750000% | 2,000,000.00 | 18,411,811.20- | 1 | 3,963.65 | |
| 21AUG85 | FED. FUND RATE 7.250000% | 914,000.00 | 17,497,811.20- | 1 | 3,523.86 | |
| 22AUG85 | FED. FUND RATE 7.750000% 8,000.00 | 850,000.00 | 16,655,811.20- | 1 | 3,585.62 | |
| 23AUG85 | FED. FUND RATE 7.562500% 103,905.41 | | 16,759,716.61- | 3 | 10,562.11 | |
| 26AUG85 | FED. FUND RATE 7.687500% 183,000.00 | 500,000.00 | 16,442,716.61- | 1 | 3,511.20 | |
| 27AUG85 | FED. FUND RATE 7.687500% 130,000.00 | | 16,572,716.61- | 1 | 3,538.96 | |
| 28AUG85 | FED. FUND RATE 7.687500% | 500,000.00 | 16,072,716.61- | 1 | 3,432.19 | |
| 29AUG85 | FED. FUND RATE 7.562500% | 200,000.00 | 15,872,716.61- | 1 | 3,334.37 | |
| 30AUG85 | FED. FUND RATE 7.562500% 500,000.00 | 150,000.00 | 16,222,716.61- | 1 | 3,407.89 | |

.616

NWM1498

CONFIDENTIAL

8-132 7 84 10-6

B-132 x 64 10-6

NEW YORK A220 INTEREST LADDERS TO 31AUG85 BY 30AUG85 187

***** 140 USA DOLLAR 00153338 00 NATWEST COMM SER INC NWB/IWB GROUP.

| V/DATE | DEBITS | CREDITS | TRUE BALANCE | DAYS | DEBIT INTEREST | CREDIT INTEREST |
|---|---|---|---|---|---|---|

************************************************************

| SUMMARY - | DEBIT | CREDIT | | DEBIT | CREDIT |
|---|---|---|---|---|---|
| AVERAGE BALANCE | 21,095,083 | 0 | INT ADJ PREVIOUS | 0.00 | 0.00 |
| NO OF DAYS | 31 | 0 | INTEREST CURRENT | 141,983.51- | 0.00 |
| HIGHEST DR BAL | 25,026,904 | | COMM RE HIGH O/D | 0.00 | |
| TURNOVER | 4,947,811 | | COMM CODE 1 | 123.00- | |
| NUMBER OF ENTRIES | 41 | | | | |
| NO AUTOMATIC POSTING - RI | | | NET INT COMM | 142,106.51- | |
| | | | ANC CHARGES | 0.00 | |
| - LADDER REQUESTED | | | LOCAL TAXES | 0.00 | 0.00 |
| | | | UNPAID INTEREST | | 0.00 |
| | | | TOTALS | 142,106.51- | 0.00 |
| | | | NET CHARGE | 142,106.51- | |

.H16

NWM1499

CONFIDENTIAL