IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 95-758T
(Judge Nancy B. Firestone)

NATIONAL WESTMINSTER BANK PLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

SUPPLEMENTAL DECLARATION OF EDWARD JUKES

United Kingdom)
)
City of London ) ss

148 New Road
Chingford
London E4 9SJ
England

I, EDWARD JUKES, of 148 New Road, Chingford, London E4 9SJ, in accordance with 28 U.S.C. § 1746 (2000), hereby DECLARE as follows:

<u>Overview</u>

1. I have been retained by Royal Bank of Scotland through its counsel, Davis Polk & Wardwell, in connection with litigation between National Westminster Bank, PLC and the Government of the United States concerning the taxation of NatWest's U.S. operations during the years 1981 through 1987.

2. In the course of this litigation, I have provided an Expert Report, dated 4 March 2004, and a Declaration, dated 2 May 2005.

Assignment

3. I have been asked to address points relating to my Expert Report and Declaration found in the Defendant's Opposition to Plaintiff's Motion for Summary Judgment and certain exhibits thereto. I also have been asked to advise whether any of my prior conclusions has changed.

4. In preparing this declaration, I have reviewed the Defendant's Opposition to Plaintiff's Motion for Summary Judgment, dated 22 July 2005, the Declaration of Barrie Akin, dated 8 July 2005, the Declaration of Jeffrey L. Dorfman, dated 6 July 2005, and the Declaration of A. Lawrence Kolbe, dated 12 July 2005.

5. For the avoidance of doubt, I would like to make clear that I have read only the documents listed above (and those identified in my Declaration and Expert Report) and have not had access to any Inland Revenue files for my assignments. I intend to address the points asserted with respect to my opinions in defendant's brief and the declarations of defendant's experts.

Confirmation of Prior Conclusions

6. As part of these assignments, I have reached the following conclusions (which I confirm):

a. The Inland Revenue Banking Manual accurately reflects the manner in which the United Kingdom Inland Revenue applied the U.S.-U.K. income tax treaty during the years at issue;

b. The Court's 2003 opinion in this case is consistent with Inland Revenue's actual practice during the years at issue;

c. On the basis of the information set forth in Plaintiff's Report on the Capital Issue dated 29 October 2004, including the report of Kevin Bandoian attached as exhibit C thereto, Inland Revenue would not have sought any further adjustments in respect of capital, including working capital;

d. In the appropriate circumstances, Inland Revenue would have accepted a taxpayer's position that a reserve for specific bad debts with respect to sovereign risk did not diminish cash available for other uses;

e. With respect to the Chicago branch during the years in which it did not have cumulative excess cash flows, Inland Revenue would not have had grounds for asserting that any amounts, other than amounts previously identified and conceded by NatWest, should be disallowed as interest paid on capital or amounts treated as allotted capital because there were not any interest-bearing advances from the head office that could have been used to fund fixed asset purchases;

f. The approach outlined by Dr. A. Lawrence Kolbe in his report on the Capital Issue, dated 4 March 2005, would not have been followed by Inland Revenue; and

g. Inland Revenue would not have used separate underlying records reflecting a loss in one physical location to create an adjustment to capital when there were adequate profits in another location reported on the same tax return, let alone used separate books maintained within a single

physical location to create such an adjustment where their aggregate capital was sufficient.

Qualifications

7. Defendant's brief states that I purport to speak for every Inland Revenue Inspector. I should make clear that I served in the International Division of Inland Revenue, which had a dual operational role whilst I was there, from early 1985 to 1995. It advised Inspectors on interpretations of the law and it assumed responsibility for some of the more difficult cases, including those where litigation seemed a strong possibility. Inspectors were required to submit to the International Division those cases where an impasse had been reached.

8. The International Division in conjunction with the Board's Solicitor would then decide whether to proceed to litigation. The procedures were such that it should not have been possible for a case to proceed to litigation on the Free Working Capital Issue without the agreement of the International Division. For that reason I can confirm that where an impasse had been reached the Inspector could be persuaded to drop lines of argument that did not accord with Inland Revenue's interpretation of a treaty. Thus, even though I cannot speak for every Inspector, I would likely have been aware of any issues as to which there was any controversy.

