# In the United States Court of Federal Claims

**No. 95-758T**
**(Filed: December 16, 2005)**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **NATIONAL WESTMINSTER BANK, PLC,** | * | |
| | * | |
| **Plaintiff,** | * | **U.S. - U.K. Tax Treaty; Summary Judgment; Conflicting Expert Testimony.** |
| **v.** | * | |
| **THE UNITED STATES,** | * | |
| **Defendant.** | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * | * | |

*D. Scott Wise*, New York, NY, for plaintiff. *Mario J. Verdolini, Jr.* and *Leslie J. Altus*, New York, NY, and *John L. Carr, Jr.*, *Michael C. Moetell*, and *Thomas M. Buchanan*, Washington, D.C., of counsel

*Steven I. Frahm*, U.S. Department of Justice, Washington, DC, with whom were *Eileen J. O'Connor, Assistant Attorney General*, and *Mildred L. Seidman*, Chief, for defendant.

**OPINION ON SUMMARY JUDGMENT**

**FIRESTONE**, *Judge*.

This case comes before the court on a motion for summary judgment by the plaintiff, National Westminster Bank PLC ("plaintiff" or "NatWest"), a United Kingdom ("U.K.") bank. The plaintiff argues that under a treaty between the United States and the

United Kingdom, it is entitled to a refund of some of its federal income tax on the income of its branches located in the United States. The defendant, the United States ("government" or "United States") argues that there are genuine issues of material fact that preclude summary judgment. For the following reasons, the plaintiff's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

## PROCEDURAL BACKGROUND

The history of this litigation may be summarized as follows. NatWest filed this suit in 1995 for a refund of its federal income tax for the tax years 1981 through 1987. NatWest is a publicly-held U.K. corporation engaged in a world-wide banking business, which is managed in the United Kingdom. During the years at issue, NatWest conducted business in the United States in both branch and subsidiary form. This case concerns the amount of profits that should be attributed to the U.S. branch operations of NatWest under Article 7 of the Convention for the Avoidance of Double Taxation, U.S.-U.K., Dec. 31, 1975, 31 U.S.T. 5668 ("Treaty"), and whether NatWest overpaid its U.S. federal income taxes on those profits.

This is the third motion for summary judgment that has been filed in this case. Soon after filing suit, NatWest filed a motion for partial summary judgment arguing that the United States had violated NatWest's rights under the U.S.-U.K. Treaty when the United States applied Treasury Regulation § 1.882-5 to re-calculate the interest income and expense NatWest had claimed in its tax computations. Under Treasury Regulation § 1.882-5, the government disallowed NatWest's deduction of interest expenses on inter-

branch transactions from NatWest's income. Using the data NatWest supplied, the government determined that NatWest owed additional federal income taxes. In its initial motion for partial summary judgment, NatWest asserted that Treasury Regulation § 1.882-5 was invalid as applied to branch banks under the U.S.-U.K. Treaty and that therefore it was entitled to deduct its interest expenses on inter-branch transactions. The court ruled that the regulation was inconsistent with the separate entity provision of Article 7(2) of the Treaty, which provides that where a U.K. bank carries on a business through a U.S. permanent establishment, there must be "attributed to that permanent establishment the profits which it might expect to make if it were a distinct and separate enterprise engaged in similar activities under the same or similar conditions and dealing wholly independently with the enterprise of which it is a permanent establishment."

The court further held that the profits of a U.S. branch of a U.K. bank should be determined on the basis of the branch's books and records, "maintained as if the branch were a distinct and separate enterprise, dealing wholly independently with the remainder of the foreign corporation" subject to adjustments as necessary to attribute "adequate capital to the branch" and "to insure use of market rates" in computing interest, also referred to as the "arm's-length" issue. See Nat'l Westminster Bank, PLC v. United States, 44 Fed. Cl. 120, 128 (1999) ("NatWest I").

In June 2002, the parties engaged in another round of partial summary judgment briefing on the "capital" issue. In particular, the court sought to resolve the widely different theories regarding the meaning of the court's ruling on "capital" in NatWest I.

In its November 2003 Opinion, Nat'l Westminster Bank PLC v. United States, 58 Fed. Cl. 491 (2003) ("NatWest II"), and January 2005 Order Denying Reconsideration ("January 18, 2005 Order"), the court held that the government could not require NatWest to re-characterize loans from other branches to establish a 6%-7% capital base, which was approximately equal to the amount that would have been required if the branch were a domestic subsidiary. Instead, the court agreed with NatWest that under the Treaty the court was bound to look at the business records of the entity and make adjustments only to the extent that the branch's capital was not properly identified in the branch's books and records. In this connection the court ruled that NatWest's position was consistent with the historic position of the U.K., as set forth in the United Kingdom's Inland Revenue Banking Manual ("Manual"). The Manual provides a framework for determining deductible interest expense through two concepts: "allotted capital," which is actually identified as capital on the branch's books and records, and "amounts treated as allotted capital," which are used to make adjustments to allotted capital. The court found, based on the guidance set forth in the Manual, that the "properly maintained books for the U.S. branch could be adjusted where: (1) an interest expense was deducted for advances to the branch [from inter-branch sources] that were not used in the ordinary course of its banking business; (2) an interest expense was deducted on amounts designated as capital on its books or on amounts that were in fact allotted to it for capital purposes, such as funding capital infrastructure; and (3) interest paid [or received] on inter-branch transactions was not at arm's- length [rates]." 58 Fed. Cl. at 505. The court then went on

to state that the Manual "will provide an adequate basis for the parties to resolve the 'capital' accounts of the branch and the interest deduction allowed by the branch." 58 Fed. Cl. at 506.

Following a period of discovery on the capital and arm's-length issues, the court adopted NatWest's suggestion that the court consider the remaining issues on summary judgment.

In the pending summary judgment motion, NatWest contends that it is entitled to a refund of $65,808,076 plus interest.[1] NatWest asserts that the uncontroverted evidence establishes that (1) NatWest has properly identified the interest expense deducted from NatWest's U.S. branch profits and has not deducted interest on amounts designated as capital or on amounts that should be treated as capital and (2) the interest paid and received by its U.S. branch operations on inter-branch and inter-company transactions was at arm's-length rates.

The government responds that genuine issues of material fact preclude awarding summary judgment to NatWest. Based on the parties' arguments, the court must decide: (1) whether the books and records of NatWest's branch offices were "properly maintained"; (2) what number of "permanent establishments" NatWest maintained in the United States for tax purposes; (3) whether NatWest paid interest (which it then deducted from its profits) on allotted capital or amounts to be treated as allotted capital; and (4)

---

[1] This amount represents the $66,234,336 the plaintiff sought less the $426,260 adjustment that the plaintiff accepted for purposes of this motion.

whether NatWest paid and received arm's-length interest rates on both (a) money market transactions and (b) clearing account transactions. For the reasons set forth below, NatWest's motion for summary judgment is Granted in Part and Denied in Part.

## FACTUAL BACKGROUND

In support of its motion for summary judgment NatWest has filed seven affidavits and declarations, two expert reports, and sixteen volumes of exhibits. The defendant, in response, has filed six affidavits and seven volumes of exhibits. The controverted and uncontroverted facts may be summarized as follows.

### A. NatWest's Books and Records

It is not disputed that NatWest maintained separate books and records for each of its branch offices in the United States. The manner in which NatWest maintained branch books and records is set forth in the declaration of Roger Walmsley, a NatWest employee from 1959 to 1995. Mr. Walmsley served as the manager of the San Francisco office from 1975 to 1979. From 1982 to 1987 he served as the deputy manager, and then manager, of the New York branch. He served as the head of international operations for NatWest from 1991 to 1995. Mr. Walmsley explains in his declaration that the daily activity of U.S. branch operations were entered on a computerized record keeping system, which would generate a number of daily and other periodic reports. Walmsley Decl. ¶¶ 13-15. According to Mr. Walmsley, at the end of each fiscal quarter, the New York, Chicago, and San Francisco branch offices would prepare profit and loss statements and balance sheets based on the computerized records. Id. ¶ 15. Mr. Walmsley states that

each branch manager was required to certify the balance sheets and profit and loss statements to be true and accurate. Id. These profit and loss statements and balance sheets were then submitted to the Head Office in London for use in preparing NatWest's worldwide consolidated financial statements. Id.