Relevance of the Inland Revenue Banking Manual

9. In his declaration, Mr. Akin questions the relevance of the Banking Manual to the years at issue. He states that the Banking Manual likely represents the position of Inland Revenue as "it evolved over time" and concludes that "since the Manual was not published in 1981 through 1987 and contains clear indicators that an

extremely relevant part of it did not exist in those years, I cannot see that the application of what is in the Manual as at 1994 is directly relevant to earlier years." (Akin Para. 9). Although Mr. Akin is correct in understanding that no single manual existed in the same form as the Banking Manual before its publication, I can attest that Inland Revenue, generally, and the International Division, specifically, maintained a number of precedent files, each relating to particular points of difficulty in administering the tax law. The International Division's precedent files were created to give consistent and, what was in Inland Revenue's view, correct advice to Inspectors on the interpretation of tax law in international matters.

10. Such a precedent file was maintained in respect of Free Working Capital. This file included correspondence relating to the Counsel's Opinion included in Appendix 9A of the Banking Manual and copies of subsequent submissions from, and advice to, Inspectors in the districts. As specific points were argued on behalf of taxpayers, the Revenue's advice evolved in light of particular facts. I cannot now recall the precise year when the International Division promulgated each aspect of the advice reflected in the Banking Manual. I can say, however, that it is clear in my mind that there was no U-turn by the International Division on any major aspect of Free Working Capital after acceptance of Counsel's Opinion of 1978, which resulted in Inland Revenue dropping attempts to impute to the U.K. branches of U.S. banks a share of the worldwide capital that they might be deemed to use. Therefore, I believe that the International Division of Inland Revenue would have taken the same view of the issues in this case regardless of whether they were raised in 1981, 1985 or 1995.

11. Based on his recollections, Mr. Akin relates that in his experience Inspectors did not follow the criteria on Free Working Capital found in Appendix 9A "slavishly" and that he "encountered a very wide range of attitudes from inspectors as to how London Free Capital should be calculated." (Akin Para. 33). I accept that a particularly robust Inspector of Taxes might, on a particular case, have argued for and achieved more than the International Division would have required to reach a settlement (Akin Para. 30) and that arguments unacceptable to the International Division, such as the net loan position Mr. Akin described, were on occasion conceded. The more important point in this case is that the International Division established consistency on the general principle that, leaving aside the situation where the actual branch capital was higher, fixed assets were the main factor in determining the minimum amount of capital treated as allotted to a branch. Mr. Akin appears to agree with this point. (Akin Para. 34).

Mr. Akin's Analysis of Mr. Bandoian's Report

12. Mr. Akin, in paragraphs 51-66 of his Declaration, explains why he believes that the method used by Mr. Bandoian in his October 29, 2004 report for identifying capital on the books of NatWest is not consistent with the Banking Manual.

13. My understanding is that the import of the NatWest report on the Capital Issue which includes Mr. Bandoian's report of 29 October 2004, is that, after concessions by NatWest, no interest is being claimed in respect of a sum equal to the total of "Balance due Head Office in Fixed Assets," "Balance due Head Office re Capital Loan" and Retained Profits. Also, Mr. Bandoian's report showed that the aggregate of those amounts exceeded Fixed Assets for all of the years at issue.

14. To use the example discussed by Mr. Akin, for the San Francisco branch in 1981, the figures were:

| | |
|---|---|
| Retained Profits | 2,009,222 |
| Due Head Office re Capital Loan | 712,086 |
| Due Head Office re Fixed Assets | 552,914 |
| Premises and Equipment | (395,106) |
| | 2,879,116 |

15. In this example, the Retained Profits, the amounts Due to Head Office re Capital Loan and Due to Head Office re Fixed Assets are all amounts that Inland Revenue would have viewed either as allotted capital or amounts that should be treated as allotted capital. These amounts total $3,274,222. Mr. Bandoian's analysis shows that NatWest did not deduct any interest on these amounts. Since they exceeded the fixed assets of $395,106, no further inquiry would be necessary.