Mr. Walmsley goes on to explain that detailed verification procedures were used by branch staff in preparing the reports. Mr. Walmsley states that without prior notification NatWest's head office regularly inspected the books and records of its U.S. branch operations to ensure compliance with the bank's internal standards as well as the standards of the Bank of England which had regulatory supervision over the bank as a whole. Id. ¶ 20. Bank regulators in the United States also performed regular examinations of NatWest's books and records and consistently found them to be satisfactory. Id. ¶ 21. It is not disputed that NatWest's internal controls for foreign exchange and money market transactions were cited by the Bank of England as a model for other banks. Id. Finally it is not disputed that the U.S. federal income tax returns that NatWest filed for each of the years in question were derived from the same separate accounts maintained by the U.S. branch operations that are at issue on this motion.

Although the government does not challenge these factual assertions, it disputes that NatWest's books and records were properly maintained. In support of its opposition to NatWest's motion for summary judgment, the government submits the declaration of A. Lawrence Kolbe, a consultant with The Brattle Group, where he specializes in financial and regulatory economics. Mr. Kolbe asserts that there are questions about the

books and records relied upon by NatWest because (1) it is not clear whether corrections made to the branch records by NatWest's Head Office in preparing final financial statements for the entire enterprise are reflected in each branch's books and records;[2] (2) the books and records do not identify capital[3] by line-item; (3) the books and records identify accumulated losses as an asset; and (4) the books and records indicate that the lines between and among branches were not respected, for example: although there are 4 separate offices in New York (International Banking Facility ("IBF"), Grand Cayman, Nassau, and New York), 100% of the collective personnel costs, building costs, and other overhead costs are carried by the New York branch alone; in addition, the New York branch carried the premises and equipment costs for the Chicago and San Francisco offices for 1986 to 1987.

**B. Number of Permanent Establishments**

It is not disputed that during the tax years at issue in this litigation, 1981 through

---

[2] Mr. Kolbe identifies the statements in the deposition of Reuben Tatz, who served as the financial comptroller for NatWest in San Francisco starting in 1987, in support of his assertion. See Def.'s Ex. 19 at 16-21. Mr. Tatz states: "In many cases there was a lot of interaction between the financial control department in London and the financial control department in New York, which was there to assist the branch in sorting out issues. . . . [A]t the end of the day everything gets reconciled." Id. at 17-19. NatWest explains that the reconciliation process did not undermine the integrity of the branch records. Mr. Anthony Scott, a chartered accountant in the U.K., who joined NatWest in 1978 and was in charge of preparing NatWest's consolidated financial statements, explains in his declaration that "[i]n accordance with banking custom, the U.S. operations performed ongoing reconciliations of account differences resulting from items in transit, in clearing or awaiting settlement or from misdirected payments, among other things." Scott Decl. ¶ 15.

[3] NatWest does not dispute that its branch records do not contain a separate capital portion on the balance sheet. NatWest contends, however, that certain line items on the liability side of the balance sheet include items that were plainly identifiable as capital.

1987, NatWest had six branch offices in the United States: (1) the New York Branch; (2) the IBF; (3) the Nassau Branch; (4) the Grand Cayman Islands Branch; (5) the Chicago Branch; and (6) the San Francisco Branch (sometimes referred to as the "San Francisco Overseas Branch" or the "San Francisco Depository Agency"). The first four branches were located in New York, in the same building. NatWest maintained separate profit and loss statements and balance sheets with respect to each branch office.

One of the core disputes between the parties is whether these six branch offices can be treated as a single permanent establishment for purposes of calculating NatWest's tax obligation for the years in question or whether each must be treated separately for purposes of calculating NatWest's tax liability. NatWest, relying on its long history of filing a single U.S. tax return that aggregated the six branch offices, as well as expert opinion regarding the Manual, asserts that it had a single permanent establishment in the United States and therefore the books and records of the six branch offices can be aggregated into a single unit for tax purposes. In the alternative, NatWest asserts that the Manual would have allowed NatWest to identify three branches based on physical location.

In support of its view, NatWest has submitted the declaration of Edward Jukes, a retired tax official of the United Kingdom Inland Revenue ("Inland Revenue"). He served in various offices, including the International Division, where he served for ten years, from 1985 to 1995. Mr. Jukes retired from Inland Revenue as the head of Inland Revenue's Special Investigation Section. While working in the International Division,

Mr. Jukes worked directly on investigations involving the computation of profits by foreign bank branches in the United Kingdom. It is Mr. Jukes' opinion that the Inland Revenue would have dealt with the branches in the aggregate. As he states in his declaration:

> There were some foreign banks that had branches in more than one location in the U.K. during the 1980s. My recollection is that the Inland Revenue permitted these banks to file their accounts either on an aggregate basis or by separate physical location. The Inland Revenue would not have used separate underlying records reflecting a loss in one physical location in the United Kingdom to create an adjustment to capital when there were adequate profits in another U.K. location reported on the same U.K. income tax return. We certainly would not have used separate books maintained within a single physical location to create such an adjustment where their aggregate capital was sufficient.

Jukes Decl. ¶ 27.

In his supplemental declaration Mr. Jukes states:

> I also recall that Inland Revenue was relaxed as to whether the taxpayer filed their accounts on an aggregate basis or by reference to physical locations. I do not think it would have been appropriate to evaluate the branches separately for purposes of computing amounts to be treated as Allotted Capital, even if they maintained separate sets of books, when the bank submitted its tax return as a single permanent establishment. If the permanent establishment was in profit overall, Inland Revenue would not, in my view, have argued that nevertheless capital should have been injected to cover the losses of what would have been just one part of a single profitable business for U.K. tax purposes.

Jukes Supp. Decl. ¶ 19.

Based on its history of filing a single tax return for all six branch offices and Mr. Jukes' declarations, NatWest argues that there was either one permanent establishment for tax purposes or at most three permanent establishments, one in each of the three U.S.

locations.

The government challenges Mr. Jukes' interpretation of the Inland Revenue Manual. The government has submitted the declaration of Barrie Akin, an English barrister specializing in United Kingdom taxation. Mr. Akin states: "[M]y guess is that the UK Revenue would have readily accepted computations based on a single set of accounts for all branches if those were the only accounts produced, but would have wished to consider carefully whether the deliberate separation into branches or the deliberate amalgamation of the figures produced for separate branches was acceptable . . . ." Akin Decl. ¶ 44.

The government also relies on Mr. Kolbe. Mr. Kolbe states in his declaration that there are books and records for six branches, not one or three, and therefore, as a matter of fact there are six permanent establishments. Kolbe Decl. ¶ 11. According to Mr. Kolbe, NatWest must separately account for "capital" at each branch and is not allowed to aggregate the balance sheets of the six branches into a single permanent establishment. See Kolbe Decl. ¶¶ 52-53.

**C. Interest on Allotted Capital or Amounts Treated As Allotted Capital**

It is not disputed that, prior to filing for summary judgment, NatWest examined its books and records and, based on NatWest's reading of the Manual, corrected its tax returns to eliminate interest paid on capital. In conducting this task, NatWest endeavored to determine what amounts were "allotted capital" and which additional amounts, if any, should be "treated as allotted capital." NatWest based its examination on its reading of

both the court's opinion and the Manual. NatWest therefore did not identify any specific percentage of economic "capital" for its U.S. branch operations. Instead, NatWest examined its books and records to determine whether capital was provided to the branches to support operations, start up costs, or fixed assets and whether it paid interest on those amounts. Because it appears from the Manual that interest on capital infusions for these purposes should not be deducted from profits, NatWest needed to identify those payments and then correct its profit and loss statements to eliminate interest paid on those amounts. Based on its examination, NatWest contends that it has identified and conceded all interest expense erroneously deducted on capital.