16. Mr. Akin appears to get caught up in the difference between amounts that are "allotted capital" and amounts that are "treated as allotted capital." Mr. Akin assumes for discussion that the sum of amounts due re capital loan and fixed assets is "allotted capital" of $1,265,000 and that the sum of retained profits plus the amount of premises and equipment is an amount "treated as allotted capital" of $2,404,328. He concludes from this that Mr. Bandoian's figure of $2,879,116 is "a higher figure than the Manual requires" (Mr. Akin Paras. 59 and 60). Mr. Akin appears to be opining that the total capital is only $2,404,328 (the "higher of allotted and amounts treated as allotted Free Capital") and not the $3,274,222 of capital that NatWest has conceded. The implication is that NatWest has made an over-concession – that it did not need to concede the capital loan charges to the extent its retained profits exceeded fixed assets. I disagree. In doing

this, Mr. Akin disregards the fact that two of the balances due the Head Office ('re Capital Loan' and 're Fixed Assets') appear to be capital in nature and would, in my view, be treated as such.

17. This may be because Mr. Akin misinterprets the "higher of" allotted capital or amounts treated as allotted capital in the Manual. The Manual simply contemplates that when the head office allots more capital to a branch than the branch uses for capital purposes (as in the case of the $3,274,222 in the example), the branch cannot deduct interest on the excess allotted capital. If the head office allots less capital than it, in fact, advances to the branch for capital purposes, then the total amount that the head office in fact advances for capital purposes (consisting of the amount allotted plus the amount treated as allotted) is treated as capital on which interest may not be deducted. That is all the "higher of" language in the Manual means. I note that Mr. Akin's recollection of actual practice is consistent with this and not with the computations he now proposes. (Akin Para. 41).

18. Mr. Akin raises concerns over the proper determination of working capital and the possible recharacterization of advances from the head office as capital funding where a branch had Premises and Equipment exceeding allotted capital, which was the case in Chicago in 1983 (Mr. Akin Para. 61). Mr. Akin's point would arise, if at all, only if each branch were treated as a separate permanent establishment. In my view, Inland Revenue would not have sought to do this.

19. Whereas Mr. Akin acknowledges that he had no experience with a foreign bank that had more than one branch in the U.K., I did have such experience. As I stated in my Declaration of 2 May 2005 at paragraph 27, I was involved in such a case, which

included the issue of Free Working Capital, while I was within the International Division. I am confident that only one assessment to tax was made on that bank. In negotiating the settlement (involving adjustments to Free Working Capital, claims to double taxation relief and attribution of profit) the branches were treated as a single permanent establishment. I recall consulting the Inland Revenue precedent files and Instruction Manuals as to the correct procedures, although I do not recall whether there were losses in one branch and profits in another. I also recall that Inland Revenue was relaxed as to whether the taxpayer filed their accounts on an aggregate basis or by reference to physical locations. I do not think that it would have been appropriate to evaluate the branches separately for purposes of computing amounts to be treated as Allotted Capital, even if they maintained separate sets of books, when the bank submitted its tax return as a single permanent establishment. If the permanent establishment was in profit overall, Inland Revenue would not, in my view, have argued that nevertheless capital should have been injected to cover the losses of what would have been just one part of a single profitable business for U.K. tax purposes.

20. Mr. Akin appears to confuse the intent of the Banking Manual when he questions my opinion with regard to my acceptance of NatWest's cash flow analysis as evidence of sufficient funding for fixed assets, notwithstanding the bad debt reserve made on the last day of 1987. I have been satisfied that, taking the branches as a whole, the sum of "Retained Profits", "Balance Due Head Office re Capital Loan" and "Balance Due Head Office re Fixed Assets" was more than sufficient to cover expenditures on Fixed Assets and to absorb any losses until the year ended 31 December 1987. I believe the cash-flow analysis coupled with the A207 report for 31 December 1987 showing the

"New Sovereign Risk" bad debt allocation on the last day of the year is further evidence demonstrating that the U.S. operations did not require capital infusions during 1987 to fund fixed assets. Mr. Akin recognizes this as a "valid point". (Akin Para. 71).