More specifically, it is not disputed that included on the liabilities side of NatWest's branch operation's balance sheets were line items labeled: "Balance due to HO [head office] re Capital Loans (code LEB)." See Def.'s Resp. Prop. Find. Uncontr. Fact ¶ 113. The balance sheets also identified "Balance due to HO re fixed assets (code LFB)," "Provisions of B&DD [bad and doubtful debts]," "profit and loss" and "retained profits." See id. NatWest contends that these items taken together make up branch "capital." NatWest contends, however, that it paid interest only on "Capital Loans" and therefore deducted interest only on "Capital Loans."

NatWest produced evidence to show that from the inception of NatWest's U.S. branch operations in the 1970s, advances from the Head Office to branches outside the United Kingdom, which were used to purchase fixed assets or for other capital purposes such as initial working capital, were separately identified on the branches' books as

"Capital Loans." Scott Decl. ¶¶ 11-12. NatWest also produced evidence to show that beginning in 1977, NatWest's Financial Control department decided that branches should not incur interest expenses on the amounts provided to them from the Head Office for their fixed assets. Scott Decl. ¶ 11. According to the undisputed declaration of Anthony Scott, NatWest's policy against charging interest on Head Office advances with respect of fixed assets continued to be in effect during the years at issue. Id.

NatWest concedes that although branches did not, as a matter of policy, pay or deduct interest on advances to fund fixed asset purposes, the branches did pay an interest charge, called a "capital loan charge" to the Head Office with respect to un-repatriated profits. Capital loan charges were paid on the excess of retained profits (plus any balances due to the head office for capital loans or fixed assets) over fixed assets. Jukes Decl. ¶ 14. As NatWest explains in its reply brief, the capital loan charges could be viewed as retained profits that were automatically repatriated and advanced back to the branch as a loan. Pl.'s Reply 16.

NatWest concedes that the following interest expenses were capital loan charges and are therefore not deductible from profit: (1) 1981: $465,868; (2) 1982: $209,433; (3) 1983: $202,745; (4) 1984: $390,459; (5) 1985: $0; (6) 1986: $2,336,260; and (7) 1987: $1,936,537. Pl.'s Prop. Find. Uncontr. Fact ("PFUF") ¶ 118. Apart from these amounts, NatWest contends that the U.S. branch offices did not deduct or pay any interest on any amount designated or in fact allotted to the branches as capital for the years at issue. PFUF ¶¶ 120-21. NatWest has also subtracted all intra-U.S. interest income and expense

from its profit and deductions, resulting in increases in NatWest's taxable income for the following years: (1) 1982: $23,991; (2) 1984: $231,163; (3) 1985: $38,246; and (4) 1987: $71,877. PFUF ¶¶ 166-67.

NatWest asserts that the branches did not receive any additional funds from the Head Office that otherwise should be "treated as allotted capital." NatWest contends that the U.S. branches were self-sufficient and did not need capital infusions from the Head Office to operate. NatWest reported over $140 million in taxable income to the United States Internal Revenue Service ("IRS") with respect to its U.S. operations during the years at issue. Jukes Decl. ¶ 14. NatWest further asserts that it acquired approximately $42 million in fixed assets and repaid approximately $12 million to the Head Office in Capital Loans and Balances for Fixed Assets. PFUF ¶¶ 10-11. NatWest contends that the branches had sufficient profits and cash flow to pay for its fixed assets and to be self-sustaining.

In support of this view, NatWest relies on the original and supplemental declarations of Kevin Bandoian, an accountant with PricewaterhouseCoopers, LLP, who states that based on his independent review of the U.S. branches' books and records, "U.S. branches in the aggregate had sufficient cash flow (exclusive of cash flows from ordinary course borrowings) to fund their purchase of fixed assets during the Covered Period [1981-1987]." Bandoian Supp. Decl. ¶ 41. Mr. Bandoian states that he also looked at the New York, San Francisco and Chicago branch offices separately to determine if the offices were self-sustaining. Mr. Bandoian's study concludes that the San Francisco

office had sufficient interest-free funds to cover the total of its fixed asset expenditures during each of the years at issue. Id. He also concluded that the New York office (which included the New York Branch, IBF, the Nassau Branch and the Grand Cayman Branch) had sufficient interest-free funds to cover its fixed asset expenditures during the years at issue. Id. ¶ 42. Finally, Mr. Bandoian states that the Chicago office had sufficient interest-free funds to cover the total of its fixed asset purchases during 1983 to 1987. For the years 1981 to 1982, when the Chicago office reported a loss, Mr. Bandoian states that he had traced all of the interest paid to the Head Office and concluded that payments could only be traced to specific short-term money market deposits from the Head Office. Id. ¶ 43. There were no additional interest payments made to the Head Office. Id. The Chicago office did not pay any interest expense to the Head Office in 1982. Id.

The government relies on the declarations of Mr. Kolbe, Mr. Akin, and Mr. Jeffrey Dorfman (an international tax expert from the IRS) to challenge NatWest's reading of the Manual and NatWest's conclusion that it has conceded all appropriate interest deductions on capital. Mr. Kolbe and Mr. Dorfman take issue with NatWest's failure to include deductions of interest on amounts based on the "economic" principles of "bank capital." Both Mr. Kolbe and Mr. Dorfman contend that it would be appropriate under the Manual to designate an amount of capital on each branch office's books and records that reflects the economic capital each branch would need to meet the economic risks assumed by the branch. Dr. Kolbe states in his declaration as follows: "[B]ank capital serves purposes in addition to the purchase of premises and fixed assets. Three such purposes of bank capital

are important for the assignments I have been given: Purchase of various physical assets; Risk-bearing; and Provision of security to other suppliers of bank funds." Kolbe Decl. ¶ 28. Bank capital, Dr. Kolbe goes on to explain, "is a cushion against a drop in the value of its assets, which could force the bank into insolvency." Kolbe Decl. ¶ 29 (quoting Frederick S. Mishkin, The Economics of Money, Banking and Financial Markets 204 (7th ed. 2004)). Mr. Kolbe questions NatWest's focus on the payment of fixed assets as the proper test of "capital adequacy." Id. Mr. Kolbe also questions NatWest's failure to account for amounts that would have been required to cover the accumulated losses in the Chicago, New York, and Grand Cayman Island branch offices for certain years. As noted above, the government contends that each branch operation must be treated as a separate permanent establishment under the Manual. Thus, Mr. Kolbe states, "[i]f no branch could operate independently and at arm's length from the rest of the bank with capital equal merely to premises and fixed assets, . . . a fortiori no branch could operate independently and at arm's length from the rest of the bank with negative capital." Kolbe Decl. ¶ 51.

Mr. Akin, the government's expert on the Manual, does not challenge NatWest's interpretation of the Manual with regard to economic capital. He concurs in NatWest's contention that Inland Revenue focused on fixed assets as the measure of capital. Mr. Akin states that "the most common approach for Inspectors [for determining capital] . . . was to increase it by reference to premises and fixed asset costs." Akin Decl. ¶ 34. Mr. Akin goes on to state:

> Plaintiff is making the assumption that amounts described in its accounts as

> loans from head office re capital or fixed assets are actual allotted capital. This is not, in my view, unreasonable, but it does not prevent the Revenue from asking whether the amount that should be treated as capital should be greater in any particular case.

Akin Decl. ¶ 42.

Mr. Akin asserts that under the Manual, payments for fixed assets should be treated as capital unless "the branch show[s] the assets have been funded out of reserves." Akin Decl. ¶ 70. Mr. Akin questions whether NatWest has sustained this burden given the years that some branch offices sustained undisputed losses.

**D. Arm's-Length Interest Rates**

The arm's-length issue concerns whether NatWest provided more favorable interest rates to related parties, as compared to third parties, on clearing accounts and on money market transactions. If NatWest did not charge or receive arm's-length rates, additional profit would have to be attributed to NatWest to account for amounts that were not based on arm's-length interest rates. NatWest contends that the uncontroverted facts establish that all of its dealings with related parties were at arm's-length interest rates. The government has submitted expert affidavits challenging NatWest's assertion.