21. Mr. Bandoian's Declaration of 30 April 2005 concentrated on cash flows to show that, if the Inspector took the position that the branches should be dealt with separately and focused on the interaction between losses and expenditures on fixed assets, the cash flow was adequate to fund the expenditure on fixed assets or to absorb the effect of the losses, other than for the years identified. Although I do not believe Inland Revenue would have argued for the evaluation of allotted capital on a branch-by-branch basis for U.K. tax purposes, I do not think that even the most robust Inspector could have argued successfully, in light of these facts, that further sums should be treated as allotted capital. Even if such an argument had been developed by an Inspector, in my opinion the International Division would not have been prepared to take this position in litigation.

22. In its opposition brief, defendant states that the Inland Revenue Banking Manual (in Appendix 9A., Para. 10.1a) places a "tracing burden squarely on the bank" to show that a purchase of fixed assets was undertaken with a branch's retained profits. (Def. pp. 25-26). I disagree. That paragraph contemplates the likelihood that in a start up situation, Fixed Assets will be acquired with funds that will be treated as capital. In this scenario, the paragraph requires the bank to provide evidence if it is to be argued that the premises were acquired with borrowed money, and suggests tracing. It should be borne in mind that a U.K. branch of a foreign bank would typically have been established to participate in the Eurodollar market, and therefore would have conducted a substantial

amount of its London business in U.S. dollars, but nevertheless would have required sterling to purchase its U.K. fixed assets. In this situation, tracing could be possible.

Where, however, a branch has been in existence for some time, the paragraph recognizes that any further acquisition of assets may be acquired with funds that will be treated as capital but may alternatively be funded out of retained profits. It is silent as to what evidence should be adduced if it was to be argued that the bank acquired further fixed assets out of retained profits. In my view, the factors listed at Para. 14 of my Declaration of 2 May 2005 are such that Inland Revenue would have accepted that, in the years at issue, no interest bearing loans from the head office were used to fund further fixed asset acquisitions but rather that such acquisitions were made out of interest free monies such as retained profits.

23. Defendant also argues that the Inland Revenue Banking Manual (in Example 4) would have required NatWest to retain records from the inception of its operations in the United States in the early 1970s as evidence of all of its purchases of fixed assets throughout the years (Def. pp. 26-27). The facts in this case, in which the sum of the interest-free capital loans and retained profits for the U.S. operations exceeded the fixed assets in the United States, establish that there was adequate capital to fund fixed assets at the commencement of the period in issue. Under these circumstances, in my view, Inland Revenue would not have looked back to years prior to the years at issue to determine how fixed asset purchases were funded.

24. Where there was inadequate cashflow with respect to Chicago in 1981 and 1982, I am inclined to the view that Inland Revenue would not have pursued the point in

light of the information provided by Mr. Bandoian in his 4 March 2005 Declaration, to wit that no interest was paid to the head office in 1982 and that all the interest paid to the head office in 1981 was associated with specific short-term money market transactions (Mr. Bandoian Para. 23). However, as I still take the view that Inland Revenue would have dealt with the branches in aggregate, this is, for me, somewhat academic.

25. Although I have been provided the Declaration of Mr. Jeffrey L. Dorfman, I am not sure that it is appropriate for me to comment overly on what is seemingly a proposed draft of instructions that Mr. Dorfman will issue to his International Examiners. I must observe, however that it does appear that Mr. Dorfman is construing the Banking Manual as if it were a statute, rather than guidance to Inspectors. Additionally, it bears pointing out that beginning with paragraph 26 and continuing with paragraphs 27, 30 and subsequent paragraphs, Mr. Dorfman, although asserting an interpretation of the Banking Manual, seems to be trying again to introduce an economic argument and ignore the requirement that it is the actual conditions that have to be taken into account and that no notional capital base can be assumed.

26. I have already commented on Dr. Kolbe's economic arguments in my prior declaration at paragraph 24.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON AUGUST 16, 2005.

Edward Jukes