**1. Money Market Transactions**

In support of its assertion that all inter-branch money market transactions reflected market or arm's-length rates, NatWest relies on the declaration of Mr. Walmsley, who stated that he was unaware of any money market transactions undertaken in the U.S. branches for the years at issue that were taken with other than market rates of interest.

Walmsley Decl. ¶ 47. Scott Payseur, Senior Vice President of the Money Market's unit of NatWest, filed an affidavit to the same effect. Payseur Aff. ¶ 22. NatWest also relies on the declaration of Dr. Clair. Dr. Clair concludes based on a 1% sample of trading days for each of the years at issue that his statistical analysis confirms the facts as represented by Mr. Walmsley and Mr. Payseur. Clair Decl. ¶ 46.

The government asserts based on the declaration of Mr. Read that Dr. Clair's sampling analysis is problematic in that it is not large enough to draw "meaningful" conclusions. Mr. Read asserts that a proper sampling analysis would involve "transactions" rather than trading days. Mr. Read concludes that he disputes the results of Dr. Clair's analysis "which are based on the sample he selected." Read Decl. ¶ 39. Mr. Read nonetheless concedes that he could not reach a conclusion contrary to Dr. Clair's conclusion: "I could not reach a conclusion with confidence about the arm's-length nature of the interest rates, because the number of transactions I was able to examine was very small." Read Decl. ¶ 7.

In response to Mr. Read's declaration, NatWest has submitted a supplemental declaration by Dr. Clair. Dr. Clair addresses Mr. Read's criticisms of his analysis regarding money market transactions. Dr. Clair states that he performed standard statistical tests to discern the presence of the problems identified by Mr. Read. Dr. Clair concludes that the test results "reaffirm my prior conclusion that the regression analysis shows that there is no statistically significant association between the interest rates on deposits or placements with the identity of the customer as a related or unrelated party."

Clair Supp. Decl. ¶ 35.

**2. Clearing Accounts**

It is not disputed that clearing accounts at the U.S. branches allowed customers to make deposits and payments in U.S. dollars. These accounts worked much like checking accounts in which dollars were deposited that could then be used to make or receive payments to or from other parties. The U.S. branches charged both related and unrelated customers a fixed per item commission for processing payments into and out of these accounts. In addition, the U.S. branches charged interest on negative overnight balances in the accounts (i.e., overdrafts) and paid interest ("credit interest") on positive overnight balances in the accounts. It is not disputed that when the balance was positive, the branch computed notional interest that reduced the fees or commission owed.

Based on the declarations of Mr. Walmsley, NatWest asserts that the U.S. branches always employed market rates and that no favors were given to related parties. NatWest concedes that the U.S. branches computed interest on clearing accounts using two pricing structures, which gave more favorable rates based on higher activity levels. Mr. Walmsley states, however, that related parties were treated the same as unrelated parties under the higher activity structure. Walmsley Decl. ¶ 27. NatWest also relies on the work of Dr. Robert Clair, an economist with KPMG LLP and former economist with the Dallas Federal Reserve Bank. Dr. Clair states that his study of NatWest's rates confirms that more favorable rates were not based on status as a related party. Dr. Clair asserts that the more favorable rates were provided to both related and non-related parties with higher

activity rates. Clair Rep. 33.

The government, relying on the declaration of Mr. James Read, an accountant with The Brattle Group, disagrees with NatWest's assertions and contends that there is evidence to show that some related party accounts were given a more favorable rate structure even though the related party had less activity than third parties with greater activity. Mr. Read states that as a consequence NatWest's branches reported less profit than they should have reported. Based on his analysis, Mr. Read concludes that NatWest should be credited with an additional $10,553,577 of profit. Read Decl. ¶¶ 25-27.

In response, NatWest has filed supplemental affidavits from Mr. Walmsley and Dr. Clair. They assert that Mr. Read's adjustment to income relates almost entirely (96.6%) to income received by the New York branch on a revolving loan provided to NatWest Commercial Services, Inc. NatWest states that revolving loans are not the same as clearing accounts. Walmsley Supp. Decl. ¶ 3; Clair Supp. Decl. ¶¶ 46-48, 60. NatWest also argues that NatWest Commercial Services, Inc. is an affiliate rather than a related party or a third party. NatWest therefore contends that Mr. Read's analysis of clearing accounts must exclude NatWest Commercial Services' revolving account. NatWest also questions Mr. Read's use of three months of data from the last two years at issue to create an adjustment covering all seven years. Clair Supp. Decl. ¶¶ 54-55.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is authorized when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"). The applicable standards for analyzing a motion for summary judgment are well-established. The party moving for summary judgment bears the burden of showing the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. The party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The defendant must identify for the court some dispute of fact that is material to the legal issues presented in the case in order to successfully oppose a motion for summary judgment. See RCFC 56(e) (noting that the nonparty "must set forth specific facts showing that there is a genuine issue for trial").

In this connection, an expert's "conclusory statements" are not sufficient to defeat a motion for summary judgment. Johnston v. IVAC Corp., 885 F.2d 1574, 1578 (Fed. Cir. 1989). "[T]he expert must set forth the factual foundation for his opinion . . . an unsupported conclusion on the ultimate issue . . . is insufficient to raise a genuine issue of fact." Arthur A. Collins, Inc. v. N. Telecom Ltd., 216 F.3d 1042, 1047-48 (Fed. Cir. 2000).

In addition, the court has before it the affidavits of several expert witnesses offering differing interpretations of the Inland Revenue Manual. It is well-established that the court may consider expert opinion to determine the meaning of a foreign law. See

RCFC 44.1 ("The court, in determining foreign law, may consider any relevant material or source, including testimony . . . ."). The proper interpretation of a regulation or agency guidance, such as the Inland Revenue Manual, presents a question of law that the court must resolve. See, e.g., Bammerlin v. Navistar Intern. Transp. Corp., 30 F.3d 898, 900 (7th Cir. 1994) ("The meaning of federal regulations is not a question of fact to be resolved by the jury after a battle of experts. It is a question of law, to be resolved by the court.").

Finally, the court is mindful that as the taxpayer, NatWest has the burden of first going forward to establish that the government's assessment is either erroneous or wrongful and then to establish by a preponderance of the evidence that it has overpaid its taxes. Lewis v. Reynolds, 284 U.S. 281, 283 (1932) ("An overpayment must appear before refund is authorized."). "Not only must the plaintiff show that the Commissioner was wrong, but he must go further and establish the essential facts from which a correct determination of his tax liability can be made." Roybark v. United States, 104 F. Supp. 759, 762 (S.D. Cal. 1952). The taxpayer must show that it has overpaid its tax and the taxpayer must show the exact amount to which it is entitled.

Here, the plaintiff has met this burden by establishing that the government's assessment, which was based on Treasury Regulation § 1.882-5, was inconsistent with the Treaty. The government had no other basis for its assessment. Having established that the assessment was erroneous, NatWest is now obligated to show by a preponderance of the evidence the correct amount of the tax. See Cook v. United States, 46 Fed. Cl. 110,

116-17 (2000). In accordance with the court's previous decisions, the plaintiff seeks to meet this burden by relying on the branch offices' books and records. The plaintiff asserts that these records demonstrate that with some adjustments for interest paid on amounts treated as allotted capital, NatWest is entitled to deduct most of its interest expenses on intra-bank transactions from its taxable profits. The plaintiff contends that it has therefore overpaid its tax.

**B. NatWest is Entitled to Summary Judgment on the Issue of Whether Its Books and Records Were Properly Maintained**

As discussed in the court's previous summary judgment decisions, Article 7(1) of the Treaty permits the United States to tax "the business profits [of a U.K. enterprise] . . . but only so much of them as is attributable to a [U.S.] permanent establishment." Article 7(2) further provides that the business profits to be attributed to a permanent establishment in the U.S. are: "the profits which it might be expected to make if it were a distinct and separate enterprise engaged in the same or similar activities under the same or similar conditions and dealing wholly independently with the enterprise of which it is a permanent establishment." This court previously ruled that under Article 7(2) the profits of the U.S. branch of a U.K. bank should be based on the "properly maintained books of the branch." NatWest II, 58 Fed. Cl. at 505.

In support of its motion for summary judgment, NatWest relies upon the separate books and records maintained by NatWest's U.S. branches during the years at issue. NatWest contends that these books and records were properly maintained in the ordinary

course of the branches' banking business and provide a proper basis for determining the profits of NatWest's U.S. branch operations for the years in question.

In particular, NatWest relies on the following undisputed facts: (1) NatWest's U.S. branches had extensive internal controls to ensure the accuracy of its records; (2) the daily activity of the U.S. branches was captured on a computer system which automatically generated numerous reports, including profit and loss statements and balance sheets; (3) NatWest's branches prepared profit and loss statements, balance sheets, and other reports for each branch using the data from the computer-generated reports; (4) NatWest's branch balance sheets and profit and loss statements were regularly submitted to the Head Office and certified that they were true and accurate to the best of the branch managers' knowledge and belief; (5) NatWest relied on these certified balance sheets and profit and loss statements in preparing its U.S. tax returns; (6) U.S. bank regulators conducted regular examinations of the books and records of the U.S. branches and consistently found that they were satisfactory; and (7) the Bank of England cited NatWest's internal controls, which were applied in the United States, as a model for U.K. branches of foreign banks to follow.

The government contends that NatWest is not entitled to summary judgment on the question of whether NatWest U.S. branches' books and records were "properly maintained." The government contends that the branches' books and records are not "properly maintained" because they are not adequate to determine whether NatWest has made correct interest expense deductions for amounts that are capital or should be treated

as capital, as provided for in the Inland Revenue Manual. In particular, the government claims that (1) NatWest failed to identify capital on the balance sheets of its branches and therefore the books and records do not provide an accurate picture of NatWest's branches' capital; (2) the books and records are only interim because the books and records do not necessarily reflect the final reconciliation prepared by the head office; (3) the books and records identify accumulated losses as an "asset" and therefore there is no identification of infusions of capital to cover such losses; and (4) the books and records contain anomalies which undermine their correctness, for example, fixed assets belonging to one branch are sometimes carried on the books of another branch and all of the employees in the four New York offices were carried on the New York branch's books.

In addition, the government complains that NatWest has not maintained the records necessary to perform the review provided for in the Manual. The government explains that the Manual puts the burden on NatWest to trace the source of the funds the branches used to purchase fixed assets. The government argues that NatWest has not retained (or at least has not made available) records of the amounts that its U.S. branches spent on fixed assets from the time they began operations in the U.S. to the end of the tax years at issue. The government argues that summary judgment should be denied because NatWest has not produced records that permit a full inquiry into each branch's capital.

NatWest maintains that the government has failed to identify any material fact that puts the accuracy or reliability of its U.S. branches' books and records into dispute. Rather, NatWest argues the government is challenging the conclusions to be drawn from

these facts. For example, NatWest asserts that the presence of fixed assets on one branch's books for an asset located in another branch reflects the fact that the U.S. branches should be properly considered as a single entity; this fact does not undermine the accuracy or reliability of NatWest's branches books and records. NatWest makes the same argument with regard to the operating expenses for the four branches located in New York. NatWest further argues that it is not necessary to trace the acquisition of fixed assets because tracing is not required. Finally, NatWest does not dispute that there was an on-going reconciliation process between the U.S. branch offices and the Head Office, but contends that this process did alter the integrity of the branches' books and records. According to NatWest, the reconciliation process was akin to balancing a checkbook and the need to account for differences in check clearing dates.

The court agrees with NatWest that it is entitled to summary judgment on the issue of whether it has presented "properly maintained" books and records. The undisputed facts demonstrate that: NatWest had a highly-regarded system for collecting information at its U.S. branches; NatWest's record keeping system was regularly checked for reliability; and the balance sheets and profit and loss statements submitted to the Head Office were certified as accurate to the best of the signer's knowledge. These same modified balance sheets and profit and loss statements generated from data available through the computer system were then used to prepare NatWest's U.S. tax returns. The government has not identified any specific facts to put the trustworthiness of the records into question. Generally, documents prepared in the normal course of business are

admissible to prove the matters asserted therein. Fed. R. Evid. 803(6).

The government has not provided the court with any facts that would lead the court to question the accuracy or reliability of NatWest's branch offices' books and records. Rather, the government's objections to NatWest's books and records are based on its legal view of the case. The government's objection to NatWest's failure to properly account for "capital" turns on the government's contention that NatWest was legally obligated to identify "economic" capital. This legal issue will be dealt with separately. Similarly, the government's objections to NatWest's inclusion of one branch's assets on another branch's balance sheet goes to the question of whether NatWest maintained one or six separate permanent establishments in the U.S. This issue will also be dealt with separately. Finally, the government's objections to NatWest's failure to produce all of the documents that would allow the court to trace the purchase of each branch office's fixed assets and premises turns on the government's contention that the Manual requires tracing. Again, this is a legal issue that will be dealt with separately. In addition, none of the government's other complaints regarding NatWest's books and records raise genuine issues of fact.

In short, none of the government's objections to NatWest's books and records undermine the accuracy and reliability of the books and records. The court therefore agrees with NatWest that the government's objections are not sufficient to raise genuine issues of fact regarding the accuracy and reliability of NatWest's books and records. Because the government has failed to identify any specific facts to show that branch

books and records were not accurate and reliable, NatWest is entitled to summary judgment on the issue of whether the branches "properly maintained" their books and records.

### C. NatWest is Entitled to Summary Judgment on its Adjustments to its Interest Expense Deductions Related to "Capital"

#### 1. NatWest has Properly Accounted for "Capital" on an Aggregated Basis for a Single Permanent Establishment

NatWest argues that under the Internal Revenue Code, the Treaty, and the Manual, NatWest operated a single permanent establishment and therefore the tax liability of branch offices may be properly determined on an "aggregated" basis. NatWest contends that a foreign corporation engaged in a trade or business in the United States is required to calculate, report and pay taxes on its U.S. income on an aggregate basis. The foreign corporation is the taxpayer without regard to the number of business offices it maintains in the United States. The foreign corporation receives one employer identification number and files one tax return reporting all of its effectively connected income.

NatWest further argues that under the Treaty the right of a host country to tax a foreign business in the United States turns on whether the foreign corporation operates a "permanent establishment" in the host country. NatWest contends that there is not a single reference in a case, the OECD Commentary, or the Manual to suggest that a bank operating several offices in a single host country is deemed to be operating more than one permanent establishment. To the contrary, Mr. Jukes, the former head of International Taxation for Inland Revenue, states on behalf of NatWest that "Inland Revenue would

have permitted . . . banks to file their accounts either on an aggregate basis or by separate physical location. The Inland Revenue would not have used separate underlying records reflecting a loss in one physical location in the United Kingdom to create an adjustment to capital when there were adequate profits in another U.K. location reported on the same U.K. income tax return." Jukes Decl. ¶ 27.

Based on the foregoing legal arguments, NatWest contends that there is no basis for treating NatWest's branch operations at its six U.S. branch offices as six separate permanent establishments for tax purposes.

The government argues that whether NatWest operated a single permanent establishment or multiple establishments is a question of fact that turns on the particular circumstances at issue. Here, the government argues that because it is undisputed that NatWest did not combine the books and financial reports of each branch office for accounting purposes and included intra-branch transactions on each office's books and records, NatWest must account for profits and losses on a segregated basis. According to the government, under these undisputed facts NatWest maintained six separate permanent establishments in the United States and each must be accounted for separately for tax purposes. The government argues that NatWest cannot simply combine the books and records of the six offices and create a single permanent establishment for tax purposes.

The court agrees with NatWest that whether NatWest operated six U.S. permanent establishments or a single permanent establishment for Treaty and tax purposes is a question of law. The fact that NatWest operated separate banking operations in New

York, San Francisco and Chicago does not mean that it operated several permanent establishments. The court agrees that under the Treaty the host country may tax profits if the foreign corporation operates an enterprise in the host country. Under Article 5(1) of the Treaty, "permanent establishment" is defined to mean "a fixed place of business through which the business of an enterprise is wholly or partly carried on" in the host country. Here, the six NatWest branch offices carried on the business of the NatWest enterprise in the United Kingdom. The fact that the six offices maintained separate books and records for internal accounting purposes does not mean that the offices are not part of a single permanent establishment for tax purposes under the Treaty. There is no precedent for treating six branch offices as six separate permanent establishments in either the United States or in the United Kingdom. To the contrary, NatWest has presented the undisputed declaration of Mr. Jukes, who states that the Inland Revenue would have treated banking operations similar to NatWest's as a single permanent establishment, in the United Kingdom. Mr. Akin, the government's Inland Revenue expert, does not disagree. He indicated that Inland Revenue would have likely accepted an aggregated tax return.

Moreover, it is not disputed that the United States always treated the six branch offices as a single establishment for tax purposes. The government has not identified a single instance where any other foreign bank with more than one branch office has been treated as having more than one permanent establishment in the U.S. For all of these reasons, the court agrees with NatWest that as a matter of law NatWest operated a single

permanent establishment in the United States and thus NatWest may account for capital and interest paid on capital contributions on an aggregated basis.

### 2. NatWest has Identified and Conceded All Interest Expenses Paid on "Capital" that were Initially Erroneously Deducted

In the court's earlier decision, the court ruled that the Treaty requires adjustments to NatWest's books and records to the extent that there were "interest expenses deducted on amounts designated as capital on its books or amounts that were in fact allotted to it for capital purposes, such as funding capital infrastructure." NatWest II, 58 Fed. Cl. at 505. NatWest contends that it has identified and conceded all interest expense that was deducted on amounts designated as capital or in fact allotted to the U.S. branches as capital during the years at issue, as required by the court's earlier decision.

In support of its motion, NatWest relies on the following undisputed facts. First, it is not disputed that if a NatWest branch was advanced funds for capital purposes, then those advances would have been separately identified on its books. Scott Decl. ¶ 13. As Mr. Scott explains in his declaration, from the inception of NatWest's U.S. branch operations in the 1970s, advances from the Head Office to branches in the United States for the purchase of fixed assets or other start up expenses were separately identified in the books and records and recorded as a "capital loan." Scott Decl. ¶¶ 11-12. This is confirmed on the balance sheets of the branch offices. The balance sheets of the U.S. branches during the 1970s include a line item for "Capital Loan" or "Balance due H.O. re. Capital Loan." Verdolini Aff. Exs. 43-45. It is also undisputed that NatWest continued

this practice during the tax years at issue in this case. Scott Decl. ¶ 11. Based on the foregoing, NatWest has conceded that the following amounts should be subtracted from its interest expense deductions: (1) 1981: $465,868; (2) 1982: $209,433; (3) 1983: $202,745; (4) 1984: $309,459; (5) 1985: $0; (6) 1986: $2,336,260; and (7) 1987: $1,936,537. PFUF ¶ 118.

Second, it is not disputed that NatWest had a policy that its branches should not incur interest-bearing liabilities to fund fixed asset expenditures. Scott Decl. ¶ 11. Thus, the undisputed evidence shows that starting in 1977, the balance sheets of the U.S. branch offices include a line item for "Balance due Head Office re Fixed Assets." Verdolini Aff. Exs. 44-45. Indeed, it is not disputed that during the years at issue, the U.S. branches did not pay interest on amounts identified on the balance sheets as "Balance Due Head Office re Fixed Assets." Scott Decl. ¶ 11; Bandoian Rep. Ex. 2; Verdolini Aff. Ex. 57.

Third, the government does not dispute the statements of Mr. Walmsley, Deputy Branch Manager of the New York branch from 1982 to 1984 and manager from 1984 to 1987, that during the years in question New York operations had sufficient retained profits and cash flow to fund their own operating expenses and capital expenditures without subsidy from the Head Office. Walmsley Decl. ¶ 19.

Fourth, it is not disputed that although the branches did not deduct interest on advances used to fund fixed assets, the branches did pay an interest charge or "capital loan charge" to the Head Office. It is not disputed that all capital loan charges have been identified and accounted for by NatWest.

NatWest also relies upon the opinion testimony of Mr. Jukes. Mr. Jukes explains, based on his experience with Inland Revenue, that Inland Revenue would not have required any additional deductions to account for capital. "On facts such as these, Inland Revenue would not have had grounds for asserting (either in an audit or in litigation) that any amounts should be disallowed as interest paid on allotted capital or amounts treated as allotted capital, for any of the U.S. operations or in any of the years at issue, apart from the amounts . . . conceded by NatWest." Jukes Decl. ¶ 23.

The government argues, irrespective of the above-undisputed facts, that NatWest is not entitled to summary judgment on the capital issue because it has (1) failed to account for "economic capital" in calculating its profits;[4] (2) failed to account for the losses sustained by various branches in calculating its profits; and (3) failed to follow the Manual with regard to "fixed assets" in calculating its profits. Each of the government's arguments are examined below.

With regard to the first argument, both Mr. Kolbe and Mr. Dorfman, on behalf of the government, contend that under the court's prior decisions and the Manual, NatWest

[4] At oral argument on December 9, 2005, the government clarified its argument with regard to "economic capital." In particular, the government explained that it does not seek to attribute a particular amount of "economic capital" to NatWest's permanent establishment. Instead, the government argues that the Manual required NatWest's permanent establishment to operate as if it were wholly independent from the Head Office, which means that the permanent establishment was required to maintain a certain amount of "economic capital." Because NatWest did not do so, the government argues that NatWest will not be able to sustain its burden of proving that it overpaid its tax using the principles of the Manual. The court finds that this is a distinction without difference. Either way, the government's arguments boil down to an assertion that NatWest's permanent establishment was required to account for "economic capital" in calculating profit in order to meet its burden in this case.

must account for "economic capital." Mr. Kolbe and Mr. Dorfman assert that NatWest had to include in the amounts "treated as allotted capital," the amount the branch would need to support the economic risks presented by its banking operations.

Contrary to the government experts' assertions, the Treaty and the Manual are not designed to ensure that banks conducting business in a host country maintain a level of capital adequate to cover economic risk. Rather, they are designed to ensure that the branches properly account for income. The regulatory and economic grounds for requiring banks to maintain capital at adequate levels are not at issue in this tax case. As the court discussed in NatWest II, the Manual adopts and implements the 1978 Queen's Counsel opinion, which expressly rejected Inland Revenue's attempt to write into branch accounts an amount of "free" capital, i.e. capital for which there is no associated interest charge, to reflect the economic risk borne by the branch. See NatWest II, 58 Fed. Cl. at 505. The Manual states that Inland Revenue's task is to determine the amount of capital which "in reality" has been granted to the branch. "In the U.K. there is no regulatory requirement that the U.K. branch of an overseas bank must be given capital. . . . The question is, therefore, how do we determine the amount of free capital which has in reality been granted to the U.K. branch . . . ." Manual ¶ 2.2 (emphasis added).

The Manual provides that premises and fixed assets, initial working capital, retained profits [where branches automatically repatriate profits], depreciation, and other reserves are likely to involve capital. Manual ¶ 10.1. The Manual, however, plainly states that interest charged to "the branch from other members of the group in the ordinary

course of its business, . . . for their use is allowable, so long as it represents an arm's length rate, i.e. the rate which would have operated between independent concerns, provided that they would have undertaken the business in question." Manual ¶ 9.3.2.1. The Manual goes on to draw the distinction between "allotted capital" and "amounts treated as allotted capital" as follows: "[I]t is possible for the U.K. branches to two U.S. banks to be funded in exactly the same amounts but to be treated differently: one may decide that capital given to the branch is to be recognized as such and it will therefore have allotted capital, while the other may simply operate a loan account. In the latter case the Inspector will have to fall back on other criteria, as described below, (such as fixed assets) to determine how much of the loan will be treated as allotted capital." Manual ¶ 6.2.

This view of the Manual is confirmed by Mr. Akin, the government's U.K. tax expert, who states that Inland Revenue ordinarily looked to fixed assets and premises to determine "amounts treated as allotted capital." "[T]he most common approach for Inspectors was to raise the London Free Capital issue every three to five years and the most common negotiated settlement was to increase it by reference to premises and fixed assets costs." Akins Decl. ¶ 34.

Thus, the government's contention that NatWest was required to maintain "economic capital" is rejected. NatWest was not obligated to identify an amount to be treated as allotted capital to account for the economic risk posed by the activities conducted by the U.S. branch. NatWest's failure to account for "economic capital" does

not preclude summary judgment for NatWest.

The government's second argument, regarding NatWest's failure to account for the losses generated in certain years by certain branch offices, is equally unsupported. The government argues that capital must be allotted to these offices because banks cannot operate with "negative capital." NatWest argues in response that the U.S. branch did not operate with negative capital. Rather, when the capital accounts of all of the branch offices are combined, NatWest always maintained positive capital. The government does not dispute that when the accounts are combined, NatWest's U.S. branch offices maintained positive capital for each of the years at issue.

The court agrees with NatWest that NatWest was authorized to treat all six U.S. branch offices as a single branch office for tax purposes. The court is persuaded by Mr. Jukes' opinion that Inland Revenue would not have required the attribution of capital where there were adequate profits to cover any loss from within the permanent establishment as a whole. "The Inland Revenue would not have used separate underlying records reflecting a loss in one physical location in the United Kingdom to create an adjustment to capital when there were adequate profits in another U.K. location reported on the same U.K. income tax return." Jukes Decl. ¶ 27.

Finally, this view is consistent with the Manual which states:

> It has been suggested that where . . . losses exist they must per se be met out of the bank's capital and that therefore an allottment of capital takes place automatically . . . . While this has the apparent merit of simplicity, the current view is that this is an argument that cannot be sustained in law, domestically or under treaty. . . . Where . . . the loan is still funded by borrowing in the branch, it is generally not possible to argue that the interest expense thereon

should not be relieved or should be deemed to belong to Head Office.

Manual ¶¶ 11.1-11.2.

For all of these reasons, the government's objections to NatWest's capital analysis based on the losses generated by the Chicago branch office in 1981and 1982 and various New York offices is rejected. NatWest's failure to account for losses does not preclude summary judgment for NatWest on the capital issue.

Finally, the government's third objection regarding fixed assets must be rejected. As discussed above, it is not disputed that capital infusions from the Head Office for premises and fixed assets as well as initial working capital were identified by NatWest's branches on their books. It is also not disputed that interest was not charged on these amounts. Nonetheless, the government contends that NatWest has failed to adequately consider all potential sources of capital. The government specifically challenges NatWest's failure to deduct additional interest to cover the amounts it repaid the Head Office on fixed assets and premises. The government argues that unless NatWest can trace the amounts it paid for fixed assets and premises to specific borrowings, the Manual presumes that the amounts will be treated as allotted capital and no interest may be deducted on those amounts.

The Manual states in relevant part as follows:

> Premises and Fixed Assets: This is the item most commonly found in the calculation of free working capital. If premises are acquired when the branch is set up they are capital assets and prima facie where the funds came from Head Office it will be treated as allotted capital. The assumption that premises will be funded from capital is based primarily on examination of normal banking practice.

> This is not a hard and fast rule, but it is up to the bank to show that the acquisition is not to be treated this way. The bank can do this by tracing the cost of the building through to a specific borrowing . . . there will be an interest deduction due in the U.K. branch.

Manual ¶ 10.1a.

The court agrees with NatWest that no further interest deduction from profits is due in order to deal with interest payments on fixed assets. The undisputed facts establish that NatWest adopted a policy in 1977 that it would not fund fixed assets in its branches with interest-bearing obligations. Thus, it is not necessary to trace the amounts used to pay for fixed assets. NatWest allotted capital on the books and records of the branches for fixed assets and premises and the undisputed evidence establishes that NatWest did not pay interest on those amounts. In such circumstances, tracing assets is not required.

Moreover, the undisputed evidence establishes that the U.S. branch had sufficient interest-free cash flow to make payments to the Head Office for their fixed asset purchases during the years at issue. Mr. Bandoian's Report confirms Mr. Walmsley's statements that NatWest's U.S. branches had, in the aggregate, sufficient resources to cover their fixed asset purchases. For all of these reasons, NatWest is entitled to summary judgment on the capital issue.

**D. Arm's-Length Interest Rates**

It is not disputed that inter-branch interest income and interest expense of NatWest's U.S. branch operations fall into two categories: (1) interest on money market transactions and (2) interest on credit and debit balances in clearing accounts. NatWest contends that it charged or collected interest at arm's-length rates in both categories. The

government contends that there are disputed issues of material fact that preclude summary judgment.

**1. NatWest is Entitled to Summary Judgment on the Issue of Interest Rates on Money Market Dealings**

It is not disputed that NatWest's U.S. money market desks managed the banking assets and liabilities in the branches' balance sheet. As Mr. Scott Payseur, Senior Vice President of the Money Market's unit of NatWest, states in his declaration:

> Over the course of each day, assets and liabilities changed as the branch made loans to customers, engaged in money market transactions to fund those loans, and engaged in transactions to manage risk and to make a profit. As the mix of assets and liabilities evolved, the money market desk managed the branch's interest rate and liquidity risk. Interest rate risk occurs due to a mismatch between maturities and rates of various assets and liabilities. Liquidity risk occurs when a bank does not have the funds, or is not able to raise funds at a reasonable cost, to cover obligations that come due.

Payseur Aff. ¶ 2.

The money market desks for each branch office traded in a range of money market instruments including: (1) Fed funds; (2) government securities under repurchase agreements; (3) Euro commercial paper of NatWest PLC; (4) negotiable certificates of deposit; and (5) Euro time deposits and placements. Payseur Aff. ¶ 15. It is not disputed that the majority of money market transactions entered into by NatWest's U.S. branches were entered into with third parties and were therefore by definition at "arm's-length rates."

Both Roger Walmsley and Scott Payseur stated in their affidavits and in their depositions that when the branches engaged in money market transactions with affiliates

and foreign branches "those transactions typically consisted of Eurodollar time deposits or placements." Payseur Aff. ¶ 21. According to the undisputed statement of Mr. Payseur:

> In most cases, the U.S. branches dealt directly with the foreign branch or affiliate at arm's length market rates. On occasion, the transaction would occur because the U.S. branch and foreign branch or affiliate had each quoted rates to a third party broker who had matched them in the same way it would have matched two unrelated parties.

Payseur Aff. ¶ 21.

Mr. Payseur further states that "I am not aware of any instance where a money market transaction between the U.S. operations and another NatWest branch or affiliate reflected anything other than arm's-length market interest rates." Payseur Aff. ¶ 22.

Mr. Payseur's statements are confirmed by Mr. Walmsley, who served in various branches for eleven years. Mr. Walmsley states in his affidavit that he was not aware of "any money market transaction entered into by NatWest's U.S. branches . . . that reflected any interest rates that were other than arm's-length commercial rates of interest." Walmsley Decl. ¶ 47. The statements of Mr. Payseur and Mr. Walmsley are corroborated by Dr. Clair, NatWest's expert, who prepared a report on the arm's-length nature of NatWest's money market transactions. Verdolini Aff. Ex. 59. Dr. Clair took a statistically random sample of twenty-one days, three for each of the years at issue, and examined the books and records of all money market transactions at the branch offices for those days. After making a comparison of related and unrelated party transactions, Dr. Clair concluded that there was no evidence that interest rates paid or received on money

market transactions with non-U.S. branches or affiliates were other than arm's-length. Clair Decl. ¶ 9.

In response to NatWest's motion, the government relies on the report and affidavit of Mr. Read. Mr. Read questions Dr. Clair's conclusions based on his own study. Mr. Read examined five days of transactions and states that he "found evidence" to suggest that the interest rates the U.S. branches received from related parties were less than the rates received from third parties and that the interest rates the U.S. branches paid to related parties for overnight deposits were greater than the rates they paid to third parties. Read Rep. ¶ 13. Mr. Read concludes, however, that because his sample size was very small, he "could not reach a conclusion with confidence."[5] Read Decl. ¶ 7. Read also contends that Dr. Clair's analysis is not sufficient to support the conclusions drawn by Dr. Clair with regard to money market transactions. Mr. Read challenges Dr. Clair's reliance on only twenty-one days of data and generally questions the adequacy of Dr. Clair's sample. Mr. Read also questions Dr. Clair's conclusions. Mr. Read states that Dr. Clair's conclusions are based only on the sample he selected and should not be extended further. Read Decl. ¶¶ 37-39.

The court agrees with NatWest that the government has failed to raise a genuine issue of fact to preclude summary judgment on the issue of arm's-length rates in

[5] The government argues that Mr. Read was not able to perform a larger study because, (1) his report was due only 30 days after the close of discovery, (2) the cost of a full sampling study would be extremely high, and (3) the plaintiff was not relying on a sampling study to meet its burden of proof. Def.'s Opp. 42. Although the court appreciates the difficulty of calculating the plaintiff's tax liability in this particular case, that does not change the fact that, as discussed below, the government has not set forth specific facts demonstrating a genuine issue for trial.

connection with money market transactions. The testimony of Mr. Walmsley and Mr. Payseur are not contradicted by Mr. Read's criticisms of Dr. Clair's report. Mr. Read did not offer an opinion on the arm's-length rates for money market transactions that would preclude summary judgment for NatWest. It is not enough for Mr. Read to question NatWest's expert's findings. The government was obligated through its expert to provide an opinion that would allow the court to conclude that NatWest's U.S. branches charged or received interest payments associated with their money market transactions that were not at arm's-length. Although Mr. Read stated that he found some evidence to suggest that money market rates were not always charged or received, he frankly admitted that he "could not reach a conclusion with confidence about the arm's-length nature of the interest rates." Read Decl. ¶ 7.

In such circumstances, the government has not sustained its burden under RCFC 56. "Although an expert affidavit need not include details about all of the raw data used to produce a conclusion, or about scientific or other specialized input which might be confusing to a lay person, it must at least include the factual basis and the process of reasoning which makes the conclusion viable in order to defeat a motion for summary judgment." Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 92 (1st Cir. 1993). Here, Mr. Read has not only failed to support his conclusions; he has failed to offer any conclusions with regard to the arm's-length nature of the interest on money market transactions. Accordingly, NatWest is entitled to summary judgment on this issue.

**2. Genuine Issues of Fact Preclude Summary Judgment on the Issue of Interest Rates on Clearing Accounts**

The U.S. branches maintained dollar clearing accounts, much like checking accounts, for unrelated non-U.S. banks, non-U.S. branches of NatWest, NatWest's subsidiary International Westminster Bank and other NatWest affiliates. According to Mr. Walmsley:

> The clearing accounts maintained by the U.S. branches enabled their non-U.S. counterparties [sic] to transact their business in dollars. It is inherent in the structure of financial markets that dollars never leave the United States, except in the form of coins or paper currency. Thus, transactions in dollars outside the United States are usually effected by means of transfer of dollars within the United States between U.S. banks (or U.S. branches of foreign banks) that have access to accounts at the Federal Reserve. . . . The clearing accounts - also referred to as bank settlement accounts - were like checking accounts in that they were accounts into which a customer could deposit funds and through which it could make and receive payments . . . . The U.S. branches derived profit from the clearing accounts they maintained for other banks and branches in two ways. First, they charged virtually all customers-both related and unrelated-a standard fixed per-transaction commission . . . . Second, when a customer used a clearing account to make a payment, a positive balance often sat in the account until the payment instruction cleared and while the funds were sitting there, the balance could be used by the bank to fund short-term assets.

Walmsley Decl. ¶¶ 23-27.

This is referred to as "float." According to Mr. Walmsley: "The clearing accounts maintained by the U.S. branches had a range of terms that correlated with the level of activity in the accounts and reflected commercial rates." Walmsley Decl. ¶ 29. Mr. Walmsley concludes that he was not aware of any "clearing account terms, whether in U.S. dollar accounts . . . or foreign currency clearing accounts held by the U.S. branches at those non-U.S. branches or affiliates, that reflected any interest rates that were other than arm's-length commercial rates of interest." Walmsley Decl. ¶ 47.

In response, the government has submitted the affidavit of Mr. Read. Mr. Read asserts, based on his review of three months of data, that the difference in interest rates between the U.S. branches and affiliates, related parties, and third parties could not be explained solely by differences in the volume of transactions, as NatWest contends. Instead, Mr. Read concluded that with respect to customers in the intermediate activity levels, affiliated and related parties were receiving better rates than similarly-situated third parties. Read Decl. ¶ 22. In other words, Mr. Read asserts:

> [M]any related-party current accounts are under the Federal Funds pricing regime [more favorable rate] . . . while third party accounts with greater activity are under the prime rate pricing regime [less favorable rate] . . . . The opposite is not true, that is, there are no third-party current accounts under the Federal Funds regime . . . that have lower activity levels than related-party accounts under the prime rate regime . . . . This is evidence that the interest rates on many related-party current accounts do not meet the arm's-length standard of the U.S.-U.K. Tax Treaty.

Read Decl. ¶ 23.

Mr. Read then estimated that NatWest's branches understated clearing account profits due to the application of non-arm's-length rates. Mr. Read concludes that as a result of NatWest's failure to charge arm's-length rates, U.S. branches understated clearing account profits by $10,553,577. Read Decl. ¶¶ 25-27.

NatWest challenges Mr. Read's assertions through supplemental affidavits filed by Mr. Walmsley and Dr. Clair. Both Mr. Walmsley and Dr. Clair challenge Mr. Read's conclusions on the grounds that Mr. Read erroneously relied on data involving the account of NatWest Commercial Services, Inc., a NatWest affiliate. NatWest argues that the Commercial Services affiliate maintained a revolving loan account with the U.S.

branches and thus the account was not a "clearing account." Walmsley Supp. Decl. ¶¶ 3, 5; Clair Supp. Aff. ¶¶ 47-52. NatWest also argues that affiliates are neither related parties nor third parties and thus should not be included in the analysis. They also question Mr. Read's conclusion, based on three months of data, that NatWest understated its clearing account profit by over $10 million. NatWest argues that Mr. Read's declaration does not suffice to defeat summary judgment.

The court agrees with the government that disputed issues of fact preclude an award of summary judgment to NatWest. Mr. Read's analysis and opinion create material issues of fact that cannot be resolved on summary judgment. In contrast to the government expert opinion regarding the money market transactions, Mr. Read's declaration offers a conclusion that NatWest understated its clearing account income by over $10 million and includes the factual basis and process of reasoning that support that conclusion. See Hayes, 8 F.3d at 92. If factually supported, conflicting opinion testimony regarding material issues of fact precludes summary judgment. See Arthur A. Collins, Inc., 216 F.3d at 1047-48 (holding that unsupported opinion testimony does not create a genuine issue of material fact); Thomas v. Christ Hosp. & Med. Ctr., 328 F.3d 890, 895-96 (7th Cir. 2003) (holding that conflicting opinion testimony created a genuine issue of material fact).

Mr. Read's conclusion, supported by a factual basis and reasoning, that some related parties did not pay arm's-length interest rates conflicts with NatWest's experts' conclusions, supported by a different analysis, that related parties did pay arm's-length

interest rates. Drawing all reasonable inferences in favor of the government, the court concludes that there is a genuine issue as to whether NatWest's related parties paid arm's-length interest on clearing account transactions and thus whether NatWest has properly accounted for its income. Moreover, whether Mr. Read correctly included NatWest Commercial Services, Inc. in his analysis and whether he properly extrapolated a conclusion from three months of data present disputed issues of opinion that must be resolved by trial. Accordingly, NatWest's motion for summary judgment on the issue of the arm's-length interest rates for clearing accounts must be denied.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. The court will contact the parties in early January to schedule a status conference. The purpose of the status conference will be to set a trial date and a schedule for filing pre-trial submissions on the remaining clearing account interest rate issue and on determining the final tax computation.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge